## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DONALD FALLS, JILL HARPER,**
**Dr. ROBERT CASSANELLO, STEPHANIE**
**NICOLE JAMIESON,** as next of friend of **RMJ,**
**Dr. TAMMY L. HODO,**

      **Plaintiffs,**

vs.                            **Case No.:**

**RON DESANTIS,** in his official
capacity as Governor of Florida; **RICHARD CORCORAN,**
in his official capacity as Commissioner of the
Florida State Board of Education; **TOM GRADY,**
**BEN GIBSON, MONESIA BROWN, MARVA**
**JOHNSON, RYAN PETTY, JOE YORK,**
in their official capacities as members of the
Florida State Board of Education; **BRIAN LAMB,**
**TIMOTHY M. CERIO, AUBREY EDGE, PATRICIA FROST,**
**EDWARD HADDOCK, H. WAYNE HUIZENGA, JR.,**
**NATASSIA JANVIER, KEN JONES,**
**DARLENE LUCCIO JORDAN, ALAN LEVINE,**
**CHARLES H. LYDECKER, STEVEN M. SCOTT,**
**WILLIAM SELF, ERIC SILAGY, KENT STERMON,**
in their official capacities as members of the Florida Board of
Governors of the State University System; and **ASHLEY MOODY,**
in her official capacity as Florida's Attorney General,

      **Defendants.**

_____

## <u>VERIFIED COMPLAINT</u>

      Plaintiffs bring this action seeking declaratory and injunctive relief,

attorney's fees, and costs against Defendants and allege:

1.     This is an action for declaratory relief, injunctive relief, attorney's fees, and costs for the deprivation and to prevent the deprivation by Defendant Governor DeSantis and his agents, acting under color of state law, of Plaintiffs' rights, privileges and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked under 28 U.S.C. §§1331, 1343, and 2201, *et seq*.; this suit being authorized by the United States Constitution and 42 U.S.C. §§1983 and 1988.

3.     Venue in this district is proper pursuant to 28 U.S.C. §1391, in that the cause of action arose in this district.

## PARTIES

4.     Plaintiff Donald Falls is a resident of Manatee County, Florida and teaches American Government and Economics at a Manatee County public high school. The legislation at issue restricts his ability to accurately and fully teach these subjects.

5.     Plaintiff Jill Harper is a resident of Leon County, Florida and teaches all subjects and all grade levels as a substitute teacher for public schools in Leon County, Florida. The legislation at issue restricts her ability to accurately and fully teach subjects such as history and American Government.

6.      Plaintiff Dr. Robert Cassanello is a resident of Seminole County, Florida and is an associate professor in the history department for the University of Central Florida. He teaches classes in Civil Rights Movements, Jim Crow America, and Emancipation and Reconstruction. The legislation at issue restricts his ability to accurately and fully teach these subjects.

7.      Plaintiff, RMJ, is a resident of Nassau County, Florida and is enrolling in kindergarten at a Nassau County Public School in August 2022. The legislation at issue here restricts her right to access information in a public-school setting.

8.      Plaintiff Dr. Tammy Hodo is a resident of Duval County, Florida and is the president and founder for All Things Diverse, a consulting firm who provides training to clients in a wide variety of industries including law firms, government agencies, corporations, non-profits, foundations, and educational institutions. Dr. Hodo's areas of consulting include race & ethnicity, implicit bias training, microaggressions, institutional racism, anti-racism work, and critical race theory. The legislation at issue here restricts her right to speak as an employer as well as has a direct impact on her business providing training to other employers as a diversity and inclusion consultant.

9.      Defendant Ron DeSantis is the Governor of the State of Florida. In his official capacity, Governor DeSantis is the chief executive officer of the State of Florida and is responsible for the faithful execution of the laws of the State of

Florida, including the laws regulating Florida's K-20 Public Schools, the Florida Civil Rights Act, and Florida Educational Equity Act.

