# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

**DONALD FALLS, JILL HARPER,**
**Dr. ROBERT CASSANELLO, STEPHANIE**
**NICOLE JAMIESON,** as next of friend of **RMJ,**
**Dr. TAMMY L. HODO,**

     **Plaintiffs,**

**vs.**                             **Case No.:**

**RON DESANTIS,** in his official
capacity as Governor of Florida; **RICHARD CORCORAN,**
in his official capacity as Commissioner of the
Florida State Board of Education; **TOM GRADY,**
**BEN GIBSON, MONESIA BROWN, MARVA**
**JOHNSON, RYAN PETTY, JOE YORK,**
in their official capacities as members of the
Florida State Board of Education; **BRIAN LAMB,**
**TIMOTHY M. CERIO, AUBREY EDGE, PATRICIA FROST,**
**EDWARD HADDOCK, H. WAYNE HUIZENGA, JR.,**
**NATASSIA JANVIER, KEN JONES,**
**DARLENE LUCCIO JORDAN, ALAN LEVINE,**
**CHARLES H. LYDECKER, STEVEN M. SCOTT,**
**WILLIAM SELF, ERIC SILAGY, KENT STERMON,**
in their official capacities as members of the Florida Board of
Governors of the State University System; and **ASHLEY MOODY,**
in her official capacity as Florida's Attorney General,

     **Defendants.**

     _____

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW

     Plaintiffs, by and through undersigned counsel, and pursuant to Fed.R.Civ.P.

65 hereby move this Court to enter its Order preliminarily enjoining Defendants

from enforcing provisions of Florida's Individual Freedom Act and administrative regulation banning the teaching of materials from the 1619 Project and what Florida's conservative politicians call "critical race theory."

1.     This case arises from the Florida Legislature and Executive Branch's efforts to suppress speech in Florida's schools and workplaces by passing laws that forbid Florida's teachers and employers from endorsing concepts about race and sex with which Florida's conservative politicians disagree. These laws are unconstitutional viewpoint-based restrictions on speech that regulate the speech of Florida's teachers and business owners in violation of their First Amendment rights. These laws also employ nebulous terms with vague definitions in order to chill protected speech.

**A. The Florida Department of Education's Ban on Instruction of Critical Race Theory and Materials from the 1619 Project.**

2.     In August 2019, *The New York Times Magazine* published an article about the impact of slavery on American history that marked the first piece in a long-form journalism project called the 1619 Project. The stated aim of the project was to "reframe the country's history by placing the consequences of slavery and the contributions of Black Americans at the very center of the United States' national narrative." The project garnered several awards, including its introductory essay winning the 2020 Pulitzer Prize for commentary.

3.      The 1619 Project drew sharp criticism from conservative politicians and shortly after its publication those politicians began putting forward a narrative that the project was being used to indoctrinate American school children.

4.      Republican politicians also began to equate the 1619 Project with "critical race theory," a legal studies term coined in 1989 by UCLA Law and Columbia Law Professor Kimberlé Williams Crenshaw. Critical race theory is not a single, cohesive ideology, but was developed from a workshop led by Professor Crenshaw and other professors who questioned the neutrality of the American legal system and sought to expand their graduate-level legal studies curriculum to explore how laws sustained racial hierarchies.

5.      Despite the fact that the term "critical race theory" had only been previously used in the graduate-level context and encompasses a wide range of ideas and concepts that are not easily cabined into a single definition, conservative politicians began using it in their rhetoric as a boogeyman that threatened American values.

6.      On June 10, 2021, Florida Governor Ron DeSantis joined a State Board of Education Meeting to "discuss the importance of maintaining the integrity of Florida's academic standards by keeping Critical Race Theory" out of the classroom.

7.      In a press release following the meeting, Governor DeSantis stated: "the woke class wants to teach kids to hate each other, rather than teaching them how to

read, but we will not let them bring nonsense ideology into Florida's schools."
(Attached as Exhibit 1).

8. On June 14, 2021, the Florida Department of Education amended its rules to ban the instruction of ideas that "suppress or distort significant" historical events—which include, according to the amendment, materials from the 1619 Project and "the teaching of Critical Race Theory."

9. The amended regulation provides:

> (b) Instruction on the required topics must be factual and objective, and may not suppress or distort significant historical events, such as the Holocaust, slavery, the Civil War and Reconstruction, the civil rights movement and the contributions of women, African American and Hispanic people to our country, as already provided in Section 1003.42(2), F.S. Examples of theories that distort historical events and are inconsistent with State Board approved standards include the denial or minimization of the Holocaust, and the teaching of Critical Race Theory, meaning the theory that racism is not merely the product of prejudice, but that racism is embedded in American society and its legal systems in order to uphold the supremacy of white persons. Instruction may not utilize material from the 1619 Project and may not define American history as something other than the creation of a new nation based largely on universal principles stated in the Declaration of Independence. Instruction must include the U.S. Constitution, the Bill of Rights, and subsequent amendments.

Rule 6A-1.094124, FAC (2021) (hereinafter "the Regulation").

10.     On April 15, 2022, the Florida Department of Education announced in a press release that it was rejecting twenty-eight mathematics textbooks from Florida's approved K-12 instructional materials "because they incorporate prohibited topics or unsolicited strategies, including CRT." (Attached as Exhibit C).

**B. Governor DeSantis Announces the Stop WOKE Legislative Initiative**

11.     On December 15, 2021, Governor DeSantis held another press conference to announce a new legislative proposal called the Stop the Wrongs to Our Kids and Employees (W.O.K.E.) Act.

12.     The press release characterized the legislative initiative as "a legislative proposal that will give businesses, employees, children and families tools to fight back against woke indoctrination" and promised to be the "strongest legislation of its kind in the nation and will take on both corporate wokeness and Critical Race Theory." (Attached as Exhibit 2).

13.     Governor DeSantis further stated: "In Florida we are taking a stand against the state-sanctioned racism that is critical race theory. We won't allow Florida tax dollars to be spent teaching kids to hate our country or to hate each other. We also have the responsibility to ensure that parents have the means to vindicate their rights when it comes to enforcing state standards. Finally, we must protect Florida workers against the hostile work environment that is created when large

corporations force their employees to endure CRT-inspired 'training' and indoctrination." Ex. 2.

**C. The Florida Legislature Introduces the Individual Freedom Act**

14.     On January 11, 2022, Republican Florida Republican Speaker *pro tempore* of the Florida House Representatives, Bryan Avila, introduced HB 7 titled "Individual Freedom."

15.     HB 7 effectuated the goals of Governor DeSantis's Stop WOKE legislative initiative by prohibiting certain speech, which Governor DeSantis dubbed "woke indoctrination," from Florida's schools and workplaces.

16.     Specifically, the legislation addressed Governor DeSantis's crusade against "corporate wokeness" by rewriting Florida's Civil Rights Act to make it unlawful for Florida employers to require employees to undergo training that included any of eight forbidden "concepts" regarding race, sex, religion, or national origin.

17.     The legislation also addressed Governor DeSantis's criticisms of critical race theory in schools by enumerating six "principles of individual freedom" and forbidding teachers from offering instruction or use instructional materials that endorsed viewpoints in conflict with those principles.

