## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DONALD FALLS, JILL HARPER,**
**Dr. ROBERT CASSANELLO, STEPHANIE**
**NICOLE JAMIESON,** as next of friend of **RMJ,**
**Dr. TAMMY L. HODO,**

     **Plaintiffs,**

**vs.**                                                     **Case No.:  4:22-cv-00166**

**RON DESANTIS,** in his official
capacity as Governor of Florida; **RICHARD CORCORAN,**
in his official capacity as Commissioner of the
Florida State Board of Education; **TOM GRADY,**
**BEN GIBSON, MONESIA BROWN, MARVA**
**JOHNSON, RYAN PETTY, JOE YORK,**
in their official capacities as members of the
Florida State Board of Education; **BRIAN LAMB,**
**TIMOTHY M. CERIO, AUBREY EDGE, PATRICIA FROST,**
**EDWARD HADDOCK, H. WAYNE HUIZENGA, JR.,**
**NATASSIA JANVIER, KEN JONES,**
**DARLENE LUCCIO JORDAN, ALAN LEVINE,**
**CHARLES H. LYDECKER, STEVEN M. SCOTT,**
**WILLIAM SELF, ERIC SILAGY, KENT STERMON,**
in their official capacities as members of the Florida Board of
Governors of the State University System; and **ASHLEY MOODY,**
in her official capacity as Florida's Attorney General,

     **Defendants.**

_____

### DECLARATION OF DR. ROBERT CASSANELLO

STATE OF FLORIDA       }
                            } SS.
COUNTY OF ORANGE     }

1

I, Robert Cassanello, do hereby submit this declaration and state the following:

1.      I am over the age of 18 and am a resident of the State of Florida. I have personal knowledge of the facts herein, and if called as a witness, could testify competently thereto.

2.      I am an associate professor of history at the University of Central Florida and have taught there since 2007. I have a PhD in history from Florida State University and have spent my career studying, producing scholarship, and teaching the history of the civil rights movement. A copy of my curriculum vitae is attached hereto as Exhibit A.

3.      I currently teach a class called The Civil Rights Movement. The class focuses on the ways in which social protests undid Jim Crow through the civil rights movement.

4.      In Spring 2023, I am also planning to teach a class called Jim Crow America. This class focuses on examining how America fell into the Jim Crow system.

5.      HB7 restricts my ability to teach these subjects fully and accurately to my students. In each of my classes, I strive to give students a comprehensive view of the history of race and racism in America, including giving them the tools to explore their own interpretations based on research of that history. As part of that

instruction, I encourage my students to think about institutional and structural racism. Specifically, the idea that policies, laws, and court decisions have racial outcomes that their proponents may not consciously intend. I also discuss with them the ways contemporary America can perpetuate a Jim Crow like outcomes despite the repeal of Jim Crow laws.

6.      The legislation assumes a condition of contemporary America that is, at best, debatable. Many historians in my field examine the ways that America has failed to move on from a racial caste system. Additionally, the law specifically prohibits concepts or discussions around the "moral superiority" of one race over another. However absent in HB7 is the prohibition, in specific terms, of the intellectual superiority of one race over another. With this absence the law itself is privileging a white supremacists discourse whether intentional or unintentional.

7.      HB7 purports to allow me to "discuss [] the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." However, this exception reflects a misunderstanding of what historians do and how history is taught. It is impossible to give an "objective" account of history. Studying history is interpreting history, and the central skill that history teaches is how to interpret historical sources into a coherent narrative. Thus, there is no single interpretation or

explanation for the study of history, but instead debates which are based on scholarly research and discourse.

8.    It is impossible to teach history without using some interpretive lens. For example, an "objective" account of the history of the holocaust would require professors to give credence to holocaust denial. However, for obvious reasons, holocaust denial is an interpretive lens that virtually all serious academics reject and is not included in history courses.

9.    An example of a discredited interpretive lens in the area that this law regulates is the concept of the Bell Curve. This sociological theory posited that cognitive ability and intelligence influenced by genetics and environmental factors predict outcomes like financial income, job performance, crime rates, and a person's socio-economic status. The Bell Curve's proponents suggested connections between race and intelligence that purportedly explained socio-economic disparities between various races. Historians and social science generally consider the Bell Curve to be junk science, and socio-economic disparities are determined by a wide range of societal factors outside a person's control than a person's innate intelligence.

