## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DONALD FALLS, JILL HARPER,**
**Dr. ROBERT CASSANELLO, STEPHANIE**
**NICOLE JAMIESON,** as next of friend of **RMJ,**
**Dr. TAMMY L. HODO,**

     **Plaintiffs,**

**vs.**                            **Case No.:  4:22-cv-00166**

**RON DESANTIS,** in his official
capacity as Governor of Florida; **RICHARD CORCORAN,**
in his official capacity as Commissioner of the
Florida State Board of Education; **TOM GRADY,**
**BEN GIBSON, MONESIA BROWN, MARVA**
**JOHNSON, RYAN PETTY, JOE YORK,**
in their official capacities as members of the
Florida State Board of Education; **BRIAN LAMB,**
**TIMOTHY M. CERIO, AUBREY EDGE, PATRICIA FROST,**
**EDWARD HADDOCK, H. WAYNE HUIZENGA, JR.,**
**NATASSIA JANVIER, KEN JONES,**
**DARLENE LUCCIO JORDAN, ALAN LEVINE,**
**CHARLES H. LYDECKER, STEVEN M. SCOTT,**
**WILLIAM SELF, ERIC SILAGY, KENT STERMON,**
in their official capacities as members of the Florida Board of
Governors of the State University System; and **ASHLEY MOODY,**
in her official capacity as Florida's Attorney General,

     **Defendants.**

_____

## DECLARATION OF PROFESSOR DEREK W. BLACK

STATE OF SOUTH CAROLINA}
                           } SS.
COUNTY OF RICHLAND      }

1

1.      I am over the age of 18 and am a resident of the State of South Carolina. I have personal knowledge of the facts herein, and if called as a witness, could testify competently thereto.

2.      I am a professor of law and hold the Ernest F. Hollings Chair in Constitutional Law at the University of South Carolina School of Law.  I teach education law and policy, constitutional law, civil rights, voting rights, and evidence. I have also taught at Howard University School of Law, Howard University School of Education, the University of North Carolina School of Law, and American University Washington College of Law.  I offered lectures at numerous other universities, including Harvard, NYU, Virginia, Fordham, Colorado, Temple, Drexel, Arkansas, and West Virginia.

3.      The focus of my scholarship is education law, policy, and history.  I have published scholarly articles on the constitutional right to education, school desegregation, educational equality, school discipline, teacher tenure, and the federal role in education, almost all of which involve analysis of state and federal education policy.  My scholarly articles have been published in various legal and non-legal journals and books, including the *Yale Law Journal*, *Stanford Law Review, New York University Law Review, California Law Review, Cornell Law Review, Northwestern Law Review, Vanderbilt Law Review, Minnesota Law Review, Notre*

*Dame Law Review, Boston University Law Review*, *William & Mary Law Review*, *Boston College Law Review*, and *North Carolina Law Review*.

4.       I am the author of an education law and policy casebook titled *Education Law: Equality, Fairness and Reform*, which is now in its third edition and taught at numerous leading universities, law schools, and schools of education across the country.  The book identifies each of the major topics in education law and policy and analyzes them from legal, policy, historical, and social science perspectives.  I am also the author of a book on school discipline, *Ending Zero Tolerance: The Crisis of Absolute School Discipline* (NYU Press), and a book on the history of the right to public education in the United States, *Schoolhouse Burning: Public Education and the Assault on American Democracy*.

5.       I am the founder and former director of the Education Rights Center at Howard University School of Law.  The Center studied the causes and extent of educational inequalities in public schools, provided information and resources to parents, and informed national and local education policy.

6.       Prior to teaching, I was the Education Project staff attorney at the Lawyers' Committee for Civil Rights Under Law, where I was responsible for litigation and policy in regard to school desegregation, diversity, school finance equity, student discipline, and special education.

7.     I attended law school at the University of North Carolina at Chapel Hill, where I was a member of the Law Review and graduated with High Honors.  I received my undergraduate degree from the University of Tennessee, Knoxville, summa cum laude, with majors in African and African American Studies, Philosophy, and Political Science.

8.     Also of relevance to this declaration is my teaching, scholarship, and education in the areas of anti-discrimination and race.  While I do not teach critical race theory and have not characterized my scholarship as critical race theory, the topic does arise in my teaching and scholarship.  My civil rights course covers the major federal civil rights statutes.  I teach the black letter law and rules in the course, but I also teach students to identify and assess civil rights laws' goals, premises, and efficacy.  As part of that analysis, students learn the distinction between formal equal opportunity, substantive equal opportunity, and rights-based concepts of equality. The course also exposes them to the major critiques of civil rights law, particularly those offered by critical legal studies and critical race theory.  I share excerpts from RICHARD DELGADO & JEAN STEFANCIC, CRITICAL RACE THEORY: AN INTRODUCTION (2012), which summarizes and contrasts many of these concepts.  In addition, because my scholarship regularly addresses racial inequality in public education, I am well versed in Critical Race Theory's critiques of racial inequality in education.

9.    Finally, I have offered expert testimony or written submissions on four prior occasions, offering expert analysis on education policy twice in federal court, education policy analysis once in state court, and education history once in state court.

## Sources Consulted

10.    In preparing this current declaration, I reviewed plaintiffs' legal pleadings and exhibits, the legislation to which they refer, examples of Florida's general curriculum and content standards, the Florida Department of Education's 2021-2022 Mathematics Instructional Materials Reviews, BROOKS, CARRASCO, & SELMI, THE LAW OF DISCRIMINATION: CASES AND PERSPECTIVES (2011), KIMBERLE CRENSHAW ET AL, CRITICAL RACE THEORY: THE KEY WRITINGS THAT FORMED THE MOVEMENT (1995), and RICHARD DELGADO & JEAN STEFANCIC, CRITICAL RACE THEORY: AN INTRODUCTION (2012).

## Findings

**I. The IFA Prohibits Educational Content, Rather than Specifying Content Goals, Which Poses Compliance Challenges**.

11.    State and federal education content standards typically set broad goals and general content requirements that provide education agencies a multitude of possibilities for compliance.  While the specificity of these goals, standards, and requirements varies, this method of policymaking enhances the ability of districts,

teachers, publishers, and students to conform their activities to the statutory and regulatory regimes. Even relatively narrowly defined-content standards—if stated as goals or standards rather than prohibitions—can leave districts, educators, and publishers wide and diverse means and materials through which to meet the standards. Equally important, education actors who offer supplemental materials and methods that address content beyond the required content do not risk violating education standards under this approach.

12.     Florida's Individual Freedom Act (IFA) and regulatory prohibition on teaching concepts like critical race theory take an inverse approach. Rather than specifying general content goals or standards and allowing educators latitude in pursing and reaching them, the IFA aims to exclude material and concepts from the state curriculum. While excluding an extremely narrow, well-defined, and precise material from the curriculum might not create compliance problems, excluding a broad, ill-defined, or indefinite amount of material creates enormous compliance concerns. An educator could consistently risk or fear inadvertent non-compliance. As the following sections indicate, the IFA includes several nebulous, ambiguous, and indefinite terms and uses them in ways that are confusing, self-contradictory, or invite government actors to impose their own varying understandings of the IFA's requirements.

## II.     The IFA Includes Vague and Indefinite Educational Content Prohibitions.

13.     The IFA's and regulatory prohibition on teaching concepts like critical race theory incorporate several nebulous, ambiguous, and indefinite terms and concepts.   Many of these terms and concepts fall under or relate to Florida's prohibition on "the teaching of Critical Race Theory" (hereinafter CRT).   CRT has no inherent meaning or scope, and the IFA's summary explanation of CRT offers relatively little guidance or certainty regarding the exact content that is to be excluded.

