## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

DONALD FALLS, et al.,

                *Plaintiffs*,

      v.

RON DESANTIS, in his official capacity as Governor of Florida, et al.,

                *Defendants.*

Case No. 4:22-cv-166-MW/MJF

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Timothy L. Newhall
*Special Counsel*
Complex Litigation
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399-1050
Telephone: (850) 414-3300
timothy.newhall@myfloridalegal.com

*Counsel for Defendant Ashley Moody, in her official capacity*

Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

*Counsel for Defendants Ron DeSantis, in his official capacity, et al.*

June 1, 2022

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION .............................................................................. 1

FACTUAL BACKGROUND ............................................................... 4

I.    Florida's Elected Officials Are Empowered To Set the Curriculum for Public Schools and To Stamp Out Discrimination in the Workplace. ....... 4

II.   Florida's Individual Freedom Act. .......................................... 7

      A. The Act's Education Provisions ........................................ 7

      B. The Act's Employment Provisions ................................... 12

III.  Plaintiffs Brought Suit Challenging the Act Under the First Amendment and Due Process Clause .......................................................... 12

STANDARD OF REVIEW .............................................................. 14

ARGUMENT .................................................................................. 14

I.    Several of Plaintiffs' Claims Are Non-Justiciable. ................... 14

II.   The Act's Educational Provisions and the Challenged Regulation Are Constitutional. .................................................................. 14

      A. Rules Governing Curriculum and In-Class Instruction in Public Schools Regulate Pure Government Speech and Are Not Subject to First Amendment Analysis. ........................................... 14

      B. Individual Teachers Do Not Have the "Academic Freedom" To Control Florida's Public School Curriculum. .................... 22

      C. Public School Students Do Not Have A First Amendment Right To Dictate Their Own Curriculum. .................................... 26

i

D. The Act's Educational Provisions Satisfy Any Standard of Heightened Constitutional Scrutiny. ...............................................28

   1.    The Education Provisions Are Narrowly Tailored To Serve A Compelling Government Interest.........................................28

   2.    Plaintiffs' Contrary Arguments Fail. .......................................31

III.   The Act's Employment Provisions Are Constitutional............................34

A. The Employment Provisions of the Act Govern Conduct, Not Speech. .....................................................................................34

B. In Any Event, the Employment Provisions Also Survive Heightened Scrutiny...................................................................39

   1.    Under the Captive Audience Doctrine, at Most Intermediate Scrutiny Applies.......................................................................39

   2.    The Employment Provisions Survive Any Level of Heightened Constitutional Scrutiny. ......................................................42

IV.   The Challenged Provisions Are Not Unconstitutionally Vague. .............44

V.   Any Unconstitutional Provisions Are Severable.....................................48

VI.   Plaintiffs Are Not Entitled to a Preliminary Injunction. ..........................49

A. Plaintiffs Have Not Shown Irreparable Injury. ..............................49

B. The Balance of the Equities Militates Against Preliminary Injunctive Relief.........................................................................50

CONCLUSION ......................................................................................50

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
    557 F.3d 1177 (2009) ............................................................... 26, 27

*Adams v. Trustees of Univ. of N.C.-Wilmington*,
    640 F.3d 550 (4th Cir. 2011) ..........................................................21

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) .......................................................28, 29

*Austin v. Univ. of Fla. Bd. of Tr.*, No. 1:21-cv-184-MW/GRJ,
    2022 WL 195612 (N.D. Fla. Jan. 21, 2022) ...............................................22

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) ................................................................40, 41

*Bishop v. Aronov*,
    926 F.2d 1066 (11th Cir. 1991) ......................... 19, 20, 23, 25, 28, 31, 32, 47

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) ..................................................................26

*Brown v. Bd. of Educ. of Topeka, Kan.*,
    349 U.S. 294 (1955) ................................................................1, 30

*Buchanan v. Alexander*,
    919 F.3d 847 (5th Cir. 2019) ..........................................................21

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005) .......................................................26, 28

*Coal. to Def. Affirmative Action v. Granholm*,
    473 F.3d 237 (6th Cir. 2006) ..........................................................25

*Dana's R.R. Supply v. Att'y Gen. of Fla.*,
    807 F.3d 1235 (11th Cir. 2015) .......................................................35

*Demers v. Austin*,
    746 F.3d 402 (9th Cir. 2014) ..........................................................21

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ..................................................................20

*Edwards v. Calif. Univ. of Penn.*,
    156 F.3d 488 (3d Cir. 1998) ........................................................18, 24

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975)..................................................................... 40

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.,*
    624 F.3d 332 (6th Cir. 2010) ................................................ 17, 18

*Frisby v. Schultz,*
    487 U.S. 474 (1988).................................................. 39, 40, 42, 43

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006)............................................................. 16, 17

*Gilder-Lucas v. Elmore Cnty. Bd. of Educ.,*
    186 F. App'x 885 (11th Cir. 2006)..............................................19

*Harris v. Forklift Sys., Inc.,*
    510 U.S. 17 (1993)......................................................................44

*Hazelwood Sch. Dist. v. Kuhlmeier,*
    484 U.S. 260 (1988)............................................................. 15, 28

*Hill v. Colorado,*
    530 U.S. 703 (2000)...........................................................39, 41, 42

*In re Hubbard,*
    803 F.3d 1298 (11th Cir. 2015) ............................................ 31, 32

*Johnson-Kurek v. Abu-Absi,*
    423 F.3d 590 (6th Cir. 2005) .....................................................24

*Jones v. United Space All., L.L.C.,*
    494 F.3d 1306 (11th Cir. 2007) ................................................... 7

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967)................................................................... 22

*Kirkland v. Northside Indep. Sch. Dist.,*
    890 F.2d 794 (5th Cir. 1989) ............................................... 18, 21

*Lane v. Franks,*
    573 U.S. 228 (2014)....................................................................29

*Lee v. York Cnty. Sch. Div.,*
    484 F.3d 687 (4th Cir. 2007) ............................................... 18, 21

*Lehman v. City of Shaker Heights,*
    418 U.S. 298 (1974)....................................................................40

*Loving v. Virginia,*
    388 U.S. 1 (1967)......................................................................... 1

*Maryland v. King*,
    567 U.S. 1301 (2012)..................................................................50

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
    474 F.3d 477 (7th Cir. 2007) .....................................................17

*Meriweather v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ............................................... 21, 22

*Miller v. Johnson*,
    515 U.S. 900 (1995)......................................................................1

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)................................................................35

*NetChoice, LLC v. Moody*, No. 21-12355,
    2022 WL 1613291, __ F.4th __, __ (11th Cir. May 23, 2022) ................... 31

*NLRB v. Gissel Packing Co.*,
    395 U.S. 575 (1969) ...................................................................41

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)....................................................................25

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*,
    391 U.S. 563 (1968)...............................................................18, 29

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992)....................................................................32

*Regents of the Univ. of Mich. v. Ewing*,
    474 U.S. 214 (1985)................................................................... 25

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)................................................................... 43

*Robinson v. Jacksonville Shipyards, Inc.*,
    760 F. Supp. 1486 (M.D. Fla. 1991) .........................................42

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)...............................................................15, 16

*Rowan v. U.S. Post Off. Dep't*,
    397 U.S. 728 (1970)............................................................... 39, 42

*Rumsfeld v. FAIR, Inc.*,
    547 U.S. 47 (2006)............................................................36, 37, 38

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996) ................................................................... 16

*Shurtleff v. City of Boston*,
 142 S. Ct. 1583 (2022)................................................................15, 32

*Solantic, LLC v. City of Neptune Beach*,
 410 F.3d 1250 (11th Cir. 2005) ....................................................30

*Sorrell v. IMS Health Inc.*,
 564 U.S. 552 (2011)............................................................... 35, 36

*Sweezy v. New Hampshire*,
 354 U.S. 234 (1957)......................................................................24

*United States v. Nat'l Treasury Emps. Union*,
 513 U.S. 454 (1995).......................................................................29

*Urofsky v. Gilmore*,
 216 F.3d 401 (4th Cir. 2000) (en banc) ......................................24

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.*,
 862 F.2d 1517 (11th Cir. 1989) .............................................. 27, 28

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
 576 U.S. 200 (2015)..........................................2, 14, 15, 16, 17

*Wieman v. Updegraff*,
 344 U.S. 183 (1952)......................................................................22

*Wollschlaeger v. Gov., Fla.*,
 848 F.3d 1293 (11th Cir. 2017) ............................... 32, 33, 37, 44, 45, 48, 49

*Wreal, LLC v. Amazon.com, Inc.*,
 840 F.3d 1244 (11th Cir. 2016) ............................................14, 49

