## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DONALD FALLS,** et al.

    **Plaintiffs,**

**vs.**                       **Case No.:  4:22-cv-00166**

**RON DESANTIS,** in his official
capacity as Governor of Florida, et. al
    **Defendants.**

_____

### PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (DOC. 4) AND RESPONSE TO DEFENDANTS' MOTION TO DISMISS (DOC. 42)

Defendants justify their sweeping ban on expression to suppress what they call "woke ideology" by invoking the Constitution's guarantee of Equal Protection. (Doc. 44 at 1). They claim to fight on the side of our nation's loftiest egalitarian precedents like *Brown v. Board of Educ. of Topeka Kan,* 349 U.S. 294, 298 (1955) and *Loving v. Virginia*, 388 U.S. 1, 11 (1967). *Id.* In this respect, Florida's conservative politicians march under a false banner—toward an enemy that exists only in their rhetoric and imaginations.

While they claim the so-called "Stop WOKE Act" and Regulation banning "critical race theory" are designed to prevent racial resentment or discrimination, their true aims lie in the opposite direction. These oppressive restrictions on speech

and freedom of expression are motivated by nothing more than a desire to advance a political narrative and misleading historical narrative.

Defendants' failure to offer any evidence supporting their proffered justification for these laws demonstrates that Florida's conservative politicians were motivated by nothing more than their desire to have Florida's schoolteachers and employers take their side on an emerging cultural debate (or at minimum, prevent them from joining the opposition). This lawsuit does not seek resolution of the ongoing discussions about race and gender in our society. Rather, it seeks to ensure those discussions continue. That is why Plaintiffs seek, and are entitled, to a preliminary injunction before these laws inflict irreparable harm on them and our state at large.

## I.  The IFA and Regulation Violate Teachers' and Professors' Rights To Free Expression and Academic Freedom

### A. The Government Speech Doctrine Does Not Apply to Classroom Instruction.

Defendants claim the First Amendment does not protect classroom instruction, because such instruction is "pure government speech." (Doc. 44 at 15–23). They read the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and its progeny to strip First Amendment protections from public school teachers and public university professors in the classroom, because said instruction is part of their official duties as employees of the State. *Id.* at 15. However, as

Defendants acknowledge, *Garcetti* expressly left open the question of whether its holding applied to classroom instruction. *Garcetti*, 547 U.S. at 425.

The Court drew this distinction for a reason. Specifically, because of its prior repeated recognition of the nation's "deep[] commit[ment] to safeguarding academic freedom." *Id.* at 425; 438–39 (Souter, J. Dissenting) (collecting cases). Defendants now suggest this "deep commitment" was, in truth, a fleeting commitment that *Garcetti*'s reasoning quietly cast aside. Under their reading, the State's authority to establish a school curriculum allows Florida's Legislature and Executive Branch to impose any ideological dogma on public schools and universities without running afoul of the First Amendment. However, their proposed framework sits at odds with Supreme Court and Eleventh Circuit precedent, as well as the policies underlying the government speech doctrine and academic freedom.

1. **Pre-*Garcetti* Supreme Court and Eleventh Circuit Decisions Recognize First Amendment Protections for Classroom Instruction**

*Garcetti* must be read in context of the decisions that came before it. In *Keyishian v. Board of Regents of University of the State of N.Y.*, 385 U.S. 589 (1967), the Court struck down a plan formulated in statutes and administrative regulations designed to prevent the appointment or retention of teachers the State considered "subversive." *Id.* at 600–602. Specifically, the plan prohibited employment or retention of teachers who, "by word of mouth or writing, willfully

3

and deliberately advocates, advises or teaches the doctrine of forceful overthrow of government." *Id.* at 599. The plan also included an annual review of every teacher to determine "whether any utterance or act of his, <u>inside the classroom or out</u>, came within the sanctions of the laws." *Id.* at 683 (emphasis added).

In striking down the state's plan, the Court noted that its holding adhered to long-established principles recognizing the importance of academic freedom:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. <u>That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom</u>. 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.

*Id.* at 1820. (emphasis added).

Defendants rely on an oversimplified characterization of *Keyishian*, cabining its holding to teacher "loyalty oaths." (Doc. 44 at 31) (citing *Bishop v. Araonov*, 926 F.2d 1066 (11th Cir. 1991)). However, their analysis misapprehends *Keyishian* in two fundamental respects. First, while the state plan in *Keyishian* did incorporate loyalty oaths as one method of removing "subversive" teachers from the classroom, the Court also struck down the plan in its entirety, including its annual reviews of teachers' speech both outside and inside the classroom. *Keyishian*, 385 U.S. at 599.

Second, as the quote above demonstrates, the Supreme Court took issue with the state's plan in *Keyishian* because of the chilling effect its strictures would have on classroom instruction—or in the Court's own words, its tendency to "cast a pall of orthodoxy <u>over the classroom</u>." *Id.* at 1820. (emphasis added). It would be a strange interpretation of *Keyishian's* rationale to argue the Court would allow states to explicitly mandate through legislative fiat the very pall of orthodoxy New York attempted to cast over the classroom indirectly through teacher loyalty oaths and annual reviews.

Contrary to Defendants' claims, binding precedent in our Circuit arising from *Keyishian* has rejected the idea that the First Amendment offers no protection for classroom instruction. *See Kingsville Independent School Dist. v. Cooper*, 611 F.2d 1109 (5th Cir. 1980)[1]; *Pred v. Board of Public Instruction of Dade County, Fla.*, 415 F.2d 851 (5th Cir. 1969). In *Pred*, the former Fifth Circuit explicitly applied *Keyishian* to classroom instruction when the school board declined to renew the contracts of two Florida public school teachers who engaged in expressive activity that the school board found distasteful. *Id.* at 853–54. Both teachers had participated in the county's Classroom Teachers' Association and one teacher alleged the school retaliated against her for her "energetic

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

advancement…in classroom instruction of her courses in literature of the new demands for campus freedom." *Id.* at 853.

The Fifth Circuit rejected the school board's argument that the teachers were not deprived their First Amendment rights because they could still speak elsewhere, just not as public-school teachers. *Id.* at 856. Relying on *Keyishian* and its progeny, the court went on to note that "the protections of the First Amendment have been given special meaning when teachers have been involved" and "[s]imply because teachers are on the public payroll does not make them second-class citizens regarding their constitutional rights." *Id.* at 856.

The court recognized that the school had a legitimate interest in preventing propaganda or agitation within and without the classroom, it nevertheless held that the court must employ a balancing test between the "sweeping declaration of First Amendment rights to students and teachers" and "the comprehensive authority of the States and of school authorities, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 858. The court reversed the district court's order dismissing the plaintiffs' claims and remanded the case for further fact-finding, including a determination of whether "under the circumstances in relation to the reasonable demands of a system of organized responsible learning these actions were protected." *Id.* at 860. Thus, as early as 1969, our circuit recognized that a school's interest in regulating its classrooms

must be balanced against teachers' First Amendment interest in expression in the classroom, even if the court did not determine in that particular case whether the restrictions at issue overstepped that balance. *Id.*

Our circuit had occasion to extrapolate that balancing test in *Kingsville Independent School Dist.,* 611 F.2d at 1113. *Kingsville* involved a public high school history teacher who employed a controversial technique called "Sunshine simulation" to teach American history of the post-Civil War Reconstruction period. *Id.* at 1111. The technique involved roleplaying by students to recreate that period of history and engendered both strong feelings from students on racial issues and complaints from parents. *Id.* Despite receiving strong reviews for her performance, the school district elected not to renew the Plaintiff's contract, with several board members citing the Sunshine simulation as the reason. *Id.*

The plaintiff brought claims under 42 U.S.C. §1983 alleging her termination violated her First and Fourteenth Amendment rights. *Id.* at 1111–12. The former Fifth Circuit held that classroom discussion was protected by the First Amendment. *Id.* at 1113. It further held that a teacher could only be discharged for discussions conducted in the classroom if those discussions "clearly overbalance[d] her usefulness as an instructor." *Id.* As such, our Circuit not only recognizes First Amendment protections for classroom instruction, but it also

demands a substantial justification from the state when it seeks to regulate such instruction.

In contravention to this well-established precedent, Defendants argue *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), held that the First Amendment did not protect classroom instruction, or, at best, that courts employ a rational basis review to restrictions on classroom instruction. (Doc. 44 at 19–20). As Plaintiffs noted in their Motion, *Bishop*'s <u>holding</u> expressly recognized a First Amendment interest in academic freedom that must be balanced against a university's authority to control its curriculum. *Id.* at 1078; (Doc. 4 at 23, n.2). Defendants contend, however, that *Bishop*'s <u>reasoning</u> commands a different result in this case, because the court found that a university should have final say in its curriculum. (Doc. 44 at 20–21).

