**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
DONALD FALLS, et al.,            )
                                 )
            Plaintiffs,          )  Case No: 4:22cv166
                                 )
        v.                       )  Tallahassee, Florida
                                 )  June 21, 2022
RONALD DION DESANTIS, in his     )
official capacity as Governor    )
of Florida, et al.,              )
                                 )  9:00 AM
            Defendants.          )
_____   )
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 145)**

```
Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com
```

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

APPEARANCES:

For the Plaintiffs:      Sheppard, White, Kachergus & Demaggio
                         By:  MATTHEW R. KACHERGUS
                              JESSE B. WILKISON
                              BRYAN EVERETT DEMAGGIO
                              CAMILLE E. SHEPPARD
                              ELIZABETH L. WHITE
                              Attorneys at Law
                              sheplaw@sheppardwhite.com
                         215 Washington Street
                         Jacksonville, Florida 32202


For the Defendants:      Cooper & Kirk, PLLC
                         By:  CHARLES JUSTIN COOPER
                              JOHN D. OHLENDORF
                              MEGAN MARIE WOLD
                              JOHN D. RAMER
                              Attorneys at Law
                              ccooper@cooperkirk.com
                              johlendorf@cooperkirk.com
                              mwold@cooperkirk.com
                              jramer@cooperkirk.com
                         1523 New Hampshire Ave Northwest
                         Washington, DC 20036


                         Office of the Attorney General
                         State of Florida
                         By:  TIMOTHY L. NEWHALL
                              Special Counsel, Civil Litigation
                              timothy.newhall@myfloridalegal.com
                         PL-01, The Capitol
                         Tallahassee, Florida 32399

**P R O C E E D I N G S**

1

2        (Call to Order of the Court at 9:00 AM on Tuesday, June 21,

3    2022.)

4            THE COURT:  Please take your seats.

5            All right.  We are here in Case No. 4:22cv166.

6    Pending before me is a motion for preliminary injunction as well

7    as a motion to dismiss.

8            As the parties know, we had a -- conducted a

9    scheduling conference on April 29, 2022.  I asked of the parties

10   whether they needed to engage in any discovery, whether they

11   intended to rely on Declarations and so forth, and to set a

12   scheduling hearing.  The parties have determined they were going

13   to move forward on Declarations only.  In fact, a notice was

14   recently filed on June 17th, ECF No. 55, wherein the parties

15   confirmed that they did not intend to call witnesses at the

16   hearing, so we're here for a legal argument only.

17           I'll also note that Mr. Cooper asked to file a reply

18   to the motion to dismiss.  The deadline would have actually

19   taken us beyond today's date.  I said that was fine, but

20   suggested it would be more helpful to have it prior to today's

21   hearing.  I received that and reviewed it and have read it and

22   have it on the bench with me, ECF Document 56.  The matter has

23   been fully briefed, both the motion to dismiss as well as the

24   motion for preliminary injunction.

25           As I indicated to the lawyers, which is consistent

 1    with how I conduct these types of proceedings, I'm going to

 2    start by asking some questions.  I'm not trying to telegraph

 3    anything to anyone, but I do have some questions that I want

 4    answered.  We'll then take a break.  And when we come back, I'll

 5    give the parties an opportunity to sum up or add anything

 6    additional you want to put on the record.

 7            It's been fully briefed.  There are no witnesses

 8    today, so -- and I don't need y'all to repeat into the record

 9    what you've already submitted in writing, but to the extent you

10    want to add anything -- and I'll also give you an opportunity to

11    confer with your co-counsel when we take a break so that you can

12    decide, based on my questions, if there is anything else you

13    need to circle back and add to the record.

14            When I do ask a question of one side, I'll then give

15    the other side an opportunity to respond, if you want.

16    Sometimes when I ask a question of one side, I'm not necessarily

17    sure it would require a response from the other side, but I'll

18    give both sides an opportunity to address each and every

19    question.

20            So let's get started.

21            With respect to the plaintiffs, I'm not going to --

22    and the defense the same way, if y'all will just identify for

23    the benefit of the court reporter who's speaking.  I don't

24    particularly -- it's not -- whoever wants to address a

25    particular question, you can let me know.  Just stand up and

1    identify yourself.  I don't -- and the same thing goes for the

2    defendants.  And maybe the easiest way to do it is when I ask a

3    question of one side, I'll ask, is there anybody else that needs

4    to be heard from that side of the V?  Then I'll turn to the

5    defense and say, does anybody wish to address it?  And you can

6    just raise your hand.  I know this is not a schoolroom, and I'm

7    not trying to treat you like students; but just for the benefit

8    of the court reporter, it's easier to do it that way so that we

9    can keep things moving in an orderly way.

10           I have a question on the motion to dismiss for the

11    plaintiffs.  And I don't mean this in a nasty way, and I'm not

12    saying it with a scowl on my face or banging on the bench.  For

13    the life of me, I don't understand how the Governor is a proper

14    party.  I think the defense in the reply hit the nail on the

15    head when they pointed out the one case you rely on, one of my

16    cases, is completely distinguishable.  I say that because I'm

17    familiar with that case, and, quite frankly, it's a unicorn.  In

18    almost all cases where the Governor is a party, I've dismissed

19    the Governor because they are not a proper party and there's no

20    standing.  In the anti-riot bill case, there were specific

21    enforcement mechanisms in place that directly related to the

22    Governor.

23           And so whoever wants to take it for the plaintiff can.

24    I just, for the life of me, don't understand how the Governor is

25    a proper defendant in this case.

1           And before you answer the question, let me note that

2    doesn't mean that nothing the Governor says is relevant.  That

3    doesn't mean -- and I don't need to pass on it now, whether it

4    would or would not be evidence properly considered by this

5    Court.  I think the short answer to that question is it depends

6    on the case; it depends on the law, and it depends on the issue

7    before the Court.  Sometimes the Governor's comments would be

8    completely irrelevant.  They may be interesting; they may relate

9    to policy; but they may not be relevant for purposes of this

10   judicial question before the Court.

11          But that's a different question, whether or not

12   something that's said may or may not be relevant for this case

13   or some evaluation of some claim.  But help me to understand why

14   the Governor is a proper defendant.

15          MR. WILKISON:  Your Honor, this is Jessie Wilkison.

16   May we make our arguments at the podium?

17          THE COURT:  Whichever you are more comfortable with.

18          MR. WILKISON:  Okay.  I will go up.

19          So the issue of whether the Governor is a proper party

20   comes from two different doctrines, the first being the

21   exception under *Ex Parte Young* to the Eleventh Immunity.  And

22   under that standard, what the Court has said is that the

23   official being sued must "by virtue of his office," have some

24   connection with the unconstitutional act or conduct complained

25   of.  Whether that connection arises out of general law or is

1    specially created by the act itself is not material, so long as

2    it exists.

3         In light of the -- and the other place it comes from

4    is the *Lujan* standing requirement that the conduct must be

5    fairly traceable to the official being sued.

6         THE COURT:  There has to be some connection for

7    enforcement; right?

8         I mean, if I'm issuing an injunction, I don't issue an

9    injunction saying, Let's all play nice; let's all be good.  I

10   mean, I issue an injunction -- I'm stopping, I'm directing or

11   prohibiting specific conduct.

12        So in this case what would I be telling the Governor

13   to do?

14        MR. WILKISON:  So I have four different connections in

15   light of what they've argued in their reply.

16        The first is the Governor's authority to direct his

17   officials to act whom he directly has oversight over.

18        THE COURT:  So the Governor literally would be a

19   proper party in any case involving any state law if I was to

20   accept that construction; right?

21        MR. WILKISON:  Well, I don't believe that's true, and

22   part of the reason is that Florida law actually gives the

23   Governor specific authority.  Under Florida Constitution Article

24   IV, Section 1(b), "The governor may initiate judicial

25   proceedings in the name of the State against any executive or

1   administrative state, county or municipal officer to enforce

2   compliance with any duty or restrain any unauthorized act."

3          So I think what separates this case from some cases

4   like *Dream Defenders* or, you know, any of the number of the

5   cases the defendants cite is that you have a plaintiff who is a

6   private individual who is challenging an unconstitutional

7   statute and saying the Governor's general authority to enforce

8   the law is what provides standing.

9          THE COURT:  Hasn't the Eleventh Circuit repeatedly

10  rejected that precise argument, for example, as it relates to

11  the attorney general of the state?

12         MR. WILKISON:  Right.

13         THE COURT:  I would think the string cite literally

14  would take up ten pages to cite every time the Eleventh Circuit

15  has rejected that precise argument.

16         MR. WILKISON:  And that's not the argument we're

17  making.  The argument we're making is the Governor, as the

18  person who oversees all state employees, and under this

19  constitutional provision gives him oversight of county employees

20  and local employees, has the authority to direct their officials

21  to act or not act.

22         And our plaintiffs are not just private citizens.

23  They are teachers who are subject to this constitutional

24  provision, or at least some of them are teachers and professors

25  who are under the Governor's direct oversight.

1           So I think it's a different scenario where you have

2    just general authority to enforce the law versus someone who is

3    high up in the chain of command who is effectively your boss, no

4    different from the CEO of a company, who can, you know, either

5    bring action or direct others to act to fire you or give an

6    injunction to enforce the law.

7           THE COURT:  Has --

8           MR. WILKISON:  In addition to that --

9           THE COURT:  -- the Eleventh Circuit ever issued any

10   decision that would allow such a connection to be -- serve as a

11   basis for establishing the Governor, or any similar individual,

12   as a proper party?

13          MR. WILKISON:  Well, we didn't cite this in our reply,

14   but I have extra copies for the Court.  I think the closest

15   case, and it is discussed in the cases the defendants cite, is

16   *Luckey v. Harris*, L-u-c-k-e-y, 860 F.2d 1012 in the

17   Eleventh Circuit.  That case involved a class action brought by

18   indigent defendants and their representatives for basically

19   inadequate resources in the criminal justice system for indigent

20   defendants, and the Court there held that the Georgia governor

21   was a proper party because Georgia's constitution provided that

22   the governor was responsible for law enforcement over the state,

23   had residual power to commence criminal prosecutions, and had

24   final authority to institute and prosecute on behalf of the

25   State.

1          (Reporter requested clarification.)

2               MR. WILKISON:  Sorry.  Going a little too fast.

3               Had residual power to commence criminal prosecutions

4      and had final authority to institute and prosecute on behalf of

5      the State.  And that was held to be a sufficient connection to

6      fall within the *Ex Parte Young* exception.

7               The governor's ability to initiate prosecutions that

8      were at issue in *Luckey* is no different from the Governor's

9      authority here to bring a suit to enjoin or force action of

10     state officials.

11              THE COURT:  Wasn't the governor's authority in the

12     provision cited in that case far more specific than just the

13     general provision that you are traveling under here?

14              MR. WILKISON:  Well, in that case it was the

15     governor's general authority to initiate criminal prosecutions

16     generally, and I would say that that's the same level of

17     specificity as a constitutional provision that says that the

18     governor can sue its state or local employees to enforce the

19     laws.

20              And this is not -- this is not a situation where the

21     Governor is enforcing laws against citizens.  It's an

22     employer -- it's in a supervisor context that's part of the

23     separation of powers in our state and the Governor's role to

24     regulate his employees, which is different from cases like *Dream*

25     *Defenders* where the only connection at play is just the Governor

1   kind of has a general duty to enforce the law.  The Governor

2   really doesn't have any relationship with the, you know, men on

3   the street who are doing what the statute prohibits.  Whereas

4   here, you know, the Governor can either direct the Commissioner

5   of Education or bring action himself to say, Hey, this teacher,

6   who is a state employee or a local school board employee, is

7   violating this law.  We are going to, you know, take action to

8   stop it or remove them.

9          And that's much the same way in that the Governor is

10  the one responsible for appointing members of the Board of

11  Governors, members of the Florida Human Relations Commission,

12  members of the school board, and they have direct oversight

13  over -- over the school system.  And specifically, in terms of

14  the regulation that we are challenging, the Governor has said in

15  media appearances that, I directed Richard Corcoran, at the time

16  the Commissioner of Education, to ban Critical Race Theory in

17  schools.

18         So this isn't some tenuous connection.  This is

19  something where the Governor walked over to Richard Corcoran's

20  office and said, Hey, I don't want this in our schools, the next

21  day or, you know, a week later.

22         THE COURT:  Help me to understand.  The Governor

23  directing policy, which I can't imagine you're suggesting

24  there's anything unusual about that -- you may think there is

25  something unusual about the policy itself, but I can't imagine

1    there is anything unusual about a governor telling those that

2    are in his chain of command, These are the policies that matter

3    to me.

4            How does that translate to the Governor is the person

5    that if I order him to do something is going to -- based on some

6    enforcement authority, I would be addressing the perceived wrong

7    here, assuming you have a claim on the merits?

8            MR. WILKISON:  Well, let's say the Court takes the

9    Governor out of the lawsuit.  Our lawsuit is now against the

10   State Commissioner of Education and the Board of Governors and

11   all the sort of lower rung state officials.  Under Florida's

12   Constitution, the Governor can bring his own lawsuit.  He

13   doesn't need to go through the Florida Commissioner of

14   Education.  He can -- he has the plenary ability to basically go

15   to the courts and enforce the laws that he advocates, even if

16   his subordinates are enjoined.  So at least in that sense, the

17   Governor has the ability to take direct action, and certainly

18   under the statements made in this case and the facts of this

19   case, he's given every indication he intends to.

20           We, you know, submitted in our reply the incident

21   where the Governor, once again, wrote a letter to the

22   Commissioner of Education regarding the mask mandates and said,

23   Don't provide this performance funding or provide this

24   performance funding based on, you know, the school's decision as

25   to whether to wear masks.

1    So the idea and I think that *Ex Parte Young* -- the

2    standard is it has to have some connection.  This is not an

3    attenuated situation where the Governor is just being named

4    because he has, you know, this plenary executive authority.

5    It's something that he is deeply personally involved in.

6    An example where courts have found that relevant and

7    dispositive -- there's a case that's out of Georgia, albeit

8    unpublished, but I think it has a pretty persuasive analysis of

9    the issue.  It's the *Board of Education for the City of Savannah*

10   *v. Georgia*.  The Westlaw cite of that is 1990 WL 608208,

11   Southern District of Georgia.  And in that case the -- actually,

12   the plaintiffs were challenging the failure to implement *Brown*

13   *v. Board of Education* and desegregate the schools, and the Court

14   found that the governor was a proper party there, not

15   necessarily because he had any direct authority to implement

16   *Brown v. Board*, but because governors in the past had taken

17   active efforts to block desegregation, essentially.  And the

18   Court found that that was a sufficient connection to meet the

19   exception for *Ex Parte Young.*

20   Another thing that that case found was that the

21   governor's recommendations as to appropriation funding was a

22   sufficient connection.  Even if he wasn't the final

23   decision-maker, his recommendations to the legislature as to

24   whether schools got funding was a sufficient connection, much in

25   the way here that the IFA and regulation -- one of the carrots

 1   and sticks they used to enforce is the withholding of academic

 2   performance funding through the conforming bill that the Senate

 3   passed.

 4           So we would argue that I don't think there is any case

 5   that the defendants cite or any case that has come through the

 6   Eleventh Circuit where all four of those things in conjunction

 7   were asserted to establish a connection with the Governor, and I

 8   think that there is a lot more here than just the general

 9   plenary executive authority the Governor has to enforce the laws

10   as result of his authority to bring action directly on behalf of

11   the State, his authority to appoint and direct the actions of

12   his officials, his demonstrated propensity to do so in these

13   issues, and, finally, the Governor's role in making

14   recommendations as to school funding.

15           THE COURT:  I understand your argument.  Thank you.

16           And also realize there is some other layers, but, in

17   any event, let me hear from the defense.

18           And for the benefit of the court reporter, each time

19   y'all stand up, if you will just identify yourself.

20           MR. OHLENDORF:  Good morning, Judge Walker,

21   John Ohlendorf for the defense.  I hesitate to add much because

22   I think, Your Honor, you have already made our points pretty

23   persuasively for us, but I do want to make -- I do want to

24   address two of their four points, Your Honor.

25           First -- and I want to start out by setting out the --

1    kind of the general principle here, which I think, Your Honor,

2    you alluded to, which is it cannot be that Governor DeSantis is

3    a proper defendant here on some basis that would make him a

4    proper defendant in every case, because the Eleventh Circuit has

5    plainly held that he cannot be a proper defendant every time

6    some plaintiff challenges the state law.

7         And I think that disposes Your Honor of the reliance

8    on Article IV, Section 1(b) of the Florida Constitution.  That

9    applies -- that gives the Governor of Florida authority to sue

10   any executive official for disregarding any legal duty under

11   Florida law under the sun.  That would -- if that justified a

12   suit here, it would justify a suit against the Governor of

13   Florida in every single case challenging any Florida law, so it

14   simply cannot be a sufficient connection.

15         THE COURT:  What says you -- and I'm not suggesting

16   that I agree or disagree, but what says you to Mr. Wilkison's

17   argument that, Well, Judge, maybe that's so, but it's when you

18   consider it in conjunction with these other factors that we get

19   across the line?

20         MR. OHLENDORF:  Well, I think, Your Honor -- I think

21   you put it best in *Dream Defenders* -- the *Dream Defenders*'

22   decision where you were relying on kind of the Governor's

23   background authority of this nature.  You have to articulate

24   some other formal and specific power that the Governor has under

25   state law to direct the enforcement of the act at issue.

1          The other point I'd make about this Article 4

2    provision is that this gives the Governor authority to go to a

3    court and try to get the court to direct an executive official

4    to do what the Governor wants the executive official to do.

5    That's the very opposite of directing the enforcement of the

6    laws.

7          If the CEO had a subordinate that they had to get to

8    court to get an order to get the subordinate to do what the CEO

9    wanted them to do, I don't think I would take that job,

10   Your Honor.

11         I'd also like to just briefly address the *Luckey v.*

12   *Harris* case.  That case, Your Honor, involved discrimination in

13   the criminal justice system.  One of the claims is that in

14   criminal cases the government was directing the prosecution

15   attorneys improperly.  So I think it, you know, certainly stands

16   to reason, where the Governor himself can bring criminal

17   enforcement actions and have direct supervision over the

18   attorneys engaging in the prosecution, that he could be a proper

19   defendant in that case.

20         THE COURT:  Your point is, Judge, based on your

21   question, there was a direct enforcement authority that was

22   identified related to the mischief that was being challenged,

23   and that's what's lacking here?

24         MR. OHLENDORF:  Correct, Your Honor.  In a nutshell,

25   that's our argument.

```
 1                THE COURT:  Thank you.

 2           Okay.  Let me turn to a general question about the

 3      posture of this case and the standard.  For purposes of

 4      standing -- and, again, whoever wants to speak on behalf of the

 5      plaintiffs can -- isn't it correct that, unlike the motion to

 6      dismiss, which is also pending before me, where I take the

 7      allegations as true for purposes of ascertaining whether or not

 8      there is or is not standing, for the preliminary injunction,

 9      aside from the -- wrapped in the four factors that I have to

10      look at for a preliminary injunction, isn't it correct that for

11      purposes of standing it's not enough for a plaintiff to rely on

12      mere allegations; it's more akin to the standard that would

13      exist at the summary judgment stage in order for me to issue a

14      preliminary injunction if there is a problem with standing?

15                MR. WILKISON:  Jessie Wilkison for plaintiffs.

16           That's correct, Your Honor.  Standing not only applies

17      to the pleading stage, but you also have to have standing to

18      seek injunctive relief.

19                THE COURT:  Well, I've got to consider standing at

20      every stage.

21                MR. WILKISON:  Right.

22                THE COURT:  I'm less concerned with that concept,

23      which is kind of a legal truism.  What I'm more interested in is

24      what the -- who bears the burden and what is the burden, because

25      it seems to me that, as it relates to the motion to dismiss, I
```

1    accept your allegations as true, and that can be enough.

2            But is not, for purpose of the preliminary injunction

3    motion, the standard a higher bar for you as is it a more

4    searching inquiry in terms of what is or is not before me on the

5    record?

6            MR. WILKISON:  It's a higher bar in the sense of the

7    quantum of evidence necessary to show it.  It needs to go beyond

8    mere allegations, and --

9            THE COURT:  And I don't necessarily just accept your

10   allegations as true; correct?

11           MR. WILKISON:  Correct.  The Court has to make a

12   factual finding or at least a legal finding based on the

13   undisputed facts in the record.

14           THE COURT:  And to do that I have to be armed with

15   more than conclusory allegations; correct?

16           MR. WILKISON:  Correct.  And, Your Honor, I would

17   argue that in the affidavits and declarations that we submitted

18   on behalf of all the plaintiffs --

19           THE COURT:  And we are going to drill down to each

20   standing.

21           MR. WILKISON:  Sure.

22           THE COURT:  I just want to make sure as a baseline

23   that nobody disagrees what the -- and I could have kept that

24   more simple, but -- so we'll go on to -- before -- you might as

25   well stay standing, because I can't imagine the defense

```
1    disagrees.
2            But whoever wants to speak for the defense, I assume
3    y'all agree; I do not simply rely on the allegations, that it is
4    a more searching inquiry for purposes of standing in the quantum
5    of evidence I need before me in order to grant a preliminary
6    injunction as it relates to standing?
7            MR. COOPER:  Yes, Your Honor.  Charles Cooper, also
8    for the defendants.
9            We agree with that statement, of course.
10           THE COURT:  So let's start with RMJ.  And I'm going to
11   go through each of the plaintiffs in this case.
12           And let me pause here to say, I don't choose the
13   parties, and I don't -- well, I guess I've ruled on who is a
14   proper party, but I don't choose who is going to bring a suit or
15   who's sued.  I also don't frame the claims.  I get the cases I
16   get.  So I don't have an eighth grader as a plaintiff in this
17   case, and I don't have a college student in front of me.
18           I also -- well, and I'll also address another issue in
19   a bit in terms of the nature of the claims.
20           What I have is -- in terms of a student claim, I have
21   a kindergartener in front of me.  So a couple of concerns I
22   have, Mr. Wilkison -- and you've got to help me out with this --
23   is let's start with what's before me other than the general
24   allegation that this law could -- and setting aside the claim on
25   the merits, this law could keep me from having access to
```

1  information I'd otherwise have access to.

