IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DONALD FALLS, et al.,

        *Plaintiffs*,

v.                          Case No.  4:22cv166-MW/MJF

RON DESANTIS, in his official
capacity as Governor of Florida,
et al.,

        *Defendants*.

_____/

## ORDER DENYING PRELIMINARY INJUNCTION IN PART

In this case, two K-12 teachers, a college professor, a diversity and inclusion consultant, and a soon-to-be kindergartener challenge a Florida Department of Education regulation and several recently amended statutes. Each challenged provision, they argue, violates their First and Fourteenth Amendment rights. Plaintiffs have moved for a preliminary injunction barring Defendants from enforcing the provisions. Opposing that motion, Defendants argue that Plaintiffs lack standing to sue and that—even if Plaintiffs had standing—the provisions at issue comply with the Constitution. Because, excepting the college professor, Plaintiffs

have not met their burden to establish standing to pursue preliminary injunctive relief, their motion for a preliminary injunction is **DENIED in part**.[1]

I

A

In 2019, the *New York Times* published the *1619 Project*. The article's title refers to the year the Dutch ship *White Lion* arrived in Virginia—carrying the first enslaved Africans to arrive in England's North American colonies. The project's "central idea" is that the *White Lion*'s 1619 arrival "could, in a sense, be considered [the United States'] origin." Jake Silverstein, *The 1619 Project and the Long Battle Over U.S. History*, N.Y. Times (Nov. 12, 2021), https://tinyurl.com/3ybdy853.

That central idea has proven controversial. *See, e.g.*, ECF No. 41-1. Responding to conservative criticism of the *1619 Project*, in June 2021, the Florida Department of Education promulgated the first provision at issue. It provides that instruction on historical events "must be factual and objective." Fla. Admin. Code R. 6A-1.094121 (2021). The regulation also provides examples of instruction that violate this objectivity requirement: "denial or minimization of the Holocaust, and the teaching of Critical Race Theory." *Id.* Finally, the regulation dictates that

---

[1] After the hearing on their motion, Plaintiffs submitted supplemental authority regarding Plaintiff Cassanello—a professor at UCF. Based on that supplemental authority, this Court ordered the parties to submit additional briefing as to Plaintiff Cassanello. Accordingly, this Court reserves ruling on Plaintiffs' motion as to Dr. Cassanello.

"[i]nstruction may not utilize material from the 1619 Project and may not define American history as something other than the creation of a new nation based largely on universal principles stated in the Declaration of Independence." *Id.*

Building on this regulation, in December 2021, Governor DeSantis announced the introduction of new legislation. That legislation became the Individual Freedom Act (IFA). Introduced in January 2022, the IFA amends several statutes governing education in Florida. Three amendments are relevant here.

*First*, all K-12 instruction in Florida "must be consistent with" six "principles of individual freedom":

> (a) No person is inherently racist, sexist, or oppressive, whether consciously or unconsciously, solely by virtue of his or her race or sex.
> (b) No race is inherently superior to another race.
> (c) No person should be discriminated against or receive adverse treatment solely or partly on the basis of race, color, national origin, religion, disability, or sex.
> (d) Meritocracy or traits such as a hard work ethic are not racist but fundamental to the right to pursue happiness and be rewarded for industry.
> (e) A person, by virtue of his or her race or sex, does not bear responsibility for actions committed in the past by other members of the same race or sex.
> (f) A person should not be instructed that he or she must feel guilt, anguish, or other forms of psychological distress for actions, in which he or she played no part, committed in the past by other members of the same race or sex.

Ch. 2022-72, § 3, at 11–12, Laws of Fla. (amending § 1003.42, Fla. Stat.).[2] While teachers can still address, "in an age-appropriate manner, how the freedoms of persons have been infringed by sexism, slavery, racial oppression, racial segregation, and racial discrimination," any such instruction "may not be used to indoctrinate or persuade students to a particular point of view inconsistent with the principles of this subsection or state academic standards." *Id.*

*Second*, the IFA amends the Florida Education Equity Act (FEEA), which prohibits discrimination in public education. Besides replacing the word "gender" with the word "sex,"[3] the IFA amends the FEEA to add a provision much like the six principles set out above:

> It shall constitute discrimination on the basis of race, color, national origin, or sex under this section to subject any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:
> 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

---

[2] Other provisions require K-12 instruction on "[l]ife skills that build confidence, support mental and emotional health, and enable students to overcome challenges." Ch. 2022-72, § 3, at 9, Laws of Fla. But any "[h]ealth education and life skills instruction and materials may not contradict the [six] principles enumerated" above. *Id.* § 3, at 10.

