## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DONALD FALLS,** et. al.

    **Plaintiffs,**

**vs.**                                                        **Case No.:  4:22-cv-00166**

**RON DESANTIS,** in his official
capacity as Governor of Florida, et. al.

    **Defendants.**

_____

## PLAINTIFF ROBERT CASSANELLO'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Robert Cassanello, by and through undersigned counsel and pursuant to this Court's Order entered June 24, 2022 (Doc. 61), hereby files this supplemental brief on the issue of his standing to sue the Florida Board of Governors (FBOG). In support thereof, Dr. Cassanello states as follows:

## I.      Introduction

On June 23, 2022, Dr. Cassanello filed a notice of supplemental authority regarding draft regulations circulated by the Florida Board of Governors implementing the IFA to Florida's University system. (Doc. 59). Defendants then filed a response. (Doc. 60). The Court ordered the Parties to file additional briefing addressing how—assuming the Board votes in favor—the proposed regulations impact Dr. Cassanello's standing to pursue injunctive relief. *Id.* The Court also asked

the Parties to address how Ch. 2022-70, §1's modification to Florida's university tenure system may or may not impact Dr. Cassanello's standing. *Id.*

FBOG's proposed regulations demonstrate Dr. Cassanello's standing to pursue injunctive relief against them. The regulations require universities to investigate professors for violations of the IFA, require universities to mandate changes to instruction and issue disciplinary measures to teachers who violate the IFA, and withhold university performance funding if universities fail to comply. Thus, the regulations pose a credible threat of enforcement if Dr. Cassanello teaches his planned curriculum sufficient to confer a concrete injury. Furthermore, Dr. Cassanello's injuries are traceable to FBOG, because the regulations require universities to enforce the IFA and impose sanctions on universities if they fail to do so. Finally, an order enjoining FBOG from implementing these or similar regulations or taking other action to enforce the IFA on Florida's University System would redress Dr. Cassanello's injuries.

## II.   <u>Provisions at Issue</u>

### A.   **FBOG Regulations Implementing the IFA**

The proposed FBOG regulations require each university to adopt a regulation that prohibits "discrimination"—as that term is defined by the IFA—by "subjecting any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the" IFA's

forbidden concepts. (Doc. 59-1 at § 10.005(2)(a))). It further requires universities to establish a method for submitting and receiving complaints of alleged violations of that regulation. *Id.* The FBOG's regulations further require universities to "direct, supervise, or coordinate" the investigation of "credible complaints that identify a training or instruction that espouses, promotes, advances, inculcates, or compels a student or employee to believe any of the concepts." *Id.* at  3(b). Following the university's investigation, the FBOG's regulations require universities to act as follows:

> In the event the investigation finds that an instruction or training is inconsistent with the university regulation [adopting the IFA], the university shall inform the Board of Governors through the Office of Inspector General and take prompt action to correct the violation by mandating that the employee(s) responsible for the instruction or training modify it to be consistent with the university regulation, issuing disciplinary measures where appropriate, and remove, by termination if appropriate, the employee(s) if there is a failure or refusal to comply with the mandate.

*Id.* at § 10.005(3)(c).

If FBOG itself receives a "credible allegation" that a university "willfully and knowingly failed to correct a violation" of the mandated university regulation implementing the IFA, FBOG's Office of Inspector General is required to "investigate to determine if evidence exists to support the allegation and eligibility for performance funding." *Id.* at §10.005 (4)(a). FBOG may also enlist an "external

qualified investigative firm" to assist in the investigation at the subject university's expense. *Id.* FBOG's Inspector General then submits its findings to the chair of the university's board of trustees, who has an opportunity to respond. *Id.* at §10.005(4)(b). FBOG's Audit and Compliance Committee then makes a recommendation to FBOG as to whether it should substantiate an allegation that the university willfully and knowingly failed to correct a violation of the university policy implementing the IFA. *Id.* at §10.0054(c). If FBOG ultimately determines the university willfully and knowingly engaged in conduct at the institutional level that constituted a substantiated violation of failing to correct a violation of the university's regulation implementing the IFA, the university will be ineligible for performance funding for the next following year following the year in which FBOG made the determination. *Id.* at § 10.0054(d).

