# EXHIBIT 1

Donald Falls

vs.

Ron DeSantis

---

Deposition of:

Robert Cassanello

---

August 05, 2022

*Vol 1*



Robert Cassanello
August 05, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO.:  4:22-cv-166-MW/MJF

DONALD FALLS, et al.,

     Plaintiffs,

vs.

RON DESANTIS, in his official
capacity of Governor of Florida,
et al.,

     Defendants.

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

DEPOSITION OF

ROBERT CASSANELLO, Ph.D.

Friday, August 5, 2022
9:51 a.m. - 4:30 p.m.

Location: The Fairwinds Tower
135 West Central Boulevard
Room 1026
Orlando, Florida 32801

Stenographically Reported By:

DONNA FONTAINE
Notary Public, State of Florida

    *  *  *  *  *  *

Job No.: 264002

Robert Cassanello
August 05, 2022

1    Q    -- is founded and based, that factual
2  information is -- does HB7 restrict your ability to
3  teach accurately those facts?
4    A    It can.  If it interferes with my ability
5  to -- to instruct on interpretation.
6    Q    Interpretation.  Well, let's -- let's -- let's
7  probe that a little more.  You say in the next sentence
8  that "In each of my classes, I strive to give students a
9  comprehensive view of the history of race and racism in
10  America."
11       First, let me ask you to define for me what
12  you mean when you use the term "racism."
13    A    Uh-huh.  Racism is a -- racism is a prejudice
14  that is based on the false notion that people are
15  biologically distinct by race and that those fictitious
16  biological distinctions have meaning, true meaning.
17    Q    And do you understand that to be the generally
18  accepted understanding of racism when --
19    A    Well, you asked my definition.
20    Q    Yes.  I am asking if you -- is your definition
21  in anyway idiosyncratic?
22    A    Okay.  I don't think so.  I don't think it is.
23  I would think in academic circles it would represent a
24  majority opinion, if you will, I would say, exclusively
25  100 percent.

1    Q    And -- and is that in any way different from
2  the meaning of racism that is used in everyday parlance,
3  in your opinion?
4    A    I don't know.  I've never tested everyday
5  parlance.  I don't have a basis to know that answer.
6    Q    Well, would you agree with the proposition
7  that racism is racial, ethnic prejudice, or intolerance?
8    A    It's a form of it.  Yes.
9    Q    Okay.  And do you understand the basic
10  dictionary definition of racism to be any different from
11  what you understand racism to mean?
12    A    I don't know what the -- what the dictionary
13  definition of racism is.  If you can produce it, I will
14  comment on it, but I don't know it off the top of my
15  head.
16    Q    Well, let's -- according to Dictionary.com, if
17  I can represent to you that --
18    A    Okay.
19    Q    -- the initial definition is "a belief or
20  doctrine that inherent differences among the various
21  human races determine cultural, individual achievement,
22  usually involving the idea that one's own race is
23  superior and has the right to rule others."
24    A    The only thing I would dispute in that
25  definition would be the fictitious notion of that,

1  because that definition doesn't dispute that that could
2  be an actual state of being.  Right?  So that would be
3  my addition to that definition.
4    Q    Fair enough.  And another, apparently,
5  secondary definition is intolerance of another race or
6  other races.
7    A    Okay.  I would -- I would agree with that.
8    Q    So your statement says, again, "In each of my
9  classes I strive to give students a comprehensive view
10  of the history of race and racism in America, including
11  giving them the tools to explore their own
12  interpretations" --
13    A    Uh-huh.
14    Q    -- "based on research of that history."
15       What are the tools you're referring to?
16    A    I mean -- cognitive skills are the tools I
17  mean.  Pedagogical strategies.
18    Q    Could you elaborate on that?
19    A    Sure.  Sure.  Critical thinking skills.  So,
20  for example, in all my classes, but also in this class,
21  if you went through the assignments, you will notice
22  that I require -- I, essentially, introduce students to
23  a set of reading, and the reading is exclusively
24  academic reading.  It's not, sort of, you know, popular
25  history, if you will.  It's people who are professional

1  historians and who offer an interpretation, offer some
2  argument, if you will, about some idea concerning The
3  Civil Rights Movement; and they support their argument
4  through primary research that they cite in their works.
5  Right?  And what I have the students do following each
6  reading that's connected to, sort of, a subject or theme
7  for that assignment, okay, is I have them go to the
8  library.  We have a set of databases on -- actually more
9  than one -- that has primary documents from The Civil
10  Rights Movement for African American history.  And
11  depending on the prompt, they are to go in there to
12  find, you know, one or more documents, whichever they
13  want to do, and then they come to the class and they
14  take their documents and they say, "Okay, I saw this
15  document on The Civil Rights Movement and I read it
16  based on how the reading influenced me this way."
17  Right.
18       So, for example let's just take what I said
19  earlier on the long history.  Right?  So the long
20  history is one of these debates.  It's not something
21  that's settled or consensus, if you will.  Right?
22  There's people that say there was this long history that
23  goes back to the antebellum period that I described
24  earlier in my testimony.  Right?  And there's others who
25  say, "No there's not."  The Civil Rights Movement was

Robert Cassanello
August 05, 2022

Page 38

1  this 1940s, '50s, '60s thing.  Anything before is
2  something else, not The Civil Rights Movement.  So it's
3  sort of a debate, if you will.
4      Q    Uh-huh.
5      A    And so I could assign reading and say, "Okay,
6  read this.  This person is offering theory on the long
7  history and find me a document that you interpret that
8  is going to either defend or support that person's
9  argument."  So, you know, theoretically a student could
10 come in and say, "Here is a document I found.  It
11 supports this notion of long history," or "There's a
12 document I found that doesn't support this historian's
13 argument of long history."  That's sort of -- what that
14 is, is -- it is introducing students to critical
15 thinking.
16          Actually, if you go to, like, a pedagogical
17 Bloom's Taxonomy of learning -- do you know what that
18 is?
19     Q    I do not.
20     A    Bloom's Taxonomy of learning is kind of this
21 pyramid.  Right?  So at the bottom are basic cognitive
22 skills, things like -- sort of like reading, assessing
23 information, and stuff like this.  And you go all the
24 way up.  And at the top of the pyramid, right, is what
25 is called original ideas.  Okay?  So my objective as a

Page 39

1  professor, as a teacher, is to get students to travel up
2  that pyramid so that they are producing original ideas.
3  Right?  And so in the assignment I just described to
4  you, if they can demonstrate, "Okay, I have this
5  document independent of the reading.  It's not in the
6  citations anywhere.  This wasn't something this
7  historian looked at to give me a prompt or give me a
8  clue about how to read this document.  Wholly
9  independent.  Then I'm reading the document and I'm
10 taking this document.  And then I'm offering an original
11 interpretation."  Okay?  That represents the top of
12 Bloom's Taxonomy of original ideas, which is what I
13 strive my students to do in every class that I teach.
14     Q    Well -- and so when you say you attempt to
15 give them the tools to explore their own interpretations
16 based on research of that history, then have you just
17 described what you mean when you say "their own
18 interpretations" that they -- if I can attempt to
19 paraphrase -- that they read this material that you've
20 directed them to --
21     A    Uh-huh.
22     Q    -- or they select material from a body of --
23     A    Uh-huh.
24     Q    -- research that you've directed them to, and
25 they determine for themselves from that material whether

Page 40

1  they agree with the long --
2      A    History.
3      Q    -- history of The Civil Rights Movement, a
4  proposition which you evidently --
5      A    Uh-huh.
6      Q    -- endorse, if you will --
7      A    Sure.
8      Q    -- or they -- or they agree with the scholars
9  who are on the other side of that debate?
10     A    Uh-huh.
11     Q    Is that an accurate perception on my part of
12 what you're describing?
13     A    Sure.  Sure.  So that's a sample, if you will.
14 I mean, every week I don't do the long history.
15     Q    Of course.
16     A    But, yeah.  That's basically the system, if
17 you will, the learning system I employ.  So the topics
18 just change.  The debates change week to week.
19     Q    You continue in paragraph 5 in saying, "As
20 part of that instruction, I encourage my students to
21 think about institutional and structural racism."
22          Would you tell me what you mean when you use
23 the terms "institutional and structural racism"?
24     A    Sure.  So institutional and structural racism
25 are policies and actions that don't necessarily have the

Page 41

1  intent to produce a racial outcome or -- let's just say
2  a Jim Crow outcome -- right? -- but ultimately do.  So,
3  you know, the intent might be quite opposite.  Right?
4  But through the conduct of the policy or the conduct of
5  the action, it could ultimately produce a racial
6  outcome.
7          So an example of this is like -- well, an
8  example of this is sort of like the -- what's out here
9  to the window?  I-4.  The interstate highway system.
10 Right?  So the interstate highway system's intent,
11 right, was to connect all these cities to cure
12 congestion of the cities.  Right?  And it was promoted
13 and conceived as a public good for the country.  Right?
14 And in the pursuit of constructing the interstate
15 highway system, especially through historic downtowns,
16 you know, there's a premium placed on securing property
17 and purchasing locations that were cheap and were
18 politically easy, if you will, and that tended to be in
19 neighborhoods that had high minority populations.
20 Right?  So that created this racial outcome to the
21 interstate highway system.  So that would be an example
22 of institutional racism.
23     Q    And the -- and that's what you mean, I take
24 it, in the succeeding sentences in this paragraph when
25 you talk about racial outcomes or Jim Crow-like

Robert Cassanello
August 05, 2022

1   under that is subsection B.  Do you see that?
2       A    I don't have that on page 6.
3       Q    I'm sorry.
4       A    Sorry.  Page 6?
5       Q    Page 6.
6       A    All right.
7            MR. DeMAGGIO:  Let's get this out of the way.
8       Okay.
9            MR. DeMAGGIO:  He's directing you there.
10  BY MR. COOPER:
11      Q    Subparagraph B.  Do you see that?
12      A    8 subparagraph B.  Yes.
13      Q    And it says "Paragraph A," which I will
14  represent to you includes the concept concerning moral
15  superiority.  "Paragraph A may not be construed to
16  prohibit discussion of the concepts listed therein as
17  part of a larger course of training or instruction,
18  provided such training or instruction is given in an
19  objective manner without endorsement of the concepts."
20           Again, that provision of the HB7 would appear
21  to permit discussion around the moral superiority -- the
22  concept of moral superiority of one race over another.
23  Do you dispute that?
24      A    I think my problem -- if you don't mind me
25  elaborating -- is on the objective manner part of that

1   passage.
2       Q    Well --
3       A    Do you want to handle that now or do you want
4   to wait?
5       Q    We are going to probe into that, but before we
6   do, let me ask you this:  Was slavery itself premised in
7   part on the concept that whites were morally superior to
8   Blacks?
9       A    I'm not a historian of slavery, in that whites
10  would have assumed superiority and moral.  Would have
11  been sort of in that milieu?  Yes.
12      Q    Do you think that HB7 would prohibit you from
13  discussing that element of slavery?
14      A    I think HB7 would prohibit me from discussing
15  that element of slavery if I have a student stand up in
16  class and say, "You're making me feel guilty by
17  introducing me to this material."  And then I think HB7
18  in that regard would be triggered in that discussion.
19      Q    Well, we are going to come to the provision or
20  the concept that deals with feelings of guilt and
21  anxiety, but I want to stay focused now on the question
22  of whether or not discussions --
23      A    Sure.
24      Q    -- in your course or in class about whether --
25  about the element of slavery in which -- in which

1   whites, where slavery was practiced, believed that
2   whites were morally superior to Blacks and whether or
3   not this HB7 --
4       A    Uh-huh.
5       Q    -- in your opinion would prohibit you from
6   discussing that fact about slavery.
7       A    I think it depends on -- you know, I don't
8   have a role in the policing mechanisms of HB7, and I
9   don't have a role in, you know, how a student may or may
10  not feel based on a topic I introduce in class or how I
11  introduce that topic.  Right?  So I don't know that, you
12  know, if I introduce something, if that's not going to
13  have a requisite cascading effect of my teaching and the
14  content of my teaching comes under scrutiny.
15      Q    And so your view of whether or not discussion
16  about moral superiority would depend how students
17  reacted to that feature of slavery that we are
18  discussing?
19      A    That, or -- I mean, if you want to go, you
20  know -- really, kind of, a thought experiment here.  I
21  mean, not only a student, but someone off the street, a
22  lawmaker in Tallahassee, an administrator at UCF.  I
23  mean, I don't know.  You know, there isn't really a lot
24  in here that protects me and my academic freedom.  So
25  when you're saying, "Does it stop you from teaching?"  I

