# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

| | |
|---|---|
| DONALD FALLS, et al., | |
| *Plaintiffs*, | Case No. 4:22-cv-166-MW/MJF |
| v. | |
| RON DESANTIS, in his official capacity as Governor of Florida, et al., | |
| *Defendants*. | |

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR LEAVE TO FILE A SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFF CASSANELLO'S MOTION FOR A PRELIMINARY INJUNCTION

Timothy L. Newhall
*Special Counsel*
Complex Litigation
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399-1050
Telephone: (850) 414-3300
timothy.newhall@myfloridalegal.com

*Counsel for Defendant Ashley Moody, in her official capacity*

August 12, 2022

Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

*Counsel for Defendants Ron DeSantis, in his official capacity, et al.*

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................. 2

STANDARD OF REVIEW ............................................................................... 5

ARGUMENT .................................................................................................... 5

    I.    Dr. Cassanello's Idiosyncratic View Of "Race" Renders His Challenge To The Act Utterly Incoherent ..................................................... 5

    II.    Dr. Cassanello Has Failed To Demonstrate That He Intends To Endorse Any Of The Prohibited Concepts In His Classes ................................... 10

    III.    Dr. Cassanello's Subjective Fear Of Erroneous Enforcement By Persons Not Before the Court Does Not Confer Standing ................................... 15

CONCLUSION ............................................................................................... 19

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                              **<u>Page</u>**

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979)...................................................................................15

*Blackburn v. Shire US Inc.*,
    18 F.4th 1310 (11th Cir. 2021)....................................................................5

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)....................................................................................8

*Garcia v. Gloor*,
    618 F.2d 264 (5th Cir. 1980)...................................................................8, 9

*Keister v. Bell*,
    29 F.4th 1239 (11th Cir. 2022).................................................................10

*Laird v. Tatum*,
    408 U.S. 1 (1972)......................................................................................15

*Legacy Enter. & Arts Found., Inc. v. Mina*, No. 6:21-cv-698-PGB-DCI,
    2021 WL 4444688 (M.D. Fla. Aug. 20, 2021) ...........................................18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................10

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022)............................................................10, 11

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)..................................................................................10

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004)....................................................................................9

*Whole Woman's Health v. Jackson*,
    142 S. Ct. 522 (2021)................................................................................17

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016)...................................................................5

**Statutes**

FLA. STAT.

§ 1000.05(4)(a) ...............................................................................17

§ 1000.05(4)(a)1 ..........................................................................2, 12

§ 1000.05(4)(a)2 ..........................................................................2, 13

§ 1000.05(4)(a)3 .................................................................. 2, 6, 13, 14

§ 1000.05(4)(a)4 ................................................................................3

§ 1000.05(4)(a)5 ...........................................................................3, 13

§ 1000.05(4)(a)6 ................................................................................3

§ 1000.05(4)(a)7 ...........................................................................3, 16

§ 1000.05(4)(a)8 ........................................................................3, 6, 13

§ 1000.5(4)(b) ..................................................................................3

§ 1000.05(9) ...................................................................................17

2022 Fla. Laws 72, § 8 ("Individual Freedom Act") .............................2

**Other Authorities**

Matthew Delmont, WHY BUSING FAILED: RACE, MEDIA, AND THE NATIONAL
RESISTANCE TO SCHOOL DESEGREGATION (2016) ..........................................12

David R. Roediger, THE WAGES OF WHITENESS: RACE AND THE MAKING OF THE
AMERICAN WORKING CLASS (2007) ...........................................................18

Michelle Alexander, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF
COLORBLINDNESS (2012) ....................................................................6, 18

## INTRODUCTION

Jurisdictional discovery in this case has made one thing clear: Dr. Cassanello has no intention of violating the Individual Freedom Act. Indeed, it would apparently be impossible for him to coherently espouse or endorse any of the eight prohibited concepts related to race because he *does not believe that race even exists*. Dr. Cassanello's remarkable rejection of the existence of race renders his claim that he is injured by the Act utterly incoherent, and he cannot demonstrate standing.