10.     Defendant Richard Corcoran is the Commissioner of the Department of Education. In his official capacity, Commissioner Corcoran is Executive Director of the Department of Education. *See* §20.15, Fla. Stat. (2022).

11.     The Florida State Board of Education is a body corporate and is charged under Florida law with supervising the system of free public education as provided by law. *See* §20.15, Fla. Stat. (2022).

12.     The Florida Board of Governors of the State University system is charged under Florida law with operating, regulating, and controlling the management of the whole State University System. *See* §20.155, Fla. Stat. (2022).

13.     Defendant Ashley Moody is the Attorney General for the State of Florida. In her official capacity, Attorney General Moody is the chief legal officer of the State of Florida and is charged with advising state and local authorities on questions of Florida and federal law.

## FACTUAL ALLEGATIONS

14.     This case arises from the Florida Legislature and Executive Branch's efforts to suppress speech in Florida's schools and workplaces by passing laws that forbid Florida's teachers and employers from endorsing concepts about race and sex with which Florida's conservative politicians disagree. These laws are

4

unconstitutional viewpoint-based restrictions on speech that regulate the speech of Florida's teachers and business owners in violation of their First Amendment Rights. These laws employ nebulous terms with vague definitions in order to chill protected speech.

15.     In August 2019, *The New York Times Magazine* published an article about the impact of slavery on American history that marked the first piece in a long-form journalism project called the 1619 Project. The stated aim of the project was to "reframe the country's history by placing the consequences of slavery and the contributions of Black Americans at the very center of the United States' national narrative." The project garnered several awards, including its introductory essay winning the 2020 Pulitzer Prize for commentary.

16.     The 1619 Project drew sharp criticism from conservative politicians and shortly after its publication those politicians began putting forward a narrative that the project was being used to indoctrinate American school children.

17.     Republican politicians also began to equate the 1619 Project with "critical race theory," a legal studies term coined in 1989 by UCLA Law and Columbia Law Professor Kimberlé Williams Crenshaw. Critical race theory is not a single, cohesive ideology, but was developed from a workshop led by Professor Crenshaw and other professors who questioned the neutrality of the

American legal system and sought to expand their graduate-level legal studies curriculum to explore how laws sustained racial hierarchies.

18.     Despite the fact that the term "critical race theory" had only been previously used in the graduate-level context and encompasses a wide range of ideas and concepts that are not easily cabined into a single definition, conservative politicians began using it in their rhetoric as a boogeyman that threatened American values.

## A. The Florida Department of Education Bans Instruction of The 1619 Project and Critical Race Theory.

19.     On June 10, 2021, Florida Governor Ron DeSantis joined a State Board of Education meeting to "discuss the importance of maintaining the integrity of Florida's academic standards by keeping Critical Race Theory" out of the classroom.

20.     In a press release following the meeting, Governor DeSantis stated: "the woke class wants to teach kids to hate each other, rather than teaching them how to read, but we will not let them bring nonsense ideology into Florida's schools." (Attached as Exhibit 1).

21.     On June 14, 2021, the Florida Department of Education amended its rules to ban the instruction of ideas that "suppress or distort significant" historical events—which include, according to the amendment, materials from the 1619 Project and "the teaching of Critical Race Theory."

22.     The amended regulation provides:

> (b) Instruction on the required topics must be factual and
> objective, and may not suppress or distort significant
> historical events, such as the Holocaust, slavery, the Civil
> War and Reconstruction, the civil rights movement and the
> contributions of women, African American and Hispanic
> people to our country, as already provided in Section
> 1003.42(2), F.S. Examples of theories that distort
> historical events and are inconsistent with State Board
> approved standards include the denial or minimization of
> the Holocaust, and the teaching of Critical Race Theory,
> meaning the theory that racism is not merely the product
> of prejudice, but that racism is embedded in American
> society and its legal systems in order to uphold the
> supremacy of white persons. Instruction may not utilize
> material from the 1619 Project and may not define
> American history as something other than the creation of
> a new nation based largely on universal principles stated
> in the Declaration of Independence. Instruction must
> include the U.S. Constitution, the Bill of Rights and
> subsequent amendments.