18.     On April 22, 2022, Governor DeSantis signed the Individual Freedom Act (hereinafter IFA) into law.

**D. The Individual Freedom Act's Restrictions on Teachers' Speech and Students' Access to Information.**

19.     The IFA amends Florida statutes that govern required instruction in K-12 public schools. Specifically, Florida law requires teachers in K-12 public schools to teach twenty prescribed courses of study "efficiently, and faithfully, using the books and materials required that meet the highest standards for professionalism and historical accuracy." *See* §1003.42(2), Fla. Stat. (2022).[1]

20.     The statutorily prescribed courses include fundamental topics in civics and American history such as "the history of the United States, including the period of discovery, early colonies, the War for Independence, the Civil War, expansion of the United States to its present boundaries, the world wars, and the civil rights movement to the present" and "the history of African Americans, including the history of African peoples before the political conflicts that led to the development of slavery, the passage to America, the enslavement experience, abolition, and the history and contributions of Americans of the African diaspora to society." §1003.42(f) and (h), Fla. Stat. (2022).

21.     The IFA amends this required instruction to mandate not just *what* topics K-12 public schools should include in their curricula, but *how* those topics must be taught.

---

[1] Statutory citations in this motion refer to Florida statutes as amended by the IFA.

22.     Specifically, the IFA enumerates six "principles of individual freedom" with which all K-12 instruction and supporting materials for topics enumerated in the section must be consistent:

> a.  No person is inherently racist, sexist, or oppressive, whether consciously or unconsciously, solely by virtue of his or her race or sex.
>
> b. No race is inherently superior to another race.
>
> c. No person should be discriminated against or receive adverse treatment solely or partly on the basis of race, color, national origin, religion, disability, or sex.
>
> d. Meritocracy or traits such as a hard work ethic are not racist but fundamental to the right to pursue happiness and be rewarded for industry.
>
> e.  A person, by virtue of his or her race or sex, does not bear responsibility for actions committed in the past by other members of the same race or sex.
>
> f. A person should not be instructed that he or she must feel guilt, anguish, or other forms of psychological distress for actions, in which he or she played no part, committed in the past by other members of the same race or sex.

§1003.42(3), Fla. Stat. (2022).

23.     The IFA further states:

> Instructional personnel may facilitate discussions and use curricula to address, in an age-appropriate manner, the topics of sexism, slavery, racial oppression, racial segregation, and racial discrimination, including topics relating to the enactment and enforcement of laws

> resulting in sexism, racial oppression, racial segregation, and racial discrimination, including how recognition of these freedoms have overturned these unjust laws. <u>However, classroom may not be used to indoctrinate or persuade students to a particular point of view inconsistent with the principles of this subsection or state academic standards.</u>

*Id.*

24.     In other words, the IFA permits teachers to discuss material that addresses the six "principles of individual freedom" in a manner that agrees with those principles or takes a neutral position but forbids teachers from opposing and/or questioning those principles.

25.     Furthermore, the IFA prohibits reviews of educational instruction material for K-12 programs from recommending any instructional materials that contradict the six "principles of individual freedom" and requires the Florida Department of Education to review and approve all such materials for compliance with those principles.

26.     Florida's K-12 required statutory curriculum is approved, monitored, and enforced by the Florida State Board of Education. If a teacher fails to comply with the regulations adopting the required curriculum their school may be subject to sanctions including reporting the violation to the legislature, withholding the transfer of state funds until the school complies with the rule, declaring the school ineligible for competitive grants, and requiring monthly reporting until the noncompliance is remedied. *See* Rule 6A-1.094124(9), F.A.C. (2021).

27.    In addition to making changes to the rules governing Florida's K-12 system, the IFA imposes similar restrictions on speech in Florida's K-20 system—which applies to state colleges and universities—by amending the Florida Educational Equity Act. *See* §100.05(4)(a), Fla.Stat. (2022)

28.    The Florida Educational Equity Act prohibits discrimination on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status against students or employees in Florida's K-20 education system. *See* §1000.05(2)(a), Fla. Stat. (2022). Any person aggrieved by violations of the Act have a right of action for such equitable relief as the court may determine and may also recover reasonable attorney's fees. *See* §1000.05(9), Fla. Stat. (2022).

29.    The IFA amends the Florida Educational Equity Act's definition of "discrimination" to include:

> subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:
>
> 1. Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.
>
> 2. An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
>
> 3. An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex or national origin.

4. Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

5. An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin.

6. An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against, or receive adverse treatment to achieve diversity, equity, or inclusion.

7. An individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race, color, sex, or national origin.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

§1000.05(4)(a), Fla. Stat. (2022).

30.     The IFA further provides that this subsection "may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, <u>provided such training or instruction is given in an objective manner without endorsement of the concepts</u>." *See* §1000.05(4)(b), Fla. Stat. (2022) (emphasis added).

31.     Once again, the IFA permits teachers and instructors to discuss material that addresses the statutorily enumerated concepts in a manner that agrees with those

principles or takes a neutral position but forbids them from opposing and/or questioning those principles.

## E. The Individual Freedom Act's Restrictions on Employers' Speech

32. The IFA also restricts speech of Florida Employers by amending the Florida Civil Rights Act of 1992. The stated purpose of that legislation was to "secure for all individuals within the state freedom from discrimination because of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status and thereby to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state." §760.01(2), Fla. Stat. (2022).

33. The Florida Civil Rights Act contains a list of "unlawful employment practices" analogous to those set out in Title VII of the Civil Rights Act of 1964, making it unlawful for employers to discharge, refuse to hire, or set an employee's compensation on the basis of their race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status. *See* §760.10, Fla. Stat. (2022).

34. The Act further permits aggrieved parties to bring an administrative action or civil lawsuit against an employer who engages in these lawful employment practices. *See* §760.11, Fla. Stat. (2022). It further provides that the Florida Attorney

General may commence a civil action for damages, injunctive relief and civil penalties of up to $10,000 dollars per violation to enforce the Act's provisions. *See* §760.021, Fla. Stat. (2022).

35.     The IFA modifies the Florida Civil Rights Act's definition of "unlawful employment practices" and "race discrimination" to include "subjecting any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination" to any "training, instruction, or any other required activity" that "espouses, promotes, advances, inculcates, or compels and individual to believe" any of eight statutorily enumerated concepts:

> 1. Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.
>
> 2. An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
>
> 3. An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex or national origin.
>
> 4. Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.
>
> 5. An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin.

13

6. An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against, or receive adverse treatment to achieve diversity, equity, or inclusion.

7. An individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race, color, sex, or national origin.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

§760.10(8)(a), Fla. Stat. (2022)

36.   The IFA further provides that its eight restrictions "may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." §760.10(8)(b), Fla. Stat. (2022)

37.   In other words, the statute permits employers to offer training that disagrees with these concepts or takes a neutral position on them, however, any training that endorses those concepts now constitute an unlawful employment practice.

38.   Because the IFA modifies the definitions contained in the Florida Civil Rights Act, any employer who offers training, instruction or other required activity that are deemed to "endorse" any of the eight forbidden concepts may be sued by their employees or the Florida Attorney General using the same cause of action under

which an employee might use to sue their employer if they were denied a position or fired on account of their race.

**F. The Florida Administrative Code's Regulation and IFA Infringe on Plaintiffs' Constitutional Rights.**

39.     The provisions at issue here impose unlawful restrictions on the First Amendment rights of teachers, students, and Florida's employers in myriad fashion.

40.     First, they intrude on the free expression and academic freedom of Florida's teachers by imposing a pall of orthodoxy over the classrooms. These provisions suppress a wide range of viewpoints accepted by academics for the sole reason that Florida's conservative lawmakers disagree with them. Even if such disagreement could form a legitimate government interest, Governor DeSantis failed to identify any actual examples of what he calls "critical race theory" being taught in Florida public school classrooms.

41.     Second, these provisions violate the rights of students to access information by creating a regime of censorship over classroom instruction and instructional materials. These provisions ensure students learn only a white-washed version of history and sociological theories that ignore systemic problems in our society that create racial injustices.