10.    HB7 restricts my ability to explain the bell curve's failings to students since it prohibits me from instructing students that "such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex

4

to oppress members of another race, color, national origin or sex." However, the bell curve theory has explicitly used the concept of merit and innate intelligence to justify socioeconomic inequality among various races and ethnicities. Under HB7's regime, it appears that I would be required to give equal credence to discredited theories like the bell curve as accepted historical theories when discussing the concept of socio-economic inequality.

11.    HB7 also restricts the course materials I can offer in my courses. One text I was planning on assigning in my Jim Crow America course is *The New Jim Crow* by Michelle Alexander. This book posits that America's justice system perpetuates a racial caste system through government funded policing, racial profiling and other factors that then disproportionately labels black men as criminals and felons and justifies subjecting them to inhuman treatment. *The New Jim Crow* is a widely discussed text that has been cited in both law review articles and judicial opinions.

12.    The sociological position that the *New Jim Crow* advocates runs afoul of HB7's restriction on endorsing the concept that "a person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." Given the legislation broad and ambiguous language, I could be violating the law by assigning the text because such instruction could be

construed to "espouse, promote, advance, inculcate, or compel" belief in this forbidden concept.

13.     Another text I plan to assign is *The Wages of Whiteness* by David Roediger. This text examines working-class racism in the United States. Part of the text explains how white workers during the labor movement were ideologically opposed to black workers and how the 19th Century labor movement demanded a racially disparate system of employment.

14.     HB7's prohibition on advocating the racial connotations of the concepts of "merit" and "hard work" as well as its prohibition of endorsing the concept that "a person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex" would restrict my ability to offer instruction on this text.

15.     A component on the civil rights movement involves criticisms of how desegregation was implemented or failed to be implemented during the civil rights movement. For example, a text I assign, *Why Busing Failed: Race. Media, and the National Resistance to School Desegregation* by Matthew Delmont discusses how predominantly white antibusing activists, including former Florida Governor Claude Kirk, ultimately succeeded in preventing public school desegregation and helped to create a system that gave precedence to the desires of white parents who opposed desegregation over the civil rights of black students.

16.    Other interpretations of the civil rights movement that I teach discuss ways in which integration harmed the black community. Specifically, the desegregation of public schools resulted in many black educators and administrators taking pay cuts and losing their jobs as schools closed. I co-directed a film called *Marching Forward* with UCF film professor Dr. Lisa Mills and my student Oswmer Louis that covers desegregation in Orlando Public schools. In discussing those topics, part of the film features interviews by black public-school administrators and teachers who were adversely impacted by desegregation.

17.    The purpose of these texts is not to advocate a return to a Jim Crow system of segregation, but to identify some of the failings of desegregation in both accomplishing its stated goal of eliminating racial class barriers and uplifting disadvantaged black communities.

18.    Under HB7's regime, I could be violating the law to offer these texts criticizing the desegregation movement because these criticisms could be perceived as advocating the viewpoint that "members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex."

19.    HB7 also restricts my ability to teach these subjects by putting the power in individual students to interpret the law and determine if a lesson implicates one of the forbidden viewpoints. For example, the prohibition on advocating

viewpoints that "a person, by virtue of his or her race, color, sex, or national origin bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national, origin or sex."

20.    I would not instruct a student, for example, that they bear personal responsibility for a lynching committed in the past. However, I have no control over how students will interpret a particular lesson. Psychological distress, anguish, or a feeling of personal responsibility to correct injustices is often a natural response when students learn the role that events during Jim Crow and the civil rights movement impacted those students' socioeconomic status.

21.    Furthermore, HB7's amendments to Florida's Education Equity Act permits students to interpret the law's vague principles as they wish and bring legal action if they feel my lessons violate those principles. Additionally, in the state budget, republican lawmakers added a provision that stated, "contingent upon HB7 or similar legislation…if any instruction is found to have a substantiated violation…the institution shall be ineligible to receive performance funding during the next fiscal year following the year in which the violation is substantiated." And Republican lawmakers on any standing committee can decide this is the case, whether they are right or wrong. Thus, by teaching these concepts, not only am I

putting myself at risk of civil liability, but also putting the University of Central Florida at risk of losing its performance funding. As such, this legislation forces me to second guess all my instructional materials to determine if they could be construed as violating one of the law's forbidden viewpoints.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on the ___17___ day of ___May___, 2022.