14.     First, CRT is not a specific content area or a well-defined list of principles upon which scholars agree. In response to the question of "what is critical race theory," Richard Delgado describes it as a "movement" and "collection of activists and scholars interested in studying and transforming the relationship among race, racism, and power." RICHARD DELGADO & JEAN STEFANCIC, CRITICAL RACE THEORY: AN INTRODUCTION 3 (2012).   He indicates that critical race theorists consider "many of the same issues that conventional civil rights and ethnic studies discourses take up, but plac[e] them in a broader perspective" and "question[] the foundations of the liberal order." *Id*.   He also notes that critical race theorists "splintered" during the decade preceding his book. *Id*.   He also admits that not every critical race theorists would "subscribe to every tenet set out in this book," even if "many" might subscribe to a short list of propositions. *Id*.at 7

7

15.     Derrick Bell's "Interest Convergence Theory,[1] his claims regarding the "permanence of racism,"[2] and the responses to these ideas are good examples of wide-ranging views and principles related to CRT.  His first article on interest convergence appears as the second article in the book CRITICAL RACE THEORY: THE KEY WRITINGS THAT FORMED THE MOVEMENT (1995).  One of his articles related to the permanence of racism also appears later in that book.  While several scholars have expanded on those theories, several others, who are sympathetic to CRT if not adherents, have criticized those theories or noted their flaws.  Disagreements of this sort raise the obvious question of whether a scholarly paper focused on goals similar to those of Bell's but which rejects the interest convergence theory or the permanence of racism are CRT articles.

16.     Second, critical race theory is more easily understood as a methodology or scholarly movement than content.  While there are a core set of law review articles and books written by scholars who refer to themselves as critical race theorists, *see* DELGADO, *supra*; KRENSHAW, *supra*, those articles and books are bound not necessarily by a core set of doctrines but rather an interest in applying a critical lens

---

[1] Interest Convergence Theory posits black people achieve civil rights victories only when their interests converge with white people.

[2] The permanence of racism theory posits "civil rights gains will be temporary and setbacks inevitable" and that black people's subordinate status in America is permanent.  DERRICK BELL, FACES AT THE BOTTOM OF THE WELL. THE PERMANENCE OF RACISM (1992).

to the way the law operates in regard to race and inequality. *See* DELGADO, *supra*
note, at 3. In other words, scholars may employ a similar methodology or critical
lens and have similar interests under the label of CRT but their individual findings,
critiques, and theories are not uniform or always consistent.

17.    Third, for the foregoing reasons, who and what counts as critical race
theory or theorists is primarily a matter of self-identification and participation in a
scholarly community rather than an objective or predefined rubric. Thus, including
or excluding any particular scholar or paper—other than by self-definition or
inclusion in a seminal text—is fraught with uncertainty.

18.    In short, a prohibition on CRT could mean one of several different
things: a prohibition on the  analytical conclusions by those who identify as critical
race theorists; a prohibition on certain papers and theories that appear in seminal
texts on CRT; a prohibition on the critical methodology that scholars studying race
and the law have employed; a prohibition on all writings by scholars whose work
has appeared in a seminal CRT text; a prohibition on scholarly work that that relies
upon one of the foregoing CRT or CRT related writings; a prohibition on a writing
that appears to accept or confirm any of the premises of one of the foregoing CRT
writings; or one of any number of additional variations. Save a definition that only
applies to authors who self-identify with CRT, the remaining definitions in this non-

exclusive list are riddled with the uncertainty of what conclusions or authors count as CRT.

19.     Florida's Administrative Regulations attempt to clarify its use of CRT by indicating that it is a theory that "racism is not merely the product of prejudice, but that racism is embedded in American society and its legal systems in order to uphold the supremacy of white persons."  This explanation, unfortunately, does not resolve the indeterminacy of CRT's meaning.  The first part of sentence implies that racism is solely the product of prejudice, but the accuracy of that statement depends on what the statute means by racism and prejudice.  Prejudice could mean current and/or past prejudice, individual and/or collective prejudice, or conscious and/or subconscious prejudice.

20.     The second part of the sentence also creates an internal uncertainty by using the phrase "to uphold the supremacy of white persons."  That phrase communicates a goal and potentially intentionality into the sentence.  This leaves open the possibility that the IFA does not bar the belief that racism is embedded in society and law so long as the proponent accepts that the racism is not a function of a continuing intent to maintain white supremacy.  This distinction, moreover, is a real one given that some critical race theorists would argue that racism remains embedded in the legal system even when no intent to perpetuate that racism exists. *See, e.g.*, Alan David Freeman, *Legitimizing Racial Discrimination Through*

*Antidiscrimination Law: A Critical Review of Supreme Court Doctrine,* 62 MINNESOTA LAW REVIEW 1049 (1978).

21.     Fourth, the IFA could be understood to prohibit discussion of topics that overlap with independent social science fundings that are unrelated to CRT. For example, the IFA prohibits promoting a position that a person can be "inherently, racist, sexist, or oppressive, whether consciously or unconsciously, solely by virtue of his or her race or sex." Charles R. Lawrence III, in his article, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism*, 39 STANFORD LAW REVIEW 317 (1987), critiques antidiscrimination law's intentional discrimination standard and the notion that conscious racial motivations are a predicate to legal liability. Lawrence posits that sub-conscious racial bias, in the modern context, has a larger impact on policy decisions than conscious ones.  That article was included in CRITICAL RACE THEORY: THE KEY WRITINGS THAT FORMED THE MOVEMENT (1995).

22.     Extensive social science evidence, however, demonstrates that, as a matter of fact, subconscious racial bias does exist and is quite common in many aspects of life.  While reasonable debates occur regarding the extent to which subconscious bias outwardly manifests itself or affects a particular behavior or policy, the fact that bias itself exists is well established. *See, e.g.*, Linda Hamilton Krieger, *The Content of Our Categories: A Cognitive Bias Approach to*

*Discrimination and Equal Employment Opportunity*, 47 STANFORD LAW REVIEW 1161, 1186-99 (1995); J.T. Jost et al, *The Existence of Implicit Bias is Beyond Reasonable Doubt: A Refutation of Ideological and Methodological Objections and Executive Summary of Ten Studies that No Manager Should Ignore*, 29 RESEARCH IN ORGANIZATIONAL BEHAVIOR 39 (2009). The finding is not radical but rather a function of the basic way in which our subconscious mental processes naturally organize and filter information. Kreiger, *supra*.

23. While scholars, practitioners, and policymakers have relied upon this scientific knowledge for decades, many would not consider themselves critical race theorists or purveyors of indoctrination. The IFA's broad proscriptions, if applied to them, would have enormous sweep given that Lawrence's law review article is one of the ten most cited in history (likely due to its overlap with scientifically verifiable facts rather than mere theory). *See* Fred R. Shapiro & Michelle Pearse, T*he Most-Cited Law Review Articles of All Time*, 110 MICHIGAN LAW REVIEW 1483 (2012).

24. The foregoing also raises the question of what the IFA means by "racism." Suffices to say that the term is subject to debate and differing definitions as well. Using the term without a clear meaning adds to the ambiguity of the IFA's prohibition. The problem is evident in other areas of the IFA that contrast racism with other terms. For instance, the IFA amended the Florida Educational Equity

Act's definition of discrimination to include "instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe. . . Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin." §1000.05(4)(a), Fla. Stat. (2022).