## Constitutions, Statutes, and Rules

42 U.S.C. § 2000e .............................................................................44

Fla. Const.
 Art. I, § 2 .......................................................................................4
 Art. III, § 8(a).................................................................................4
 Art. IX § 1(a) .................................................................................4

Fla. Stat.
 § 760.01 ......................................................................................... 6
 § 760.10 .........................................................................................7
 § 760.10(1).....................................................................................12
 § 760.10(1)(8)(b) ...........................................................................12
 § 760.10(8).....................................................................................12
 § 760.10(8)(a)...........................................................................35, 36

§ 760.10(8)(b) ...................................................................................12

§ 760.10(8)(a)(7) ..............................................................................48

§ 1000.01 .............................................................................................5

§ 1000.03(2)(a) ...................................................................................6

§ 1000.03(5)(a)-(c) .............................................................................5

§ 1000.05(2)(a) ...................................................................................6

§ 1000.05(4)(a) .................................................................................12

§ 1000.05(4)(a)(1)-(8) .................................................................7, 8, 9

§ 1000.05(4)(b) ...................................................................................9

§ 1003.42(2) ........................................................................................5

§ 1003.42(2)(a) ...............................................................................4, 5

§ 1003.42(2)(h) ...........................................................................10, 11

§ 1003.42(2)(s)(1) ..............................................................................5

§ 1003.42(3) ................................................................1, 9, 10, 30, 31

§ 1006.31(2)(d) .................................................................................10

§ 1012.98(4)(b)(1) ............................................................................10

FLA. ADMIN. CODE r. 6A-1.094124(3)(b) ...................................6, 45, 46

2022 Fla. Laws 72, § 8 .........................................................................7

## Other Authorities

Declaration of John D. Ohlendorf (June 1, 2022)

    Exhibit 1 .................................................................................33, 34

    Exhibit 2 .......................................................................................34

    Exhibit 3 .......................................................................................46

    Exhibit 4 .................................................................................46, 47

## INTRODUCTION

"At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up). "All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle." *Brown v. Board of Educ. of Topeka, Kan.*, 349 U.S. 294, 298 (1955).

Impelled by the fundamental moral principle at the root of the Equal Protection Clause—that discriminating against people solely because of their race, sex, or other immutable characteristics is "odious to a free people whose institutions are founded upon the doctrine of equality, " *Loving v. Virginia*, 388 U.S. 1, 11 (1967) (cleaned up)—the State of Florida has enshrined in the statute at issue in this case, the Individual Freedom Act, six "principles of individual freedom." Among the six are principles such as "[n]o person should be discriminated against or receive adverse treatment solely or partly on the basis of race, color, national origin, religion, disability or sex"; "[n]o person is inherently racist, sexist, or oppressive"; and "[n]o race is inherently superior to another race." FLA. STAT. § 1003.42(3) (as amended by the Act). Believing these principles to be fundamental and sacrosanct, Florida has directed that they cannot be contradicted in the instruction provided to students in

1

its public schools and universities, nor in the training mandated by Florida employers for their employees.

Plaintiffs have brought suit challenging the Act's provisions related to these principles—both in the educational context and the employment context—as contrary to the First Amendment, and they have requested a preliminary injunction preventing the Act from taking effect. The request must be denied.

Plaintiffs' First Amendment challenge to the educational provisions fails because the Act regulates pure Government speech—the curriculum used in state schools and the in-class instruction offered by state employees—and the First Amendment simply has no application in this context. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Indeed, that is the only way government of any kind can go on; for if the First Amendment required content neutrality in this context, the government would be forced "to voice the perspective of those who oppose" it. *Id.* at 208. Here, the Act does not prevent the State's educators from espousing whatever views they may hold, on race or anything else, on their own time, and it does not prevent students from seeking them out and listening to them. All it says is that state-employed teachers may not espouse or advocate in the classroom views contrary to the principles enshrined in the Act, while they are on the State clock, in exchange for a

State paycheck. The First Amendment does not compel Florida to pay educators to advocate ideas, in its name, that it finds repugnant. And even if the First Amendment did apply here, Florida's compelling interest in stamping out discrimination based on race and other immutable characteristics amply justifies any burden on speech the Act may impose.

The Act's employment provisions pass constitutional muster for similar reasons. Here too, the Act does not limit any speech that is protected by the First Amendment. Anything that a Florida employer could say (or could hire consultants to say) before the Act takes effect can still be said after, just as freely and in exactly the same manner. What the Act does—all it does—is prevent employers from *conscripting their employees*, against their will, into the audience *as a condition of their employment*. The First Amendment may protect the right of employers (and their paid consultants) to *espouse* the ideas that a person *should* be "discriminated against … on the basis of race," and that one race *is* "inherently superior to another race." And it may protect the rights of employees to seek out, listen to, and share those views. What it does *not* protect is the ability of employers to use their economic leverage over their workers to *force them* to listen to such odious views, on pain of losing their jobs. That is conduct, not speech, and the First Amendment has nothing to say about it. And once again, even if it did, the Act would easily pass any level of

3

heightened constitutional scrutiny, given the State's unquestionably compelling interest in eliminating open racial discrimination in the workplace.

Plaintiffs are not likely to succeed on the merits of their claims, the balance of the equities favors enforcement of the Act, and the motion for preliminary injunction should be denied.

## FACTUAL BACKGROUND

### I.   Florida's Elected Officials Are Empowered To Set the Curriculum for Public Schools and To Stamp Out Discrimination in the Workplace.

The People of Florida enshrined in their Constitution certain fundamental principles that lie at the bedrock of our Nation and the State of Florida. Article I, § 2, of the Florida Constitution enumerates these "Basic Rights":

> All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property. No person shall be deprived of any right because of race, religion, national origin, or physical disability.

And the People of Florida empowered their elected officials to enact laws that both promote these fundamental principles and prohibit efforts to contravene them. *See* FLA. CONST. Art. III, § 8(a), Art. IX § 1(a). To that end, the Florida Legislature exercises the power to "establish education policy, enact education laws, and appropriate and allocate education resources." FLA. STAT. § 1000.03(2)(a).

Florida's elected officials therefore determine the curriculum of Florida's public schools. *Id*. § 1000.01 *et seq.* (The "Florida Early Learning-20 Education Code"). And the "priorities of Florida's Early Learning-20 education system" seek not only to promote student academic excellence, but also to prepare students "to become civically engaged and knowledgeable adults who make positive contributions to their communities." *Id.* § 1000.03(5)(a)-(c).

In furtherance of these priorities, the Florida public school curriculum requires instruction on the fundamental principles that serve as a foundation for both Florida and our Nation. For example, Florida's elected officials have determined that students should learn the "history and content of the Declaration of Independence, including" the principle of "equality of all persons." *Id.* § 1003.42(2)(a). Relatedly, schools must provide development programs that teach K-12 students "the qualities of," among other things, "racial, ethnic, and religious tolerance." *Id.* § 1003.42(2)(s)(1).

Florida's Education Code also authorizes the State Board of Education ("Board") to issue rules implementing these requirements. Specifically, the Board may issue rules to ensure that schools are teaching the principles required by law "efficiently and faithfully, using the books and materials required that meet the highest standards for professionalism and historical accuracy." *Id.* § 1003.42(2). Pursuant to this authority, in June 2021, the Board issued a rule requiring that

instruction on topics such as the Holocaust, slavery, the Civil War, the Civil Rights Movement, and "the contributions of women, African American and Hispanic people" to our Nation "be factual and objective, and may not suppress or distort significant historical events." FLA. ADMIN. CODE r. 6A-1.094124(3)(b). As "[e]xamples of theories that distort historical events," the Board listed theories that "include the denial or minimization of the Holocaust, and the teaching of Critical Race Theory, meaning the theory that racism is not merely the product of prejudice, but that racism is embedded in American society and its legal systems in order to uphold the supremacy of white persons." *Id.* In particular, the Board determined that schools "may not utilize material from the 1619 Project" and that instruction "must include the U.S. Constitution, the Bill of Rights and subsequent amendments." *Id.*

Apart from the public-school curriculum, Florida's elected officials have recognized that the State must practice the principles it teaches. Therefore, Florida law prohibits discrimination on the basis of race or sex "against a student or an employee in the state system of public K-20 education." FLA. STAT. § 1000.05(2)(a). Likewise, no person may "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any public K-20 education program or activity" on the basis of race or sex. *Id.*

Similarly, Florida's elected officials have prohibited discrimination in the workplace through the Florida Civil Rights Act of 1992. *See id.* § 760.01. This

legislation was "modeled on Title VII" of the federal Civil Rights Act of 1964. *Jones v. United Space All., L.L.C.*, 494 F.3d 1306, 1310 (11th Cir. 2007). It thus prohibits "employment practice[s]" that discriminate on the basis of race, sex, national origin, and religion. FLA. STAT. § 760.10. Through these two significant pieces of legislation—the Florida Early Learning-20 Education Code and the Florida Civil Rights Act of 1992—Florida's elected officials have taken steps not only to prohibit practices that undermine the foundational principle of equality in the present, but also to ensure this principle is carried forward by the next generation into the future.