However, Defendants' reading of *Bishop* cherry-picks statements out of context to support its argument while ignoring the court's analysis recognizing teachers' interests in academic freedom. *Bishop* explicitly stated that it was engaging in a balancing test between the teacher's and university's competing interests, weighing the particular facts and circumstances of the case before it:

> The University's chief concern is that its courses be taught without personal religious bias unnecessarily infecting the teacher or the students. <u>Dr. Bishop's interest in academic freedom and free speech</u> do not displace the University's interest inside the classroom. Contrary to the district court, *Bishop,* 732 F. Supp. at 1568, we find that

> the University's interests in the classroom conduct of its professors are sufficient, <u>in the balance we have suggested</u>, to warrant the reasonable restrictions it has imposed on Dr. Bishop. Under the analysis by which we have examined the University's action, we do not discover an infringement of Dr. Bishop's free speech rights.

*Bishop*, 926 F.2d at 1076 (emphasis added).

Defendants argue *Bishop* announced a rational basis test for classroom instruction and that a public school's interest regulating a school's curriculum is a *per se* legitimate interest. (Doc. 44 at 20). They rely on the court's statement (actually, a quote from *Kuhlmeier* regarding school-sponsored publications) that schools could regulate expressive activity "related to legitimate pedagogical concerns." *Id.* at 19 (quoting *Bishop*, 926 F.2d at 1074). However, *Bishop* expressly noted that it was <u>not</u> announcing a *per se* rule or generally applicable standard but was instead engaging in a fact-specific inquiry into "whether the legitimate interest of the authorities is demonstrably sufficient to circumscribe a teacher's speech." *Id.* at 1074 (quoting *Mailloux v. Kiley*, 448 F.2d 1242, 1243 (1st Cir. 1979))[2].

---

[2] The First Circuit's decision in *Mailloux*—which the *Bishop* court distinguished from its own facts but endorsed the legal standard and reasoning—described the balancing test as follows:

> We also recognized, however, that free speech does not grant teachers a license to say or write in class whatever they may feel like, and that the propriety of regulations or

The Eleventh Circuit's holding and reasoning in *Bishop* must be read in light of the facts before the court: a university restricting a biology professor from injecting his religious beliefs during classroom instruction. *Id.* at 1086 (emphasis added). It did not involve a case, such as here or those binding decisions prior to *Bishop*, where the state imposed an ideological viewpoint based on divisive social issues. Had the state restricted Professor Bishop's lectures in a manner that prohibited him from endorsing established, or at least debatable, viewpoints in his field—say, a law that required him to endorse intelligent design as a valid scientific theory—the court's reasoning and holding would likely have been different. Indeed, the Supreme Court has outright stated as such. *See Epperson v. Arkansas*, 393 U.S. 97, 107 (1968) ("The State's undoubted right to prescribe the curriculum for its public schools does not carry with it the right to prohibit, on pain of criminal penalty, the teaching a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment. It is much too

---

sanctions must depend on such circumstances as the age and sophistication of the students, the closeness of the relation between the specific technique used and some concededly valid educational objective, and the context and manner of presentation.

*Mailloux,* 448 F.2d at 1243.  The *Mailloux* decision grappled with a teacher who was fired for discussing the meanings and origins of a taboo word in a classroom that was relevant to his classroom instruction and was "regarded by experts of significant standing as serving a serious educational purpose." *Mailloux v. Kiley*, 323 F. Supp. 1387, 1390–92 (D. Mass. 1971).

late to argue that the State may impose upon the teachers in its schools any condition that it chooses, however restrictive they may be of constitutional guarantees.") (citing *Keyishian* 385 U.S. at 605–606). [3]

*Bishop* neither stripped classroom instruction of First Amendment protection, nor announced a rational basis test for regulations on instructors' classroom speech. Rather, the court engaged in a fact-specific, case-by-case analysis to the facts before it—facts far different from those at issue here. To the extent Defendants read the *Bishop* panel's holding otherwise, this Court is precluded from adopting such a rule given our Circuit's prior binding precedent in *Perd* and *Kingsville*. *See United States v. Guerrero*, Case No. 22-10391; 2022 WL 1788462 at *2 (11th Cir. June 2, 2022) ("Under our prior-panel-precedent rule, a prior panel's holding is binding unless it has been overruled or abrogated by the Supreme Court or by this Court sitting *en banc.*"). Thus, under our Circuit's binding precedent, the First Amendment protects classroom instruction. [4]

---

[3] *Epperson* was ultimately decided on Establishment Clause grounds, but the Court discussed its prior decisions recognizing academic freedom. *Id.* at 270–73.

[4] Furthermore, in *Wollschaeger*, an *en banc* majority of the Eleventh Circuit cited *Kingsville* favorably, by noting:

> Our own circuit precedent also cuts against adoption of a rational basis standard for evaluating so-called professional speech. In *Kingsville Independent Sch. Dist. v. Cooper,* 611 F.2d 1109, 1113 (5th Cir. 1980), we held that a role-playing technique used by a public high-

## 2. <u>Neither *Garcetti*'s Holding Nor Its Reasoning Apply to Classroom Instruction</u>

Defendants concede *Garcetti* reserved the question of whether its holding applied to classroom instruction. (Doc. 44 at 16) (citing *Garcetti*, 547 U.S. at, 421–22). However, they argue this Court is "bound by *Garcetti*'s reasoning in equal measure with its holding." *Id.* To support their expansive reading of *Garcetti*'s holding, they rely on *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 67 (1996). There, the Court noted that "when an opinion issues for the Court, it is not only the result but also those portions of the opinion <u>necessary</u> to that result which we are bound." *Id.*  Thus, whether the Court's statements are binding hinges not whether the statements were part of the court's "reasoning"—a nebulous standard that

---

school history teacher in the classroom was "protected activity" under the First Amendment even if it was characterized as "private expression." We then explained that the school district's decision to not renew the teacher's contract "for discussions conducted in the classroom could not be upheld unless the discussions clearly overbalanced the teacher's usefulness as an instructor." *Id.*

*Wollschlaeger v. Governor, Florida*, 848, F.3d 1293, 1311 (11th Cir. 2017) (cleaned up). Although, candidly, *Wollschlaeger* set aside the question of whether *Kingsville*'s holding applied to public employees in a footnote. *Id.* More recently, the current Fifth Circuit recognized that *Kingsville* was still binding in a First Amendment case regarding classroom instruction. *See Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) ("classroom discussion is protected activity.") The court in *Buchanan* proceeded to apply the second part of the *Pickering* balancing test to determine if the lewd statements made by a professor implicated matters of public concern. *Id.* at 853–54.

could be used to stretch any dicta into a holding—but whether that reasoning was essential to the result the Court reached.

Stripping classroom instruction of First Amendment protection was not necessary to *Garcetti*'s holding. For one, *Garcetti* involved the question of whether a deputy clerk's interoffice memorandum regarding purportedly false information on arrest reports constituted pure government speech. *Id.* at 414.  The Court crafted its government speech doctrine considering the government's interest in controlling its official communications against the public and employee's potential interest in exposing government misconduct and inefficiency. *Id.* at 422–23, 425. The Court justified its rule by noting the "powerful network of legislative enactments" to protect government whistleblowers. *Id.* at 426–27.

However, classroom instruction is a different animal from ordinary government communications—one that carries its own unique set of competing interests and policy considerations. The Supreme Court has repeatedly recognized classroom instruction to occupy a special niche in First Amendment jurisprudence. *See Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) ("We have long recognized that, given the important public purpose of public education and the <u>expansive freedom of speech</u> and thought associated with the university environment, universities occupy a special niche in our constitutional tradition.") (emphasis added); *Keyishian,* 385 U.S. at 603 (noting the nation's deep commitment to

safeguarding academic freedoms); *Weiman v. Updergraff*, 344 U.S. 183, 196 (1957) ("To regard teachers—in our entire educational system, from the primary grades to the university—as the priests of our democracy is therefore not to indulge in hyperbole."). Such instruction could hardly be said to occupy a "special niche" if—as Defendants contend—courts treated it like every other kind of government speech.

Indeed, Justice Souter's dissent in *Garcetti* raised these exact authorities when questioning the scope of the majority's new rule. *See Garcetti*, 547 U.S. at 438. (Souter, J. Dissenting). When the majority stated it would not decide whether its holding applied to scholarship or teaching, it was directly responding to Justice Souter's concerns regarding the "additional constitutional interests" in those fields for which the Court's analysis did not account. *Id.* at 425. To have held otherwise would have required the Court to upend decades of its own precedent recognizing the special importance of such protections, which it, wisely, declined to do.

The unpublished, per curium Eleventh Circuit decision on which Defendants rely to suggest otherwise is inapposite because it did not involve classroom instruction. (*See* Doc. 44 at 19) (*citing Gilder–Lucas v. Elmore County Bd. of Educ.*, 186 Fed. Appx. 885 (11th Cir. 2006)). That case involved a teacher's responses to a questionnaire about cheerleading tryouts "pursuant to her duty as junior varsity cheerleader sponsor." *Id.* at 887. Unlike the instant case, *Gilder-*

*Lucas*'s facts and rationale sat squarely on-point with *Garcetti*. The fact that Ms. Gilder-Lucas happened to be a teacher is of no consequence because nothing in that case implicated classroom instruction. *Id.* at 886. Therefore, the *Gilder-Lucas* decision offers no persuasive value here.