2          Is there anything at all related to RMJ -- and I

3  realize it doesn't have to be the minor.  It could be a teacher.

4  It could be somebody else.  Is there anything at all in the

5  record that says, for example, here are four books that are

6  routinely read to kindergartners -- and let's assume it's not

7  even Nassau County, although curriculum can vary a lot from

8  place to place.

9          But is there anything at all in this record to say,

10  Here are, like, four books that normally would be read as part

11  of the curriculum to teach these points, and under the law we

12  believe that these resources could not be used?  Other than the

13  most amorphous, it could impact what somebody does or does not

14  teach the kindergartner, is there anything more specific in the

15  record before me?

16          MR. WILKISON:  As to RMJ specifically, no.

17          THE COURT:  Well, then my next question to you is how

18  do you bootstrap, for purposes of a preliminary injunction,

19  what's happening with older students to a kindergartener?  For

20  purpose of a preliminary injunction doesn't the harm have to be

21  imminent?

22          I mean, I'm not -- you're not here representing a

23  fourth grader that's going to start school in September.  You're

24  not here representing a FAMU student who wants to participate in

25  the student chapter of the NAACP at FAMU and that -- I was

1    alluding to that earlier.

2              I was going to ask a question about -- I don't believe

3    there's a claim in front of me about what can and can't be done

4    outside the classroom.  I'm not sure the standards aren't

5    different -- or might -- we might have different questions, I

6    should say, before this Court if we were talking about

7    extracurricular activities as opposed to the classroom.

8              But I've got -- what I've got is a kindergartener, so

9    how in the world -- you've already told me there's nothing

10   specific about RMJ.  How in the world would I find there's

11   anything imminent as it relates to RMJ based on something that

12   could happen when he's in the fourth grade or the eighth grade

13   based on other declarations you've given me?

14             And why does RMJ, for purpose of preliminary

15   injunction, get to bring a claim for other students of other

16   ages?  I don't understand how you get to bootstrap that

17   information into RMJ's claim.

18             MR. WILKISON:  Yeah.  I think there may be some --

19   maybe we weren't as clear as to what affidavits were supporting

20   what claims.  We did submit many student declarations, and that

21   wasn't necessarily to establish the RMJ had standing.  That was

22   to establish the impact that this is going to have on classroom

23   instruction and to refute the argument that this is a bill that

24   is regulating indoctrination of students by showing that the

25   students want to learn the -- and many of the topics that the

1    law regulates.

2          THE COURT:  And so we -- that's not why they're before

3    me, but what I need to then focus on, because I don't get to --

4    I mean, you're not -- you can't -- you're not amending your

5    complaint right now to add in other students or older students

6    or adding in, for example, an extracurricular claim.  I've got

7    what's in front of me.

8          How does RMJ have standing?

9          MR. WILKISON:  So RMJ has standing -- and it's kind of

10   an offshoot of the principle that you can't know what you don't

11   know.  And RMJ's claim is a claim that is based on her right to

12   receive information in the classroom context.  In that sense, it

13   is very analogous to the Supreme Court's decision in *Hynes v.*

14   *Oradell* where one of the section --

15         THE COURT:  Haven't all those cases had specific

16   examples of at least something concrete that you couldn't -- you

17   wouldn't have access to?  I mean, it seems to me all the

18   right-of-access cases that have been cited by you had something

19   specific, that they were -- and it wasn't just this amorphous

20   maybe there's something out there that I might not have access

21   to.

22         MR. WILKISON:  Sure.  Well, in *Hynes*, the issue in

23   that case specifically --

24         THE COURT:  I mean -- by the way, let me give you an

25   example.  I don't think every case is the same.  So if they

passed a law tomorrow that said you can't teach math, I mean,
okay, I get it.  If you've got a specific -- you can't have --
teach math at all in elementary school, then, you know, I
understand that pointing out to a specific school book or
textbook that was going to -- you know, is typically used that's
a -- you know, maybe that's not required.

But here, given what's at issue and whether or not it
would or would not apply to a kindergartener and -- in terms of
concepts that would be taught, such that they'd be proscribed by
the -- what you're challenging, don't I need something
specifically identified?

MR. WILKISON:  Well, in *Hynes* what they specifically
identified was the right to receive people who were canvassing
for electors and, you know, that was a case much like this one
where some of the plaintiffs were the speakers and some of the
plaintiffs were the listeners.

And I don't think anyone would argue that, you know,
someone sitting in their home and -- you know, is going to plan
for a solicitation or political canvasser.  The problem is is
that when a law like this restricts the discussion, when the
right of the listener is impacted, the listener's interest in it
is to receive information that they don't know.

THE COURT:  And, Counsel, I understand, and that would
be true if we were talking about a student in high school where
they're going to take AP psychology, for example.  I can clearly

```
 1    see where, regardless of identifying a specific textbook or

 2    something, you could almost by definition suggest that the

 3    provisions that you're challenging could implicate something

 4    that would be taught in AP psychology.

 5           But when -- I just -- for the life of me, I don't

 6    understand how that is true for a kindergartener, and absent you

 7    giving some example of something that would be used -- and I can

 8    conceive of some -- but I'm not -- some books, for example, that

 9    could be used in a kindergarten classroom, but it's not up to

10    the Court to say -- conceive of, you know, I believe there may

11    be these examples that I might have included, for example, in a

12    declaration or in the complaint.

13           Help me to understand what is there from which I can

14    reasonably infer?  So let me -- there's two parts here.  Number

15    one, you acknowledged, I think, that you didn't acknowledge any

16    particular materials that couldn't be used.  I guess the other

17    way of looking at it is what is there before me from which I

18    could reasonably infer that a kindergartener was going to have

19    access limited to something specific?

20           MR. WILKISON:  And, you know, first we would argue

21    that when you say something specific, cases like Hynes -- and I

22    don't believe that there's a requirement that I have to name

23    this textbook that I want to read, because the counterargument

24    to that is, Well, just read the textbook.  You don't have to

25    read it in school, right?
```

1          THE COURT:  For imminent harm, though, doesn't there

2    have to be something, some little nugget somewhere -- and let me

3    do it this way.

4          You tell Judge Pryor -- you're speaking to him

5    directly -- Chief Judge Pryor -- he gets on this panel.  Judge

6    Pryor, Here's what RMJ is not going to have access to based on

7    the provisions we're challenging, dot, dot, dot, go.

8          Because that's what you're asking me to do.  That's

9    what I've got to tell 3 of the 11 judges -- well, not

10   necessarily.  I guess they could have a visiting judge or a

11   senior judge, but I got to tell a panel of three judges -- I got

12   to explain it.  And I think it's fair to say I'm not shy about

13   explaining my views to the Eleventh Circuit.  So I'm happy to do

14   it, but I've got to be able to explain it.

15         So help me out there.  I know you're not my law clerk,

16   but that's your role.  You're going to write this part of the

17   order.  What is it that RMJ, a kindergartener, is in imminent

18   danger of being barred from being able to have access to?

19         MR. WILKISON:  So, I mean, the complaint goes

20   through -- and the motion for preliminary injunction goes

21   through many examples of just categories of discussion that the

22   law bans, and not all of those are -- and the law applies to

23   kindergarteners just as well as it does fourth graders.

24         THE COURT:  What do I have in front of me that says

25   those concepts -- not through a particular textbook, not through

1   a particular handout, not through a particular workbook, but I'm

2   a kindergarten teacher, and here is -- in Nassau County, and we

3   typically, to try to teach children to socialize, use the

4   book -- and I can't think of the critter's name now.  It doesn't

5   matter.

6          It's a cartoon character and there's a book that talks

7   about how his friend has two dads -- and I'll think of the name

8   in a little bit.  I haven't had a kid in elementary school in

9   quite some time, but I remember that book.  And that -- we use

10  that in our curriculum in Nassau or similar materials.  They

11  don't even identify a particular book.

12         Is there anything at all like that from anybody that's

13  an educator -- and, yes, I'm sorry, and that's -- this is why

14  God made law clerks and assistants -- Arthur is who I'm thinking

15  of.  I just couldn't remember the particular critter.

16         You can phone a friend.

17         MR. WILKISON:  One moment, Your Honor.

18         THE COURT:  I'm just glad somebody knew what my

19  reference was, and just so it's clear, I was talking about the

20  beloved bespectacled aardvark.

21         MR. WILKISON:  Your Honor, I think the answer to that

22  question is that race, from all ages, the topics that this law

23  regulates pervades all aspects of life to people of all ages.

24         THE COURT:  This law prohibits any discussion of race

25  at all?

1              MR. WILKISON:  Well, it chills discussion of race

2      certainly, and --

3              THE COURT:  What discussion of race that you would

4      have with a kindergartener would this chill?

5              MR. WILKISON:  Well --

6              THE COURT:  I understand if you had a high school --

7      you'd have -- I think it's a reasonable inference if we had a

8      high school class, at least any high school I would want my

9      children to go to, that you might have these types of

10     discussions, but --

11             MR. WILKISON:  Well, for example, Nassau County

12     schools, like all schools, I believe, are closed on Martin

13     Luther King Day, and usually that occasion is marked and, in

14     fact, the required educational standards has -- you know,

15     requires teachers to teach certain topics about the Civil Rights

16     Movement, and I think for a kindergartener part of that

17     instruction would --

18             THE COURT:  But how does the fact that the State still

19     mandates -- for example, it mandates that you talk about the

20     Ocala massacre, which is a little close to home since I was

21     raised in the sister city, Winter Garden, so I'm intimately

22     familiar with that event, even though it occurred long before I

23     was born.  I'm not that old.

24             But how does this law prohibit or chill any discussion

25     about anything in the civil rights or Martin Luther King to a

```
 1   kindergartener, when the curriculum actually mandates that
 2   certain things be taught?  I mean, I understand how it would
 3   limit nuanced discussions about race, arguably.  I'm not ruling
 4   on that.  I'm suggesting that's your argument.
 5          But what is there possibly in front of me from which I
 6   could reasonably infer that it is anything other than fanciful
 7   to suggest those sorts of nuanced conversations would occur in a
 8   kindergarten, assuming, arguendo, that the law -- the provisions
 9   at issue would prohibit it in any way, which I understand that
10   the defense has a different position on that.  But I don't need
11   to address that as to a kindergartener because I just don't see
12   how it's even plausible that that kind of nuance -- in terms of
13   a reasonable inference, that kind of nuanced conversation would
14   occur.
15          MR. WILKISON:  So I don't -- the IFA doesn't only
16   limit nuanced conversations.  It has six to eight broadly stated
17   principles about race or similar topics that it forbids, one of
18   them being the idea that someone bears a moral responsibility
19   for actions committed in the past by a person of the same race
20   as them.
21          THE COURT:  And what's in this record from which I
22   could reasonably infer that talking about somebody bearing
23   responsibility would be the type of topic that would be
24   discussed in a kindergarten room?
25          MR. WILKISON:  Well, I mean --
```

1          THE COURT:  And, by the way, I had pretty precocious

2    children that were reading far ahead of their age by the time --

3    and they'd be horrified that I was referring to them, but I'm

4    proud of them both, but I just --

5          MR. WILKISON:  Yeah.  Well, a central tenet of

6    Dr. King's philosophy, which I don't think is too complex for a

7    young person like a kindergartener to understand is that we all,

8    and especially he said white people, have an affirmative

9    obligation to oppose in his time what was segregationist laws,

10   but certainly the reason that we honor Martin Luther King today

11   is to oppose racial injustice in other forms.

12         THE COURT:  Here's what I can see being taught in an

13   elementary school:  You need to be kind to everybody.  You

14   see -- look at the person to your right, look at the person to

15   your left, and you need to be kind to everybody, and you

16   shouldn't care whether they're a girl or a boy; you shouldn't

17   care about what color they are, and so forth.

18         Let's assume that's a reasonable inference that can be

19   drawn just by virtue of the fact that we're talking about what

20   is or isn't being taught in elementary school, and setting aside

21   what is before me in a record, either from a teacher in Nassau

22   County or somebody that could talk about what is or isn't in the

23   curriculum -- let's assume that's not necessary.  I can just,

24   based on the very nature of education in kindergarten, assume

25   that that's -- there's a reasonable inference that I can make.

1   I'm not deciding to do that.

2          What in the provisions at issue would bar that

3   discussion:  You need to treat everybody well; You need to be

4   kind to everybody and not care what color they are, what gender

5   they are, what race they are, what religion they are?  What in

6   the provisions at issue here -- and, by the way, I'm not here to

7   decide whether they're good or bad policies.  That is not --

8   absolutely not my role.  Although I understand at some point, if

9   we get to the claims themselves, is a question of whether

10  there's a pedagogical -- you know, anyway, support for a

11  legitimate reason for what they're doing.

12         But for our purposes for standing, help me understand

13  what is there in these regulations that would say you cannot

14  have the kind of discussion that I just outlined, which maybe

15  there's a reasonable inference before me that can be drawn from

16  the record that that's the type of thing that might be

17  discussed.

18         MR. WILKISON:  Well, Your Honor, I wouldn't say that

19  the IFA, broadly written as it is, prohibits teachers from

20  telling students you should be kind to everyone, regardless of

21  their race, but I also don't believe that kindergarten

22  instruction is kind of so limited to that kind of topics.

23         In fact, one of the -- one of the instructional

24  materials -- and I believe it was pitched a little bit older

25  than kindergarten, but probably, you know, was aiming for that

1   age demographic, was an animated video that appeared on an

2   online course substitute about the murder of George Floyd and

3   police, and the Governor took issue with it because --

4           THE COURT:  What was the grade --

5           MR. WILKISON:  I believe that was an elementary school

6   video, like third or fourth grade.

7           THE COURT:  -- I mean, can't we surely agree there's a

8   much bigger difference between a fourth grade curriculum and a

9   kindergarten curriculum in terms of the topics and the scope of

10  the topics that are going to be covered?

11          MR. WILKISON:  There is a difference, but I -- you

12  know, that doesn't mean --

13          THE COURT:  I mean, I think my oldest read *To Kill a*

14  *Mockingbird* in the fourth grade --

15          MR. WILKISON:  Yeah.

16          THE COURT:  So, I mean, you know, if you're a

17  particularly precocious kid in the gifted program -- again,

18  she'd be horrified, but, yeah, I get it.

19          But -- and I guess that sort of begs the question,

20  Counsel.  You were able to cite that for a fourth grader.  Don't

21  I need something in front of me, even if it's not a specific

22  video, where somebody has said these are topics, even loosely to

23  RMJ, would normally get in kindergarten, but he's not going to

24  get this year, in order to show there's imminent harm such that

25  I could issue -- and I think you can phone a friend.

1            MS. WHITE:  Briefly, Your Honor.

2            Elizabeth White.

3            It is true that our plaintiff is in fourth grade, but

4    the decision -- I mean, is a kindergartener.  Excuse me.

5            THE COURT:  I understood.

6            MS. WHITE:  I'm suffering from widow brain.

7            It is true that our plaintiff is a kindergartener.

8    However, discussions of race do not start in fourth grade.  They

9    start at the very beginning.  So to say that you have not

10   presented a specific example, which we will concede simply

11   because the law has not gone into effect yet, so we can't

12   anticipate what will be taking -- taken out of the schools.

13           THE COURT:  Ms. White, respectfully, wouldn't it be

14   possible -- because I did practice before I became a judge.

15   Couldn't you have a declaration before me from a teacher in

16   Nassau County saying, Here are some examples of things we

17   typically talk about that relate to race in kindergarten in

18   Nassau County, and then it would then be legal argument for you,

19   Judge, we've made our record.  These provisions we're

20   challenging would bar them -- bar the teachers in Nassau County

21   this year from teaching RMJ or covering this topic or

22   potentially do it?  I mean --

23           MS. WHITE:  I understand.

24           THE COURT:  -- you certainly could have done that,

25   couldn't you?

1          MS. WHITE:  Yes, we could have, Your Honor.  However,

2   given the circumstances of how this case was -- the legislation

3   was passed and when it is to go into effect, it is to go into

4   effect prior to the school year.

5          So when this law comes into effect, that is when, I

6   guess, we'll know what books are actually going to be taken out.

7   The point that I'm trying to make --

8          THE COURT:  Again, I'm not asking for books.  I'm

9   asking for a more generalized -- we have a set -- for example --

10  maybe things have changed, because, again, my one kid is digging

11  in an archaeology site in Ireland, and the other kid's in law

12  school, so maybe things have changed a lot.

13         When my kids went to elementary school, there were set

14  curriculums and, like, summaries that they used in kindergarten:

15  Here's the topic for this quarter for this particular thing, and

16  here's things -- or here's the sheet for Martin Luther King Day

17  we used for last year or something.  I mean, not a particular

18  book, but here -- and not even necessarily a flyer or something

19  that's put up on a bulletin board, but here are concepts that we

20  have in our curriculum related to race that we teach every

21  February.

22         We do that because it's Black History Month and kids

23  all over the school are taught about Black History Month, and

24  here, because it's Black History Month, these are concepts that

25  we teach in Black History Month in Nassau County in

1   kindergarten.

2           I mean, I understand that you don't necessarily have

3   or have to have a particular book or flyer that would be used,

4   but I don't even have in front of me, Here are concepts that are

5   typically taught in Nassau County that RMJ isn't going to have

6   access to, other than the, Judge, there's a reasonable inference

7   because of the broad nature of the regulations we're

8   challenging; right?

9           MS. WHITE:  Your Honor, I think that really does go

10  back to the -- it kind of goes back to the fundamental nature of

11  the lawsuit is that when you begin limiting information, even to

12  kindergarteners, who may have -- and I also -- having had six

13  children who were quite precocious, I can assure Your Honor that

14  in kindergarten my children had active discussions about racism

15  and its impact on their lives and their history, their personal

16  history.

17          So I think that what we are saying, Your Honor, is

18  that --

19          THE COURT:  And let me pause here.  I wasn't

20  suggesting that my kids had no discussion of race in

21  kindergarten --

22          MS. WHITE:  Right.

23          THE COURT:  -- or their teachers didn't.  What I was

24  suggesting is there's a range of discussions, and it seemed like

25  some of the more nuanced discussions may be had when children

1    were slightly older.  That was my only point.

2          MS. WHITE:  And I think that may be true in certain

3    circumstances and perhaps in certain counties.  However, for

4    instance, if you look at Nassau County, the demographics of

5    Nassau County, there are many white and black children that

6    attend public school together on a daily basis.

7          THE COURT:  Are you asking me to take -- and I also am

8    familiar with, you know -- I'm not sure if it's in Nassau

9    County, I believe it is -- isn't there, for example, a

10    historically black beach in Nassau County?

11          MS. WHITE:  That's correct.

12          THE COURT:  And some things I could take judicial

13    notice of, for example, the demographics of Nassau County, but

14    what's in my record before me, other than my knowledge of

15    Florida and my ability to take judicial notice of things like

16    demographics -- what's in the record before me -- again, because

17    we are talking about Nassau County and RMJ -- from which I

18    could, you know, extrapolate the information that we were just

19    discussing, namely, that Nassau County has a different

20    demographic mix, which would necessitate perhaps different

21    discussions than you might have, say, in Liberty County or

22    Madison County.

23          MS. WHITE:  And I think that is a broad principle that

24    I am advocating here today, Your Honor, is that --

25          THE COURT:  But I can't have broad principles.  For

1    standing, I've got to have standing for RMJ --

2              MS. WHITE:  Yes.

3              THE COURT:  -- based on what he is or is not going to

4    have access to in Nassau; right?

5              MS. WHITE:  Yes, correct.  And that is because that

6    child attends a public school in a very -- a racially

7    desegregated public school system.  And it is our position that

8    these regulations are of such a nature that the limitation of

9    information -- and I understand that you're concerned about as

10   children get older, and they understand more complex concepts

11   about race and racial history and racial violence that occurred

12   in this state.

13             Those conversations don't start in high school.  They

14   don't start in junior high school.  It is our position that they

15   must start at the kindergarten level.  Because if we teach -- if

16   we don't teach, and then all of a sudden we're teaching

17   something, we have deprived that kindergartener of the right to

18   learn the racial history as she should learn it because of the

19   chilling effect of these regulations, so that is our position.

20             THE COURT:  Let me circle back to where we started

21   with standing, which is -- and I'm having this discussion with

22   you on the record for a reason and doing it this way.

23             Isn't the uncertainty that I'm inquiring about the

24   problem that I identified when I talked about what the standard

25   is for a preliminary injunction is there has to be -- I -- as it

1    relates to the motion to dismiss and RMJ, I take the allegations

2    as true and all reasonable inferences that can be drawn

3    therefrom, and you survive the motion to dismiss.

4            But for a preliminary injunction, to ascertain that

5    RMJ is in imminent harm of not having access to information

6    about race he would otherwise have this year in kindergarten but

7    for the legislation at issue, what are we traveling under other

8    than, Judge, we just think it's common sense?

9            MS. WHITE:  I don't think -- I apologize if the Court

10   has perceived my argument as common sense.  I'm not making a

11   common sense argument.  I'm making an argument that in this

12   situation, when you start at kindergarten with discussions about

13   race, that may be quite uncomfortable for that kindergartener.

14           THE COURT:  Is there anything in these provisions that

15   bars discussions about race in toto?

16           MS. WHITE:  Not in toto, Your Honor, but --

17           THE COURT:  Is there anything in the record before me

18   that suggests that anything that might be discussed as it

19   relates to race in kindergarten can no longer be discussed?

20           MS. WHITE:  I don't -- I think we have to go back to

21   our original argument that Mr. Wilkison made is that we can't

22   know what we can't know.

23           We have a statute that has been put into effect that

24   has required this.  It is our argument that the vagueness of

25   those regulations has a chilling effect on even a

1  kindergartener's right to learn about our racial history in the

2  state of Florida.

3           THE COURT:  I understand.  But, of course, before I

4  get to vagueness -- before I get to the vagueness, I've got to

5  ascertain whether there's standing.  We're chasing our tail a

6  little bit here.

7           MS. WHITE:  Yes.  Thank you, Your Honor.

8           THE COURT:  I understand your position.

9           MR. WILKISON:  Your Honor, did you want to ask more

10  questions about standing?  I know --

11          THE COURT:  I'm going to let -- we're going to do --

12  we're going to talk about RMJ, and then we're going to take a

13  break because I'm talking fast, and I'm sure the court reporter

14  is not going to bake me any cookies this weekend.