[3] The Legislature, however, left in place the provision allowing public schools and Florida College System institutions to "provide separate toilet, locker room, and shower facilities on the basis of *gender*," even though "such facilities shall be comparable to such facilities provided for students of the other *sex*." Ch. 2022-72, § 2 at 5, Laws of Fla. (emphases added). For the purposes of this Order, this Court need not speculate whether the Florida Legislature intended any particular nuance in differentiating between sex and gender in public school toilet, locker room, and shower facilities.

4

2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

*Id.* § 2, at 5–6 (amending §§ 1000.05, Fla. Stat.). As with the curricular provisions, this provision also contains a carve-out, stating that the foregoing "may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." *Id.* § 2, at 6.

The FEEA applies to all K-20 public education in Florida. *See* § 1000.05(2)(a), Fla. Stat. Though no Florida court has confronted the issue, the

FEEA, together with the IFA's amendment to the FEEA's definition of "discrimination," appear to authorize suits against K-20 educational institutions—but not individual teachers—if institutions allow teachers to "espouse[], promote[], advance[], inculcate[], or compel[] . . . [a] student or employee to believe any of the [prohibited] concepts."[4] Ch. 2022-72, § 2, at 5, Laws of Fla.

*Third*, and finally, the IFA amends the Florida Civil Rights Act by expanding the definition of "unlawful employment practice" to include requiring training inconsistent with the principles above:

> Subjecting any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination, to training, instruction, or any other required activity that espouses, promotes, advances, inculcates, or compels such individual to believe any of the following concepts constitutes discrimination based on race, color, sex, or national origin under this section:
> 1. Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.
> 2. An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
> 3. An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin.
> 4. Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

---

[4] Any "person aggrieved by a violation" of the FEEA "has a right of action for such equitable relief as the court may determine." § 1000.05(8), Fla. Stat. The FEEA is patterned after the federal Title IX. *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1286 (11th Cir. 2003). And Title IX suits are only available against institutions. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1169–70 (11th Cir. 2003). While this Court does not definitively rule on this unsettled issue of Florida law, it seems unlikely that the FEEA authorizes suits against private individuals, such as the teacher Plaintiffs in this action.

5. An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, sex, or national origin.

6. An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. An individual, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the individual played no part, committed in the past by other members of the same race, color, sex, or national origin.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

*Id.* § 1, at 2–3 (amending § 760.10, Fla. Stat.). Once again, the IFA permits trainings "provided such training or instruction is given in an objective manner without endorsement of the concepts" articulated above. *Id.* § 1, at 3. Thus, when a private employer in Florida holds a mandatory training inconsistent with the principles above, an employee forced to attend may sue the employer under the Florida Civil Rights Act.[5] The Governor signed the IFA on April 22, 2022, and the Act will take effect on July 1, 2022. *Id.* § 8, at 15.

B

The same day the Governor signed the IFA, Plaintiffs filed suit. ECF No. 1. Plaintiffs are a diverse group of persons regulated by the IFA. Plaintiff Donald Falls

---

[5] The Florida Civil Rights Act also permits the Attorney General to commence civil actions for violations under certain enumerated circumstances. § 760.021, Fla. Stat.

teaches American government and economics at a high school in Manatee County. *Id.* ¶ 4. Plaintiff Jill Harper is a substitute teacher for the Leon County public school system who teaches "all subjects and grade levels." *Id.* ¶ 5. Plaintiff Dr. Robert Cassanello is an associate history professor at the University of Central Florida. *Id.* ¶ 6. Dr. Cassanello teaches classes on the Civil Rights Movement, Jim Crow, Emancipation, and the Reconstruction Era. *Id.* Plaintiff RMJ is a minor who will begin kindergarten at a Nassau County public school in August 2022. *Id.* ¶ 7. Finally, Plaintiff Dr. Tammy Hodo is the president of All Things Diverse, "a consulting firm [that] provides training to clients . . . . [on] race & ethnicity, implicit bias training, microaggressions, institutional racism, anti-racism work, and critical race theory." *Id.* ¶ 8.