In sum, FBOG's proposed regulations require all public universities to investigate and enforce the IFA's prohibitions on classroom instruction espousing the forbidden principles. If anyone alleges that a university failed to do so, FBOG then initiates its own investigation into the university's failure to comply, where FBOG itself acts as the investigator, prosecutor, and judge to determine if the violation will result in the university losing performance funding.

### B.     The Florida Legislature's Changes to Professor Tenure

In tandem with passing the IFA, Florida's legislature also made changes to tenure for university professors that permits FBOG greater authority to regulate professors with tenure. *See* Laws of Fla. 2022-70 (codified at §1001.706(6), Fla. Stat. (2022)). This new statutory authority provides:

> (b) The Board of Governors may adopt a regulation requiring each tenured state university faculty member to undergo a comprehensive post tenure review every 5 years. The board may include other considerations in the regulation, but the regulation must address:
> 1. Accomplishments and productivity;
> 2. Assigned duties in research, teaching, and service;
> 3. Performance metrics, evaluations, and ratings; and
> 4. Recognition and compensation considerations, as well as improvement plans and consequences for underperformance

*Id.* In other words, in addition to FBOG's general oversight over personnel programs for state universities, they may now take an active role in reviewing tenured professors based on any considerations they wish, including—presumably—compliance with the IFA and its implementing regulations.

The new law also requires universities and colleges to publicly post all instructional materials for at least 95% of all university courses to be posted as early as feasible, but at least 45 days before the first day of class and keep the list posted for at least 5 academic years. *Id.* at § 1004.085(5)(b). The effect, if not intention, of this provisions is to empower anyone to avail themselves to the IFA's enforcement

mechanisms, either through private right of action or FBOG's mandated investigations, well in advance of instructional materials being offered to students or well after professors teach these materials by monitoring publicly posted lists for books that run afoul of the IFA's eight forbidden principles.

**III.   Dr. Cassanello Has Suffered A Concrete Injury Because the IFA and FBOG Regulations Implementing the IFA Chill His Protected Speech.**

Under Article III, "the injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged government action—where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Pittmann v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (quoting *Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756 (11th Cir. 1991)). When mounting a pre-enforcement First Amendment challenge, a plaintiff need only show "an intention to engage in a course of conduct arguably affected with a constitutional interest," but "proscribed by a statute," and there exists a "credible threat" of enforcement. *Id.* "A plaintiff need not expose herself to enforcement of a law to challenge it in the First Amendment context;" instead, "an actual injury can exist where the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Bloedorn v. Grube,* 631 F.3d 1218, 1228 (11th Cir. 2011).

When regulations restrict full-throated debate over controversial topics, the Supreme Court has liberally interpreted the standard of whether speech "arguably" falls within a law's proscriptions. *See Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979). In *Babbitt*, farmworkers brought suit challenging provisions of Arizona's Agricultural Employment Relations Act that, among other things, made it a crime for labor organizations to "induce or encourage the ultimate consumer of any agricultural produce to refrain from purchasing, consuming, or using such agricultural product by the use of dishonest, untruthful, and deceptive publicity." *Id.* at 295, n. 6. The Court held that the plaintiffs had suffered a concrete injury, rejecting the defendants' argument that the criminality provision "has not been applied and may never be applied" to commissions of unfair labor practices involving forbidden consumer publicity. *Id.* at 301. The plaintiffs did not even claim they intended to violate the statute by engaging in "dishonest, untruthful, [or] deceptive publicity." *Id.* Rather, they relied on the truism that "erroneous statement is inevitable in free debate." *Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964)). The plaintiffs then argued that to avoid criminal prosecution, they would need to curtail their consumer appeals and forgo full exercise of their First Amendment rights. *Id.*

Here, the IFA and FBOG's regulations create the same climate where Dr. Cassanello is forced to curtail his full exercise of his First Amendment rights. As a

professor whose area of instruction includes the civil rights movement and Jim Crow America, it is "inevitable" that some viewpoint he endorses could be perceived as violating the IFA's prohibitions—and FBOG's regulations require the University of Central Florida to investigate and "correct" every perceived violation on penalty of losing their performance funding. Dr. Cassanello's declaration explains how this environment exposes him to the same chilling effect discussed in *Babbitt* by stating the IFA "forces him to second guess all my instructional materials to determine if they could be construed as violating one of the law's forbidden viewpoints." (Doc. 30-2 "Cassanello Declaration" at ¶ 21).