1   mean, theoretically -- I mean, this law is designed to
2   stop me from teaching a variety of things or its intent
3   is designed to stop me from teaching a variety of
4   things.  Unfortunately, I'm not the arbitrator of
5   whether what I'm teaching is appropriate or, you know,
6   germane to the topic or not.
7       Q    And who do you understand the arbitrator to
8   be?
9       A    I think there's a variety of arbitrators here.
10  One is the student, any student.  I think people off the
11  street -- if -- you know, say if I were to record a
12  lecture or discussion that I wanted to disseminate
13  publically and it's out there from a class, someone off
14  the street can say, "Hey, you know, he's violating HB7."
15  An administrator at UCF could say, "Yeah, you're
16  violating HB7 and we're not going to get our performance
17  fund.  It'll be taken away."
18           Board of Governors -- any standing committee
19  in the Florida legislature and there's -- I don't mean
20  to offend anybody in here, but I would like to talk --
21  if you don't mind giving me a little latitude here.
22      Q    Please.
23      A    Okay.  We have a local legislature who
24  represents Lake County, Anthony Sabatini.  Anthony
25  Sabatini went on our local news station, Channel 13 News

Robert Cassanello
August 05, 2022

Page 54

1   -- this would be just before this sometime -- and he
2   went on the news and he was interviewed by a local
3   newscaster.  And I am quoting here.  I'm not
4   paraphrasing.  He said, "99 percent of the professors
5   who teach in our public universities are cultural
6   Marxists and indoctrinate their students."  Now, that's
7   the figure he used.  99 percent.  I'm assuming I'm not
8   the 1 percent.  I'm assuming I'm the 99 percent.  And
9   Anthony Sabatini -- correct me if I'm wrong -- sits on
10  standing committees in Tallahassee.  And this law, or
11  the subsequent part of this law -- the -- and the
12  conforming bill -- allows any standing committee to
13  determine, you know, whether an HB7 violation had
14  occurred or not.
15          So, you know, I don't trust someone like
16  Anthony Sabatini to determine, whether, you know -- what
17  I'm doing in class is germane or not, because he has
18  inherent prejudice to someone like me and what I teach.
19     Q     I want to move now to paragraph 7.
20     A     Okay.
21     Q     And I will read, again, the first sentence,
22  which I read earlier: "HB7 purports to allow me to
23  'discuss' the concepts listed therein as part of a
24  larger course of training or instruction, provided such
25  training or instruction is given in an objective manner

Page 55

1   without endorsement of the concepts."  End quote.
2          You continue in your paragraph 7:  "However,
3   this exception reflects a misunderstanding of what
4   historians do and how history is taught.  It is
5   impossible to give an objective account of history."
6          I would like for you to explain -- I think you
7   alluded to it earlier --
8      A     Uh-huh.
9      Q     -- when you used the word "objective."  But I
10  would like for you to explain why you believe it's
11  impossible to give an objective account of history.
12     A     Sure.  As I mentioned earlier, when you were
13  saying, "Does this stop you from facts?"
14          And I said, "Well, history is not facts.
15  History is interpretation."
16          And since I believe history is interpretation,
17  objectivity comes into question because history is not a
18  science.  It's not a hard science.  It is not even
19  really a social science.  Right?  So the pursuit of
20  history -- and as a professional historian, I do not
21  believe that my personal pursuit -- my own research, my
22  own publications -- yields variable truth.  Right?
23  That's something that, you know, chemists and physicists
24  do and stuff.  They do an experiment.  Right?  And then
25  someone can reproduce that experiment anywhere in the

Page 56

1   world and they come to the same conclusion.  Right?
2   Verifiable.  Right?  We don't have that in history.  We
3   have interpretation.  And what we, as historians, must
4   do is understand that we are not objective.  Right?  The
5   history produced is not objective.  Right?  History I
6   produce is not objective.  And I would say never the
7   articles I have written, the books I've done, represent
8   anything approaching a variable truth.  It represents a
9   truth.  It represents what I believe to be true; what
10  I'm trying to interpret; what I'm trying to prove.
11  Right?  But it doesn't represent something that is, sort
12  of, universally true, if you will.  Right?
13          And so when I instruct students on the
14  practice of history, right, I have this objectivity
15  discussion with them because what I don't want them to
16  come away with is the idea that there is a single
17  objective truth.  It's philosophically, sort of, a
18  school of thought that I think predominates in history
19  as an academic discipline now.
20          And so the problem with objectivity and the
21  problem with -- specifically with our -- the guidance we
22  have been given at UCF -- I've seen at the University of
23  Florida and the language I've seen in this document, as
24  well as previous laws passed about the instruction of
25  history in the Florida legislature, all assume that

Page 57

1   history is objective truth.  It's a single objective
2   truth.  Right?  And it's not.  It's not what I do, and
3   it's not how I instruct students to think, if their
4   intent is to become a practicing historian in some
5   capacity.
6      Q     Are there no objectively variable facts that
7   historians agree upon having occurred?
8      A     You're confusing facts with interpretation.
9      Q     Well -- and we discussed this previously and
10  if I --
11     A     You're being a little postmodern here.
12  Historians don't dispute facts.  Historians dispute
13  interpretation.  That interpretation is based on facts,
14  but historians don't say, "No, your facts are wrong."
15  They say, "Your interpretation is wrong."  And they
16  might bring with them other facts, other documents, but
17  they wouldn't say, "Hey, that fact is wrong.  This fact
18  is wrong."  That's kind of an absurd way of thinking
19  about history.
20     Q     So, for example, in your interpretation of the
21  facts that you believe to be relevant --
22     A     Uh-huh.
23     Q     -- and the historical events that occurred --
24     A     Okay.
25     Q     -- that you believe to be relevant to the

Page 74

1  you know, I would address it in that sort of way.  Does
2  that make sense?
3      Q    I think it does.
4      A    It's not completely out of the realm.  Right?
5      Q    Well, by "out of the realm," you mean it's --
6  a history teacher could be confronted with a student --
7      A    Yeah.
8      Q    -- who might want to do that?
9      A    Right.  So it's not as blunt as, you know,
10  denying the Holocaust.  It's just sort of ancillary to
11  it.  Right?
12      Q    Okay.  I do want to ask you if you meant to
13  suggest that the difference between the possibility of
14  100,000 Jews being murdered in the Holocaust and
15  8 million is -- is a matter of indifference to
16  historians who study that event and that period of
17  history?
18      A    No.  I think it's more a proxy way, that
19  Holocaust denialism.  Right?  If I say, "Oh, the
20  Holocaust happened.  It was 100,000.  It wasn't 8
21  million.  Why are Jewish people making such a big deal
22  about this?"  That's where it comes from.  So it's kind
23  of a way of conceding a point, if you will, but then
24  achieving the same goal of Holocaust denialism.  Does
25  that make sense?

Page 75

1      Q    I think it does.  Thank you.
2           All right.  So let's move now back to
3  exhibit -- the exhibit we marked as 5, which is HB7.
4  Could you -- if you turn to page 5.  So this is really
5  the central issue in the case --
6      A    Uh-huh.
7      Q    -- these concepts.
8      A    Sorry.  You're including 8, too, in that,
9  right?  The 1 through 8?
10      Q    Yes.  Yes, I am.
11           Again, for the record, let me read into the
12  record the portion that's marked as section 4, little
13  (a).  "It shall constitute discrimination on the basis
14  of race, color, national origin, or sex under this
15  section to subject any student or employee to training
16  or instruction that espouses, promotes, advances,
17  inculcates, or compels such student or employee to
18  believe any of the following concepts."
19           And then the legislation lists eight concepts.
20  I want to -- I want to discuss those eight concepts with
21  you.
22           The first one reads:  "Members of one race,
23  color, national origin, or sex are morally superior to
24  members of another race, color, national origin, or
25  sex."

Page 76

1           So, Dr. Cassanello, do you believe that
2  members of one race are morally superior to members of
3  another race?
4      A    Are you asking me to respond to 4(a) and 1 or
5  just 1?
6      Q    Just 1.
7      A    No.
8      Q    You do not believe that.
9           Do you believe that someone who does believe
10  that members of one race are morally superior to members
11  of another race would be a racist?
12      A    Yes.
13      Q    So if one of your colleagues espouses that
14  belief -- espoused to his students -- that members of
15  the white race are morally superior to members of the
16  Black race, for example, you believe that would be a
17  racist?
18      A    I believe that's a racist statement.
19      Q    Yes.  Would that be, what I think -- elsewhere
20  in your declaration you use the term "white supremacist
21  discourse," would that be white supremacist discourse?
22      A    No.  White supremacist discourse would be more
23  aligned to some kind of racial outcome that benefits the
24  morally superior race.
25      Q    So moral superiority is not an element to the

Page 77

1  white supremacy?
2      A    It is, but I think, you know -- you're giving
3  it a discrete thing, and you're saying "What is this
4  discrete thing?"  And I answered it.  I said, "That's a
5  racist statement."
6           And you said, "Well, is it a white
7  supremacist?"
8           And I said, "Well, it's white supremacist if
9  that racist statement is attached to an action.  That
10  action that would be an action of white supremacy."
11  That's where I'm going with this.
12      Q    So white supremacy is -- if I understand that
13  comment -- is tied to outcomes more --
14      A    Or aspirations.
15      Q    Okay.  So someone who -- who believes that
16  whites are morally superior to Blacks?
17      A    Uh-huh.
18      Q    But that is not in any way attached to any
19  particular outcome that is racially disparate.  That
20  would -- that would take that belief out of the --
21      A    Put action to the belief, if you will.
22      Q    Are you saying that white supremacy and the
23  belief in white supremacy requires action as opposed to
24  just mental beliefs?
25      A    I believe that the racist feeling or

Robert Cassanello
August 05, 2022

Page 90

1    all of them, but those are the ones I'm aware of.
2        Q    Well, let me ask you this:  Do you think that
3    instructing in class -- and to make this as egregious as
4    I can -- a class that is integrated racially --
5        A    Okay.
6        Q    -- that Blacks are morally inferior to whites,
7    or whites -- to use the exact framing -- whites are
8    morally superior to Blacks, would that be like Holocaust
9    denial in its egregiousness that it would warrant
10   short-circuiting this process?  If you don't know --
11       A    I've never thought about that.  I would have
12   to -- I would have to have more specific information to
13   make a determination.  Academic misconduct is a very
14   specific thing.  Right?
15       Q    I don't know.
16       A    So academic misconduct is when you do
17   something that violates the ethics of research and
18   publications.  Right?  And it could extend to teaching.
19   So...
20       Q    Plagiarism?
21       A    Plagiarism is the most common, but it could
22   also be, you know, your -- you know, your research is
23   corrupted, let's say.  So an example of this -- I'll
24   give a specific example that you-all might be aware of
25   because maybe you watched the news in the '90s.  You

Page 91

1    weren't watching it --
2            (Simultaneous laughter.)
3        A    But there was the professor that wrote that
4    book "Armed in America" about the Second Amendment and
5    gun culture and all sorts of things that was disputing
6    the notion of America and, you know, having an
7    inherent --
8    BY MR. COOPER:
9        Q    More guns, less crime?
10       A    No, no, no.  It's not that at all.
11       Q    Not that good?
12       A    He was arguing that the founders didn't really
13   envision a nation full of guns and guns owners.  That
14   the second amendment was written in a much more
15   circumspect way.  And what he did to prove that argument
16   is he was looking at this gun ownership data and -- what
17   is it? -- when you die, you go to court --
18           MR. DeMAGGIO:  Probate?
19       A    The probate records.  And who was leaving
20   guns.  If guns were so valuable, who was leaving guns in
21   wills and things like?  So he had all this quantitative
22   data from, you know, research.  I think he was looking
23   New England over all these decades and stuff.  Right?
24   He published charts and graphs and things.  And said, "I
25   counted up, and -- you know, I'm just making this up --

Page 92

1    "20 percent of people, you know, only willed guns to
2    other people, so how common could it have been?" or
3    something like that.  You know.  What had happened is
4    there were some people -- some academics, some people
5    who were gun enthusiasts, if you will, who poured over
6    his research and said, you know, like, went into the
7    citations and said, "You said this.  Where is this?
8    Where is that?  I can't find it."  Right?
9            And so he confessed later, "Oh, all those
10   records I had were destroyed when the ceiling in my
11   office collapsed from a rainstorm and I threw out all of
12   those legal pads and all those records, so I don't have
13   them and I can't reproduce them, but these are the
14   figures I got from them."
15           And other people were saying, "Well, I can't
16   duplicate your figures."  Right?  "So unless I can see
17   your data, I can't verify."
18           And he said, "Sorry."
19           So he was at Emory, and Emory did a misconduct
20   evaluation.  Usually it's like a commission -- internal
21   group of professors decide.  So he was fired.  He was
22   terminated because of that.  So that's like -- he wasn't
23   plagiarizing, but his research was in question.  And so,
24   you know, he was terminated.  I am sure he had tenure.
25           I don't know an example like that at UCF.