In any event, Dr. Cassanello has made clear that the foundation of his teaching methodology is *not* to *endorse or advocate* the arguments and theories in material he assigns, but rather to foster in his students the "critical thinking" skills that will enable them to *think for themselves*. Because the Act prohibits only *the endorsement* of the prohibited concepts—and expressly permits *discussion* of them—even if some reading material that Dr. Cassanello assigns expressly endorses one of the eight concepts, his act of assigning the material would clearly not violate the Act.

Moreover, Dr. Cassanello testified that he does not believe that any of his readings actually violate the Act. Instead, his concern is that people could *misconstrue* his teaching as violating the Act. His concern, however, is centered on persons who lack enforcement power and are not before the Court. A fear of enforcement based on a *misreading* of either the Act or a misconstruction of Dr.

1

Cassanello's assignments by a non-party who lacks enforcement power is not the kind of objectively reasonable fear that gives rise to an Article III injury.

If all that were not enough, Dr. Cassanello further testified that he himself *rejects* most of the concepts prohibited by the Act. And for the concepts that he was reluctant to either condemn or endorse, it is clear that his reluctance plainly stems from a *misunderstanding* of what those two provisions of the Act actually prohibit.

Dr. Cassanello lacks standing.

## FACTUAL BACKGROUND

In April, Governor DeSantis signed the Individual Freedom Act. *See* 2022 Fla. Laws 72, § 8. As relevant here, the Act prohibits the practice of "subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts":

1.    Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2.    A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3.    A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4.      Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5.      A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6.      A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.      A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8.      Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

FLA. STAT. § 1000.5(4)(a)1-8.

Although it prohibits all persons from subjecting a student or employee to "endorsement" of these concepts, the Act makes clear that it does not "prohibit discussion of the concepts . . . as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner." *Id.* § 1000.5(4)(b).

3

Dr. Cassanello and several other plaintiffs sued, seeking a preliminary injunction. *See* Verified Complaint, Doc. 1 (Apr. 22, 2022); Pls.' Mot. for Prelim. Inj. and Mem. of Law, Doc. 4 (Apr. 22, 2022). They argue that the Act violates the First Amendment and is void for vagueness. The Court denied the preliminary injunction motion for lack of standing as to all Plaintiffs other than Dr. Cassanello. *See* Order Denying Prelim. Inj. in Part, Doc. 62 (June 27, 2022) ("PI Order"). Dr. Cassanello's motion for an order preliminarily enjoining enforcement of Section 1000.5(4)(a) of the Act is still pending. On July 1, the Act went into effect. The following week, the Court denied Defendants' motion to dismiss Dr. Cassanello's claims against the Board of Governors. Order Granting in Part and Denying in Part Mot. to Dismiss, Doc. 68 (July 8, 2022) ("MTD Order").

Defendants thereafter sought jurisdictional discovery related to Dr. Cassanello's standing. Specifically, they requested documents related to the instruction that Dr. Cassanello believed would be prohibited by Section 1000.5(4)(a) of the Act. In addition, Defendants deposed Dr. Cassanello on August 5, 2022. In light of Dr. Cassanello's production and deposition, Defendants move for partial summary judgment and for leave to file this supplemental brief in opposition to Dr. Cassanello's motion for a preliminary injunction.

4

## STANDARD OF REVIEW

To sustain his motion for a preliminary injunction, Dr. Cassanello bears the burden of persuasion to "clearly establish" that (1) he "has a substantial likelihood of success on the merits"; (2) he will suffer "irreparable injury" if he does not obtain an injunction; (3) his "threatened injury . . . outweighs whatever damage the proposed injunction may cause" Defendants; and (4) the injunction "would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotation marks omitted). In turn, summary judgment is appropriate "when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." *Blackburn v. Shire US Inc.*, 18 F.4th 1310, 1317 (11th Cir. 2021).