Rule 6A-1.094124, FAC (2021) (hereinafter "the Regulation").

23.     On April 15, 2022, the Florida Department of Education announced in a press release that it was rejecting twenty-eight mathematics textbooks from Florida's approved K-12 instructional materials "because they incorporate prohibited topics or unsolicited strategies, including CRT." (Attached as Exhibit 3).

**B. Governor DeSantis Announces the Stop WOKE Legislative Initiative**

24.    On December 15, 2021, Governor DeSantis held another press conference to announce a new legislative proposal called the Stop the Wrongs to Our Kids and Employees (W.O.K.E.) Act.

25.    The press release characterized the legislative initiative as "a legislative proposal that will give businesses, employees, children and families tools to fight back against woke indoctrination" and promised to be the "strongest legislation of its kind in the nation and will take on both corporate wokeness and Critical Race Theory." (Attached as Exhibit 2).

26.    Governor DeSantis further stated: "In Florida we are taking a stand against the state-sanctioned racism that is critical race theory. We won't allow Florida tax dollars to be spent teaching kids to hate our country or to hate each other. We also have the responsibility to ensure that parents have the means to vindicate their rights when it comes to enforcing state standards. Finally, we must protect Florida workers against the hostile work environment that is created when large corporations force their employees to endure CRT-inspired 'training' and indoctrination." Ex. 2.

**B. The Florida Legislature Introduces the Individual Freedom Act**

27.    On January 11, 2022, the Republican Speaker *pro tempore* of the Florida House Representatives, Bryan Avila, introduced HB7, titled the "Individual Freedom Act."

28.    HB 7 effectuated the goals of Governor DeSantis's Stop WOKE legislative initiative by prohibiting certain speech, which Governor DeSantis dubbed "woke indoctrination," from Florida's schools and workplaces.

29.    Specifically, the legislation addressed Governor DeSantis's crusade against "corporate wokeness" by rewriting Florida's Civil Rights Act to make it unlawful for Florida employers to require employees to undergo training that included any of eight forbidden "concepts" regarding race, sex, religion, or national origin.

30.    The legislation also addressed Governor DeSantis's criticisms of critical race theory in schools by enumerating six "principles of individual freedom" and forbidding teachers from offering instruction or use instructional materials that endorsed viewpoints in conflict with those principals.

31.    On April 22, 2022, Governor DeSantis signed the Individual Freedom Act (hereinafter IFA) into law.

**C. The Individual Freedom Act's Restrictions on Teachers' Speech and Students' Access to Information.**

32.     The IFA amends Florida Statutes that govern required instruction in K-12 public schools. Specifically, Florida law requires teachers in K-12 public schools to teach twenty prescribed courses of study "efficiently, and faithfully, using the books and materials required that meet the highest standards for professionalism and historical accuracy." *See* §1003.42(2), Fla. Stat. (2022).[1]

33.     The statutorily prescribed courses include fundamental topics in civics and American history such as "the history of the United States, including the period of discovery, early colonies, the War for Independence, the Civil War, expansion of the United States to its present boundaries, the world wars, and the civil rights movement to the present" and "the history of African Americans, including the history of African peoples before the political conflicts that led to the development of slavery, the passage to America, the enslavement experience, abolition, and the history and contributions of Americans of the African diaspora to society." §1003.42(f) and (h), Fla. Stat. (2022).

34.     The IFA amends this required instruction to mandate not just *what* topics K-12 public schools should include in their curricula, but *how* those topics must be taught.

---

[1] Statutory citations in this Complaint refer to Florida Statutes as amended by the IFA.