42.     Third, these provisions unlawfully regulate how employers train their employees without any legitimate or compelling government interest to do so.

Rather, the IFA imposes sweeping restrictions on employer's speech based on anecdotal incidents of what Governor DeSantis calls "corporate wokeness."

43.    Fourth, these provisions are unconstitutionally vague and overbroad. They employ sweeping general principles with which Florida' employers and educators are required to either conform or are prohibited from disagreeing. These broad principles are subject to various interpretations and allows the state to arbitrarily decide what speech is prohibited and what speech is permitted.

44.    As such, Plaintiffs are likely to show that the IFA and Regulation violate the First and Fourteenth Amendment rights of Florida's teachers, students, and employers.

45.    Furthermore, Plaintiffs will sufferer irreparable harm if a preliminary injunction is not issued because of these provisions' sweeping restrictions of their First Amendment rights.

46.    The balance of harms also favors issuance of an injunction because the State lacks any legitimate interest in enforcing an unconstitutional statute.

47.    Likewise, the public interest favors enjoining statutes that infringe on citizens' First and Fourteenth Amendment rights.

WHEREFORE, Plaintiffs respectfully request this Court enter an order preliminarily enjoining defendants from enforcing the IFA and Regulation.

## Local Rule 7.1(B) Certification

Counsel for Defendants have not entered an appearance in this matter. The undersigned certifies that as soon as possible, they will conduct an attorney conference as required by N.D. Fla. Loc. R. 7.1(B) and supplement this motion if it remains pending at that time. The motion is filed in advance of an attorney conference so that it can be served with the Verified Complaint in this matter.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs are entitled to a preliminary injunction because they satisfy each prong of the four-part test necessary for the issuance of a preliminary injunction. Specifically, (1) Plaintiffs are likely to prevail on the merits of their constitutional claim; (2) they will be irreparably injured in the absence of an injunction against Defendant's unconstitutional activities; (3) the granting of a preliminary injunction will cause less harm to the Defendants than would be caused to the Plaintiffs in the absence of a preliminary injunction; and (4) the public interest would clearly be served by enjoining Defendant's unconstitutional acts. *See Nadi v. Richter*, 976 F.2d 682, 690 (11th Cir. 1992).

## I.   Substantial Likelihood of Success on the Merits

The bedrock of the First Amendment is protection of the free marketplace of ideas. "The best test of truth is the power of the thought to get itself accepted in the competition of the market…Every year, if not every day we have to wager our

salvation upon some prophecy based on imperfect knowledge." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). "While that experiment is part of our system [] We should be eternally vigilant against attempts to check the expression of opinions we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country." *Id.*

In the later months of 2020 following the murder of George Floyd, Governor DeSantis and Florida's conservative politicians saw opinions on race in America "fraught with death" on the horizon—or at least they convinced themselves of such. Rather than heed a century of First Amendment precedent regarding the sanctity of the marketplace of ideas, they set out to limit what that marketplace could offer in Florida's schools and workplaces. They banned teachers and employers from endorsing a litany of opinions about race that had been stuck in their craw, covering everything from the 1619 Project, institutional racism, white privilege, implicit bias, and antiracism to what Governor DeSantis refers to as "critical race theory" and "corporate wokeness."

This constitutional challenge is not about whether these ideas are right or whether they should be taught throughout Florida's schools and workplaces. Rather, it is about an attempt by Florida's conservative politicians to silence exchange of these ideas and win a so called "culture war" through legislative and executive fiat.

For the reasons explained below, the First Amendment does not tolerate such blunt attempts to silence political and sociological viewpoints and Plaintiffs are likely to succeed on the merits of their claim due to these laws' many constitutional infirmities.

## A.   The IFA and Regulation Violate Teachers' First Amendment Right to Free Expression.

The laws at issue here intrude on long-established precedent recognizing the First Amendment's protection of expression in the classroom and academic freedom. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1968): *See also, Weiman v. Updegraff,* 344 U.S. 183 (1952); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957).

The Supreme Court first articulated the First Amendment's protections of academic freedom in *Weiman.* That case involved a challenge by two college professors who refused to take a state-mandated oath that they were not affiliated with any organization deemed to be a "communist front" or "subversive organization." *Weiman*, 344 U.S. at 186–87. The plurality opinion struck down the statute as an arbitrary exercise of state power. *Id.* at 190–191. However, Justice Frankfurter and Justice Douglas concurred in the result for the additional reason that the statute intruded on public schoolteachers' special role in safeguarding the

exercise of our constitutional rights by educating the nation's youth so that they can effectively exercise those rights. *Id.* at 195 (Frankfurter, J., Concurring). Specifically, Justice Frankfurter stated:

> To regard teachers—in our entire educational system, from the primary grades to the university—as the priests of our democracy is therefore not to indulge in hyperbole. It is the special task of teachers to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion. Teachers must fulfill their function by precept and practice, by the very atmosphere which they generate; they must be exemplars of open-mindedness and free inquiry. They cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them. They must have the freedom of responsible inquiry, by thought and action, into the meaning of social and economic ideas, into the checkered history of social and economic dogma. They must be free to sift evanescent doctrine, qualified by time and circumstance, from that restless, enduring process of extending the bounds of understanding and wisdom, to assure which the freedoms of thought, of speech, of inquiry, of worship are guaranteed by the Constitution of the United States against infraction by national or State government.

*Id.* at 196–97.

Five years later, in *Sweezey,* the Supreme Court again recognized the First Amendment's protections for academic freedom when it considered a challenge to an investigation brought by the New Hampshire legislature into a state university

professor's alleged affiliation with the communist party. *See Sweezy*, 354 U.S. at 235–247. Again, the plurality opinion condemned the state's intrusion into the academic freedom of public-school teachers:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Id.* at 250.

Further recognizing protections for academic freedom, the Supreme Court has held the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of University State of N.Y.*, 385 U.S. 589, 603–04 (1967). Furthermore, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) (striking down Arkansas anti-communism statute that required teachers to disclose every organization to which they had been a part of for the last five years as a condition of employment).

However, the First Amendment's protections are not infinite. *See Pickering v. Bd. of Ed. of. Tp. High School Dist. 205, Will Cnty, Ill.,* 391 U.S. 563, 574–75 (1968). In *Pickering*, the Supreme Court created a two-part balancing test for assessing the constitutionality of regulations on public employees' speech. *Id.* The first part of the test asks, "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If the speech meets that threshold, the court then balances the employee's First Amendment interests with the employer's interest in an efficient, disruptive-free workplace. *Connick v. Meyers*, 461 U.S. 138, 154–55 (1983).

Here, the IFA and Regulation restrict speech on "matters of public concern." Suppression of such discussion is the very reason Florida's conservative lawmakers enacted these laws to—in their words—"fight back against woke indoctrination." Ex. 1. As such, the speech at issue here is "fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps,* 562 U.S. 443, 453 (2011).

Thus, under the first prong of *Pickering*, the central question is whether Plaintiffs must also prove that the provisions regulate teachers' speech as "citizens." *Pickering* arose in the context of a teacher's dismissal from their position for sending a letter to a local newspaper and did not implicate the teacher's speech inside the classroom. *Id.* at 565. In *Garcetti*, the Supreme Court later held that when public

employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the constitution does not insulate their communications from employer discipline. *Garcetti*, 547 U.S. 510, 541 (2006). However, the Supreme Court explicitly stated that its holding did not address speech related to academic scholarship or classroom instruction. *Id.* at 425.