25.    Merit, fairness, neutrality, and objectivity, however, all depend on context and values for specific definition. Academic merit, for instance, can incorporate a number of factors, including subjective factors such as a teachers' assessments of student effort and progress.  Merit can also mean grade point averages or standardized tests.  These factors, however, can and do conflict with one another regarding individual students, as a student may be strong on one factor but not the others.  A school could select or not select any one of those factors—or a different one—as the main criteria for judging merit.  That selection will typically have a differential demographic effect and a school's awareness of that impact may influence the decision of to how to measure merit.  The point here is not that one definition is appropriate or inappropriate, but the definition is indeterminate and potentially influenced by considerations of race and gender.  It is unclear, however, which definition the IFA intends or whether it would prohibit exploration of this indeterminacy in the context of a math assignment, for instance.

26.     Similar uncertainty arises in regard to fairness and neutrality.   For instance, fairness, in the context of education, can mean providing the accommodations and supports necessary to allow all students to achieve a basic level of education or it could mean providing all students the exact same resources. *See, e.g.*, Julie K. Underwood, *School Finance Adequacy as Vertical Equity*, 28 U. MICHIGAN JOURNAL OF LAW REFORM 493 (1995).

## III.    Florida's Instructional Standards as Modified by the IFA and Administrative Regulations Include Internal Contradictions and Tensions

27.     Florida's administrative regulations create compliance challenges and uncertainties through internal contradictions.  For instance, the IFA indicates that "instruction may not utilize material from the 1619 Project and may not define American history as something other than the creation of a new nation based largely on universal principles stated in the Declaration of Independence."   While the prohibition on using "material from the 1619 Project" clearly identifies the scope of what it prohibits, the second part of the sentence creates contradictions or ambiguity. One reading is that the Act prohibits any substantial focus on caveats to universal founding principles, but the very next sentence requires instruction on the "the U.S. Constitution, the Bill of Rights and subsequent amendments."

28.     The U.S. Constitution created exceptions to the universal principle that "all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." Most obviously, the 1787 Constitution did not extend these rights to African Americans and formally protected slaveholders and their rights over those of enslaved African Americans.  *See* U.S. CONSTITUTION, Article 1, Section 1; *Id*. at Article 4, Section 2, Clause 3.  Furthermore, white voters in slave holding states received proportionally more representation in Congress than white voters in free states. *Id*. at Article 1, Section 2, Clause 3.  Failing to teach these uncontested facts would raise one set of content standard concerns while emphasizing these facts might raise concerns regarding the IFA's requirement to teach the nation was "largely" founded on "universal principles."

29.     In at least two instances, Florida's administrative regulations either oversimplify or fail to clarify a prohibition that exists within a complex content area. First, the principles upon which the nation was founded are complex and contradicted, as noted above.  The amendment process confirms the complexity, even if it has not fully resolved it.  The Act, to some extent, acknowledges that complexity by requiring that students be taught that the nation was "largely" founded on universal principles.  But "largely" implies that the complexity can be simplified such that universal principles are the predominate explanation.  To the extent that

15

simplification is not obvious, however, the means by which one could comply with the law is uncertain, particularly as it pertains to coverage and emphasis choices that exist along a spectrum. That same quandary exists regarding the prohibition against teachers "suppress[ing] or distort[ing] significant historical events." Rule 6A-1.094124, FAC (2021). Suppression exists along a spectrum, ranging from spending less than the optimal amount of time on an event to spending no time on it at all. What level crosses the threshold is uncertain.

30.     Similar tension arises regarding the IFA's statement that "instructional personnel may facilitate discussions and use curricula to address, in an age-appropriate manner, the topics of sexism, slavery, racial oppression, racial segregation, and racial discrimination, including topics relating to the enactment and enforcement of laws resulting in sexism, racial oppression, racial segregation, and racial discrimination, including how recognition of these freedoms have overturned these unjust laws. However, classroom may not be used to indoctrinate or persuade students to a particular point of view inconsistent with the principles of this subsection or state academic standards."

31.     The problem is the same as the one raised above. This paragraph instructs teachers to instruct students on racism and sexism and how those forms of discrimination have required constitutional amendments and laws, but they cannot teach those facts in a way that is inconsistent with the notion that the nation at its

16

founding was based primarily on universal principles.  Given the direct tension of these two notions, compliance is nearly impossible.

### IV.    The IFA's Prohibitions Invite Arbitrary, Discriminatory, and Inconsistent Enforcement

32.    The danger of the foregoing problems is confirmed in Florida's recent math book adoption process.  The reviewers in that process understood and applied CRT in a variety of different ways in their evaluations.  The Department of Education released those reviews on its website at https://www.fldoe.org/academics/standards/instructional-materials/.    All the remaining citations in this section of the declaration are to the sub-links on that webpage, which divides the reviews by the textbook bid numbers:

> Reviews                for                Bids                298-320:
> https://www.fldoe.org/core/fileparse.php/5574/urlt/Bids-298-320.pdf
> Reviews                for                Bids                320-348:
> https://www.fldoe.org/core/fileparse.php/5574/urlt/Bids-320-348.pdf
> Reviews                for                Bids                348-390:
> https://www.fldoe.org/core/fileparse.php/5574/urlt/Bids-348-390.pdf
> Reviews                for                Bids                390-420:
> https://www.fldoe.org/core/fileparse.php/5574/urlt/Bids-390-420.pdf
> Reviews                for                Bids                421-459:
> https://www.fldoe.org/core/fileparse.php/5574/urlt/Bids-421-459.pdf
> Reviews                for                Bids                462-475:
> https://www.fldoe.org/core/fileparse.php/5574/urlt/Bids-462-475.pdf

33.    I reviewed those documents with a particular focus on reviewers' response to questions regarding whether the textbooks incorporated CRT.  The

Department's rubric asks one general question regarding whether the materials include CRT.  It also asks two more detailed questions regarding whether the materials include Social Emotional Learning or Social Justice concepts as they pertain to CRT.

34.    The answers to these questions reveal a wide range of understandings among reviewers regarding what the state's rules prohibit and what CRT is. Some reviewers appeared to have given CRT the narrowest possible meaning.  Statements such as "no mention" or "evidence" of CRT, which was a common response, is consistent with the notion that these reviewers were looking for the explicit words "critical race theory" and did not find them. *See, e.g.,* Reviews for Review for Bid 348-390, page 208; Review for Bid 348-390, page 796; Review for Bid 390-420, page 473.

35.    Other statements indicate reviewers may have equated CRT with the author's discriminatory statements, racial bias, or racial negativity. *See, e.g.*, Review for Bid 342, page 899 (The scenarios and questions do not favor nor discriminate against any one group"); Review for Bid 391, page 58 ("Very Good Alignment no evidence of racial negativity"); Review for Bid 421, page 610 ("no bias noted"); Review for Bid 421, page 696 ("Negative Free").  Others took a potentially broader view of CRT, equating it with the mere discussion of racial inequality, discrimination, or bias. Review for Bid 395, page 217 (noting that the discussion of

"race and college plans," "racial profiling in policing," and "discrimination in magnet school admissions. . . may violate the rule's prohibitions about racism being embedded in society and legal systems"); *see also* Review for Bid 404, page 675 (indicating that raising questions about "racial bias" and "gender imbalances on campus" indicates an inappropriate emphasis on racism being embedded in society).