## II.   Florida's Individual Freedom Act.

The Individual Freedom Act amended both the Florida Early Learning-20 Education Code and the 1992 Florida Civil Rights Act. It will take effect on July 1. *See* 2022 Fla. Laws 72, § 8.

### A. The Act's Education Provisions

Sections 2 through 7 of the Act amended the Education Code. As relevant here, Section 2 enumerates actions that constitute "discrimination on the basis of race, color, national origin, or sex" against a public school student or employee and are thus prohibited under Section 1000.05(2). The Act prohibits the practice of "subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts":

1.      Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2.      A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3.      A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4.      Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5.      A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6.      A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.      A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8.      Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

FLA. STAT. § 1000.05(4)(A)(1)-(8) (as amended by the Act).[1]

Although it prohibits all persons from subjecting a student or employee to indoctrination of these concepts, the Act makes clear that it does not "prohibit discussion of the concepts … as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." *Id.* § 1000.05(4)(b).

The Act also amended the Education Code's required-instruction provisions. Specifically, Section 3 provides that the "Legislature acknowledges the fundamental truth that all persons are equal before the law and have inalienable rights." *Id.* § 1003.42(3). "Accordingly," the Act continues, "instruction and supporting materials on the topics enumerated in this section must be consistent with the following principles of individual freedom":

(a)     No person is inherently racist, sexist, or oppressive, whether consciously or unconsciously, solely by virtue of his or her race or sex.

(b)     No race is inherently superior to another race.

(c)     No person should be discriminated against or receive adverse treatment solely or partly on the basis of race, color, national origin, religion, disability, or sex.

(d)     Meritocracy or traits such as a hard work ethic are not racist but fundamental to the right to pursue happiness and be rewarded for industry.

---

[1] All subsequent statutory citations are of the provisions as amended by the Act on July 1.

(e)     A person, by virtue of his or her race or sex, does not bear responsibility for actions committed in the past by other members of the same race or sex.

(f)     A person should not be instructed that he or she must feel guilt, anguish, or other forms of psychological distress for actions, in which he or she played no part, committed in the past by other members of the same race or sex.

*Id.* § 1003.42(3).

The Act prohibits the use of "classroom instruction and curriculum" to "indoctrinate or persuade students to a particular point of view inconsistent with the principles of this subsection." *Id.* § 1003.42(3). Relatedly, Section 4 of the Act ensures that neither the Department of Education nor school district personnel who review instructional materials may recommend any instructional materials that contradict the enumerated principles. *See id.* § 1006.31(2)(d). And similarly, the Department of Education must ensure that the materials used in every Florida school's professional development system comply with the Act's principles of individual freedom. *See id.* § 1012.98(4)(b)(1).

The Act also requires instruction on the evils of slavery, segregation, and racial discrimination. For example, under the Act, Florida schools must teach the "history of African Americans, including the history of African peoples before the political conflicts that led to the development of slavery, the passage to America, the enslavement experience," and "abolition." *Id.* § 1003.42(2)(h). More specifically, the Act provides that students "shall develop an understanding of the ramifications

of prejudice, racism, and stereotyping on individual freedoms," including "how the individual freedoms of persons have been infringed by slavery, racial oppression, racial segregation, and racial discrimination." *Id.* That instruction may include "topics relating to the enactment and enforcement of laws resulting in racial oppression, racial segregation, and racial discrimination." *Id.*

And schools must teach about individuals who overcame these evils to thrive. For example, students must learn "the history and contributions of Americans of the African diaspora to society." *Id.* Accordingly, "[i]nstructional materials shall include the vital contributions of African Americans to build and strengthen American society and celebrate the inspirational stories of African Americans who prospered, even in the most difficult circumstances." *Id.*

Relatedly, the Act requires instruction on how adherence to the principles of individual freedom has helped "overturn[ ] unjust laws," like those that imposed racial segregation. *Id.* And the Act requires that students learn "what it means to be a responsible and respectful person, for the purpose of encouraging tolerance of diversity in a pluralistic society and for nurturing and protecting democratic values and institutions." *Id.* To that end, schools must teach about "the courageous steps" taken by "individuals from all walks of life" to "fulfill the promise of democracy and unite the nation." *Id.*

## B. The Act's Employment Provisions

Apart from its education provisions, the Act also amended Florida's Civil Rights Act. Section 1 of the Act enumerates several employment practices that constitute "discrimination based on race, color, sex, or national origin" under FLA. STAT. § 760.10(1). Specifically, the Act makes it unlawful for any employer to "[s]ubject[ ] any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination, to training, instruction, or any other required activity that espouses, promotes, advances, inculcates, or compels such individual to believe" concepts that are materially identical to the concepts listed in Section 1000.05(4)(a). *See* FLA. STAT. § 760.10(8). Section 1 makes clear, however, that it "may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." *Id.* § 760.10(1)(8)(b).

## III. Plaintiffs Brought Suit Challenging the Act Under the First Amendment and Due Process Clause.

Plaintiffs are three educators, a consultant, and a rising kindergartener. Together, they argue that the Act and the June 2021 regulation violate their rights under the First Amendment and the Due Process Clause.

The three educators are Mr. Falls, who teaches American Government and Economics at a Florida high school; Ms. Harper, who serves as a substitute teacher

for multiple subjects and grade levels; and Dr. Cassanello, who is an associate professor of history at the University of Central Florida. They contend that the Act and regulation violate "their right to free expression" and "academic freedom" under the First Amendment. Compl. ¶¶ 53.

The lone student Plaintiff is RMJ, who "is enrolling in kindergarten at a Nassau County Public School in August 2022." Compl. ¶ 7. She challenges the same educational provisions on the ground that they violate her right "to receive information" under the First Amendment. Compl. ¶¶ 63-65

Dr. Tammy Hodo is the president and founder of a consulting firm that provides training to various organizations, including corporations, non-profits, and educational institutions. Compl. ¶ 8. Her "areas of consulting include race & ethnicity, implicit bias training, microaggressions, institutional racism, anti-racism work, and critical race theory." *Id.* She alleges that the employment provisions of the Act restrict her own right to speak as an employer and have a negative effect on "her business providing training to other employers as a diversity and inclusion consultant" by restricting her clients' right to speak. *Id.*

Lastly, all Plaintiffs argue that the Act and the regulation are unconstitutionally vague under the Fourteenth Amendment.

Alongside their complaint, Plaintiffs filed a motion for a preliminary injunction. Defendants now file this response.

13

**STANDARD OF REVIEW**

Under Rule 65 of the Federal Rules of Civil Procedure, a district court may grant a preliminary injunction if the movant shows "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (cleaned up). The movant "bears the burden of persuasion to clearly establish all four of these prerequisites." *Id.* (cleaned up). Here, Plaintiffs have failed to carry their burden on all four scores.

**ARGUMENT**

**I.     Several of Plaintiffs' Claims Are Non-Justiciable.**

Plaintiffs fail to show a likelihood of success at the threshold, because as shown in Defendants' motion to dismiss, filed contemporaneously with this brief, all their claims fail for lack of standing.

**II.    The Act's Educational Provisions and the Challenged Regulation Are Constitutional.**

**A. Rules Governing Curriculum and In-Class Instruction in Public Schools Regulate Pure Government Speech and Are Not Subject to First Amendment Analysis.**

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker*, 576 U.S. at 207. "Were the Free

Speech Clause interpreted otherwise, government would not work," because it could not "effectively" implement its policies if it "had to voice the perspective of those who oppose" it. *Id.* at 207-08. Therefore, government speech—"and government actions and programs that take the form of speech"—generally do not "trigger the First Amendment rules designed to protect the marketplace of ideas." *Id.* at 207. The Constitution instead "relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022).

The public-school curriculum set by elected officials is government speech. As the Supreme Court held in a case involving a public university: "When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). The same principle—that public schools do not violate the First Amendment when setting their curriculum—explains why schools may even control *student* speech in a school-sponsored student newspaper that could "fairly be characterized as part of the school curriculum," and thus "bear the imprimatur of the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). When the government "determines the content of the education it provides" in public schools,

15

it is thus the government speaking, *Rosenberger*, 515 U.S. at 833, and its determination does not implicate the Free Speech Clause, *Walker*, 576 U.S. at 207-08.