**3. Other Jurisdictions Interpreting *Garcetti* Provide Persuasive Reasons Against Applying the Government Speech Doctrine to Classroom Instruction.**

As neither the Supreme Court nor the Eleventh Circuit have overturned their pre-*Garcetti* precedents, they remain the law in this Circuit. However, even if this Court had the power to overturn them, it should not do so. *Keyishian* announced a prohibition on laws that "cast a pall of orthodoxy over the classroom" for good reason. *See Keyishian*, 385 U.S. at 603. Imposing ideological dogma on classrooms—particularly in the social sciences—sets a dangerous precedent and leads toward autocracy. *Cf. Kerr v. Hurd*, 694 F. Supp. 2d 817, 844 (S.D. Ohio 2010) ("The disastrous impact on Soviet agriculture from Stalin's enforcement of Lysenko biology orthodoxy stands as a strong counter example to those who would discipline university professors for not following the 'party line.'"); Robyn Dixon, *Russia Seeks to Militarize School Children and Censor Textbooks Amid War*, THE WASHINGTON POST (June 11, 2022) (attached as Exhibit 1).

As such, post-*Garcetti* decisions in the Fourth, Fifth, Sixth, and Ninth Circuits have recognized First Amendment protection for academic freedom. *See Merriwether v. Harp,* 992 F.3d 492, 507 (6th Cir. 2021) ("the academic freedom

15

exception to *Garcetti* covers all classroom speech related to matters of public concern, whether that speech is germane to the contents of the lecture or not.")[5]; *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) ("classroom discussion is protected activity."); *Demers v. Austin,* 746 F.3d 402, 412 (9th Cir. 2014); ("We hold that academic employee speech not covered by *Garcetti* is protected under the First Amendment, using the analysis established in *Pickering*."); *Adams v. Trs, of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011) ("We are. . . persuaded that *Garcetti* would not apply in the academic context of a public university.")

These circuits provide persuasive reasons rejecting the *Garcetti* doctrine for classroom instruction. In *Meriwether*, the Sixth Circuit synthesized prior Supreme Court precedent to identify three First Amendment interests that separated

---

[5] Defendants point out the Sixth Circuit's application of *Garcetti* depends on whether the classroom instruction at issue occurred in the university or K-12 context. *See Evans-Marshall v. Board of Educ. of Tipp City Exempted Village School Dist.*, 624 F.3d 332 (6th Cir. 2010). While that decision does explicitly delineate secondary and post-secondary education in its holding, our Circuit has not drawn such a distinction in its precedents recognizing First Amendment protection for classroom instruction. *See Kingsville*, 611 F.2d at 1113 (applying First Amendment protection to public high school teacher.) Furthermore, such a distinction is not well-supported by the Supreme Court's pronouncements that first recognized the First Amendment's application to the classroom. *See Weiman*, 344 U.S. at 196 ("To regard teachers—in our entire educational system, from primary grades to the university—as the priests of our democracy is not to engage in hyperbole) (emphasis added) (Frankfurter, J., Concurring). In any event, the IFA's Amendment's to Florida's Education Equity Act apply to Florida's entire K-20 system. *See* §1000.05(2)(a), Fla. Stat. (2022).

classroom instruction from the typical *Garcetti* case: (1) students' interest in receiving an informed opinion, (2) the professor's right to disseminate his own opinion, and (3) the public's interest in exposing our future leaders to different viewpoints. *Meriwether*, 992 F.3d at 507. Or, as that court aptly noted: "If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity. A university president could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as comrades." *Id.* at 492.

On the other hand, the authorities upon which Defendants rely offer no persuasive justifications to apply *Garcetti* to classroom instruction. The Seventh Circuit's decision in *Mayer v. Monroe County*, 474 F.3d 447 (7th Cir. 2007) does not distinguish or cite *Keyishian* nor the legion of other cases recognizing First Amendment protections for academic freedom.[6]  Furthermore, the Seventh Circuit

---

[6] What feeble attempts *Mayer* made to address concerns raised by cases like *Keyishian* regarding the dangers of handing total control of classroom instruction to the State are ham-fisted and internally inconsistent: "Majority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination; elected school boards are tempted to support majority positions about religious or patriotic subjects especially. But if indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers."  In other words, the court said we should address dangers of indoctrination posed by subjecting classroom instruction to majority rule by leaving those decisions in the hands of schoolboard members elected by majority rule.

was bound by its prior decision, *Webster v. New Lenox School Dist. No. 122*, 917 F.2d 1004 (7th Cir. 1990), which held that a social studies teacher did not have a First Amendment right to teach creationism. *Id.* at 479. This Court is not similarly bound. Unlike the Seventh Circuit, the Eleventh Circuit's pre-*Garcetti* jurisprudence recognized First Amendment protection for academic freedom. *See Kingsville Independent School Dist.*, 611 F.2d at, 1113. Finally, the *Mayer* court explicitly did not decide whether its holding left open room for constitutional protection of scholarly viewpoints in post-secondary education. *Mayer*, 474 F.3d at 480.

Defendants also deploy out-of-context statements some circuits have made about "curricular speech" to create the impression that more jurisdictions take their view of *Garcetti*. (Doc. 44 at 18–19). For example, they rely on the Fifth Circuit's statement in *Kirkland v. Northside Indep. Sch. Dist*., 890 F.2d 794, 800–802 (5th Cir. 1989) that a public-school teacher is not free, under the First Amendment, to "arrogate control of curricula" to claim that the Fifth Circuit does not recognize First Amendment protection for classroom instruction. (Doc. 44 at 18). However, *Kirkland* dealt with a teacher substituting the school board's approved reading list for his own. *Kirkland*, 890 F.2d at 794. The Fifth Circuit made the statement Defendants quote in response to the plaintiff's contention at oral argument that he possessed <u>unlimited</u> discretion over his curriculum. *Id.* at 801. (emphasis added).

18

Indeed, *Kirkland* repeatedly emphasized that neither the state nor teachers should enjoy unfettered control over curricular decisions in public schools. *Id.* at 801 ("The power to teach and inform, and lead is also the power to indoctrinate, distort judgment, and perpetuate the current regime. It does not matter, for purposes of influencing young minds, whether such power is exercised, to the exclusion of others <u>by the government or public-school teachers</u>."); *Id.* at 802 ("Our decision should not be misconstrued as suggesting that a teacher's creativity is incompatible with the First Amendment, nor is it intended to suggest that schoolteachers foster free debate in their classrooms only at their own risk or that their classrooms must be cast with a pall of orthodoxy.").

Defendants misconstrue *Kirkland*'s rejection of the claim that the First Amendment affords teachers unlimited power to say what they wish in the classroom to mean that the First Amendment affords teachers <u>no protection</u> for classroom instruction. Plaintiffs have never argued the former to be the case, while Defendants have staked the better part of their argument on the latter being the law. *Compare* Doc. 4 at 22 ("However, the First Amendment's protections are not infinite.") *with* Doc. 44 at 20 ("The First Amendment has no purchase here.").

Indeed, if *Kirkland*'s repeated insistence otherwise were not enough to settle the matter, the Fifth Circuit's decisions both preceding and following it refute Defendants' claim that the Fifth Circuit does not recognize First Amendment

protection for classroom instruction. *See Buchanan*, 919 F.3d at 852 ("classroom discussion is protected activity"); *Kingsville* 611 F.2d at 1131 ("We thus join the First and Sixth Circuits in holding classroom discussion is protected activity.").

Defendants similarly rely on the Fourth Circuit's pre-*Garcetti* decision *Urofsky v. Gilmore*, 216 F.3d 401, 404–411 (4th Cir. 2000). However, *Urofsky*'s analysis is unpersuasive, as it wrote off the Supreme Court's decision in *Keyishian* as a freedom of association case. *Id.* at 414. ("*Keyishian*…involved the right of a professor to speak and associate in his capacity as a private citizen, and thus is not germane to Appellee's claim."). Even a cursory reading of *Keyishian*'s rationale demonstrates that the constitutional harm that the Court sought to prevent was stifling the exchange of ideas inside the classroom, not teachers' association as private citizens outside of it. *See Keyishian*, 385 U.S. at 603 ("The classroom is peculiarly the 'marketplace of ideas'. The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues rather than through any kind of authoritative selection.").

In any event, *Urofsky*'s reasoning failed to stand the test of time even in its own circuit. Following *Garcetti*, the Fourth Circuit abandoned any notion of academic freedom as a right belonging only to academic institutions in *Adams*, where it rejected *Garcetti* and applied the *Pickering* test to an individual

professor's First Amendment claim against a university involving his classroom instruction. *Adams*, 640 F.3d at 562–65. As such, the Fourth Circuit's interpretation of *Garcetti* also does not support Defendants' claim.

In sum, Defendants' claim that the First Amendment does not protect classroom instruction as "pure government speech" find no support in the Supreme Court's and the Eleventh Circuit's pre-*Garcetti* decisions, the *Garcetti* opinion itself, or the greater weight of persuasive authority answering whether *Garcetti* applies to classroom instruction. [7] *Garcetti* explicitly declined to apply its holding to classroom instruction and scholarship. As such, the Supreme Court's prior

---

[7] Of the remaining circuits, the Second, Third, and D.C. Circuit have acknowledged doctrinal uncertainty following *Garcetti*, but declined to resolve that uncertainty. *See e.g.*, *Gorum v. Sessoms*, 561 F.3d 179, 186 (3d Cir. 2009) (acknowledging but declining to reach the issue because the professor's statements "clearly were not 'speech related to scholarship or teaching'); *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 18 (D.C. Cir. 2008) (Edwards, J., concurring) (same); *Panse v. Eastwood*, 303 Fed. Appx. 933, 934-35 (2d Cir. 2008) (declining to answer whether *Garcetti* applies to classroom instruction because the appellant teacher failed to raise the issue on appeal).