15          So let me turn to Mr. Cooper, and if you'll address

16  RMJ.  We'll have other issues to talk about later, but it's

17  helpful for me, whether y'all like it or not, to do it in pieces

18  rather than just globally talk about every party.

19          MR. COOPER:  Of course, Your Honor.  I think it's

20  probably helpful for the parties as well, so we appreciate that.

21          Again, Charles Cooper for the defendants.

22          Your Honor, I don't really have much to add to the

23  points that I think you've raised in your colloquy with the

24  counsel for the plaintiffs.  I guess the one thing I would add

25  is that it's a -- the general proposition, I'm sure we're going

 1    to get to it when we get to the merits, but it's that the claim
 2    on behalf of the kindergarten student is one that, even if made
 3    on behalf of any other students, strains the whole nature of the
 4    merits of this case because it basically is that students have
 5    some kind of a right to receive information on a customized
 6    basis.
 7            And as we will discuss, we deny that even teachers
 8    have any kind of First Amendment or, you know, academic freedom
 9    right to customize their own curriculum.  But it would strain
10    the point by -- in multiplicity to suggest that students have
11    some type of right to hear what they want to hear and customize
12    every kid in the class.
13            THE COURT:  I don't believe this claim is in front of
14    me, but would you agree that the analysis and the questions I'd
15    have to ask that would have to be answered would be different if
16    it was older students and we were discussing extracurricular
17    activities and what they're allowed to do and extracurricular
18    activities and whether or not -- would that analysis be
19    different?
20            MR. COOPER:  I believe, Your Honor, it would be
21    different.
22            THE COURT:  But you also would -- I don't -- and I'll
23    hear from the plaintiff later, but I don't believe that claim is
24    in front of me in either the complaint or through any
25    modification in any papers that have been filed in front of me.

1          Right now what I believe is in front of me is what's

2    going to be taught in the classroom and that's it.  Is that --

3    do you agree with that?

4          MR. COOPER:  I do, Your Honor.  And I agree that the

5    only claim on behalf of a student is what's going to be taught

6    in a kindergarten classroom.  And I have nothing more to add to

7    the questions that you've asked, with this exception, and that

8    is that counsel made the comment that the IFA, and I guess the

9    rule, will prohibit categories of discussion that the law bans.

10   And as I'm sure we will get into, we don't think that is a fair

11   reading of --

12         THE COURT:  And I think I suggested it earlier when I

13   indicated that I understood y'all had a different view of what

14   the law does -- the provisions do or don't do, but before you

15   get there we've got to talk about, obviously, standing.

16         MR. COOPER:  That's true.  However, I think if it did

17   ban categories of discussion generically, their case for

18   standing, I think, would be -- as well as their case on the

19   merits would be significantly stronger.

20         Thank you.

21         THE COURT:  I understand.

22         It's been an hour.  I don't want to take too long of a

23   break, so we're going to come back at 10:05.  So we'll take a

24   quick -- actually, there's limited facilities on the fifth

25   floor.  We'll come back at 10:10 to give y'all enough time to

1    use the facilities if you need to.

2              Thank you for your patience.  I'll see you back in ten

3    minutes.

4         (Recess taken at 9:58 AM.)

5         (Resumed at 10:11 AM.)

6              THE COURT:  Please take your seats.

7              I should be paying attention to the realtime.  I did

8    not realize I said Ocala, not Ocoee.  I do know the difference,

9    especially since I grew up next to Ocoee, so my apologies.

10             I'm also told that I referred to RMJ as "he," not

11   "she," and I apologize for that.  The record is clear.

12             In fairness to me, this is a Tuesday morning after a

13   long holiday weekend, so I'll give myself a pass on that.

14             I did want to ask, just to clear up a couple of other

15   things on the record.  Mr. Wilkison, you mentioned that video.

16   I don't recall that being in the record.  Is that -- I'm not

17   suggesting it's dispositive or determinative, but if it's in the

18   record, where is it?

19             MR. WILKISON:  So, Your Honor, it's not in the -- it's

20   not in the record as an attachment.  It is as part of the

21   Governor's press release in the motion for preliminary

22   injunction that we rely on, I think, also as an exhibit to our

23   complaint.  The Governor cites three news articles as to the

24   motivation --

25             THE COURT:  It's referenced in the press release.

1          MR. WILKISON:  Yeah.

2          THE COURT:  I just -- I wanted to verify that I saw

3     everything, and I didn't recall seeing the video, and that makes

4     sense.

5          MR. WILKISON:  I have watched the video, Your Honor,

6     but it's on like a proprietary educational website, and my free

7     trial has expired, so I think the news article describing its

8     contents are the best that we're going to be able to submit for

9     the Court.

10         THE COURT:  Fair enough.  But that's -- the reference

11    in the press release is in the record?

12         MR. WILKISON:  Correct.

13         THE COURT:  All right.

14         The other thing that I'll note, I mentioned before

15    that there was not an affidavit talking about, Here's what we do

16    or don't teach in Nassau County and topics or how we do it.  I

17    do recognize that the Southern Poverty Law Center filed a list

18    of benchmarks that would apply, general benchmarks.  However,

19    there's nothing in the record that says, These benchmarks can't

20    be met and here's why in light of the new regulation.  So I do

21    recognize that there are some -- that is in -- is properly

22    before me.

23         Two quick questions before we move on to the next

24    topic.  I asked Mr. Cooper and I was -- should have been more

25    directed at you.  There is not currently a claim before me as it

 1   relates to speech outside the courtroom -- I mean, outside the

 2   classroom; correct?

 3        MR. WILKISON:  Correct.  And I believe the defendants

 4   have even said that the IFA and regulation only regulate -- at

 5   least the relevant provisions only regulate instruction and

 6   training inside the classroom.

 7        THE COURT:  Well, if they say it, that makes it true?

 8   That's an interesting construct.

 9        MR. WILKISON:  Well, I would say that -- you know, I'd

10   probably agree with them.  I don't see, you know, given the way

11   that the provisions that we're talking about are worded, that --

12   I could conceive of some way that maybe it would apply, but

13   that's really not the --

14        THE COURT:  Fair enough.  It's not in front of me.

15   There's plenty of live issues in front of me.  I don't need to

16   add extras, okay.

17        And I understand RMJ, she's just starting school.  So

18   I'm not suggesting what she, herself, would or would not -- or

19   her family would not be privy to.  And I understand also when

20   she could have brought a claim and when it would have been

21   imminent, I'm now starting school, so I understand that.

22        So setting that aside, isn't the regulation that

23   you're talking about -- hasn't it been on the books for a year?

24   And so just in terms of the development of the record, when you

25   say we can't know what we don't know, which you said earlier and

1    your colleague echoed, in terms of the ability to go and talk to

2    teachers about what is or is not being taught and how this might

3    impact it, the regulation's been on the books for a year; right?

4             MR. WILKISON:  It has.  And I believe it's an example

5    of the wheels of education policy sometimes moving slowly.  In

6    terms of any kind of publicized action enforcing the regulation,

7    I believe the first word we have of it is in May of this year

8    with the math textbooks that were rejected on the basis of

9    Critical Race Theory.  Because, especially in regards to

10   instructional materials, there's a lengthy review process that

11   instruction materials are sent to reviewers to make comments.

12   That goes to the Secretary -- or the Commissioner of Education,

13   and then they make the final decision as to whether it goes in

14   or out.

15            THE COURT:  How does that affect the ability to know

16   how a teacher in kindergarten in Nassau County would or would

17   not feel like they were going to be limited in what they could

18   or could not present as it relates to race in a kindergarten

19   classroom?

20            MR. WILKISON:  Well -- and that would only apply to

21   the regulation.  And, frankly, Your Honor, I will admit that we

22   don't have any record evidence of how the regulation has

23   impacted classroom instruction in Nassau County, but I think

24   that part of what's missing from this conversation is that, at

25   least in the -- my recollection of kindergarten, it wasn't a

1    situation where you have a teacher who gives a lecture, the

2    students sit quietly, and then they go home at the end of the

3    day.

4            Like the Court instructed us to do, there's a lot of

5    this going on (indicating), and there are a lot of questions --

6            THE COURT:  So the record will reflect, you just

7    raised your hand.

8            MR. WILKISON:  Yes.

9            I apologize to the court reporter.

10           THE COURT:  Not a particular digit, but your hand.

11           MR. WILKISON:  You know, there's a lot of questions

12   being asked and, you know, while I agree with Mr. Cooper that

13   students don't have the right to control their curriculum, they

14   certainly do have the right to influence it, because I think in

15   any classroom setting --

16           THE COURT:  Well, that's going to be my question to

17   you.  As I understood your claim, your claim isn't that a

18   student, RMJ or any other student, can control their curriculum,

19   but there are certain -- the State cannot deny access based on

20   ideological or political reasons, which is a much different

21   claim than you have to -- you get to decide what the curriculum

22   is or is not; correct?

23           MR. WILKISON:  That's correct.

24           THE COURT:  That is, your claim is narrower, as I just

25   described it.  Did I misapprehend what your claim is?

1          MR. WILKISON:  No.  That's a correct statement of what

2     the claim is, and our argument, as it pertains to standing, is

3     that when that sort of chilling effect is imposed on classroom

4     instruction, that in and of itself constitutes a constitutional

5     injury that's cognizable under Article III, and it's for the --

6     you know, the phrase we keep repeating, "You don't know what you

7     don't know."

8          A student who is inquisitive about these topics and

9     wants to ask maybe why the name of the school in the town across

10    the highway is named after Robert E. Lee that we're going up

11    against in the football game coming up, and that might not be

12    part of the Nassau County School District's curriculum, but the

13    teacher's got to provide an answer to that question.

14         And it would be very hard to discuss, you know, the

15    people in our monuments that some of these schools are named

16    after were the reasons for holidays like Martin Luther King Day

17    or, more recently, Juneteenth without getting into that area

18    where, yes, the teacher could answer the question, but could

19    they answer it fully in light of the strictures of the IFA and

20    regulations.

21         THE COURT:  Mr. Wilkison, you and your colleague have

22    given me some examples today, but where is that in the record

23    and where is it in the record from which I could make a

24    reasonable inference that those are examples of things that

25    can't be taught or discussed that would otherwise be discussed

1  but for -- because you're not a witness, and --

2         MR. WILKISON:  Right.

3         THE COURT:  -- you're not giving me a declaration, so

4  I -- at this juncture of the proceedings, I'm stuck with the

5  record.

6         So what's the source of those types of examples that I

7  would rely on that would be in this record for purposes of

8  finding standing?

9         MR. WILKISON:  I think, at least in terms of the

10 preliminary injunction, it's not alleged in the complaint, but

11 in that sense, even though they are of different age groups, I

12 do think that there are instructive passages in the affidavits

13 of teachers and students who --

14        THE COURT:  And you're saying, Judge, from that you

15 could fairly extrapolate that similar issues would arise in

16 kindergarten?

17        MR. WILKISON:  Yeah.  And maybe not the same, but I

18 don't think that kindergarteners are as sheltered as, you know,

19 sometime we picture them, and especially in the South,

20 especially in schools that have had fraught racial histories.

21        And, you know, I don't -- we don't have record

22 evidence of a, you know, lengthy discussion about that, but I

23 think some of this is common knowledge as to what school's names

24 are that could be the subject of judicial notice and things like

25 that.

```
1              THE COURT:  Where does the common knowledge and what
2   makes sense and doesn't make sense begin and end for purposes of
3   this Court relying on that for purposes of, Here's what I'm
4   hanging my hat on to find there's standing?
5              I mean, it seems to me that that is an exercise, you
6   know, fraught with all kinds -- I mean, do I really get to
7   export -- import rather, not export -- import any information?
8   That's why I asked the question earlier about common sense.  I
9   guess when I say "common sense," I'm broadly talking about
10  common experience or my own personal experiences.
11             To what extent does the Court just get to import all
12  of that, even if it's not before me in a declaration, if it
13  hasn't been presented before; there's no record evidence of it?
14  Do I really get to just say, Well, let me go look on Wikipedia
15  or Google for the next hour -- or more likely have my law clerks
16  do it -- and let me come up with examples that I can rely on so
17  I can find standing?
18             It just seems to me that the Eleventh Circuit wouldn't
19  look too kindly on me engaging in such an exercise.
20             MR. WILKISON:  I would concede that point, Your Honor,
21  that -- and we're not asking --
22             THE COURT:  That they wouldn't be kind to me or
23  that --
24             MR. WILKISON:  That they wouldn't be kind to you.
25             THE COURT:  I'm sorry.
```

1          MR. WILKISON:  But I think where it is appropriate to

2     have these arguments about common sense is in the context of

3     speakers receiving information, because I think two paradigms --

4          THE COURT:  But here's my concern, Mr. Wilkison.  The

5     standard is facts are reasonable inferences, so I can make -- I

6     can rely on reasonable inferences for purposes of standing;

7     right?

8          MR. WILKISON:  Uh-huh.

9          THE COURT:  But it has to be a reasonable inference

10    drawn from the record; right?  It can't just be a reasonable

11    inference drawn from my own knowledge or something I may have

12    read or something I know or something you suggest today at the

13    hearing.  It has to be a reasonable inference based on the

14    record before me as it relates to RMJ; right?

15         MR. WILKISON:  That is correct in a sense, but to give

16    you an example from a case, Your Honor, in the -- I believe it

17    was the *Babbitt* decision, the Supreme Court case about the

18    prohibition -- the statutory prohibition on making false

19    statements and the context of customer advocacy.

20          That case was a speaker, not a listener case, but what

21    the plaintiffs in that case said is that, We don't intend to

22    make any false statements, but we do intend to speak on this

23    topic, and in speaking on this topic, it's inevitable that

24    probably we're going to say something that someone's going to

25    perceive as false or erroneous.

1           THE COURT:  Is there a kindergartener that says -- I

2    mean, is there a teacher from Nassau County that provided me

3    with a declaration, In light of my experience in the classroom

4    teaching kindergarteners, based on these -- the provisions at

5    issue, I am likely to run afoul of them based on my normal

6    experience in talking about race issues to my kindergarteners?

7    Is there anything like that?

8           MR. WILKISON:  Not in that exact sense.  However --

9           THE COURT:  I don't mean in that exact sense.

10          MR. WILKISON:  Right.

11          THE COURT:  I mean, let's talk about the same

12   universe, not -- I'm not asking for exact.  I'm asking for is

13   there anything like that?

14          MR. WILKISON:  So a star in that universe would be in

15   the verified complaint RMJ makes the allegation that she is

16   interested in the topics that are regulated by the IFA and

17   regulation, is interested about learning about them.

18          I think is it a reasonable inference from that

19   allegation, which is sworn, that she's likely to ask questions

20   in the course of the next year about those topics, and she would

21   be deprived of the right to have a full and fair explanation of

22   those topics if she did ask those questions under the IFA's and

23   regulation's regime.

24          THE COURT:  I understand your argument.

25          Let me turn to one of my least favorite decisions,

1    *Jacobson*, and find out -- in that case the Eleventh Circuit --

2    while it wasn't a constitutional provision, it was a statute,

3    that the Secretary of State has the ability to and will bring

4    actions by statute, not dissimilar to the argument that you made

5    with respect to the Governor or the constitutional provision.

6    Didn't the Eleventh Circuit explicitly reject that as a basis --

7    not for *Ex Parte Young*, which you mentioned, they said maybe --

8    but didn't they explicitly reject that argument for purposes of

9    Article III standing and traceability?

10         MR. WILKISON:  They did, however, I think you also

11   have to compare that to the *Luckey* decision where, among other

12   factors I'll concede, the ability to commence criminal

13   prosecutions was a factor that they considered as drawing a

14   connection, so I don't think -- you know, I think if we isolate

15   every single contact and said this is a case that held that it

16   wasn't enough, that's not the analysis the Court has to perform.

17         THE COURT:  Let me try again.  Let's do it the way I

18   did before.  You're not my law clerk, but you can play one here

19   this morning.

20         You're writing the order.  Your audience is the

21   Eleventh Circuit.  You know you're going to have to confront

22   *Jacobson.  Jacobson* -- and you're writing a couple of sentences

23   at the bare minimum.  *Jacobson* is not controlling in its view

24   that there's not Article III standing because there's not

25   traceability.  That's distinguishable here dot, dot, dot -- go

1    for it.

2              MR. WILKISON:  It's distinguishable here because the

3    contacts alleged here do not rely solely on the ability to bring

4    enforcement actions, but there are other contacts that the

5    Governor has or connections that the Governor has in relation to

6    the enforcement of the statute like those I mentioned at the

7    beginning of this argument.

8              THE COURT:  Well, doesn't -- in *Jacobson* the Secretary

9    of State issues advisory statements to the supervisors.  There's

10   all kinds of other ways they interact with folks.  I mean,

11   wasn't all that true as it relates to the Secretary of State

12   exercising their authority as the chief election officer, and

13   didn't they -- I mean, I, you know, thought Judge Pryor -- Jill

14   Pryor's dissent was brilliant, but, I mean, you know -- but it's

15   the dissent.

16             Didn't the majority decisions explicitly go through

17   and say, Here's all the ways that the Secretary of State

18   interacts with the supervisors, and even though they have

19   this -- all that, coupled with the ability to sue, that is not

20   enough traceability in Article III standing?

21             I mean, so they didn't just say it's just this

22   provision that allows them to sue.  Placed in context, I thought

23   the Court went through and said, Here are the many, many other

24   ways, and that's just collectively not enough.

25             MR. WILKISON:  Well, to that I'd counter the

1    Eleventh Circuit's decision in *Grizzle v. Kemp*, also a Secretary

2    of State decision, where the Court found that the Secretary's

3    position as chairperson of the state election board under

4    Georgia law was sufficient to confer a connection under *Ex Parte*

5    *Young* and that --

6              THE COURT:  Well, connection's different, though,

7    isn't it?  Isn't the standard for connection under *Ex Parte*

8    *Young* -- that is a different hurdle than Article III standing

9    traceability, right?

10             MR. WILKISON:  Correct.

11             THE COURT:  And that's what *Jacobson* absolutely makes

12   clear, right?

13             MR. WILKISON:  Yeah.  There are two different

14   considerations, and, you know, the cases that I think the

15   parties cite on whether the Governor --

16             THE COURT:  Because even *Jacobson* says that maybe

17   there's enough for -- the connection under *Ex Parte Young*.  They

18   said the problem is not *Ex Parte Young* in a connection, they

19   said the problem is traceability; right?

20             MR. WILKISON:  Right.  And I believe in *Jacobson* one

21   of the distinguishing factors that we have here that wasn't

22   there is a direct action by the person in that office, which I

23   think bears a lot more on traceability in the standing context

24   than *Ex Parte Young*.  You know, if you're asking if complained

25   of conduct is fairly traceable to an official, the fact that

1  they ordered it, as Governor DeSantis has said he's done here,

2  you know, that's traceable.  It's cause and effect.  He ordered

3  the commissioner to do this, and the commissioner did it.  So in

4  terms of the regulation, yes.

5        Now, I understand there are cases where they say

6  ordering officials, not enough under *Ex Parte Young*, but I

7  believe we have factors that bring us more in line with *Grizzle*

8  *v. Kemp* where merely sitting on the board of electors -- even

9  though the Secretary of State didn't have the authority to

10 challenge votes, the fact that they directed the board was

11 enough to get under the -- get over the *Ex Parte Young* hurdle.

12       THE COURT:  I understand your argument.

13       We need to move on to another topic.  Before you do,

14 let me find out, is there anybody on the defense -- I mean, we

15 don't need to correct Ocala versus Ocoee again, but is there

16 anything that we just covered when we got back in the courtroom

17 that y'all want to address?

18       MR. COOPER:  No, Your Honor.

19       THE COURT:  So, Mr. Wilkison -- and you can either

20 defer to one of your colleagues, or you certainly can consult

21 with one of your colleagues -- I want to turn next to the

22 employer claim.

23       And let me start with -- since I called it the

24 employer claim, Dr. Hodo, I don't, for the life of me,

25 understand -- you're not suggesting she is an employer within

1    the meaning of the provision such that she has standing to

2    challenge it as an employer, are you?

3             MR. WILKISON:  No, she -- it's based on her standing

4    as someone who provides the services that employers do.

5             THE COURT:  Let me ask another -- because I want to

6    narrow -- because I don't want to spend too much time on this.

7    If that's not your -- and you've already said, Judge, we're not

8    claiming she's an employer under the provision.

9             And there's no employer in front of me, correct?  In

10   other words, there's nobody saying, I would require my employees

11   to come in and have diversity training.  I think it's

12   important -- and the State of Florida has now decided that

13   they're going to run my business and tell me how I get to run my

14   business and I can't have diversity training and they're barring

15   me from speaking.  There's no such claim in front of me;

16   correct?

17            MR. WILKISON:  Correct.

18            THE COURT:  Okay.  Are you suggesting that the

19   consultant -- and there's a third issue, and I don't think this

20   is what I read you do.

21            Are you suggesting the consultant can stand --

22   Dr. Hodo can stand in the shoes of an employer and somehow has

23   standing by proxy?

24            MR. WILKISON:  Yes, that is a contention.  I don't

25   think it's the only way that she has standing, but certainly

that's -- that's one of the ways.  I think, you know, as early

as *Flast v. Cohen* you have bar owners bringing constitutional

challenges based on discrimination laws on behalf of their

customers.

I don't think that's any different from what Tammy

Hodo is doing when she's providing this training to willing

recipients, or willing employers, at least, and the constitution

says that now -- or the law says that they're now not allowed to

require their employees to attend that training.

THE COURT:  So the theory is Dr. Hodo, who is not an

employer within the meaning of the statute at issue, can bring a

claim and is, in fact, bringing a claim that employers cannot

require their employees to take diversity training and that is

limiting the speech of the employers?

MR. WILKISON:  Yes.  I think she does have the ability

to stand in the shoes to make that claim of her clients, but

also independent of that --

THE COURT:  Well, hold on.  We're going to get to

independent in a minute, because I want to --

MR. WILKISON:  Okay.

THE COURT:  And that's how this is pled before me, and

you believe that she can stand in their shoes; correct?