Defendants are Governor DeSantis, the members of the Florida State Board of Education, the members of the Florida Board of Governors of the State University System, Florida Education Commissioner Manny Diaz Jr.,[6] and Florida Attorney General Ashley Moody—all in their official capacity. *Id.* ¶¶ 9–13.

Plaintiffs argue that the Florida Department of Education's regulation and the IFA violate their First and Fourteenth Amendment rights. Plaintiffs Falls, Harper,

---

[6] Plaintiffs originally filed suit against then-education commissioner Richard Corcoran. Because Commissioner Diaz has replaced Commissioner Corcoran, he is automatically substituted as a party under Federal Rule of Civil Procedure 25(d).

and Cassanello claim that the challenged provisions violate their right to free expression and academic freedom (Count I). *Id.* ¶¶ 57–61. Plaintiff RMJ claims that the challenged provisions violate her right to access information (Count II). *Id.* ¶¶ 62–66. Plaintiff Hodo claims that the IFA violates employers' right to freedom of expression (Count III). *Id.* ¶¶ 67–71. Finally, all Plaintiffs claim that the challenged provisions are impermissibly vague (Count IV). *Id.* ¶¶ 72–78.

The same day they filed their complaint, Plaintiffs also filed a motion for preliminary injunction, asking this Court to enjoin the challenged provisions before the IFA goes into effect. ECF No. 4. Defendants responded in opposition. Defendants also moved to dismiss for lack of jurisdiction and, in the alternative, for failure to state a claim. ECF No. 42.[7] After receiving extensive evidence and briefing, this Court held a hearing on Plaintiffs' motion on June 21, 2022. On the record at that hearing, this Court denied Plaintiffs' motion because it found that Plaintiffs were unlikely to establish standing. This Order elaborates on that ruling.

II

A

A district court may grant a preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable

---

[7] This Court will address Defendants' motion to dismiss by separate order. Still, this Court necessarily discusses some arguments set out in Defendants' motion here.

injury "unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although a "preliminary injunction is an extraordinary and drastic remedy," it should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). No one factor, however, is controlling; this Court must consider the factors jointly, and a strong showing on one factor may compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Finally, "[a]lthough the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)). Applying this standard, this Court first considers whether Plaintiffs have established a likelihood of success on the merits.

B

This Court begins—and ends—with whether Plaintiffs have shown a substantial likelihood of success on the merits. This Court addresses this factor first because, typically, if a plaintiff cannot "establish a likelihood of success on the

10

merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). Relevant here, the "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that [a] plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting).

Over time, the Supreme Court has developed a three-part test for determining when standing exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, "a plaintiff cannot 'rest on such mere allegations, [as would be appropriate at the pleading stage] but must set forth by affidavit or other evidence specific facts, which for purposes of the summary

judgment motion will be taken to be true.' " *Cacchillo*, 638 F.3d at 404 (quoting *Lujan*, 504 U.S. at 561) (some alteration in original).[8]

For standing purposes, Plaintiffs can be divided into three rough categories: teachers, students, and employers. This Court addresses each category in turn.

1

This Court begins with the teachers, Plaintiffs Falls and Harper. Although Defendants attack the teachers' standing on all three standing prongs, because this Court finds that the teachers have not shown how their injury is traceable to the Defendant Board of Education,[9] or how an injunction against the Board can redress their injury, this Court assumes injury and addresses only those factors.

Traceability and redressability are interrelated concepts. *See Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). On the one hand, traceability requires a showing that Plaintiffs' "injuries are connected with" Defendants' conduct. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). In other words, Plaintiffs must show that their injury is "fairly traceable to the

---

[8] At the hearing, Plaintiffs conceded they bear this burden. *See* Tr. at 18 (conceding that "[i]t's a higher bar in the sense of the quantum of evidence necessary to show it. It needs to go beyond mere allegations").

[9] Setting Governor DeSantis aside, all agree that Plaintiffs Falls and Harper can proceed only against the Florida State Board of Education.

challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

On the other hand, redressability "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis removed). A "substantial likelihood" of redressability will satisfy this prong. *Duke Power*, 438 U.S. at 79. And Plaintiffs' redress need not be total. *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018); *see also I.L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014). But it must be "the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury." *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (quoting *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)).

In sum, "where, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals*, 8 F.4th at 1201.