Dr. Cassanello's evidence also goes a step beyond what the plaintiffs offered in *Babbitt*, as he identifies specific viewpoints he has espoused in his prior courses or courses he intends to offer next year that—at minimum, arguably—violate the IFA's prohibitions. A substantial part of Dr. Cassanello's instruction involves showing how facially race-neutral policies enacted after *Brown v. Board of Education* actually disadvantaged the black community. *Id.* at ¶ 16. Dr. Cassanello's instruction also debunks narratives suggesting disparities in racial equity in our "colorblind" society are the product of hard work or innate intelligence based on his criticisms of the Bell Curve Theory and teaching texts that demonstrate how advances in the labor movement disproportionately benefited white workers. *Id.* at ¶¶ 9–10, 13. Under the IFA and FBOG's regulations, the university would be

8

required to investigate (and likely discipline) Dr. Cassanello for espousing these viewpoints because they espouse "virtues such as…fairness, neutrality, and racial colorblindness…were created by members of a particular race…to oppress members of another race…" (Doc. 59-1 at §1(a)).

FBOG's requirement that universities discipline teachers if they refuse to comply with the IFA also impose a concrete injury on Dr. Cassanello. This Court has found warnings that plaintiffs will be subject to professional discipline sufficient to constitute a "credible threat" for Article III standing purposes. *See Allen v. School Bd. for Santa Rosa Country, Fla.*, 782 F. Supp. 2d 1304, 1310–11 (N.D. Fla. 2011). In *Allen*, a group of teachers brought suit challenging provisions of a consent decree that their school entered as a result of a settlement in a prior lawsuit alleging Establishment Clause violations. *Id.* at 1311. The plaintiffs argued the consent decree chilled their right to free exercise of religion and free expression.[1] *Id.* at 1311–12. They cited, as an example, the fact that a school official had told one plaintiff she would be disciplined if she wore her school colors or sat with other teachers at a private religious baccalaureate service. *Id.* The defendants argued that the teachers lacked standing because their fears were hypothetical and not objectively reasonable in light of the plain language of the consent decree which only prohibited them from

---

[1] Specifically, the consent decree provided, among other things, that school officials could not "promote, advance, endorse, participate, or cause prayers during or in conjunction with a school event." *Id.* at 131, n. 7.

"promoting, advancing, or endorsing" religion in their official capacity as teachers. *Id.* at 1316.

However, this Court disagreed and found that plaintiffs had standing sufficient to seek a preliminary injunction enjoining a portion of the consent decree. *Id.* at 1316–18; 1327–28. It found that the school policies implementing the consent decree arguably placed restrictions on the free speech rights of school district employees and noted that the statement made to one teacher to refrain from expressive conduct at private worship services or face discipline chilled the other teachers' participation in those services. *Id.* at 1316. This Court also noted the teacher's concerns arising from the vagueness of the consent decree, which caused them to alter their conduct and left them uncertain regarding what conduct is permitted or will subject them to discipline under the policies while attending religious events. *Id.* at 1317–18.

Like the disciplinary threats in *Allen*, FBOG's regulations also effect a concrete injury on Dr. Cassanello by commanding that—if a violation is found—the university must "mandate[] that the employee(s) responsible for the instruction modify it to be consistent with the university regulation, issu[e] disciplinary measures where appropriate and remove by termination, if appropriate, the employee(s) if there is a failure or refusal to comply with the mandate." *Id.* at § 3(c).

Defendants will likely argue that the phrase "if appropriate" absolves FBOG of culpability, because it creates the appearance that universities ultimately

10

determine whether a professor will receive discipline. However, when read in context with the rest of FBOG's regulations, universities really have no discretion but to discipline professors who refuse to comply with the IFA. *Id.*at § 4. If a university fails to remedy a violation of the IFA, FBOG must conduct its own investigation and, if it finds that the university willfully failed to "correct" a violation of the IFA, withhold performance funding the following fiscal year. *Id.* Furthermore, FBOG now has the statutory authority to directly audit the performance of tenured university professors directly every five years, allowing them to monitor professors' compliance for IFA violations even if the university fails to do so. *See* §1001.706(6)(b), Fla. Stat. (2022).