Page 93

1    UCF -- I know the misconduct stuff I'm aware of is all
2    in the nature of plagiarism.  I haven't seen anything
3    that's research misconduct.
4    BY MR. COOPER:
5        Q    Let's move on to concept number 2 in Exhibit
6    5, HB7.
7        A    Okay.
8        Q    I will read that as well.  "A person by virtue
9    of his or her race, color, national origin, or sex is
10   inherently racist, sexist, or oppressive, whether
11   consciously or unconsciously."
12           Do you believe that a person by virtue of his
13   or her race is inherently racist or oppressive, whether
14   consciously or unconsciously?
15       A    No.
16       Q    Are you -- let me ask you, Doctor:  Are you
17   aware of any -- are you aware of --
18       A    I'm sorry.
19       Q    Are you aware of any -- it's a short table.
20           Are you aware of any of your colleagues at UCF
21   who hold that belief?
22       A    You mean from, like, casual conversations
23   or...?
24       Q    Any way you might be acquainted with their
25   beliefs and -- and know them to believe this concept.

Robert Cassanello
August 05, 2022

Page 94

1   A   I mean, not that I'm aware of.  No.

2   Q   From what you may know about other history
3   teachers within the public higher education system in
4   Florida --

5   A   Okay.

6   Q   -- any other teachers?  Are you aware of any
7   teachers who -- who hold that belief?

8   A   You mean someone I know personally?

9   Q   Not necessarily.  If you know maybe from their
10  scholarship that they, you know, hold that belief, I
11  would be interested to know about that.

12  A   Who's a college or university professor?

13  Q   Yes.

14  A   Not that I'm aware.

15  Q   Let's go to paragraph -- or concept number 3.
16  "A person's moral character or status as either
17  privileged or oppressed is necessarily determined by his
18  or her race, color, national origin, or sex."

19      So, Dr. Cassanello, do you believe that a
20  person's moral character is necessarily determined by
21  his or her race?

22  A   No.

23  Q   So that --

24  A   I noticed you skipped over "status."

25  Q   I -- I don't plan to not go back to...

Page 95

1       But earlier we talked about, in concept number
2   1, the whole notion of moral superiority.  And I just --
3   this kind of goes hand in hand with that.  And so I'm
4   assuming your views are consistent here as they were
5   when we discussed concept number 1?

6   A   Yes.  Okay.

7   Q   So let me ask this, then:  Do you believe that
8   a person's status as either privileged or oppressed is
9   necessarily determined by his or her race?

10  A   I think it's possible.

11  Q   Okay.  Okay.  Let me ask you to elaborate that
12  and -- and tell me what you base that on.

13  A   I base it on my understanding of institutional
14  and structural racism.

15  Q   Can you elaborate on that?

16  A   Well, earlier I gave the example of -- again,
17  this is not nationally systematic, let's say.  I won't
18  go that far, but, you know, we have -- I believe we have
19  seen evidence of individual, local policing policies, I
20  think, that would confer a differentiated status, either
21  privilege or oppressed, based on one's color, race,
22  national origin.  Maybe sex.  I don't know.  I haven't
23  thought about that.

24  Q   Well, just remaining focused on the race
25  issue.

Page 96

1   A   Okay.

2   Q   And I take it from your syllabi -- I take it
3   from the course you've taught that your -- that your
4   historical focus is on race.

5   A   That's a fair assessment.

6   Q   Okay.  So in these -- in the example that you
7   just offered, the privileged race is, say, white cops
8   and the oppressed race is Black.

9   A   No.  I think you're thinking of this too
10  narrowly.  Right?

11  Q   Okay.

12  A   So the privileged race would be white citizens
13  and their interaction with cops.

14      And the oppressed would be Black citizens and
15  their interactions with cops.

16  Q   Okay.  And in most of these urban police
17  departments -- at least that I am aware of -- the police
18  force itself is quite thoroughly integrated.

19  A   Could be.

20  Q   Racially integrated.

21  A   Sure.

22  Q   And is the -- do those -- is the oppressed
23  Black citizenry oppressed by the Black police officers
24  as well as the white police officers, or is it a -- or
25  is that a white police officer phenomenon?

Page 97

1   A   I mean, I can't say with authority because it
2   isn't something I research or have data on, but I don't
3   think the way institutional and structural racism works
4   on the part of the people who have power is necessarily
5   exclusively to one race, if that makes sense.

6   Q   I'm not sure that does make sense to me.

7   A   Okay.  So -- because I'm basing this on my
8   understanding of institutional and structural racism.
9   Right?  The people at the levers of power do not
10  necessarily have to be uniformly of a certain race.  And
11  when I, kind of, corrected you on status and where the
12  status is deployed, for example, of policing, right, I
13  said, "Police."  I never said white police or Black
14  police.

15  Q   True.

16  A   So that's what I meant by that.

17  Q   Okay.  So a -- so the structural racism or
18  institutional racism is a phenomenon that -- that you
19  were describing that occurs notwithstanding that the
20  police force -- and I would suggest, perhaps, even the
21  individual policeman in any particular episode -- may be
22  Black.  They may themselves be Black, or at least the
23  police force is thoroughly integrated.

24  A   Conceivably but, again, I don't research
25  this, so I don't want to say authoritatively.

Robert Cassanello
August 05, 2022

Page 102

1    this is how it works," and what have you.  I know there
2    has been some success, you know.  And this came about
3    through the George Floyd protests in that there's some
4    police departments who adapted to community policing and
5    then they weren't having similar outcomes to places
6    like, you know, Minneapolis or what have you.
7         Q    They were not having similar outcomes?
8         A    It's my understanding, but I'm -- you know,
9    again, this is not something I research.  It's something
10   I've just read in the news or maybe read a report or
11   something like that.
12        Q    Okay.
13        A    I can't verify anything.
14        Q    When you say that "those things," including
15   these "other factors," then "disproportionately labels
16   Black men as criminals and felons."
17             What do you mean by labels them?
18        A    So this is part of, you know, this notion of,
19   sort of, embedding status -- I guess that would be the
20   academic term for it -- whereby -- so if we take Jim
21   Crow, if you don't mind me building an analogy.  So the
22   intent of Jim Crow, you know, was multifaceted.  It
23   wasn't just to create separation of the races in the
24   legal way.  Its intent was also to prescribe African
25   Americans with a visible reminder of second-class

Page 103

1    citizenship.  Right?  So it had that -- that other
2    purpose as well.  And so here, I believe what Michelle
3    Alexander is arguing, is that policing in America is
4    also prescribing a status, which she describes, to Black
5    men.
6         Q    And this labeling Black men as criminals and
7    felons --
8         A    Uh-huh.
9         Q    -- as you put it, disproportionately labeling
10   Black men, but that -- but am I correct, though, that
11   the label of white men as criminals and felons who have
12   been convicted is -- is also the same label, correct?
13        A    No.
14        Q    How so?
15        A    Okay.  So there is a proportionality to this.
16   Right?  So if you look at stats, right, and you, know,
17   Black men and women are caught in the criminal justice
18   system at higher proportions to white men and women.
19   Right?  So on the part of people who might be so
20   inclined to pursue the moral character of one race over
21   another might look at those stats and say, "See, Black
22   people have a propensity to criminality because look at
23   these stats of convictions, stats of incarceration." da,
24   da, da, yada, yada, yada.  But you don't hear the same
25   argument for white criminality or white people who are

Page 104

1    caught in the criminal justice system.  So see, there's
2    a difference in how the population is interpreted by
3    some.  That's the -- that's the kind of clothing of a
4    status, if you will.
5         Q    And that is based upon the disproportionate
6    conviction and imprisonment of Blacks?
7         A    Right.  So -- right.  So Michelle Alexander
8    would say that is because of institutional racism and
9    the criminal justice system.  Right?  That would be her
10   explanation.  Others, like, you know, might say, "Well,
11   no.  It's pathology.  Black people are just morally
12   inferior, so the incidence of criminality is higher
13   within their populations."  And that's where the
14   conferring happens in discourse, in that public
15   discourse.
16        Q    I take it the professor you earlier
17   mentioned --
18        A    Uh-huh.
19        Q    -- perhaps not in the context of criminal
20   justice, but has voiced this notion of -- of -- that
21   you're just describing, correct?
22        A    You know, I don't remember word for word what
23   those texts were, so I don't want to say.  I don't want
24   to put words in his mouth.  Right?  But I don't think
25   that what you just said is too far afield from what he

Page 105

1    wrote.
2         Q    Do you know if anyone apart from him --
3         A    Uh-huh.
4         Q    -- who's advanced the view based upon the
5    disproportionate conviction and imprisonment rates of
6    white and Black men, that -- who takes -- who's
7    concluded from that that they are morally -- Blacks are
8    morally inferior to whites?
9         A    Again, this isn't my research.  But at
10   colleges and universities?
11        Q    Yes.
12        A    I personally don't know anybody.  But -- I
13   mean, I have heard students who have said, "Professor X
14   said this and this," but I don't take too much stock in
15   what a student might say a professor said personally.
16        Q    And the sentence goes on to say,
17   "disproportionately labels Black men as criminals and
18   felons and justifies subjecting them to inhuman
19   treatment."
20             What is the inhuman treatment you're referring
21   to there?
22        A    Well, you know, there was the case recently --
23   I don't remember his name, but the person that was in
24   the Angola prison and the Black man in Louisiana was in
25   solitary confinement for 48 years.  You know, I think

Robert Cassanello
August 05, 2022

Page 110

1    Q    -- advocates?
2    A    I was specifically referring to institutional
3  and structural racism.  That's the position I meant.
4    Q    And how -- and how did she -- how does
5  Michelle Alexander articulate that
6  structural-institutional racism as the sociological
7  position --
8    A    Uh-huh.
9    Q    -- that she advocate?
10    A    Sure.  Sure.  So, again, I'm basing this on
11  memory.  But, you know, she posits that the criminal
12  justice system, up to and including prisons, you know,
13  is a system in which, you know, racial outcomes
14  determine the -- you know, the experience and the --
15  maybe go so far as to say the rehabilitation of
16  prisoners of color, if you want to include both Hispanic
17  and Black.
18    Q    Is there any particular passage or place in
19  this book or chapter you would point to that you would
20  say runs afoul of this concept?  This concept --
21    A    You mean the concepts here?
22    Q    Yes.  The concept that is number 3 and that
23  you quote in paragraph 12.
24    A    It's the status part, not the moral part.
25    Q    Right.  Okay.  The status part.

Page 111

1          Is there a -- is there a place you can refer
2  me to in the book that you think would reflect content
3  that runs afoul because it endorses the concept that a
4  person's status is either privileged or oppressed is
5  necessarily determined by his or her race?
6    A    It's the thesis of the book.  So, certainly,
7  the conclusion and introduction.  Like I said, I don't
8  remember any real specifics because it's been a while
9  since I read that.
10    Q    Well, let me ask you this:  What do you think
11  -- what do you believe the word "necessarily" means in
12  that concept?
13    A    That's in the actual text of the -- I'm sorry.
14  To me, "necessarily" would mean something that is -- I
15  don't know if I'm using the right word -- but fixed.
16  Right?
17    Q    Okay.
18    A    If we are going back to my caste conversations
19  we were having, that would -- you know, that would
20  represent that fixed status, if you will, as a caste.
21  That might be one way I interpret this.
22    Q    Okay.  Well, if there are, let's say,
23  non-people of color, white people, who are convicted and
24  imprisoned and subjected to and labeled as criminals and
25  felons and subjected to exactly the same inhuman

Page 112

1  treatment that Black people in the --
2    A    Uh-huh.
3    Q    -- who have likewise been convicted and
4  imprisoned, then it would at least seem to me that their
5  status is likewise oppressed just as much as the Black
6  person.  And so race, in that circumstance, has not
7  determined, has it --
8    A    I think you misunderstood --
9    Q    -- who has been oppressed or privileged in
10  that -- in that criminal justice context?
11    A    Sure.  Sure.  I understand the question.  I
12  think you misunderstand how race operates.  Right?
13  You're taking a discrete anecdotal thing and you're
14  saying, "This example represents the whole."  What is
15  ascribed in the disproportionate treatment and the
16  inhumane treatment that's attached to people of color,
17  African Americans, right, is something that, not only
18  has consequences within the criminal justice system, but
19  also has consequences because of the way the media
20  portrays disproportionate, you know, outcomes in
21  criminal justice experience between Blacks and whites.
22  Right?  So it's not -- you know, it's not -- it's in the
23  individual; it's in the whole.  It's in the collective
24  and how the collective is interpreted and racialized, if
25  you will, might be a better way to think about it.