## ARGUMENT

### I.   Dr. Cassanello's Idiosyncratic View Of "Race" Renders His Challenge To The Act Utterly Incoherent.

Until last Friday, we thought we understood the nature of Dr. Cassanello's argument: The Act prohibits him from espousing certain concepts related to race that he believes and intends to endorse in his classroom this upcoming schoolyear. Dr. Cassanello states in his declaration that he "strive[s] to give students a comprehensive view of the history of race and racism in America." Decl. of Dr. Robert Cassanello ¶ 5, Doc. 30-2 (May 18, 2022) ("Cassanello Decl."). And he

5

believes that his instruction might be deemed to endorse the concepts prohibited by the Act.

For example, some of his instruction, Dr. Cassanello said, could be seen as endorsing the concept that "a person's moral character or status as either privileged or oppressed is necessarily determined by his race." *See* Cassanello Decl. ¶ 12; FLA. STAT. § 1000.05(4)(a)3. Similarly, he declared that he would be prohibited from criticizing "the 'bell curve' theory" that "used the concept of merit and innate intelligence to justify socioeconomic inequality" because doing so would be considered endorsing the concept that "such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex." Cassanello Decl. ¶ 10; MTD Op. at 8; FLA. STAT. § 1000.05(4)(a)8. Likewise, Dr. Cassanello stated that the Act prohibited him from assigning THE NEW JIM CROW because doing so would be considered endorsing the concept that "a person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." Cassanello Decl. ¶¶ 11-12; MTD Op. at 9; FLA. STAT. § 1000.05(4)(a)3. Because he believed that the Act prohibits him from teaching what he intends to teach, he filed this lawsuit.

During Dr. Cassanello's deposition, however, the straightforward nature of his argument was completely upended. There, Dr. Cassanello explained that he had no intention of endorsing any of the eight concepts related to race because he did not even believe that race *exists in the first place*. He did not mince words: "I don't want to endorse the notion of race and say race is something which exists. So I don't want to say, you know, 'I believe everyone of every different race should be treated equally' because then I'm endorsing the notion of race[.]" Ex. 1 to Notice of Filing Exhibit in Support of Defendants' Motion for Partial Summary Judgment at 143:13-18, Doc. 73-1  (Aug. 11, 2022) ("Dep. Tr.").

Dr. Cassanello's attempt to explain his view of race raised more questions than it answered. When asked what race he considers himself to be, Dr. Cassanello responded, "I would consider myself part of the human race." *Id.* at 149:21-23. When asked about other people's races, Dr. Cassanello stated that he believed their races are determined by "their own self-ascribed identities." *Id.* at 158:14-21. This fluid, mutable view of race necessarily contemplates the possibility of a "trans-racial identity," *id.* at 162:5-9, which Dr. Cassanello ultimately concluded he would "[p]robably" accept were a student to identify as trans-racial, *see id.* at 166:10-15.

Given Dr. Cassanello's understanding of race, it is difficult to understand what his lawsuit is about. If race is *not* "something which exists" and is merely a self-ascribed, discretionary identity, then every person is both any race and no race. And

7

*nothing* Dr. Cassanello believes can even conceivably be prohibited by the Act—which *presupposes* not only that race exists, but that it is an immutable natural characteristic determined at birth. For example, if race does not exist, then the proposition that members of one race are morally superior to members of another race is simply incoherent. It is on the order of saying that aliens from Mars are morally superior to aliens from Venus.  Dr. Cassanello seemingly acknowledged this fact when he said that he could *not* say that "'everyone of every different race should be treated equally' because then" he would be "endorsing the notion of race" as "something which exists." *Id.* at 143:13-15.