35.     Specifically, the IFA enumerates six "principles of individual freedom" with which all K-12 instruction and supporting materials for topics enumerated in the section must be consistent:

> a. No person is inherently racist, sexist, or oppressive, whether consciously or unconsciously, solely by virtue of his or her race or sex.
>
> b. No race is inherently superior to another race.
>
> c. No person should be discriminated against or receive adverse treatment solely or partly on the basis of race, color, national origin, religion, disability, or sex.
>
> d. Meritocracy or traits such as a hard work ethic are not racist but fundamental to the right to pursue happiness and be rewarded for industry.
>
> e. A person, by virtue of his or her race or sex, does not bear responsibility for actions committed in the past by other members of the same race or sex.
>
> f. A person should not be instructed that her or she must feel guilt, anguish, or other forms of psychological distress for actions, in which he or she played no part, committed in the past by other members of the same race or sex.

§1003.42(3), Fla. Stat. (2022).

36.     The IFA further states:

> Instructional personnel may facilitate discussions and use curricula to address, in an age-appropriate manner, the topics of sexism, slavery, racial oppression, racial segregation, and racial discrimination, including topics relating to the enactment and enforcement of laws

resulting in sexism, racial oppression, racial segregation, and racial discrimination, including how recognition of these freedoms have overturned these unjust laws. <u>However, classroom may not be used to indoctrinate or persuade students to a particular point of view inconsistent with the principles of this subsection or state academic standards.</u>

*Id.*

37.     In other words, the IFA permits teachers to discuss material that addresses the six "principles of individual freedom" in a manner that agrees with those principles or takes a neutral position but forbids teachers from opposing and/or questioning those principles.

38.     Furthermore, the IFA prohibits reviews of educational instruction material for K-12 programs from recommending any instructional materials that contradict the six "principles of individual freedom" and requires the Florida Department of Education to review and approve all such materials for compliance with those principles.

39.     Florida's K-12 required statutory curriculum is approved, monitored, and enforced by the Florida State Board of Education. If a teacher fails to comply with the regulations adopting the required curriculum their school may be subject to sanctions, including reporting the violation to the legislature, withholding the transfer of state funds until the school complies with the rule, declaring the school ineligible for competitive grants and requiring monthly reporting until the noncompliance is remedied. *See* Rule 6A-1.094124(9) F.A.C. (2021).

40.     In addition to making changes to the rules governing Florida's K-12 system, the IFA imposes similar restrictions on speech in Florida's K-20 system— which applies to state colleges and universities—by amending the Florida Educational and Equity Act. *See* §1000.05(4)(a), Fla.Stat. (2022).

41.     The Florida Educational and Equity Act prohibits discrimination on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status against students or employees in Florida's K-20 education system. *See* §1000.05(2)(a), Fla.Stat. (2022). Any person aggrieved by violations of the Act have a right of action for such equitable relief as the court may determine and may also recover reasonable attorney's fees. *See* §1000.05(9), Fla.Stat. (2022)

42.     The IFA amends the Florida Educational Equity Act's definition of "discrimination" to include:

> subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:
>
> 1. Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.
>
> 2. An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
>
> 3. An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex or national origin.

4. Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

5. An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin.

6. An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against, or receive adverse treatment to achieve diversity, equity, or inclusion.

7. An individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race, color, sex, or national origin.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

§1000.05(4)(a), Fla. Stat. (2022).

43.     The IFA further provides that this subsection "may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, <u>provided such training or instruction is given in an objective manner without endorsement of the concepts</u>." *See* §1000.05(4)(b), Fla.Stat. (2022) (emphasis added).

44.     Once again, the IFA permits teachers and instructors to discuss material that addresses the statutorily enumerated concepts in a manner that agrees with those

14

principles or takes a neutral position but forbids them from opposing and/or questioning those principles.