Most circuits and some courts in the Eleventh Circuit have applied the Supreme Court's prior holdings on academic freedom to recognize an exception to *Garcetti* for classroom instruction and proceeded to the second prong of the *Pickering* balancing test.[2] *See Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021)

---

[2] Plaintiffs expect the Defendants will rely on the pre-*Garcetti* decision, *Bishop v. Aronov,* 926 F.2d 106 (11th Cir. 1991) to argue that the Eleventh Circuit's precedent is inconsistent with these decisions, particularly in light of the court's statement "we do not find support to conclude that academic freedom is an independent First Amendment right." *Id.* at 1075. However, a closer reading of *Bishop* reveals that its analysis is much closer to the decisions from other circuits recognizing First Amendment protection for classroom instruction.

*Bishop* involved a university physiology professor challenge to a memo restricting his ability to express his religious views during classroom instruction. *Id.* at 1068. The Eleventh Circuit found no caselaw on point and crafted its own balancing test that noted a university could impose "reasonable restrictions" over in-class speech out of concern for the school's "basic educational mission." *Id.* at 1074. Applying that test, the court found that the school had a legitimate interest in restricting the professor's speech to eliminate religious bias from classroom instruction. *Id.* at 1078. However, the court explicitly held that the state's interest, balanced against the professor's interest in academic freedom, did not justify proscribing the professor's conduct to an extent any greater than what the court outlined in its opinion. *Id.* As such, the Eleventh Circuit—as other jurisdictions have—*does* recognize a First Amendment interest in academic freedom when balanced against a school's legitimate educational interests.

23

(holding that university professor's speech about student pronouns during classroom lectures was protected by the First Amendment); *Adams v. Trustees of University of N.C. Willingham*, 640 F.3d 550, 563-565 (4th Cir. 2011) (holding *Garcettti* did not apply to classroom instruction and applying *Pickering* balancing factors to professor's speech); *Buchanan v. Alexander,* 919 F.3d 847, 853 (5th Cir. 2019) (holding that classroom discussion was protected by the First Amendment if on a matter of public concern); *Demers v. Austin*, 746 F.3d 402, 418 (9th Cir. 2014) (holding exception applied to *Garcetti* for teaching and academic writing); *Parducci v. Rutland*, 316 F. Supp. 352 (M.D. Ala. 1970) (applying balancing test to determine that school violated high school English teacher's First Amendment rights by firing her for assigning students to read Kurt Vonnegut's short-story 'Welcome to the Monkey House').

Some circuits, however, have rejected the *Pickering* balancing test in the context of classroom instruction and instead borrowed the Supreme Court's language to ask whether the restriction at issue casts "a pall of orthodoxy over the classroom." *See Miles v. Denver Public Schools*, 944 F.2d 773, 779 (10th Cir. 1991) (rejecting high school teacher's argument that First Amendment protected his discussion of rumor about students 'making out on the tennis court' and noting that such restrictions did not threaten to "cast a pall of orthodoxy over the classroom") {quoting *Keyishian,* 385 U.S. at 603}. Other circuits have simply recognized First

Amendment protections for academic instruction without applying a particular balancing test. *See Keef v. Geanakos*, 418 F.2d 359 (1st Cir. 1969) (holding First Amendment protected teacher's utterance of offensive word relevant to academic discussion).

Under any threshold, the IFA and Regulation's restrictions on teachers cannot survive First Amendment scrutiny. Florida lawmakers enacted these provisions to suppress certain political views rather than address legitimate educational interests. They are a naked and unashamed attempt to cast "a pall of orthodoxy over the classroom." *Keyishian,* 385 U.S. at 603.

These laws fare no better under the second prong off *Pickering*'s balancing test. *Pickering* arose from the context of individual employees disciplined for engaging in expressive conduct. The state carries a greater burden in a case such as this where the restrictions at issue are not based on a single individual's speech, but "wholesale deterrent[s] to a broad category of expression by a massive number of potential speakers." *United States v. National Treasury Employees Union*, 513 U.S. 454, 467 (1995). For these types of proscription, the state must show "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of government." *Id.* at 468.

The laws at issue impose a substantial burden on present and potential future expression. The IFA's "principles of individual freedom" are drafted to appear reasonable on their face. However, even a cursory inspection reveals they actually proscribe broad swaths of ideas that have gained wide acceptance by academics or that prominent civil rights figures have espoused.

For example, the first "principle of individual freedom" states that "no individual is inherently racist, sexist, or oppressive, whether consciously or unconsciously, solely by virtue of his or her race or sex." §1003.42(3)(a), Fla. Stat. (2022). This principle is simply a strawman construction of implicit or unconscious bias theory, which suggests that people can act on the basis of prejudice and stereotypes without intending to do so. Psychologists and legal scholars have used the theory to explain why certain racial disparities may exist in employment, education, home ownership, and criminal justice. *See* Justin D. Levinson et al, Judging Implicit Bias: *A National Empirical Study of Judicial Stereotypes*, 69 Fla. L. Rev. 63, 70–71 (2017). Under the IFA's regime, a psychology teacher could not endorse implicit bias theory because doing so suggests that a person might be "inherently racist" "unconsciously" "by virtue of his or her race."

Likewise, the third principle states that "no individual should be discriminated against or receive adverse treatment solely or partly on the basis of race, color, national origin, religion, disability or sex." § 1003.42(3)(c), Fla. Stat. (2022). At first

blush, this statement would appear uncontroversial, until one considers its application to race-conscious remedial policies. The Supreme Court has recognized on multiple occasions that remedying past invidious discrimination is a "compelling government interest" that may support the use of race-conscious remedial measures in certain circumstances. *See Fullilove v. Klutznick*, 448 U.S. 448, 484 (1980) ("When effectuating a limited and properly-tailored remedy to cure the effects of discrimination, such a sharing of the burden by innocent parties is not impermissible.") *standard modified by Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995); *Local 28 of Sheet Metal Workers' Intern. Ass'n v. EEOC,* 478 U.S. 421, 445 (1986) (noting Title VII permits courts to order affirmative race-conscious relief as a remedy for past discrimination). Any public-school teacher who "endorses" race-conscious remedial action in conformance these holdings now violates Florida law, since such policies involve "adverse treatment" of non-recipients "partly on the basis of race."

The fourth principle states, "meritocracy or traits such as a hard work ethic are not racist, but fundamental to the right to pursue happiness and be rewarded for industry." §1003.42(3)(d), Fla. Stat. (2022). This is a proscription on critiques of "bootstraps narratives." *See, e.g.,* Natasha Hicks et al, *Still Running Up the Down Escalator, How Narratives Shape Our Understanding of Racial Wealth Inequality*,

The Samuel Dubois Cook Center on Social Equality at Duke University (2021).[3] Specifically, These critiques posit that narratives about meritocracy are often used to turn a blind eye toward how centuries of racially disparate government policies impacted African-Americans' ability to build generational wealth, such as depriving them access to subsidies, social safety nets, and other benefits afforded to white Americans. *Id.* at 7–10. Indeed, the idea that narratives about the protestant work ethic mask racial and economic injustices goes back as far as the civil rights movement. *See* Dr. Martin Luther King, Jr., *The Three Evils Speech* (1967) ("Again, we have deluded ourselves into believing the myth that capitalism grew and prospered out of the Protestant work ethic of hard work and sacrifices. Capitalism was built on the exploitation of black slaves and continues to thrive on the exploitation of the poor, both black and white, both here and abroad.") Under the IFA's regime however, a history teacher who suggests that America's present wealth inequality across races has more to do with discriminatory provisions in the Homestead Act of 1862 than "meritocracy" or the relative "hard work" of white and black Americans would risk discipline and loss of school funding.