36.    Another reviewer took factual assertions regarding race to be evidence of CRT.   For instance, the reviewer wrote that a bar graph "measuring racial prejudice by age" and a lesson that said the "The United States has eradicated neither poverty nor racism" was CRT.  Review for Bid 401, page 485. If the underlying facts in those problems are inaccurate, the reviewer could fairly contest them as potentially motivated by a particular world view or bias (which the IFA would appear to separately address), but if the underlying facts in the book are accurate, classifying the facts as evidence of CRT would amount to a very broad definition of CRT.  A later comment by the reviewer criticizes the foregoing prejudice problem as lacking "a source." *Id* at 488.  Such a criticism is fair as a general matter if this critique was applied to all materials lacking a source.  Otherwise, it may reflect a bias against problems that conflict with the reviewer's own world views.

37.    Some reviewers appeared to associate CRT with content that was unrelated to race but which was of uncertain accuracy.  *See, e.g.,* Review for Bid 391, page 41 (in response to a rubric question regarding CRT, the reviewer wrote

19

"Talks about water consumption between two different countries but does not provide a source to verify accuracy of the statistics."). Another review found an absence of CRT because the book made "[c]onsistent connections to real world applications . . ., activities are often designed for Rigor and Relevance framework and opportunities for work provided." Review for Bid 421, page 57.

38. Other reviews clearly sought to distinguish the general concepts of social justice, social emotional learning, and culturally responsive teaching from critical race theory, while others may have conflated those distinct concepts with CRT. *Compare* Review for Bid 320-348, page 485 ("culturally responsive teaching is mentioned but not related to critical race theory"); Review for Bid 348-390, page 147 ("The instructional materials omitted Culturally Responsive Teaching as it relates to CRT"); Review for Bid 348-390, page 337 (same); Review for Bid 348-390, page 796 (same) *with* Review for Bid 340-48, page 485 ("no evidence of social justice concepts," which potentially implies a conflation of CRT and social justice); Review for Bid 348-390, page 574 (same); Review for Bid 391, page 58 (same type of comment regarding culturally responsive teaching).

39. Some reviews implicitly acknowledge the ambiguity of CRT or its potential overlap with other distinct concepts and proceed to draw their own implicit personal distinctions. *See, e.g.*, Review for Bid 348-390, page 625 ("While being culturally sensitive with names and illustrations, CRT is not taught"); Review for

20

Bid 418, page 1254 (finding no CRT but noting "First example with a black student pic is basketball. Most pictures are of white people, unless sports-related."). In fact, one review noted the absence of CRT, but noted that the text should have been more culturally representative. Review for Bid 421, page 21.

40.    One review also demonstrates the problem of standards that attempt to simplify (with subjective or indeterminate language) extremely complex historical matters. Applying the "universal principles" regarding the nation's founding, one reviewer criticized the book's statement that "the framers of the Constitution believed that the opinion of the majority sometimes had to be tempered by the wisdom of elected representatives" for its failure to give a "counter argument" or "mention . . . the Federalist Papers." Review for Bid 401, page 488. Given the complexity of history and the limited space in which a math textbook could address it, any mention of history is potentially fraught with peril and this reviewer counts it as error by the book.

## Conclusion

41.    The IFA and Florida's administrative regulations' decision to prohibit educational content, rather than compel content, creates a general compliance challenge regardless of the terms it might have used. Its inclusion of numerous ambiguous and indefinite terms exacerbates the challenge and makes compliance uncertain. The result of prohibitions with ambiguous, contradictory, and indefinite

21

terms was that reviewers applied varying different standards to texts and potentially interjected their own meanings into the review process.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on the _18th_ day of _May_, 2022.

# EXHIBIT
# A & B

# DEREK W. BLACK
1525 SENATE ST., COLUMBIA, SC 29208
blackdw@law.sc.edu; (803) 777-9652

## EDUCATION

UNIVERSITY OF NORTH CAROLINA SCHOOL OF LAW,  J.D., May 2002
*High Honors*; *Order of the Coif;* NORTH CAROLINA LAW REVIEW, *staff and senior staff*

UNIVERSITY OF TENNESSEE, B.A., May 1999
*Summa Cum Laude; Majors*: African American Studies, Philosophy, and Political Science

## TEACHING EXPERIENCE

UNIVERSITY OF SOUTH CAROLINA SCHOOL OF LAW, Columbia, SC
*Professor of Law*, June 2012 – present
*Ernest F. Hollings Chair in Constitutional Law,* July 2019 – present
*Director*, Constitutional Law Center, July 2020 – present

HOWARD UNIVERSITY SCHOOL OF LAW, Washington, DC
*Assistant and Associate Professor of Law*, August 2005 – June 2012
*Director and Founder,* Education Rights Center, October 2008 – June 2012

UNIVERSITY OF NORTH CAROLINA SCHOOL OF LAW, Chapel Hill, NC
*Visiting Associate Professor of Law*, August 2010 – July 2011
*Advisor, UNC Center for Civil Rights*, August 2010 – July 2011

## PUBLICATIONS

### BOOKS

SCHOOLHOUSE BURNING: PUBLIC EDUCATION AND THE ASSAULT ON AMERICAN DEMOCRACY (Public Affairs/Hachette 2020) (reviewed and excerpted in NY REVIEW OF BOOKS, and TIME, FORBES).

EDUCATION LAW: EQUALITY, FAIRNESS, AND REFORM (3rd ed. 2021; 2nd ed. 2017; 1st ed. 2013).

ENDING ZERO TOLERANCE: THE CRISIS OF ABSOLUTE SCHOOL DISCIPLINE (NYU Press 2016).

### FULL LENGTH ARTICLES, ESSAYS AND REVIEWS

*Localism, Pretext, and the Color of School Dollars,* MINNESOTA LAW REVIEW (forthcoming).

*Religion, Discrimination, and the Future of Public Education,* UC-IRVINE LAW REVIEW (forthcoming).

*Analysis of Carson v. Makin* (title to be determined), YALE LAW JOURNAL FORUM (forthcoming)

*Freedom, Democracy, and the Right to Education,* 116 NORTHWESTERN UNIVERSITY LAW REVIEW 1031 (2022).

*Educational Gerrymandering: Money, Motives, and Constitutional Rights,* 94 N.Y.U. LAW REVIEW 1385 (2019).

*The Right to Education, Equal Opportunity, and the Schoolhouse Gate,* 128 YALE LAW JOURNAL 2302 (2019) (review essay with Michelle Adams).

*The Fundamental Right to Education,* 94 NOTRE DAME LAW REVIEW 1059 (2019).

*Preferencing Educational Choice: The Constitutional Limits,* 102 CORNELL LAW REVIEW 1359 (2018).

*The Constitutional Compromise to Guarantee Education,* 70 STANFORD LAW REVIEW 735 (2018).

*Abandoning the Federal Role in Education,* 105 CALIFORNIA LAW REVIEW 1309 (2017).

*Averting Educational Crises*, 94 WASHINGTON UNIVERSITY LAW REVIEW 423 (2017).

*Reforming School Discipline,* 111 NORTHWESTERN UNIVERSITY LAW REVIEW 1 (2016).

*Taking Teacher Quality Seriously*, 57 WILLIAM & MARY LAW REVIEW 1597 (2016).

*The Constitutional Challenge to Teacher Tenure,* 104 CALIFORNIA LAW REVIEW 75 (2016).