The in-class instruction offered by state-employed educators is also pure government speech, not the speech of the educators themselves. When "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006). And "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22. Therefore, "the employee has no First Amendment cause of action." *Id.* at 418. Accordingly, under the square reasoning of *Garcetti*, educators in public schools do not have a First Amendment right to control the curriculum.

To be sure, *Garcetti* reserved the question whether its holding applies to classroom instruction. *Id.* at 425. But this Court is bound by *Garcetti*'s reasoning in equal measure with its holding, *Seminole Tribe of Fla. v. Florida.*, 517 U.S. 44, 67 (1996), and public-school teachers or professors providing instruction to students clearly fall within the rationale of *Garcetti* because they are making "statements pursuant to their official duties." *Garcetti*, 547 U.S. at 421-22. Moreover, if *Garcetti* did not apply to curricular speech, it would invite "judicial intervention" that is

"inconsistent with sound principles of federalism," *id.* at 423, because the Supreme Court has articulated the "oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Kuhlmeier*, 484 U.S. at 273.

Multiple courts have recognized that *Garcetti*'s reasoning applies to public-school teachers providing instruction. The Seventh Circuit explained that, because "teachers hire out their own speech," applying *Garcetti* to a public-school teacher's in-class speech was "an *easier case* for the employer than *Garcetti*" itself, "where speech was not what the employee was being paid to create." *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (Easterbrook, J., for the court) (emphasis added). For similar reasons, the Sixth Circuit has likewise applied *Garcetti* to in-class instruction in a public high school. *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010) (Sutton, J., for the court).

Both the Sixth and Seventh Circuits recognized the difficulty the Supreme Court envisioned if the First Amendment were to apply to government speech—"government would not work." *Walker*, 576 U.S. at 207-08. The Sixth Circuit identified numerous challenging questions that would follow if *Garcetti* did not apply to teachers' in-class curricular speech. As most relevant here: "Could a teacher continue to assign materials that members of the community perceive as racially

insensitive even after the principal tells her not to?"; or "Could a teacher raise a controversial topic (say, the virtues of one theory of government over another or the virtues of intelligent design) after a principal has told her not to?" *Evans-Marshall*, 624 F.3d at 341-42.

The application of *Garcetti* aligns with other Circuits' determination that curricular speech is not subject to First Amendment scrutiny. For example, in an opinion by then-Judge Alito, the Third Circuit held that "a public university professor does not have a First Amendment right to decide what will be taught in the classroom." *Edwards v. Calif. Univ. of Penn.*, 156 F.3d 488, 491 (3d Cir. 1998). Similarly, the Fourth Circuit has held that "speech" that "is curricular in nature" is unprotected because it is not on "a matter of public concern" within the meaning of the balancing test established by *Pickering v. Board of Education of Township High School Dist. 205, Will County*, 391 U.S. 563 (1968). *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 697 (4th Cir. 2007). So too the Fifth Circuit has held "that public school teachers are not free, under the first amendment, to arrogate control of curricula" because they do "not speak out as a citizen" when teaching in class. *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 800-02 (5th Cir. 1989). And although the Eleventh Circuit has not yet addressed in a binding decision whether *Garcetti* applies to a teacher's in-class curricular speech, in an unpublished opinion it applied *Garcetti* to a high school teacher's speech that was made pursuant to her official

duties as a cheerleading team sponsor. *See Gilder-Lucas v. Elmore Cnty. Bd. of Educ.*, 186 F. App'x 885, 886-87 (11th Cir. 2006).

The Eleventh Circuit's pre-*Garcetti* decision in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), also supports the application of *Garcetti* to speech related to the "content in the courses" taught. In *Bishop*, the Court held that a public university's decision to prohibit a professor from speaking about his religious beliefs "during instructional time" did not violate that professor's free speech rights. *Id.* at 1076-77. The Court spoke in no uncertain terms: The government's "conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Id.* at 1077. When the government (there, the university) and an individual educator "disagree about a matter of content in the courses he teaches," the Court explained, the government "must have the final say in such a dispute." *Id.* at 1076-77. The government, "as an employer and educator can direct" an individual professor "to refrain from expression" of particular views "in the classroom," and federal judges cannot second-guess the government's determination by acting as "ersatz deans or educators." *Id.* at 1075, 1077.

Drawing from the Supreme Court's decision in *Kuhlmeier*—then the leading case on the subject—the Eleventh Circuit concluded that the appropriate analysis was limited to determining whether the State's restrictions "are reasonably related to legitimate pedagogical concerns," *id.* at 1074—a standard largely

indistinguishable from "rational basis" review, the form of scrutiny that would apply *in the absence* of any First Amendment (or other fundamental) right, under "the separate constitutional prohibitions on irrational laws," *District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008). And *Bishop* makes clear that the government's "interests in the classroom conduct of its professors" are *per se* a legitimate pedagogical concern. 926 F.2d at 1076.

Both *Bishop*'s reasoning and holding are thus consistent with the conclusion that obviously follows from the Supreme Court's later cases in *Rosenberger* and *Garcetti*: Where, as here, a State prescribes or restricts the curricular instruction taught in its schools and the in-class conduct of its educators, nothing but government speech is in play, and the First Amendment has no application. Although *Bishop* did not hold that the First Amendment categorically does not apply in this context under the government speech doctrine, the Supreme Court had *not yet announced* that doctrine. The *Bishop* Court candidly admitted that it was doing its best to "frame" its "own analysis to determine the sufficiency of the University's interests in restricting" the professor's "expression in the classroom," in the absence of any "controlling" "cases satisfactorily on point." *Id.* at 1074. But thirty years later, in the more penetrating light shed by the Supreme Court's intervening decisions in *Rosenberger* and *Garcetti*, the best reading of *Bishop* is plainly the one that accords

with the teachings of those cases: The First Amendment simply has no purchase here.

Many of Plaintiffs' post-*Garcetti* cases are not to the contrary. *See* Pls.' Mot. for Prelim. Inj. And Mem. of Law 24, Doc. 4 (Apr. 22, 2022) ("Pls.' Br."). In *Adams v. Trustees of University of N.C.-Wilmington*, 640 F.3d 550, 563-64 (4th Cir. 2011), the professor's speech at issue "was unrelated to any of [his] assigned teaching duties at" the university; and *Adams* is a decision of the Fourth Circuit, which (as noted above) holds that curricular speech is unprotected. *Lee*, 484 F.3d at 697. And in *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019), the court concluded that a professor's in-class "use of profanity and discussion of her sex life" was *not* protected because it did "not serve an academic purpose" and thus was "not of public concern"; and *Buchanan* is a decision of the Fifth Circuit, which (also noted above) holds that teachers' in-class speech is unprotected. *Kirkland*, 890 F.2d at 800-02.

True, decisions in the Ninth Circuit and Sixth Circuit have distinguished between curricular speech at the college and K-12 levels, holding that *Pickering*, and not *Garcetti*, governs the regulation of such speech in university classrooms. *See* Pls.' Br. 23-24 (citing *Demers v. Austin*, 746 F.3d 402, 418 (9th Cir. 2014) and *Meriweather v. Hartop*, 992 F.3d 492 (6th Cir. 2021)). But those decisions are inconsistent with *Bishop* and the reasoning of *Garcetti* and *Rosenberger*. Moreover, they are limited to educators at the *university* level and lend no support to applying

21

*Pickering* to the curricular speech of K-12 teachers. *See, e.g.*, *Meriweather*, 992 F.3d at 505 n.1.

Additionally, the Act applies solely to "training or instruction." FLA. STAT. § 1000.05(4)(a). It therefore does not implicate educators' published scholarship. Nor does it broadly regulate anything that "relates to" educators' "expertise," *Austin v. University of Florida Board of Trustees*, No. 1:21-cv-184-MW/GRJ, 2022 WL 195612, at *15 (N.D. Fla. Jan. 21, 2022), or their membership in private organizations.

In sum, the speech that the Individual Freedom Act's education provisions regulate—the content of the curriculum used in public schools and the in-class instruction that occurs there—constitutes pure government speech that does not implicate Plaintiffs' Free Speech rights.