The First and Tenth Circuits do not appear to have published any post-*Garcetti* decisions addressing classroom instruction, so are presumably bound by their pre-*Garcetti* decisions recognizing varying levels of First Amendment protections. *See Mailloux v. Kiley*, 448 F.2d 1242, 1243 (1st Cir. 1979) (applying a balance of interests tests similar to the Fifth Circuit); *Miles v. Denver Public Schools*, 944 F.2d 773, 779 (10th Cir. 1991) (questioning whether the First Amendment recognized a right to academic freedom, but ultimately applying *Keyishian*'s "pall of orthodoxy" standard to determine school could reprimand teacher for his comment about students "making out on the tennis court.").

decision in *Keyishian* and the former Fifth Circuit's decision in *Kingsville* recognizing First Amendment protection for classroom instruction remain binding.

**B. The IFA and Regulation Support No Compelling, or Even Legitimate Government Interest.**

Defendants further argue that, even if the First Amendment does protect classroom instruction, the IFA satisfies strict or intermediate scrutiny. (Doc. 44 at 28–33). Their analysis balancing the State's proffered interests against the First Amendment interests of teachers is flawed from the start, because it uses the rational basis test they extracted from their misreading of *Bishop*. *See* Pt. I, § A.1. However, the *Pickering* balancing test—much less strict or intermediate scrutiny— requires much more from the State than proffering a plausible rational basis for their decision.

Defendants rely on the Supreme Court's decision in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) and the Eleventh Circuit's decision in *Virgil v. Sch. Bd. of Columbia Cnty, Fla.*, 862 F.2d 1517 (11th Cir. 1989) to suggest the State must only demonstrate some "legitimate pedagogical interest" to limit teachers' classroom instruction. However, these decisions are inapposite to the educator Plaintiffs' claims, as neither examined a teacher's First Amendment rights with regard to classroom instruction. *Kuhlmeier* held that educators do not offend the First Amendment by exercising editorial control over student expression in a school-sponsored publication. *Kuhlmeier*, 484 U.S. at 273. Likewise, *Virgil* applied

22

*Hazelwood* to a group of parents' First Amendment challenge to their school board's decision to remove books containing sexual and vulgar material from the reading list for an elective course. *Virgil*, 862 F.2d at 1524.[8]

As the Eleventh Circuit noted in its <u>teacher</u> speech cases, there is "no substitute for a case-by-case inquiry into whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech." *Bishop*, 926 F.2d at 1074. (quotation omitted). While the First Amendment affords students a right to receive information, *see infra*-Pt II, different interests come into play when a teacher overrides a student's speech during classroom instruction versus when the state overrides a teacher's speech in that same context. Our public education system permits teachers, if not expects them, to challenge their students' viewpoints and challenge their preconceptions. Encouraging critical thinking often requires students to confront topics that make them uncomfortable. During that process, students in the classroom must naturally surrender some degree of control to their teachers.

---

[8]Two other factors distinguish *Virgil*. First, the parties in that case stipulated that the board's actions were motivated by its determination that the books' sexually explicit passages were not appropriate for children. *Id.* at 1523, n. 8. Additionally, the court took great pains to note that the school board had not outright banned the books and "no student or teacher is prohibited from assigning or reading these works or discussing the themes contained therein in class or on school property." *Id.* at 1525.

Better polestars here are the precedents in our Circuit that already control First Amendment protection for classroom instruction. In *Kingsville*, the former Fifth Circuit held that a teacher could not be punished for classroom only if their discussions "clearly overbalanced [their] usefulness as an instructor." *Kingsville Independent School Dist.* 611 F.2d at 1112. Furthermore, at minimum, the state cannot regulate teachers in a manner that "cast[s] a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603.

Under either standard—or even Defendants' proposed rational basis standard— the State comes up empty here. The Eleventh Circuit's decision in *Searcy v. Harris*, 888 F.2d 1314 (11th Cir. 1989), provides an example of why the Defendants' proffered interests here cannot support the IFA and Regulation. *Searcy* upheld an anti-war group's First Amendment challenge to a schoolboard rule that excluded them from participating in the school's career day. *Id.* at 1325–26. Because the case involved citizens outside the school system accessing a curricular public forum, the court applied *Kuhlmeier'*s "legitimate pedagogical interests" standard—the same standard the Defendants argue should apply here. *Id.* at 1319–1320.

However, the Eleventh Circuit's application of the *Kuhlmeier* standard involved far more rigorous inquiry into the school board's justifications than Defendants suggest the Court should perform here. The court rejected the

schoolboard's argument that its regulations only needed to be <u>reasonable</u> and that it did not have to be the most reasonable or only reasonable limitation. *Id.* at 1331 (emphasis in original). The court pointed to the lack of record evidence to support the schoolboard's decision as demonstrating the policy was not reasonable: "There is no evidence which even arguably explains the Board's change in position; for example, there is no evidence that the Board had experienced any problems with individuals who were not affiliated with a group. We cannot <u>infer</u> reasonableness from a vacant record." *Id.* at 1322 (emphasis in original).

The court went on to reject the school board's contention—which Defendants also make here—that the *Kuhlmeier* standard permitted schools to impose viewpoint-based regulations. *Id.* at 1319, n.7. Specifically, it noted:

> Of somewhat more concern is the suggestion by the School Board that *Hazelwood* eliminates the requirement that restrictions on speech in a curricular activity be viewpoint neutral. Although the Supreme Court did not discuss viewpoint neutrality in *Hazelwood*, there is no indication that the Court intended to drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's views.

*Id.* Based on the lack of record evidence supporting the school board's decision, the court struck down the regulation at issue, finding it was likely enacted to deny plaintiffs access to the school's career day because of their views about the military. *Id.* at 1325–26.

Like in *Searcy*, the Defendants here identify no record evidence to support the State's ban on a wide swath of classroom instruction other than their disagreement with the viewpoints expressed. The only incident their briefs or submissions provide any detail regarding is the "segregated" meetings at Douglas Anderson School of the Arts ("Douglas Anderson"), and even those arguments rely solely on newspaper articles that mischaracterized that incident. (Doc. 44–1, Ex. 2). The proposed meetings at Douglas Anderson were affinity group sessions designed to address student-raised concerns about racial incidents at the school, including white students' use of the N-word. *See* Declaration of Tammy Hodo, attached as Exhibit 2 at ¶5. Affinity groups are a common and accepted practice in a school setting, and their purpose is to provide a safe space for a cultural group to discuss issues unique to them. *Id.* at ¶10. Common examples of affinity groups include black student unions or black law students' associations. *Id.* at ¶12.

Contrary to how Defendants portrayed the incident, affinity groups are <u>not</u> segregated based on race or any other characteristic. *Id.* at ¶10. Designating an affinity group as "for" a particular group designates the group who is the subject matter of discussion, not who may attend—and people attending or joining affinity groups outside their race, sexual orientation, and gender is common practice *Id.* at ¶11. The reason the Douglas-Anderson incident became a news story was because the principal sent an email to parents and students that—while not stating the

meetings were segregated—failed to adequately explain the purpose of the meetings and the concept of an affinity group. *Id.* at ¶ 13. The principal sent the email to students and parents without consulting Dr. Hodo or any of the diversity and inclusion professionals running the meetings. *Id.* As a result of the e-mail, Douglas Anderson cancelled the meeting and suspended the principal from her position without any intervention from the State or Florida Legislature. *Id.* at ¶14.

Even if the Douglas Anderson incident was—as Defendants claim—an "attempted violation of *Brown v. Board*," they fail to explain how the IFA would prevent similar incidents from occurring in the future. As Defendants note, "the IFA applies solely to training or instruction." (Doc. 44 at 30) (citing § 1000.05(4)(a), Fla. Stat. (2022)). Nothing in the IFA or Regulation prevents teachers from holding segregated meetings so long as the instruction in those meetings do not endorse any of the forbidden viewpoints. Rather, Florida's Educational Equity Act, <u>as written</u>, prohibits segregating students based on race. § 1000.05(c), Fla. Stat. (2021) ("All public k-20 education classes shall be available to all students without regard to race, ethnicity, national origin, gender, disability, religion, or marital status.") (emphasis added).

Defendants also assert that they have an interest to prohibit instruction that "promote[s] resentment toward a race or class of people" or "[a]dvocate ethnic solidarity instead of the treatment of pupils as individuals." (Doc. 44 at 28–29)

27

(*citing Arce v. Douglas*, 793 F.3d 968, 973, 985–86 (9th Cir. 2015)). The Ninth Circuit's decision in *Arce* involved a student and parent who challenged statutes that led to the elimination of an Arizona school's Mexican America Studies program. *Id.* at 974–75. However, the *Arce* decision did not hold that the state could regulate curriculum just by asserting that instruction "promotes resentment" or "advocates ethnic solidarity."