MR. WILKISON:  Yes.

THE COURT:  Independent of that, you say she has

standing because, I'm going to lose business because I'm not

 1    going to get hired now because once this law is put into effect,

 2    I'm going to lose business; correct?

 3              MR. WILKISON:  Correct.

 4              THE COURT:  Is there anything in this record --

 5    because let's -- again, for purposes of standing for the

 6    preliminary injunction -- not the motion to dismiss, but for the

 7    preliminary injunction, what is in this record to say that my

 8    clients -- a client, or clients, plural, if they can't mandate

 9    it, they won't get it, give it, diversity training, and they

10    won't hire me anymore?

11              MR. WILKISON:  Well, I think --

12              THE COURT:  Is there any showing of an actual harm

13    other than a -- I might be harmed because -- and some of my

14    clients may choose not to hire me and give diversity training if

15    they can't mandate it for all their employees?

16              MR. WILKISON:  Well, I think, you know, the economic

17    impacts that she describes as a result of the Trump executive

18    order is then you can draw a reasonable inference from that for

19    where she lost contracts as a result of the ban.

20              THE COURT:  There it was a ban, though.  It wasn't

21    a -- is there a reasonable inference to say that the fact you

22    can't mandate it for every employee is going to have the same

23    effect as a total ban?

24              MR. WILKISON:  Well, you can't mandate it for any

25    employee under the IFA.

1          THE COURT:  Right, but you can -- so you could have a

2    bunch of -- presumably I have -- I mean, isn't there a

3    difference between I can hold diversity training, and I only

4    have 90 percent of my employees show up because 10 percent

5    don't, and I can't force the other 10 percent to show up versus

6    saying you can't do diversity training?  Aren't those different

7    for purposes of this analysis?

8          MR. WILKISON:  They are two different things, but I

9    think the -- you know, at some point we have to be reasonable

10   about how the world works is that probably if the diversity

11   training was not mandatory in most companies, you wouldn't have

12   a 90 percent attendance rate.

13         THE COURT:  Is there anything at all in this record to

14   say that that's true?  And, I mean, I ask that because there's

15   all -- I mean, I didn't go to the Eleventh Circuit conference

16   this year, and when and if they tell me that that's mandatory, I

17   will go as a judge because I don't want to be impeached.

18         But as the letter I get each time -- every two years

19   says, You're not required to go, but we strongly encourage it.

20   To which I say, Thank you.  Enjoy yourselves.  I'll try a case

21   and stay in the courtroom and do my legal work.  I don't need to

22   go to a cocktail party in Atlanta.

23         So is it really true that it's a one-size-fits-all if

24   something is -- to say that you can't require it versus it's

25   banned in terms of participation and whether -- I mean, the

```
 1    Eleventh Circuit still goes on.  Since there's some judges, such
 2    as myself, that have an issue with the types of lectures that
 3    occur there and spending money from the public purse on a
 4    nonessential meeting that doesn't include, you know, substantive
 5    education classes -- I mean, in fairness, I'm an outlier.  Most
 6    people think it's wonderful, but I don't.  I very proudly
 7    disclose very little non-court travel, virtually none, and I
 8    list no gifts, because it's a very -- my view, my view only.
 9    But -- I'm an outlier, but it still goes on, even though it's
10    not mandated.
11          So help me to understand -- it just seems to me that's
12    a critical distinction as it relates to her standing,
13    particularly when I don't have anything from anybody saying that
14    she won't -- that people won't use her anymore.
15          MR. WILKISON:  Well, and to be clear, she does not
16    need to prove for standing that people won't use her anymore.
17          THE COURT:  That it will limit her revenue?
18          MR. WILKISON:  Right.
19          THE COURT:  And that's why I said one -- one customer.
20    I -- I have a customer, XYZ Company, and they've said if they
21    can't make it mandatory, this is a minefield.  I don't want to
22    deal with it in light of this new law.  I just don't want to do
23    it at all.  I mean, I get it.  That's a lost income.  I'm not
24    saying that's the end of the standing inquiry.  I'm just
25    saying -- or the end of the claim.  I'm just saying I
```

1    understand.  But there's nothing like that in this record, is

2    there?

3            MR. WILKISON:  So there are no customer affidavits, so

4    to speak, where they've said that, you know, I've canceled this

5    contract.

6            THE COURT:  Does Dr. Hodo even include hearsay

7    statements, that I've taken a survey, and a couple of my clients

8    have told me they will not hire me if it's not mandated?

9            MR. WILKISON:  Well, I know that several of our

10   diversity consultants have -- you know, who operate in that

11   sphere have said that, I've, you know, received calls from HR

12   managers concerned about our ability to go forward under this

13   law for the kind of training we offer.

14           But I think on a more fundamental level, a reasonable

15   inference from the record before us is that the value of the

16   services Ms. Hodo, and any diversity consultant, offers is

17   diminished by the fact that they can no longer offer training as

18   a compulsory element, because to the employer who wants to hire

19   them for it, it goes from something that --

20           THE COURT:  Isn't it an equally reasonable inference

21   that if my boss, who -- and I -- my example -- and I should

22   think about examples more as kind of -- is bad because I'm not

23   subject to the same concerns that a regular employee might be as

24   it relates to whether I do or don't go to the Eleventh Circuit

25   conference, so that's arguably a bad example.

1          But isn't it just as easily a reasonable inference

2     there's going to be a few naysayers and a small number of people

3     that are going to assert their right not to have to go to the

4     training and that the vast majority of people -- my employer

5     wants me to go to this training, I'm going to go to it?

6          Isn't that an equally reasonable inference, that there

7     isn't going to be this mass exodus from the training such that

8     this is going to impact her cash flow?  Isn't that an equally

9     reasonable inference?

10          MR. WILKISON:  I don't know if it's equally

11     reasonable.  It's certainly an inference that could be drawn,

12     and I don't think we require a showing of a mass exodus, so to

13     speak, to confer standing.

14          And the other thing I'd mention is that oftentimes the

15     people who --

16          THE COURT:  Hold on a second, though, because you are

17     stacking inferences, and when I use -- and maybe mass exodus,

18     you know -- I probably could -- we could do a little less with

19     hyperbole and exaggeration, but I use that to make a point.

20          But there has to be a reduction such that an employer

21     is going to say, Well, it no longer makes sense.  Because I've

22     only got half the people participating now, it doesn't make as

23     much sense to hire this consultant.  Or, I'm not going to pay

24     you the $1,000 we've historically paid you for the four hours

25     because I've only got 5 employee, not 25 employees.

1              So in order for there to be a reasonable inference

2    that it's going to cause her economic harm, that is, either

3    they're not going to use her or pay her less, there has to be

4    some reasonable inference that there's going to suddenly be far

5    fewer people participating; right?

6              MR. WILKISON:  Well, I think that --

7              THE COURT:  Or fewer people?

8              MR. WILKISON:  Yeah.

9              THE COURT:  I'll delete "far" or "mass exodus" from my

10   hard drive, but go ahead.

11             MR. WILKISON:  Yes.  I think there would have to be an

12   inference that fewer people would participate, but I would note

13   that the people who oftentimes most need diversity, equity and

14   inclusion training are the ones who are probably the ones that

15   don't want to show up to that voluntarily.

16             THE COURT:  How is that -- that may affect the

17   operation of those businesses.  That may be a reason why this is

18   bad policy, but how in the world does that affect -- I'm not

19   saying it is or isn't.  I'm just saying that's a different

20   issue.

21             But the question is how in the world would that -- the

22   fact that other people need it more, what if the -- you have 100

23   employees, and the only employee that opts out is the person --

24   the only person that needs it, how in the world does that show

25   me that it will or won't impact whether they do or don't have

1  diversity training and whether or not it could or could not --

2  would or would not impact Dr. Hodo's income?

3          MR. WILKISON:  Well, most -- and there are examples of

4  this in the record.  Most times that people like Dr. Hodo are

5  called to provide diversity training, there's something going on

6  at the organization that needs to be addressed.  Usually there's

7  a bad actor or bad actors that are causing problems.

8          For example, I know we go into great detail talking

9  about Douglas Anderson High, and that was a result of students

10 that were using the N-word, teachers that were engaging in

11 discrimination, and those are the people who would be the least

12 likely to attend training, and those are the ones that the

13 training is designed to target.

14         THE COURT:  Well, I want to talk to the lawyer that's

15 advising their client company, Don't have any training; don't

16 get out ahead of this and bring all the employees in and say the

17 use of the N-word or sexist comments aren't acceptable, because

18 the one person we really want to show up who's the worst

19 offender won't come, so let's just not address it as a company

20 or do anything.

21         Is that really the reasonable inference that you're

22 telling me that's what a law firm is going to advise their

23 employer?  Because if they do, they probably ought to up their

24 malpractice policy.

25         MR. WILKISON:  Well, sometimes these decisions are not

1  made with the advice of counsel.  But beyond that, I think that

2  the inference that they wouldn't do anything to address it is

3  not something that we necessarily need to reject.  But the fact

4  that they might not decide that Dr. Hodo's 60-minute course on

5  implicit bias that she charges X amount for is maybe not the way

6  to go because Officer So-And-So is never going to attend that if

7  we don't force him to, that would be affect their

8  decision-making, I think that's a reasonable inference that can

9  be drawn from the record.

10         THE COURT:  I understand.

11         Let me turn to counsel for the defendant as it relates

12  to Dr. Hodo, the consultant/employer.

13         Mr. Ohlendorf, I've already acknowledged that they're

14  not suggesting that Dr. Hodo is an employer within the meaning

15  of the provision at issue, so we don't have to address that.

16  Quite frankly, I'm -- well, there's two other theories that they

17  travel under.  You can address both certainly, but I'm far more

18  interested in this -- and I'm not suggesting that means it's

19  more meritorious, but I'm far more interested in hearing your

20  response to whether or not Dr. Hodo can bring a claim for the --

21  and the statement that's used, basically, the employer saying,

22  We can't speak and we want to have everybody come in and require

23  them, and that's the claim, as opposed to, I'm losing revenue

24  because I'm no longer going to be used as a consultant.

25         Y'all have addressed that.  I've got it.  You can

1    certainly discuss it, but I'm less interested in hearing about

2    that.  I'm far more interested in an arguably more novel

3    argument, which is she can stand in the shoes of the employers.

4           MR. OHLENDORF:  Thank you, Your Honor.  Again, John

5    Ohlendorf for the defendants.

6           I have just a couple brief points about both sort of

7    strands of standing argument, but I'll begin with that one.  And

8    my first answer, Your Honor, is I don't see it in the complaint.

9    I don't think it's pleaded in the complaint.  I don't see a

10   whisper of it in their reply brief, and I don't see any citation

11   to *Flast*.  I don't see a citation to *Craig v. Boren*, which is

12   kind of the standard citation for this line of third-party

13   standing cases.  I don't see any -- again, I don't see a hint of

14   this in their papers.

15          THE COURT:  Let's assume it's there.

16          MR. OHLENDORF:  On the argument, Your Honor, my

17   recollection, from having addressed this standing issue in

18   previous cases, is that under, for example, the *Kowalski v.*

19   *Tesmer* case, they would have to show that it's a close

20   relationship with the third party that they are advancing the

21   interests of, and, critically, that the third party faces some

22   hindrance, some hindrance to suing -- to bringing their own

23   claim -- to bring suit in their own name.

24          THE COURT:  So as I understand it, Judge, it's --

25   let's assume they're close.  Let's assume they've pled it.

1    Judge, what they definitely don't have here is anything before

2    this Court that says they couldn't have just as easily -- the

3    employers couldn't have come in themselves, and that is

4    absolutely fatal to their claim?

5             MR. OHLENDORF:  I think that's right.  I think all

6    three points are fatal, Your Honor, but I think, by extension,

7    the third one is fatal.

8             On whether Hodo has standing due to lack of the impact

9    on her revenues, I just make two quick points.

10            First, Your Honor, this is a third-party causation

11   argument, that third parties not before the Court who are

12   impacted by the law are going to react in some way that's going

13   to cause a downstream injury to Dr. Hodo.  The plaintiffs -- the

14   showing required of plaintiffs in that circumstance is

15   substantially higher.

16            I've heard a lot of mights from Mr. Wilkison:  Well,

17   an employer might decide that they don't want to offer these

18   training sessions anymore.  They might, you know, decide that

19   they don't want to have the full 60-minute session.

20            THE COURT:  So my questions to Mr. Wilkison about

21   what's in the record to suggest this won't happen are pertinent

22   to that analysis; correct?

23            MR. OHLENDORF:  Yeah.  He's certainly correct; an

24   employer might make that conclusion, but --

25            THE COURT:  No, I guess what I meant, Counsel, is my

1    question is there is nothing in the record to support that is

2    why those questions mattered, because that's critical to their

3    burden to make such a claim?

4         MR. OHLENDORF:  There's nothing in the record to

5    support it, and there's certainly nothing in the record that

6    shows that -- to quote the Supreme Court standard in this area

7    that the plaintiff has to show that third parties will likely

8    react in predictable ways, not that they might react in a way

9    that would hurt us.

10        THE COURT:  That's *California v. Texas*?

11        MR. OHLENDORF:  That's the case that we have cited.

12   There's many others.  And I think that simply not -- there's

13   nothing in the record making that showing, Your Honor.

14        THE COURT:  Plaintiff, I'll allow you, if there is

15   anything additional you want to respond -- I guess the one thing

16   that came up that's new that I did not ask you that I probably

17   should have asked you is about what is there to suggest there's

18   somehow a hindrance to an employer bringing such a claim?

19        MR. WILKISON:  Well, the hindrance I think you can

20   find elsewhere in the defendant's argument relating to the

21   conduct/speech standard is that their clients are not the ones

22   speaking in this scenario.  So if an employer were to bring a

23   case, you know, saying, We can't require this training, they'd

24   be, you know, probably making the opposite argument that, Oh,

25   it's not you speaking; it's the diversity consultant.

1            So I think given the nature --

2            THE COURT:  You're saying the hindrance is that they

3    wouldn't have a viable claim?

4            MR. WILKISON:  Not necessarily that they wouldn't have

5    a viable claim, but there is an additional separate argument

6    that -- a separate interest that Dr. Hodo has --

7            THE COURT:  What's the case law that would support the

8    idea that hindrance within that context would include there may

9    be some problematic aspect of a claim being brought directly by

10   that other party?

11           MR. WILKISON:  Well, I don't know if I was making

12   necessarily that argument, and I don't have any cases.  I'm

13   happy to submit supplemental briefing on this topic because I

14   know that we were more focusing in our reply on the economic

15   aspect of --

16           THE COURT:  So you agree with opposing counsel;

17   there's not even a whiff of that in the complaint or the motions

18   before me?

19           MR. WILKISON:  I don't know if I'd concede that

20   there's not a whiff of it, but certainly the focus of our

21   arguments have been on the economic impacts, Your Honor.

22           THE COURT:  I understand.

23           MR. WILKISON:  But I think the argument is that

24   Dr. Hodo is performing a different role than her clients are

25   because she is the one who has the subject matter expertise and

1  the one that's offering the training and can articulate how her

2  training is impacted by the law as opposed to the employer who

3  just says, Well, I just hire the consultant.  I don't know what

4  they teach.  I leave that in their expertise.

5          And I will say, Your Honor -- I know this isn't

6  apropos of the record before us, but I have heard that there are

7  employers that are getting ready to file suit and try to file a

8  notice of related cases to sort of shore up that issue.

9          THE COURT:  And they very well may have standing, but

10  that doesn't give Dr. Hodo standing.

11          MR. WILKISON:  I understand that.  I just thought it

12  was worth mentioning since we're discussing it.

13          THE COURT:  All right.  Mr. Ohlendorf, it looks like

14  he wants to stand.

15          MR. OHLENDORF:  Just really briefly on this hindrance

16  point, Your Honor.

17          First of all, I don't think the weakness of the claim

18  on the merits counts as a hindrance, but, also, I think we're

19  talking ourselves into circles here because the argument here is

20  that Dr. Hodo has standing to advance the First Amendment rights

21  of her employers, but then the response is, Well, it's not the

22  employers who have First Amendment rights; it's Dr. Hodo.  And

23  so I just don't think that circle can be closed in the way that

24  results in Dr. Hodo having standing, Your Honor.

25          THE COURT:  I understand your argument.

 1             Let's turn to the teachers.  And I think you'll agree

 2    with some of this.  You are not suggesting that Plaintiffs Falls

 3    or Harper have standing to proceed against the Board of

 4    Educations, are you?

 5             MR. WILKISON:  No, because they're not at the

 6    university level.

 7             THE COURT:  All right.  And so same sort of question:

 8    You're not suggesting that Plaintiff Cassanello has standing to

 9    proceed against the Board of Education, are you?

10             MR. WILKISON:  No.  And I'm trying to think if the

11    Board of Education has any enforcement role over college and

12    universities.  I don't believe it does so.  I think that those

13    would be segregated against their own defendants, and perhaps

14    that could have been drawn a little more clearly in the

15    complaint.

16             THE COURT:  I just wanted to -- like I said, I thought

17    you would probably agree on those things, but I wanted to close

18    that circle.

19             We've already addressed the Governor.  And so as it

20    relates to Falls and Harper and the Board of Education, or

21    Cassanello as it relates to the Board of Governors as opposed to

22    the Board of Education, help me to understand your position as

23    to why the teachers have standing in this case as opposed to --

24    we can talk about the merits of these -- any of the claims

25    later.

1          MR. WILKISON:  Sure.  And it's a little bit hard to

2    separate this from the merits in some cases, but I'll try.

3          And the standard for standing is -- at least in the

4    First Amendment context is that the statute has to arguably

5    apply to the expression that they wish to engage in.  I know

6    that the defendants have in their briefs kind of done a close

7    reading of the statute and all the texts and said, Oh, because

8    this adverb is in here, it doesn't actually apply to this text.

9    And I think that we could give 100 different texts that you

10   could make those kinds of arguments for, given how the statute

11   is worded.

12         The basis for their standing --

13         THE COURT:  Well, let me -- let me -- I want to drill

14   down and be a little bit more specific.  And you are absolutely

15   right that the -- I didn't mean to suggest you can divorce the

16   concepts entirely of standing and the merits, but let's start

17   with Cassanello.

18         He doesn't have standing to challenge the regulation

19   with respect to CRT or the required course instruction statute,

20   Section 1003.42, Florida Statutes, because those only apply to K

21   through 12; correct?

22         MR. WILKISON:  Correct.

23         THE COURT:  So Cassanello can proceed only against the

24   Board of Governors, assuming you lose on the Governor's issue.

25   And it would only be as it relates to the definition of

1    discrimination and limitation on instruction under Section

2    1000.05, Florida Statutes; is that correct?

3              MR. WILKISON:  Yes.

4              THE COURT:  I'm just trying to make sure I understand

5    the claim.  It's -- assuming, without deciding at this juncture

6    that the Governor is not a proper party, Cassanello can sue the

7    Board of Governors, and he's suing for the definition of

8    discrimination, that's the claim before me?

9              MR. WILKISON:  Correct, under the IFA and the

10   amendments to the Education Equity Act specifically for him.

11             THE COURT:  All right.  So sort of narrowing what's

12   before me as it relates to Cassanello's claim and who it's

13   against and assuming, arguendo, that there's -- an

14   injury-in-fact has been established, how is -- for purposes of

15   Article III standing, how would it be redressable against the

16   Board of Governors inasmuch as there are no -- they haven't

17   promulgated any regulations implementing the statute, and what

18   exists, I thought, was -- a private enforcement is all that

19   exists at this point?

20             MR. WILKISON:  That's actually not true --

21             THE COURT:  Which --

22             MR. WILKISON:  -- although it's not contained --

23             THE COURT:  Which part?

24             MR. WILKISON:  Oh, I'm sorry.  The fact that it's only

25   privately redressable.

1          And the Board of Governors does actually have an

2    enforcement role under the conforming bill relating to

3    university funding, and that's something that Dr. Cassanello

4    specifically talks about is, you know, chilling his expression

5    is, I'm afraid that if I say this, my school is going to lose

6    its funding, which would have severe professional consequences.

7          And give me a moment --

8          THE COURT:  So I want to -- let's start with two

9    things.  One, there is, in fact, a private individual lawsuit;

10   correct?

11         MR. WILKISON:  Correct.

12         THE COURT:  Which would not apply to Cassanello;

13   correct?

14         MR. WILKISON:  Well, I'm not 100 percent sure that's

15   accurate.

16         THE COURT:  You're not 100 percent sure whether or not

17   she could or could not be sued under those provisions?

18         MR. WILKISON:  So correct.  And the reason for that

19   being is there's kind of an interesting quirk in Florida's

20   discrimination enforcement scheme.  The Education Equity Act

21   appears to only have been applied as the defendants argue to

22   suits against the school itself, much like Title VII or Title

23   IX.

24         However, Florida's Civil Rights Act has a much broader

25   provision that kind of incorporates the Education Equity Act

1    that says this, and this is at Section 760.07, Florida Statute:

2    *Any violation of any Florida Statute that makes unlawful*

3    *discrimination because of race, color, religion, gender,*

4    *pregnancy*, et cetera, et cetera, *in the areas of education,*

5    *employment, or public accommodation gives rise to a cause of*

6    *action for all relief and damages described in 760.11(5)* --

7            THE COURT:  That is, Judge, the argument isn't the

8    other provision you were talking about, but through 760.07 that

9    would be, Judge, we cannot concede that that would not give a

10   path to sue a teacher?

11           MR. WILKISON:  Correct.  And it hasn't been used

12   before because why wouldn't you just go through the Florida

13   Civil Rights Act as written.  Now there's a good reason to

14   because there's all these different educational definitions in

15   the Florida Educational Equity Act.

16           And if I were to sue, for instance, my employer or a

17   proprietor of public accommodations through the Florida Civil

18   Rights Act, I could sue an individual employee, in addition to

19   the organization itself, unlike Title VII.  And there are cases

20   that do that.  I just have not found one since the reply was

21   filed where that was done to a university or a school district.

22           THE COURT:  And here, because I think the answer you

23   gave me earlier was slightly different, has the Board of

24   Governors promulgated any regulations implementing this statute?

25           MR. WILKISON:  No.

1          THE COURT:  So that part was correct.  The other part

2     about the provision I was talking about was correct.  It's just,

3     Judge, there's a different statute that, arguably, you could sue

4     a teacher under, 760 -- namely, 760.07.