Accepting for the purpose of argument that Plaintiffs are suffering an injury in fact—chilled speech—the question is how that injury is traceable to the Board of Education and redressable by an order against it. Responding to that question,

Plaintiffs ask this Court to enter an injunction stating that the Board "[s]hall not enforce the provisions of the IFA in a conforming bill restricting . . . performance funding for [K-12 institutions] and shall not implement the IFA and its regulations regarding [K-12 institutions] in regulating classroom instruction." Tr. at 85–86.

Plaintiffs' logic goes like this: pursuant to its statutory authority, the Board of Education will withhold funding from the teachers' school districts if they violate the challenged provisions. *See* § 1008.32(4)(b), Fla. Stat. (providing that the Board of Education may [w]ithhold the transfer of state funds, discretionary grant funds, discretionary lottery funds, or any other funds specified as eligible for this purpose by the Legislature until the . . . school district . . . complies with the law or state board rule"). In turn, members of the schoolboard will withhold money from the teachers' individual schools—or, perhaps, put pressure on officials at those schools to discipline the teachers. In other words, the teachers' theory of traceability and redressability flows from the Board to the school district, from the school district to the teachers' school, and—only then—to the teachers. Thus, Plaintiffs' argument requires the Court to stack multiple layers of inferences.

Favorable inferences may sustain Plaintiffs' theory at the more-forgiving motion-to-dismiss stage. Without further factual support, however, Plaintiffs' theory simply requires too many inferential leaps to demonstrate standing at the preliminary injunction stage. *See Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to

14

merely speculative, that the injury will be redressed by a favorable decision." (internal quotation marks omitted)). Accordingly, the Plaintiff teachers—Falls and Harper—have not shown that they are likely to establish standing.[10]

2

Next, this Court addresses RMJ's standing. Defendants argue that it is not plausible, and thus this Court cannot infer, that the regulation or IFA will deny RMJ access to any information.

To start, this Court notes that other right-to-access cases specifically identified the material the plaintiff could not access.[11] Here, however, Plaintiffs concede that

---

[10] At the hearing, Plaintiffs suggested that section 760.07, Florida Statutes, may be relevant to the teachers' standing. It provides that "[a]ny violation of any Florida statute that makes unlawful discrimination because of race, color, religion, gender, pregnancy, national origin, age, handicap, or marital status in the areas of education, employment, or public accommodations gives rise to a cause of action for all relief and damages described in s. 760.11(5)." § 760.07, Fla. Stat. Plaintiffs say section 760.07 exposes the teacher Plaintiffs to private capacity suits for violating the FEEA. *See* Tr. at 73–74. Whether that is so is far from clear. It is also unclear whether Defendant Moody may bring enforcement actions under section 760.07. Given that Plaintiffs first raised this statute at the hearing, and that so many questions about its applicability remain unanswered, this Court finds that section 760.07 does not help Plaintiffs establish a substantial likelihood of standing.

[11] *See Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) (the challenged law "directly led to the elimination of" a Mexican American studies program); *Virgil v. Sch. Bd. of Columbia Cnty. Fla.*, 862 F.2d 1517 (11th Cir. 1989) (the Columbia County School board removed a textbook—*The Humanities: Cultural Roots and Continuities* Volume I—from its curriculum); *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771 (8th Cir. 1982) (based on complaints from a group of parents, the Forest Lake school board voted to remove a film adaptation of the short story *The Lottery*); *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300 (7th Cir. 1980) (school board and various employees removed the textbook *Values Clarification* from school grounds, banned the use of *Growing up Female in America*, *Go Ask Alice*, *The Bell Jar*, and *The Stepford Wives* in a "Women in Literature" course, required teachers to excise certain portions of the book *Student Critic*, and permanently removed *Go Ask Alice* from the school library); *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) (the Texas State Board of Education rejected an environmental science

they have not identified *any* specific material that the challenged provisions deny RMJ access to. *See* Tr. at 20. Of course, that is not to say that Plaintiffs *must* identify specific material. As this Court pointed out on the record, if, for example, Florida banned instruction on math in all K-12 institutions, this Court could safely assume that RMJ would be denied access to information. Likewise, if RMJ was about to enroll in an AP United States history course, this Court might be able to infer that the IFA would deny RMJ access to information.