Finally, even if the university chose to risk its performance funding to stand with their professors and decline to issue discipline, FBOG's regulations still require the university and FBOG itself to investigate violations of the IFA and treat them as a form of race discrimination, Doc. 59-1 at § (2)(a). This in-and-of-itself inflicts injury on professors sufficient to chill their speech. Indeed, the Supreme Court has found standing to challenge viewpoint-based restrictions like the IFA even when those restrictions lacked enforcement mechanisms that personally punished the speaker. *See Meese v. Keene*, 481 U.S. 465 (1987). *Meese* involved a challenge to a provision of the Foreign Agents Registration Act of 1938 that required expressive materials designated as "political propaganda," as defined by the Act, comply with

the Act's registration, filing, and disclosure requirements. *Id.* at 467. The plaintiff brought suit challenging, not the Act's registration and disclosure requirements, but Congress's use of the label "political propaganda" as the statutory name for the category of expression the Act sought to regulate. *Id.* at 467.

The Court found that the plaintiff had standing to challenge the statutory designation based on his intention to display three films that met the statutory definition of "political propaganda." *Id.* at 473–74. The plaintiff presented evidence that if he presented films labeled as "political propaganda," his personal, political, and professional reputation would suffer and his ability to obtain reelection and practice his profession would be impaired. *Id.* at 474. The Court noted that the plaintiff never alleged that fewer people would attend his screenings as a result of the statutory label but cited the "risk that the much larger audience that is his constituency would be influenced against him because he disseminated what the government characterized as the political propaganda of a foreign power." *Id.* at 475. The Court also rejected the argument that the plaintiff could mitigate the reputational harm by providing disclaimers before showing the films—such as noting one of the films had won an Oscar. *Id.* at 475. It found that the need to take such affirmative steps to avoid the risk of harm itself constituted a cognizable injury under the First Amendment. *Id.*

Similarly, here, the IFA and FBOG regulations employ an invidious label to those who engage in protected speech by labelling such expression "discrimination on the basis of race, color, national origin or sex." (Doc. 59-1 at § 10.005(2)(a)). The reputational harm of being labeled as someone who engages in race discrimination is self-evident—particularly for someone like Dr. Cassanello who has spent his entire career researching and teaching about the civil rights movement. (Doc. 30-2 "Cassanello Declaration" at ¶ 2). The University of Central Florida's Employee Code of Conduct, attached as Exhibit 1, states: "we have a zero-tolerance policy for any form of discrimination." *Id.* at 15. Likewise, under the University of Central Florida's policies, any complaint of discrimination substantiated by the University's Office of Institutional Equity must be forwarded to the President, Provost, or Vice President to take appropriate corrective action. *See* UCF-3.0134(5), attached as Exhibit 2.

In sum, the regulations require universities to adopt policies prohibiting discussion of concepts Dr. Cassanello intends to offer in his classroom instruction and conduct investigations if anyone reports that he "espouses, promotes, advances, inculcates, or compels a student or employee to believe any of the concepts." The FBOG's regulations further require the university—on penalty of losing performance funding—to "correct" Dr. Cassanello's violation and impose discipline if he refuses to change his instruction. Finally, even in the unlikely event that the

university bucks the FBOG's mandate, the FBOG's own authority to investigate or find that Dr. Cassanello engaged in "discrimination on the basis of race" inflicts an injury separate and apart from formal discipline. Therefore, Dr. Cassanello has shown that the IFA and FBOG's regulations inflict a concrete injury on him.

**IV.   FBOG Need Not Directly Discipline Dr. Cassanello For Their Actions to Be Fairly Traceable To His Injuries**

Defendants argue FBOG's regulations do not change Dr. Cassanello's standing analysis, because his argument still relies on what they characterize as "downstream" consequences of FBOG's actions or a "hip bone connected to the thighbone" argument. (Doc. 60 at 2). The implication behind such arguments is that a plaintiff cannot demonstrate causation for purposes of standing unless the entity sued directly acts against them. However, Defendants overstate Article III's traceability requirement in arguing that causation is too remote here.