Page 113

1    Q    And so that is how a person's status is
2  privileged or oppressed is necessarily determined by his
3  or her race?
4    A    I mean, are you asking me as a rule?
5    Q    Yes, I am.
6    A    I can't answer that because I don't know.  You
7  mean -- you know, everything is -- a lot of things are,
8  you know, determined on a variety of variables.  Right?
9  And so for African Americans in the criminal justice
10  system more often than not that is probably the rule.  I
11  can't say with authority, again, because it's not my
12  research.  I have just read things, but I wouldn't say
13  it's like a -- you know, a -- universal experience,
14  but I think it represents the majority experience.
15    Q    What -- in the next sentence you say, "I could
16  be violating the law by assigning the text."
17          By "text" you mean The New Jim Crow?
18    A    Yes.
19    Q    "By assigning the text because such
20  instruction could be construed to 'espouse, promote,
21  advance, inculcate, or compel' belief in this forbidden
22  concept."
23          On what do you base your concern that, if you
24  assign this as part of your class on Jim Crow America --
25  if you assign this book, presumably among other texts --

Robert Cassanello
August 05, 2022

Page 114

1  A   Sure.
2  Q   You are going to assign a number of texts; are
3 you not?
4  A   It's on the syllabus.
5  Q   Yeah.  If you assign this book that you would
6 be, yourself, espousing, promoting, advancing,
7 inculcating or compelling --
8  A   I'm sorry.  I said "construed" too.  So that's
9 someone interpreting my behavior, not I'm doing this.
10  Q   Okay.  So let me ask you something.  By
11 assigning this book --
12  A   Uh-huh.
13  Q   -- or any book that is listed on your --
14  A   Sure.
15  Q   -- syllabus, does that -- do you -- do you
16 endorse -- do you espouse the -- the thesis, even let
17 alone all the material or content that is included in
18 every book that you assign?
19  A   I'm sorry.  I don't -- if you give me some
20 latitude here.
21  Q   Of course.
22  A   I think you're focusing on the wrong thing
23 here.  What -- how it can be construed, how it can be
24 construed, right, I think is -- is the idea that someone
25 sees that I'm assigning that book.  Right?  And then

Page 115

1 that book is going to come with a set of prejudices
2 along the lines of what is prohibited in this piece of
3 legislation.  Right?  And it's going to make me a target
4 of someone who is going to claim -- could be a student
5 in the class.  Could be a person on the street.  Like, I
6 have gotten emails from, you know, local UCF residents
7 who are not at all connected to UCF in any way and
8 said -- in fact, the most recent one was something to
9 the effect of, "You are doing Black people a great
10 disservice by teaching them that they are equals with
11 whites," and, you know, "They are" -- you know, "They
12 are never going to be a" -- you know, I'm paraphrasing.
13 I don't remember the exact words, but something to that
14 effect.  And "If you don't believe me, go drive through
15 Pine Hills," which is the Black -- one of the Black
16 neighborhoods here.  Right?  And that I would see with
17 my own eyes, and he confused me of being in the ivory
18 tower and, sort of, you know, I don't know what's going
19 on around the world.  Right?  So there's a person out
20 there, right, who's assuming what I'm doing in the
21 class, right, based on what I teach -- what's probably
22 online.  A separate piece of legislation, not connected
23 to HB7, right, requires me to keep a public record of
24 all the books I assign, right, any learning materials
25 that can be made public, and the syllabus and things

Page 116

1 like this, for five years -- for a five-year window.
2 Right?  So this, again, provides the opportunity for one
3 to construe what I am doing in the classroom.  Right?
4 And so if one is so inclined to construe that assigning
5 this book is equivalent to violation of one of these
6 eight things, right, they then can go to UCF and say,
7 "Well, now you have got to investigate Cassanello.  He
8 violated HB7.  He assigned that book."  And there could
9 be an investigation.  Or they could go to the
10 legislature -- go to one of those standing committees
11 and say, "Hey, he assigned this book" or "He assigned
12 that book.  He's teaching," you know -- you know,
13 "critical race theory" or whatever is embedded in all
14 this.  Right?  That's what I mean by this.
15  Q   I understand.  And I appreciate that
16 clarification -- clarifying explanation.
17  A   Can I add?
18  Q   Of course.
19  A   Sure.  For me -- the fear for me is not so
20 much what I do, because, I think, if you haven't
21 already, you got the impression that I come in the
22 class.  I'm a professional.  I take my job seriously as
23 an instructor in the classroom.  Right?  So -- but I
24 can't control what someone thinks of me or what someone
25 wishes to think of me.  You know.  That could include a

Page 117

1 student.  That could include someone off the street.
2 That could include -- I love saying his -- Anthony
3 Sabatini, you know, who says, "99 percent of all
4 professors are cultural Marxists."  Right?  So for him,
5 who's on a standing committee -- probably more than one
6 standing committee -- it wouldn't take much for him to
7 see that I'm assigning that book and then come to some
8 conclusion that I'm violating the --
9  Q   Violating one of the concepts.
10  A   Right.  That's my concern.
11  Q   I understand.  And, yes.  I certainly, through
12 this dialogue we have been having, do believe you take
13 your profession and your responsibilities as a teacher
14 of these young people very, very seriously.
15      But I want to come back to my question,
16 because now I think I know the answer.  You say that,
17 because such instruction by assigning Michelle
18 Alexander's book, you could be construed to espouse,
19 promote beliefs, you know, that are in this book --
20  A   Yes.
21  Q   -- whatever they may be.  That would not be a
22 correct construction.  You don't espouse, promote,
23 advance the -- necessarily anyway -- everything that's
24 in the books that you assign, do you?
25  A   Any book.

Robert Cassanello
August 05, 2022

Page 118

1    Q    Any book.  Okay.

2    A    Sure.  Because that's part of the critical

3 thinking.  Right?  You want students to be able to take

4 arguments apart.  Say, maybe this part of the argument

5 works; this part doesn't, so on and so forth.  And that

6 includes my own work.  Like I said, people have poked my

7 work and said, you know, "Cassanello was wrong on this

8 or wrong on that."  That's how we get at a truth, if you

9 will.  Right?

10    Q    And that's how your students arrive at their

11 own interpretations, as you put it earlier?

12    A    Presumably.

13    Q    And presumably a student encountering your own

14 work could come to the student's own interpretation that

15 you're all wet, right?

16    A    Sure.

17    Q    That, you know, Cassanello doesn't have it

18 right on this and would --

19    A    Could be a whole class.  Could be.

20    Q    And that student's grade wouldn't be

21 prejudiced because they ventured a disagreement with

22 their professor in your class, would it?

23    A    Not on that alone.  No.  Seriously.  So what

24 you describe -- and I have had students who have done

25 this, because, like I said, I'm on the -- you know, when

Page 119

1 I present the long history versus, we say, the short

2 history, if you will, for lack of a better term --

3    Q    Yes.

4    A    -- when I present it, I clearly -- and I

5 disclose to my students I'm long history.  You know.  If

6 they were to look up my research and figure it out

7 themselves.  Right?  Now, if a student says, "Dr.

8 Cassanello, I disagree with you.  It's short history."

9 And then that student is able to produce evidence and

10 some facts -- some evidence for their interpretation,

11 you know, able to, kind of, compile, like, "Well, you

12 know, there are these historians who say this.  It's

13 counter, and I think it has salience because of this,

14 this, and that.  And I did some research."  Right?  So

15 it constructs this -- what's the word I used? --

16 compelling narrative?

17    MR. DeMAGGIO:  Coherent narrative.

18    A    Coherent narrative.  Presents a coherent

19 narrative.  I would say "Tallyho.  You don't agree with

20 me, but wonderful that you got to this place."

21    The thing is the coherent narrative.  Now, a

22 student can present something which is not a coherent

23 narrative and say, "Well, I disagree with you,

24 Cassanello, because I know Black people are

25 pathologically inclined to be criminals."  And, you

Page 120

1 know, "There's this that I saw from a website called

2 League of the South."  I actually had that once when

3 someone presented something from League of the South.

4 Turned it in.  And, like, "Here's my evidence."

5    I said, "Wow, League of the South are

6 self-professed," you know -- you know, "white

7 nationalists, right?  And "I don't think what you have

8 here" -- I'm just -- this is a fictitious example.  "I

9 don't think what you have here represents a compelling

10 narrative.  And so I'm sorry, but I'm going to have to

11 provide some grade consequences for you."

12 BY MR. COOPER:

13    Q    Material on League of the South wouldn't,

14 under any accepted academic or scholarship -- scholarly

15 standards -- qualify as serious scholarship?

16    A    Are you asking me?

17    Q    I am.

18    A    Oh, oh.

19    Q    I'm asking if you agree with that.

20    A    Oh, oh, oh.  You know, I have not -- I have

21 not perused the League of the South's website in some

22 time.  And, as I understand it, initially were some

23 academics attached to it who were sort of trained in the

24 '50s and '60s and had a little bit of -- you know, in

25 the parlance that I used -- an outdated interpretation

Page 121

1 to things.  And they did a lot of work with the League

2 of the South -- I want to say the '70s and '80s, but

3 since then, it's pretty much amateur historians, if you

4 will.  So, no.  I don't think what people see on the

5 League of the South represents academic -- academically

6 accepted scholarship.

7    Q    What is it -- let me ask you this:  Apart from

8 the potential that you're assigning to this text --

9    A    Uh-huh.

10    Q    -- that could be construed --

11    A    Right.

12    Q    -- as you're espousing, advancing, endorsing

13 --

14    A    Uh-huh.

15    Q    -- everything in it or anything in it for that

16 matter --

17    A    Uh-huh.

18    Q    -- apart from assigning it, what is it that

19 you would like to say about this text in your

20 instruction that concept number 3 would not allow you to

21 say that?  That -- perhaps to be clear, what is it that

22 concept number 3 would prohibit you from saying that you

23 would like to say in your instruction, in your upcoming

24 course, that would be prohibited by concept number 3?

25    A    So it's the status part, right, which we have

Page 122

1  been -- we have talked about already.  So I think you
2  know my position on that.  Right?  What I usually do
3  with these texts and these readings is, you know, I
4  assign the readings.  They take, sort of, a quiz on the
5  reading to determine whether they read or not.  Right?
6  Then we usually have a -- I give a -- so you printed up
7  a study guide.  Right?  This is a study guide.  And so
8  -- so imagine, you know, that is just the study guide
9  for this.  Right?  So they would have study guide.  I
10 give them the questions, and these questions,
11 essentially, are quiz related.  And quizzes are specifically
12 just to the reading.  Right?  And then, you know, they
13 take the quiz.  I determine, oh, they read, they didn't
14 read, what have you.  Then they come into class and we
15 will have a class discussion about the reading.  Then I
16 let them pick out -- usually can't do the entire study
17 guide, but I will pick out the questions that I might
18 think are important.
19          Then I will say, "Okay.  This question here,
20 this question there from the readings, where are you on
21 this or what can you do?"
22          And we'll have a discussion.  And the intent
23 of the discussion is a check to make sure they read.  So
24 got the quiz to make sure they read.  I do the
25 discussion to make sure they read.  And then I would

Page 123

1  assign something.  Right?  And the assignment is
2  where -- where I'm getting at your question.  Right?
3          So what I do with reading is they read
4  something.  And I say, "Okay."  Because, remember, I'm
5  trying to get to the top of the Bloom's Taxonomy
6  original.  And I say, "Okay.  You got the New Jim Crow
7  thesis?"  She spends a lot of time on criminal justice.
8  So criminal justice is off the table.  "Go out there and
9  find some documents.  Maybe do some research that
10 supports or refutes her thesis based on the subject
11 you're looking at," which of course can't be criminal
12 justice.  Right?  So they can look at -- I don't know --
13 city planning, urban renewal, gentrification.  I'm just
14 throwing stuff out.  I mean, "Okay.  Does this apply in
15 any way to what is here in this?"  And you can
16 presumably, you know, argue for or against, but it's
17 usually based on, you know, the argument that they're --
18 that they have read.  And so what I am testing them on
19 is that they comprehended the argument; they can apply
20 the argument in a new way.  That's the original part.
21          So, again -- I hate to go back to the
22 construe.  You know, so I could be doing everything
23 aboveboard and say, you know -- there's 30 students in
24 here.  The end of the semester I want 30 independent
25 thinkers.  That doesn't matter.  If there's one or two

Page 124

1  students in the classroom who are so inclined to want to
2  make issue with the text.  You know, if there's someone
3  on the street that wants to make issue with the texts I
4  assign.  Someone in the legislature.  Someone at UCF.
5  So someone in the Board of Governors.  It doesn't matter
6  what I actually do or say in the classroom, because they
7  have the authority to determine -- to construe -- what I
8  have done, not me.
9      Q    And so that the record is clear, I think you
10 were referring to Exhibit No. 6?
11     A    Yeah.
12     Q    When you were illustrating --
13     A    Yes.
14     Q    -- kind of methodology you have in your
15 classroom.  And that's the To Brown from --
16     A    To Brown From Brown.
17     Q    -- To Brown From Brown study?
18          MR. COOPER:  You know, if we take a short
19 snack/lunch break, I may be able to kind of tighten
20 my thoughts and --
21          MR. DeMAGGIO:  Fine.
22          MR. COOPER:  -- and make the rest my questions
23 more efficient and less time-consuming.
24          THE WITNESS:  That's because my answers are so
25 great.  Give me credit.  Right?