Moreover, accepting Dr. Cassanello's startling viewpoint that race does not exist would undermine the very premise of nondiscrimination laws and jurisprudence. The foundation of the nondiscrimination principle enshrined in the Equal Protection Clause, the 1964 Civil Rights Act, and Florida law is that an individual should not be discriminated against on the basis of an attribute like "race," which "is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). As the Eleventh Circuit has held, "Title VII protects persons in covered categories with respect to their immutable characteristics, but not their cultural practices." *EEOC v. Catastrophe Mgt. Solutions*, 852 F.3d 1018, 1030 (11th Cir. 2016). "No one can change his place of birth (national origin), the place of birth of his forebears (national origin), [or] his

8

race[.]" *Garcia v. Gloor*, 618 F.2d 264, 269 (5th Cir. 1980). Thus, "a person's race" is "permanently discernible." *Vieth v. Jubelirer*, 541 U.S. 267, 287 (2004) (plurality). And the discrimination prohibited by Section 1000.05, Title VII, and the Equal Protection Clause target discrimination based on characteristics that are "beyond the victim's power to alter." *Garcia*, 618 F.2d at 269. In Dr. Cassanello's view, however, a person's race is *not* an "immutable characteristic" determined at birth but rather is discretionary persona, based on a person's "own self-ascribed identit[y]." Dep. Tr. 156:6-8. Indeed, if a student identified as "trans-racial"—*e.g.*, a white person decides to "identif[y]" as a black person—Dr. Cassanello's view would require him to affirm that identity as true. *See Id.* at 166:5-6 ("If a student corrects me and says, 'This is how I self-identify.' I will say, 'Okay.'"). Under Dr. Cassanello's view, the foundation of American nondiscrimination law and jurisprudence collapses into nonsense.

Given Dr. Cassanello's idiosyncratic view of race, his claim that he is injured by the Act completely unravels. Because Dr. Cassanello does not believe in the premise underlying the prohibited concepts—*i.e.*, that race even exists—he cannot plausibly claim that the Act infringes on his academic freedom or free speech rights. He has therefore failed to demonstrate an injury sufficient to support Article III standing, and this Court lacks jurisdiction. Thus, the Court should deny his motion

9

for a preliminary injunction and grant summary judgment for Defendants on Dr. Cassanello's claims.

## II.   Dr. Cassanello Has Failed To Demonstrate That He Intends To Endorse Any Of The Prohibited Concepts In His Classes.

Dr. Cassanello has failed to demonstrate standing for a second reason. Specifically, Dr. Cassanello has failed to show that any injury is imminent as a result of the Act because, by Dr. Cassanello's own admission, he does not believe, and has no intention of endorsing, any of the concepts that the Act prohibits. Article III standing is a jurisdictional requirement. *Keister v. Bell*, 29 F.4th 1239, 1249 (11th Cir. 2022). To establish standing, Dr. Cassanello must show that he has suffered an injury-in-fact; that the injury is fairly traceable to the allegedly unlawful conduct; and that a favorable decision will likely redress the injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury-in-fact must be "actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up).

In a pre-enforcement First Amendment challenge, to show that an injury is imminent and not hypothetical, a "plaintiff must show (1) that he has 'an intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) that his conduct is 'arguably proscribed,' and (3) that he is subject to 'a credible threat of enforcement.'" *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119-20 (11th Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 162

10

(2014)). And when seeking a preliminary injunction, a plaintiff may not rest on "mere allegations" but instead "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." PI Order at 11-12 (internal quotation marks omitted).

As discussed above and in our prior briefing, the Act generally prohibits public school teachers from espousing eight specific concepts in the classroom. Dr. Cassanello has not shown that his instruction is even arguably proscribed by this prohibition. To the contrary, in his August 5th deposition, he explained in detail that his teaching methodology encourages students to determine for themselves what they believe, and that he *does not* espouse or endorse the reading material that he assigns. As part of this method, he explained, he "could assign a reading" and ask students to find "a document that [they] interpret that is going to *either defend or support*" the author's argument. Dep. Tr. 38:5-9 (emphasis added). The point "is introducing students to critical thinking," *id.* at 38:13-15, which is one of the main "tools" that Dr. Cassanello "strive[s] to give students" in his classroom, *see id.* at 36:8-19. For this reason, Dr. Cassanello rejected the notion that his assignment of a book—"[a]ny book"—should be or could be construed as him "espous[ing], promot[ing], or advanc[ing]" its contents. *Id.* at 117:15-118:2. And his refusal to endorse the books he assigns is "part of the critical thinking" he attempts to foster in his students. *Id.* at 118:2-3. "You want students to be able to [take] arguments apart,"