## D. The Individual Freedom Act's Restrictions on Employers' Speech

45.    The IFA also restricts speech of Florida Employers by amending the Florida Civil Rights Act of 1992. The stated purpose of that legislation was to "secure for all individuals within the state freedom from discrimination because of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status and thereby to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state." §760.01(2), Fla. Stat (2022).

46.    The Florida Civil Rights Act contains a list of "unlawful employment practices" analogous to those set out in Title VII of the Civil Rights Act of 1964, making it unlawful for employers to discharge, refuse to hire, or set an employee's compensation on the basis of their race, color, religion, sex, pregnancy, national origin, age, handicap or marital status. *See* §760.10, Fla. Stat. (2022).

47.    The Act further permits aggrieved parties to bring an administrative action or civil lawsuit against an employer who engages in these unlawful employment practices. *See* §760.11, Fla. Stat. (2022). It further provides that the

Florida Attorney General may commence a civil action for damages, injunctive relief and civil penalties of up to $10,000 dollars per violation to enforce the Act's provisions. *See* §760.021, Fla. Stat. (2022).

48.    The IFA modifies the Florida Civil Rights Act's definition of "unlawful employment practices" and "race discrimination" to include "subjecting any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination" to any "training, instruction, or any other required activity" that "espouses, promotes, advances, inculcates, or compels and individual to believe" any of eight statutorily enumerated concepts:

> 1. Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.
>
> 2. An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
>
> 3. An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex or national origin.
>
> 4. Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.
>
> 5. An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin.

6. An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against, or receive adverse treatment to achieve diversity, equity, or inclusion.

7. An individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race, color, sex, or national origin.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

§760.10(8)(9), Fla. Stat. (2022)

49.     The IFA further provides that its eight restrictions "may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." §760.10(8)(b), Fla. Stat. (2022)

50.     In other words, the statute permits employers to offer training that disagrees with these concepts or takes a neutral position on them, however, any training that endorses those concepts now constitute an unlawful employment practice.

51.     Because the IFA modifies the definitions contained in the Florida Civil Rights Act, any employer who offers training, instruction or other required activity that are deemed to "endorse" any of the eight forbidden concepts may be sued by their employees or the Florida Attorney General using the same cause of action under

which an employee might use to sue their employer if they were denied a position or fired on account of their race.

**E. The Florida Administrative Code's Regulation and IFA Infringe on Plaintiffs' Constitutional Rights.**

52.    The provisions at issue here impose unlawful restrictions on the First Amendment rights of teachers, students, and Florida's employers in myriad fashion.

53.    First, they intrude on the free expression and academic freedom of Florida's teachers by imposing a pall of orthodoxy over the classrooms. These principles suppress a wide range of viewpoints accepted by academics for the sole reason that Florida's conservative lawmakers disagree with them. Even if such disagreement could form a legitimate government interest, Governor DeSantis failed to identify any actual examples of what he calls "Critical Race Theory" being taught in Florida public school classrooms.

54.    Second, these provisions violate the rights of students to access information by creating a regime of censorship over classroom instruction and instructional materials. These provisions ensure students learn only a white-washed version of history and sociological theories that ignore systemic problems in our society that create racial injustices.

55.    Third, these provisions regulate how employers train their employees without any legitimate or compelling government interest to do so. Rather, the IFA

imposes sweeping restrictions on employer's speech based on anecdotal incidents of what Governor DeSantis calls "corporate wokeness."

56.     Fourth, these provisions are unconstitutionally vague and overbroad. They employ sweeping general principles with which Florida' employers and educators are required to either conform or are prohibited from disagreeing. These broad principles are subject to various interpretations and allow the State to arbitrarily decide what speech is prohibited and what speech is permitted.

## COUNT I
## FIRST AMENDMENT— TEACHERS' FREEDOM OF EXPRESSION/ACADMEIC FREEDOM

57.     Paragraphs 1 through 56 above are realleged and incorporated by reference herein.

58.     Plaintiffs Falls, Harper, and Cassanello are entitled to exercise their right to free expression under the First Amendment of the United States Constitution.