Along similar lines, the fifth "principle of individual freedom" states that "an individual, by virtue of his or her race or sex, does not bear responsibility for actions

---

[3] A*vailable at* https://insightcced.org/wp-content/uploads/2021/09/INSIGHT_Still-Running-Up-Down-Escalators_vF.pdf

committed in the past by other members of the same race or sex." §1003.42(3)(d), Fla. Stat. (2022). Once again, this principle is a strawman paraphrasing of another sociological principle that has drawn the ire of conservative politicians in recent years. This time, the IFA proscribes endorsing of antiracism or racial justice, most-recently popularized by National Book Award winner, Dr. Ibram X. Kendi. *See* Anna North, *What It Means to Be Anti-Racist*, VOX (June 3, 2020)[4] Antiracism posits that it is not enough to simply be "not racist" but that beneficiaries of racially biased systems have a moral obligation to affirmatively oppose those systems. *Id.* Under the IFA's proscriptions, a sociology teacher who suggests that white students have a responsibility to oppose racism or correct racially oppressive systems would violate Florida law.

While the IFA's six "principles of individual freedom" target ideas that conservative lawmakers of today find disagreeable, the Regulation's proscription on teaching concepts that "suppress or distort significant historical events" allow those lawmakers to suppress any historical theory with which they may take issue in the future. Rule 6A-1.094124, FAC (2021). The regulation, on its face, appears to ask Florida's teachers to strive for accuracy in teaching historical events, however it includes as examples of materials from the 1619 Project or materials that define

---

[4] *Available at* https://www.vox.com/2020/6/3/21278245/antiracist-racism-race-books-resources-antiracism

"American history as something other than the creation of a new nation based largely on universal principles stated in the Declaration of Independence." Rule 6A-1.094124, FAC (2021).

The 1619 Project is a Pulitzer-prize winning piece of long-form journalism that has been adapted to education at multiple grade levels. *See, e.g.,* The 1619 Project Curriculum, Pulitzer Center, https://pulitzercenter.org/lesson-plan-grouping/1619-project-curriculum (Date accessed February 20, 2022). Furthermore, for a sizable portion of America's history, our country only offered the Declaration's guarantees of "liberty, and the pursuit of happiness" and demands of legislative representation to white, land-owning males. If these ideas are "distortions" of significant historical events, then virtually any idea Florida's conservative lawmakers might disagree in the future could be similarly labeled.

In sum, the IFA and Regulation proscribe a broad array of potential expression. Historical and sociological theories like implicit bias, antiracism, or the 1619 Project may not ultimately gain the traction necessary to be taught in schools for decades to come. However, by forbidding teachers and schoolboards from endorsing these ideas, Florida's conservative lawmakers cut off the free exchange information that fuels our democratic process. *See Mahoney Area School District v. B.L. by and through Levy*, 141 S.Ct. 2038, 2046 (2021) (noting that "America's public schools are the nurseries of our democracy" and "our representative

democracy only works if we protect the marketplace of ideas."). As such, the burden these laws pose on protected expression is substantial.

On the other side of the balance, the state interest asserted to justify these sweeping restrictions is virtually non-existent. This is not a situation where a statute addresses some legitimate educational concern and incidentally restricts protected speech in the process. Rather, the legislation's very focus here is targeted toward restricting ideas that Florida's conservative politicians find disagreeable. Suppressing undesirable political views is not a legitimate state interest. *See Austin v. University of Florida Board of Trustees*, Case No. 1:21-cv-184, 2022 WL 1956512 (N.D. Fla. Jan. 21, 2022) (finding University of Florida's side of the *Pickering* scale was "empty" when it claimed the right to restrict speech if it determined in its unlimited discretion that the viewpoints expressed by Plaintiff's speech harmed the interest of the university). "Free public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party or faction." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1942) (holding state did not have a legitimate interest in requiring students to salute the American Flag).

Governor DeSantis's press releases make no effort to hide the political motivation behind these laws. In addition to the legislative initiative's name—the Stop WOKE act— making its aim clear, Governor DeSantis told the public at its

unveiling that "we won't allow Florida tax dollars to be spent teaching kids to hate our country or to hate each other." Ex. 2 Florida Commissioner of Education, Richard Corcoran, stated: "our classrooms, students and even teachers are under constant threat by Critical Race Theory advocates." *Id.*

Even if these politically driven desires to suppress opinions constituted a legitimate state interest, Florida's conservative lawmakers have failed to point to any actual examples of Florida schools teaching students to "hate our country and each other." Governor DeSantis's press releases identify only three anecdotal examples of "critical race theory" being taught in Florida schools. Ex. 1. The first anecdotal example did not even involve classroom instruction to students but instead was an "equity statement" adopted by the Palm Beach County School Board which stated, "the School District of Palm Beach County is committed to dismantling structures rooted in white advantage." This is not a message of hate, but simply an answer to a call issued by many civil rights leaders throughout our nation's history, including Dr. Martin Luther King Jr. Dr. Martin Luther King, *Where Do We Go from Here?* (1967) ("White Americans must recognize that justice for black people cannot be achieved without radical changes in the structure of our society.").

The second anecdotal example involved a nine-minute video offered by a third-party instructional website with a similarly innocuous message about systemic racism. Brynn Mechem, *Parents Protest after Black Lives Matter Video Shown to*

*Students*, YourObserver.com (Date Accessed Feb. 20, 2022).[5]  The school did not show students the video during class, but the video was available for them to watch if they chose, through a tab on the third-party's website called "current events." *Id.* The video contained a disclaimer to students that it discussed sensitive material. *Id.* Governor DeSantis took issue with the video because a character said, "there is a built-in system of bias that makes life easier for white people" when explaining to another character why people were protesting after George Floyd's murder. *Id.* The character went on to say, "this isn't about blaming the police. When an officer abuses their power, that's just a symptom. The problem is much more widespread than that, which is why we need everybody's help to change things, and that's what these protests are about." *Id.* The video was never shown to students during class. *Id.* After a parent complained about the video's contents, the school principal restricted students' access to the video without an adult. *Id.*

The final anecdote Governor DeSantis cited to justify this legislative initiative was two meetings that a Jacksonville school planned to hold to discuss racial issues that would have been segregated by race. Jennifer Ready & Marilyn Parker, *Principal Apologizes After Segregated Meetings at Douglas Anderson Canceled*

---

[5] *Available at* https://www.yourobserver.com/article/parents-protest-after-black-lives-matter-video-shown-to-students

*Amid Backlash*, NEWS4JAX (Mar. 3, 2021)[6]. The intention behind the meetings was to provide students an environment where they could candidly discuss racial issues. *Id.* However, when parents raised concerns about segregating students, the school voluntarily cancelled the meeting and apologized to students without state intervention. *Id.*[7]

Therefore, despite claiming that Florida's schools are under "constant threat by critical race theory advocates," Florida's conservative lawmakers failed to identify as a single instance of critical race theory actually being taught in a Florida classroom when they announced this sweeping initiative. At bottom, the legislation is not really about critical race theory. Rather, Florida's conservative law makers are using its constituents' concerns about critical race theory (which they themselves have fomented) to suppress a broad range of ideas they find disagreeable and impose a pall of orthodoxy over Florida's classrooms. For these reasons, as the IFA's "six principles of individual freedom" and the Regulation's ban on teaching theories that "suppress or distort" significant historical events impose an unconstitutional restriction on Florida's public school teachers' academic freedom and freedom of expression.