*Federalizing Education by Waiver?,* 68 VANDERBILT LAW REVIEW 607 (2015).

*The Constitutional Limit of Zero Tolerance in Schools,* 99 MINNESOTA LAW REVIEW 823 (2015).

*Charter Schools, Vouchers, and the Public Good,* 48 WAKE FOREST LAW REVIEW 445 (2013).

*Middle Income Peers as Educational Resources and the Constitutional Right to Equal Access*, 53 BOSTON COLLEGE LAW REVIEW 373 (2012).

*Education's Elusive Future, Storied Past, and the Fundamental Inequity in Between*, 46 GEORGIA LAW REVIEW 557 (2012).

*Civil Rights, Charter Schools, and Lessons to Be Learned,* 64 FLORIDA LAW REVIEW 1723 (2012).

*How the Elementary and Secondary Education Act Undermines Equal Protection and Congress's Duty to Remedy It,* 90 BOSTON UNIVERSITY LAW REVIEW 313 (2010).

*Unlocking the Power of State Constitutions with Equal Protection: The First Step Toward Education as a Federally Protected Right,* 51 WILLIAM & MARY LAW REVIEW 1343 (2010).

*Cultural Norms and Race Discrimination Standards: A Case Study in How the Two Diverge*, 43

CONNECTICUT LAW REVIEW 503 (2010).

*In Defense of Voluntary Desegregation: All Things Are Not Equal*, 44 WAKE FOREST LAW REVIEW 107 (2009).

*Turning Stones of Hope into Boulders of Resistance: The First and Last Task of Social Justice Curriculum, Scholarship, and Practice*, 86 NORTH CAROLINA LAW REVIEW 673 (2008).

*The Mysteriously Reappearing Cause of Action: The Court's Expanding Concept of Intentional Discrimination in Gender and Race Discrimination Statutes,* 67 MARYLAND LAW REVIEW 358 (2008).

*A Framework for the Next Civil Rights Act: What Tort Concepts Reveal about Goals, Results, and Standards,* 60 RUTGERS LAW REVIEW 259 (2008).

*The Uncertain Future of School Desegregation and the Importance of Good Will, Good Sense, and a Misguided Decision,* 57 CATHOLIC LAW REVIEW 947 (2008).

*The Contradiction Between Equal Protection's Meaning and Its Legal Substance: How Deliberate Indifference Can Cure It*, 15 WILLIAM & MARY BILL OF RIGHTS JOURNAL 533 (2006).

*The Power of Small Schools: Achieving Equal Educational Opportunity Through Academic Success and Democratic Citizenship*, 82 NEBRASKA LAW REVIEW 50 (2003) (Gregory Malhoit, co-author).

*Picking Up the Pieces After Alexander v. Sandoval? Resurrecting a Private Cause of Action for Disparate Impact*, 81 NORTH CAROLINA LAW REVIEW 356 (2002).

*The Case for the New Compelling Government Interest: Improving Educational Outcomes*, 80 NORTH CAROLINA LAW REVIEW 923 (2001) (cited by the *en banc* panel of the 9th Circuit in *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 426 F.3d 1162, 1175 (9th Cir. 2005) and also three briefs filed in the appeal before the Supreme Court).

## BLOGS

Co-Founder, Co-Editor & Author, EDUCATION LAW PROF BLOG, http://lawprofessors.typepad.com/education_law/.

Guest Blogger, THE FACULTY LOUNGE, thefacultylounge.org.

## SHORTER WORKS: CHAPTERS, ESSAYS, REVIEWS, AND POLICY BRIEFS

*"The American Right to Education: The Northwest Ordinance, Reconstruction, and the Current Challenge,"* 30 POVERTY & RACE RESEARCH ACTION COUNCIL 5 (Jan. 2021).

*NEPC Review: Religious Charter Schools: Legally Permissible? Constitutionally Required?,* NATIONAL EDUCATION POLICY CENTER (Feb. 2021).

*Old Ideas, Not New Ones, Are the Key to Education — and Democracy,* 102 PHI DELTA KAPPAN (Jan. 2021).

*Closing Achievement Gaps Through Socio-Economic Integration* in OXFORD'S HANDBOOK OF U.S. EDUCATION LAW (Kristi Bowman, ed., 2019).

*Implying a Fundamental Right to Education* in A FEDERAL RIGHT TO EDUCATION (Kimberly Robinson, ed., NYU Press 2019)

*Leveraging Federal Funding for Equity and Integration* in EXPLORING NEW PATHS TO EQUAL EDUCATIONAL OPPORTUNITY (Charles Ogletree & Kimberly Robinson eds., HARVARD UNIVERSITY EDUCATION PRESS 2015).

*Defining Discrimination: Intent, Impact, and the Future of Title VI of the Civil Rights Act of 1964* in THE PURSUIT OF RACIAL AND ETHNIC EQUALITY IN AMERICAN PUBLIC SCHOOLS: *MENDEZ, BROWN,* AND BEYOND (Kristi Bowman ed., MICHIGAN STATE UNIVERSITY PRESS 2014).

*Reflecting on the 50th Anniversary of the Civil Rights Act of 1964*, 23 POVERTY & RACE RESEARCH ACTION COUNCIL 5 (July 2014).

Fisher v. Texas *and the Irrelevance of Function in Race Cases,* 57 HOWARD LAW JOURNAL 701 (symposium 2014).

*In Defense of Voluntary Desegregation: All Things Are Not Equal* in CHARLES H. HOUSTON: AN INTERDISCIPLINARY STUDY OF CIVIL RIGHTS LEADERSHIP (James L. Conyers, Jr., ed. 2012).

*Middle-Income Peers as Educational Resources and the Constitutional Right to Equal Access*, 21 POVERTY & RACE RESEARCH ACTION COUNCIL 3 (2012).

*Parents Involved in Community Schools v. Seattle School District No. 1*, ENCYCLOPEDIA OF DIVERSITY IN EDUCATION (James A. Banks, eds., 2012).

Book Review, *Martha Chamallas & Jennifer B. Wriggins, The Measure of Injury: Race, Gender, and Tort Law*, 39 JOURNAL OF PSYCHIATRY AND LAW 517 (2011).

*Voluntary Desegregation, Resegregation, and the Hope for Equal Educational Opportunity*, 98 HUMAN RIGHTS 2 (2011).

*Accounting for Historical Forces in the Effort to Align Law with Science,* 54 SAINT LOUIS UNIVERSITY LAW JOURNAL 1511 (2010) (Childress Lecture Symposium).

*Ensuring Equity, Deconcentrating Poverty, and Meeting Student Needs Through the Elementary and Secondary Education Act*, Policy Brief, EDUCATION RIGHTS CENTER (Feb. 2010).

*Leave No Child Out: An Introduction to Homelessness, Joblessness, and Bullying in America's Schools,* 51 HOWARD LAW JOURNAL 765 (2008) (symposium introduction).

*Beyond* Brown*: Its Impact upon American Education and Culture*, NATIONAL BAR ASSOCIATION

MAGAZINE (March 2004).

## SELECTED POPULAR MEDIA PUBLICATIONS

*Legacy of Jim Crow Still Affects Funding for Public Schools,* THE CONVERSATION (April 15, 2022).

*Could Public Money Finance Private-School Discrimination, Religion and Fake History?,* USA TODAY, April 12, 2021 (with Rebecca Holcombe).

*The Logjam That Awaits Biden's Education Secretary,* CNN, Dec. 14, 2020.