### B. Individual Teachers Do Not Have the "Academic Freedom" To Control Florida's Public School Curriculum.

Even if the First Amendment applied in this context, and it does not, it would not give the three educator Plaintiffs a First Amendment right to violate the Act and override the curriculum adopted by Florida's elected officials. These Plaintiffs assert a right of "academic freedom" that, they say, is grounded in a trilogy of Supreme Court cases from the Cold War era. *See* Pls.' Br. 19-21 (citing *Wieman v. Updegraff*, 344 U.S. 183 (1952); *Sweezy v. New Hampshire*, 354 U.S. 234 (1957); and *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967)).

22

Plaintiffs' argument is foreclosed by Eleventh Circuit precedent. In *Bishop*, the Eleventh Circuit was clear: "Though we are mindful of the invaluable role academic freedom plays in our public schools, particularly at the post-secondary level, we do not find support to conclude that academic freedom is an independent First Amendment right." 926 F.2d at 1075. *Bishop* acknowledged "abundant cases" that "acclaim academic freedom," including *Keyishian*. *Id.* at 1075. But it held that the "pronouncements about academic freedom" in the "context" of those cases "cannot be extrapolated to deny schools command of their own courses." *Id.* Under *Bishop*, Plaintiffs have no individual right to academic freedom.

Plaintiffs' attempt to avoid *Bishop* on this point is unpersuasive. They focus on a sentence in the concluding paragraph of the opinion where the Court stated that, "balanced against the interests of academic freedom," the government "cannot proscribe" the professor's "conduct to an extent any greater than we have indicated by our opinion." *Id.* at 1078. The problem for Plaintiffs, however, is that the "extent" to which the Court indicated the government could proscribe the professor's speech was *everything the professor said and did* "with respect to classroom conduct issued under its authority to control curriculum." *Id.* That type of restriction, the Court explained in the same paragraph, does "*not* infringe the free speech" rights of professors. *Id.* And that type of restriction is the precise restriction at issue here.

Even if *Bishop* had not settled this issue, the conclusion that in-class curricular speech can be regulated by the State is obviously correct. As the en banc Fourth Circuit explained in its exhaustive analysis of the right to academic freedom, that right, to the extent it exists, belongs to academic *institutions*—specifically universities—and does *not* belong to individual educators. *See Urofsky v. Gilmore*, 216 F.3d 401, 410-14 (4th Cir. 2000) (en banc). Indeed, Justice Frankfurter's classic statement on academic freedom makes clear that it is comprised of "'the four essential freedoms *of a university*—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" *Sweezy,* 354 U.S. at 263 (Frankfurter, J., concurring) (citation omitted). Other courts agree that any purported right to academic freedom is held by universities as an institution. As then-Judge Alito explained, "academic freedom ha[s] been described" only "as a *university's* freedom." *Edwards*, 156 F.3d at 492 (emphasis added); *see also Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593 (6th Cir. 2005) (same). And how could it be otherwise? The notion that individual professors have a constitutional right to make their own decisions, free from interference by anyone, whether university administrators or the State itself, concerning what may be taught and how it shall be taught would be a recipe for educational chaos, not excellence. Again, when the university and an individual educator "disagree about a

matter of content in the courses he teaches," the university "must have the final say in such a dispute." *Bishop*, 926 F.2d at 1076-77.

Moreover, to whatever extent public universities possess an institutional right of academic freedom, that right is best understood as a right of institutional autonomy *from the judiciary*, not the State that chartered it, governs it, and provides its funding. *See, e.g.*, *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985) (citing *Keyishian* as representing *the Court's* "reluctance to trench on the prerogatives of state and local educational institutions"). Indeed, it is unclear "how the Universities, as subordinate organs of the State," could "have First Amendment rights against the State or its voters." *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 247 (6th Cir. 2006). Plaintiffs have not cited a single case holding that a public university or K-12 school possesses a right to academic freedom that permits the institution to reject and override the State's education curriculum. And even if there were such an institutional right to academic freedom from democratic accountability, it is held only by universities, not K-12 schools. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 724 (2007) (noting "considerations unique to institutions of higher education").

In sum, under *Bishop*, the educator-plaintiffs have no constitutional right of academic freedom to override curriculum policies adopted by democratically elected lawmakers.

### C. Public School Students Do Not Have a First Amendment Right To Dictate Their Own Curriculum.

The claim by the student plaintiff, RMJ, that the Act violates her First Amendment right to "access information" also fails. Again, the Act regulates the public-school curriculum, which is pure government speech that does not implicate any purported right "to access information." *See supra*, at 15-22.

RMJ relies on three cases. Pls.' Br. 35-37. None of them supports her claim. In *Board of Education, Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality opinion), four Justices stated that a local school board's decision to remove books from the school library was subject to some form of First Amendment scrutiny. But given the fracturing of the Court on both votes and rationale, the Eleventh Circuit has already held that *Pico* "is a non-decision so far as precedent is concerned" and "establishes no standard." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009). Moreover, the *Pico* plurality "carefully circumscribed th[e] potential right, acknowledging that the case 'does not involve textbooks' and that the Court's conclusion 'does not intrude into the classroom, or into the compulsory courses taught there.' " *Chiras v. Miller*, 432 F.3d 606, 619 (5th Cir. 2005) (quoting *Pico*, 457 U.S. at 862). Thus, *Pico* has no precedential value, and the decision itself expressly did not reach the regulation of a school's curriculum.

*ACLU v. Miami-Dade* also involved a school board's decision to remove a book from the school library. *See* 557 F.3d at 1200. And the Court expressly distinguished the facts there from the situation here, noting that "the speech at issue d[id] not form part of a course of study in a school's curriculum," a context that would likely require a different standard. *See id.* Instead, it was "a school library book case." *Id.* Ultimately, the Court held that, even assuming *Pico* applied, the challengers still lost. *See id.* at 1202. That decision lends no support to RMJ's attempt to override the public-school curriculum policies set by democratically accountable officials.

That leaves *Virgil v. School Board of Columbia County, Florida*, which involved a school board's decision to "remov[e] a previously approved textbook." 862 F.2d 1517, 1518 (11th Cir. 1989). As in *Bishop*, *Virgil* was decided before the Court issued its key government speech precedents in *Rosenberger* and *Garcetti*. The *Virgil* opinion noted that courts had thus far "failed to achieve a consensus on the degree of discretion to be accorded school boards to restrict access to curricular materials." *Id.* at 1520-21. And as in *Bishop*, "the most direct guidance from the Supreme Court" at that time regarding the application of the First Amendment to the content of a public school's curriculum was *Kuhlmeier*. *Id.* at 1521. Therefore, the Court applied the *Kuhlmeier* standard and held that the board could remove the textbook from the curriculum without violating the First Amendment if its actions

were "reasonably related to legitimate pedagogical concerns." *Id.* at 1518, 1520-22 (cleaned up).

In any event, *Virgil*, like *Bishop*, must now be read in light of the Supreme Court's subsequent decisions in cases like *Rosenberger* and *Walker*. *See Chiras*, 432 F.3d at 617 (noting *Virgil* "did not have the benefit of" the Supreme Court's recent government-speech cases). In the light shed by those cases, *Virgil* cannot be read as requiring any sort of heightened First Amendment scrutiny in this context.

### D. The Act's Educational Provisions Satisfy Any Standard of Heightened Constitutional Scrutiny.

#### 1. The Education Provisions Are Narrowly Tailored To Serve A Compelling Government Interest.

Even if the Court reads the Eleventh Circuit's pre-*Garcetti* decisions in *Bishop* and *Virgil* as adopting a level of scrutiny marginally more stringent than rational basis review, that standard still requires, at most, that the Act's provisions be "reasonably related to legitimate pedagogical concerns." *Kuhlmeier*, 484 U.S. at 272-73; *see Bishop*, 926 F.2d at 1074; *Virgil*, 862 F.2d at 1521-23. The educational provisions here easily pass muster under this "deferential standard." *Virgil*, 862 F.2d at 1520. As the Ninth Circuit held, educational statutes that, among other things, prohibit teaching classes that "[p]romote resentment toward a race or class of people" or "[a]dvocate ethnic solidarity instead of the treatment of pupils as individuals" are "reasonably related to the state's legitimate pedagogical interest in

reducing racism." *Arce v. Douglas*, 793 F.3d 968, 973, 985-86 (9th Cir. 2015) (cleaned up).