Indeed, if the Defendants ran out the history of that case, they might not have so readily cited it in support of their argument. *See Gonzalez v. Douglas*, 269 F. Supp. 3d 948 (D. Ariz 2017). After the Ninth Circuit remanded the case, the district court struck down the school board's decision as violating the plaintiffs' First and Fourteenth Amendment rights—citing the school board's lack of evidence supporting the ban. *Id.* at 973–74. The court noted the evidence demonstrated the statute was enacted and enforced to pursue "discriminatory ends in order to make political gains." *Id.* at 973. It recounted how the issue became a "political boon" to candidates because concerns about the program had "spread across the state like wildfire." *Id.* The superintendent had also framed the dispute in political terms, describing himself "as a conservative with a lot of forces against him" and that there was "nothing more that liberals love than to have a conservative ban a book." *Id.* at 974. The court also noted the paucity of evidence indicating that the classes promoted racial resentment, noting the defendants'

investigation into the classes were "one sided", "outcome-driven," and ignored the advice of experts. *Id.*

The parallels between the rejection of ethnic studies courses in Arizona and the recent moral panic about "critical race theory" described in the Complaint are obvious and the myriad evidence of politicized motives undergirding the IFA is a dead horse that need not be further beaten. The major difference between Arizona's curriculum ban and Florida's is that Florida's conservative politicians were far more transparent in their motivations enacting the so-called "Stop WOKE" Act, and apparently did not make an effort to conduct even a "one-sided investigation" before enacting these sweeping laws. As such, Defendants' naked assertions that the IFA is designed to prohibit teachers from promoting "racial resentment" or "ethnic solidarity" are not sufficient to show a legitimate government interest.

Finally, Defendants argue that they do not need evidence to support these laws, because the state believes "the restricted speech itself is pernicious and has no place in Florida's public schools." (Doc. 44 at 33) (emphasis in original). But this is just another way of saying that the state is banning the speech because it disagrees with it—i.e., viewpoint discrimination. Even Defendants' proffered "legitimate pedagogical interest" test does not support disagreement with an idea as a legitimate government interest. *See Searcy*, 888 F.2d at 1325–26. As such, the

State's empty record is not sufficient to establish a legitimate pedagogical basis for its actions, much less meet the more demanding standard that actually controls in this context—that the speech at issue "clearly overbalanced [their] usefulness as an instructor." *Kingsville,* 611 F.2d at 1112.

## C. Teachers' Interests in Providing Legitimate and Necessary Instruction About Issues Relating to Race, Gender, and Sexual Orientation Are Substantial.

On the other side of the balance, Defendants' attempts to minimize the IFA and Regulations' impact on protected expression are unavailing. They argue that the IFA's clause stating concepts can be taught in an "objective manner" as part of "a larger course of training or instruction" constitutes narrow tailoring. (Doc. 44 at 30) (citing § 1000.05(4)(b), Fla. Stat. (2022)). However, the social sciences cannot be taught in a purely "objective" fashion, as these fields are based on interpretation rather than empirically distilled rules. *See* (Doc. 30-2 "Cassanello Declaration" at ¶¶7–8).

Defendants argue that social sciences can be taught in an objective manner, using Dr. Cassanello's example of Holocaust denial being an interpretive lens rejected by most historians. (Doc. 42–1 at 18–19). But even if a teacher only taught interpretations of history that have gained universal consensus, they would not be providing an "objective" account of history. Even in empirically driven sciences, new theories often gain legitimacy from previously discarded ideas. *See, e.g., Kerr*,

694 F. Supp. 2d at 844 n. 11 (noting courts must be careful at defining "accepted" ideas and describing how the practice of using leeches returned to modern medicine after being regarded for many years as the "height of medieval superstition.").

This is no less true in fields like history and sociology, where issues as clear cut as whether the Holocaust happened are few and far between. *See Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ("in the social sciences…few, if any, principals are accepted as absolutes."). At what level of academic consensus does an interpretive lens become sufficiently objective that teachers can safely endorse it without giving credence to an opposing viewpoint? More than 90% of scholars? More than half? Neither the IFA nor the Regulation provide answers, rendering this "objectivity" exception nothing more than an illusory safe harbor.

Some of the IFA's provisions themselves contradict viewpoints that currently hold academic consensus. Implicit bias is a widely accepted phenomenon in the fields of psychology and sociology, *See* (Doc. 30–8 "Krop Affidavit" at ¶¶ 10–13), which the IFA purports to prohibit by banning any instruction that promotes the concept that "a person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously." §1000.05(4)(a)(2), Fla. Stat. (2022). A psychology professor

would be hard pressed teach such an accepted phenomena "without endorsement of the concept." *Id.* at §1000.05(b).

Defendants also spend a great deal of effort picking apart the texts and concepts Plaintiffs wish to teach and explain why—if you read closely—those texts do not actually violate the provisions at issue. (Doc. 42-1 at 14–19). To be sure, the IFA and Regulation were cunningly drafted with nebulous terms that can contract when subject to constitutional scrutiny and expand when actually regulating teachers.

The IFA's enforcement mechanisms operate in such a way that Defendants cannot be sure those who actually enforce the law will share their interpretation. By virtue of amending the Florida Education Equities Act, the Florida Legislature has handed any student, parent, or interested party license to interpret whether any classroom instruction or assigned text violate one of the IFA's nebulous strictures. *See* § 1000.05(8), Fla. Stat. (2022). Furthermore, in conjunction with passing HB7, the Florida Legislature passed a conforming bill regarding performance funding for universities that stated:

> If any institution is found to have a substantiated violation of §1000.05(4)(a), the institution shall be ineligible to receive performance funding during the next fiscal year following the year in which a violation is substantiated. Substantiated findings are those as determined by a court of law, a standing committee of the Legislature, or the Board of Governors.

§10001.92(5), Fla. Stat. (2022).

As such, even if an instructor believed their planned instruction does not fit within the IFA's strictures—they must also have confidence every student in the classroom, parent of said student, the state judiciary, and every standing committee of the state legislature will share their interpretation, or else risk serious professional consequences ranging from discrimination lawsuits, discipline, termination, and loss of funding for their schools.

Indeed, if the enforcement of the Regulation is anything to go by, the State has taken a broad, rather than narrow view of its restrictions on discussion relating to race. The Florida Department of Education recently rejected 41 percent of proposed math textbooks, many of which were banned for violating the state's new prohibition on "critical race theory." *See* Moriah Balingit, *DeSantis Accused Textbooks of 'Indoctrination.' Here's What He Meant.* THE WASHINGTON POST. (May 9, 2022) (attached as Exhibit 3). Reasons reviewers gave for books failing to comply with the ban on critical race theory included "emphasis that racism is embedded in American society," word problems about the gender pay gap, discussions about racial profiling, discrimination in school admissions, discussions about racial disparities in New York's police department not matching the city's population, discussions about Harvard's implicit bias assessment test, and "failing to give an opposing" viewpoint in a discussion about the Constitution because it

did not mention the Federalist Papers. *Id;* (Doc. 30-3 "Black Declaration" at 32–39).

If the State Board of Education and reviewers of instructional materials can extract so many different ideas and viewpoints just from the State's ban on "critical race theory," the IFA's nebulous strictures can be used to challenge and suppress a staggering array of ideas. Under such a climate, most teachers will simply elect not to teach ideas that could run afoul of the IFA rather than hazard the risk that every student, parent, judge, or legislative committee will land on the same interpretation once their lesson bounces through the IFA's interpretive pachinko board of qualifiers and nebulous phrases.

The natural—and, likely, intended—effect of the IFA and Regulation is to punish teachers bold enough to teach difficult topics about race and gender, and to silence those teachers who are not. The First Amendment's protections of academic freedom in the classroom do not tolerate laws like these designed to cast such a "pall of orthodoxy" over the classroom. Therefore, the educator Plaintiffs' claims are likely to succeed on the merits and state a cause of action under Rule 12(b)(6).

## II. The IFA and Regulation Violate Students' Right to Access Information

A student's First Amendment interest in receiving information implicates corollary principles to a teachers' interest in academic freedom. See *Kleindienst v.*

*Mandel*, 408 U.S. 753, 762-63 (1972) ("This Court has recognized that [the right to receive information] is 'nowhere more vital' than in our schools and universities."); *Barenblatt v. United States*, 360 U.S. 109, 112 (1959) (noting "learning-freedom" is a "corollary" of "academic teaching-freedom."). Recognizing this right supports First Amendment's goal of "preserving an uninhibited marketplace of ideas" where the public may obtain "suitable access to social, political, esthetic, moral, and other ideas and experiences." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969); *see also Board of Educ., Island Tress Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982) (noting a school's discretion to determine the content of their school's libraries "may not be exercised in a narrowly partisan or political manner.").