5          And then separate and apart from that, as I understood

6     it, which is not directly responsive to my question about

7     whether or not the Board of Governors had promulgated

8     implementing regulations, is that, Judge, we have the theory

9     that her speech is -- I'm sorry -- the Cassanello speech is

10    chilled by virtue of the fact that they can, under existing

11    regs, cut funding, and if your school is going to lose funding,

12    then it would certainly create a chilling effect on a professor

13    who doesn't want to be the source or cause of his school losing

14    revenue.

15         MR. WILKISON:  That's correct.  And I think -- I

16    apologize if it was unresponsive.  But I think that was in

17    response to the Court's statement that this was only enforceable

18    through a private right of action.

19         THE COURT:  I could have been more specific.

20         MR. WILKISON:  Okay.

21         THE COURT:  That's why we are narrowing it down, and

22    that afforded you an opportunity to bring up 760.07 and the

23    alternative theory.  That's why we're going through this

24    exercise.  It's helpful to clarify and know what arguments are

25    being made and those that are not being made.

1              So your views on redressability are tied to 760.07 and

2       the chilling effect on Cassanello's speech by virtue of the fact

3       the Board of Governors can penalize her -- I'm sorry.  Is it him

4       or her?

5              MR. WILKISON:  Him.  Sorry.

6              THE COURT:  I'm sorry.  Somebody raised an eyebrow

7       when I said "him" before.  That's why I assumed I was doing what

8       I did with the minor earlier.

9              -- that Dr. Cassanello's speech is chilled by virtue

10      of the fact the Board of Governors will slash the income and,

11      Judge, that's not fanciful or farfetched because the same thing

12      happened, for example, with mask mandates.

13             MR. WILKISON:  Correct.  There's also one other

14      redressability aspect, and that is the Board of Governors

15      oversees the entire university system, including the

16      universities who have hiring and firing and discipline authority

17      over Dr. Cassanello and any public university professor.  So

18      absent the drastic effort of funding being cut, the -- an

19      injunction against the Board of Governors --

20             THE COURT:  And Cassanello says, I think I'm going to

21      be fired and -- by not the Board of Governors, but by my

22      university or otherwise disciplined by my university, who will

23      want to keep the Board of Governors happy.  Not that the Board

24      of Governors is going to do something to me, but that my

25      university will to keep the Board of Governors happy.

1          MR. WILKISON:  Yes, correct.  So it's not a direct

2     hiring and firing authority.  As far as I know, they don't have

3     that, but they do oversee the institutions that do have that

4     direct authority.

5          THE COURT:  And what's your best authority that that's

6     enough to confer standing for Cassanello as it relates to the

7     Board of Governors.

8          MR. WILKISON:  So I think, Your Honor, I'd rely on --

9     well, I don't know if this is necessarily authority, but I think

10    if you just read the *Lujan* standard for redressability, it just

11    has to be likely, as opposed to speculative, the injury will be

12    redressed by a favorable decision.

13         Certainly some of the injuries that Dr. Cassanello is

14    claiming -- chilling of speech because I'm afraid my university

15    is going to lose funding at the hands of the Board of

16    Governors -- is -- fits the redressability causation pattern if

17    the Court were to enjoin it from enforcing the law by cutting

18    funding or any other mechanisms it has to enforce the law.

19         THE COURT:  I understand.  Let's break this down into

20    subparts.  We'll turn to Falls and Harper in a minute.

21         Let me hear from the defense, whoever wants to address

22    the issue, as it relates to standing and Cassanello.

23         MR. COOPER:  Thank you, Your Honor.  Charles Cooper

24    again for the defendants.

25         Your Honor, with respect to Dr. Cassanello in

1   particular, we think the basic theory of the

2   hipbone-connected-to-the-thigh-bone injury that Dr. Cassanello

3   is alleging here is simply not a sufficient injury-in-fact to

4   create an invasion of a legally protected interest which is

5   concrete and particularized and actual or imminent, not

6   conjectural or hypothetical.

7          And, Your Honor, the potential downstream consequences

8   that the plaintiffs are saying provides the professor with his

9   standing are simply quite conjectural.  We've --

10          THE COURT:  Does it make any difference that in --

11   just in recent history when schools or entities or organizations

12   have not complied with what is demanded by Tallahassee that

13   funding has been cut, for example, the face mask?  Does that

14   make it any less speculative and less conjectural?

15          MR. COOPER:  Your Honor, I don't think so because we

16   certainly concede that there is the possibility of that form of

17   enforcement against the institutions, and that is, as you say, a

18   recent example of that authority being exercised by the -- I

19   guess here, the Board of Governors.

20          THE COURT:  And then Disney is going to lose its

21   status because -- arguably, because they made a statement that

22   run afoul -- ran afoul of state policy of the controlling party.

23          At what point do you stack so many examples where

24   punitive actions are taken if you don't do what you are told

25   that suddenly it no longer becomes conjectural and you pass that

1    threshold so you can establish standing?  It's no longer

2    fanciful or conjectural.

3            MR. COOPER:  Well, I think you first have to identify

4    some causes of action that have been brought under the statute

5    that you're examining.  And as counsel, I think, has conceded --

6    certainly our research has suggested to us -- there are no cases

7    in which a teacher has been in any way determined to have been

8    liable under the private cause of action.  With respect to these

9    administrative enforcement mechanisms, Your Honor, we're not

10   aware even of the mask example or any examples.  I can't --

11           THE COURT:  It's one step removed for the teachers;

12   correct?

13           MR. COOPER:  That's --

14           THE COURT:  So, Even if you're going to assume, Judge,

15   that you've got a pattern or behavior -- and we're not conceding

16   there is.  But even if we were going to agree there was a

17   pattern of behavior, that would be a pattern of behavior

18   directed by similar folks in authority against institutions, but

19   not with the downstream effect on others.  And that's the fatal

20   flaw here.  Even if you assume all the others, which we're not

21   conceding, there's nothing that would -- other than mere

22   conjecture to suggest it would affect anybody downstream.

23           MR. COOPER:  That's exactly it.  We don't

24   understand -- and I'll be perfectly candid.  I don't know the

25   specifics of how far downstream the mask example went, but we

1   don't know of concrete examples.

2           THE COURT:  And, Judge, there's certainly nothing

3   before you on the record where individuals, as opposed to

4   entities, were punished as a result of that.

5           MR. COOPER:  We are aware of none, Your Honor.  We are

6   aware of none.  And certainly the record before you doesn't

7   suggest --

8           THE COURT:  It's completely devoid.

9           MR. COOPER:  In fact, the record before you doesn't

10  even invoke the mask example, but we acknowledge you can -- you

11  know about it.  You can take notice of it.

12          And, Your Honor, that's -- that's the bottom line of

13  our standing argument.  This -- again, not to be pejorative, but

14  it's a hip-bone-connected-to-the-thigh-bone type of argument

15  that is, you know, by definition quite conjectural.

16          And with respect to 760.07, Your Honor, that is not a

17  provision that we've studied that we've -- that's been invoked

18  previously.  We would like an opportunity to do that.  And I

19  know, of course, the briefing has been accelerated on this

20  motion to dismiss, so it's by no means any complaint against

21  the --

22          THE COURT:  Mr. Cooper, I understand.

23          Judge, this is the first time it's come up, and I

24  don't want to shoot from the hip.  I'm an officer of the court,

25  and I want to read it and study it and think about it before I

1    shoot from the hip.

2         MR. COOPER:  That's exactly right.  But I guess I

3    would have an instinctive point to make here.  First, it does

4    suggest that if any other cause of action has an administrative

5    process, as I read the statute here on the fly, that that

6    administrative process has to be exhausted before that

7    particular 760.07 cause of action can be invoked.

8         And in light of the fact that there is a specific

9    private cause of action under the only provision that applies to

10   the professor, it's hard to imagine, frankly, that that is more

11   or less rendered kind of superfluous or even unnecessary if

12   there is a -- if there is a direct cause of action that could be

13   asserted against a teacher -- an individual teacher.  So -- I

14   think that's my argument.

15        THE COURT:  Actually, I have a -- you can keep

16   standing where you're at.  I have a question for plaintiffs'

17   counsel.

18        I can go pull it, certainly.  I don't have 760.07 in

19   front of me.  But Chapter 760 -- who can sue and who can be sued

20   under Chapter 760?  I mean, I know under Chapter 760 generally,

21   an employer can be sued as defined by the statute, but is 760.07

22   an all-encompassing statute that says anybody can be sued,

23   irrespective of the relationship, if discrimination is involved?

24   I don't have it in front of me, so that's why I'm asking.

25        MR. WILKISON:  And my understanding -- and the statute

1    doesn't say one way or the other itself, you know, this is only

2    limited or this includes individual liability.  But I do know

3    just from past experience that an action under that provision of

4    the Florida Civil Rights Act -- because that's the only

5    provision that gets you -- that links up the damages remedy and

6    the rest of the -- and the rest of Chapter 760 can apply, for

7    instance, punitive damages or compensatory damages for an

8    individual employee.

9         THE COURT:  But 760.07 goes beyond the other

10   provisions of Chapter 760 that generally define employer,

11   employee, and who can sue and so forth?

12        MR. WILKISON:  I don't believe it goes beyond the

13   general definition.  It just says that any individual that --

14   any violation of an antidiscrimination statute in these fields

15   has a cause of action or this provision for the remedies that

16   760 provides.

17        THE COURT:  Has 760.07 been construed as going beyond

18   the employer/employee context?

19        MR. WILKISON:  It has been construed in, like -- in

20   the fair housing context.  I have not found it in cases that

21   have construed it in the education context.

22        THE COURT:  And we're not going to resolve this now.

23   I certainly would allow folks to provide supplemental briefing.

24        MR. COOPER:  Thank you for that, Your Honor.

25        I guess I would only just kind of footnote to the

1    question you just asked.  At least on first glance it looks like

2    it's in the employment discrimination, including, perhaps,

3    employment in education, but it doesn't -- it's in the second

4    760 series, not, Your Honor, in the 1000 series dealing with --

5    that directly deals with the eight concepts that the professor

6    complains about.

7            THE COURT:  I understand.  Of course, the issue is

8    going to be whether or not there is some sort of catch-all

9    provision that creates another claim independent of the standard

10   Chapter 760 employer/employee claims.  I don't know the answer

11   to that question because I haven't studied it, and I was a state

12   court judge before I became a federal judge, and nobody has

13   brought a claim in front of me as a -- either a supplemental

14   claim in this court or as a state court judge under 760.07, so I

15   don't know.  I have to look at it.

16           MR. COOPER:  Yes, sir.

17           THE COURT:  That's the first time only, Mr. Cooper,

18   that a federal judge will acknowledge they don't know something

19   to you on the record.

20           Thank you.  You can step back.

21           MR. COOPER:  I think that is a first.

22           THE COURT:  It's been about an hour.  We are going to

23   take a break, come back.  Let's go ahead and just -- we'll come

24   back at 11:20.

25           I thank you for your patience with us.

```
1          (Recess taken at 11:12 AM.)

2          (Resumed at 11:29 AM.)

3               THE COURT:  Please take your seats.

4               One moment, please.

5               I'm told that plaintiffs' counsel -- and I --

6     hopefully it won't take this long -- that you -- somebody needs

7     a -- we're going to break at lunch.  If we break at 12:30, is

8     that enough?

9               MS. WHITE:  Yes, sir.

10              THE COURT:  Okay.  Briefly to plaintiffs' counsel, as

11    I understand it, Mr. Wilkison, as it relates to the teachers,

12    and I'm talking about Professor Cassanello, the injury is the

13    chilled speech; correct?

14              MR. WILKISON:  Jesse Wilkison for plaintiffs.

15              That's correct, Your Honor.

16              THE COURT:  And then the traceability is the -- which

17    is fairly and reasonable that if my school is going to get

18    slashed in terms of the funding, that's the -- would suffice for

19    the traceability to the injury; correct?

20              MR. WILKISON:  Yes.

21              THE COURT:  All right.  So what I need you to

22    address -- and I think it was my fault, not Mr. Cooper's, that I

23    may have used terms loosely.  Help me to understand -- it seems

24    to me that when we start about something being conjectural and

25    so forth, it's really the redressability.
```

1          And I want to say that I've stuck with -- I could have

2    just as easily talked about Falls and Harper because I'm not

3    sure that this analysis, whether you win or lose, is any

4    different in terms of the issues as between Falls and Harper and

5    Cassanello.  So if either side believes the analysis -- even

6    though we're talking about the Board of Education versus the

7    Board of Governors, but if anybody believes the analysis would

8    be different in terms of -- I understand the entities are

9    different, but if the analysis would be somehow worse or better

10   as it relates to the Board of Governors versus the Board of

11   Education, y'all can explain that.

12          But if you could, help me to understand why isn't

13   redressability a problem as it relates to the teachers' claims

14   here.

15          MR. WILKISON:  Well, as the Court said, the injury is

16   chilled speech, and the way that injury is redressed is to cut

17   off the enforcement mechanisms, the consequences that would

18   chill that speech.  So, for example, in the context of cutting

19   funding --

20          THE COURT:  I'm issuing an injunction.  What am I

21   telling -- let's start with the Board of Governors.  The Board

22   of Governors shall not, dot, dot, dot.

23          MR. WILKISON:  Shall not enforce the provisions of the

24   IFA in a conforming bill restricting -- restricting performance

25   funding for universities and shall not implement the IFA and its

1   regulations regarding universities in regulating classroom

2   instruction.

3            THE COURT:  So basically, Judge, what we believe the

4   injunction should be as it relates to the Board of Governors,

5   you can't do anything related to this legislation in terms of

6   enforcing any limitation or reacting to anything associated with

7   the legislation at issue; correct?

8            MR. WILKISON:  Correct.  And --

9            THE COURT:  Same thing you are asking for me to do as

10  it relates to Falls and Harper and the Board of Education, thou

11  shalt not do anything, take any action to penalize or otherwise

12  sue or do anything else against anyone as it relates to this

13  legislation?

14           MR. WILKISON:  Correct.

15           THE COURT:  I understand your argument.

16           MR. WILKISON:  And I know that -- just kind of going

17  back to what we were talking about before, I know I introduced

18  that individual private cause of action, and my intention wasn't

19  to sandbag anyone.  It was something that I found yesterday

20  after reading the defendants' reply, but I also didn't want --

21           THE COURT:  Let me pause there.  Nobody -- I certainly

22  wasn't saying that, and Mr. Cooper didn't say that.

23           MR. WILKISON:  Sure.

24           THE COURT:  Mr. Cooper, I think, recognized that we

25  had an abbreviated briefing schedule here, and that's why I said

```
 1   if something comes up that I would allow the parties to brief
 2   something that comes up.
 3          MR. WILKISON:  Absolutely.  And just didn't want to
 4   give that appearance.
 5          THE COURT:  I'm not -- I'm not -- Mr. Wilkison, you
 6   haven't been in front of me that much, but I'm not that shy
 7   about making my feelings known.  So if I thought somebody was
 8   engaged in legal shenanigans, I certainly would have said so.
 9          MR. WILKISON:  Understood, Your Honor.
10          But I also didn't want that argument to make it appear
11   as though we were conceding that a lawsuit must be able to be
12   brought against an individual to confer standing, as anyone who
13   has been in the crosshairs of a Title VII or Title IX lawsuit.
14          THE COURT:  And I understand that, and y'all already
15   said also that the funding is enough, so, I mean, it's clear
16   from the record, from the very beginning y'all's position has
17   been if your speech is chilled, something doesn't have to be --
18   you don't have to be fired or you, yourself, don't have to have
19   your salary cut.  There's other ways that indirectly your speech
20   is chilled and, for example, in this case what's done to your
21   university.
22          MR. WILKISON:  Correct.  And as the Supreme Court and
23   Eleventh Circuit have said, self-censorship is the harm in an
24   overbreadth and facial constitutional challenge where we're
25   alleging a chilling effect.
```

```
1              THE COURT:  All right.  Before -- and if you can step
2       back.  Let me -- and I'm not sure if they do.
3              Anybody from the defense want to add anything to that
4       last exchange?
5              MR. COOPER:  Your Honor, very briefly.
6              Again, Charles Cooper.
7              I do want to zero in on, apart from redressability,
8       the standing argument we are making, which is that the injury
9       they claim in this preenforcement challenge is conjectural; it's
10      not concrete.
11             Yes, that the injury is the chilled speech,
12      Your Honor, but they have to be able, Your Honor, as *Susan B.*
13      *Anthony* makes clear, in a preenforcement First Amendment
14      challenge show that there is some intended -- specific intended
15      future conduct that they plan to engage in that is arguably --
16      so that's friendly to them, certainly, but arguably proscribed
17      by the challenged statute.
18             And, Your Honor, we -- we think --
19             THE COURT:  I understand.  That bleeds over to the
20      merits.
21             MR. COOPER:  It does.
22             THE COURT:  We don't believe that the statute at issue
23      would keep Cassanello from doing what she says she wants to do.
24             MR. COOPER:  Not insofar as the allegations that we
25      have seen thus far, Your Honor.  That's -- that's exactly it.
```

1          If I could just make the further point, I'm informed

2    by state officials relating to the Board of Governors that

3    they're in the process of doing regulations right now under the

4    IFA, and so some of the mysteries in terms of enforcement --

5          THE COURT:  I wasn't, by the way, suggesting they

6    never would.  I was just asking the questions that such

7    regulations did not currently exist.

8          MR. COOPER:  Exactly.  And I just wanted, again, to

9    inform the Court as I have been informed, but I also would have

10   to say that I -- and this gets to my -- to our point about the

11   conjectural nature of the -- of at least their concerns about

12   being personally subject to enforcement actions.

13         And that is I am confident that when those regulations

14   come out, they'll have some type of administrative process.

15         THE COURT:  They don't have to personally, though, be

16   subject to enforcement actions in order for them to have

17   standing based on the argument that their speech is being

18   chilled, do they?

19         MR. COOPER:  Fair point.  However, they're making the

20   claim that they are personally subject, but I think that is a

21   fair point.  But when their point is that, no, they could be

22   themselves personally victimized by the -- by the -- this

23   downstream consequence of a third party's action against them, I

24   think that the *Lujan* -- I think it's the case -- suggests that

25   that is a higher standing burden that they -- that at least they

```
 1   have to articulate to demonstrate that concrete harm, not
 2   conjectural concrete harm.
 3             THE COURT:  Thank you.
 4             My final set of questions before I then let y'all take
 5   a break -- and let me know what, if anything, you want to add to
 6   the papers you've already filed -- addresses Supreme Court and
 7   Eleventh Circuit authority about teacher expression.
 8             And I want to ask about Garcetti and Kingsville and
 9   Bishop and Virgil.  Who from the defense side wants to address
10   these questions?
11             MR. COOPER:  Your Honor, I will.
12             THE COURT:  All right.  If you'll --
13             I want to start at the end, Mr. Cooper, and say I
14   recognize that even if the answer to all the other questions I'm
15   getting ready to ask you is yes -- Yes, Judge, this is still
16   good law; Yes, Judge, you're bound by that, whether you like it
17   or not -- even if you go through all of that, I understand
18   that's not the end of the inquiry under Bishop and so forth.
19   That doesn't mean you -- in terms of what I have to look at you
20   automatically lose, so I get it that there are other layers to
21   the merits analysis, irrespective of what your answer to the --
22   my next series of questions are.
23             But let's start with Garcetti.  Doesn't Garcetti
24   explicitly carve out an exception to its holding of whether the
25   same analysis would apply in the same manner to a case involving
```

 1   speech related to scholarship or teaching?  I mean, I thought
 2   *Garcetti* said -- in terms of something being pure government
 3   speech, they explicitly said, We're not going there.  We don't
 4   have to address and we're not going to address classroom
 5   discussion.
 6        Doesn't *Garcetti* -- I guess for the life of me, I
 7   don't understand how *Garcetti* could control that question if
 8   *Garcetti* explicitly says, We are not addressing that question.
 9        MR. COOPER:  Your Honor, *Garcetti* did reserve the
10   question whether or not it would apply in the same way in the
11   context of academia, yes --
12        THE COURT:  Okay.
13        MR. COOPER:  -- it did.
14        THE COURT:  And so then help me to understand, didn't
15   the old Fifth -- which I'm bound by, unless the Eleventh Circuit
16   has reversed it en banc -- didn't the old Fifth in *Kingsville*
17   hold that a teacher's classroom discussion is protected
18   expression, include a carve-out that doesn't treat it?
19        And I realize that was long before *Garcetti*, but
20   didn't they treat it as protected expression and -- for purposes
21   of academic freedom and classroom discussion, didn't they treat
22   that as a -- something different, as an exception to other
23   employer speech?
24        MR. COOPER:  Your Honor, certainly *Kingsville* -- and
25   I'd like to talk about *Kingsville* with you, to be sure.  But I

1  think *Kingsville* simply said that a teacher's classroom speech

2  is not private speech.  And this was pre-*Given*, Your Honor,

3  pre-*Given*.

4          THE COURT:  But didn't the Fifth in *Buchanan versus*

5  *Alexander* as recently as 2019, relying on *Kingsville*, say that

6  in-class discussion is protected expression?

7          MR. COOPER:  Your Honor, yes, *Buchanan* does indicate

8  that.  And, Your Honor, I think that even *Bishop*, which

9  ultimately -- which is certainly more recent than *Kingsville* --

10          THE COURT:  Aren't *Virgil* and *Bishop* still good law?

11          MR. COOPER:  *Bishop* certainly is, yes, Your Honor.

12          THE COURT:  Why is *Virgil* not good law?

13          MR. COOPER:  Well, and *Virgil* -- I'm not suggesting

14  *Virgil* is not good law.

15          THE COURT:  When I said "good law," I mean binding

16  law.  Good/bad suggests that I'm making a values judgment.  I'm

17  not.  When I said "good," I meant binding.  I don't understand,

18  regardless of how I think what the Supreme Court will do now --

19  and I know that's an exercise because I see this in briefs filed

20  with me with some regularity -- Judge, here's what we think the

21  U.S. Supreme Court is going to do now.  Well, I don't -- that's

22  not -- I don't sit around guessing what the Supreme Court might

23  do, if they are going to overturn precedent and they are going

24  to, you know, change the law.  I have to go with, you know, what

25  is binding authority.