The problem here is that RMJ is not about to take AP United States history; RMJ is about to start kindergarten. Far from discussing this Nation's fraught racial history, kindergartners, Defendants say, are "learning letters and numbers, trying not to sleep during nap time, and developing basic social skills." *See* ECF No. 42-1 at 24. True, kindergarteners learn far more than Defendants suggest; Florida's kindergarten curriculum includes various topics that could stimulate discussions on race. *See* ECF No. 35-1 at 56. *Maybe* these topics *could* trigger a discussion that would violate the IFA or Board regulations. But it is simply not reasonable to infer—based on the record before this Court—that kindergartners are learning about

---

textbook because it acknowledged the oil and gas industries' role in causing environmental problems); *Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) (based on complaints from a conservative parents' group, the school district removed *Slaughterhouse-Five*, *The Naked Ape*, *Down These Mean Streets*, *Best Short Stories of Negro Writers*, *Go Ask Alice*, *Laughing Boy*, *Black Boy*, *A Hero Ain't Nothin' But a Sandwich*, and *Soul on Ice* from the school library); *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 2009) (Miami-Dade School Board removed ¡*Vamos a Cuba!* from its library because it discussed life in Cuba without mentioning the totalitarian brutality of the Castro regime).

redlining, Red Shirts, or redeemers. Accordingly, Plaintiffs have not met their burden to show that the challenged provisions injure RMJ.[12]

This conclusion does not, as Plaintiffs suggest, put them in an impossible position. *See* Tr. at 22, 37 (claiming that, regarding the right to receive information, "you can't know what you don't know"). The regulation Plaintiffs challenge has been in place for a year. Plaintiffs could have introduced an affidavit from a Nassau County kindergarten teacher explaining what information they can no longer teach or what classroom discussions they now avoid to not run afoul of the challenged provisions.[13] The same goes for the IFA. Plaintiffs could have introduced an affidavit from a school official, teacher, or employee explaining what materials they anticipate removing from the kindergarten curriculum. Plaintiffs have not done so, and thus have not carried their burden as to RMJ.

---

[12] Plaintiffs argue that *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610 (1976), supports their augment that RMJ has standing. But *Oradell* supports RMJ's standing to raise a *vagueness* claim, not an access-to-information claim. *See Arce*, 793 F.3d at 987 (citing *Hynes* and holding that students had standing to raise a vagueness claim to a statute that did not apply to them but inhibited their right to receive information). But "standing is not dispensed in gross," and *Hynes* thus does not explain how RMJ has standing to assert a right-to-access claim. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). And even as to vagueness, RMJ has the same problem. Assuming the challenged provisions are unconstitutionally vague, she has not shown that kindergarten teachers would offer certain information to their classes absent the allegedly vague provisions.

[13] Indeed, the challenged regulation explicitly bans instruction on the *1619 Project*— Plaintiffs could have provided an affidavit from a kindergarten teacher setting out what materials adapted from the *1619 Project* for kindergarten instruction are no longer used in school.

3

Finally, this Court turns to employer standing. The complications are immediately apparent; namely, Plaintiff Hodo is not an employer under the Florida Civil Rights Act. *See* Tr. at 55 (conceding that Dr. Hodo is not an employer as defined by law). Still, Plaintiffs argue that Dr. Hodo has standing under two theories: (1) that she has *jus tertii*, or third-party, standing to assert the rights of the employers who would otherwise hire her, and (2) that she, herself, is harmed by the IFA because employers will no longer hire her. This Court addresses each theory in turn, beginning with third-party standing.

Generally, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This rule, however, is not absolute. A party may assert the rights of others when they have (1) a " 'close' relationship with the person who possesses the right," and (2) "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). When, as here, the First Amendment is implicated, the Supreme Court has applied these requirements far more leniently. *Id.* Even applying a lenient standard, however, Dr. Hodo falls short.

*First*, Dr. Hodo seeks to assert the rights of potential future clients. This relationship—consultant-employer—is not sufficiently "close." Indeed, in *Tesmer*,

the Court held that attorneys do not have a "close relationship" with potential clients. *Id.* at 131. As sacrosanct as the attorney-client relationship is, if attorneys do not have a close relationship with potential clients, this Court cannot say that inclusivity consultants have a close relationship with their potential clients.