"A showing that an injury is 'fairly traceable' requires less than a showing of 'proximate cause.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012). Indeed, "[n]o authority has even remotely suggested that proximate causation applies to the doctrine of standing." *Loggerhead Turtle v. County Council of Volusia County, Fla.*, 148 F.3d 1231, 1251 (11th Cir. 1998). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action." *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1273 (11th Cir. 2003).

Defendants' hip-bone, thigh-bone argument comes from statements in *Lujan* that standing to challenge regulations on independent actors not before the court is "substantially more difficult to establish." (Doc. 60 at 2) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)) (cleaned up)). However, by "cleaning up" the Court's statement, Defendants omit important context and add words of their own in attempt to align *Lujan*'s reasoning with FBOG's regulations. The full quotation is as follows:

> The existence of one or more of the essential elements of standing depends on the unfettered choices made by <u>independent actors not before the courts</u> and whose exercise of <u>broad and legitimate discretion the courts cannot presume either to control or to predict</u>, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, <u>when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.</u>

*Id.* at 562 (quotations and citations omitted) (emphasis added).

The meaning of "independent actors not before the courts" must be understood in light of *Lujan*'s facts and reasoning. The opinion's redressability analysis[2]—which only garnered support from a plurality of Justices—examined an

---

[2] The Court did not independently address traceability and redressability, but Defendants seem to be using *Lujan's* statements primarily to address the causation or traceability requirement. (Doc. 60 at 2).

attempt by environmental groups to enforce overseas a provision of the Endangered Species Act requiring the Secretary of the Interior to "assist" federal agencies in ensuring that any action "authorized, funded, or carried out by such agency" was not likely to jeopardize certain endangered species. *Id.* at 557–58. Justice Scalia's finding that the plaintiffs could not prove redressability against the Secretary of Interior rested on the fact that there was an open dispute as to whether the Secretary's regulations were even binding on the agencies who funded the projects at issue. *Id.* at 568.

*Lujan*'s cautionary words about the difficulty of establishing standing to challenge regulations on third-parties do not apply to FBOG's regulations for two reasons. First, unlike the plaintiffs in *Lujan*, Dr. Cassanello is "himself the object of" the challenged government action. *Lujan*, 504 U.S. at 562. FBOG's proposed regulations require universities to establish regulations prohibiting "discrimination" by offering "training" or "instruction" that conflict with the IFA's principles. Doc. 59-1 at § 10.005(2)(A). FBOG's regulations further define these terms as:

> (b) "Training" is defined as a planned and organized activity conducted <u>by the university</u> as a mandatory condition of employment, enrollment, or participation in a university program for the purpose of imparting knowledge, developing skills or competencies, or becoming proficient in a particular job or role.
>
> (c) "Instruction" is defined as the process of <u>teaching or engaging students</u> with content about a particular subject

16

> by a <u>university employee</u> or a person authorized to provide
> instruction by the university within a course.

Doc. 59 at § 10.005(1)(b), (c) (emphasis added). Thus, while the FBOG regulations' proscription on "training" regulates universities themselves, their proscription on "instruction" applies <u>only</u> to employees and instructors. *Id.* The fact that FBOG regulates Dr. Cassanello's speech by forcing universities to take a first crack at investigating or disciplining him does not change the fact that FBOG is still, at bottom, regulating Dr. Cassanello's speech by its mandate on universities and own investigation and enforcement authority.,

Second, unlike in *Lujan*, the "independent actor not before the court" is not an independent federal agency but a subordinate state entity subject to FBOG's governance. *See* Fla. Const. Art. 9, §7(b) ("There shall be a single state university system comprised of all public universities. A board of trustees shall administer each public university and a board of governors shall govern the state university system."); § 1008.322(1), Fla. Stat. (2021) ("The Board of Governors of the State University System shall oversee the performance of state university boards of trustees in the enforcement laws, rules, and regulations."); § 1001.706(6)(a), Fla. Stat. (2021) (requiring FBOG to "establish the personnel program for all employees of a state university.")