Page 125

1          MR. DeMAGGIO:  This is -- the thing is, like,
2  what we are talking about here --
3          THE STENOGRAPHER:  On the record?
4          MR. COOPER:  We are off the record.
5          (Recess taken 1:08 p.m. until 1:46 p.m.)
6          MR. COOPER:  Back on the record.
7          THE WITNESS:  Sure.
8  BY MR. COOPER:
9      Q    Okay.  Dr. Cassanello, I want to now move to
10 paragraph 13 of your declaration.
11     A    All right.
12     Q    And it reads: "Another text I plan to assign
13 is the Wages of Whiteness by David Roediger."
14     A    Roediger.
15     Q    Roediger?
16     A    Roediger.
17     Q    And I'm going to hand you a book by that title
18 and author and ask you if this is the book that you are
19 referring to?
20     A    That is the book.
21     Q    Okay.  You say that "The text examines
22 working-class racism in the United States.  Part of the
23 text explains how white workers during the labor
24 movement were ideologically opposed to Black workers and
25 how the 19th century labor movement demanded a racially

Robert Cassanello
August 05, 2022

Page 134

1  things will come up.  So it's not so much that students
2  might have to confront the labor movement of the 19th
3  century, but then in what way do these concepts, you
4  know, are the sort of ancestor to these, you know,
5  racial concepts that we are today grappling with and,
6  you know, that are -- some of which are a target in this
7  legislation.
8       Q    Uh-huh.  And so you say that this book, the
9  Wages of Whiteness, is -- contains content that, if you
10  assign it -- or that you believe that concept number 3,
11  as we have been discussing it here, would restrict your
12  ability to offer instruction in this text, does that get
13  us back to our dialogue earlier about, for example,
14  Mr. Sabatini or any particular student in the class?
15       A    Yes.  Construed.  Construed question?
16  Absolutely.  Absolutely.  You know, whiteness is a
17  buzzword.  I don't know that academics still use --
18  like, employ whiteness currently, but certainly
19  whiteness -- like I said, whiteness starts there, and
20  then there's all these branches that come out to these
21  racial theories that are in prohibition here.  Right?
22       And so, for me, I can't see myself teaching
23  that book and just say, "Okay.  Labor movement, labor
24  movement, labor movement.  Thank you.  Go home.  I'll
25  see you next week."  I'm going to have to bring up the

Page 135

1  legacy of this book because it has such an
2  intellectually important paternity, if you will.  It
3  happens to interest me.  You know.  So, you know, I
4  don't see this purely as an instruction on the 19th
5  century labor -- labor movement.
6       Q    Okay.  And that legacy is one that includes
7  concepts that you believe you are prohibited from
8  teaching in the course that you're going -- in which
9  you're going to assign?
10       A    I believe that includes concepts that one will
11  be more than willing to construe that I'm teaching that
12  violates the prohibitions in HB7.
13       Q    Okay.
14       A    I think we have established what I do in the
15  classroom.  It's about how one construes.  And I'm
16  certain -- you know, like using Anthony Sabatini
17  because he's a convenient example.  But, I mean, I'm
18  sure -- you know, like I said, my book assignments and
19  my syllabi are going to be public for five years --
20  five-year window -- for the purpose of people to go
21  through them and say, "This thing, this thing."  And
22  when someone sees Wages of Whiteness, the whiteness is
23  going to trigger a discussion that's going to get us
24  back to here --
25       Q    Uh-huh.

Page 136

1       A    -- no matter how I teach it.  How I teach is
2  irrelevant.
3       Q    Okay.  Well, which is -- which is to say, as
4  we earlier, I think, discussed, whether you -- you would
5  not be endorsing this book and its content or espousing
6  it by assigning it, but simply assigning it and having
7  it as a subject of discussion in your classes could be
8  misconstrued --
9       A    Certainly as an endorsement.  Right?
10       Q    -- as an endorsement.  Misconstrued.
11       A    I would like to say on the record I do like
12  the Wages of Whiteness.  It's one of my favorite books,
13  so I'll put that out there.
14       Q    Okay.  Can we now move along last to concept
15  number four in HB7.
16       A    Okay.
17       Q    Actually before we do, let me ask one other
18  question, and I will ask it before, so... I think I can
19  anticipate the answer.  But what would you want to say
20  about this book or its content or its legacy that you
21  believe that concept number 3 would forbid you to say in
22  your instruction in class?
23       A    Let me answer it this way:  I believe someone
24  might construe an endorsement in the way I have fondness
25  for this book.  And I think this book represents an

Page 137

1  important point, an important dialogue in the history of
2  race and the study of race and racism in the country.
3  And I think, you know, if I were to present it that way
4  and say, "Okay.  Wages of Whiteness, let's use that as
5  an origin point and let's, you know, kind of tree all of
6  the ideas that flow out of the Wages of Whiteness."  To
7  me, it's an incredible story because I was in graduate
8  school when this book came out and I remember this book
9  was hotly contested.  Now, you probably would think
10  every, you know -- in order to get a degree in history,
11  you've got to sign off on this book somewhere before
12  they give you your diploma.  Right?  Not true.  When the
13  book came out it was -- the concept of whiteness was
14  contested.  There were historians who were saying
15  whiteness is, you know, a canard.
16       And since then, I think -- this is my personal
17  opinion -- I think the book's legacy has been much more
18  esteemed than it was when it came out.  And so I think
19  by discussing that with my students, mapping that out in
20  some way, pointing to the idea that, "Okay.  Here's a
21  book that people, you know, were willing to, kind of,
22  track when it came out; and then, since then it's had,
23  you know, this kind of legacy to, you know, to engender
24  and germane all these kinds of interesting ideas on race
25  and stuff like that."  I think someone in the class,

Robert Cassanello
August 05, 2022

Page 142

1  they producing truth?"  You know, invariably from this
2  conversation the students will say, "Well, I guess not."
3  Right?  "If it's just numbers" -- "if it's numbers
4  absent of other things."  You know.  "How can this
5  be" -- you know, "How can this be valid history, if you
6  will?"
7          So I get at that kind of objectivity question
8  by assigning that text.  So that's a text I do not
9  endorse.  Right?  I don't think it's a well -- I don't
10  want to say it's not well researched.  It's well
11  researched, obviously, but it's just not well argued.
12  Right?  So it's a problem with the narrative and
13  interpretation, for me.  You know.  Then I get the
14  students to think about, "Well, if it's" -- you know,
15  because when I assign the text, I talk about that moment
16  in historiography -- philosophy of history -- where
17  historians begin to push away from this notion of
18  objectifiable truth.  Right?  That's the book that did
19  it for the profession.
20          Then they started to think about objectivity
21  and truth in, you know, very different ways than the
22  ways I've described so far in this deposition.
23      Q    Turning to concept number 4, it reads:
24  "Members of one race, color, national origin, or sex
25  cannot and should not attempt to treat others without

Page 143

1  respect to race, color, national origin, or sex."
2          Do you believe, Dr. Cassanello, that members
3  of one race cannot and should not attempt to treat
4  others without respect to race?
5      A    Well, I mean, I have a problem with the notion
6  of race that we mentioned earlier, but I think all
7  people should treat others with -- with respect, no
8  matter the category or classifications they fall under.
9      Q    Okay.  Well, does that -- is that the same as
10  saying people should treat others regardless of their
11  race as they would treat anyone else --
12      A    As their perceived race maybe.  That's how I
13  would modify it, but yes.  Does that make sense?  I
14  don't want to endorse the notion of race and say race is
15  something which exists.  So I don't want to say, you
16  know, "I believe everyone of every different race should
17  be treated equally" because then I'm endorsing the
18  notion of race, that I'm endorsing.  I don't mind
19  speaking about race in an historical way.
20      Q    Okay.  Well, I do have to ask you to explain
21  that to me.  What do you mean by you don't want to
22  endorse the concept of races as though races exist, if I
23  understood?
24      A    Sure.  Yeah.  You understood me correctly.
25  Right?  So I believe that race is a social construct and

Page 144

1  not a biological one.
2      Q    Not a biological one?
3      A    That is correct.  Yes.
4          So when we speak about race, we are actively
5  constructing race.  Right?  And so I understand
6  historically and the way, you know -- I even write in
7  terms of race in a past connotation.  I take great care
8  not to give voice to it in my presence -- my present.
9  Right?  So I don't want to say, "Well, yeah, everybody
10  of all these different races should all just get along,"
11  because then I'm endorsing this notion that there are
12  these different races and these different races are
13  biologically determined.
14          If you're saying, "Well, couldn't they be
15  socially constructed?"
16          Yes.  They could be socially constructed and I
17  have a problem with the social construction.  And if I'm
18  employing the notion of race, I am also a person
19  actively constructing that notion of race.  Does that
20  make sense?
21      Q    Not -- to be perfectly frank, no.  I don't
22  think I'm following you.
23          When Roediger speaks of Wages of Whiteness, is
24  he speaking about a race that we often, in normal terms,
25  speak of as the white race?

Page 145

1      A    It depends what your definition of white race
2  is.  Do you think race is a biological determination or
3  are there biologically white people and Black people and
4  Asian people?
5      Q    Well, did --
6      A    You have to define race for me.
7      Q    I'm actually asking you to define it for me
8  and how you understand it, but how --
9      A    Sure.  Sure.
10      Q    How did Roediger?
11      A    So Roediger is -- actually, that book is an
12  argument about the social construction of race.  He's
13  not making a biological argument to race.  He's making a
14  social construction to race.  These people, you know,
15  white and Black, if you will, you know, saw each other
16  as distinct races of people.  And I think, like,
17  technically whites would have been on the biological
18  definition of race.  Blacks in 19th century and 20th
19  Century America would have gravitated towards a cultural
20  understanding of race as opposed to a biological.
21  Right?  But they would have both interacted and
22  recognized each other as categories of races.  Right?
23          So I understand that in an historical sense.
24  I write about this stuff in my research.  I use the term
25  white.  I use the term Black.  Things like this.  Right?

Robert Cassanello
August 05, 2022

Page 146

1  Which -- okay.  But what I don't want to do is be a
2  person today, in 2022, that's, sort of, constructing
3  someone's race for them and saying, "Well, there's the
4  white race and the Black race, because I don't believe
5  that people's race is biologically determined.  Right?
6  It's socially determined.  And we construct when someone
7  is white and someone is Black; when someone is Asian,
8  what have you.  Right?  So I don't personally want to be
9  an active participant in constructing someone else's
10 race.
11      Q   When you -- in your instruction and in your
12 scholarship, you use the term "white" and "Black" --
13      A   Uh-huh.
14      Q   -- or "Asian" or --
15      A   Sure.
16      Q   -- any of these other terms that, I think, in
17 the -- in the average person's mind --
18      A   Uh-huh.
19      Q   -- is a biological construct.
20      A   I don't know.  I might dispute that.
21      Q   Well --
22      A   What's your evidence that the average person
23 thinks race is a biological construct?
24      Q   Well, then let me --
25      A   Because I will say this, if you don't mind.

Page 147

1      Q   Please.
2      A   So -- I mean, I have been -- you know, like I
3  said, Wages of Whiteness was one of the seminal books
4  for me in graduate school.  Right?  So I was very
5  conscious of this notion of socially constructed versus
6  biological constructions of race.  Right?  And when I
7  got into the classroom, you know, that really became
8  something for me to point out to students.  Okay?
9  There's a way of thinking about race as a social
10 construction.  If it's social construction, what does
11 that mean, so on and so forth.
12          What I found early on within, like, one or two
13 years of teaching, the students understood that.  Like,
14 I have yet to meet a student, at least verbally or in
15 any way, shape, or form who has communicated a
16 biological category of race, as I understand it
17 historically.
18          So historically in my own research, if I'm
19 referencing something that's white, Black, Hispanic,
20 what have you, I'm basing that on the perceptions of the
21 time, right, not in a contemporary categorization.
22      Q   When you use those terms to -- in reference to
23 contemporary times --
24      A   Uh-huh.
25      Q   -- what do these terms mean, the terms "white"

Page 148

1  and "Black"?
2      A   When I use them in contemporary terms, they
3  are social constructions.
4      Q   And who -- who are you describing when you
5  describe the race -- when you describe Blacks as a race?
6      A   So I guess an example I might go to in the
7  classroom would be this.  You know, if you look
8  historically at -- especially the South and the legal
9  definitions of the South, right, students are familiar
10 with this notion of the one-drop rule.  You know.  One
11 drop of African blood equals an African American, no
12 matter what someone's complexion may look like.  Right?
13 So students are familiar with this.  They understood
14 what it means.  They understood it's a biological
15 definition.
16          Okay.  Then I talk about Brazil.  Right?  And
17 Brazil has, like -- I don't know the exact figure, but
18 roughly like 20 different racial categories of Black.
19 Racial categories of Black, based on skin color.  Right?
20 You know, so race is not the same thing around the
21 world.  You know.  And so -- I mean, it's not the same
22 thing.  It doesn't have the same definitions.  Isn't it
23 ultimately socially conducted?  Right?  Like, the
24 Brazilians can have a different definition of race than
25 we employ in the United States, that is employed in

Page 149

1  Cuba, that is employed at West Africa, things like that,
2  South Africa.  Right?
3      Q   Then, again, when you use the term "Black" --
4      A   Uh-huh.
5      Q   -- to make reference to a group or a class, if
6  you will, of people in contemporary times, who are you
7  referring to?
8      A   I'm referring to people of African descent.  I
9  employ the word "Black" because most people of African
10 decent prefer that term.  I don't want to say I
11 exclusively use it.  Sometimes I use "African American"
12 because, when we say, "Black, Black, Black," you know,
13 it can -- you know, in a prose or in a lecture or
14 something, it can almost sound -- have a connotation or
15 intent you don't mean.  So I mostly use "Black," but I
16 then switch back and forth.  But the reason I adopt
17 "Black" is because most African Americans, based on
18 surveys, prefer to be called "Black" than "African
19 American" or any of the other racial categories that
20 have come about over the years.
21      Q   Well, racial categories.  What race do you
22 consider yourself?
23      A   I consider myself part of the human race.
24      Q   Do you -- and of course no one would dispute
25 that.  Do you consider yourself part of the white race?