11

he said. *Id.* at 1118:3-4. Given these pedagogical goals, Dr. Cassanello's teaching method—*i.e.*, his *refusal* to endorse or espouse the arguments in the books he assigns—means that his instruction does not violate the Act.

This point is well illustrated by Dr. Cassanello's discussion, during his deposition, of the book "WHY BUSING FAILED: RACE, MEDIA, AND THE NATIONAL RESISTANCE TO SCHOOL DESEGREGATION" by Matthew Delmont. *See* Cassanello Decl. ¶ 15. In his declaration, Dr. Cassanallo expressed concern that he might violate the Act by assigning this text. Cassanello Decl. ¶ 15. But as he explained in his deposition testimony, his actual classroom assignment of this book instructs students to *either* "affirm *or* refute the thesis of" the book. Dep. Tr. 169:1-15 (emphasis added). In fact, Dr. Cassanello is utterly "indifferent to whether they affirm or refute it"; the point of the assignment, like his class generally, is to grade students "on how they support it" or "how they defend it." *Id.* at 170:6-10. Thus, no matter what the book says, Cassanello's assignment of it does not and cannot violate the Act because he does not endorse the arguments in the book as part of his instruction.

Indeed, Dr. Cassanello affirmatively *rejects* nearly all of the concepts prohibited by the Act. At his deposition, he was asked if he "believe[d] that members of one race or morally superior to members of another race." *Id.* at 76:1-6; *see also* FLA. STAT. § 1000.05(4)(a)1. He answered "[n]o." Dep. Tr. 76:7-8. He was asked if he "believe[d] that a person by virtue of his or her race is inherently racist or

oppressive, whether consciously or unconsciously." *Id.* at 93:5-14; *see* FLA. STAT. § 1000.05(4)(a)2. He answered "[n]o." Dep. Tr. 93:15. He was asked if he "believe[d] that a person's moral character is necessarily determined by his or her race." *Id.* at 94:15-21; *see also* FLA. STAT. § 1000.05(4)(a)3. He answered "[n]o." Dep. Tr. 94:22. He was asked if he "believe[d] that a person by virtue of his or her race bears responsibility for or should be discriminated against or receive adverse treatment because of actions committed in the past by other members of the same race." *Id.* at 178:23-179:9; *see also* FLA. STAT. § 1000.05(4)(a)5. He answered "[n]o." Dep. Tr. 179:10.

Even with respect to the few concepts that Dr. Cassanello was reluctant to reject outright, it is clear that his reluctance rests on misreadings of the Act's text. For example, Dr. Cassanello testified that he "can't answer" whether the virtues of "merit, excellence, hard work, fairness, neutrality objectivity, and racial colorblindness" are "racist" because "it depends on the instruments, and the people who are measuring all those categories." *Id.* at 185:18-186:13. Thus, racist individuals could "use . . . the notion of merit and colorblindness and so on and so forth to achieve a racist goal, which is inherently not those things." *See id.* at 191:9-12. But the Act does not prohibit endorsing the idea that these virtues could be *used* in a racist manner; it prohibits endorsing the idea that the virtues *themselves* are racist. *See* FLA. STAT. § 1000.05(4)(a)8. And as Dr. Cassanello made clear, "it's not

13

the concept" itself that is racist, "[i]t's the one who employs the concept." Dep. Tr. 186:20-21. Dr. Cassanello's concerns about the virtues listed in the Act being used in a racist manner even though the virtues themselves are "inherently" not racist, *id.* at 191:9-12, is thus perfectly consistent with the Act.