59.     The Florida Administrative Code's Rule banning instruction on critical race theory and the IFA unlawfully restrict that right as they are not narrowly tailored to meet a compelling state interest.

60.     Furthermore, the Florida Administrative Code's Rule banning instruction on critical race theory and IFA constitute viewpoint discrimination as they are explicitly designed to target and suppress ideas with which GOP lawmakers disagree.

61.    Accordingly, these provisions unconstitutionally infringe on Plaintiffs Falls, Harper, and Cassanello's First Amendment rights and are unconstitutional both facially and as applied to Plaintiffs Falls, Harper, and Cassanello's curricula.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)    A declaratory judgment that the administrative regulation banning critical race theory and IFA's provisions amending the Florida Education EquityAct, restricting K-12 instruction or classroom materials that do not agree with the six "principles of individual freedom" are unconstitutional and violate the First Amendment;

(b)    An order enjoining Defendants from enforcing the above provisions;

(c)    An award of reasonable attorney's fees and costs; and

(d)    Such other relief that this Court deems necessary and proper.

## COUNT II
## FIRST AMENDMENT-STUDENT ACCESS TO INFORMATION

62.    Paragraphs 1 through 56 above are realleged and incorporated by reference herein.

63.    Plaintiff RMJ is entitled to receive information regarding sociological, historical, and civic issues under the First Amendment of the United States Constitution.

64.     The Florida Administrative Code's Rule banning instruction on critical race theory and the IFA unlawfully restrict that right as they are not narrowly tailored to meet a compelling state interest.

65.     Furthermore, the Florida Administrative Code's Amendment banning instruction on critical race theory and IFA constitute viewpoint discrimination as they are explicitly designed to target and suppress ideas with which GOP lawmakers disagree.

66.     Accordingly, these provisions unconstitutionally infringe on Plaintiff RMJ's First Amendment rights and are unconstitutional both facially and as applied to Plaintiff RMJ.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)     A declaratory judgment that the administrative regulation banning critical race theory and IFA provisions restricting instructional or classroom materials that do not agree with the six "principles of individual freedom" are unconstitutional and violate the First Amendment;

(b)     An order enjoining Defendants from enforcing the above provisions;

(c)     An award of reasonable attorney's fees and costs; and

(d)     Such other relief that this Court deems necessary and proper.

## COUNT III
## FIRST AMENDMENT-EMPLOYERS' FREEDOM OF EXPRESSION

67.     Paragraphs 1 through 56 above are realleged and incorporated by reference herein.

68.     Plaintiff Hodo is entitled to exercise her right to free expression under the First Amendment of the United States Constitution.

69.     The IFA's amendments to the Florida Civil Rights Act of 1992 unlawfully restrict that right as they are not narrowly tailored to meet a compelling state interest.

70.     Furthermore, the IFA's amendments to the Florida Civil Rights Act of 1992 constitute viewpoint discrimination as they are explicitly designed to target and suppress ideas with which GOP lawmakers disagree.

71.     Accordingly, the Defendants' implementation of these provisions unconstitutionally infringes on Plaintiff Hodo's First Amendment rights and those of her clients.

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)     A declaratory judgment that the IFA's Amendments to the Florida Civil Rights Act of 1992 are unconstitutional and violate the First Amendment;

(b)     An order enjoining Defendants from enforcing the above provisions;

(c)     An award of reasonable attorney's fees and costs; and

(d)     Such other relief that this Court deems necessary and proper.

## COUNT IV
## FOURTEENTH AMENDMENT- VAGUENESS

72.     Paragraphs 1 through 56 above are realleged and incorporated by reference herein.

73.     The Florida Administrative Code's Rule banning instruction on critical race theory employs vague and nebulous terminology that prohibits teachers from instructing students on "theories that distort historical events."