---

[6] https://www.news4jax.com/news/local/2021/03/03/segregated-cultural-meetings-at-douglas-anderson-high-school-canceled-after-dismay-from-parents-school-district/

[7] Governor DeSantis also listed seven national examples of "critical race theory" being taught in schools, only three of which actually involved classroom instruction.

**B.    The IFA and the Regulation Violate Students' Right to Receive Information.**

In addition to restrictions on teacher's expression, the laws at issue here also infringe Florida public school students' constitutional rights to access information. *See Board of Educ, Island Trees Union Free School Dist. No. 26 v. Pico,* 457 U.S. 853 (1982). In *Pico,* a plurality the Supreme Court held the First Amendment protects students' right to access information in a public-school library. *Id.* at 871. Relying on the academic freedom precedents above, the Court rejected the school board's claim that it had unfettered discretion to determine the contents of the school library. *Id.* It noted that while schools "rightfully possess significant discretion to determine the content of their school libraries, … that discretion may not be exercised in a narrowly partisan or political manner." *Id.* at 870.

By way of example, the Court noted that "if a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of students denied access to those books." *Id.* at 871. Thus, whether state restrictions on students' access to information violated the First Amendment depends on the motivations behind the state's action. *Id.*

Two Eleventh Circuit decisions have applied the *Pico* standard. *See American Civil Liberties Union of Florida, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1206 (11th Cir. 2009); *Virgil v. School Bd. of Columbia County, Fla.*,

862 F.2d 1517, 1522 (11th Cir. 1989). In *ACLU v. Miami Dade*, the court reviewed a challenge to a school's decision to remove the book *Vamos a Cuba* from the library due to factual inaccuracies contained in the book. 557 F.3d at 1183–84.

The court found that if inaccuracy was truly the motivating concern behind the board's decision, the school board properly exercised its role in the determination of school library content. *Id.* at 1206. However, the court found that "if the Board removed the book simply because it disliked the ideas contained in it and by removal of the book sought to prescribe political orthodoxy or other matters of opinion, then the board violated Plaintiffs' First Amendment rights." *Id.* at 1206.

In *Virgil*, the Eleventh Circuit upheld a school board's decision to ban certain books from its library due to concerns about offensive language contained therein. 862 F.2d at 1525. The court noted that one such legitimate concern for schools to restrict student access to information was to consider the emotional maturity of the intended audience and protecting minors from "sexually explicit" or "vulgar" materials. *Id.* at 1522. However, in that case the parties stipulated to the reasons for the board's decision, and thus the court found that the "decisive factor" underlying *Pico's* decision—the board's political motivation for removing the materials—was absent. *Id.* at 1523, n.8.

The provisions here do not involve laws promulgated to correct factual inaccuracies or protect young students from sexually explicit material. Rather, this

case presents the very sorts of ideologically driven proscriptions designed "to prescribe political orthodoxy" that the Supreme Court decried in *Pico.* The "six principles of individual freedom" do not relate to the truth or falsity of historical facts, but instead espouse ideological dogma. Furthermore, the IFA extends not only to what a teacher may say in a classroom, but also what instructional materials students may access.[8] *See*, §1006.31(2)(d), Fla. Stat. (2022). These provisions do

---

[8] The sweep of the IFA's impact on instructional materials may not be apparent at first blush. The provision at issue states that reviewers may not recommend instructional materials that contain any matter that "otherwise contradict[s] the principles enumerated under § 1003.42(3)." (The section containing the six "principles of individual freedom"). *See* §1003.41(d), Fla. Stat. (2022). Florida Statutes define instructional materials as items "having intellectual content that by design serve as a major tool for assisting in the instruction of a subject or course." §1006.29(1)(d), Fla. Stat (2022).

Section 1006.28(2)(a)1., Fla. Stat. (2022) provides that each district school board is responsible for "all instructional materials and any other materials used in a classroom, made available in a school library, or included on a reading list." It also provides that the school board must keep a list of all such instructional materials. *Id.* Parents then receive an opportunity to object to any instructional materials that violate §1006.31(2) or any materials, instructional or otherwise, that contain pornographic material, is not suited to student needs to comprehend material, or is inappropriate for the grade level or age group the material is used for. *Id.* at §10006.28(2)(a)2., Fla. Stat. (2022). If the schoolboard finds the material violates any of these two provisions, it then discontinues the use of the materials. *Id.*

Thus, the IFA not only prohibits what a teacher may say in class, but also provides a vehicle to remove any instructional materials from the school if a parent can show that the material violates one of the six "principles of individual freedom" and served as a "major tool for assisting in the instruction of a subject or course." This flexible definition of instructional materials could include textbooks, materials on reading lists, and/or materials in libraries those students use for research papers.

not merely regulate how history is taught. They are an attempt to rewrite history by keeping students away from viewpoints with which Florida's conservative politicians disagree. As such, Plaintiffs are likely to succeed on their claim that the laws at issue here impermissibly restrict students' right to access information.

## C.   The IFA Violates Employers' Right to Free Expression.

The IFA's provisions amending the Florida Civil Rights Act of 1992 also violate the First Amendment rights of employers. Unlike the provisions of the IFA limiting Florida public school curriculum and instructional materials, the IFA's restrictions on employer training extend beyond the realm of public officials to the speech of private citizens. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 479 (2011) ("The State may not burden the speech of others in order to tilt public debate in a preferred direction.") Generally, the First Amendment requires the government to prove that any content-based regulation pass strict scrutiny, in other words, that they "further a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert, Az.*, 576 U.S. 155, 171 (2015).[9]

---

[9] Commercial speech and certain content-neutral restrictions on speech are subject to lesser First Amendment scrutiny. *Reed v. Town of Gilbert, Az.,* 576 U.S. 155, 172 (June 18, 2015). Courts employ a heightened scrutiny test that requires the government to prove that the provisions "directly advance a substantial governmental interest and that the measures are drawn to achieve that interest." *Sorrell v. IMS Health, Inc.*, 546 U.S. 552, 572 (2011).  This lesser standard does not apply here. First, the speech regulated by these provisions is not commercial speech, which is defined as "speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *see also*

The IFA attempts to obfuscate the First Amendment's protections against content-based restrictions by hiding its provisions within the Florida Civil Rights Act's prohibitions on discrimination. However, merely because the legislature labels the speech it regulates as "harassment" or "discrimination" does not shield the regulation from First Amendment scrutiny. *See Wollschlaeger v. Florida,* 848 F.3d 1293 (11th Cir. 2017). *Wollschlaeger* struck down another Florida law passed under similar auspices to the IFA. *Id.* at 1302–1303. There, the Florida Legislature learned of five anecdotal encounters patients had experienced where their doctors asked them unwelcome questions about their firearm ownership. *Id.* at 1302. In response, the legislature passed the Florida's Firearms Owner's Privacy Act (FOPA), which, among other things, prohibited doctors from recording any information about a patient's firearm ownership and stated that a medical professional "should refrain from unnecessarily harassing a patient about firearm ownership during an examination." *Id.* at 1303.

---

*Coral Ridge Ministries Media, Inc. v. Amazon.com*, 406 F.3d 1258, 1288 (M.D. Ala. 2019) (holding map designating hate groups used for fundraising and employee training was not commercial speech).

Second, as explained in further detail below, these laws are not only content-based restrictions on speech, but they are also viewpoint-based restrictions, which are even more disfavored by the First Amendment. *See, infra,* §I.D. However, as explained in this section, the IFA does not even pass muster under heightened First Amendment scrutiny under binding Eleventh Circuit precedent.