*Public Schools Are the Starting Point for Bridging Our Divides,* THE HILL, Dec. 24, 2020.

*The Future of Public Education Will Be Decided in the 2020 Election,* THE INQUIRER, Oct. 21, 2020 (with Jack Schneider & Jennifer Berkshire).

*"Originalism" Isn't What You Think It Is,* CNN, Oct. 21, 2020.

*America's Founders Recognized the Need for Public Education. Democracy Requires Maintaining That Commitment,* TIME, September 22, 2020.

*Betsy DeVos' Sneak Attack: How the U.S. Secretary of Education Has Diverted COVID Relief Funding to Private Schools,* NY DAILY NEWS, August 30, 2020.

*Betsy DeVos Just Crossed Another Line,* USA TODAY, July 22, 2020 (with David Sciarra).

*Supreme Court School Voucher Ruling Threatens American Unity and Public Education,* USA TODAY, July 3, 2020.

*Federal Court Delivers Holy Grail of Education Advocacy,* WASHINGTON POST, April 29, 2020.

*Many Public Schools Never Recovered from the Great Recession,* WASHINGTON POST, April 2, 2020.

*Trump's "Education Freedom" Plan is an Attack on Public Schools,* USA TODAY, February 14, 2020.

*Teacher Pay Hikes Alone Can't Fix Education,* USA TODAY, April 5, 2019.

*Congressional Oversight Is at the Heart of America's Democracy,* THE CONVERSATION, April 4, 2019 (republished by INTERNATIONAL BUSINESS TIMES).

*Ensuring Racial Equity—from Classrooms to Workplaces—Depends on Federal Regulations Trump Could Roll Back,* THE CONVERSATION, March 6, 2019 (republished by BUSINESS INSIDER, SALON).

*Charter Schools Exploit Lucrative Loophole That Would Be Easy to Close,* THE CONVERSATION,

Feb. 19, 2019 (republished by INTERNATIONAL BUSINESS TIMES, SALON, TRUTHOUT).

*Fight for Federal Right to Education Takes a New Turn,* THE CONVERSATION, Dec. 7, 2018 (republished by THE RAW STORY, ALTERNET, GOOD MEN PROJECT).

*New Mexico Case Should Serve as Wake-up Call on School Funding,* THE CONVERSATION, July 25, 2018 (republished by UNIVISION).

*Don't Divert Taxpayer Money to Vouchers,* USA TODAY, August 16, 2018.

*On Racial Diversity, Schools Should Heed Obama and Courts, Ignore Trump Scare Tactic,* USA TODAY, July 6, 2018.

*We Shouldn't Call Teacher Salary Hikes "Raises,"* EDUCATION WEEK, May 4, 2018.

*Don't Cheer Too Loudly at Massachusetts' Charter-School Ruling*, SLATE, May 1, 2018.

*The Arizona Teacher Walkouts Are Just a Skirmish in the Larger War on Public Education,* L.A. TIMES, April 26, 20018.

*States Are Favoring School Choice at a Steep Cost to Public Education,* THE CONVERSATION, April 24, 2018 (republished by HUFFINGTON POST, SALON, NEWS AND OBSERVER).

*Zero Tolerance Discipline Policies Won't Fix School Shootings,* THE CONVERSATION, March 15, 2018 (republished by UPI, GOOD MAGAZINE, SALON).

*The Constitutional Right to Education Is Long Overdue,* THE CONVERSATION, Dec. 4, 2017 (republished by L.A. TIMES, CHICAGO TRIBUNE, SALON, TIME).

*Why Schools Still Can't Put Segregation Behind Them,* THE CONVERSATION, June 6, 2017 (republished by NEWSWEEK, INTERNATIONAL BUSINESS TIMES, BUSINESS INSIDER).
*Trump Budget Would Abandon Public Education for Private Choice*, THE CONVERSATION, May 23, 2017 (republished by SALON, HUFFINGTON POST).

*"Moonlight" Schooled Hollywood on Race. Can It Take on School Discipline, Too?,* THE CONVERSATION, May 9, 2017 (republished by HUFFINGTON POST).

*Why Integration Matters in Schools*, EDUCATION WEEK, May 14, 2014.

## SIGNIFICANT APPELLATE BRIEFS

Amicus Brief of Education and Constitutional Law Schools, *Carson v. Makin*, U.S. Supreme Court (2021)

Amicus Brief of First Amendment and Education Law Scholars, *Mahanoy Area School District v. B.L.*, 141 S.Ct. 2038 (2021).

Amicus Brief of Lawyers' Committee for Civil Rights Under Law and Constitutional and

Education Law Schools, *In Re Renewal Application of Team Academy Charter School* (N.J. S.C. 2020).

Amicus Brief of Education Law Center and Constitutional and Education Law Scholars, *Guzman v. State of Minnesota* (Minn. S.C. 2017).

Amicus Brief of Law Professors, *Vergara v. State* (Cal. App. 2015).

Amicus Brief of NAACP Legal Defense and Education Fund*, Doe v. Lower Merion School Dist*., 665 F.3d 524 (3rd Cir. 2011).

Brief of Petitioner, Lawyers' Committee for Civil Rights Under Law*, Holton v. City of Thomasville School District,* 521 F.3d 1318 (11th Cir. 2008) (*en banc*).

Civil Rights Clinic at Howard University School of Law, Brief of Amicus Curiae, *Parents Involved in Community Schools v. Seattle School District* and *Meredith v. Jefferson County Board of Education,* Supreme Court Nos. 05-908 and 05-915 (2007).

Brief of Appellant, Lawyers' Committee for Civil Rights Under Law, *Holton v. City of Thomasville School District*, 490 F.3d 1257 (11th Cir. 2007).

Brief of Appellant, Lawyers' Committee for Civil Rights Under Law, *Holton v. City of Thomasville School District*, 425 F.3d 1325 (11th Cir. 2005).

Brief of Amicus Curiae, Lawyers' Committee for Civil Rights Under Law, *Comfort v. Lynn School Committee*, 418 F.3d 1 (1st Cir. 2005) (*en banc*).

Brief of Appellee, U.S. Postal Service, *Martinez v. Potter*, 347 F.3d 1208 (10th Cir. 2003).


## SELECTED PRESENTATIONS

*Theoretical Trends in Charter School and Voucher Litigation*, Network for Public Education Annual Conference (April 30, 2022).

*Systemic Inequality in South Carolina Schools,* Panelist, Center for Civil Rights History and Research, University of South Carolina (April 5, 2022).

*The Legacy of Rose v. Council,* Keynote Lecture, Kentucky Association of School Administrators Annual Conference (March 18, 2022).

*The Past, Present, and Future of Public Education,* Keynote Lecture, American Association of Colleges for Teacher Education Annual Conference (March 4, 2022).

*Rule of Law and Civics*, Panelist, Inaugural William Hubbard Conference on Law and Education (Feb. 25, 2022).

*The Changing Dynamics of the Fight for Public Education,* Luncheon Speaker*,* American Association of School Administrators Annual Conference (Feb. 17, 2022).

*State Options in Light of Evolving Supreme Court Doctrine*, Expert Testimony, Vermont Senate (Jan. 25, 2021).

*School Vouchers in the Context of South Carolina's Constitutional Commitment to Public Education,* Keynote Lecture, South Carolina School Boards Association Annual Conference (Dec. 4, 2021).

*State and Federal Developments Regarding the Privatization of Public Education,* Lecture, American Association of School Administrators, State Executives Conference (Dec. 3, 2021).