If the Court concludes that *Bishop* and *Virgil*'s "reasonably related" standard does not apply, then it should apply the *Pickering* balancing test because the speech at issue involves government employees. Under that test, the court must balance the employee's interest against the State's interest, as employer, in promoting the efficiency of its programs. *Lane v. Franks*, 573 U.S. 228, 236 (2014).[2]

Here, recognizing a right of public educators to violate the State's public-school curriculum policies would unquestionably "imped[e] the teacher's proper performance of his daily duties in the classroom." *Pickering*, 391 U.S. at 572-73. Indeed, it would *subvert* the teacher's classroom duties. Plaintiffs' argument would require Florida's education administrators to stand idly by as a teacher espouses white supremacy, antisemitism, Holocaust denial, male superiority, or critical race theory at the head of a public-school classroom. The State's interest in providing its

---

[2] Plaintiffs suggest that the State bears a higher burden under *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995). Pls.' Br. 25. But that case applied a different standard only "[b]ecause the vast majority of the speech at issue" did "not involve the subject matter of Government employment and takes place outside the workplace." 513 U.S. at 470; *see also id.* at 465 ("With few exceptions, the content of [the employees'] messages *has nothing to do with their jobs*." (emphasis added)). Therefore, to the extent *NTEU* imposes a higher burden on the government, it also requires a higher burden from Plaintiffs: a showing that the regulated speech occurs outside the workplace and has essentially no relevance to their employment. Because the speech restrictions here govern *only* their employment-related, in-school speech, *NTEU* does not apply.

legislatively defined education to students vastly outweighs that individual interest under *Pickering*.

In all events, the provisions here pass muster even under strict scrutiny. The compelling nature of the government's interest in stamping out racial discrimination is so fundamental that it is embodied in our highest law. *See Brown*, 349 U.S. at 294 (noting the "fundamental principle that racial discrimination in public education is unconstitutional"). Thus, public schools are *constitutionally* prohibited from teaching, for example, that one "race is inherently superior to another race," or that a person should be "discriminated against" "on the basis of race." *See* FLA. STAT. § 1003.42(3). The same is true of discrimination on the basis of sex, religion, and national origin.

The Act's educational provisions are "narrowly drawn to accomplish those ends." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267 (11th Cir. 2005). As an initial matter, by its own terms, the Act does *not* "prohibit discussion of the concepts" listed in Section 1000.05(4)(b). It merely requires that those concepts be taught "as part of a larger course of training or instruction" and "in an objective manner without endorsement." *Id.* The Act only prohibits teaching that "espouses, promotes, advances, inculcates, or compels" students or employees to believe the concepts. *Id.* And even within the concepts themselves, the provisions are narrowly drawn—for example, prohibiting instruction that a person is

"inherently" racist "solely" by virtue of his or her race or sex, meaning that a person's race is the *only and entire* explanation for his or her racism.

### 2. Plaintiffs' Contrary Arguments Fail.

Plaintiffs' primary argument is that the educational provisions cast a "pall of orthodoxy" over the classroom, citing the Supreme Court's 1967 decision in *Keyishian*. But the Eleventh Circuit in *Bishop* declined to extrapolate such a broad principle from cases like *Keyishian*. The court noted that "*Keyishian* dealt with that brand of regulation most offensive to a free society: loyalty oaths." *Bishop*, 926 F.2d at 1075. But the "Court's pronouncements about academic freedom in that context," *Bishop* continued, "cannot be extrapolated to deny schools command of their own courses." *Id.* Thus, there is no freestanding "pall of orthodoxy" standard for judicial scrutiny of a public school's curriculum.

Next, Plaintiffs rely extensively on lawmakers' public statements. Pls.' Br. Ex. 1-2. But the Eleventh Circuit has "held—'many times'—that 'when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose.' " *NetChoice, LLC v. Moody*, No. 21-12355, 2022 WL 1613291, at *19, __ F.4th __, __ (11th Cir. May 23, 2022) (quoting *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015)). The principle of *In re Hubbard* is derived from the longstanding historical doctrine of "legislative privilege." *In re Hubbard*, 803 F.3d at 1307-08,

31

1311-12. Nor is *ACLU v. Miami-Dade*, Pls' Br. 35-36, to the contrary because that case (decided before *In re Hubbard*) involved the action of a *school board*, which does not hold legislative privilege. Therefore, the only question here is whether the text of the challenged provisions are constitutional; the statements of Governor DeSantis or Florida legislators are irrelevant to Plaintiffs' free speech challenges.

Plaintiffs are also wrong to suggest that they prevail if the Act regulates based on viewpoint.  Even if the Act were viewpoint-based, it does not change the analysis, since as *Bishop* makes clear, the State "*must* be allowed" to determine the "*viewpoints*" that are taught "in the classroom." *Bishop*, 926 F.2d at 1077 (emphasis added); *see also Shurtleff*, 142 S. Ct. at 1589 (For "government speech," the government may regulate "based on viewpoint."). Much curricular speech mandated by state education authorities is, after all, inherently viewpoint based. And in all events, even viewpoint-based regulation is at most subject to strict scrutiny, *see R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395-96 (1992)—which the Act survives, *see* Part II.D.

In addition, Plaintiffs assert that the provisions are unconstitutional because there is no empirical evidence that the conduct prohibited by the Act is actually occurring in schools. *See* Pls.' Br. 42 (relying on *Wollschlaeger v. Gov., Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc)). But Plaintiffs misunderstand *Wollschlaeger*, which involved a *means-ends* assessment of whether the challenged

regulation on speech—rules preventing medical professionals from asking certain questions and gathering certain information about their patients' firearms ownership—"directly advance[d]" the State's proffered interest in protecting Second Amendment rights. 848 F.3d at 1312 (cleaned up). In that context, which is outside of the context of government speech, the State must come forward with a "quantum of empirical evidence" that varies depending on "the novelty and plausibility" of its theory that there is actually a sufficient "fit between the legislature's ends and the means chosen to accomplish those ends." *Id*. (cleaned up).

Here, by contrast, Defendants do not seek to justify the Act's speech restrictions as furthering some end other than eliminating the speech at issue; the Act's justification is that *the restricted speech itself is pernicious and has no place in Florida public schools*. It makes no sense in this context to ask for empirical evidence that the means chosen will advance the government's end; the "end" *is* the elimination of the speech that the "means" proscribes. The Constitution would permit Florida to prohibit teachers from using racial slurs to address students of one race without having to wait until teachers actually begin doing so, and it permits Florida to prohibit the equally offensive speech at issue here in equal measure.

In any event, the examples that Plaintiffs themselves put forward as the motivation provide ample justification for the Act. One example involved named Plaintiff Dr. Hodo, who had been hired as a consultant by a public school in

Jacksonville. *See* Decl. of John D. Ohlendorf, Ex. 1 (June 1, 2022). The school informed parents that, in response to "cultural issues that have arisen" at the school, Dr. Hodo would be hosting two meetings with students—one for "students of color" and one for "white students." *Id.* This deliberate racial segregation of a public school's students was prevented only because parents complained. *See* Ohlendorf Decl., Ex. 2. The Florida Legislature did not need to tolerate *more than one* attempted violation of *Brown v. Board* before determining that the Act was necessary. And as Plaintiffs concede, the State had other examples as well. Pls.' Br. 32-33. These publicly reported, highly controversial, factually undisputed stories were much more than the "anecdotes" at issue in *Wollschlaeger*—which involved, for example, a story that a state representative's daughter told him about a pediatric appointment. 848 F.3d at 1302.

### III.   The Act's Employment Provisions Are Constitutional.

#### A. The Employment Provisions of the Act Govern Conduct, Not Speech.

Plaintiffs' First Amendment challenge to the employment provisions fails at the outset because these provisions do not regulate speech at all. Rather, the employment provisions regulate pure conduct: an employer's non-expressive, commercial action of imposing "a condition of employment" that requires its employees to attend certain instruction or training activities. Accordingly, the Act regulates conduct, not speech, and the First Amendment simply does not apply.

While drawing the line between speech and conduct may at times be difficult, the Supreme Court's precedents "have long drawn it, and the line is long familiar to the bar." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (cleaned up). "[R]estrictions on protected expression are distinct from restrictions on economic activity," and "the First Amendment does not prevent" the latter. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). As the Eleventh Circuit has explained, "laws that target real-world commercial activity need not fear First Amendment scrutiny. Such run-of-the-mill economic regulations will continue to be assessed under rational-basis review." *Dana's R.R. Supply v. Att'y Gen. of Fla.*, 807 F.3d 1235, 1251 (11th Cir. 2015).

It is evident that the Act's provisions regulating Florida employees lie safely on the "conduct" side of this speech-conduct divide. Yes, speech occurs *at* workplace "training" and "instruction" events that inculcate the propositions, for example, that members of one race "are morally superior to members of another," or that members of one race "should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion." FLA. STAT. § 760.10(8)(a). But the Act does not restrict that speech in the slightest. Employers remain free to arrange, sponsor, and pay for training events advocating these propositions (subject to any other relevant principles of federal or state anti-discrimination law not challenged here); consultants like Dr. Hodo remain free to espouse these ideas and

35

to collect fees for doing so; employees remain free to attend such training events. The *only thing* that the Individual Freedom Act prohibits is this: an employer may not make attendance at training events or sessions like these a mandatory "condition of employment." *Id.* Imposing such a condition is pure conduct, and the First Amendment has nothing to say about it.