Defendants mischaracterize the claims of Plaintiff RMJ as one of a student seeking to "dictate [her] own curriculum" (Doc. 40-1 at 26-28), as opposed to what her claim really is about: a student's First Amendment right to receive information. They rely on the Eleventh Circuit's decision in *American Civil Liberties Union of Florida, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1200 (11th Cir. 2009), in which they claim the court disavowed *Pico* and its rationale regarding the First Amendment's protections of student right to access information. (Doc. 44 at 27). However, that decision nevertheless found that students *could* challenge book bans under *Kuhlmeier*'s "legitimate pedagogical interest standard." *ACLU,* 557

F.3d at 1200–01. The Eleventh Circuit's decision in *Virgil*, likewise, recognized the existence of such a right if the state failed to satisfy *Kuhlmeier*'s standard. *Virgil,* 862 F.2d at 1521–22.

As explained above, Defendants have failed to offer sufficient (or any) evidence supporting their proffered justification for the IFA and Regulation to satisfy even *Kuhlmeier*'s deferential standard. *See, supra*, § I.B. Furthermore, while our Circuit has not explicated a students' right to receive information in as forceful of terms as it has a teacher's academic freedom in the classroom, it is not apparent that *Kuhlmeier* would apply in this context. Both *Virgil* and *ACLU* examined a school board's decision to ban specific books from school libraries, where findings had already been made that the boards were motivated by the books' sexual content or accuracy of the information contained in them.

The regulations at issue here, however, apply across the board to public school curricula, where the State overrides both student and teacher speech. As such, a more appropriate standard for analyzing students' right to receive information as listeners in this instance is the standard used for the "corollary" right of teachers to disseminate that information in the classroom as speakers. In any event, because the IFA and Regulation fail to put forward even a "legitimate pedagogical interest," Plaintiff RMJ is likely to succeed on her First Amendment right to receive information claim.

36

### III. The IFA Violates Employers' Right to Free of Expression

In the context of the IFA's prohibitions on employers' speech, the First Amendment provides even greater protection. *See Cook v. Gwinnet County School Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005) (noting that a state's interest "as an employer in regulating the speech of its employees differs significantly from those it possesses in connection with regulation of the speech of citizenry in general.") (quoting *Connick v. Myers*, 461 U.S. 138, 140 (1983)). Even in the context of so-called "professional speech" our circuit has declined to afford the state any kind of deferential scrutiny. *See Wollschlaeger*, 848 F.3d at 1307–1308 (striking down speaker and content-based restrictions under intermediate scrutiny while reserving question of whether strict scrutiny applied).

Defendants offer two arguments in attempt to distinguish the IFA's amendments to the Florida Civil Rights Act: first, that the IFA regulates employer conduct, rather than speech and second, that the state should receive greater deference because employees subject to diversity and inclusion training are a "captive audience." (Doc. 44 at 24-25, 39) Neither justification is availing, as the IFA targets speech, not conduct, and the captive audience doctrine has never been applied to speaker-focused, content-based restrictions on speech in the manner Defendants propose.

37

**A. The IFA's Amendments to Florida's Civil Rights Act Regulate Speech, Not Conduct.**

Defendants argue the IFA governs conduct because it only applies to the "commercial action" of requiring employees to attend training or instruction activities—a distinction so fine, it amounts to wordplay. (Doc. 44 at 24–25). Binding First Amendment precedent demonstrates that courts do not construe "speech" of companies in the private sector in so limited terms as Defendants propose. "In determining whether conduct is expressive, we ask whether the reasonable person would interpret it as <u>some</u> sort of message, not whether an observer would necessarily infer a <u>specific</u> message. If we find that the conduct in question is expressive, any law regulating that conduct is subject to the First Amendment." *Coral Ridge Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254 (11th Cir. 2021) (emphasis in original).

Following these principles, courts have recognized First Amendment protections in a wide array of expressive activity that does not involve literal speech. *See Netchoice, LLC v. Attorney General, Fla.*, 34 F.4th 1196 (11th Cir. May 23, 2022) (holding social media companies engage in expressive activity when they ban or de-platform users); *Coral Ridge Ministries*, 6 F.4th at 1254–55 (holding Amazon's excluding religious organization from donation program constituted expressive activity); *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241 (11th Cir. 2018) (holding that distributing food

could constitute expressive activity when done in the context of anti-war advocacy).

Here, this Court need not even descend into the expressive/speech distinction as the IFA explicitly regulates speech. True, the IFA only applies to mandatory employee training, but it does not regulate employee training across the board. Rather, it only regulates trainings where an employer "espouses, promotes, advances, inculcates, or compels an individual to believe" any of the statute's forbidden concepts. *See* § 760.20(8)(a), Fla. Stat. (2022).

Even if one interpreted the word "require" to draw some sort of distinction between conduct and speech, the conduct the IFA describes is expressive conduct, which the First Amendment protects. When an employer subjects their employees to mandatory training—particularly in the context of diversity and inclusion training—they are communicating the organization's values and expectations to their employees. Furthermore, such training also shapes how employees present themselves when speaking on behalf of their organization. Training on diversity and inclusion can provoke strong responses from those who participate, both positive and negative. *Compare*, (Doc. 30-5 "Chieves Declaration" at ¶14) (describing outbursts by police officer when learning about implicit bias as teaching "anti-whiteness") *with* (Doc. 30-4 at 9–10; Doc. 30-7 at 9) (positive testimonials from organizations that have educated its employees through diversity

and inclusion training). As such, a reasonable person would interpret her employer subjecting them to training on these topics as conveying "some sort of message." *Coral Ridge Media, Inc.*, 6 F.4th at 1254.

The authorities on which Defendants rely do not command a different result. They first present a highly misleading interpretation of *Wollschlaeger*, which they argue upheld a provision prohibiting doctors from discriminating against patients for firearm ownership. (Doc. 44 at 36). However, the only reason *Wollschlaeger* left the anti-discrimination provision intact was because the court applied a limiting instruction so the provision only applied to non-expressive conduct. *Wollschlaeger*, 848 F.3d at 1317. The court completely struck down every other provision that imposed content and speaker-focused restrictions on doctors, including those the statute labelled as "harassment." *Id.* at 1307.

The IFA does not ban discrimination, but instead inserts its forbidden concepts into the Florida Civil Rights' Act's pre-existing ban on discrimination. *See* §760.10, Fla. Stat. (2021). Wohlschlaeger's limiting construction on FOPA's anti-discrimination provision offers Defendants no help here, because a limiting construction of the IFA stripping out any non-expressive conduct would just revert the Florida Civil Rights Act to how it stood before the IFA went into effect. As such, the IFA's prohibitions are more closely analogous to the "anti-harassment" and record-keeping provisions that *Wollschlaeger* struck down because they

"limit[ed] the ability of…doctors and medical professionals [] to write and speak about a certain topic—the ownership of firearms—and therefore restrict their ability to communicate and/or convey a message." *Wollschlaeger*, 848 F.3d at 1307.

The Supreme Court's decision in *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006) also does not support the conduct/speech distinction that Defendants advocate here. In *FAIR,* the Supreme Court found that a law school's decision to ban military recruiters on campus because of its disagreement with the "Don't Ask, Don't Tell Rule" was not protected by the First Amendment since such conduct was only "expressive" insofar as the law school accompanied it with speech to explain the message. *Id.* at 66. The Court noted that students who saw military recruiters outside the law school campus had no way of knowing the expressive message and could have just as easily concluded that the interview rooms were full or the military had simply chosen a different location to recruit. *Id.* The Court further found that the government's substantial interest in raising and supporting the Armed Forces justified the regulation's incidental burdens on speech. *Id.* at 67.

Here, however, when an employer requires its employees to sit for training on implicit bias or institutional racism, there is no ambiguity about what message the employer is trying to send. Indeed, the Eleventh Circuit has repeatedly distinguished *FAIR* when examining cases involving conduct that conveys a

41

message without the need for explanatory speech. *See Netchoice*, *supra,* Slip Opinion at p. 31–36; *Fort Lauderdale Food Not Bombs*, 901 F.3d at 1243–45. Furthermore, as discussed above, the IFA is not supported by any legitimate government interest, much less the substantial government interest that justified the restrictions in *FAIR. See supra*–Pt. I, §. B. As such, the IFA does not escape First Amendment scrutiny on the basis of its purported regulation of conduct versus speech.

**B. The Captive Audience Doctrine Does Not Apply to the IFA's Amendments to the Florida Civil Rights Act.**

Defendants also argue that the captive audience doctrine limits the First Amendment's application to the IFA, because the state has an interest in "preventing employers from conscripting a captive audience for that speech, made up of presumptive employees who are presumptively unwilling to receive it." (Doc. 44 at 39). However, "[t]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 210 (1975). "Where adults are concerned the Supreme Court has never used a vulnerable listener/captive audience rationale to uphold a speaker-focused and content-based restrictions on speech." *Wollschlaeger*, 848 F.3d at 1315.