1          And so what I don't understand -- since there seems to

2    be this thread through these arguments, that what a teacher says

3    in the classroom is pure government speech; ergo, it has no

4    protection at all, it's not protected speech, I don't understand

5    how I square that position with *Kingsville*, *Buchanan*, *Virgil*,

6    *Bishop*.  It just seems to me that ultimately that may be what

7    the U.S. Supreme Court says.  And they didn't -- in *Garcetti*, we

8    didn't go there, and we didn't get there, but -- and that may be

9    where the Court ultimately goes, but right now I'm stuck with

10   what the old Fifth said and what the Eleventh said, and I'm not

11   aware of anything the Eleventh has said where they abandon

12   *Kingsville*.  And I guess part of the answer may be, Judge, I

13   just don't think any of those cases collectively stand or

14   individually stand for the proposition that classroom discussion

15   is protected speech.  And maybe that's the answer.

16          But, separate and apart from that, I'm just -- I don't

17   understand how we go from *Garcetti* said, We reserve on the

18   issue, to the law is, based on the Eleventh Circuit casting into

19   doubt in comments it's made, public teacher expression in light

20   of *Garcetti*.  *Garcetti* didn't address it, so the

21   Eleventh Circuit may allude to it.  They may think reading the

22   tea leaves it will change.  But they didn't en banc reverse

23   themselves, and I don't know how it helps me for them to say,

24   Well, *Garcetti* didn't do it, but it seems like that's probably

25   not protected speech.  I don't -- I'm lost on that analysis.

1          MR. COOPER:  Let me attempt to walk you through what

2     our responses are to that.

3          THE COURT:  Sure.

4          MR. COOPER:  And, Your Honor, let me begin with

5     *Kingsville*.  In *Wollschlaeger*, the Court dropped the footnote,

6     and it observes that *Kingsville* may, in fact, not survive

7     *Garcetti*.  Footnote 6 of Wollschlaeger in the Eleventh Circuit

8     says *Kingsville* is, you know, under --

9          THE COURT:  But the problem is -- and the

10    Eleventh Circuit can say that.  The problem I have is I'm not on

11    the Eleventh Circuit, and I'll never be on the Eleventh Circuit.

12    I'm bound by the Fifth, old Fifth, and the Eleventh.

13         MR. COOPER:  Yes.

14         THE COURT:  So unless the Eleventh Circuit has -- one

15    of two ways.  They've abandoned those or the U.S. Supreme Court

16    certainly could have issued a decision after *Garcetti* that says

17    something where they are expressly overruling something, which

18    also doesn't appear to occur.  So how do I get there, where I

19    don't follow those cases based on the Eleventh Circuit saying

20    something may not be good law?  It's good law until the U.S.

21    Supreme Court or the Eleventh Circuit en banc says it isn't good

22    law; right?

23         MR. COOPER:  Your Honor, what I'm offering to you is

24    basically let's step back and let's look at all that law.  Let's

25    look at all the law.  How does *Kingsville* survive *Bishop*?

1 *Bishop* is subsequent to *Kingsville,* as is *Pred.*

2        And the plaintiffs' counsel suggested both *Pred* and

3 *Kingsville* somehow are controlling here, but *Bishop* is not.  And

4 there's no way, no way at all, to square *Bishop* with what they

5 say *Kingsville* stands for or *Pred.*  And, in fact, the Court in

6 *Bishop* cites *Pred* and says it was a perfectly fine discussion of

7 the law as it existed at the time many, many years before

8 *Bishop.*  But it then goes on to say, We don't have any

9 controlling cases here, as we examine a claim, a First Amendment

10 academic freedom claim, just exactly like the one they are

11 making, that a particular teacher had a First Amendment right to

12 incorporate certain extracurricular and prohibited items in that

13 teacher's classroom activity.

14        So -- and let me, if the Court will indulge me.

15 *Garcetti* --

16        THE COURT:  Isn't there a difference though -- and

17 maybe the answer is no.  Isn't there a difference, arguably,

18 between curriculum versus classroom discussion?  I mean, you can

19 set the curriculum, but isn't that different than what can and

20 cannot be discussed in the classroom?  Aren't those two

21 different constructs?

22        MR. COOPER:  Your Honor, I think the classroom

23 expression, the classroom instruction would come under the

24 larger umbrella of curriculum, but it is instruction that the

25 statutes before you speak to.

1          THE COURT:  Have the cases treated curriculum and

2     discussion exactly the same and treated them as if they are

3     synonymous?

4          MR. COOPER:  Yes, Your Honor, they have.  They have

5     not drawn a distinction along the lines that I perceive you to

6     be suggesting.  They deal with classroom materials, and they

7     deal with classroom comments and discussion and instruction.

8          And, Your Honor, since *Garcetti* has been decided,

9     there have been several Courts of Appeals, including the

10    Eleventh Circuit, that have said that it applies in the

11    education context.

12         The Eleventh Circuit said it in *Gilder-Lucas* against

13    *Elmer County Board*.  And, yes, that is not binding on you

14    because it was an unestablished decision.  But it did say that

15    a -- there a science teacher, but who was also the cheerleader

16    sponsor --

17         THE COURT:  Didn't my colleague in the Middle District

18    just get chastised for -- and I think it's a fair

19    characterization; if I were that judge I probably would have

20    felt worse -- where the Eleventh Circuit said, We've told you

21    time and again don't follow unpublished decisions and, by the

22    way, when there is a binding authority, you have to follow it

23    even if it's inconsistent?  I mean, I just --

24         MR. COOPER:  Yes.

25         THE COURT:  I'm waiting for the missive that they'll

1  send heading my way if I do exactly what my colleague, Judge

2  Merryday, was just accused of in a case out of the Middle

3  District.

4       MR. COOPER:  Certainly.  And I don't know about that

5  episode, but I make clear that I'm not suggesting that the Court

6  adopt that view of the impact of *Garcetti*, the necessary impact,

7  we would suggest to you, from accepting its reasoning and

8  applying it to the education context over a binding authority to

9  the contrary.  But we don't believe there is binding authority

10 to the contrary and certainly the panel in the *Gilder-Lucas* case

11 didn't where they specifically applied *Garcetti* in an education

12 context and in, frankly, an instructional context.

13      But there have been several cases, Your Honor, since

14 *Garcetti* that have applied it in the educational context to be

15 sure, only in the K through 12 context at least thus far.  But

16 there have been several Courts of Appeals -- we've cited a few

17 of them.  The classic one is the *Mayer* case, Your Honor, from

18 the Seventh Circuit, but there's also the *Evans-Marshal* case

19 from the Sixth Circuit, and, Your Honor, another, to be sure,

20 unpublished decision, but one from the Ninth Circuit, which we

21 haven't cited and only found recently, *Nampa Classical Academy*

22 *against Goesling*, 447 Fed Appx. 776, where the Court, relying on

23 *Mayer*, said that the curriculum presented in a public charter

24 school is not the speech of the teachers, parents, or students,

25 but that of the Idaho government.  Because the government's own

```
 1   speech is not subject to the First Amendment, plaintiffs have no
 2   First Amendment right to compel that speech, and that --
 3           THE COURT:  I understand the argument is, Judge, it's
 4   not -- it's what's said by the public school teacher is
 5   government speech, full stop, end of inquiry, no First Amendment
 6   claim.
 7           MR. COOPER:  And, Your Honor, I want to take us back
 8   to a pre-Garcetti case that Garcetti relied upon and that more
 9   or less -- and that hit directly in the heartland of academics,
10   and that's Rosenberg, Your Honor -- Rosenberger.  The Court --
11   I'm sure you recall the University of Virginia denied a
12   Christian student publication, student activity fees subsidy,
13   and the Court held that that constituted First Amendment
14   violating viewpoint discrimination.  But, Your Honor, it made
15   clear -- it went beyond that to make a distinction between that
16   and the speech of faculty members, of the speech of the
17   University itself, and it said in its holding that the
18   University may not discriminate based on the viewpoint of
19   private persons whose speech it facilitates does not restrict
20   the University's own speech.
21           And, Your Honor, just if you'll indulge me two more
22   sentences from that opinion.
23           When the State is the speaker, it may make
24   content-based choices.  When the University determines the
25   content of the education it provides --
```

1          THE COURT:  Doesn't that beg the question, though?

2    The question is when is the State a speaker and where does the

3    State end and, if at all, the classroom speech and the academic

4    freedom of the instructor begin?  And you are suggesting that it

5    never begins in the classroom.  It is and remains government

6    speech, end of story.

7          MR. COOPER:  Yes, Your Honor, that's exactly what I'm

8    suggesting, and I'm suggesting it's not just the classroom, but

9    it is quintessentially the classroom.  It's in instructional

10   settings.  A professor or a teacher can't elide the restrictions

11   of whatever they may be that the school board or the State, or

12   whoever its superior authority is in setting the curriculum and

13   either prescribing or proscribing particular instructional

14   messages, if you will, it can't elide that or evade that by

15   holding class under a tree on a pretty day outside or in an

16   assembly of some kind in the school.  So it's something that is

17   in an instructional setting.

18          But just to further, I think, if I may, emphasize the

19   point of *Rosenberger* and why I think -- why I think it's so

20   important here is that there -- and, again, keeping in mind,

21   yes, my view is that this extends to anything that the professor

22   at the University of Virginia might say in an instructional

23   setting, anything.  And we have permitted the government to

24   regulate the content of what is or is not expressed when it is

25   the speaker or when it enlists private entities to convey its

1     own message.

2            And they cite the *Rust* case there, Your Honor, of

3     course, the funding case, and I'm going to come back to that, if

4     the Court please.  It does not follow, however, that

5     viewpoint-based restrictions are proper when the University does

6     not itself speak.

7            So clearly from this, viewpoint-based restrictions are

8     appropriate and proper and not a First Amendment problem when

9     the university speaks through its spokesmen, the people at the

10    head of the class, when the university does not itself speak or

11    subsidize transmittal of a message it favors, but it instead

12    expends funds to encourage a diversity of views from private

13    speakers.

14           Your Honor, and -- then Judge Alito in the Third

15    Circuit in the *Edwards* case, which we've cited to the Court in

16    our papers, read *Rosenberger*, we would submit to you, very

17    correctly, as essentially compelling the proposition that I'm

18    advancing to you here, which is that, yes, classroom speech,

19    instructional speech, is the State's speech or it's the

20    university's speech.  It's not -- and that speech is to be

21    controlled in the -- in the context of any dispute by the

22    curriculum decider, and this is what --

23           THE COURT:  Bottom line, we're saying the state can

24    control whatever speech and whatever is taught in the classroom,

25    full stop, end of story.  Judge, Florida only has six points;

1    China has ten; same deal works, the government absolutely

2    controls what's said in the courtroom -- I mean in the

3    classroom; correct?

4            MR. COOPER:  Your Honor, let me just, if I may --

5            THE COURT:  I'm not saying you're wrong.  I'm just

6    saying that's the principle that you're citing Alito.  Anything

7    that's said in the classroom is controlled by the State, good,

8    bad, or indifferent, so each state can mandate exactly what is

9    or is not said in the classroom and there is no First Amendment

10   right at all as it relates to the speech of a professor at a

11   public university or a teacher in a public school?

12           MR. COOPER:  Your Honor, I'm not going to go so far as

13   to state there is no right at all, but in --

14           THE COURT:  I thought you just said in the classroom

15   the State has the absolute right to control whatever is said by

16   a public school teacher in a public school or in a public

17   university in the state.  Is that not --

18           MR. COOPER:  Well, in terms of instruction.  The

19   caveat I want to offer is that we do not believe that the State

20   has the authority to require any instructional personnel, as the

21   statute puts it, and certainly none of the plaintiffs, to avow a

22   belief that they don't have.  But they -- and so -- but, again,

23   this statute --

24           THE COURT:  That is, they can't force you to say

25   something you don't agree with?

1          MR. COOPER:  No, that you don't -- that -- they can

2    certainly include in the lesson plan a lesson and material and

3    curriculum that the teacher doesn't agree with.

4          THE COURT:  But, say, for example, they say that there

5    is no such thing as global warming.  They can force the teacher

6    to say there -- not talk about, Here's a chapter on why global

7    warming is not occurring or man doesn't contribute to it.  What

8    they can't do is force the teacher to say, And, by the way, I

9    agree with that?

10         MR. COOPER:  Your Honor, I think that is --

11         THE COURT:  That's the line; correct?

12         MR. COOPER:  I think that is a line, and so I just

13   want to be clear that our submission to you isn't as absolute as

14   you had suggested.

15         THE COURT:  Well, that's why I was asking.  I'm trying

16   to make sure I understood the contours of your argument.

17         MR. COOPER:  And that's why this -- Your Honor, this

18   exercise is so important and thank you.

19         But, Your Honor, I guess -- and this is a

20   fast-forward, but in responding to your point about -- about the

21   various authorities here, the authority of the school board or

22   ultimately the State, the school board's ultimate authority

23   versus the authority of the individual teacher, the *Bishop* case,

24   Your Honor, is --

25         THE COURT:  Well, let's stop.  What does *Bishop* teach

1   us?  That was going to be one of my next questions.

2          You agree *Bishop* is still good law; correct?

3          MR. COOPER:  Yes.  Yes.  We rely on it.

4          THE COURT:  And so what is --

5          MR. COOPER:  We think that is binding, Your Honor,

6   yes.

7          THE COURT:  What's the holding in *Bishop* then?

8          MR. COOPER:  Well, Your Honor, I think its ultimate

9   bottom line holding is that when an individual professor

10  disagrees with the university about a matter of content in the

11  course that he teaches, the university must have the final say

12  in that dispute.  So -- and that's, and that really is the

13  essence of what we're talking about here.

14         Professors and teachers have, you know, in the scheme

15  of things, a wide range of discretion to teach courses in the

16  way that they believe is most pedagogically sound but obviously

17  to teach the curriculum that is established.

18         But when the -- when the teacher doesn't agree with

19  the curriculum or doesn't -- or wants to teach something that is

20  contrary and contradicts the curriculum or the -- or the

21  messages, if you will, that are either prescribed or proscribed

22  by the school board or the ultimate authority, then that

23  dispute, it has to be resolved somehow, and the *Bishop* Court

24  said -- what we would submit to is the common sense of it -- is

25  that you can't have a school board in every classroom deciding

1    for him or herself what the curriculum is going to be, what the

2    message is going to be, and what the teacher believes should be

3    taught and how it should be taught.

4         That's -- that ultimately is the call of the teachers'

5    superiors and those who decide what the -- what the lessons in

6    public schools shall be.  So, yes, we think that is the bottom

7    line holding, and the Court did, to be sure, undertake a

8    balance, a balancing process, and it identified academic freedom

9    interest of a professor.

10        But I would submit to you --

11        THE COURT:  But why -- if there's a balancing test,

12   and they talk about academic freedom, why does that lead to the

13   conclusion that the State has the absolute authority to -- and

14   the teacher, other than agreeing or disagreeing personally,

15   otherwise is bound and required to either not talk about or talk

16   about whatever they're told, and that absolutely controls

17   classroom discussion?

18        I thought you just said it's a balancing test that

19   includes academic freedom.  That's why I started off with my

20   questions to you that even under *Bishop* the plaintiff may lose

21   still, because it's a balancing test where you consider that,

22   but I thought -- and you can correct me if I'm wrong -- even

23   *Bishop* recognized a component of academic freedom as part of the

24   balancing test.

25        MR. COOPER:  Well, Your Honor, it -- it did include

1    that in its balancing test, but it's -- it came to the

2    conclusion that academic freedom does not provide -- and I'm

3    paraphrasing at least, maybe even quoting it -- does not either

4    accord a -- does not have an independent First Amendment right

5    in the professor and that the Supreme Court's discussions about

6    academic freedom -- and I want to come back and elaborate on

7    that a bit -- cannot be extrapolated to accord individual

8    teachers an academic freedom First Amendment right to control

9    the -- the discussion in the classroom in contradiction to the

10   teacher's superiors.

11           THE COURT:  In *Bishop*, in addition to academic

12   freedom, what else is it being balanced against?

13           MR. COOPER:  Well, Your Honor, the Court seems to me

14   to emphasize the fact that -- and seems to trudge through the

15   various contexts in which the First Amendment would be at play,

16   and they're similar to the *Rosenberg* context that we discussed

17   earlier, and that is -- well, first of all, when --

18           THE COURT:  Let me ask you -- I think a better

19   question is -- let me just ask the question directly rather than

20   being coy.

21           Does it matter whether or not the directive is based

22   on political or partisan -- or purely political or partisan

23   reasons, We're directing thou shalt not say X, or, Thou shall

24   say Y?  Does that matter and what have the cases said about

25   that?

1          MR. COOPER:  No, it doesn't, Your Honor.  The State is

2     entitled to have a viewpoint, and I think that's clear from --

3     even just from *Rosenberger*, but it is -- but it's also clear

4     from -- pellucidly clear from the cases that are adjacent to

5     these classroom pedagogical cases, if you will, dealing with

6     government funding.

7          Your Honor recall -- recall the cases, Your Honor --

8     and, again, *Rosenberger* said this about the government funding

9     cases and the government's First Amendment authority, when the

10    government disburses public funds to convey a governmental

11    message, it may ensure that its message is neither garbled nor

12    distorted by the grantee.  It is entitled to say what it wishes.

13         And, of course, earlier we trudged through the quote

14    that specifically used the term "viewpoint," "viewpoint-based

15    decisions."  And in *Legal Services Corp. versus Velazquez*, the

16    Court said this quite flatly:  *Viewpoint-based funding decisions*

17    *can be sustained in instances in which the government is itself*

18    *the speaker.*  It then cites the *Board of Regents against*

19    *Southworth* case -- and, by the way, that *Legal Services* for the

20    reporter here is 531 US at 541 -- but it then cites the

21    *Southworth* case, Your Honor, which was discussing specifically

22    the speech of faculty at a public university.

23         And the other area of the law, which is, again,

24    adjacent to this, and is quite clear that the government is

25    allowed to have a viewpoint, even a political viewpoint,

1   Your Honor, is in the governmental use of property, it's own

2   property.

3        *Walker* against the *Texas Sons of the Confederacy*, the

4   Court held that the message on those specialty license tags,

5   they couldn't put -- they refused to permit a confederate flag

6   to be put on there by these Sons of the Confederacy in Texas

7   because it was offensive, because they disagreed with the

8   viewpoint.  They disagreed with the political ramifications and

9   implications of it.

10       And the theory there was that these license tags are

11  the government's property, and it controls what kind of slogans

12  and logos and the rest of it are going to go on them, and so it

13  specifically can have a viewpoint.

14       The *Pleasant Grove case* against *Summum* --

15       THE COURT:  Let me ask a question to plaintiffs.  I

16  didn't understand the plaintiffs ever suggesting the government

17  can't have a viewpoint, the government doesn't have speech, and

18  there's some context.  What I understood the plaintiffs to be

19  saying is, Judge, there's an exception that applies based on

20  well-established case law for discussions in the classroom.

21       Did I misapprehend the plaintiffs' position?  I just

22  want to make sure I understand what --

23       MR. WILKISON:  No, Your Honor.

24       THE COURT:  Okay.

25       MR. COOPER:  Well, Your Honor --

1          THE COURT:  I'm not cutting you off.  I just want

2     to --

3          MR. COOPER:  These -- what I'm saying to you, and I'm

4     offering these -- these points in these cases as adjacent to the

5     issue before us, but illuminating and important for your

6     consideration, and they're important because of this, is it --

7     is it really plausible that the government, when the speech is

8     uttered by private parties on these license tags, these

9     specialty tags, or in the *Summum* case, where the City accepts

10    these donated monuments but only to express a governmental

11    message and so, therefore, it can reject monuments for the city

12    park that it finds inconsistent with the City's message -- the

13    cases like that, is it plausible that the government can do that

14    with private speech, private parties who are expressing

15    government speech but not government employees who are

16    themselves hired for one purpose?

17         THE COURT:  The law clearly says that's not true under

18    *Garcetti* for most speech, which all begs the question is -- and

19    maybe the answer is no -- but is there a difference and

20    exception for classroom speech?  I mean, all of that's

21    absolutely true.  I've granted all manners of summary judgment

22    where employees claimed that they couldn't be, for example,

23    terminated and that speech was a part of their employment, and

24    I've routinely granted summary judgment.  I think that almost

25    has become a legal truism.

1        The question becomes is there -- and I understand your

2   answer is no -- is there an exception that applies for classroom

3   discussion?  I mean, that's -- and I understand your point,

4   which is, Judge, look at all these other ways where the court,

5   U.S. Supreme Court, has so broadly applied the authority of the

6   government to control its own speech.  It strains credulity to

7   think that they're going to, even with private actors, in all

8   these other contexts restrict -- be able to control government

9   speech, but the only exception would be the classroom.  That

10  just doesn't make any sense, and that's -- I understood that's

11  why you were relying on those cases.

12        MR. COOPER:  Your Honor, yes, sir.  You get it.  You

13  get my -- obviously get my point there.

14        But, you know, again to -- maybe to fast-forward to --

15  to kind of my Plan B point --

16        THE COURT:  All right.  And let me do this:  For Plan

17  B what I'd like to do is -- you answered my question, which is,

18  Judge, we do not believe that *Kingsville* is still good law, and

19  you've articulated why.  And we believe that this is pure

20  government speech and can be regulated.  That was my initial

21  question, and you've answered that question, and I know that

22  Mr. Wilkison respectfully disagrees.

23        What I want to do is y'all have now answered my

24  questions.  I want y'all to be able to go over your notes and

25  figure out -- I don't need y'all to repeat everything that's in

1    your papers, certainly, but I want y'all to have a chance, in

2    light of my questions, and in light of what you didn't put in

3    your papers, and in light of what you'd like to make sure that

4    you have an opportunity to address to me so that you have a

5    complete record -- I want you to have time to do that.

6            And let me tell my courtroom deputy, to the extent we

7    have to move our proceedings this afternoon, we certainly can.

8            I also need to give the court reporter a break.  I

9    also understand that we've got somebody that has a personal

10   issue that they need to address that I need to accommodate,

11   which I'm happy to do that.