*Second*, employers are not hindered in raising their First Amendment rights on their own. While Plaintiffs argue that employers cannot assert their own First Amendment rights, that is simply not so. Plaintiffs argue that any speech made during an inclusivity training is Dr. Hodo's speech, not an employer's speech. Thus, they say, employers' rights are not implicated. So an employer cannot bring their own suit challenging the IFA.[14] This Court does not see it that way. Companies are legally—but not literally—persons. Employers thus cannot speak *except* through their agents, whether they be employees or hired inclusivity consultants. In other words, when an employer *specifically hires* Dr. Hodo to speak, that speech is the employer's speech. When the state restricts that speech, employers can challenge that restriction. Indeed, a private employer—Honeyfund.com, Inc.—has filed just such an action in this Court. *See* ECF No. 1, *in* Case No. 4:22cv227. The second

---

[14] On this score, Plaintiffs' argument is also somewhat circular. That is, Plaintiffs argue that Dr. Hodo must raise employers' speech rights for them because the employers cannot raise them themselves. And that the employers cannot raise their speech rights themselves because *Dr. Hodo's* speech rights are actually at issue.

prong thus also weighs against third-party standing. So Dr. Hodo cannot proceed under a third-party standing theory.

This Court next turns to Dr. Hodo's direct injury theory. Dr. Hodo argues the following: (a) the IFA effectively bars employers from having mandatory inclusivity trainings, (b) if employers cannot force their employees to attend trainings, they will conclude that the trainings are not worth the cost, and (c), having so concluded, employers will not hire Dr. Hodo.

With a theory such as this, "where a causal relation between injury and challenged action depends upon the decision of an independent third party . . . , standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (cleaned up). And Dr. Hodo does not offer much.

Here's what is before this Court. Dr. Hodo's affidavit attests that inclusivity training is important, empirically supported, praised by clients, and contrary to the IFA's tenets. ECF No. 30-4 ¶¶ 3–13. All that may be true, but it does not establish Dr. Hodo's injury. Dr. Hodo also describes an executive order issued by former-President Donald Trump, banning all inclusivity training in the federal government. *Id.* ¶ 14. This cost Dr. Hodo a contract with a VA center in Georgia. *Id.* Further, Dr. Hodo asserts that the IFA "will have the same negative economic effect" on her business. *Id.* In a second declaration, Dr. Hodo seeks to rebut criticism of work she

has done at the "Douglas Anderson School of the Arts," which, she says, "has been mischaracterized by several newspaper articles upon which the Defendants in this case are relying." ECF No. 49-2 ¶ 3. Nowhere in this seven-page affidavit does Dr. Hodo discuss the impact the IFA has had on her business.

This is simply not enough. Dr. Hodo does not claim that she has lost clients, that clients have told her they will no longer hire her, or that clients have even expressed trepidation about hiring her. The only evidence before this Court is that a more restrictive federal regulation cost her business *in Georgia*. This Court cannot reasonably infer that Dr. Hodo has lost or will lose business because of the IFA based solely on a prior federal ban that injured her in a different state. Dr. Hodo has simply not carried her "more difficult" burden to establish an injury-in-fact under her direct injury theory. *California*, 141 S. Ct. at 2117.

### III

In sum, this Court determines that Plaintiffs are not entitled to a preliminary injunction because they have not shown that they are likely to establish standing. With that said, a word is in order about what this Court is *not* determining.

For one, this Court is not determining whether this case can move forward. An inability to establish a substantial likelihood of constitutional standing, in a motion for preliminary injunction, requires denial of the motion, not dismissal of the case. *See Waskul*, 900 F.3d at 256. This Court will determine later—when it rules on

Defendants' motion to dismiss—whether this case can proceed. Plus, this Court is not determining whether the challenged regulations are constitutional, morally correct, or good policy. And this Order *should not* be interpreted as endorsing the IFA or the related Board of Education regulation.

Finally, at the motion hearing, this Court heard extensive debate about academic freedom and whether the Constitution protects discussions in a public classroom from total government control. Much ink has already been spilled over such weighty questions. This Court recognizes, however, that these questions are not purely academic. Their answers have very real consequences for students, teachers, parents—indeed, for all Floridians. For those who applaud state suppression of ideas that the government finds displeasing—such as the *1619 Project*—this Court offers the following observation, made by Justice Jackson over half-a-century ago:

> As governmental pressure toward unity becomes greater, so strife becomes more bitter as to whose unity it shall be. Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943).

For the above reasons,

**IT IS ORDERED**:

1. Plaintiffs' motion for a preliminary injunction, ECF No. 4, is **DENIED in part** as to Plaintiffs Falls, Harper, RMJ, and Hodo.

2. This Court reserves ruling as to Plaintiff Cassanello pending additional briefing.

**SO ORDERED on June 27, 2022.**

**s/Mark E. Walker** _____
**Chief United States District Judge**