Therefore, this case does not present a situation like in *Lujan* where an open question exists as to whether the named defendant possesses the authority to regulate

an "independent actor." Rather, there is no question here that FBOG may regulate universities to require them to implement (or refrain from implementing) the IFA. Otherwise, FBOG would not even be voting on the regulations at issue. Indeed, Defendants have previously urged this Court to treat the two entities as one and the same. *See* (Doc. 44 at 23) ("to whatever extent public universities possess an institutional right of academic freedom, that right is best understood as a right of institutional autonomy from the judiciary, not the State that chartered it, governs it, and provides its funding. Indeed, it is unclear how the Universities, as subordinate organs of the State, could have First Amendment rights against the State or its voters.") (quotations omitted). Defendants cannot claim Florida's universities are "subordinate organizations of the state" for purposes of its First Amendment analysis and then change their tune completely when arguing standing to claim those same universities are now "independent actors not before the court." (Doc. 60 at 2). As such, *Lujan*'s "substantially more difficult" standard for challenges to regulations of "independent actors not before the court" neither applies to nor addresses Dr. Cassanello's claims.

A more persuasive comparison is the preliminary injunction this Court granted in *Gale Force Roofing & Restoration, LLC v. Brown*, 548 F. Supp. 3d 1143, 1169 (N.D. Fla. 2021). That case involved a lawsuit seeking a preliminary injunction against Florida's Secretary of the Department Business and Professional Regulation

from enforcing a statute that prohibited contractors from using advertisements that "encourage[], instruct[], or induce[] a consumer to contact a contractor or public adjuster for the purpose of making an insurance claim for roof damage." *Id.* at 1151 (quoting § 489.1471(1), Fla. Stat., (2021)). The plaintiffs argued they faced a constitutional injury through self-censorship since their planned advertisements could subject them to disciplinary proceedings and a $10,000 fine. *Id.* at 1151.

Notably, the disciplinary proceedings at issue in *Gale Force* would have been overseen by the Construction Industry Licensing Board, composed of eighteen members appointed by the governor, and confirmed by the senate. *See* § 489.107(1), (2), Fla. Stat. (2021); § 489.129(1), Fla. Stat. (2021). Nevertheless, this Court found the plaintiffs' injuries were "fairly traceable" and "redressable" to enjoin the Secretary of the Department of Business and Professional Regulation, because the disciplinary proceedings overseen by the Construction Industry Licensing Board were "within the jurisdiction of the Department." *Id.* at 1155.

It also noted that the Department had the authority, pursuant to Florida Statute to "initiate an investigation if it has reasonable cause to believe that a licensee or group of licenses has violated a Florida Statute, Rule of the Department, or a rule of the Board." *Id.* Finally, this Court rejected the defendants' argument that the dispute was not yet ripe without threatened enforcement of the new law, finding that the

Department's intent to enforce the challenged law could be inferred because the plaintiffs had challenged the law several weeks after it was enacted. *Id.* at 1157.

In *Gale Force*, this Court did not indulge in the game of three card monte Defendants invite here and say the plaintiffs should have sought relief from the Construction Industry Licensing Board, since the Board was the subordinate state entity who ultimately would discipline or fine the plaintiffs for their planned advertisements. *See also Harriet Tubman Freedom Fighters Corp. v. Lee,* 2021 WL 7083360 at *7–8 (N.D. Fla. Oct. 8, 2021) (holding restrictions on speech under voter registration statute was "fairly traceable" to the Secretary of State because the Secretary had the authority to "refer the matter to the Attorney General for enforcement.") Rather, it correctly recognized that the Board was a subordinate political entity "within the jurisdiction" of the Secretary plaintiffs sought to enjoin. This is no different from the relationship between FBOG and Florida's universities under the single state university system. *See* §1001.705(2)(l), Fla. Stat. (2021) (noting that the Florida Board of Governors has responsibility for "complying with, and enforcing for institutions under the board's jurisdiction, all applicable local, state, and federal laws.")