Robert Cassanello
August 05, 2022

Page 158

1    Q    -- declaration.  And it reads: "A component
2  of The Civil Rights Movement involves criticisms of how
3  desegregation was implemented or failed to be
4  implemented during The Civil Rights Movement.  For
5  example, a text I assign, Why Busing Failed:  Race,
6  Media, and the National Resistance to School
7  Desegregation, by Matthew Delmont discusses how
8  predominantly white antibusing activists, including
9  former Florida Governor Claude Kirk, ultimately
10 succeeded in preventing public school desegregation and
11 helped to create a system that gave precedence to the
12 desires of white parents who opposed desegregation over
13 the civil rights of Black students."
14            Now, who are you referring to in that sentence
15 when you referred to "white antibusing activists" and
16 when you refer to "white parents"?
17    A    Sure.  So, again, these are in historical
18 contexts.  So I didn't do the research.  Delmont did the
19 research and he's ascribing people being Black and
20 white.  And I'm assuming he's basing that on their own
21 self-ascribed identities.  I don't know that he's -- I
22 can't say for certainty he doesn't determine whether
23 it's biological or social constructed, but he's
24 employing that to categorize the people who are engaged
25 in the history.

Page 159

1    Q    Well, during that period of time -- what
2  period of time is he referring to?
3    A    He actually starts in the '50s, the late '50s,
4  and he goes into the early '70s.
5    Q    Early '70s?
6    A    He starts in New York, I believe.  New York
7  and Boston.  No, not Boston.  He starts in New York and
8  then ends up in the '70s where busing or antibusing
9  activism was really kind of a national movement, if you
10 will.
11    Q    And during that period of time, would you say
12 that the categories of white and Black were referring to
13 biological categories?
14    A    I don't know.  I didn't do the research, but I
15 can talk about my own research, if that would help.
16    Q    No.  I'm wondering about this research and --
17    A    I don't know that --
18    Q    -- that you assign it --
19    A    Sure.  Sure.  I don't know that, um, Matt
20 Delmont would know the answer to that question.  We
21 can't know the answer to that question because you're
22 looking at historical documents, and in the historical
23 documents, when someone uses "Black" they don't say
24 "Black, I mean socially constructed" or "white, I mean
25 biological."  No one uses that.

Page 160

1            Sometimes you can draw the context from what
2  is written and you can make that distinction, but then
3  you're only drawing a conclusion based on the person who
4  wrote the document or possibly the people who are
5  predisposed to agree with said document.  So it's not --
6  there isn't an answer to your question.
7    Q    Well, then, if there's not an answer to the
8  question, do we know what kind of group of people he's
9  referring to when he speaks about predominantly white
10 antibusing activists?
11    A    He is speaking to white suburban.  And I
12 believe he's making the case of mostly of women,
13 mothers, who are trying to prevent busing of students to
14 achieve some kind of integration goals in local school
15 systems.
16    Q    When you say "white suburban" --
17    A    Uh-huh.
18    Q    -- "women," who are they?
19    A    Those are white women who probably would
20 self-describe themselves as white and live in suburbs.
21 Certainly they would use those -- those terms and some
22 documents and things and some of the advocacy they are
23 doing would self-describe as white.
24    Q    Might those women you're referring to as
25 likely self-describing as white, could they just as

Page 161

1  accurately describe themselves as Black?
2    A    I don't think so.  I've never seen evidence of
3  that.
4    Q    How do you mean?
5    A    Well, you're talking about, like -- what's her
6  name? -- Rachel Dolezal.  Right?
7            MR. NEWHALL:  Dolezal or --
8    A    Do you know who I'm talking about?
9  BY MR. COOPER:
10    Q    I do.
11    A    So I don't think that phenomenon existed in
12 this period of time, at least I have never seen evidence
13 of it.
14    Q    Well, if we were talking about today --
15    A    Uh-huh.
16    Q    -- could those suburban women describe
17 themselves as white or Black?
18    A    Well, I mean, I do believe they have the
19 constitutional right to describe themselves any way they
20 want.  That's not for me to determine or evaluate.
21    Q    And -- and race as a social construct would
22 accept as accurate either description, correct?
23    A    I don't know.  I don't think that's true.
24 Again, I'll use the Rachel Dolezal example.  Right?
25 Here's a white woman who --

Robert Cassanello
August 05, 2022

Page 162

1    Q   Well, you say she's a white woman.  As a --
2    A   Can I finish?
3    Q   Please.
4    A   I'm just saying how people interpret it.
5    Right?  All right.  So she came out and said that, you
6    know, she's a Black woman.  She got a great deal of
7    criticism for that.  I don't know that anybody that I'm
8    aware of affirmed her trans-racial identity, if you
9    will.  So, you know, for me personally, you know, I'm
10   not trying to arbitrate her race.  Right?  But I don't
11   think she -- she's making a social construction
12   argument, but I don't think it is a social construction
13   argument that has salience and that people are accepting
14   it.
15       Q   Well, do people accept your argument about the
16   social construction of race?
17       A   I think some people do.  Sure.  A lot of
18   people do.
19       Q   Well -- and do the people who accept your
20   argument for the social construction of race accept
21   Rachel Dolezal's self-identification as Black?
22       A   I can't answer that question.  I've never
23   talked to anybody.
24       Q   Do you?
25       A   Do I?  I mean, to be honest with you I don't

Page 163

1    think about it.  You know.  It's not something that sort
2    of impacts me as a scholar, so I don't really have a
3    scholarly opinion about it.  I think it's kind of
4    interesting that she's making that argument, but I think
5    it also -- it's also -- there's a -- you know, I don't
6    know her and I never researched her motivations or
7    anything, so I don't want to ascribe any behavior to
8    her.  But in cases like that kind of smack of
9    convenience, if you will.  And what is probably a
10   greater example of that is Ward Churchill.  Do you know
11   who Ward Churchill was?
12       Q   I do.
13       A   To me Ward Churchill more, kind of, represents
14   this -- this convenience of using the social
15   construction of race to achieve a material gain, if you
16   will.
17       Q   Well, if we eliminate from Rachel -- I'm not
18   sure --
19       MR. NEWHALL:  It's Dolezal, D-O-L-E-Z-A-L.
20   BY MR. COOPER:
21       Q   -- Rachel Dolezal's insincere motives and we
22   attribute to her sincerity in her self-perception and
23   self-description --
24       A   Uh-huh.
25       Q   -- would you accept it?

Page 164

1    A   I mean, accept in what way?  I mean, it's none
2    of my business.  I don't interact with her.  She's no --
3    she has no consequence to my life or my scholarship or
4    me as a professional.  I mean, you know, if she --
5    however she wishes to self-describe is her business.
6    It's not my business and it's not my business to
7    arbitrate who she is or who she thinks she is.
8        Q   So that -- and to the extent race is a social
9    construct, then, you would have no basis on which to
10   dispute her if you didn't doubt her sincerity, would
11   you?
12       A   I don't know her sincerity.
13       Q   If you had no basis to doubt her sincerity.
14   That's my hypothetical.
15       A   Sure.  Sure.  Again, I would not put myself in
16   a position to affirm or dispute how she self-identifies.
17   She put it out there.  Everybody knows all the
18   information.  It's not up to me.  What do I care?  What
19   does it matter what my opinion is?  So I just -- you
20   know, I wouldn't have an interest in formulating one or
21   expressing one.  It doesn't achieve anything for me.
22       Q   Well, would -- I'm simply trying to understand
23   how you draw your distinctions among people concerning
24   race.  And -- and I'm -- I quite simply don't understand
25   how you understand race as a social construct --

Page 165

1    A   Uh-huh.
2    Q   -- if you are unwilling to answer questions
3    about Rachel Dolezal.
4    A   I thought I did answer questions.  I'm not --
5    I'm not saying that she represents a race of people.
6        Q   You're not saying what?
7        A   I'm not saying that she represents a race of
8    people.  That's my position.  She's saying that.  That
9    is on her.  So it's not on me.  I'm not the race police.
10   I don't go in and say, "This person is this race; that
11   person is that race," or anything like this.  I think
12   you're kind of misconstruing my belief system.
13       Q   I am just having a hard time understanding
14   your belief system and -- and how it is that -- based
15   upon how you have described your belief system, that
16   race is a social construct, you identify the races of
17   individuals that you encounter.  How do you?
18       A   You know, I think you mentioned it earlier.
19   Some of it is assumptions.  Some of it is guess.  I
20   mean, some of it self-describes.  I've had students over
21   the years who said, "I don't"-- "I believe race is a
22   social construction," and so, you know, "I believe," you
23   know, "I'm human" or something or whatever.
24       You know.  I say, "Okay."  But, I mean, until
25   I have that information, I try not to know make

Robert Cassanello
August 05, 2022

Page 166

1  assumptions.  I try not to.  You know.  But, you know,
2  there's sort of a -- you know, I recognize how we
3  socially group ourselves by race.  So I can recognize
4  that in the classroom.  And I am open to the fact of
5  being wrong in that.  If a student corrects me and says,
6  "This is how I self-identify," I will say, "Okay."
7      Q    You wouldn't say that with Rachel Dolezal?
8      A    I don't know Rachel Dolezal.  I've never met
9  her.  I don't know her --
10     Q    If she were a student.  If she were a student
11  in your class and she said just what you just said --
12     A    Uh-huh.
13     Q    -- would you say, "Well, okay"?
14     A    Probably.  It's not my business to ascribe her
15  race or police her race.
16          Can I say something off the record for a
17  moment?
18          MR. COOPER:  Go off the record for a second.
19          (Discussion off the record.)
20  BY MR. COOPER:
21     Q    I am going to hand you another document and
22  ask if that is one that you recognize.
23     A    Okay.
24     Q    Do you recognize the document?
25     A    Uh-huh.

Page 167

1      Q    What is it?
2      A    That is an assignment from the section, or
3  part of class, where I introduce the book Why Busing
4  Failed.
5          MR. COOPER:  I am going to ask the court
6      reporter to mark that as our next exhibit.
7          (Defendants' Exhibit 7 was marked for
8          identification.)
9  BY MR. COOPER:
10     Q    Okay.  So this exhibit, which has been marked
11  as Exhibit 7 -- in this exhibit you say, "In a
12  two-paragraph essay cite two interviews from the
13  Assignment 11-Busing and the Media."
14     A    Do you want me to tell you where that link
15  goes?
16     Q    That would be helpful.  Yes.
17     A    So the link goes to a website that hosts
18  public radio and TV interviews from the past.  I don't
19  remember the name of the sites.  Like, American Public
20  Television Archive or something like that.  And so I was
21  able to create a link that just had historic news items
22  from busing from the late '60s and early '70s, like in
23  Boston.  There might have been a few in Florida and
24  things like this.  So the interviews are going to be,
25  sort of, news reports from radio or from TV -- public

Page 168

2      Q    I see.  Okay.  So you ask your students to
3  cite two of the interviews from that link.  And "In
4  these two paragraphs affirm or refute the thesis of Matt
5  Delmont's book Why Busing Failed or use the information
6  from the book and in the discussion post to argue that
7  busing can represent a declination narrative for The
8  Civil Rights Movement."
9          What -- what is the book's thesis that you're
10  asking students to either affirm or refute?
11     A    Sure.  The book argues that busing, sort of,
12  represents failure to truly grapple with the integration
13  of American schools after The Civil Rights Movement.  So
14  this is Matt -- this is his word.  I don't know if I
15  would have worded that... When The Civil Rights Movement
16  ends, there is this expectation that American public
17  schools would be integrated.  And he's saying that
18  busing -- busing interferes with efforts at what maybe
19  he might describe as a true integration.  And it is sort
20  of similar in a way of the Wages of Whiteness in that
21  he's looking a lot at the suburban moms.  Right?  And
22  trying to make the case that it's this -- you know, it's
23  sort of a gendered movement, women movement, to sort of
24  block integration.  Meaningful ways in these -- that's
25  roughly his thesis.