The same goes for Dr. Cassanello's hesitance to reject the idea that "a person's status as privileged or oppressed is necessarily determined by his or her race." *Id.* at 95:7-10; *see also* FLA. STAT. 1000.05(4)(a)3. It is plain from the Act's use of the word "necessarily" that the prohibited concept is categorical: "Tell me someone's race, and I'll tell you whether he or she is privileged or oppressed." But Dr. Cassanello's examples invariably *added facts*—such as "local policing policies"— to support his conclusion that "it's possible" that a person's race could determine their status. *See* Dep. Tr. 95:10-23. Moreover, Dr. Cassanello stressed that he was merely contending that a greater "proportion" of oppressed people are racial minorities, *id.* at 103:6-18, not that it is "a universal experience" for racial minorities to be oppressed, *id.* at 113:1-14. But the Act addresses *only* the concept that it *is* the universal experience of members of one race to experience privilege or oppression. For an individual's status as either privileged or oppressed is "*necessarily* determined by his or her race" only if *all* people of that race—*regardless* of the culture, nation, or point in history in which they live—are either privileged or

14

oppressed. Nothing Dr. Cassanello has said is even remotely contrary to the Act's prohibition of this concept.

In sum, Dr. Cassanello has *admitted* that he has no intention of violating the Act.

## III. Dr. Cassanello's Subjective Fear Of Erroneous Enforcement By Persons Not Before The Court Does Not Confer Standing.

Dr. Cassanello also cannot, as a matter of law, claim that the Act injures him because he fears the possibility that some third party may *mistakenly* accuse him of violating the Act. When a plaintiff self-censors in response to a law, that self-censorship results in an Article III injury only if it is objectively reasonable. "Allegations of a 'subjective chill' are not an adequate substitute for . . . a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs."). Thus, Dr. Cassanello's concerns in this regard support standing only if the Act itself "objectively chills" his classroom instruction. *Speech First, Inc.*, 32 F.4th at 1120. It does not, for at least two reasons.

First, Dr. Cassanello plainly misunderstands the concept prohibited by Section 1000.05(a)(4). He repeatedly testified that his concern is based on the possibility that he could be charged with violating the Act if a student merely feels guilty or

distressed because of something Dr. Cassanello teaches: "I think HB7 would prohibit me from discussing that element of slavery if I have [a] student stand up in class and say, 'You're making me feel guilty by introducing me to this material.' And then I think HB7 in that regard would be triggered[.]" Dep. Tr. 51:14-18; *see also id.* at 52:8-11 ("I don't have a role in, you know, how a student may or may not feel based on a topic I introduce in class or how I introduce that topic."); *id.* at 191:22-23 (discussing students' "natural psychological distress" in response to certain teachings). But as this Court has already explained, the Act "does not bar instruction that incidentally makes students feel bad; it bars *instructing* students that they '*must* feel guilt, anguish, or other forms of psychological distress for actions, in which he she played no part, committed in the past by other members of the same race or sex.'" MTD Order at 9-10 (quoting FLA. STAT. § 1000.05(4)(a)7). Thus, Dr. Cassanello's concern that a student will sue him merely because the student *felt* a certain way is plainly unreasonable—*i.e.*, not an "objective chill"—and thus not a basis for Article III standing.

Second, Dr. Cassanello repeatedly testified that the Act would force him to self-censor because of the risk that third parties—who are not before the Court and who lack any enforcement authority under the Act—might *misconstrue* his assignment of a book as endorsement of the author's ideas and complain about his instruction. A recurring theme at his deposition was his fear that "people off the

16

street" would sue him for violating the Act. Dep. Tr. 53:7-11; *see also id.* at 53:13-14 ("someone off the street"); *id.* at 115:3-5 ("a person on the street"); *id.* at 117:1 ("someone off the street"). But random people "on the street" do not have enforcement power under the Act. Instead, the Act creates a cause of action only for those "aggrieved by a violation," FLA. STAT. § 1000.05(9), meaning a person actually "subject[ed]" to "training or instruction," FLA. STAT. § 1000.05(4)(a).