74.     Reasonable minds could differ as to whether a given theory "distorts historical events" and the Rule provides teachers no guidance to determine whether their instruction is prohibited by the Rule.

75.     Furthermore, the IFA employs similarly, vague, and nebulous definitions by enumerating six "principles of individual freedom" and prohibiting any classroom instruction which could "indoctrinate or persuade" students to a particular point of view inconsistent with those principles. Many subjects in sociology, history, and civics, such as slavery, America's history with discrimination, and current racial and gender-based disparities in modern America, have a natural tendency to persuade students to engage in beliefs inconsistent with some of the "principles of individual freedom" such as "an individual, by virtue of his or her race or sex, does not bear responsibility for actions committed in the past by other members of the same race or sex" or that "an "individual should not be

made to feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race."

76.     As a result, these provisions are so vague that they fail to put a reasonable person on notice of what is prohibited and would cause people of common intelligence to guess at its meaning and differ as to its application.

77.     Furthermore, the IFA's lack of precision invites arbitrary and discriminatory enforcement. Whether a given school curriculum "distorts historical events" is left in the hands of state officials who answer to Governor DeSantis, a GOP lawmaker who has vowed to "fight back against woke politics." As such, Plaintiffs have every reason to believe that these vague standards can and will be used to silence speech on these topics with which Florida's GOP politicians disagree.

78.     Accordingly, Defendants' implementation of these provisions violate Plaintiffs' Due Process Rights.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)     A declaratory judgment that the administrative regulation banning critical race theory, the IFA's amendments to the Florida Education Equities Act and provisions restricting instructional or classroom materials that do not agree with the six "principles of individual freedom" are unconstitutionally vague in violation of the Fourteenth Amendment to the Constitution of the United States;

24

(b)     An order enjoining Defendants from enforcing the above provisions;

(c)     An award of reasonable attorney's fees and costs; and

(d)     Such other relief that this Court deems necessary and proper.

Respectfully submitted,

*/s/ Jesse B. Wilkison*
Elizabeth L. White, Esquire
Florida Bar No.:  314560
Matthew R. Kachergus, Esquire
Florida Bar No.:  503282
Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Jesse B. Wilkison, Esquire
Florida Bar No.:  118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus, DeMaggio &
Wilkison, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone: (904) 356-9661
Facsimile: (904) 356-9667
Email: sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFF

I, _Donald Fans_, DECLARE UNDER PENALTY OF PERJURY under the laws of the United States of America that the foregoing is true and correct. Executed on the ___12th___ of ___march___ 2022.

I, _Jill B. Harper_ DECLARE UNDER PENALTY OF PERJURY

under the laws of the United States of America that the foregoing is true and

correct. Executed on the _18th_ of _March_ 2022.


<br>

**State of Florida**

County of _Leon_

TAMARA BROWNING
Commission # HH 077355
Expires March 28, 2025
Bonded Thru Troy Fain Insurance 800-385-7019

The foregoing instrument was acknowledged before

me this _18_ day of _March_ _2022_

      Day     Month     Year

by _Jill Beth Harper_

     Name of Person Acknowledging

who is personally known to me or who has produced

_Driver License_

     Type of Identification

as identification.

_Tamara Browning_ Notary Public

    Signature of Notary Public

_Tamara Browning_

    Name of Notary Typed, Printed or Stamped

Commission No. _HH077355_

I, Robert Cassanello , DECLARE UNDER PENALTY OF PERJURY under the laws of the United States of America that the foregoing is true and correct. Executed on the 23 of March 2022.

I, _S. Nicole Jamieson_, DECLARE UNDER PENALTY OF PERJURY under the laws of the United States of America that the foregoing is true and correct. Executed on the _23rd_ of _March_ 2022.

I, Tammy L. Hodo, PhD, DECLARE UNDER PENALTY OF PERJURY under the laws of the United States of America that the foregoing is true and correct. Executed on the 30 of March 2022.