The Eleventh Circuit struck down both provisions[10] as content-based regulations on speech. *Id.* at 1323. The court declined to determine whether strict scrutiny or heightened scrutiny applied to the statute, since Florida failed to justify the statute's restrictions on speech even under a heightened scrutiny standard. *Id.* at 1307. Regarding the anti-harassment provision, the court noted that while it is possible to harass individuals through conduct, the regulations at issue here only regulated <u>speech</u> between a doctor and patient during examinations. *Id.* (emphasis added).

Applying the heightened scrutiny standard, the Eleventh Circuit found that the state failed to justify FOPA's burden on physicians' speech. Looking first at the state's justifications for the regulation, the court recognized that protecting patient's Second Amendment rights was a legitimate government interest. *Id.* at 1313. However, it noted that the Florida Legislature, in enacting the regulation, did not rely on any empirical studies to support its position that these rights were actually under threat. *Id.* at 1312. Instead, it "relied on six anecdotes and nothing more." *Id.* Furthermore, the State presented no evidence whatsoever that any doctors or medical professionals had taken patients' firearms. *Id.*

---

[10] The court also upheld an anti-discrimination provision in FOPA, applying a narrowing construction so that the provision applied only to conduct, such as refusing to see a patient or giving them undesirable appointment times, rather than applying to speech. *Id.* at 1317–19.

The IFA's proscriptions on employers' speech are cut from the same cloth as Florida's conservative politicians' previous attempts to curtail medical professionals' speech through FOPA. First, just because the legislature uses the terms "discrimination" or "unlawful activity" to describe what the IFA proscribes, the text of the statute itself makes clear that these proscriptions target speech, not conduct. Specifically, the provision targets "activity" that "espouses, promotes, advances, inculcates, or compels an individual to believe" any of the eight forbidden concepts. §760.10(8)(a), Fla. Stat. (2022).

Second, Florida's conservative lawmakers did not pass this legislation to further a compelling or even a legitimate government interest. In *Wollschlaeger,* the State could at least argue that the legislation was designed to prevent interference with Second Amendment rights. Here, however, the IFA is purely aimed at regulating speech with which Florida's conservative lawmakers disagree, or, in Governor DeSantis's words, to "take on corporate wokeness." (Ex. 2).

Third, as discussed previously, the IFA restricts a broad range of protected expression.[11] *See, supra,* §1.A. Discussion of topics like white privilege, implicit bias, systemic racism is no less important in the workplace than in the classroom. Like the provisions of FOPA at issue in *Wollschlaeger*, the IFA proscribes sharing,

---

[11] The IFA's proscription on employers' speech largely mirrors the six "principles of individual freedom" from the education section.

espousing or promoting ideas supported by empirical evidence and national professional associations. By way of example, the American Bar Association adopted a resolution urging states, territories, and tribes to require medical and social services professionals who work with the public receive periodic training on implicit biases. *See* American Bar Association 116G (Adopted August 3-4, 2020).[12] Under the IFA's proscription on employer's speech, neither the Florida Bar nor any Florida law firm could implement this recommendation, since acknowledging implicit biases might "espouse" or "promote" the belief that "an individual, by virtue of his or her race, color, sex, or national origin is inherently racist, sexist, or oppressive, whether consciously or unconsciously." §760.10(8)(a)2., Fla. Stat. (2022).

Fourth, like the regulations the Eleventh Circuit struck down in *Wollschlaeger,* what arguable interest the government has here is supported only by thin, anecdotal evidence. Specifically, Governor DeSantis's press release included only three examples of "woke corporate training," all of which he pulled from conservative media outlets and none of which occurred in Florida. The first anecdote was a pledge that defense contractor Raytheon encouraged its employees to engage in innocuous practices like checking their biases, identifying their

---

[12] *Available at* www.americanbar.org/content/dam/aba/directories/policy/annual-2020/116g-annual-2020.pdf.

privileges, and moving out of their comfort zone to learn about the experiences and perspectives of others. Audrey Conklin, *Raytheon's Critical Race Theory Program Calls on White Employees to Acknowledge 'Privilege,'' Report.* Fox Business News (July 6, 2021).[13]

The second anecdote involved implicit bias training of Bank of America employees, which Governor DeSantis took issue with because it told employees that white toddlers develop racial biases by ages three to five years old. *See* Christopher F. Rufo, *Toddlers Are Racist…and other Insights from Bank of America's Woke Training*, New York Post (August 19, 2021).[14] Holding aside the press release's alarmist phrasing, Bank of America's claim that white children develop implicit biases at a young age is founded in empirical research. *See* Jennifer R. Steele, et al., *A cross-cultural investigation of Children's Implicit Attitudes Toward White and Black Racial Outgroups*, Dev. Sci. 2018; e12673 at p.2–3 (Feb. 13, 2018).

The third anecdote Governor DeSantis cited was a Google employee program, which he took issue with because it featured a guest appearance by national book award winner Dr. Ibram X. Kendi, who made the statement "to be raised in the

---

[13] *Available at* https://www.foxbusiness.com/politics/raytheon-critical-race-theory-program.

[14] *Available* at https://nypost.com/2021/08/19/toddlers-are-racist-and-other-insights-from-woke-bank-of-america-training/

United States, is to be raised to be racist." Christopher F. Rufo, *Don't Be Evil*, City Journal (September 8, 2021).[15] However, read in context with the rest of Dr. Kendi's remarks, the quote is referring to implicit biases and recognition of race that develops in children of an early age, which, as just discussed, is supported by empirical evidence. *Id.* As such, not only are the IFA's proscription on employers' speech based on thin anecdotal evidence, but the anecdotes Governor DeSantis used do not establish a compelling nor legitimate state interest in regulating employee training.

Florida employers have vital interests in discussing topics like implicit bias or institutional racism, if for no other reason than to ensure these sociological factors do not prevent them from selecting the most qualified person for a job, promotion, loan or contract. In time, Florida employers may discard some of these ideas or stop including them in employee training. However, if that happens, it should happen through the full and fair exchange of information in the marketplace of ideas, not through a legislative mandate. As such, Plaintiffs are likely to succeed on their claim that the IFA violates Florida employers' First Amendment right to free expression.

---

[15] *Available at* https://nypost.com/2021/08/19/toddlers-are-racist-and-other-insights-from-woke-bank-of-america-training/

**D.     The IFA and Rule Banning Critical Race Theory Constitute Viewpoint-Based Restrictions in Violation of the First Amendment.**

In addition to violating the First Amendment rights of students, teachers, and employers, the provisions at issue tread on more fundamental First Amendment prohibitions against viewpoint-based regulations on speech. "It is rare that a regulation restricting speech because of its content would ever be permissible." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 818 (2000). Viewpoint-based regulations, however, occupy an even more disfavored status in First Amendment jurisprudence than content-based restrictions. *Attwood v. Clemons,* 526 F. Supp. 3d 1152, 1172 (N.D. Fla. 2021).

Viewpoint restrictions are an "egregious form of content restriction because the rationale of the restriction is based on suppressing the speaker's ideology, opinion, or perspective." *Id.* As such, more so than content-based restrictions on speech, viewpoint-based restrictions have great difficulty passing the First Amendment's strict scrutiny analysis. *See Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020). Viewpoint-based restrictions strike at the very heart of what the framers drafted the First Amendment to protect against. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

The provisions here are viewpoint-based restrictions because they do not prohibit employers or teachers from discussing certain topics but prohibit them from endorsing specific viewpoints related to those topics. *See* §760.10 (8)(b), Fla. Stat. (2022) (stating the IFA's amendments to the Florida Civil Rights Act of 1992 "may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner <u>without endorsement of the concepts</u>.") (emphasis added); §1003.42(3), Fla. Stat. (2022) (providing "classroom instruction and curriculum may not be used to indoctrinate or persuade students to a particular point of view inconsistent with the principles of this subsection or state academic standards.")