*The Fight for Public Education,* Lecture, American Association of School Administrators, Superintendent of the Year Conference (Nov. 5, 2021).

*Slavery, Freedom, and the Right to Education,* Distinguished Lecture, University of Kentucky School of Law (Nov 4, 2021).

*School District Lines and the Perpetuating of Inequality,* Plenary Panel, Education Law Association Annual Conference, San Antonio, TX (Oct. 22, 2021)

*Schoolhouse Burning,* Book Club, American Bar Association, Section of Civil Rights and Social Justice (Oct. 22, 2021).

*Racial Disparities in School Discipline*, Expert Testimony, U.S. Commission on Civil Rights, West Virginia Advisory Committee (Aug. 26, 2021)

*The History of the Right to Education*, Keynote Address, Annual Conference, Education Law Institute, Indiana University-Bloomington (April 14, 2021).

*Historical Tipping Points in the Funding of Public Education*, Keynote Address, National Education Finance Academy Annual Conference (April 7, 2021).

*Congress's Role in Education as Civil Right*, Lecture, U.S. Capitol Historical Society (March 11, 2021).

*Fundamental Questions for Our Democracy Regarding a Federal Right to Education*, Panelist, University of Virginia School of Law (Feb. 25, 2021).

*Race, Money, and Public Education Values*, Lecture, Pennsylvania State University Center for Education and Civil Rights (Feb. 19, 2021).

*Pressing Legal Issues in Public Education*, Brown Bag Lecture, Education Week (Feb. 5, 2021).

*Rule of Law, Public Education, and the Insurrection at the U.S. Capitol,* Special Address, U.S. Capitol Historical Society (Jan. 7, 2021).

*The Reconstruction of Race Relations Post Election 2020*, Panelist, Baruch College-CUNY (Dec. 10, 2021).

*Litigating the Right to Education*, Guest Lecture, New York University School of Law (Nov. 23, 2020).

*Adams v. McMasters*, Panelist, South Carolina School Board Association Council of School Attorneys (Nov. 20, 2020).

*Schoolhouse Burning*, Webinar, National Organization of Lawyers for Educational Associations (Oct. 9, 2020).

*Socio-economic Integration and the Right to Education*, Guest Lecture, University of California-Irvine School of Law (Oct. 6, 2020).

*School Funding, Vouchers, and the Assault of Public Education*, Public Funds Public Schools (Oct. 6, 2020).

*Schoolhouse Burning*, Book Event, Town Hall Seattle (Sept. 30, 2020).

*The Foundational Role of Public Education in American Democracy,* Keynote Address, 2020 Program on Law and State Government Symposium, Indiana University-Indianapolis (September 25, 2020).

*Schoolhouse Burning,* Book Event, Network for Public Education (Sept. 23, 2020).

*Pressing Legal Issues in the Reopening of Public Schools*, Panelist, National Governor's Association (June 23, 2020).

*A Federal Right to Education: From* Brown *to* Rodriguez *and What Lies Ahead*, Panelist, Center for American Progress (May 13, 2020).

*Gerrymandering School Funding Inequality,* Presentation, Education Law Association Annual Conference (November 16, 2019).

*The Legal and Fiscal Implications of School Vouchers in South Carolina,* South Carolina Association of School Administrators Symposium (October 3, 2019).

*The Growing Risks and Illogic of School Vouchers,* Keynote Address, South Carolina School Boards Association Annual Law Conference (Aug. 24, 2019).

*The Federal Role in Education and the Statutory Structure for Encouraging Civics and Service Learning in Public Schools,* Testimony, National Commission on Military, National and Public Service (June 20, 2019) (congressional commission).

*The Role of State Policy in Segregation and Inequality,* 65th University of Brown v. Board Conference, Center for Education and Civil Rights at Pennsylvania State University (May 10, 2019).

*Taking the Right to Education in Pauley v. Kelly Seriously,* Keynote Address, 2018-19 West Virginia Law Review Symposium (Feb. 22, 2019).

*A Federal Right to Education?,* Debater, American Enterprise Institute (Jan. 24, 2019).

*What Norms Should We Break When We Reform Schools?,* Keynote Address, 2018-19 Arkansas Law Review Symposium (Nov. 2, 2018).

*New Insights into School Privatization,* Public Education Network Annual Conference, Indianapolis, IN (Oct 20, 2018).

*The Foundations of Democracy: Critical Literacy, Civics Knowledge, and Public Education,* Tedx, University of South Carolina (Oct. 9, 2018).

*Empirical Trends, Constitutional Challenges, and School Privatization*, Annual Conference, National Organization of Lawyers for Education Associations (Oct. 5, 2018).

*Free Speech and Student Conflict on the Modern University Campus*, Panelist, 80th Judicial Conference of the Fourth Circuit (June 29, 2018).

*Theorizing a Constitutional Right to Education*, Presidential Session, American Educational Research Association (April 14, 2018).

*Charter Schools and Educational Equity*, Debate, Harvard Graduate School of Education (March 29, 2018).

*Social Science and Education Law Reform: Discipline, Special Education, and School Funding,* University of Colorado School of Education (Nov. 29, 2017).

*Preferencing Educational Choice,* University of North Carolina School of Law (Nov. 16, 2017).

*The Constitutional Compromise to Guarantee Education,* Temple University School of Law (Oct 26, 2017).

*Preferencing Educational Choice,* University of North Carolina School of Law (Nov. 16, 2017).

*The Constitutional Compromise to Guarantee Education,* Temple University School of Law (Oct 26, 2017).

*Abandoning the Federal Role in Education,* Drexel University School of Law (March 8, 2017).

*The Intersection of School Quality and Student Discipline*, Fordham University School of Law (March 6, 2017).

*Legislative Barriers to School Funding Reform,* Virginia Commonwealth Institute, Richmond, VA (Nov. 11, 2016).

*Averting Educational Crises,* Education Law Association Annual Conference, Orlando, FL (Nov. 3, 2016).

*Choosing the Correct Measuring Stick for Charter Schools and Vouchers,* NYU School of Law (April 5, 2016).

*Half a Step Forward, Three Steps Back: The Every Student Succeeds Act,* American Association of Law Schools, New York City (Jan. 6, 2016).

*Ending Zero Tolerance,* American Const. Society, Harvard Law School (Sept. 17, 2015).

*Creating Access and Equity: Have Charter Schools Made The Dream More Real?,* National Alliance for Public Charter Schools, Memphis, TN (April 16, 2015).

*Due Process Implications of School Discipline,* Guest Lecture, Washington University School of Law (Feb. 24, 2015).

*The Constitutional Requirements of Abbeville v. State,* SC House of Representatives Education Policy Review and Reform Task Force, Columbia, SC (Feb. 23, 2015).

*Recognizing the Right to Education at the Federal Level,* Constitutional Personhood Summit, New York University School of Law: Hosted in Princeton, NJ (Nov. 7, 2014).

*The Constitutional Limits of Zero Tolerance,* Law and Society, Minneapolis, MN (May 30,

11

2014).

*Balancing Competing Values in School Desegregation: The Beginning of the End,* 50th Anniversary of the Civil Rights Act of 1964 Conference, Michigan St. Univ. College of Law-Univ. of Missouri-KC School of Law (April 11, 2014).

*Ending Zero Tolerance,* University of North Carolina School of Law, Chapel Hill, NC (Jan. 23, 2014).

*Getting Started on Your Scholarly Agenda: Topic Selection, Scheduling, Scope, and Pitfalls,* AALS New Law Teachers Conference, Washington, DC (June 2 2013).

*NCLB Waivers,* No Child Left Behind Symposium: 10 Years in Review, Thurgood Marshall School of Law (Feb. 8, 2013).

*Leveraging Federal Funding for Equity and Integration,* 40th Anniversary of San Antonio v. Rodriguez: Exploring New Paths to Equal Educational Opportunity, University of Richmond School of Law (March 7, 2013).

*Pursuing the Public Good in Education: The Competing Interests of Individual Autonomy and Collective Action,* Privatizing the Public Good: Emerging Trends in K-16 Education Symposium, Wake Forest University School of Law (October 26, 2012).

*A Legal History of Disparate Impact Analysis in Education and Civil Rights,* Applying Disparate Impact in Civil Rights Complaints to Derail the School to Prison Pipeline Teleconference, ABA Children's Rights Litigation Committee (October 17, 2012).

*Getting Started on Your Scholarly Agenda,* AALS New Law Teachers Conference, Washington, DC (June 22, 2012).

*Implicit Bias Across the Educational Spectrum: Ability Grouping, Special Education and Discipline,* Implicit Racial Bias Across the Law: A Book Conference, Harvard Law School (June 14, 2012).

*Parallel Movements: Incorporating School Integration into School Reform Agendas*, Advancing the Legacy of Mendez and Brown: A National Conference on School Diversity, Georgetown University Law Center (May 17, 2012).

*Racially Unequal Access to Middle Income Peers*, Charles Hamilton Houston Institute for Race and Justice, Harvard Law School, Boston, MA (Jan. 25, 2012).

*Hearing Testimony on the Benefits of Racial Integration,* Minnesota Department of Education Integration Revenue Replacement Task Force (Dec. 20, 2011).

*Education's Elusive Future, Storied Past, and the Fundamental Inequity in Between*, Civil Rights or Civil Wants Conference, University of Georgia School of Law (August 26, 2011).

*Civil Rights and the K-12 Education Reform Agenda*, Panelist, Southeastern Association of Law Schools (July 26, 2011).

*The Limits of Educational Equity,* Paper Presentation, Wake Forest University School of Law (April 28, 2011).

*Economic Justice for Families and Communities,* Panelist, "The Unfinished Work": Advancing New Strategies in the Struggle for Civil Rights, University of North Carolina School of Law (Nov. 1, 2010).

*Racially Unequal Access to Middle Income Peers,* Study Presentation, NC NAACP State Convention, Charlotte, NC (Oct. 8, 2010).

*Public Perceptions of Race Discrimination and Intent: What Matters Most?,* Panelist, Southeastern Association of Law Schools Annual Meeting (July 30, 2010).

*What the Federal Government Is Doing, and What It Can Do, to Reduce Racial and Socioeconomic Isolation and Promote Diversity in K-12 Schools,* Moderator, Reaffirming the Role of School Integration in K-12 Education Policy Conference, Howard University School of Law (Nov. 13, 2009).

*The Misdirection of Federal Education Funds: Helping Poor Kids or Pushing Educational Agendas?,* Paper Presentation, Poverty and Economic Mobility Conference, American University Washington College of Law (Oct. 26, 2009).

*How the No Child Left Behind Act Shortchanges Minority Students Through Its Funding Formulas and Congress's Constitutional Duty to Fix It,* Congressional Black Caucus Foundation Conference on Breaking Barriers for African American Males, Russell Senate Office Building (April 24, 2009).

*When Old Enemies Become New Friends: Desegregation Lawyers, School Districts, and Communities*, Panelist, National Summit on Interdistrict School Desegregation, Harvard Law School (January 18, 2009).

*Education Is a Civil Right,* Presentation, National Alliance of Black School Educators, Washington, DC (January 2009).

*Racial Bias in School Room Discipline*, Panelist, George Washington University School of Education (April 2008).

*Solidifying Education as a Civil Right: The Choice Between a Constitutional Amendment and the Courts*, Panelist, National Alliance of Black School Educators Annual Convention, Washington, DC (April 2008).

*Teaching Hope to Social Justice Students*, Presenter, Teaching for Social Change Conference, University of California School of Law (March 2008).

*Can We Continue Brown v. Board's Promise by Suiting Kennedy's Taste?*, Presenter, Supreme

13

Court Update, Southeastern Association of Law Schools Annual Meeting (July 2007).

*The Future of Voluntary Desegregation,* Panelist, The Marshall-Brennan Constitutional Literacy Project Conference, American University Washington College of Law (March 2007).

*A Reason to Hope*, Opening Address, 4th Annual Norman Amaker Public Interest Law Retreat, Indiana University School of Law-Indianapolis (Feb. 2005).

*Connecting the Dots from Brown to Grutter*, Brown v. Board 50th Anniversary Lecture Series, Georgetown University (April 2004).

*The Right to a High Quality Education under Florida Law*, Presenter, Brown v. Board 50th Anniversary Event, University of Miami School of Law (March 2004).

*Recognizing Inequity in Ability Grouping Practices*, Panelist, Georgia Branches of NAACP Annual Convention, Atlanta, GA (Oct. 2003).

*When Discrimination Can't Be Proven: The Uphill Battle of Alexander v. Sandoval*, Tennessee Branches of the N.A.A.C.P Annual Convention, Nashville, TN (Sept. 2003).

*Proving Intent by Alternative Means: An Answer to Alexander v. Sandoval*, Panelist, Lawyers' Committee for Civil Rights Under Law 40th Anniversary Symposium, Washington, DC (June 2003).

## SELECTED PRO BONO ACTIVITIES AND COMMUNITY SERVICE

Fellow, National Education Policy Center (2020-present).

South Carolina Advisory Committee, United States Commission on Civil Rights (2015-2017).

Steering Committee and Member, National Coalition for School Diversity (2009-present).

Counsel, Brief of Amici Curiae NAACP Legal Defense & Education Fund, et al., *Doe v. Lower Merion School District*, Civ. No. 09-2095 (3rd Cir. 2011).

Counsel, Lawyers' Committee for Civil Rights Under Law (trial, appellate and post-trial proceedings in *Holton v. City of Thomasville School District*, 425 F.3d 1325 (11th Cir. 2005) (2005-2009).

Volunteer Regional Supervisor, Election Protection, Lawyers' Committee for Civil Rights Under Law (2008).
Supervisor, New Orleans Alternative Spring Break (2008, 2009).

Co-Author, Amicus Brief of Howard University School of Law, *Parents Involved in Community Schools v. Seattle School District,* 551 U.S. 701 (2007).

Coordinator, Student Hurricane Network *pro bono* program (2006–07).

14

EXHIBIT C

*Prior Expert Testimony and Submissions*

I testified as an expert for the State of Louisiana in federal district in *Jindal v. United States Dep't of Educ.*, No. CV 14-534-SDD-RLB, 2015 WL 5474290 (M.D. La. Sept. 16, 2015).

I submitted an expert affidavit in *Smith v. Henderson*, No. 13-420 (D.D.C.), a case involving the disparate impact of school closures in the District of Columbia.

I testified as an expert in *Adams v. McMaster*, 432 S.C. 225, 851 S.E.2d 703, 706 (2020) for plaintiffs.

I testified as an expert in *William Penn School District v. Pennsylvania Department of Education*, No. 587 MD 2014 (Commonwealth Court of Pennsylvania) in November 2021.