The Act's employment provisions thus do not impose even an incidental burden on speech. Everything that could be said on the topic of race, color, sex, or national origin *before* the Act goes into effect can *also* be said *after*—without any restraint, and in exactly the same way. But even if the Act's limits—preventing employers from *conscripting their workers into the audience* at these events—did somehow *incidentally* burden the speech that is uttered there, heightened constitutional scrutiny would still not apply. For "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell*, 564 U.S. at 567. After all, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006) (cleaned up). A legislature, for example, can prohibit racial discrimination in hiring without violating the First Amendment, even though such a prohibition would require an employer to take down a sign reading "White Applicants Only."

*Id.* at 63. And here, the Individual Freedom Act does not even impose *that* much of a burden on speech. Rather, the Act's employment provisions are akin not to a prohibition on a "White Applicants Only" sign, but rather to a prohibition on an employer's practice of *forcing all employees to look at it.*

The Eleventh Circuit's en banc decision in *Wollschlaeger*, confirms that the Act's employment provisions do not implicate the First Amendment. That case held that a Florida law prohibiting doctors from discriminating against patients for owning firearms did not implicate the First Amendment because it could be construed "to apply to non-expressive conduct such as failing to return messages, charging more for the same services, declining reasonable appointment times, not providing test results on a timely basis, or delaying treatment because a patient … owns firearms." 848 F.3d at 1317. Here, a savings construction is unnecessary: the Act's employment provisions, by their plain terms, apply only to the non-expressive conduct of *requiring* employees, as a condition of employment, to attend training sessions where the kind of speech identified by the Act occurs.

The Supreme Court's decision in *FAIR* is to the same effect. *FAIR* concerned the constitutionality of the Solomon Amendment, which required law schools to provide military recruiters equal access to students as any other recruiter. The Court concluded that the Solomon Amendment regulated conduct, not speech: "It affects what law schools must *do*—afford equal access to military recruiters—not what they

may or may not *say*." 547 U.S. 47 at 60. Further, any speech that was affected by the Amendment—such as "send[ing] e-mails or post[ing] notices on behalf of the military"—was "plainly incidental to the Solomon Amendment's regulation of conduct." *Id.* at 62. And "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.*

So too here. Just as the Solomon Amendment "affect[ed] what law schools must *do*," *id.* at 60, the Act's employment provisions solely affect *the conduct* of employers: mandating attendance at training or educational sessions espousing the discriminatory principles at issue, on pain of losing your job. And just as "[l]aw schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy," *id.*, employers, employees, and consultants like Dr. Hodo remain free under Florida's Act to express whatever views they may have pertaining to matters of race, color, sex, religion, or national origin. The only thing employers may not do is require, on pain of sanction, their employees to listen to those views if they do not wish to.

### B. In Any Event, the Employment Provisions Also Survive Heightened Scrutiny.

#### 1. Under the Captive Audience Doctrine, at Most Intermediate Scrutiny Applies.

Even if the Act's employment provisions regulate speech, which they do not, they serve the "substantial and justifiable" interest of preventing employers from conscripting a "captive audience" for that speech, made up of employees "who are presumptively unwilling to receive it." *Frisby v. Schultz*, 487 U.S. 474, 488 (1988) (cleaned up). Whether or not the First Amendment prevents Florida from keeping employers in the State from *uttering* such speech, "the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it." *Hill v. Colorado*, 530 U.S. 703, 716 (2000).

The Supreme Court has repeatedly recognized that "[t]he First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." *Frisby*, 487 U.S. at 488 (cleaned up). Because "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate," *Rowan v. United States Post Off. Dep't*, 397 U.S. 728, 736 (1970), the State has the power to protect "[t]he unwilling listener's interest in avoiding unwanted communication," *Hill*, 530 U.S. at 716. Although the authority to protect "captive audiences" is of course most acute in the

home and its immediate environs," *Frisby*, 487 U.S. at 485, the Government may protect unwilling listeners outside the home, in those situations where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 (1975).

In *Lehman v. City of Shaker Heights*, for example, the Court upheld a city's rule barring the display of political advertising in its mass-transit vehicles. 418 U.S. 298, 299 (1974) (plurality). Though no single opinion commanded a majority, both the plurality opinion ruling for the City and Justice Douglas's concurrence emphasized the captive nature of commuters and their right to avoid unwanted speech. The City's rule, the plurality concluded, was designed to minimize "the risk of imposing upon a captive audience." *Id.* at 304. And Justice Douglas reasoned that, while a speaker "has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it." *Id.* at 307 (Douglas, J., concurring). Subsequent cases have thus read *Lehman* as standing for the proposition that the government "may protect its citizens against unwilling exposure to materials that may be offensive" in those situations where "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." *Erznoznik*, 422 U.S. at 208–09.

Later Supreme Court decisions are in accord. In *Bethel School District No. 403 v. Fraser*, for example, the Court upheld the School District's decision to

discipline a student for a lewd speech he gave during an assembly in part based on the authority of the school (and, hence, the State) "to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech." 478 U.S. 675, 684 (1986). Similarly, in *Hill v. Colorado*, the Court upheld state restrictions on "speech-related conduct within 100 feet of [an abortion clinic]" based partly on "the interests of unwilling listeners in situations where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure." 530 U.S. at 707, 718 (cleaned up).

The Individual Freedom Act's employment provisions apply *only* in precisely such a captive situation. To the extent these provisions burden speech at all, they do so only where an employee is being coerced into attending an instructional event that he wishes to but cannot, practically, avoid—at least not without risk to his job and, hence, his livelihood. Other Supreme Court First Amendment precedents recognize that the degree of protection for "an employer's free speech right to communicate his views to his employees" must "take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969). Indeed, because of concerns like these, the U.S. District Court for the Middle District of Florida held, in an influential case, that

41

"the regulation of discriminatory speech in the workplace" in general is justified under the First Amendment because, in part, female workers "are a captive audience in relation to the speech that comprises the hostile work environment," given the "coercion" inherent in "employer-employee relations." *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1535–36 (M.D. Fla. 1991).

The Supreme Court case law does not make it entirely clear what form of (diminished) First Amendment scrutiny applies to laws protecting the members of a captive audience from unwanted speech. The language in some cases intimates that the First Amendment simply has no application to such speech, *see Rowan*, 397 U.S. at 738, and indeed *Lehman* appeared to apply something akin to rational basis review, 418 U.S. at 303–04. A more moderate reading of the precedent is that a form of intermediate scrutiny applies in this context, where "the interests of unwilling listeners" are balanced against "the rights of speakers." *Hill*, 530 U.S. 718; *see also Frisby*, 487 U.S. at 488 (upholding anti-picketing ordinance based on the State's "substantial and justifiable interest" in protecting captive audiences). Here, the Act's employment provisions clearly survive either standard—or, indeed, even strict scrutiny.

### 2. The Employment Provisions Survive Any Level of Heightened Constitutional Scrutiny.

As just explained, the Act's employment provisions serve the "substantial and justifiable" interest of preventing Florida employers from foisting speech that the

State finds repugnant on a "captive audience" of employees "who are presumptively unwilling to receive it." *Frisby*, 487 U.S. at 488 (cleaned up). And as discussed above, the State also clearly has a compelling interest in stamping out invidious discrimination. *See supra*, Part II.D; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984) (recognizing "compelling state interests" in "[a]ssuring women equal access" to "business contacts and employment promotions"). There can thus be no serious doubt that the Act's employment provisions advance government interests of the very highest order.

The provisions are also narrowly tailored to those interests. The Act surgically targets speech that the State believes reflects invidious bias against certain employees on the basis of their race, sex, national origin, or religion; and specifically speech that the employee is forced to listen to or else suffer the consequences. It is in this narrow context that Florida's interests—in (1) protecting against invidiously biased speech aimed at employees on the basis of their race, sex, religion, or national origin and (2) preventing employers from coercing their employees to listen to speech that they, like the Florida Legislature, find abhorrent—unite and are at their apex. And the employment provisions are the least restrictive means of curbing this practice. They leave employers free to engage in, promote, and pay for any speech they wish, including the speech targeted by the Act, and they leave willing employees free to hear and to join in it. All they prevent is the use of the employer's

coercive economic leverage over its employees to make them an offer they can't refuse: Listen to the company's speech or clear out your desk.

Thus, the Act is far narrower than general statutes barring race or sex-based hostile environments in the workplace, such as Title VII. *See* 42 U.S.C. §§ 2000e *et seq.* Plaintiffs offer no explanation of how the employment provisions at issue here can be declared unconstitutional without dooming a vast range of routine employment discrimination claims under Title VII. And unlike the provisions at issue here, Title VII is not limited to the narrow context where an employer literally forces its employees to listen to the unwelcome, discriminatory speech as a condition of keeping their jobs. Any holding striking down the Act's employment provisions would thus directly threaten the validity of Title VII's protections against hostile working environments. Yet the Supreme Court has endorsed hostile environment claims. *See, e.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993). And *no* court, to Defendants' knowledge, has suggested that this entire field of employment discrimination law is unconstitutional. Yet that is a conclusion that Plaintiffs' arguments invite.

## IV.   The Challenged Provisions Are Not Unconstitutionally Vague.

Under the Due Process Clause, a statute is void for vagueness "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and

discriminatory enforcement." *Wollschlaeger*, 848 F.3d at 1319 (cleaned up). In the speech context, the government must regulate "with narrow specificity," but "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.* at 1320.

Plaintiffs cite two provisions that they say are unconstitutionally vague. First, they cite (Pls.' Br. 47) the Board's June 2021 regulation providing that instruction "must be factual and objective, and may not suppress or distort significant historical events." *See* FLA. ADMIN. CODE r. 6A-1.094124(3)(b). As an initial matter, because this curricular regulation applies only to government speech, it implicates neither Plaintiffs' speech or Due Process rights, and the vagueness doctrine is irrelevant. In any event, Plaintiffs' argument fails. They say that the regulation "offers no guidance" on how to determine whether instruction "distorts significant historical events." Pls.' Br. 47. In the very same sentence, however, Plaintiffs acknowledge that the regulation "offer[s] examples" of instruction that are prohibited. *Id.* And apart from this lone and self-contradictory sentence, Plaintiffs make no other argument that the regulation "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Wollschlaeger*, 848 F.3d at 1319.

Plaintiffs also challenge the regulation's definition of critical race theory, *supra* at 6. But their principal complaint appears to be only that the definition

"sweeps in concepts about institutional racism that far exceed the scope of traditional critical race theory." Pls.' Br. 48. That is not a vagueness argument.

Plaintiffs also say that the term "[c]ritical race theory lacks a singular definition even among its proponents." *Id.* That is completely irrelevant, since the regulation adopts its *own* definition of "critical race theory"—the theory "that racism is not merely the product of prejudice, but that racism is embedded in American society and its legal systems in order to uphold the supremacy of white persons." *See* FLA. ADMIN. CODE r. 6A-1.094124(3)(b). And Plaintiffs make no argument that *this definition* is vague.

Plaintiffs also suggest that the regulation's specific curricular prohibition on teaching "material from the 1619 Project" shows that the broader prohibition on material that "suppress[es] or distort[s] significant historical events" invites arbitrary enforcement because (Plaintiffs imply) there is no other reason for prohibiting the use of the 1619 Project. But the historical claims in the 1619 Project have been widely criticized by some of the best historians in the country. *See, e.g.*, Ohlendorf Decl., Ex. 3. (noting numerous factual criticisms from history professors and historians). Indeed, when Governor DeSantis spoke at the Department of Education's public meeting, he stressed the 1619 Project's inaccuracies as a basis for the regulation, stating that the State's history and civics courses must be "factual," and that the 1619 Project's claims—for example, that "the American

46

Revolution was primarily fought to preserve slavery"—were "factually false" as reflected by "the historical record." Ohlendorf Decl., Ex. 4.[3] A state regulation that requires teaching that is "factual and objective" and does not "suppress or distort significant historical events" is not unconstitutional. And again, the State, not the Plaintiffs or this Court, must have the final word in any dispute about the historical accuracy of the 1619 Project or any other curricular question. *Bishop*, 926 F.2d at 1076.

Plaintiffs' concerns that the writings of Dr. Martin Luther King Jr. "would be banned" under the regulation are equally misplaced. Apart from the fact that Dr. King's advocacy and literary works are *themselves* "significant historical event[s]" and thus clearly may be taught, the material Plaintiffs quote does not even purport to discuss historical events—it is instead a call for future actions to achieve justice. The 1619 Project is a different genre altogether: it is a highly controversial, historical account of America's "founding" that the Board has determined to be tendentious and inaccurate and thus has prohibited from the State's public-school curriculum. Making curricular decisions such as this is the Board's very *raison d'etre.*

Plaintiffs next argue that § 760.10(8)(a)(7)'s prohibition on particular mandatory employee training is unconstitutionally vague because it "hinges entirely

---

[3] Although the *Pico* standard does not apply, *see supra* at 26, these statements demonstrate why the provisions here satisfy that standard nonetheless.

on how certain speech makes the listener feel." Pls' Br. 49. But the provision prohibits required training that espouses or promotes how a person *should* or *must* feel; it says nothing about how any person actually *does* feel. It prohibits teaching the idea that an individual, "by virtue of his or her race … *must* feel guilt, anguish, or other forms of psychological distress because of" wrongs committed in the past by other members of that person's race. FLA. STAT. § 760.10(8)(a)(7) (emphasis added). The law is utterly indifferent to a person's actual "feelings" about such historical wrongs. Thus, the statute is neither ambiguous nor remotely unconstitutionally vague.[4]

## V.   Any Unconstitutional Provisions Are Severable.

To the extent the Court finds Plaintiffs' claims likely to succeed with respect to any of the Act's provisions, it should sever them from the remainder of the Act. Severability is "a matter of state law," and in Florida, unconstitutional provisions are severable even in the absence of a severability clause if "(1) they can be separated from the remaining valid provisions; (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void; (3) the

---

[4] Plaintiffs' concede that their overbreadth challenge is entirely subsumed by their own First Amendment challenges. Pls' Br. 50. They offer one paragraph of analysis and conclude that the provisions are overbroad "[f]or the same reasons" that they "fail the *Pickering* balancing test and First Amendment heightened and strict scrutiny." *Id.* Thus, to the extent Plaintiffs even allege an overbreadth claim, it fails for the same reasons their other claims fail.

good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other; and (4) an act complete in itself remains after the invalid provisions are stricken." *Wollschlaeger*, 848 F.3d at 1318 (cleaned up). Here, each of the provisions of the Act clearly stands on its own and independently furthers Florida's interests in enacting it. If any portion of the Act is held unconstitutional, it should be severed from the remaining, valid provisions.

## VI.   Plaintiffs Are Not Entitled to a Preliminary Injunction.

### A. Plaintiffs Have Not Shown Irreparable Injury.

Plaintiffs' cursory argument that the Act will cause them irreparable harm is based entirely on the rule that "[v]iolations of First Amendment freedoms" are per se "irreparable injury," Pls.' Br. 50. But because they have not shown any likelihood that the Act *actually violates* any First Amendment freedoms, this presumption does not apply.

Plaintiffs' failure to show irreparable harm is especially pronounced with respect to their challenge to the Board's June 2021 rule, which has been on the books *for nearly twelve months*. Plaintiffs' almost year-long delay should foreclose their demand for emergency relief. *See Wreal*, 840 F.3d at 1248 (plaintiff's "unexplained five-month delay in seeking a preliminary injunction, by itself, fatally undermined any showing of irreparable injury").

## B. The Balance of the Equities Militates Against Preliminary Injunctive Relief.

The balance of the equities and the public interest weigh decisively against enjoining the Act. As shown above, the State has a compelling—constitutionally imperative—interest in ending discrimination based on race and other immutable characteristics, and enjoining the Act will sanction conduct and curricular speech that Florida has determined, in the exercise of its sovereign judgment, is pernicious and contrary to the State's most cherished ideals. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up), and that is true all the more when the statute at issue furthers interests as fundamental as those at the heart of Florida's Individual Freedom Act.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated: June 1, 2022

Respectfully Submitted,

/s/ Timothy L. Newhall
Timothy L. Newhall
*Special Counsel*
Complex Litigation
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399-1050
Telephone: 850.414.3300
timothy.newhall@myfloridalegal.com

*Counsel for Defendant Ashley Moody,*
*in her official capacity*

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com
johlendorf@cooperkirk.com
mwold@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Defendants Ron DeSantis,*
*in his official capacity, et al.*

## **CERTIFICATE OF WORD COUNT**

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Defendant's Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 11,908 words as measured by Microsoft Office for Word 365.

s/      Charles J. Cooper
Charles J. Cooper