Any purported economic "coercion" inherent in the "employer-employee" relationship does not justify regulating the content of private citizen's speech. *Wollschlaeger* rejected the same justification when the state attempted to rely on the "significant power imbalance between doctors and patients, who are in a vulnerable position" to support regulation of physicians' speech. *Id*. at 1315. The Court's answer to that concern in *Wollschlaeger* was that a patient could seek healthcare elsewhere if they felt so strongly about being subjected to questions and advice about their firearm ownership. *Id.*[9]

Nor do the Defendants' attempts to justify the IFA as an anti-harassment statute, akin to Title VII's protections against hostile work environments, hold any sway. (*See* Doc. 44 at 42). There is "no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate

---

[9] It bears noting that Florida is an "at-will" employment state that offers no protection for terminated workers, even when terminated for reasons that contravene public policy. *See Hartley v. Ocean Reef Club, Inc.*, 476 So.2d 1327, 1329 (Fla. 3d DCA 1985) (holding that employees lack of bargaining power in the modern workplace did not justify "abrogat[ing] the inherent right of contract between employee and employer" by allowing employee to sue for wrongful discharge). In Florida, private employers can terminate employees for disagreeing with their employer, having a different political affiliation from their employer, or even because of their political beliefs—including beliefs the IFA espouses, so long as the employer does not subject their employee to mandatory "training, instruction, or other required activities" that contravene those beliefs. *See* § 760.10(8)(a), Fla. Stat. (2022).

religious beliefs." *Saxe v. State College Area School Dist.*, 240 F.3d 200, 206 (3rd Cir. 2001) (Alito, J. for the court). "When laws against harassment attempt to regulate oral or written expression on such topics, however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications." *Id.*

Courts have repeatedly struck down statutes purporting to punish "harassment" under the First Amendment without finding a need to declare "the entire field of employment discrimination law is unconstitutional." (Doc. 44 at 44); *see Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125–28 (11th Cir. May 2, 2022) (striking down the University of Central Florida's anti-discrimination and harassment policy because it was a content and viewpoint-based restriction on speech); *see also*, *United States v. Yung*, No.19-1640 & 20-3448; 2022 WL 2112794 (3d Cir. June 13, 2022) (applying narrowing construction to cyberstalking statute that limited the definition of harassment only to statements made to put someone in fear of physical harm and noting "broad harassment laws that punish offensive speech steer into the territory of the First Amendment) ("quotations and citations omitted).

Neither the Defendants' speech/conduct distinction nor its captive audience theory differentiate the IFA from other content and viewpoint-based regulations on expression. In order to justify the IFA's regulations on private citizen's speech, the

State must demonstrate a compelling state interest and narrow tailoring to achieve that interest. For the reasons discussed previously, the record offered by the Defendants fails to put forward even a legitimate government interest. *See*, *supra*, Pt. I, §§ B & C; (Doc. 4 at 38–44). For these reasons Dr. Hodo is likely to succeed on the merits of her First Amendment free expression claim.

## IV. The IFA and Regulation Are Unconstitutionally Vague

Defendants' claim that the IFA and the Board of Education's June 2021 regulation are not unconstitutionally vague is unpersuasive. The IFA prohibits teachers from providing instruction or utilizing curriculum to "indoctrinate or persuade students to a particular point of view inconsistent" with the six principles of set forth in §1003.42(3), Fla. Stat. (2022). Likewise, the Board of Education's June 2021 Regulation mandates teachers "not suppress or distort significant historical events." Rule 6A-1.094124, F.A.C. (2021). Similarly, the IFA enacted two provisions declaring that it is unlawful discrimination to subject students or employees to training or instruction that "espouses, promotes, advances, inculcates or compels" them to believe any of the eight enumerated concepts[10]. *See*

---

[10] The eight enumerated concepts in these statutory enactments largely track the six principles set forth in §1003.42(3), Fla. Stat. (2022), with addition of two concepts that provide that: (1) An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin; and (2) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin. *Compare* §§760.10(8) and 1000.05(4), *with* §1003.42(3), Fla. Stat. (2022).

§§760.10(8) and 1000.05(4), Fla. Stat. (2022). These enactments provide that training or instruction may discuss the eight concepts "provided such training or instruction is given in an objective manner without *endorsement* of the concepts." *Id.* (emphasis added). Such language fails to provide persons of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited, as well as authorizing and encouraging arbitrary and discriminatory enforcement. *See Wollschlaeger*, 848 F.3d at 1319.

Given the nebulous language employed by the statutes, one is left in doubt as to the reach of them. Does a teacher who provides instruction to her students about: implicit bias, affirmative action and/or other remedial remedies, or America's unfortunate history of slavery and racism and its lasting impact on society violate the statute by "indoctrinating or persuading" students to a particular point of view inconsistent with the six principles? Does an employer who provides training or instruction on these topics "espouse, promote, advance, inculcate or endorse" the concepts prohibited? If a teacher encourages his students to read books about these topics, does such encouragement violate the statute and rule? *See Keyishian*, 385 U.S. at 601 ("For example, does the university librarian who recommends the reading of such materials thereby 'advocate … the … propriety of

---

Although the language employed in these two provisions differ slightly, it is fundamentally the same.

adopting the doctrine contained therein'?"). A reasonable person of ordinary intelligence would not know.

Additionally, the threat of arbitrary and discriminatory enforcement is real. Given the absence of any meaningful standard by which one can determine whether a person has indoctrinated or persuaded a student or espoused, promoted, advanced, inculcated or endorsed prohibited concepts to an employee in contravention of the statutes or suppressed or distorted significant historical events in violation of the rule, whether there has been violation of those proscriptions depends on the personal viewpoints of those charged with enforcement of the statutes and regulation. "Vague laws encourage erratic administration whether the censor be administrative or judicial; individual impressions become the yardstick of action, and result in regulation in accordance with the beliefs of the individual censor rather than regulation by law." *Dream Defenders v. DeSantis*, 559 F.Supp. 3d 1238, 1281-82 (N.D. Fla. 2021) (internal quotation and citation omitted).

As a result, the affected speakers will "steer far wider of the unlawful zone… than if the boundaries of the forbidden areas were clearly marked, thus silencing more speech than intended." *Wollschaeger*, 848 F.3d at 1320 (internal quotation and citation omitted). *See e.g.* (Declaration of Donald Falls (Doc. 30-1) at p.5, ¶. 7) (stating with respect to his teaching regarding economic inequality: "I have substantial concerns that if I offered instruction that adhered to these

standards, I would risk professional or civil retribution from presenting factual data to get students to think about the economy and how we could potentially improve it for everyone regardless of economic status."); (Declaration of Dr. Robert Cassanello (Doc. 30-2) at p. 9, ¶. 21) ("As such, this legislation forces me to second guess all my instructional materials to determine if they could be constructed as "violating one of the law's forbidden viewpoints."); (Declaration of Barbara Chieves (Doc. 30-5) at p. 6, ¶. 18) ("I am also seriously concerned that, given the broad and ambiguous the statute uses, virtually any training I offer could subject both myself and my clients to liability.") As such, Plaintiffs have shown a likelihood of success on their Fourteenth Amendment vagueness claims.

## V.  Plaintiffs Have Demonstrated Irreparable Harm and Balance of Equities Sufficient to Justify Injunctive Relief

Defendants do not make any additional argument with respect to irreparable injury other than to suggest that Plaintiffs should have challenged the Regulation sooner. (Doc. 44 at 50). However, the State had not shown how and whether it would enforce the Regulation or how the Department of Education would interpret its broadly worded ban on teaching "critical race theory" or other theories that "distort significant historical events." Since Plaintiffs Falls and Harper do not teach critical race theory, they could not have been sure their instruction would violate

48

the Regulation.[11] Likewise, RMJ is only entering public kindergarten and did not have standing to bring suit last year.

It was not until after Florida passed the IFA that it became clear how broadly Florida's conservative politicians were interpreting their crusade against "critical race theory" and the Department of Education took any action to enforce the Regulation by rejecting math textbooks on the basis that they contained "critical race theory." (See Exhibit 3). A delay in seeking injunctive relief is not determinative as to irreparable harm and, "generally, each case hinges on the reason for delay." *Dream Defenders*, 559 F. Supp. 3d at 1286 (N.D. Fla. 2021). Furthermore, "delay is less probative in the context of continuing injuries— especially constitutional injuries." *Id.* at 1285.

Defendants also argue that the balance of the equities militates against preliminary injunctive relief because the State is enjoined from effectuating a statute enacted by the legislature. (Doc. 44 at 50). However, "the public and state have no interest in enforcing a likely unconstitutional policy." *Austin v. University of Florida Board of Trustees*, 2022 WL 195612 at *26 (N.D. Fla. January 21, 2021). As such, the balance of equities favors injunctive relief.

---

[11] Indeed, Defendants fault Plaintiffs for bringing this suit before the IFA has been enforced against them (*See* Doc. 42-1 at 17, 19–20) (criticizing these Plaintiffs for offering only speculative justifications for how the IFA would be enforced). In essence Defendants are simultaneously arguing that Plaintiffs were both too early to file suit and too late.

## VI. Plaintiffs Allege Injuries in Fact Sufficient to Confer Standing

In order to establish an injury-in-fact, a plaintiff must demonstrate they hold "a legally cognizable interest that has been or is imminently at risk of being invaded." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1286 (11th Cir. 2010). This requirement is not particularly onerous at the pleading stage and is satisfied by general factual allegations of injury stemming from defendant's conduct. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). "The injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Hallandale Pro. Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). Furthermore, it is well established that plaintiffs are not required to wait until they are subject to the ultimate consequence of a law before they may file suit. "[Courts] will not force a plaintiff to choose between intentionally violating a law to gain access to judicial review and foregoing what he or she believes to be constitutionally protected activity in order to avoid criminal prosecution." *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1329 (11th Cir. 2000).

"[A]n actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement

consequences." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998). The injury is self-censorship. *ACLU v. The Fla. Bar,* 999 F.2d 1486, 1492 (11th Cir. 1993). The fundamental question of standing in "speech code" cases "is whether the challenged policy 'objectively chills' protected expression." *Speech First, Inc. v. Cartwright,* 32 F.4th 1110, 1120 (11th Cir. 2022).

"In order for a plaintiff alleging that his speech was chilled to have standing, he or she must show that either (1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." *Pittman v. Cole*, 267 F.3d 1269, 1283–84 (11th Cir. 2001). A credible threat of prosecution arises when the following factors are considered (1) whether a plaintiff intends to engage in a course of conduct arguably affected by a constitutional interest; (2) whether plaintiff's conduct is "arguably proscribed by [t]he statute" they are seeking to challenge; and (3) whether there is a threat of some future enforcement. *Susan B. Anthony List,* 573 U.S. 149, 161-64 (2014).

The educator plaintiffs meet each of these requirements. Each alleges the subject they teach, which is covered by the Act and the fact that the IFA and Regulation restrict their ability to teach their subjects fully and accurately. (Doc 1 at ¶4-6). Furthermore, in the Declarations, Plaintiffs provide examples of teaching they engage that is arguably proscribed by the statute they seek to challenge.

Lastly, there exists a credible threat of prosecution for the plaintiff teachers, given its myriad and open-ended enforcement mechanisms. *See*, *supra*, Pt. I, § C.

The vague terms of the law, which abut First Amendment-protected activities, and the enforcement mechanisms in the Act, establish a reasonable threat of enforcement. *See Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 302 (1979) (risk of injury was not speculative where "the State has not disavowed any intention of invoking the criminal penalty provision" even though state defendants maintained that the criminal penalty provision "may never be applied.")

The IFA and Regulation's chilling effect on speech lends further support to plaintiff teachers' standing. *See Harrell v. Florida Bar,* 608 F.3d 1241, 1244 (11th Cir. 2010) (finding a lawyer's speech was chilled, and therefore attorney had standing to sue, where certain Florida Bar rules failed to "provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited and fail[ed] to provide explicit standards for those who apply them."). Similarly, courts have found standing for students where it was unclear whether a particular statement is permitted or prohibited under University's discriminatory-harassment policy. *Speech First, Inc.,* 32 F.4th at 1122. The plaintiff teachers are no doubt teachers who teach in areas the law proscribes certain conduct and are subject to the enforcement mechanisms of the Act. Accordingly, the teacher plaintiffs have properly alleged an injury in fact.

RMJ also properly alleged that the Act injures her right to access information as the Act applies to kindergarten students. Where the effect of a vague statute would infringe upon a party's First Amendment rights, standing requirements to challenge the statute under the Fourteenth Amendment Due Process Clause are broader than they otherwise might be. *See Hynes v. Mayor & Council of Borough of Oradell,* 425 U.S. 610 (1976). In *Hynes,* a local ordinance required anyone canvassing or calling house-to-house for a charitable or political purpose to give advanced notice to the local police. *Id.* The Supreme Court found that three registered voters could pursue a due process vagueness claim challenging the ordinance, even though they were not the individuals directly targeted by the statute, given that "[the voters'] right to receive information would be infringed because persons canvassing for political causes would be uncertain whether the ordinance covered them." *Id.* at 620, 621 n. 5.

Defendants also argue that Dr. Hodo has not shown that credible threat of enforcement exists as to her. However, the Eleventh Circuit has described the analysis for determining whether a credible threat of enforcement exists as "quite forgiving." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (citation omitted). Indeed, "[i]f a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Harrell*, 608 F.3d at 1257. Indeed, Dr. Hodo is

53

well acquainted with the injury she will face when the IFA's prohibitions on diversity and inclusion training go into effect. When President Trump enacted his order enacting similar prohibitions for federal contractors, Dr. Hodo was halted from implementing ongoing federal training courses. (Doc. 30-4 "Hodo Declaration" at ¶14). Article III does not require her to wait for the same events to play out with her Florida clients before she may challenge provisions regulating her speech.

## VII. Governor DeSantis Is a Proper Party

Defendants argue that Governor DeSantis is not a proper defendant because Defendants claim the Governor has no enforcement authority when it comes to the statutes and regulations at issue. (Doc. 42-1 at 28-30). However, both the Florida Constitution and Florida's statutes provide enforcement mechanisms through which the Governor can enforce the provisions at issue. In *Dream Defenders*, 559 F.Supp.3d at 1261-62, this Court found that Governor DeSantis was a proper party in an action challenging Florida's newly amended anti-riot statute. The Court reached that conclusion in part because the Governor "has the power under Florida law to suspend sheriffs who decline to obey his directives to suppress riots." *Id.* at 1261 (citing Fla. Const. Art. IV, §7(a)). The Court also observed that Florida law gives the Governor the power to order the Florida Department of Law Enforcement

to investigate sheriffs before the Governor suspends them. *Id.* at 1261-62 (citing §943.03, Fla. Stat.).

Likewise, Florida law vests the Governor with the power to enforce the challenged provisions here. The same Constitutional provision which gave the Governor the authority to suspend sheriffs discussed in *Dream Defenders* (Fla. Const. Art. IV, §7(a)) also gives the Governor the power to suspend school board members and superintendents. *See In Re: Advisory Opinion to the Governor-School Board Member-Suspension Authority*, 626 So.2d 684, 689-90 (Fla. 1993). Florida law also grants the Governor the power to suspend a member of the Florida Commission on Human Relations. *See* §760.03(4) Fla. Stat. (2021) As this Court has previously noted, "[t]hat the Florida Senate must later approve or deny any suspension does not make suspensions less coercive." *Dream Defenders,* 553 F.Supp.3d at 1080. "Indeed, the fact that the Governor may reinstate a suspended [official] at any time before the senate finalizes their removal creates a carrot and stick through which the Governor may exert control." *Id*. (citing Fla. Const. Art. IV, § 7(a)).

Finally, Governor DeSantis has not hesitated to deploy the power of his office to direct the Department of Education to comply with the Governor's wishes. Recently, the Florida Legislature passed House Bill 5003, a general appropriations bill that, among other things, amended §1000.36 to "reward school

districts and charter schools" for "complying with the provisions of emergency rules promulgated by the Department of Health relating to face covering mandates during the 2020-2021 or 2021-2022 school years[.]" *Id.* Upon signing the bill into law, the Governor sent a letter to the current Commissioner of the Department of Education (Manny Diaz) and instructed the Department of Education to disregard a recent statutory change prohibiting funds to be distributed to schools in districts which would have been ineligible for such funds under the amended statute. *See* Letter of Governor Ron DeSantis to Commissioner Manny Diaz, dated June 2, 2022 (attached as Exhibit 4). In other words, the Governor has not been shy about "directing" the Department of Education regarding the allocation for performance funding.

Accordingly, the Governor's constitutional authority to suspend school board members and elected school superintendents and his statutory authority to suspend members of the Florida Commission on Human Relations, along with his own recent actions directing the Commissioner of the Department of Education in regard to performance funding, demonstrates that he has enforcement authority over the challenged legislation so as to make him a proper party to this action.

## VIII. The Unconstitutional Provisions of the IFA and Regulation Are Not Severable

The constitutional infirmities inherent in the provisions challenged in this action, *to wit:* the amendments to: §760.10 enacting subsection (8); §1000.05

56

enacting subsection (4); and §1003.42 enacting subsection (3), do not permit the severance of the provisions within those enactments. As set forth above, the vagueness of the terms employed in the legislation apply to the entirety of the subsections enacted. *See Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.3d 1320, 1347, (finding severability not possible where the taint of unconstitutional provision infects the entire enactment). Thus, the provisions of those specific statutory amendments challenged here cannot be separated from the remaining valid provisions.

## <u>CONCLUSION</u>

For the reasons stated above and in Plaintiffs' Motion for Preliminary Injunction (Doc. 4), Defendants' Motion to Dismiss (Doc. 42) should be denied and Plaintiffs' request for preliminary injunction granted.

Respectfully submitted,

_____*/s/ Jesse B. Wilkison*_____
Elizabeth L. White, Esquire
Florida Bar No.:  314560
Matthew R. Kachergus, Esquire
Florida Bar No.:  503282
Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Jesse B. Wilkison, Esquire
Florida Bar No.:  118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus, DeMaggio &
Wilkison, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone: (904) 356-9661
Facsimile: (904) 356-9667
Email: sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to

**Charles Cooper, Esquire,** ccooper@cooperkirk.com, **Davis Cooper, Esquire,**

pdcooper@cooperkirk.com, **Timothy Newhall, Esquire,**

timothy.newhall@myfloridalegal.com, **John D. Ohlendorf, Esquire,**

johlendorf@cooperkirk.com, **John Ramer, Esquire,** jramer@cooperkirk.com,

**Alannah Lee Shubrick, Esquire,** Alannah.shubrick@myfloridalegal.com, by

electronic mail this 16th day of June, 2022.

                          */s/ Jesse B. Wilkison*
                          ATTORNEY