12           What I want to find out -- and I'm not going to hold

13   you to the exact minute, and I'm not going to shoot anybody with

14   4 Taser if you go over slightly, but if each side, if y'all

15   could take 4 moment to confer with each other and let me know

16   how much time -- we're going to break briefly for lunch -- how

17   much time y'all would like when we come back to at that point

18   sort of add whatever it is you want to add on the record.

19           Including, Mr. Cooper, what you were just going to

20   pivot to, which was Plan B.  I want to give y'all 4 full and

21   fair opportunity to put whatever else you need on the record.

22   But if y'all will confer -- not each team, but within each

23   team -- about how long you think you need, so I can figure out

24   what I need to do with the balance of my afternoon.  Okay?

25           MR. COOPER:  Very well, Your Honor.  Thank you.

```
 1              THE COURT:  Thank you.
 2         (Pause in proceedings.)
 3              THE COURT:  All right.  Mr. Cooper, how long do you
 4    need?  And then I'll hear from them if they need another minute.
 5              MR. COOPER:  Well, without knowing what may be said
 6    from the other side that we might want to respond to --
 7              THE COURT:  Sure.
 8              MR. COOPER:  -- I think 20 minutes max is what it
 9    would take for us to tie things up here.
10              THE COURT:  Fair enough.
11              MR. COOPER:  And that's accounting --
12              THE COURT:  I understand if they --
13              MR. COOPER:  -- accounting for what I think will be
14    continued colloquy.
15              THE COURT:  Oh, I'll be as quiet as 4 church mouse.
16              MR. KACHERGUS:  Matthew Kachergus for the plaintiffs,
17    Your Honor.
18              Recognizing that attorneys' estimates of time in these
19    proceedings always tends to be woefully inadequate, we'd suggest
20    about 4 half hour.  It may be less than that, but just with that
21    understanding.
22              THE COURT:  Fair enough.  Do y'all need -- I want
23    to -- I don't know how long we need -- how long do we need to
24    take 4 break for before we come back?
25              MS. WHITE:  4 minimum of 4 half an hour, Your Honor.
```

1          THE COURT:  We're going to definitely take more than

2     that.  Do y'all have -- and, look, this is not an endurance

3     contest, and I want to be respectful of lawyers -- well, let me

4     first start, when are y'all trying to fly out?  What time is

5     your flight?

6          MR. OHLENDORF:  Your Honor, I have 44:30 flight out.

7     Obviously happy to stay as long as helpful to the Court.

8          MR. COOPER:  I am -- I drove up from my home here in

9     Florida, so I'm fine.

10         THE COURT:  All right.  So I've got one person that's

11    got 44:30 flight, and I'll do my best to accommodate that.  I

12    think y'all have answered most of my questions, and I think I'm

13    not clairvoyant, but I think I probably can -- could write 4

14    script for what both sides are going to say coming up, but why

15    don't we do this:  If we -- do y'all have something that y'all

16    can eat quick -- did y'all bring anything, or do you need to go

17    out?

18         MS. WHITE:  No, Your Honor, and because of my medical

19    condition, I need to have food.

20         THE COURT:  So we'll come back at 1:20.  Does that

21    give y'all enough time?

22         MS. WHITE:  Yes, Your Honor.

23         MR. KACHERGUS:  Yes.

24         MR. COOPER:  Can we leave our materials spread here?

25         THE COURT:  Absolutely.  Y'all are free to leave your

1    materials.

2              And, if I could, can we just leave the courtroom open?

3              COURT SECURITY OFFICER:  Yes, sir.

4              THE COURT:  We'll leave the courtroom open, so y'all

5    can come and go if you wish.  I'll also let y'all know, if y'all

6    want to send somebody out, like, to Po'Boys -- or the church

7    across the street is probably even quicker to get food to bring

8    back, y'all can certainly -- there's witness rooms right outside

9    the courtroom that y'all certainly can use and certainly are

10   allowed to bring food in and stuff to eat in there if you don't

11   want to go out.  You obviously can go out as well, okay.

12             I don't want to burn your hour for lunch, so we'll

13   come back at 1:20.

14             Thank you.

15        (Recess taken at 12:21 PM.)

16        (Resumed at 1:24 PM.)

17             THE COURT:  Please take your seats.

18             Mr. Wilkison, just quickly before I ask y'all to

19   proceed -- I'll have the plaintiff go first and then I'll hear

20   from the defense -- any additional remarks?

21             I think this is obvious, but consistent with the other

22   questions I asked you, in terms of Defendant Hodo, you're

23   certainly not seeking to enjoin the Board of Governors or the

24   Board of Education as it relates to that defendant; correct?

25             MR. WILKISON:  That's correct, Your Honor.

1          THE COURT:  And setting aside the Governor, the

2   attorney general is the only defendant that Dr. Hodo alleged

3   injuries arguably traceable to; is that correct?

4          MR. WILKISON:  That's also correct.

5          THE COURT:  And as it relates to the attorney general

6   and the enforcement authority, that's what you're relying on,

7   760.021; correct?

8          MR. WILKISON:  Correct; their authority to enforce the

9   Florida Civil Rights Act.

10          THE COURT:  You may proceed.

11          MR. WILKISON:  Thank you, Your Honor.

12          I know the parties in our briefs have traded many

13   arguments about the proper standard we should apply, and I think

14   that the Court is well apprised of plaintiff's position on that

15   and stated it accurately in the colloquy that it is -- the First

16   Amendment does protect classroom instruction.  It is a 4ing

17   test, and that test, at least in terms of *Kingsville*'s holding,

18   is one that tends to favor the employee and requiring a showing

19   that the restricted classroom instruction needs to clearly

20   overbalance by a 4 disruption in the classroom.  So I'm not

21   going to try to relitigate all that.

22          Instead, I want to take kind of 4 step back and look

23   at the bigger picture and put these precedents into context and

24   hopefully maybe deviate 4 little bit from the script, that you

25   could to write about what I'm going to say.

1            I know that the one precedent that we can agree on

2    before *Garcetti* that applies in this case is that in *Keyishian*

3    which said that the First Amendment does not tolerate laws that

4    cast 4 pall of orthodoxy over the classroom.

5            And, you know, I think that's 4 recognition that in

6    government speech academic freedom is special; it occupies 4

7    special constitutional niche.  And I'm not aware of any cases

8    that the Supreme Court has said -- before or after *Garcetti* that

9    has said -- warned about the dangers of laws that cast a pall of

10   orthodoxy over license plates.  It's just 4 different set of

11   circumstances, 4 different set of interests.

12           So I wanted to examine what orthodoxy means in this

13   context of these laws and put it into greater context of what

14   harm the Court was trying to prevent in *Keyishian*.  Orthodoxy by

15   its nature is rigid, but it's not unchanging.  100 years ago,

16   orthodoxy in relation to race would have you believe the views

17   espoused by cases like *Plessy v. Ferguson*, that segregation was

18   permissible.  100 years before that, orthodoxy held that African

19   Americans were an inferior race and predisposed to enslavement.

20   We'd all be much worse off today if those orthodoxies continued

21   to cast a pall over us.

22           Indeed, it's difficult to discuss these ideas that

23   without -- that our ancestors and forebearers clung to with so

24   much vigor without feeling 4 little bit of discomfort, guilt,

25   anguish, or other forms of psychological distress.

1          I was planning on arguing, if we got here in the

2   merits, that it would be impossible to talk about topics like

3   slavery or segregation or the many racially fraught topics that

4   history teachers must confront without invoking those feelings,

5   but, candidly, in preparing for this argument, I did come across

6   what I thought was able to accomplish that feat.

7          I was looking up on YouTube -- there's 4 video that

8   was put out by an outfit called PragerU called 4 "Short History

9   of Slavery."  It's about five minutes long.  It's kind of aimed

10  at children.  It's got these very flashy, eye-catching

11  animations.  In the video most of the run time is spent

12  discussing at great lengths about Egyptian slavery, Roman

13  slavery, West African slavery -- or East African slave trade on

14  the Barbary Coast of European slaves and, of course, West

15  African slave traders who sold the slaves who were taken to the

16  United States to European colonists.

17         Conspicuously absent from the video was much

18  discussion about the slave trade and the practice of slavery

19  trade in the United States.  In fact, the video went to great

20  lengths to point out that it was, in fact, White people who

21  ended slavery.

22         I think this is the reading of history that the IFA

23  seeks to canonize in our classrooms and workplaces, sanitized,

24  inoffensive litanies of facts and dates curated to avoid hurting

25  anyone's feelings, and when we have to editorialize history, we

1    should editorialize it so that we excuse our ancestors for what

2    they have done rather than excoriate them.

3              THE COURT:  Counsel, let me ask you this:  Is it your

4    position -- and you can say, Judge, it doesn't -- it does not

5    implicate it, because that's not what these provisions do.  But

6    what says you to it being legitimate as it relates to 4

7    restriction to avoid 4 substantial disruption to say, for

8    example, you can't have 4 student come to the front of the room

9    during that discussion on slavery and apologize for what their

10   ancestors did?  If that's the mischief to be avoided and that's

11   what the government is trying to stop, would that somehow run

12   afoul of the principles that you're articulating?

13             MR. WILKISON:  Well -- and I think 4 prohibition on

14   that certainly would run afoul of the principles regarding

15   viewpoint discrimination.  I think that the State, if it were to

16   pass such a regulation, would need to show --

17             THE COURT:  So the State cannot prohibit teachers from

18   knowingly and intentionally humiliating 4 student?

19             MR. WILKISON:  I did not say that.

20             THE COURT:  Same kind of thing I do with Mr. Cooper.

21             MR. WILKISON:  Sure.

22             THE COURT:  And I understand I asked the extreme

23   question.

24             MR. WILKISON:  Right.

25             THE COURT:  And I do it for 4 reason, because it

1    highlights the logic of whatever position somebody is taking.

2          So I'm just trying to -- so is it the way the language

3    is crafted -- I understand we have 4 vagueness, but setting

4    aside the vagueness, but is it the way it's crafted that's

5    problematic, or is it the limitation at all that's problematic?

6          MR. WILKISON:  Well, I don't -- we don't argue that

7    the First Amendment provides unlimited discretion in the

8    classroom.  So certainly if there is 4 compelling --

9          THE COURT:  I'm not even saying that, because, again,

10   I don't want you to dodge the question.  It seems to me these

11   issues are nuanced.  And if you disagree that they are nuanced,

12   you can let me know.  So there's 4 world of difference between

13   you can't limit anything in the classroom versus you can limit

14   everything in the classroom.

15         Isn't there some in between, and isn't that what the

16   very balancing test that you've talked about urges?  And it

17   depends on what balancing test, I understand.  But even

18   *Kingsville* would recognize that; correct?

19         MR. WILKISON:  Certainly, And on the other side of the

20   token, if you were to apply the statement from *Hazelwood* about

21   the legitimate pedagogical interest standard, there's still an

22   examination of what are the State's interests?  What are the

23   interests of the person who is engaging in speech and giving

24   that expression?

25         So, for example, 4 statute that prohibited teachers

1    from humiliating students, that would apply 4 very different

2    balancing test than the --

3             THE COURT:  You'd still have the same vagueness claim,

4    wouldn't you?

5             MR. WILKISON:  Well, yeah, it would implicate

6    vagueness --

7             THE COURT:  I guess what I'm trying to do -- I asked

8    Mr. Cooper the question that other than saying you can't require

9    4 teacher to agree with something, you can force them to say

10   whatever you want them to say.  I sort of want to ask you the

11   flip side of that.

12            Recognizing, which I think even the case law you cite

13   recognizes, that the State does get to set the curriculum.  The

14   State does have an interest in the curriculum.  The State does

15   have an interest in what is taught and how it's taught.  You

16   know, help me to understand those limits.  I tried to see what

17   the limits were in asking Mr. Cooper, and he said, Yes, there

18   are limits.  The limit is you can't force 4 teacher to say they

19   agree with something.  I'd ask you the same, you know, question.

20            It just seems to me, even the case law you're

21   advancing, that the State is able to say, These are concerns we

22   have, and these are limitations we're placing on what you can

23   and cannot do.  And so then the question becomes when has the

24   State gone too far?

25            Just same question -- reverse the question I asked

1  Mr. Cooper:  When does the State's ability to control the

2  curriculum stop and the teachers' ability to speak begin?  Same

3  question for you:  When is their ability to limit?  And

4  certainly there is some limit; right?

5       MR. WILKISON:  Of course there's some limit, and I

6  think that, you know, the nature of the balancing test, it's

7  kind of hard to set out bright-line rules, and you have to look

8  at what is the interest that supports the regulation.  And I

9  definitely think that if 4 law was succinctly written and

10 narrowly tailored to govern --

11      THE COURT:  But when we talk about that interest,

12 here's my -- does Judge Walker or any judge, any man or woman

13 wearing 4 black robe, really get to decide whether that is the

14 best way to particular -- to accomplish 4 particular goal or

15 isn't my role different?  Did you cross that constitutional line

16 and violate the Constitution?

17      Because are you really saying to me the idea that

18 folks are taking sort of this introspection -- that it's not 4

19 fair consideration for the legislature to say -- whether I agree

20 with it or not is immaterial -- and I'll go with the term that's

21 often applied to the law in front of me, the "Stop WOKE Act."

22 and I understand it's both 4 concept and an acronym.

23      But, you know, is it really the plaintiffs' position

24 that somehow there is no pedagogical interest, and it's not

25 legitimate for the State to say -- if they truly believe that

1    what they've described as woke has run amuck, there has to be

2    limits.  Wouldn't -- would there not be 4 legitimate pedagogical

3    interest to provide some limits and some breaks?

4           MR. WILKISON:  It depends on what the evidence shows

5    to supports that interest.  My belief that woke ideology is

6    running amuck, that could be, and in this case we argue it is,

7    rank political censorship motivation.  And, in fact, in the

8    defendants' papers, they say, We're not regulating this speech

9    because of any means, ends, analysis, any negative effect it

10   has.  We are regulating the speech because we find it in itself

11   to be pernicious.  And that's the very definition of viewpoint

12   discrimination, even under the *Hazelwood* standard.

13          As the Court described in the *Searcy* case, the State

14   has to come forward with some evidence supporting its

15   regulations, and viewpoint discrimination is not 4 legitimate

16   interest.

17          Now, if it was 4 question of accuracy or an actual

18   classroom disruption occurring and you're showing how the

19   statute is going to curtail that disruption, then possibly you

20   can get to the balancing analysis.  But just because the

21   Governor says these woke people are running amuck in our society

22   does not give him license to impose any restrictions, because

23   the government still has the burden of coming forward with that

24   legitimate pedagogical interest, and we'd argue it has 4 much

25   greater burden, given the precedent in our jurisdiction,

1    establishing the balancing test, which it hasn't done so here.

2           So it's hard for us to entertain hypotheticals of the

3    parade of horribles that they cite in their brief.  You know,

4    what if something got up and denied the Holocaust, or what if

5    somebody got up and, you know, went on 4 racist tirade?  Well,

6    that's not what this law regulates, and there would certainly be

7    different interests that apply that the State is asserting in

8    those cases or cases like *Virgil* or the *ACLU* case where you have

9    texts that are maybe age inappropriate or contain factual

10   inaccuracies.  And that's an easier balance to apply because you

11   can say, okay, the State has legitimate interests in permitting

12   accuracy.  It has legitimate interests in exposing kids to

13   age-appropriate materials.

14          When you're dealing with 4 regulation like this that's

15   just 4 straight-up ideological-based regulation, the State can

16   assert no interest other than --

17          THE COURT:  What does the case law say about when

18   their stated purpose is based on partnership or ideology?

19          MR. WILKISON:  So, I mean, there's ample cases that

20   say that that's not 4 legitimate explanation, probably the most

21   recent being the Eleventh Circuit's most recent *Cartwright*

22   decision.  You know, that was kind of on the other foot.  It

23   wasn't 4 teacher speech case.  It was kind of an anti-harassment

24   provision designed to target, you know, various things that the

25   school designated harassment.  It also had 4 vagueness problem.

But part of the problem there is that, you know, the State was
taking 4 stance on an issue that was 4 partisan political
divide.

In fact, Judge Marcus has 4 very good concurrence in
that case.  And I did want to read it to the Court because we
didn't get to cite it in our briefs:

*History provides us with ample warning of those times*
*and places when colleges and universities have stopped pursuing*
*the truth and have, instead, turned themselves into cathedrals*
*for the worship of certain dogma.*

*By depriving itself of academic institutions that*
*pursue truth over any other concern, a society risks falling*
*into the abyss of ignorance.  Humans are not smart enough to*
*have ideas that lie beyond challenge and debate.  A*
*discriminatory-harassment policy that assumes the most popular*
*idea that least interferes with limits, deprives, or alters the*
*terms or conditions of education is the clearly correct one and*
*is plainly at odds with the First Amendment and our notion of*
*free speech.*

And he concludes that opinion by saying:  *A university*
*that turns itself into an asylum from controversy has ceased to*
*be 4 university; it has just become an asylum.*

When the State regulates along narrowly partisan
lines, that's what they do.  They put their thumb on the scale
of free debate and endorse 4 viewpoint that produces no other

1    effect in our society or no other effect in the classroom beyond

2    giving one side 4 greater voice and 4 greater ability to sort of

3    lend the cultural debate about the issues relating to race.

4              THE COURT:  Or as, I guess, Justice Jackson referred

5    to it:  *Compulsory unification of opinion achieves only the*

6    *unanimity of the graveyard*; right?

7              MR. WILKISON:  Yeah, exactly.

8              There is 4 reason that we have these precedents like

9    *Keyishian* warning us of casting a pall of orthodoxy over the

10   classroom.  And it's because when we go down this road, it's 4

11   hard road to come back from.  I mean, there's plenty of examples

12   in history.  The Court alluded to one about how Tiananmen Square

13   can be talked about in China.  We cited an example of Russia's

14   Administrative of Education.  One of the first things they did

15   after the Ukraine war was taught how that could be taught in

16   schools.

17             Taking 4 stance on 4 historical viewpoint, especially

18   one that is open to debate, is the first page in the autocrats

19   playbook.  The Supreme Court has recognized this very early on.

20   Our circuit's binding case law recognizes this.  And, in fact --

21             THE COURT:  I'm pretty sure, by the way, Russia didn't

22   define it as new ways to talk about the Ukrainian war since they

23   say it wasn't 4 war.

24             MR. WILKISON:  Right.  That's actually what that

25   policy is.  You can't call it an invasion.

1          THE COURT:  Setting aside from this, because I really

2     don't want this to become a policy debate between you and

3     Mr. Cooper and Mr. Ohlendorf, I understand both sides'

4     positions, and I've tried to ask you questions early on to point

5     out the danger of not allowing the State 4 say into what's

6     taught and how it's taught.

7          But, I mean, what would be helpful, to the extent you

8     want to focus on the balancing, I mean, and what's in the

9     record, that's more helpful than sort of the -- I understand

10    what's more fun is to talk about the big policy implications,

11    but that's not really what's before me.

12         So why don't you instead focus on what's the state of

13    the record, whose burden is it, when does it shift to the

14    defense for purposes of preliminary injunction in terms of the

15    balancing test and talking about the pedagogical interest and so

16    forth.  I think that's -- to the extent we get there -- and I

17    want to make plain, by asking these questions, I'm not

18    suggesting we get there.  I think it's -- should be abundantly

19    clear to anybody that's been in this courtroom, I have serious

20    reservations about standing based on the current state of the

21    record and this stage of the proceedings; namely, 4 preliminary

22    injunction.

23         But that would, quite frankly, be more helpful to me.

24         MR. WILKISON:  Sure.

25         THE COURT:  If I get to that, Judge, this is what the

1   state of the record is; this is why we should win, and this is

2   why the government would have to come forward with something,

3   and they didn't come forward with it, and that's why we'd win on

4   the merits applying the standard -- that's what I need to hear

5   from you, not sort of the big picture.

6           And I understand I'm the person that made the cutesy

7   comment about the ten points in China, although I couldn't

8   resist because it seems eerily similar to the terms and

9   structures that are being used here, but go ahead.

10          MR. WILKISON:  Sure.  I mean, take, for example,

11  Dr. Hodo.  She teaches several classes, one of them being this

12  60-minute instruction on implicit bias.  Her clients include

13  municipal organizations and law enforcement officials.  And I

14  know this isn't in one of her classes, but one of our

15  declarations says that in one training that was similar to the

16  one that she offers, 4 white police officer got up when 4 brief

17  video was played about the concept of implicit bias and said,

18  This is antiwhite BS.

19          And under the IFA's regime beginning next week, that

20  officer could have walked out the door and brought 4 lawsuit on

21  her own behalf against her employer.  Dr. Hodo would have been

22  called as 4 witness in that lawsuit, and her curriculum would

23  have been scrutinized.

24          And implicit bias is -- you know, the Court used the

25  example of global warming before -- is 4 pretty well-regarded

1    concept.  We've introduced the affidavits of Dr. Krop and

2    Dr. Dunbar who talk about it at length and cite studies.  This

3    is not something that's 4 fringe belief.  It's not something

4    that's 4 -- you know, even subject to much debate, at least in

5    terms of its existence.

6         Now, certainly scholars debate over whether -- you

7    know, what extent and what factors play 4 role.  I know the

8    defendants try to kind of sidestep that by saying that implicit

9    bias isn't really regulated because one of the provisions says

10   that you can only instruct that the inherent racism is 4 sole

11   factor based on race.  But the forbidden principles -- the eight

12   forbidden principles and the definitions in the Florida Civil

13   Rights Act don't have that word "solely."

14        It just says an individual by virtue of his or her

15   race, color, sex or national origin is inherently racist, sexist

16   or oppressive, whether consciously or unconsciously.  That is

17   just 4 restatement, somewhat inartfully, of what the implicit

18   bias theory is, at least in terms of the unconscious aspect of

19   it, is that we develop certain preferences that are not

20   conscious in our minds.

21        And what the recommendation of psychologists is is the

22   best way to deal with them is to confront them, and confronting

23   them is, as the kind of anecdote that Dr. Cheives gave in her

24   declaration -- is oftentimes not a pleasant experience and it

25   often gives rise to negative feelings.

1          I think you can go through most, if not all, of these

2     principles and kind of find out what ideas that the legislature

3     is really trying to regulate, even though they're worded in such

4     4 way to make them seem kind of inoffensive or uncontroversial,

5     and we try to do that in our paper in explaining all the

6     different ways this can regulate things.

7          But the -- I think the bigger harm here in terms of

8     the teacher's interest is that it really limits the ability to

9     have full and fair discussions.  Take, for example,

10    Dr. Cassanello's statement in his declarations that one of the

11    things he teaches in his Jim Crow class and the history of the

12    Civil Rights Movement is the negative impact that desegregation

13    had on Black people.

14         And that's not, you know, 4 comfortable thing to talk

15    about because, you know, *Brown v. Board of Education* is,

16    rightfully, 4 celebrated opinion.  It -- you know, it goes

17    against the narrative that this law is trying to push, that as

18    long as we have colorblind laws, everything's going to be okay,

19    you know.  Racism is going to be solved.

20         But what Dr. Cassanello's course teaches is that

21    that's not always the case.  For some people who experience

22    *Brown v. Board of Education*, it was a negative experience.  They

23    started out as teachers in school systems that were underfunded

24    compared to their White counterparts.  *Brown v. Board* hit and

25    then they were out of 4 job.

1          So there is -- an argument that naturally stems from

2    that is that maybe when we are addressing past inequities about

3    racism, we can't fight those inequities with race-neutral

4    policies.  We may need to employ race consciousness, and

5    certainly there's Supreme Court case law, like *Grutter v.*

6    *Bollinger*, that says that things like diversity can be a

7    compelling government interest in college admissions.

8          So there are legitimate areas of scholarship and many

9    legitimate viewpoints, or at least debatable viewpoints, that

10   each of these principles of individual freedom --

11          THE COURT:  Do I have to decide whether these are

12   legitimate viewpoints, or do I have to decide that the

13   plaintiff, for example, a teacher, has 4 -- is going to be able

14   to have 4 full-throated discussion of these without any

15   limitations based on the new law and balance whatever stated

16   interest there is in the new law versus that?  Is that --

17          MR. WILKISON:  Yeah, that's correct.  So, you know --

18   and I think -- I think the reason that I say they're legitimate,

19   you know, we argue and we put record evidence forward saying

20   they're legitimate theories is because that does have 4 bearing

21   on what the extent of the teachers' interest is.

22          And, in fact, if you look at a lot of the cases that

23   the defendants have been relying on, applying *Garcetti* to these

24   incidents, you know, I -- I've been told by judges who, you

25   know, when parties have committed the same issue that Judge

1    Merryday was accused of committing, that, If you're going to

2    cite persuasive authority to me, tell me why it's persuasive.

3    Tell me what the reasoning is that I should adopt.

4         And if you look at many of the cases the defendants

5    cite, if you look at the facts, the type of expression that was

6    being regulated was not something like this where we're diving

7    into whole fields of social studies and cutting it in half and

8    saying this viewpoint you can only express in an

9    objective-neutral fashion, but this viewpoint you can endorse.

10        They were much more often marginal things that were

11   incidental to the classroom speech, like in *Bishop v. Aranov*

12   where the issue in that case was 4 professor that was given 4

13   memo that said that you can't, essentially, teach creationism in

14   your biology class.  And I think that the Court has to look at

15   those details that -- what is the legitimacy of the interest

16   that the teachers are asserting --

17        THE COURT:  And Courts have said the legitimacy of the

18   interest depends on the legitimacy of the topic that they seek

19   to talk about?

20        MR. WILKISON:  Yeah.  And some Courts have gone that

21   route.  We cite a Southern District of Ohio case called -- I

22   think it's *Kerr v. Hurd* or something along those lines.  It's in

23   our reply brief.

24        THE COURT:  How does that work with ever-evolving

25   disciplines where -- I mean, it seems to me that we're saying

1  we're going to base it on -- it's frozen in time at that one

2  moment, that five years later it's rejected and so the outcome

3  of the exact same case would be different five years later based

4  on the evolution of academic thought?  Is that -- are we really

5  limiting what you can and cannot discuss based on vagaries of,

6  you know, how differing views and topics evolve?

7          MR. WILKISON:  No.  And when I say -- when I'm talking

8  about a legitimate interest, I'm not saying that that's

9  necessary.  I'm saying it's sufficient, and we have it here.

10         But what, you know, that Southern District case that I

11 was referring to said is that we have to be very careful about

12 what we label as an accepted theory, and I think the example

13 they used was the uses of leeches in medicine, how that fell out

14 of favor for 4 long time and then came back.

15         So that concern is part of the reason why the Court

16 needs to take 4 very deferential standard toward teacher

17 expression, because what might seem radical today may become the

18 orthodoxy of tomorrow.  So when we argue that these are accepted

19 theories, we're not by any means saying that that is 4 necessary

20 condition that, you know, we need to meet, but we do meet it,

21 and I think that does kind of weigh the scales in that balancing

22 test more favorably toward us than if we were dealing with 4

23 case that was, like, you know, the creationism where, you know,

24 it's possible that that could come back but is largely rejected

25 in the field that that person was teaching.

1          So the problem with orthodoxy is you don't realize

2    that you're in an orthodoxy until you step out of it, and when

3    we impose a part of orthodoxy over the classroom, the harm is

4    substantial and often unseen.  So I know we've had 4 lot of

5    discussions about, you know, was there 4 specific book you want

6    to read, is there 4 specific, you know, area that you want to

7    engage in and talk about that as sufficiency to confer standing.

8          The thing about open and fair debate that the First

9    Amendment protects is that the things that change our lives and

10   the things that change our viewpoints, we can't predict them.

11         THE COURT:  Mr. Wilkison, you're not going to -- and

12   I -- understand, I'm not going to force you to yield, and I want

13   to make plain I'm doing this in 4 soft-spoken sort of way.

14         You still don't recognize or agree that my analysis is

15   going to be different because the only student plaintiff is 4

16   kindergartener?

17         MR. WILKISON:  Well, I won't concede that it's -- I'm

18   not saying --

19         THE COURT:  You don't think that alters my analysis

20   for standing at all.

21         MR. WILKISON:  So I'm not saying it doesn't alter your

22   analysis for standing, but I'm not saying that it precludes as 4

23   finding of standing just because she can't articulate what

24   specific text that she would be exposed to.

25         I think it's sufficient in the context of the right to

1    receive information, much like the voter canvassing cases, to

2    say, I'm interested in this information, and I want to go to

3    school and have the opportunity to learn it, and I may ask

4    questions about it, and I'd like to have -- be in an environment

5    where the people who answer those questions aren't fearing for

6    their job because of a law like the IFA.

7              THE COURT:  I understand.

8              MR. WILKISON:  Your Honor, just to kind of sum up and

9    close, I think that ultimately what we're fighting over is that

10   whether these ideas take hold or not shouldn't be decided by the

11   Governor.  I think that the State may have some interest in

12   regulating curricular decisions, but it's got to prove up that

13   interest, and here we are facing what we would argue is

14   essentially an empty record on the side of the State justifying

15   their interest and having -- their briefs basically said that --

16   you know, admitted to engaging in viewpoint discrimination.

17             Their argument is not we're not viewpoint

18   discriminating.  It's we are viewpoint discriminating, and we

19   can.  And the binding case law in the Eleventh Circuit, even

20   applying their deferential standard, says that's not the case.

21             Justice Frankfurter, we quoted, called our teachers

22   the priests of our democracy because of the important role that

23   they play.

24             THE COURT:  I'm familiar with it.

25             MR. WILKISON:  And I don't think that -- he said it

1    wasn't hyperbole.  I don't think it's hyperbole, and I think

2    that, you know, laws like this really take away the tools that

3    teachers have to elevate our social consciousness, and if 4 law

4    like this was passed in 1964 or 1864, we'd be in trouble.

5            And, you know, like *Keyishian* said -- that was a case

6    dealing with the most pernicious of all ideologies that have

7    gained acceptance, is the forceful overthrow of government is

8    pretty serious, but the Court found that the countervailing

9    consideration posed 4 greater threat, and that is censorship,

10   because once the State imposes that dogma --

11           THE COURT:  The forceful overthrow of government is

12   now a commonly held view, right?  Sorry.  Go ahead.

13           MR. WILKISON:  Well, I don't think it's -- I don't

14   think it's commonly held in universities, but, you know, that

15   was 4 situation where the Court recognized that the State did

16   have 4 compelling interest, but nevertheless found that the laws

17   in question imposed 4 pall of orthodoxy and that that danger

18   outweighed the interest that the government had.

19           Here we have no compelling government interest and

20   substantial burdens on speech, and we believe that that inflicts

21   an irreparable injury and 4 concrete injury on all of our

22   plaintiffs.

23           THE COURT:  I understand.

24           Thank you.

25           MR. WILKISON:  Thank you.

1          THE COURT:  Mr. Ohlendorf, why don't we do this:  Why

2  don't we take -- we're not going to leave, take 4 break, but for

3  two minutes let's give the court reporter just 4 break, and you

4  can confer with your colleagues, and we'll get started in

5  just -- you don't have to talk to your colleagues, but we'll get

6  started in 4 couple of minutes.

7          (Recess taken at 1:57 PM.)

8          (Resumed at 2:03 PM.)

9          THE COURT:  Y'all keep your seats.  That's fine.

10          MR. OHLENDORF:  Judge Walker, before Mr. Cooper sort

11  of draws together our submissions on the Education Provision

12  Act, I just wanted to make three quick points on the substance

13  of the employment provisions of the act, responding to some of

14  the arguments from plaintiffs' most recent brief.

15          First of all, number one, Your Honor, we do believe

16  that the employment provision of the act regulates conduct and

17  not protected expression.  Plaintiffs' principal response to

18  this argument is that the conduct of requiring employees to

19  attend a training session in the workplace is inherently

20  expressive conduct.

21          We think that's plainly not correct, Your Honor.  And

22  the test that, for example, the *Rumsfeld v. FAIR* case has set

23  forward for sorting inherently expressive conduct from

24  nonexpressive conduct really asks whether 4 reasonable observer

25  who sees the conduct at issue and is not acquainted with any

1   expression accompanying the conduct would necessarily conclude
2   that the person engaging in the conduct was attempting to convey
3   some message thereby.  That's the case, obviously, with flag
4   burning, for example, or the cross burning.  But the *FAIR* case
5   held it's not the case with off-campus interviews for law school
6   students, because someone observing that conduct would not
7   conclude that the fact that the interviews are being held off
8   campus is meant to convey some message.
9          Here, too, we think someone who views a group of
10  employees being required to attend some kind of training session
11  wouldn't necessarily conclude that the employer is conveying
12  some message by requiring their attendance there.  Now, the
13  plaintiff suggests that, well, surely they must be conveying
14  some kind of generic message of support for what's being said at
15  the meeting, but I don't think an outside observer, 4 reasonable
16  observer would necessarily conclude that.  They might well
17  conclude that, for example, it's 4 safety training session
18  required by OSHA that the employer couldn't care less about,
19  except it doesn't want to get crosswise with its regulator.  Or
20  it could be 4 sexual harassment training that the employer
21  believes it has to require its employees to attend to avoid some
22  legal liability.  The fact that it's requiring their attendance
23  there doesn't mean it's not a hostile workplace.  It doesn't
24  mean it's necessarily expressing support for the messages that
25  are being conveyed there.

1          So because of these alternative explanations for the

2    conduct at issue, just as there were in the *FAIR* case, we think

3    it cannot be said to be inherently expressive.

4          Second point, we think that even if this does

5    implicate the First Amendment, it's justified by the Supreme

6    Court's captive audience case law.  The principal response of

7    the plaintiffs to that point is to argue that forcing employees

8    to attend 4 training session isn't sufficiently captive because

9    Florida is an at-work employment state.  I think that

10   misunderstands --

11          THE COURT:  You mean at will.

12          MR. OHLENDORF:  My apologies, Your Honor, an at-will

13   employment state.

14          I think the question here isn't whether an employee

15   has a right to keep their job.  The question, as the Supreme

16   Court's captive audience case puts it, is whether it's

17   impractical; it's impractical for an unwilling listener to avoid

18   the unwanted speech.

19          I think surely, of course, an employee could just quit

20   their job rather than hear the unwelcomed speech, just as 4

21   woman entering the clinic in *Hill v. Colorado* could have sought

22   to get an abortion at 4 different clinic, just as 4 commuter on

23   the master transit system in Shaker Heights could have found 4

24   different way to work.  It's certainly possible to avoid the

25   speech, but it's not practical to do so.  And we would submit to

1    you that that's the test.

2            The final point, Your Honor, if the Court does reach

3    scrutiny of the employment provisions and even strict scrutiny,

4    we do submit to you, Your Honor, that these provisions pass even

5    strict scrutiny, given not only the State's interest in

6    protecting vulnerable employees from being conscripted into 4

7    captive audience, but also its unquestionably compelling

8    interest in stamping out what it used to be, rational

9    discrimination and sex-based discrimination in the workplace.

10   That's the same interest that sustains Title VII's hostile

11   workplace claims, for example.  And we think any decisions

12   striking down the employment provisions of the IFA under strict

13   scrutiny would call into serious question whether hostile

14   environment claims could continue to go forward consistent with

15   the First Amendment under --

16           THE COURT:  You realize under Title VII, to be 4

17   hostile work environment it has to be severe and pervasive and

18   that even saying rude things or unpleasant things and even

19   saying rude things and disrespectful and gross things over and

20   over again, I would grant summary judgment.  So you understand

21   it's not 4 -- it's 4 less-than-perfect analogy, I would say, to

22   compare -- I don't like my employer talking about racial

23   disparity in the classroom is different than you having to

24   repeatedly sexually assault an employee for it to rise to the

25   level of sexual harassment under Title VII.

1          MR. OHLENDORF:  I'm certainly not equating the two

2    sets of conduct, Your Honor.  What I'm suggesting to you is the

3    State's interest at stake, the State's interest that's being

4    asserted, is the same.  And even in the most egregious Title VII

5    cases, for example, the --

6          THE COURT:  It's not the most egregious.  It has to be

7    egregious in order to be 4 hostile work environment under the

8    law as applied by every federal court that I'm aware of.

9          MR. OHLENDORF:  To be sure, Your Honor.  And my only

10   response to you --

11         THE COURT:  It's not determinative of the issue.

12   Let's move on.  I just couldn't let that pass because I don't

13   see how some hyper -- I'm not sure how we equate the most

14   hypersensitive snowflakes in our society that don't want to sit

15   in 4 training session with somebody who's being violated

16   sexually at work.  It's just an odd --

17         MR. OHLENDORF:  Your Honor --

18         THE COURT:  -- comparison.

19         MR. OHLENDORF:  Your Honor, I don't think I've said

20   anything that equates those two situations.  I apologize if I

21   gave that impression.

22         But here are two things that are similar about the two

23   contexts:

24         Number one, the State's interest being asserted is the

25   same.  You may not believe it's implicated to the same extent,

1    but it is the same interest.

2            Number two, the conduct that's being complained of,

3    the workplace conduct, is in both cases protected by the First

4    Amendment.  Even, again, in the most egregious Title VII cases,

5    based on hostile environment we're talking about pernicious --

6    pernicious visual displays or pernicious audible --

7            THE COURT:  Severe and pervasive is the legal

8    standard, but go ahead.

9            MR. OHLENDORF:  Yes, Your Honor.

10           That is protected by the First Amendment.  And so my

11   only point to you, Your Honor, is that any decision holding that

12   the State does not have 4 sufficient interest in stamping out

13   sex-based and race-based discrimination in the workplace would

14   call that line of cases into question at the least, Your Honor.

15           THE COURT:  Thank you.

16           Mr. Cooper?

17           MR. COOPER:  Thank you, again, Judge Walker.  Charles

18   Cooper for the defendants.

19           Your Honor, before I go to Plan B --

20           THE COURT:  Let me give you some guidance, and I

21   should have done the same thing with Mr. Ohlendorf, because, by

22   the way, I understand the point you were making.  My concern is

23   that if I say nothing and somebody gets 4 copy of this

24   transcript in one of my Title VII cases and suggests somehow I

25   agreed or that -- with 4 particular proposition, so I --

1          MR. COOPER:  Understand.

2          THE COURT:  In fairness to you, it was less about what

3     you were saying, Mr. Ohlendorf, in this case and more about

4     reading it in another case, which happens with some frequency.

5          Mr. Cooper, I'm not -- I want to give you some

6     guidance.  I want you to be able to put whatever y'all want on

7     the record, if you feel the need it's not adequately briefed, if

8     the plaintiffs appeal the denial of 4 preliminary injunction.

9     But I have grave concerns about there being standing required

10    for me to issue 4 preliminary injunction, but I also am not

11    going to artificially cut you or Mr. Ohlendorf off, because he

12    can also come back if there is something that -- Well, Judge,

13    if -- we don't think we'd lose, but if the Eleventh Circuit

14    decided that you were wrong on standing, they might go on to the

15    rest of the analysis, and we didn't get to make these two points

16    that aren't covered in our written papers.

17         So I ordinarily don't do this, but I also want to make

18    sure you know who your audience is because I am not, for

19    purposes of the preliminary injunction, going to reach the

20    merits.

21         MR. COOPER:  Your Honor, I will subside.

22         THE COURT:  And I'm not telling you you can't.  I

23    just --

24         MR. COOPER:  No, no, no.

25         THE COURT:  If you want to confer with your colleagues

 1   again -- if there is something that you want to make sure that

 2   you add to the record, I wanted you to have the opportunity to

 3   do that knowing who your audience would be and for what purpose,

 4   but -- we may revisit these issues later in this case, but for

 5   my purposes today -- and I should have, quite frankly, done that

 6   with Mr. Ohlendorf because I was having an exchange with him and

 7   thinking to myself we're really talking about how many angels

 8   fit on the head of 4 pin, because it's really not essential to

 9   what I'm going to do.

10        So I could have done that with him and I thought I --

11   because it would be largely academic for you and I to have the

12   further exchange.

13        MR. COOPER:  And, Your Honor, I've been at this 4 long

14   time, and I know when to sit down, and so I'm going to sit down.

15        Thank you.

16        THE COURT:  And, Mr. Ohlendorf, apologies.  I could

17   have done that before, and I thought about doing it.  And I'm

18   also conscious that we've gone way over today.

19        I'm going to get an order out 4 lot less quickly on

20   the motion to dismiss.  I'm going to get an order out quickly on

21   the preliminary injunction.  We need to set the hearing in 4

22   timely way, and I need to rule on it so either side has the

23   ability to appeal.

24        I am not going to get into the weeds on the merits.

25   I've indicated -- the reason why we had such 4 vigorous

1   discussion this morning, Mr. Wilkison, is I had reservations

2   about standing based on the state of the record and what the

3   burden is, not for 4 motion to dismiss, but for 4 preliminary

4   injunction.  And I wanted -- quite frankly, we didn't even have

5   to have the hearing since there was no evidence and it's fully

6   briefed, but I wanted to make sure that you had a chance to

7   address all my concerns.

8          And both sides have done an admirable job of

9   presenting their positions in that regard, but I also want to be

10  respectful of everyone's time and recognize that the issues on

11  the merits are going to -- would be decided at 4 different stage

12  by this Court.  And I didn't want to get too far in the weeds

13  with either side, but I also wanted both sides to be able to

14  fully make their record for purposes of any -- appeal of any --

15  either grant or denial of 4 preliminary injunction.

16         Mr. Wilkison, anything else you have to add?

17         MR. WILKISON:  No, Your Honor.

18         THE COURT:  All right.  Well, I'm going to -- I'll get

19  the order on the preliminary injunction out in 4 couple of days.

20  I'm not going to give you an exact deadline because I have other

21  obligations and other cases, but I also do realize that we set

22  this -- I know there's some judges that would say, Okay, the law

23  is going into effect, but school doesn't start until the fall

24  and there's other issues and might not have moved it as quickly.

25  But I think I'm obligated to move -- put these cases on 4 quick

```
 1    timeline, and I do that for 4 reason.  And it makes your life

 2    harder.  Quite frankly, it makes my life harder, but I do that

 3    for 4 reason.

 4          So I'll try to get out an order quickly.  It's not

 5    going to be a tome on standing, but what I am going to do is

 6    make plain what my concerns are and why I find no standing.

 7    I'll do it in such 4 way so it will be clear what I find so that

 8    both -- certainly you can challenge my ruling if you deem that

 9    appropriate.

10          It may then take me 4 little bit longer to get the

11    order out on the motion to dismiss.  Quite frankly, I've got to

12    circle back and look at my calendar what's coming up in the next

13    two weeks to kind of know what time I have.

14          Again, I thank everybody for their presentation and

15    hard work.  And I hope that counsel understands that when I ask

16    questions vigorously, it's in the spirit of making sure I

17    understand what each side's position is, probing the contours of

18    arguments and the weaknesses.  It's not meant to be difficult or

19    unpleasant.

20          Quite frankly, it would be much easier for me to come

21    into these hearings and sit and stare at you, which I've had

22    judges do to me, and you have no idea what the judge's concerns

23    are, what they're thinking, or what the ultimate order will look

24    like.  So you basically can just repeat what's in your papers,

25    and it's 4 meaningless exercise.  It's harder to do it this way.
```

1    I know it's harder on y'all, but, quite frankly, it's also

2    harder on me.  It would be 4 lot easier just to sit and stare at

3    the gallery and say nothing, but I think that would make this 4

4    meaningless exercise.  So that's why I did what I did today, and

5    I thank you for your patience with me.

6           This wasn't as challenging as some of my preliminary

7    injunction hearings in terms of the questioning, but I know it

8    probably feels 4 little bit like you were back in law school

9    when you get questioned vigorously from the bench.

10          But, anyway, I thank you for your patience.  I hope

11   everyone has 4 safe journey home, whether it's 4 short distance

12   or a long distance.

13          Court is in recess.

14     (Proceedings concluded at 2:18 PM on Tuesday, June 21,

15   2022.)

16                        * * * * * * * *

17          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
18   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy is noted within the
19   transcript.

20

21   /s/ Megan A. Hague                    6/21/2022

22   Megan A. Hague, RPR, FCRR, CSR            Date
     Official U.S. Court Reporter

23

24

25