Also like the defendant in *Gale Force*, FBOG enjoys direct statutory authority to investigate university faculty for violations of state law. *See* §1008.322(3), Fla. Stat. (2021) (noting the Board's Chancellor "may investigate allegations of

noncompliance with any law or Board of Governors' Rule or regulation and determine probable cause. The chancellor shall report determinations of probable cause to the Board of Governors, which may require the university board of trustees to document compliance with the law or Board of Governors' rule or regulation.") Similarly, FBOG's proposed regulations grant it authority to conduct its own investigations into violations of the IFA's prohibition on offering "instruction" on forbidden concepts. (Doc. 59-1 at § 10.005(4)). Finally, the legislature's recent changes to university professor tenure provide FBOG additional plenary authority to review professors' compliance with the IFA during their five-year post-tenure review.

In some respects, Defendants' thigh bone, hip bone argument provides an apt analogy. Whenever our hip bone moves, our thigh bone inevitably and predictably follows. The problem with Defendants' argument here is that this analogy assumes a direct causation standard that Article III's traceability analysis simply does not require. The mere fact that FBOG threatens Dr. Cassanello with discipline through mandates and threats to the universities under its jurisdiction rather than issuing discipline itself does not render their actions untraceable to Dr. Cassanello's injuries for Article III purposes. As such, Dr. Cassanello's injuries of self-censorship are "fairly traceable" to FBOG.

## V.   Injunctive Relief Against FBOG Would Redress Dr. Cassanello's Injuries

Dr. Cassanello's injuries are redressable through an injunction against FBOG for much the same reasons that his injuries are fairly traceable to FBOG. The redressability prong focuses on "whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Comm'cns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 296, 287 (2008). A "substantial likelihood" of redressability is sufficient to meet this prong. *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 79 (1979).

When constitutional injuries stem from a defendant's authority to investigate or discipline violations of a constitutionally infirm statute, this Court has previously held an order enjoining defendants from conducting such investigations or imposing such discipline sufficient to meet the redressability prong. *See Harriet Tubman Freedom Fighters Corp.*, *supra,* at *9–10 (holding that enjoining Attorney General and Secretary of State from using their powers to investigate and prosecute civil enforcement proceedings for suspected violations of voter registration statute would "go a long way" to addressing First Amendment freedom of speech and association claim); *Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238, 1263 (N.D. Fla. 2021) (holding plaintiffs' injuries could be redressed through enjoining governor and one sheriff, without needing to also enjoin the relevant state attorneys or remaining 63 other Sheriff's Departments who could enforce anti-protest law against plaintiffs).

22

Here, FBOG's proposed regulations show multiple ways in which Dr. Cassanello's injuries could be redressed through injunctive relief. This Court could (and should) enjoin FBOG from requiring universities to adopt regulations enforcing the IFA, (Doc. 59-1 at § 10.005(2)(a)), requiring universities to investigate complaints of alleged violations of the IFA, (Doc. 59-1 at § 10.005(3)(a)), requiring universities to discipline or terminate professors "where appropriate" who violate the IFA, (Doc. 59-1 at § 10.005(3)(c)), investigating IFA violations (Doc. 59-1 at § 10.005(4)(a)), hiring outside consulting firms to investigate violations of the IFA, (Doc. 59-1 at § 10.005(4)(a)), withholding performance funding from universities based on their employees' compliance with the IFA, (Doc. 59-1 at § 10.005(2)(a)), labelling instruction that violates of the IFA as "discrimination on the basis of race, color, national origin, or sex" (Doc. 59-1 at § 10.005(2)(a)); exercising its Chancellor's statutory authority to "investigate allegations of violations of any law or Board Rule", § 1008.322(3), Fla. Stat. (2021), or using its statutory authority to consider violations of the IFA in its five-year post-tenure performance reviews, Laws of Fla. 2022-70 (codified at §1001.706(6), Fla. Stat. (2022)).

Even if FBOG does not ultimately adopt these regulations, its mere consideration of them demonstrates their authority to force universities into compliance with the IFA. Indeed, if FBOG's governance over Florida's single university system empowers them to mandate every university under their

jurisdiction to adopt regulations enforcing the IFA, it also stands to reason that FBOG possesses the authority to pass regulations that <u>prohibit</u> enforcing the IFA if the statute is found to violate the Constitution.

Defendants may argue that, even if Dr. Cassanello obtains injunctive relief against FBOG, such an injunction would not necessarily prevent universities from enforcing the IFA on their own. Even if this Court assumes that maxim to be true, Article III "does not demand that the redress sought by a plaintiff be complete." *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018). The Supreme Court has held that even $1 dollar of nominal damages can be sufficient to fulfill the redressability requirement. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021).

Accepting this argument would also mean neither the IFA nor any of the other myriad statutes incorporating private rights of action into their enforcement schemes would ever be subject to a pre-enforcement challenge. As Defendants have pointed out, "no judgment entered by this Court could prevent private parties from bringing action under [Florida's Education Equity Act], since any injunctive or declaratory relief would not be binding on them." (Doc. 56 at 8, n.3). As such, an injunction against FBOG would—at minimum—partially redress Dr. Cassanello's injuries, and that is sufficient to demonstrate Article III standing.

24

## VI.   **Conclusion**

When applying Article III's standing requirement, courts should be mindful that the root purpose of standing is to ensure that the parties "have such a personal stake in the outcome of the controversy to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quotation omitted). Despite how the doctrine has, at times, been applied, Article III's standing requirements were not designed merely as a pothole to derail unsuspecting plaintiffs navigating the road to vindicating their constitutional rights.

Dr. Cassanello's speech sits directly in the crosshairs of government censorship imposed from the top down. If FBOG and Governor DeSantis believed Florida's universities would be inclined or even likely to enforce the IFA on their own volition, they would not be considering such draconian punishments for universities who fail to keep their professors in line.  The real parties in dispute in this litigation are the teachers whose speech is restricted and the top-level state officials who desire to and have now demonstrably taken steps to restrict that speech. The fact that those officials are waging their culture war against professors through the proxies of state universities under their jurisdiction does not change the fundamental character of this dispute.

The IFA's enforcement mechanisms were designed to evade constitutional challenge through doctrines like standing. Its drafters knew well that any university would be reluctant to bring suit to challenge these provisions, given the culture of fear this administration has perpetuated through its attacks on teacher tenure, university accreditation, and most recently performance funding. *See, e.g.,* the facts giving rise to *Austin v. University of Florida Board of Trustees*, 2022 WL 195612 at *4 (N. D. Fla. Jan 21, 2022); *See also* Hannah Natanson and Moriah Balingit, *Caught in the Culture Wars, Teachers Are Being Forced From Their Jobs*, The Washington Post (June 16, 2022) (describing how Duval county teacher was terminated for putting a Black Lives Matter Flag in her classroom after Commissioner of Education Richard Corcoran told a conservative audience "we made sure she was being terminated."), attached as Exhibit 3.

However, the standing analysis's core questions ask whether the defendant caused the plaintiff's injuries and whether those injuries can be redressed by a judicial remedy against the defendant. In the case of FBOG, the answer to both questions is yes. The proposed regulations demonstrate FBOG has broad authority (which it intends to exercise) to require universities to enforce the IFA, require universities to discipline professors, investigate violations of the IFA themselves, and use violations of the IFA against professors directly in post-tenure reviews. As such, Dr. Cassanello has standing to enjoin FBOG from enforcing the IFA.

Respectfully submitted,


_____/s/ Jesse B. Wilkison_____
Elizabeth L. White, Esquire
Florida Bar No.:  314560
Matthew R. Kachergus, Esquire
Florida Bar No.:  503282
Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Jesse B. Wilkison, Esquire
Florida Bar No.:  118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus, DeMaggio &
Wilkison, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone: (904) 356-9661
Facsimile: (904) 356-9667
Email: sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFF

27

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to

**Charles Cooper, Esquire,** ccooper@cooperkirk.com, **Davis Cooper, Esquire,**

pdcooper@cooperkirk.com, **Timothy Newhall, Esquire,**

timothy.newhall@myfloridalegal.com, **John D. Ohlendorf, Esquire,**

johlendorf@cooperkirk.com, **John Ramer, Esquire,** jramer@cooperkirk.com,

**Alannah Lee Shubrick, Esquire,** Alannah.shubrick@myfloridalegal.com, by

electronic mail this 28th day of June, 2022.

_/s/ Jesse B. Wilkison_
ATTORNEY

28