Page 169

1      Q    And I want to hand you a book that is titled
2  Why Busing Failed -- and it's by Matthew Delmont -- and
3  ask you if you confirm to me that that's the book that
4  you do assign and that you were talking about?
5      A    Yes.  Yes it is.
6      Q    Thank you.  Now, you ask your students to
7  either affirm or refute that thesis and so --
8      A    Or the declination narrative.
9      Q    Yes.
10     A    Those are two different things.
11     Q    Sure.  They have a --
12     A    Choice.
13     Q    They have a choice.  They can choose either
14  option?
15     A    Uh-huh.
16     Q    But if they choose to treat [sic] with the
17  thesis itself, they are free to refute it or affirm it
18  based upon -- harkening back to our earlier conversation
19  --
20     A    What's the term I use on the narratives?
21     Q    Coherent narrative.
22     A    Coherent narrative.
23     Q    Based upon their own interpretation of the --
24     A    And constructing a coherent narrative.
25     Q    Yes.

Robert Cassanello
August 05, 2022

Page 170

1    -- of the paragraphs -- excuse me -- of the
2  interviews that they select, correct?
3    A    Uh-huh.
4    Q    Yeah.
5    A    Conceivably.
6    Q    And I take it you're indifferent to whether
7  they affirm or refute it.  Your assessment of their
8  paragraphs, of their work in the assignment depends on
9  how they support it and how they defend it?
10    A    Yes.
11    Q    Okay.  Moving on to your paragraph 16.  "Other
12  interpretations of The Civil Rights Movement that I
13  teach discuss ways in which integration harmed the Black
14  community.  Specifically, the desegregation of public
15  schools resulted in many Black educators and
16  administrators taking pay cuts and losing their jobs as
17  schools closed.  I co-directed a film called Marching
18  Forward with UCF film professor Dr. Lisa Mills and my
19  student" --
20    A    Oswmer.
21    Q    -- "Oswmer Louis that covers desegregation in
22  Orlando public schools.  In discussing those topics,
23  part of the film features interviews by Black public
24  school administrators and teachers who were adversely
25  impacted by desegregation."

Page 171

1    When did you and Dr. Mills produce Marching
2  Forward?
3    A    We did it in a -- we teach a class that's
4  called History Documentary Workshop.  And I'm the
5  historian and she's the filmmaker.  And we have students
6  there that are in the Burnett Honors College.  This is,
7  like, the fourth film we have done.  We have done
8  previous ones as well.  And we collaborate on a
9  documentary project.  Most of them end up on public
10  television.  So this film was WUCF.  It's aired
11  nationally.
12    Q    What's the content of the time frame that --
13    A    The time frame of the content or when we made
14  it?
15    Q    Originated.
16    A    So this class -- I think we started in 2016
17  and we had a final film 2020.  It aired nationally on
18  public television February of 2021.
19    Q    Okay.  So very recently it aired?
20    A    Yeah.  But it streams online, so anybody can
21  watch it because it's public television.  So it's not
22  behind the paywall.
23    Q    And in order to produce the film, did you
24  and/or Dr. Mills -- are you the ones that interviewed
25  the Black public school administrators, or were those

Page 172

1  clips of interviews that had previously been taken and
2  you found in archives?
3    A    The black administrators?
4    Q    Yes.
5    A    They were -- we interviewed them.
6    Q    You interviewed them?
7    A    We did or the students did.
8    Q    Okay.
9    A    We had -- there was a person involved in the
10  content of the film who passed before we started the
11  project, and there were some historic interviews he did
12  that's in the film, but we never interviewed him.  But
13  he's the only one.
14    Q    The Black public school administrators and
15  teachers that you interviewed, how did you identify them
16  as Black?
17    A    They identified themselves as Black.
18    Q    They identified themselves as Black too.
19    A    Sure.
20    Q    Moving to paragraph 18.  "Under HB7's regime,
21  I could be violating the law to offer these texts
22  criticizing the desegregation movement because these
23  criticisms could be perceived as advocating the
24  viewpoint that 'members of one race, color, national
25  origin, or sex cannot and should not attempt to treat

Page 173

1  others without respect to race, color, national origin,
2  or sex.'"  That is concept number 4 that we have been
3  talking about.
4    Explain to me how these texts that criticize
5  the desegregation movement -- and I take it the
6  criticism is based upon the harm that some in the Black
7  community suffered as a result of that desegregation
8  movement.
9    A    Sure.
10    Q    Explain to me how -- how those criticisms of
11  the desegregation movement could be perceived as
12  advocating the viewpoint that members of one race,
13  color, national origin, or sex cannot and should not
14  attempt to treat others without respect to race, color,
15  national origin, or sex.
16    A    So that, again, goes back to how a discussion
17  or concept can be construed.  Obviously, I want to --
18  because I said I want to teach that.  I want it to be
19  part of the curriculum.  But the literature, if you
20  will, on desegregation is pretty recent and it's pretty
21  -- can be controversial because it -- to some extent --
22  maybe not so much in Why Busing Failed, but some other
23  stuff with the film -- some other things that I might be
24  so inclined to assign -- really sort of criticizes
25  things like white flight, public schools, various and,

Robert Cassanello
August 05, 2022

Page 174

1  you know, multiple attempts to integrate public schools
2  and things like this.  And I think in that context,
3  there could be a person or their student off the street
4  or one of these entities that has the ability to
5  construe what I do.
6      Q    Mr. Sabatino?
7      A    Mr. Sabatini.
8      Q    Mr. Sabatini?
9      A    Right.  Sabatini could construe that as a
10  criticism of, you know -- school system criticism of,
11  you know, families who desired, let's say, to move to
12  the suburbs, you know, you know, which had a direct
13  impact on desegregation.  You can go so far as to say
14  private school and charter school systems, you know,
15  things like that.
16          Now, this may not -- you know, again, I don't
17  come in the class and say, "In order to pass this class,
18  you must think X, Y and Z."  We have pretty much
19  established that here.  Right?  But I can tell you when
20  I taught -- when I taught this last time, I had a
21  student in the class who was a -- not just supportive
22  but was an activist for the school choice movement.  And
23  I know that, you know, when did this reading, had this
24  discussion -- it didn't get heated, right, but, you
25  know, I could say that she probably expressed views that

Page 175

1  some students didn't agree with, let's say, but it was
2  in a politeful [sic] and -- what's the word here,
3  respectful?  It was in a respectful way.  I'm in touch
4  with her.  We talk frequently and stuff like this.  You
5  know.  There's no ill-will from her experience there.
6  But I can see, you know, in a different context someone
7  presenting that same argument, yet feeling that somehow
8  that -- that the class discussion, class content was
9  violating.
10      Q    Was what?
11      A    That somehow the class content or class
12  discussion was in somehow violating their opinion about
13  desegregation.
14      Q    And you're citing her and her support for
15  school choice as the person whose opinion about
16  desegregation might have been violated?
17      A    No.  I'm saying that -- not her, because
18  obviously it didn't happen.  I'm giving you an example
19  where this did not happen.  I'm saying I could see in
20  the future, because this law is going to create the
21  conditions by which, you know, students, people in the
22  street, Representative Sabatini have police powers in a
23  sense almost.  Right?  I can see, you know, someone
24  with, you know, that viewpoint who doesn't take the
25  discussion, say, the respectful way that it was offered

Page 176

1  might construe it in a way that they believe is a
2  violation of HB7.
3      Q    Well, how is it that the discussion you have
4  just described would advocate the viewpoint that members
5  of one race cannot and should not attempt to treat
6  others without respect to race?
7      A    Not in the -- not in the real example I gave
8  you.  But, say, again, in a future class, if I have a
9  student that believes, say, in the Black pathology
10  argument of African Americans, I can see that discussion
11  become quite a contestation, if you will.  Because, you
12  know, then, you know, I would have to challenge that.
13  And, you know, we kind of had a discussion about some of
14  these things.
15      Q    Yes.
16      A    And imagine that discussion transposed to this
17  desegregation.  Because, you know, that argument is made
18  for -- by -- those who ascribe to the pathology argument
19  also subscribe oftentimes to, you know, a feeling that
20  desegregation should never have been attempted at all.
21  Right?  So that kind of discussion could lead down.
22  Again, it wasn't in the example I gave you, but I could
23  see it.
24      Q    It sounds to me, actually, like exactly the
25  kind of discussion that we hope is happening in our

Page 177

1  college classrooms where people of differing approaches
2  and thoughts are airing them, exposing them to other
3  students, seeing the reactions of the other students and
4  their professors, debating them and what have you.
5  That's -- that's what I -- how I remembered --
6      A    Sure.
7      Q    -- college.
8      A    That's the idea.  Right?
9      Q    That's the idea.
10      A    Right.  But, unfortunately, the way the law is
11  written, one can construe what my intent is or what my
12  purpose is or what my -- what -- what I achieved.  And
13  whether it's correct or not, I think has no bearing.
14      Q    Well, a student -- this hypothetical
15  student -- down the road who believed in the pathology
16  theory that we discussed, would, by definition, not
17  believe, I take it, that members of one race should
18  attempt to treat others without respect to their race.
19  He would --
20      A    I think you're making a lot of assumptions
21  there.  We don't know.  You know, if we are using --
22  we'll use a real person.  If we are using Richard
23  Spencer, right, Richard Spencer says, "We should treat
24  every race as respectful," and so on and so forth, but
25  he would be -- I'm speculating on this.  He would be of

Robert Cassanello
August 05, 2022

Page 178

1  the opinion that, you know, African Americans, as a
2  lesser race of people, you know, would represent, you
3  know, the kind of pathology that we are talking about
4  and would not be someone who would be so inclined to
5  support efforts to, say, truly integrate American public
6  schools.
7      Q   Right.
8      A   And I think he does it in a very respectful
9  way.  He wears a suit and tie.  He doesn't use the word
10 racism.  He uses racialist.  And someone like him would
11 take offense, you know, to some of this material, I
12 would think.
13     Q   Let's move on to -- let's move on to concept
14 number 5.
15     A   Concept number 5.
16         MR. DeMAGGIO:  Can I run to the bathroom
17 before we do that?
18         MR. COOPER:  Yeah.  Sure.  Let's take ten
19 minutes or so.
20         (Recess taken 3:17 p.m. until 3:24 p.m.)
21         MR. COOPER:  Back on the record.
22 BY MR. COOPER:
23     Q   All right.  I want to call your attention to
24 concept number 5 in HB7.  That concept reads: "A person,
25 by virtue of his or her race, color, national origin, or

Page 179

1  sex bears responsibility for, or should be discriminated
2  against or receive adverse treatment because of, actions
3  committed in the past by other members of the same race,
4  color, national origin, or sex."
5          So, Dr. Cassanello, do you believe that a
6  person by virtue of his or her race bears responsibility
7  for or should be discriminated against or receive
8  adverse treatment because of actions committed in the
9  past by other members of the same race?
10     A   No.
11     Q   Okay.  In fact, in paragraph 20 of your
12 declaration -- we can take a quick look at that -- you
13 say in that first sentence, "I would not instruct a
14 student, for example, that they bear personal
15 responsibility for a lynching committed in the past."
16         So that's just, I take it, an example of --
17     A   Sure.
18     Q   And so why wouldn't you instruct the student
19 in one of your classes that they bear personal
20 responsibility for that kind of lynching in the past?
21     A   Why wouldn't I?
22     Q   Yes.  Why wouldn't you?
23     A   I think that would be irresponsible teaching.
24 That could be something that could result in academic
25 misconduct.

Page 180

1      Q   Okay.  And let me just -- to fill this out:
2  Would you instruct that same student that they should be
3  discriminated against or receive adverse treatment
4  because of that lynching or some such other thing that
5  was committed in the past by other members of that
6  student's same race?
7      A   No.  I would not.
8      Q   So this -- this concept number 5 --
9      A   Uh-huh.
10     Q   -- I think goes hand in hand with number 7.
11 So why don't we jump --
12     A   Actually, can we stay on 5?
13     Q   Yes, of course.
14     A   Because I think you're missing a nuance here.
15     Q   Please.  I don't want to do that, so...
16     A   Great.  Great.  So I used the example of
17 lynching here.  That's a pretty historically remote
18 example.  Right?
19     Q   Yes.
20     A   So my concern with number 5 would be if I were
21 teaching or had my students reading things about white
22 flight -- some of the desegregation issues we talked
23 about -- because that has a much more immediate or a
24 student could interpret that, let's say, construe that
25 -- has a much more immediate responsibility than

Page 181

1  lynching that might have taken place 100 years ago.
2  Right?  So they could look at themselves and say, "Oh, I
3  live in the suburbs so all of this stuff about white
4  flight and problems with white flight I might have some
5  personal responsibility to that."
6          Now, I wouldn't teach that.  I would, you
7  know, definitely expect that students wouldn't come away
8  from a lesson on that with that sort of opinion, but I
9  think that if one were so inclined -- a student, on the
10 street, Sabatini -- they can walk away with that sort of
11 interpretation of what I'm doing with that specific
12 lesson.
13     Q   Okay.  And I think this may get to your
14 description of a student's possible reaction to that
15 lesson about the more recent, kind of, racial
16 controversy relating to busing and white flight that the
17 student's reaction may be something you describe in
18 paragraph 20 --
19     A   Uh-huh.
20     Q   -- of your --
21     A   Uh-huh.
22     Q   -- of your declaration when you -- beyond the
23 first sentence, which we just referenced with respect to
24 lynching you go to say, "However, I have no control over
25 how students will interpret the particular lesson."

Robert Cassanello
August 05, 2022

Page 182

1    A    Uh-huh.
2    Q    "Psychological distress, anguish, or a feeling
3    of personal responsibility to correct injustices is
4    often a natural response when students learn the role
5    that events during Jim Crow and The Civil Rights
6    Movement impacted those students' socioeconomic status."
7    A    Sure.
8    Q    Okay.  Well -- and -- and that -- that
9    particular --
10    A    Can I qualify some of that?  Do you mind?
11    Q    Qualify your --
12    A    What you just read.
13    Q    Yes.
14    A    So the reason I used the term "natural
15    response" is because over the years I have seen students
16    who internalize lessons, especially lessons on Jim Crow,
17    The Civil Rights Movement, and stuff I've taught over
18    the years.  So, to me -- and I'm using the term "natural
19    response" in an anecdotal way from what I've seen
20    students -- how I've seen students internalize these
21    lessons and say, "Hey, I" -- you know, "I'm a person" --
22    you know, I don't know they -- I don't recall
23    specifically how they might articulate it but it could
24    be, you know, "I lived in suburbs and I went to a
25    private school."  And, you know, then they start kind of

Page 183

1    unpacking all this stuff.  Right?
2    Q    Uh-huh.
3    A    And so forth ones who -- and, again, over
4    years I have seen this.  For the ones who approach me --
5    say after class or something -- you know, I will talk to
6    them about that, and, sort of, talk them off the ledge,
7    if you will.  And just say, "Hey, this is history.
8    Let's" -- you know, and I will speak to them, but I
9    guarantee you there are students who don't approach me
10    after probably and who might harbor those feelings.  And
11    if they are so inclined, you know, to interpret this
12    stuff this way, I can see them also lashing out and
13    saying, "Well, Professor Cassanello made me feel this
14    way."  And that's, you know...
15    Q    But the ones who -- and you have had this
16    actually happen, I take it --
17    A    Uh-huh.
18    Q    -- you're saying --
19    A    Uh-huh.
20    Q    -- where students do feel this psychological
21    anguish --
22    A    Uh-huh.
23    Q    -- in light of a lesson and come to you,
24    but -- and you've -- you know, what is it that you say
25    to them?

Page 184

1    A    I mean, it depends situationally, you know,
2    what they communicate to me, but usually --
3    Q    Talk about the ledge.
4    A    The ledge.  Sure.  Sure.  So usually it -- it
5    brings forth -- like I said, what I notice is an
6    internal psychological anguish.  Right?  And so I try
7    and get them to -- to undo that, if you will.  "Let's
8    not internalize this.  Let's not make this about you.
9    Let's learn about history so that, you know, we can take
10    lessons from this."  And, you know, "Learning about the
11    history about people might make you a much more
12    empathetic person and that's what you might want to be
13    going forward.  And that maybe is the lesson you learned
14    out of all of that.  That might be something I would
15    say.
16    Q    Sure.  But your concern is for the students --
17    A    That don't talk to me.
18    Q    -- that don't and who may feel the same
19    reaction?
20    A    Because I think -- yeah.  I personally think
21    it might be, you know, more often the case than not.
22    Q    Uh-huh.
23    A    You know.  It depends if a student feels
24    comfortable talking to you, if a student feels they are
25    in a place where they can tell you about how they

Page 185

1    emotionally feel.  You know.  You might find it hard to
2    believe, I'm not the most cuddly professor on campus and
3    so a lot of students feel intimidated to talk to their
4    professors.  So I would imagine there's a lot of
5    students who keep this stuff inside.
6    Q    Okay.  So let's move on to concept number 8.
7    A    We're going to be here till 7:00.
8    Q    Huh?
9    A    We're going to be here till 7:00.
10    Q    Why do you say that?
11    A    Concept 8.
12         MR. DeMAGGIO:  It's the last one.
13    A    It's what's in there -- what's in there is, I
14    think, is going --
15    BY MR. COOPER:
16    Q    Okay.  Well --
17    A    We'll see.
18    Q    All right.  Well, concept 8 reads as follows:
19    "Such virtues as merit, excellence, hard work, fairness,
20    neutrality, objectivity, and racial colorblindness are
21    racist or sexist, or were created by members of a
22    particular race, color, national origin, or sex to
23    oppress members of another race, color, national origin,
24    or sex."
25         So, first of all, Dr. Cassanello, do you

Robert Cassanello
August 05, 2022

Page 186

1   believe that these concepts that are ticked off here --
2   merit, excellence, hard work, and the rest of them -- do
3   you believe those are virtues as they are characterized
4   in the statute?
5       A   Just as a base definition?
6       Q   Yes.
7       A   Yes.
8       Q   Do you believe that those virtues, then --
9   just using that as a base definition -- those virtues or
10  any of them are racist?
11      A   I can't answer that question because it
12  depends on the instruments and the people who are
13  measuring all those categories.  So my answer would be
14  they could be.  Inherently they may not be, but they
15  could be.
16      Q   Give me an example of -- of a concept that
17  could be racist in its -- in its use.
18      A   Use this?
19      Q   Yeah.
20      A   Well, it's not the concept.  It's the one who
21  employs the concept.  Right?  So what you're assuming is
22  if one, you know, faithfully deploys each of these
23  concepts, right, the outcome will be fairness.  Right?
24  My argument would be that would depend on the person
25  employing the concept.  If the person employing the

Page 187

1   concept is racist, is not colorblind, sexist, what have
2   you -- any of these categories or more -- then I think
3   it doesn't matter whether those concepts in and of
4   themselves are truly virtuous.
5       Q   So they -- they can be used -- would it be
6   fair to say -- or is it fair for me to understand your
7   point here that these concepts could be used as pretexts
8   for racist actions?
9       A   I think racist would point to these things and
10  claim some cloak of objectivity, if you will, and make
11  the case that their actions did not violate any of these
12  principles.
13      Q   Okay.
14      A   But, again, it would depend on the person.  It
15  would depend on the tool, if you will.
16      Q   Well -- and let's -- I think it may be helpful
17  to my understanding anyway if we refer to your
18  declaration --
19      A   Okay.
20      Q   -- when you mentioned a couple of these
21  things.  Let's go to paragraph 14.
22      A   14?
23      Q   Now, first of all, recall that in paragraph 14
24  you were referring to the Wages of Whiteness text, which
25  you describe in paragraph 13.

Page 188

1       A   Uh-huh.
2       Q   Is that -- as you look at that; is that
3   correct?
4       A   I believe that's correct.
5       Q   In paragraph 13 you talk about the Wages of
6   Whiteness.
7           In paragraph 14 you say that -- you say,
8   "HB7's prohibition on advocating the racial connotations
9   of the concepts of merit and hard work..."
10      A   Uh-huh.
11      Q   And then I'm going to skip over the next
12  because we have already discussed that concept.
13      A   Sure.
14      Q   "...of merit and hard work would restrict my
15  ability to offer instruction on this text."
16          "This text" being the Wages of Whiteness.
17      A   Sure.
18      Q   So now, reflecting back upon what you have
19  already said about these virtues as being potentially
20  racist --
21      A   It could.
22      Q   -- if that's a fair point.
23      A   Sure.
24      Q   What do you mean when you say "prohibition on
25  advocating the racial connotations of the concepts of

Page 189

1   merit and hard work," racial connotations?
2       A   That I recall, the context of 14, you're
3   right.  It's centered around Wages of Whiteness.  So I
4   believe what I was doing there was trying to present
5   those concepts within concepts of the history of work
6   and labor in the labor movement.  You know.  And,
7   clearly, Roediger's book -- you know, those virtues that
8   we mentioned have no role in -- I'm not saying no role,
9   but have limited role in whether someone can achieve
10  social mobility in 19th century America.
11          But if I were to kind of revise this, I would
12  maybe move that paragraph below 15 and include both
13  texts because I think the desegregation questions and
14  white flight, and all this other kind of stuff, too,
15  probably runs into what I'm saying in 14.
16      Q   Okay.  So how -- well, just keeping the focus
17  for a moment now on the Wage of Whiteness text.  What in
18  this text in busing -- excuse me, Wages of Whiteness --
19  would contradict the proposition that -- or maybe -- let
20  me rephrase that.
21          What in the Wages of Whiteness would endorse
22  the proposition that merit and hard work are racist or
23  that they were created by members of a particular race
24  to oppress members of another race?
25      A   I would say it this way, if we are talking

Robert Cassanello
August 05, 2022

Page 190

1   about Wages of Whiteness.  Right?  What Wages of
2   Whiteness does is introduce the ways in which the person
3   or the instrument, right, is inherently racist.  Right?
4   The whiteness.  And they are using concepts of merit,
5   excellence, hard work, fairness, neutrality, objectivity
6   -- I don't know that I would go so far as
7   colorblindness, but all of those other things to say --
8   to defend the racial outcomes that are their intent.
9        So this is an example of where we have the
10  people who are employing the virtues of merit and so on
11  and so forth, but their intent is not to truly create a
12  system of those virtues.  It's something different, but
13  employ those virtues to cover what their real intent is.
14       Q    To cover.  They are offered as, essentially, a
15  pretext for racism or racial --
16       A    Right.
17       Q    -- discrimination, if you will, or --
18       A    National origin, too -- national origin with
19  the labor movement because the Irish and German --
20       Q    The Irish.
21       A    -- were probably not treated equally too.
22       Q    And so those -- that example from the Wage of
23  Whiteness with respect to the 19th century labor
24  movement is one in which these virtues have been -- I
25  think, to use your phrasing -- used really to cover

Page 191

1   racist actions.  Is that a fair understanding of what
2   you mean?
3        A    I think I did say that, but I don't know if
4   "cover" is the accurate word.  Right?  Because they
5   would have had the intent to be racist, and they would
6   have seen nothing wrong with being racist, so it wasn't
7   for them a moral failing.  So I don't know that "cover"
8   really -- I know I said that, but I don't know that
9   "cover" really explains things more.  They use -- they
10  sort of racialize the notion of merit and colorblindness
11  and so on and so forth to achieve a racist goal, which
12  is inherently not those things.
13       Q    And you -- you express the concern that this
14  concept, number 8, would restrict your ability to offer
15  instruction on Wage of Whiteness.  And I think you have
16  now added Why Busing Failed to that concern.
17       A    Sure.
18       Q    Does this get back to the Sabatini --
19       A    Uh-huh.
20       Q    -- dialogue?
21       A    Certainly.  Certainly.  Because it's related
22  to the earlier point about, you know, sort of, natural
23  psychological distress, if you will.  Right?  Because
24  this also kind of rolls with my personal responsibility
25  for this system.  You know.  And if you're talking about

Page 192

1   busing, it's certainly much more recent to those
2   students individually.  Right?  And then they might feel
3   anguish because they might question whether, "Well, did
4   I get here because of merit?  Did I get here because of
5   fairness?"  And it could cause some psychological
6   distress to that individual.
7        Q    Well, further to this point, or to this issue,
8   let's take a look at paragraph 9 of your declaration,
9   which you address the Bell Curve.
10       A    Uh-huh.
11       Q    Paragraph 9 reads: "An example of a
12  discredited interpretative lens in the area that this
13  law regulates is the concept of the bell curve."
14       Now, there was a book by Richard Herrnstein
15  and Charles Murray -- and I very well remember when this
16  book came out --
17       A    So do I.
18       Q    -- and the controversy that erupted around the
19  book.
20       A    Continues to erupt currently.
21       Q    Well, I'm sure it hasn't -- it hasn't
22  dissipated a lot.  Maybe only increased.  But when you
23  refer to the Bell Curve, are you referring to this book
24  specifically or to the basic theory?  Or what does this
25  book, if anything, have to do --

Page 193

1        A    Sure.
2        Q    -- with your reference here to the concept of
3   the Bell Curve --
4        A    Uh-huh.
5        Q    -- which you don't really --
6        A    I don't have it in quotes or --
7        Q    -- identifies --
8        A    -- italics of the book.  I get what you're
9   saying.
10       Q    Yeah.
11       A    So, yeah.  That's -- I think that's accurate.
12  I'm trying to express the notion of the bell curve more
13  so than the book itself.  So I think what the Bell Curve
14  does is it introduces -- it's been a while since I read
15  the Bell Curve.  I read it when it came out.  I haven't
16  read it recently.  But it expresses -- I guess to be
17  most accurate -- a question about whether genetics and
18  intelligence can be correlated to race.  Right?
19  There's, like, a chapter in there, essentially, that
20  maps that whole thing out.  And since that book got
21  published there have been people, including Charles
22  Murray -- his work since -- at least his recent work --
23  has been trying to make that connection of race and
24  intellectual -- intellectual correlation of race.  It is
25  more recent work that he's done.