Relatedly, Dr. Cassanello also expressed fear of enforcement stemming from a single specific state legislator who is not a party in this case, not a member of the Florida Board of Governors, and not vested with independent enforcement authority. *See, e.g.*, Dep. Tr. 53:22-54:18; *id.* at 117:2-4; *id.* at 174:2-12; *id.* at 191:13-21. Under the "historical practice" that limits federal courts' equity power, however, this Court may not "enjoin the world at large" or "purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (internal quotation marks omitted). Therefore, Dr. Cassanello may not seek an injunction against enforcement of the Act by *everyone* throughout *all of Florida* based on entirely unsupported and speculative assertions that "people off the street" are going to sue him or that one state legislator will somehow singlehandedly enforce the act against him. And again, because the Act provides no mechanism for such third-party lawsuits, these concerns are utterly speculative and unfounded in any event.

17

Finally, Dr. Cassanello's testimony makes clear that his fundamental concern is that such third parties could *misconstrue* his teaching. *See* Dep. Tr. 117:15-118:2 (agreeing it would "not be a correct construction" to construe his assignment of THE NEW JIM CROW as endorsing the book); *id.* at 134:8-16 (similar for THE WAGES OF WHITENESS); *id.* at 124:5-8; *id.* at 134:14-15 ("I think we have established what I do in the classroom. It's about how one construes."); *id.* at 136-10 (agreeing that "simply assigning" a book "and having as a subject of discussion . . . could be misconstrued" as "an endorsement"). In this argument, the "flaw in [Dr. Cassanello's] reasoning is subtle—[he] do[es] not argue that the Statute itself improperly penalizes protected speech, but that the Statute will be improperly *applied* to penalize protected speech." *Legacy Enter. & Arts Found., Inc. v. Mina*, No. 6:21-cv-698-PGB-DCI, 2021 WL 4444688, at *5 (M.D. Fla. Aug. 20, 2021). But this erroneous *application* of the Act "cannot be litigated *ex ante*." *Id.* By definition, if Dr. Cassanello's decision to censor his own speech is based on the fear that someone might *misconstrue* that speech, that chill is manifestly "subjective," not "objective," so it cannot support standing.

In sum, any alleged self-censorship by Dr. Cassanello is not a reasonable response to an "objective chill" caused by the Act. A fear that someone with no enforcement power will misconstrue either the Act or Dr. Cassanello's teaching and

bring a lawsuit is not reasonable. Thus, Dr. Cassanello has failed to demonstrate an injury in fact.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff Cassanello's motion for a preliminary injunction and grant summary judgment for Defendants on Dr. Cassanello's claims.

19

## **LOCAL RULE 7.1(B) CERTIFICATION**

In accordance with Local Rule 7.1(B), Defendants have conferred with counsel for Plaintiffs regarding this motion to the extent it seeks leave to file a supplemental memorandum in opposition to Plaintiff Cassanello's motion for a preliminary injunction. Plaintiffs do not oppose on the understanding that Plaintiffs will be permitted to file a response to Defendants supplemental memorandum, which Defendants do not oppose.

## **LOCAL RULE 7.1(F) CERTIFICATE OF WORD COUNT**

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Defendant's Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 4,453 words as measured by Microsoft Office for Word 365.

Date: August 12, 2022

Respectfully submitted,

/s/ Timothy L. Newhall
Timothy L. Newhall
*Special Counsel*
Complex Litigation
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399-1050
Telephone: 850.414.3300
timothy.newhall@myfloridalegal.com

*Counsel for Defendant Ashley Moody, in her official capacity.*

/s/ Charles J. Cooper
Charles J. Cooper
(Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.220.9600
Facsimile:  202.220.9601
ccooper@cooperkirk.com
johlendorf@cooperkirk.com
mwold@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Defendants Ron DeSantis, in his official capacity, et al.*

21