The IFA and Regulation are nothing more than a naked attempt to impose the viewpoint of conservative politicians on Florida's schools and workplaces. It is doubtful that any state interest could support this kind of legislation and, as discussed above, no such justification exists for either the restrictions on teachers' or employers' speech. *See* §§IA and IC. Accordingly, Plaintiffs are likely to succeed on their First Amendment claims against the IFA and the Regulation for the additional reason that these provisions engage in unlawful viewpoint discrimination.

## E.   The IFA and Rule Banning Critical Race Theory Are Vague and Overbroad.

The provisions at issue are also unconstitutionally vague and overbroad. The First and Fourteenth Amendment protect individuals from enforcement of

unconstitutionally vague laws. In order to meet the constitutional requirements of clarity, laws must give people of ordinary intelligence fair notice of what is prohibited. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is also impermissibly vague if it is so standardless that it authorizes or encourages discriminatory enforcement. *United States v. Williams,* 553 U.S. 285, 304 (2008).

"The vagueness of [content-based regulation] of speech raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 872 (1997). "Vague laws force potential speakers to 'steer far wider of the unlawful zone… than if the boundaries of the forbidden areas were clearly marked,' thus silencing more speech than intended." *Wollschlaeger*, 848 F.3d at 1321. (Marcus, J. Concurring) quoting *Baggett v. Bullitt,* 377 U.S. 360, 372 (1964).

The Regulation prohibits teachers from offering instruction that "suppress[es] or distort[s] significant historical events." Rule 6A-1.094124, FAC (2021).   The Regulation offers no guidance on how to determine whether instruction meets this threshold other than to offer examples that include critical race theory and materials obtained from the 1619 Project. *Id.* Given that the 1619 Project is a Pulitzer-prize winning piece of journalism that has inspired a wide-array curricular materials, its inclusion among the list of banned materials opens the door for state officials to act against virtually any historical theory they might disagree with.

Furthermore, even if a teacher tried to abide by the examples set forth in the Regulation, they would find themselves having difficulty doing so. Critical race theory lacks a singular definition even among its proponents. The administrative code's definition— "that racism is not merely the product of prejudice, but that racism is embedded in American society and its legal systems in order to uphold the supremacy of white persons"—sweeps in concepts about institutional racism that far exceed the scope of traditional critical race theory. Indeed, even some of Dr. Martin Luther King Jr's works would be banned under the Regulations' definition of theories that "suppress or distorts significant historical events.". *See* Dr. Martin Luther King Jr., *Where do We Go from Here* (1967) ("White Americans must recognize that justice for Black people cannot be achieved without radical changes in the structure of our society. The comfortable, entrenched, the privileged cannot continue to prospect of change to the status quo.")

The IFA similarly fails to provide adequate notice of what it prohibits. It relies on broad, nebulous statements of principle that could prohibit a wide array of speech. For example, the IFA prohibits employers from in any was espousing the principle that:

> An individual, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the individual played no part, committed in the past by other members of the same race, color, sex or national origin.

48

§760.10(8)(a)7., Fla. Stat. (2022). A substantial part of this principle hinges entirely on how certain speech makes the listener feel. For some topics—like a bank who trains its employees regarding the effect of red-lining on African-American poverty or a city who trains its officers on the disproportionate use of force against African Americans reflected in police statistics—guilt, anguish, or psychological distress is a natural response.

The logical and intended effect of these broad principles is to chill employers' and teachers' speech when they discuss difficult topics related to race and sex. The state is the ultimate arbiter over whether a given statement violates one of these broad principles. When faced with such ambiguity, most teachers and employers will choose to err on the side of caution and either avoid these topics altogether or espouse ideas with which Florida's conservative politicians agree, rather than risk discipline, loss of funding, or a lawsuit.

A corollary to vagueness is overbreadth. To prevail on an overbreadth claim, Plaintiffs must show the challenged provisions "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep'…." *Hicks v. Virginia*, 539 U.S. 113, 118-19 (2003), quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Courts should try to construe statutes to avoid constitutional problems, however "federal courts are without power to adopt a

narrowing construction unless such a construction is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988).

For the same reasons these provisions fail the *Pickering* balancing test and First Amendment heightened and strict scrutiny, they are also overbroad. *See, supra* §§ IA & IC. They proscribe a broad swath of protected speech by forbidding employers and teachers from endorsing opinions inconsistent with the political orthodoxy these provisions prescribe. Furthermore, unlike other provisions this Court has struck down for overbreadth, the laws at issue here lack any plainly legitimate sweep. *See Dream Defenders v. DeSantis*, Case No. 4:21-cv-191; 2021 WL 4099437 at * (N.D. Fla. Sept. 9, 2021) (noting that overbroad protest statute "to be sure…criminalizes a large amount of protected activity."). Rather, The IFA and Regulation solely target opinions with which Florida's conservative lawmakers disagree. In addition to their many other constitutional infirmities, these provisions are also overbroad.

## II.   <u>Irreparable Harm</u>

Violations of First Amendment freedoms are commonly considered irreparable injury in regard to a preliminary injunction. The United States Supreme Court, in *Elrod v. Burns*, 427 U.S. 347, 373 (1976), held that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury." *See also*, *Walters v. National Assoc. of Radiation Survivors*, 473 U.S. 305 (1985).

## III.   <u>Balance of Harms</u>

The balance of harms favors the Plaintiffs for the reasons discussed under the likelihood of success prong. The legislation at issue serves no legitimate government purpose other than to suppress views disagreeable to Florida's Republican lawmakers. The harm to Plaintiffs in suppression of their First Amendment rights outweighs any harm to the State, as the implementation of these laws not only curbs Plaintiffs' speech, but could subject them to discipline, loss of funding and lawsuits for engaging in protected speech if these laws are enforced.

## IV.   <u>Public Interest</u>

The public interest is always served when constitutional rights are vindicated. *See, e.g., League of Women Voters of Fla. v. Browning¸*863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition."); *A Choice for Women v. Butterworth*, 2000 WL 34402611, at *13 (S.D. Fla. June 2, 2000) ("the public interest is well served when the Court protects the constitutional rights of the public"). As such, the public interest strongly favors the issuance of an injunction.

## V.   <u>Bond</u>

The issuance of a security bond pursuant to Fed.R.Civ.P. 65(c) is not necessary in the instant case, or if necessary, then should be limited to a nominal amount. A security bond is necessary as the court deems proper for the repayment of costs and damages that the enjoined party may suffer if the injunction is improper. *See* Fed.R.Civ.P. 65(c). Despite the clear case law in support of Plaintiffs' Motion for Preliminary Injunction, the Defendant will, at most, suffer nominal damages. An improper injunction will only result in a delay in implementation of a law that addresses no real societal harm. Accordingly, no security bond should be required or should be for a nominal amount only.

## **CONCLUSION**

For the above reasons, Plaintiffs respectfully ask this Court to preliminarily enjoin Defendants from enforcing the Regulation and IFA.

Respectfully submitted,

*/s/ Jesse B. Wilkison*
Elizabeth L. White, Esquire
Florida Bar No.:  314560
Matthew R. Kachergus, Esquire
Florida Bar No.:  503282
Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Jesse B. Wilkison, Esquire
Florida Bar No.:  118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus, DeMaggio &
Wilkison, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone: (904) 356-9661
Facsimile: (904) 356-9667
Email: sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFF