## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DONALD FALLS, et. al.**

     **Plaintiffs,**

**vs.**                                                   **Case No.:  4:22-cv-00166**

**RON DESANTIS, in his official
capacity as Governor of Florida, et. al.**

     **Defendants.**

_____

## <u>PLAINTIFF CASSANELLO'S RESPONSE TO DEFENDANTS'</u>
## <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiff, Robert Cassanello, by and through undersigned counsel, hereby responds to Defendants' Motion for Partial Summary Judgment (Doc. 74-1). As set forth below, there exists genuine issues of material fact which preclude summary judgment. Accordingly, Defendants' motion should be denied.

**I.      Introduction**

Defendants have moved for summary judgment on the basis of Dr. Cassanello's deposition. Contrary to the Defendants' claim, Cassanello's deposition does not weaken his request for preliminary injunctive relief nor his standing in this case. To the contrary, it strengthens both by highlighting the constitutional issues with the challenged legislation and his reasonable fear of being chilled by the same. Moreover, since his deposition was taken, the Board of

Governors met and approved its new regulation implementing the IFA, which was previously subject to supplemental briefing before this Court when the regulation was in the proposal phase. This presents more evidence of the need for injunctive relief and further buttresses Cassanello's standing here as well. Therefore, for all of the reasons discussed herein, Defendants' motion should be denied.

## II.  Summary Judgment Standard

This Court is undoubtedly aware of the summary judgment standard set forth in Fed.R.Civ.P. 56, so that standard need not be repeated here. However, Cassanello would stress that in determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Hayes v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Brothers International, S.A., v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.  Argument

### A.  Dr. Cassanello's Views on Race Are Not "Idiosyncratic," and Even If They Were, It Does Not Affect His Challenge To The Act

To begin, Cassanello's views on race are not "idiosyncratic" because they are not unique. Rather, they represent a consensus of those in his field as well as other fields of study. Believing that race is socially constructed and not biologically defined is not controversial; instead, Humanities and Social Science scholars promote the idea that race is a concept and is not biologically defined. *See*

2

Reanne Frank, *The Molecular Reinscription of Race: A Comment on "Genetic Bio-Ancestry and Social Construction of Racial Classification in Social Surveys in the Contemporary United States*," Demography 51, 2333–36 (2014); Trina Jones and Jessica L. Roberts, *Genetic Race? DNA Ancestry Tests, Racial Identity, and the Law*, 120 Colum. L. Rev. 1929, 2014-16 (2020); *See also Deposition of Robert Cassanello ("Cassanello Depo.")* at 34 (when asked if his view of racism was "anyway idiosyncratic," Cassanello responded "I don't think so. I don't think it is. I would think in academic circles it would represent a majority opinion, if you will, I would say, exclusively 100%.").[1] Moreover, Cassanello also agreed with the dictionary definitions of racism. *Id.* at 34-35.

Defendants' attack on Dr. Cassanello's views on race centers on his belief that "race is a social construct and not a biological one." *Id.* at 143-144. That said, he was clear that the biological view is the way race has historically been construed and "so [he] even write[s] in terms of race in a past connotation." *Id.* at 144. His social construction of race is his contemporary view of race. *Id.* at 149. However, if he's "referencing something that's white, Black, Hispanic, what have you, I'm basing that on perceptions of the time…not contemporary categorization." *Id.* at 147; *see also Id.* at 143 ("I don't mind speaking about race in an historical

---

[1] A complete copy of Cassanello's deposition is being filed herewith as Exhibit 1 since Defendants only filed excerpts of the same. (Doc. 73-1).

way."). Furthermore, his students understand the social vs. biological construction discussion of race. *Id.* at 147.

Accordingly, even though Cassanello views himself as part of the "human race," *id.* at 149, and views race as a social construction (a view heavily accepted in academia), when he researches, writes, and instructs about the matter, he nevertheless discusses the historically biological construction of race. And, importantly here, when asked "what would the difference be in the--in the enforcement and implementation of the statute if they believed it [race] was one [construction] or the other? Would there be any difference in how it [the statute] was understood or enforced?", Cassanello replied "I don't think so." *Id.* at 150-51. Therefore, Cassanello's views on race do not affect his challenge to the legislation here whatsoever. At a minimum, there is a dispute of fact on this issue which precludes summary judgment.

**B.    Contrary to Defendants' Claim, Cassanello Has Shown Imminent Injury as a Result of the Act and Its "Endorsement" Provision**

Defendants next argue that Cassanello lacks standing because he has "failed to demonstrate that he intends to endorse any of the prohibited concepts in his classes." (Doc. 74-1 at 10.). Defendants premise this argument upon Dr. Cassanello's description of his teaching style, which is to foster critical thinking in his students in accordance with Bloom's Taxonomy. *See Cassanello Depo.* at 38-39. However, in making this argument, Defendants overlook the entirety of text of

4

the statute at issue and misconstrue Dr. Cassanello's testimony.

First, Defendants focus their argument on the term "endorsement" in section 1000.05(4)(b), Florida Statutes. In full, that subsection provides:

> (b)     Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of such concepts.

§1000.05(4)(b), Fla. Stat. (2022). The problem with Defendants' argument is that they overlook the requirement that such training or instruction be given in an "objective manner." Defendants instead only focus on the term "endorsement" of the concepts. But, what is an "objective discussion" of the concepts? Moreover, there is no guidance on what the term "endorsement" means either. Therefore, the IFA both fails to provide fair notice of what is prohibited and "is so imprecise that discriminatory enforcement is a real possibility." *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991).

As this Court recently held in the preliminary injunction it issued in *Honeyfund.com, Inc. v. DeSantis, et al.*, Case No.: 2022-cv-227, Doc. 55 (N.D. Fla. Aug. 18, 2022), "few terms are as loaded and contested as 'objective.' And many would suggest that it is impossible to discuss a concept – or anything for that matter – 'as perceived without distortion by personal feelings, prejudice, or

interpretation.'" *Id.* at 35.[2] This Court found this particularly true when discussing historical phenomena. *Id.* Indeed, Cassanello has stated "[i]t is impossible to give an 'objective' account of history." *See* (Doc. 30-2 at ¶7); *Cassanello Depo.* at 54-57.

In *Honeyfund*, this Court also considered the context in which the IFA was passed:

> The State deems these concepts specters haunting Florida, and to simply acknowledge they exist likely constitutes endorsement. As detailed above, the IFA is *designed* to exorcise these viewpoints out of the marketplace of ideas – Governor DeSantis went so far as to call it the STOP WOKE Act at a press conference with children waving anti-critical race theory signs. It thus comes as no surprise that permissible discussion of these concepts turns on "objectivity" – an inherently vague term that fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned [v. City of Rockford]*, 408 U.S. [104] at 108. Additionally, lacking explicit standards to circumscribe enforcement of "objectivity," Defendants can weaponize this term to further discredit the prohibited concepts. The IFA thus "impermissibly delegates basic policy matters to [Defendants] for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108-09. *Accordingly, as this "objectivity" standard commands the entire statute, the IFA is impermissibly vague in violation of the Due Process Clause of the Fourteenth*

---

[2] While *Honeyfund* dealt with the employer related provisions of the IFA, the language relating to providing such training or instruction "in an objective manner without endorsement of the concepts" is identically worded in the education related provisions of the IFA. *Compare* §760.10(8)(b) *with* §1000.05(4)(b), Fla. Stat. (2022).

*Amendment.*

*Id.* at 37 (emphasis added).

Second and related, while Cassanello did testify his assignment of a particular book does not mean that he "endorses" that book, the vagueness of the term "endorses" and how it may be enforced likewise presents a similar problem here. As he testified, a major concern of his is how people may "construe or misconstrue" his teaching or what he has assigned as violating the Act. His testimony tracks the very vagueness concerns that this Court addressed in *Honeyfund*:

> If there's one or two students in the classroom who are so inclined to want to make issue with the text. You know, if there's someone on the street that wants to make issue with the text I assign. Someone in the legislature. Someone at UCF. *So, someone in the Board of Governors. It doesn't matter what I actually say or do in the classroom, because they have the authority to determine -- to construe -- what I have done, not me.*

*Cassanello Depo.* at 123-124 (emphasis added).

This was all the more illustrated in Dr. Cassanello's discussion about the book *Wages of Whiteness*.[3] As it relates to this book he assigns his classes,

---

[3] Recall *Wages of Whiteness* was discussed in Cassanello's Declaration. (Doc. 30-2). "This text examines working-class racism in the United States. Part of the text explains how white workers during the labor movement were ideologically opposed to black workers and how the 19th century labor movement demanded a racially disparate system of employment." *Id.* at ¶ 13. Thus, this book would run afoul of the prohibitions regarding "merit," "hard work," and related to concepts

7

Cassanello testified "it is one of my favorite books," so "someone might construe an endorsement in the way that I have fondness for this book," which is a progenitor to current topics such as white privilege and white fragility. *Cassanello Depo.* at 126, 136-137. Thus, Cassanello testified that someone could witness his conversation on the *Wages of Whiteness* and walk away from it saying, "this is what Cassanello believes" because he is "not neutral on the book" and what one is "passionate about" is "not objective." *Id.* at 138. As Cassanello put it:

> I just have a fondness for this book. I don't think I would hide that and say -- you know, when I teach the book, I would say "I really like this book." Someone could construe that, well, that's an endorsement. You're telling me this book and its legacy I have to endorse. I may not be doing that. I may not have been intending that, but, certainly, you know, me coming in the classroom and just, you know, professing for the record, "I like this book," could have that -- could have that consequence.

*Id.* at 138-139. As a result, Cassanello meets the "endorsement" provision of the Act for standing purposes. At a minimum again, there is at least a genuine dispute of material fact on this issue by which to preclude summary judgment.

**C.    Cassanello's Fears of Enforcement are Objective and Directly Relate to Enforcement by Persons Before this Court, *to wit:* the Board of Governors**

Defendants incorrectly argue that Cassanello only has a subjective fear of enforcement by third parties not before this Court, allegedly causing him to lack

about someone's status being necessarily determined by his or her race. *Id.* at ¶ 14.

standing. This is not the case. Defendants begin their argument by claiming that Cassanello misunderstands the concepts prohibited by §1000.05(4)(a). *See* (Doc. 74-1 at 19). The problem there is that these concepts are vague and subject to discriminatory application as set forth above. As this Court found, "this 'objectivity' standard commands the entire statute" so it "is impermissibly vague[.]" *Honeyfund* at 37. This Court has also found that some of the concepts themselves are vague. *Honeyfund* at 32-34 (discussing concepts 1 and 4). Furthermore, Cassanello also testified how his teaching and assignment of books on certain topics could be construed as "endorsing" some of the prohibited concepts, as discussed above. Last, Defendants only claim Cassanello "misunderstands" what is prohibited by concept 7, *see* (Doc. 74-1 at 15-16), but do not mention other concepts Cassanello feared his teaching violates, such as concept 3. *Cassanello Depo.* at 94-113.

Defendants also argue that Cassanello is trying to rope in third parties not before this Court and cannot have standing because of that. True, Cassanello did talk about random people "on the street" and a particular state legislator as part of his concern. But, Cassanello was also clear about his concern relating to "someone in the Board of Governors," the very party he sued in this case. *Cassanello Depo.* at 124. And, as of August 26, 2022, the Board of Governors has now adopted the regulation implementing the IFA which was previously submitted to the Court and

subjected to supplemental briefing. *See* BOG Regulation 10.005 (enacted August 26, 2022)[4]; *see also* (Docs. 59 and 64). Thus, contrary to the Defendants' argument, Cassanello directly stated in his deposition his concern about the Board of Governors and how they may construe what he is teaching. Furthermore, its new regulation could result in discipline, including termination, if Cassanello is deemed in violation of the vague IFA. *See* BOG Regulation 10.005(3)(c).

Defendants also argue "random people on the street do not have enforcement power under the Act… [because] the Act creates a cause of action only for those "aggrieved by a violation," Fla. Stat. §1000.05(9), meaning a person actually "subjected[ed]" to "training or instruction," Fla. Stat. §1000.05(4)(a)." (Doc. 74-1 at 21). Yet, Cassanello testified about his fears regarding such a person, *to wit:* a student. *Cassanello Depo.* at 116-117 ("That could include a student."; *Id.* at 123-124 "If there's one or two students in the classroom who are so inclined to want to make issue with the text.").

Certainly, given the vagueness issues with this statute, Cassanello's testimony regarding his fear of the Board of Governors, its recently enacted Regulation, and the very subjects on which Cassanello has instructed in the past and intends to teach going forward, there is more than an objective fear that his speech would be chilled so as to confer him standing. *Babbit v. United Farm*

---

[4] *See* (Docs. 75 and 75-1), previously filed by Defendants.

*Workers National Union*, 442 U.S. 289, 301-303 (1979); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120-22 (11th Cir. 2022). His concerns of enforcement are also more than reasonable for standing purposes. *See e.g. Harrell v. The Florida Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010) ("If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred."). Consequently, any reasonable person in Cassanello's situation "could fear that his speech would get him crossways" with the IFA and the Board of Governors' new regulation, "and that he'd be better off just keeping his mouth shut." *Speech First, Inc.*, 32 F.4th at 1122.

## IV.   Conclusion

For all of the reasons set forth herein, Defendants' Motion for Partial Summary Judgment should be **DENIED**.

Respectfully submitted,

_____

Elizabeth L. White, Esquire
Florida Bar No.:  314560
Matthew R. Kachergus, Esquire
Florida Bar No.:  503282
Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Camille Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:  (904) 356-9661
Facsimile:   (904) 356-9667
Email:       sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to

**Charles J. Cooper, Esquire,** ccooper@cooperkirk.com, **Davis Cooper, Esquire,**

pdcooper@cooperkirk.com, **John D. Ohlendorf, Esquire,**

johlendorf@cooperkirk.com, **John Ramer, Esquire,** jramer@cooperkirk.com,

**Timothy Newhall, Esquire,** timothy.newhall@myfloridalegal.com, **Alannah Lee**

**Shubrick, Esquire,** Alannah.shubrick@myfloridalegal.com, via Electronic Mail

this 31st day of August, 2022.

ATTORNEY

13

EXHIBIT 1

Donald Falls

vs.

Ron DeSantis

---

Deposition of:

Robert Cassanello

August 05, 2022

*Vol 1*



PHIPPS REPORTING

*Raising the Bar!*

Robert Cassanello
August 05, 2022

```
                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
                    TALLAHASSEE DIVISION

             CASE NO.:  4:22-cv-166-MW/MJF

DONALD FALLS, et al.,

     Plaintiffs,

vs.

RON DESANTIS, in his official
capacity of Governor of Florida,
et al.,

     Defendants.

     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

                      DEPOSITION OF

                ROBERT CASSANELLO, Ph.D.

                 Friday, August 5, 2022
                 9:51 a.m. - 4:30 p.m.

             Location: The Fairwinds Tower
             135 West Central Boulevard
             Room 1026
             Orlando, Florida 32801

             Stenographically Reported By:


                    DONNA FONTAINE
             Notary Public, State of Florida

                 *   *   *   *   *   *   *
```

Job No.: 264002

Robert Cassanello
August 05, 2022

Page 2

```
 1    APPEARANCES:

 2       APPEARING ON BEHALF OF THE PLAINTIFFS:

 3           SHEPPARD, WHITE, KACHERGUS, DeMAGGIO &
             WILKISON, P.A.
 4           215 North Washington Street
             Jacksonville, Florida 32202
 5           904-356-9661
             BY:  BRYAN E. DeMAGGIO, ESQUIRE
 6           Email: bdemaggio@sheppardwhite.com

 7       APPEARING ON BEHALF OF THE DEFENDANTS:

 8           COOPER & KIRK, PLLC
             1523 New Hampshire Avenue, N.W.
 9           Washington, D.C. 20036
             202-220-9600
10           BY: CHARLES J. COOPER, ESQUIRE (Pro Hac Vice)
             BY: JOHN RAMER, ESQUIRE
11           Email: ccooper@cooperkirk.com
             Email: jramer@cooperkirk.com
12
     and
13
             OFFICE OF THE ATTORNEY GENERAL
14           The Capitol, PL-01
             Complex Litigation Section
15           Tallahassee, Florida 32399-1050
             850-414-3633
16           BY: TIMOTHY L. NEWHALL, ESQUIRE
             Email: timothy.newhall@myfloridalegal.com
17

18

19

20

21

22

23

24

25
```

Robert Cassanello
August 05, 2022

Page 3

1                          I N D E X

2   August 5, 2022

3

4   TESTIMONY OF ROBERT CASSANELLO, Ph.D.:
          Direct Examination by Mr. Cooper          4
5

6
    CERTIFICATE OF OATH                           219
7   CERTIFICATE OF REPORTER                       220
    LETTER OF NOTIFICATION                        221
8   ERRATA SHEET                                  222

9

10

11                      E X H I B I T S

12  NUMBER          DESCRIPTION                  PAGE

13  Defendants' Exhibit 1 ......................   15
          (Curriculum Vitae)
14  Defendants' Exhibit 2 ......................   26
          (Declaration of Dr. Robert Cassanello)
15  Defendants' Exhibit 3 ......................   27
          (Course Syllabus)
16  Defendants' Exhibit 4 ......................   28
          (AMH 4XXX Jim Crow America)
17  Defendants' Exhibit 5 ......................   49
          (Committee Substitute HB7)
18  Defendants' Exhibit 6 ......................   64
          (To Brown From Brown Study Guide)
19  Defendants' Exhibit 7 ......................  167
          (Assignment 11-Busing and the Media)
20  Defendants' Exhibit 8 ......................  206
          (Twitter Thread)
21

22

    (STENOGRAPHER'S NOTE: All documents were sent to Phipps
23  Reporting.  A sticker was placed on the documents which
    were marked during the proceeding.)
24

25

Robert Cassanello
August 05, 2022

Page 4

 1                 Proceedings began at 9:51 a.m.:

 2                 THE STENOGRAPHER:  Please raise your right

 3         hand.

 4                 Do you swear that the testimony you are about

 5         to give in this cause shall be the truth, the whole

 6         truth, and nothing but the truth?

 7                 THE WITNESS:  I do.

 8                 THE STENOGRAPHER:  Thank you.

 9                    ROBERT CASSANELLO, Ph.D.,

10    having been first duly sworn to tell the truth, was

11    examined and testified upon his oath as follows:

12                       DIRECT EXAMINATION

13    BY MR. COOPER:

14         Q    **Good morning, Dr. Cassanello.  I'm Chuck**

15    **Cooper.**

16         A    Good morning.

17         Q    **Appreciate very much your being here this**

18    **morning.  And for purposes of the record, why don't you**

19    **tell us what your full name is.**

20         A    My name is Robert Cassanello.

21         Q    **Okay.  And would you prefer that I address you**

22    **for purposes of this deposition as Dr. Cassanello or**

23    **Professor Cassanello?**

24         A    I prefer Robert.

25         Q    **Well, I'll go with Doctor for these purposes;**

Robert Cassanello
August 05, 2022

Page 5

1   Robert during the break.

2          And also for the record, why don't we identify

3   the people around the table here.

4          MR. COOPER:  Again, I'm Charles Cooper with

5       Cooper and Kirk, representing the defendants in

6       this case.

7          MR. RAMER:  I'm John Ramer with Cooper and

8       Kirk, also representing the defendants.

9          MR. NEWHALL:  I'm Tim Newhall with the Florida

10      Attorney General's Office on behalf of the Attorney

11      General.

12         MR. DeMAGGIO:  And Bryan DeMaggio of the

13      Sheppard, White firm in Jacksonville on behalf of

14      Dr. Cassanello.

15  BY MR. COOPER:

16      Q    Dr. Cassanello, have you ever given testimony

17  in a case?

18      A    I have given expert witness testimony, but

19  never testimony as a -- what? -- eyewitness.  I don't

20  know.

21      Q    A party?

22      A    As a party.

23      Q    Okay.  Tell me about the testimony you've

24  given as a witness.

25      A    As an eyewitness?

Robert Cassanello
August 05, 2022

Page 6

1     Q    Yes.

2     A    It was -- I was hired by Gray and Robinson in

3 either 2011 or 2012 to give expert testimony on a

4 redistricting case for district -- what was District

5 5? -- in the -- it would have been -- what? -- 2010 maps

6 that would have encompassed parts of Downtown

7 Jacksonville and Downtown Orlando into one district that

8 was 120 miles long.

9        I was asked to give expert testimony on

10 redistricting and historic evidence of Black political

11 representations in Jacksonville because I had published

12 a book called To Render Invisible: Jim Crow and Public

13 Life in Jacksonville, Florida.  So I had written about

14 this and researched it.  And they were interested in

15 introducing testimony that, in effect, argued that --

16 that at the time District 5 was designed -- there would

17 have been some logic to putting Black urban voters in

18 Jacksonville and Orlando in a district as opposed to

19 Black urban and Black rural voters in a district, which

20 is what the -- now I'm trying to think.  They would be

21 the plaintiffs.  Right?

22     **Q    Were you engaged on behalf of the plaintiffs**

23 **in the case?**

24     A    I'm kind of confused now who the plaintiff

25 would have been.  Yes.  I think I would have been.

Robert Cassanello
August 05, 2022

1   Yeah.  So I was -- Gray and Robinson represented the

2   State of Florida, the legislature.  The NAACP, Southern

3   Poverty Law Center.  I think that's it.

4        Q    Okay.

5        A    I'm sorry.  That was from 2011, and then the

6   actual case was 2014.  So they contracted me in 2011.

7   The case was -- or the trial was summer of 2014, I

8   believe.

9        Q    And you gave testimony on behalf then of the

10  state legislature defending the --

11       A    I wasn't -- I didn't give testimony defending

12  anything.  They asked me about historic political

13  discrimination for African Americans in Jacksonville

14  that was based on my research.

15       Q    And you were engaged by the lawyers

16  representing the side of the case that was defending the

17  legislature's work in redistricting?

18       A    That's what the lawyers were doing.

19       Q    Yes.

20       A    That contracted me out.

21       Q    Is that the only time you've given testimony

22  under oath?

23       A    That's the only time, I believe, I was ever in

24  a court as a participant, if you will.

25       Q    Okay.  Have you given testimony under oath as

Robert Cassanello
August 05, 2022

Page 8

1   an expert in any other context, for example?

2       A    I have never been an expert witness

3   anywhere --

4       Q    Okay.

5       A    -- in any capacity.

6       Q    Okay.  And so why don't I speak to some basic

7   ground rules here.  I'm sure you were deposed in that

8   case; were you not?

9       A    When you say "deposed," what do you mean?

10  Like this?

11      Q    Like this.

12      A    No.  I wasn't actually, no.  What I did was --

13  when I was contracted out, what I was told by Gray and

14  Robinson was that they were going to ask me a series of

15  questions -- questions.  Ultimately, I think it was like

16  12.  And if it necessitated research, I would research,

17  and then I would provide them with a report that had

18  citations with primary research to it.  Then answer

19  their questions.

20      Q    Uh-huh.

21      A    So I can't, off the top of my head, tell you

22  what all the questions were, but I did that.  That

23  report, I believe, they submitted as part of the

24  discovery or something.  I know it was attached to the

25  case in some way.

Robert Cassanello
August 05, 2022

1          And then on a date, they told me to come up to

2   Tallahassee and I was cross-examined, I guess.

3       Q    You were put on the stand?

4       A    As a witness.  Yeah.

5       Q    As a witness.

6       A    Yeah.  Yeah.  So...

7       Q    Well --

8       A    But between the report and the witness, no.  I

9   wasn't deposed.

10      Q    So this is the first time you have been

11  deposed in a case in any capacity.  And so I want to

12  make sure we don't talk past each other in some way.  So

13  if I ask you a question you don't understand or you're

14  not sure, feel free to ask me for an explanation.

15          And I'm going to assume if you don't do that,

16  you have understood my question.

17      A    Okay.

18      Q    It's very important for the court reporter

19  that we respond to one another verbally --

20      A    Uh-huh.

21      Q    -- rather than with a head nod or something

22  such as that.  Let's try not to talk on each other.  I

23  will try to make sure I let you finish your answer.

24      A    Uh-huh.

25      Q    And if you will let me finish my question, I

Robert Cassanello
August 05, 2022

1    think it would be much clearer for the court reporter.

2            Your counsel may object, as we go, to a

3    question, but unless your actual counsel actually

4    instructs you not to answer a question, you do have to

5    answer it.

6    A    (Witness nods head.)

7    Q    So -- and, you know, any time you feel like

8    you need a break from this, just let me know and we'll

9    take a break, so long as you finished an answer to any

10   pending question.

11           So how did you come to be involved as a

12   plaintiff in this lawsuit?

13   A    There was a young man from the White Law Firm

14   who had contacted me and said --

15   Q    I'm not going to ask you for any information

16   in terms of anything --

17   A    You just want like a basic answer?

18   Q    Well, I'm just jumping in to say, I'm not

19   interested in trying to elicit from you any

20   attorney-client communications.  But -- so any

21   communications you have had with your lawyers, that's

22   not something I'm going to ask you to report to me.

23   A    Okay.

24   Q    It's not something -- I'm sure your lawyer --

25   A    So you just want like a brief description?

Robert Cassanello
August 05, 2022

Page 11

    1       Q     **Basic description of --**

    2       A     Basic.

    3       Q     **-- of who contacted you.**

    4       A     Okay.  So you wanted the name of the person

    5    who contacted me?

    6       Q     **Please.**

    7       A     I don't know his name.  Is it Jessie Wilkison?

    8             MR. DeMAGGIO:  Yeah.  That used to work at the

    9       firm?  Yeah.

   10       A     Yeah.

   11             So he had called me because he had gotten my

   12    name from a colleague at UCF.  And Jessie and I were

   13    chatting on the phone, and said that, you know, they

   14    were interested in this case -- pursuing this case.  And

   15    he gave me a description of a profile of a type of

   16    professor they were interested in talking to.

   17             I said, "Well, that person sounds like me."

   18             And he asked me a couple follow-up questions.

   19    I answered them.  And at that point in time I think he

   20    felt that I was someone who would be interested in

   21    pursuing in this matter.

   22    BY MR. COOPER:

   23       Q     **Okay.  Who was the professor that had referred**

   24    **Mr. Wilkison to you?**

   25       A     I believe his name is Aubrey Jewett,

Robert Cassanello
August 05, 2022

Page 12

1   J-E-W-E-T-T.

2        Q     Okay.  And did you discuss the matter with

3   Mr. Jewett?

4        A     No.  I really don't know him.  I -- I'm trying

5   to think.  He might have sent me an email.  I believe he

6   sent me an email and just said, "A former student of

7   mine named Jessie is going to contact you," but he had

8   already contacted me by that point in time.  It

9   wasn't -- I didn't know what -- "is going to contact

10  you."  There wasn't a description of what it was about.

11       Q     Okay.  What did you do?  What, if anything,

12  did you do to prepare for this deposition?

13       A     Today?

14       Q     Today.

15       A     That doesn't include all the discovery stuff

16  you-all asked for?

17       Q     Well --

18       A     Because me preparing the discovery stuff is

19  like preparing for this.  Right?

20       Q     Right.  Not including that.

21       A     Okay.  I looked over my -- what is it

22  called? -- what's the statement called?

23             MR. DeMAGGIO:  Oh, the declaration?

24       A     I looked over my declaration.  I looked at

25  HB7.  I looked at the Board of Governors' draft policy

Robert Cassanello
August 05, 2022

Page 13

```
 1   concerning enforcing HB7 and that's about it.
 2   BY MR. COOPER:
 3        Q    That's about it.  Did you discuss your
 4   deposition with anybody?
 5        A    I haven't had the deposition yet.
 6        Q    Did you -- in preparation for your deposition.
 7        A    Oh.  In preparation other than my attorney?
 8        Q    I would like to know if you it discussed with
 9   your attorney.
10        A    I mean just that.  He gave me the --
11             MR. DeMAGGIO:  You can tell him that we
12        discussed it, but just not what we discussed.
13        A    Right, right.  This is what you should expect,
14   dress this way, be polite, that kind of stuff.
15   BY MR. COOPER:
16        Q    But you discussed it with your attorney.  Did
17   you discuss your deposition today in preparation for it
18   with anyone else?
19        A    No.
20        Q    Okay.
21        A    You're not including, like, if someone says,
22   "What are you doing on Friday?"
23             If I say I'm doing a deposition, that's not
24   what you mean.  Right?
25        Q    No.  That's not what I mean.
```

Robert Cassanello
August 05, 2022

Page 14

1          So there's nobody of your colleagues at UCF or

2     anything like that?

3     A    No, no.

4     Q    So when this litigation -- why don't you tell

5     me what your basic claim is in this litigation as a

6     party plaintiff.

7     A    Sure.  My claim is that HB7 violates my right

8     to free speech in the classroom and my right to academic

9     freedom as prescribed in our collective bargaining

10    agreement.

11    Q    And by HB7 -- so that we're clear as we go

12    today -- that is the Individual Freedom Act.  And do you

13    understand HB7 to be the Individual Freedom Act, if I

14    refer to it that way?

15    A    I believe that's what it's called.  Yeah.

16    Although it says on the actual legislation "House Bill

17    Number 7."

18    Q    So what's your current occupation?

19    A    I am an associate professor of history at the

20    University of Central Florida.

21    Q    How long have you been there?

22    A    I have been there since 2003.  I brought a

23    copy of my CV, if you would want.

24    Q    I would very much like to have a copy of your

25    CV.  In fact, it was -- your declaration says it was

Robert Cassanello
August 05, 2022

1   attached as an exhibit, but, Bryan, it wasn't actually

2   attached.

3          MR. DeMAGGIO:  Maybe that's why I didn't see

4       it when I had the declaration too, but okay.

5   BY MR. COOPER:

6       Q    I'm going to look at this.  We pulled a

7   document that looks very much like this off the website.

8       A    The one on the website would be two pages.

9   That is 12, I believe.

10      Q    This is 12 pages?

11      A    Yes.

12      Q    Okay.

13          MR. DeMAGGIO:  If you guys want to take a

14       ten-minute break to look at that, that's fine too.

15          MR. COOPER:  I appreciate that, Bryan, but I

16       don't think it will be necessary.  I guess what I

17       would like to do, though, is mark this --

18          MR. DeMAGGIO:  Sure.

19      A    You can have it.

20          MR. COOPER:  I would like to mark this, Madam

21       Court Reporter, as an exhibit.

22          (Defendants' Exhibit 1 was marked for

23          identification.)

24   BY MR. COOPER:

25      Q    So this identifies your education as a Ph.D.

Robert Cassanello
August 05, 2022

Page 16

1    in history --

2         A    Uh-huh.

3         Q    -- from Florida State University.  That's

4    accurate, I trust?

5         A    Yes, yes.  I try not to lie.  I do my best not

6    to lie.

7         Q    Did -- did you have any particular

8    concentration in your history?

9         A    Sure.  I wouldn't call it a single

10   concentration, but my adviser -- my dissertation adviser

11   at FSU was Neil Betton.  He's since retired, but he was

12   a labor historian.  And I was interested in

13   working-class history, specifically African American

14   working-class history, which is what drives a lot of

15   my -- the research I have published over the years.  So

16   I would say that is my primary concentration.

17            And then there's, like -- you know, we have to

18   do kind of a subfield, if you will, but I don't really

19   do anything with the subfields.  It isn't something I'm

20   known for.

21        Q    And what was your dissertation?

22        A    My dissertation was on migration and

23   working-class African Americans in Jacksonville.

24        Q    What was your educational background before

25   Florida State?

Robert Cassanello
August 05, 2022

Page 17

1      A    I am 100 percent reared in the public Florida

2    education system from kindergarten all the way up

3    through Ph.D.  Do you want all my schools?

4      **Q    Just your higher education.**

5      A    Sure.  I did my bachelor's at Florida Atlantic

6    University.

7           I did a master's at Florida Atlantic

8    University.

9           And I did my Ph.D. at Florida State

10   University.

11     **Q    What is your bachelor's degree in?**

12     A    History.

13     **Q    And your master's degree?**

14     A    History.

15     **Q    So when did you say you started at UCF?**

16     A    2003.

17     **Q    2003.  And prior to that, where were you?**

18     A    I was at a Historical Black College in

19   Birmingham, Alabama, for four years, from -- this would

20   have been 1999, I think, to -- or maybe '98 -- to --

21   should be on there -- to 2003.  It was called Miles

22   College.  It was a private college that was affiliated

23   with the Christian Methodist Church.  And I was hired to

24   teach African American studies and various history

25   classes.

Robert Cassanello
August 05, 2022

Page 18

1      Q    And what has been the focus of your academic

2    pursuits?

3      A    The focus of my academic pursuits has been on

4    a variety of questions or debates, if you will, on

5    African American history.  Probably the one that is the

6    broadest would be the question of the long history in

7    The Civil Rights Movement.  And this is the idea that

8    The Civil Rights Movement can be traced back as far back

9    as the antebellum period by looking at organizing

10   related and borne out of the early abolitionists

11   movement all the way through to the contemporary.  When

12   I say "contemporary," I'm meaning like today.  So it

13   might include the George Floyd protests or something

14   like that.

15     Q    Are you a member of any organizations?

16     A    I'm a member of a lot of organizations.  I

17   will try and recall them all.

18     Q    Before you do, I thumbed through the --

19     A    It's in there.

20     Q    It is?

21     A    Yeah.

22     Q    Could you point it out to me?

23     A    Sure.

24     Q    That might --

25     A    Do you want me to say it for the record too?

Robert Cassanello
August 05, 2022

1      Q    If you point it out to me, I will see if I

2  want to ask any questions.

3      A    It should be on here.  I'm sorry.  It looks

4  like I don't have it on the CV.  It must have been

5  something I took out over the years.  Would you like me

6  to list the organizations?

7      Q    Would you, please, the ones you're currently a

8  member of.

9      A    Sure.  The American Historical Association,

10  Organization of American Historians.  This organization

11  is referred to as ASALH, which is African American

12  Studies and Life organization, which is the African

13  American History Professional organization.  National

14  Council for Public History, National Council for History

15  Education, Labor and Working Class History Association,

16  Florida Historical Society, H-NET.

17      Q    What is H-NET?

18      A    It's humanities -- it's like a digital

19  humanities organization where you go and you create a

20  dialogue and sort of online community with other

21  scholars in your field.  So like each -- every sort of

22  subfield has a network, if you will.  So I'm subscribed

23  to an H-podcast network, H-Florida, H-labor, H-urban.

24  And so scholars within those fields can use those to

25  communicate with.  Almost like -- back in the day it was

Robert Cassanello
August 05, 2022

 1   a balloon board.  I don't know if you know what those

 2   are.

 3        Q    Are you a member of the United Faculty of

 4   Florida?

 5        A    Yes, I am.  I'm president of our chapter.

 6        Q    Okay.

 7        A    At UCF.

 8        Q    And what is that organization?

 9        A    That is our -- that is our union that

10   negotiates our collective bargaining agreement and

11   oversees grievances for members.

12        Q    How long have you been a member of that?

13        A    I think 2008, but I'm not sure off the top of

14   my head.  But it would be around there.

15        Q    Does the organization have any kind of

16   podcasts or any other kind of public --

17        A    I did a podcast for a little bit over a year.

18   I have stopped doing it because I found that no one is

19   listening to it, unfortunately.

20        Q    And this was a podcast that was connected with

21   the United Faculty of Florida?

22        A    It was connected with our chapter.  So United

23   Faculty of Florida at UCF.

24        Q    Have you done any podcasts apart from --

25   excuse me -- apart from that?

Robert Cassanello
August 05, 2022

Page 21

1       A     Oh, yeah.  I've done plenty.  Would you like

2   me to list them?

3       **Q     No.  But have you done any that are podcasts**

4   **that you host as opposed to are an invited guest on?**

5       A     Yes.

6       **Q     And would you list those?**

7       A     Sure.  So one I did was -- we did a podcast

8   series on Florida constitutions to commemorate the 50th

9   anniversary of the 1968 Constitution.  And I did this at

10  a conference, and I got a scholar from each -- for each

11  constitution, to talk about every constitution from the

12  St. John's Constitution in the antebellum period through

13  the 1968 Constitution.  And so each episode was an

14  interview with a scholar about that constitution.

15            So we also did the Seminole/Miccosukee

16  Constitutions.  However many Florida constitutions there

17  are and so many episodes there are, plus the

18  Seminole/Miccosukee ones.

19            I hosted a podcast called The Art of the

20  Review with H-NET, which was about reviewing as a style

21  a mode of communication.  I did that for about a year --

22  a little over a year.  It was a project to -- at the

23  time, I was vice president of reviews and publications

24  with H-NET.  We did it sort of as a -- I think it was

25  approaching the 25th anniversary of H-NET, so we wanted

Robert Cassanello
August 05, 2022

Page 22

1    to kind of bring attention to the reviews program there;

2    so the podcast was a way to kind of celebrate, if you

3    will, the reviews program.

4              I hosted a podcast called Every Tongue Got to

5    Confess, which is connected with -- it's locally.  It's

6    connected with the Zora Hurston festival here.  It

7    happens every January.  I collaborated on that with a

8    colleague at Rollins College named Julian Chambliss,

9    who's since left.  He's at Michigan State now.  But he

10   worked as a producer.  I hosted, I think, the first

11   year, maybe the first two years of it.  And it was

12   basically an interview podcast where I interviewed

13   people who were connected in some way with that year's

14   festival.  And it was kind of a promotional thing to

15   bring attention to the festival.

16        Q    Do you have a Twitter account?

17        A    I do.

18        Q    Do you have any other type of social media

19   account?  Facebook page?

20        A    Sure.  I have a Facebook account.  I have

21   Instagram.  And over the years, I'm pretty certain I've

22   made various other accounts that I no longer use.

23   Probably at one time I had a Reddit, but I never did

24   anything with it.  And any other, at the time, trendy

25   social media that I don't currently use, but I might

Robert Cassanello
August 05, 2022

Page 23

1    have created an account at one time, like Myspace.

2        **Q      During your time at UCF, what are the courses**

3    **that you have taught?  Maybe --**

4        A    It's in the --

5        **Q      Maybe I didn't ask.  Is it listed in this?**

6        A    They are, but I don't know if it's going to be

7    comprehensive.  Let me look at it.

8        **Q      Please.**

9        A    I can read it off and then tell you what's not

10   on here, if that works.

11       **Q      Why don't you point it to me, and I will ask**

12   **you questions.**

13       A    It's probably not up to date.

14       **Q      Well, it doesn't appear to me to be up to**

15   **date.  Would you identify, for example, what course --**

16       A    Uh-huh.

17       **Q      -- what -- what courses are you teaching**

18   **currently?**

19       A    That's not on here.  So undergraduate, I've

20   taught and I am teaching this coming semester a course

21   called The History of The Civil Rights Movement.

22            And I will be teaching a course called Jim

23   Crow America, and a course called Emancipation and

24   Reconstruction.  Those are all undergrad and they are

25   not on here.

Robert Cassanello
August 05, 2022

Page 24

1              Graduate classes.  I will be teaching a

2   graduate -- we have what's called a Readings and

3   Seminar.  It's a two -- so students take readings one

4   semester; take seminar the second.  It's on the same

5   topic.  So I will be doing a graduate course on The

6   Civil Rights Movement next year.  That would be Readings

7   and Seminar.

8        **Q    When you say "next year," do you mean in the**

9   **spring semester of 2023?**

10       A    No.  Fall semester of 2023; spring of 2024.

11       **Q    Okay.  And so this coming school year is the**

12  **-- is what you're referring to when you say "next year"?**

13       A    When I say "this year," I mean in two weeks.

14  When I say "next year," I mean a year from now.

15       **Q    Okay.**

16       A    Does that make sense?

17       **Q    So then in the -- we are now coming onto the**

18  **fall semester.  Right?**

19       A    Uh-huh.

20       **Q    Now, what courses are you going to be teaching**

21  **in the fall semester?**

22       A    History of The Civil Rights Movement.

23       **Q    Any other courses?**

24       A    No.

25       **Q    Is that an undergraduate course?**

Robert Cassanello
August 05, 2022

Page 25

 1    A    Yes.
 2    **Q    Now, what courses will you be teaching in the**
 3  **spring semester of -- of this coming year, 20- -- the**
 4  **spring of 2023?**
 5    A    I will be teaching a course called The Digital
 6  Museum.  It's an undergraduate course.  That's not on
 7  there, either.  Or it might be on there.  I don't think
 8  it's on there.  Do you want a description of the course
 9  or just --
10    **Q    No.**
11    A    -- title?
12    **Q    Any other courses this spring?**
13    A    I'm sorry.  Jim Crow America, I'll be teaching
14  this spring.
15    **Q    Any other courses in the spring?**
16    A    That's it.
17    **Q    Okay.  I would like to now show you a document**
18  **that we'll -- that we'll also mark as an exhibit.  I**
19  **will ask you if you recognize that document.**
20    A    Yes.
21    **Q    Is that the declaration that you filed in this**
22  **case?**
23    A    Uh-huh.  Yeah.
24         MR. COOPER:  Keep a copy of that.  I would
25         like to ask that it be marked, I guess, as Exhibit

Robert Cassanello
August 05, 2022

Page 26

 1      2.

 2              (Defendants' Exhibit 2 was marked for

 3              identification.)

 4   BY MR. COOPER:

 5      Q    All right.  So I'm going to ask you to turn to

 6   page 2 of the document.

 7      A    Uh-huh.

 8      Q    And I want to focus on paragraph 3 --

 9      A    Uh-huh.

10      Q    -- where you say -- and I'm going to read it

11   into the record.

12      A    Okay.

13      Q    "I currently teach a class called The Civil

14   Rights Movement."

15              Now, I'm going to ask -- I'm going to give you

16   another document and ask if you can identify that --

17      A    Uh-huh.

18      Q    -- document.

19              What is that document?

20      A    That's the syllabus to the class.  I'm not

21   sure -- it's pretty long, so I'm not sure if there is

22   other stuff attached here.

23      Q    Well, go ahead and take a look at the

24   document.

25      A    Yes.  The syllabus.

Robert Cassanello
August 05, 2022

Page 27

1        Q    That's the syllabus for your class that you're

2    referring to --

3        A    Yeah.

4        Q    -- in paragraph 3?

5        A    (Witness nods head.)

6             MR. DeMAGGIO:  Is this going to be Exhibit 3?

7             MR. COOPER:  Yes, yes.  I'm going to mark that

8        as Exhibit 3.

9             (Defendants' Exhibit 3 was marked for

10            identification.)

11   BY MR. COOPER:

12       Q    And if you will look now to paragraph 4 of

13   your declaration.

14       A    This?

15       Q    Yes.  There you say, "In spring 2023, I'm also

16   planning to teach a class called Jim Crow America."

17       A    Uh-huh.

18       Q    You mentioned that earlier, correct?

19       A    Uh-huh.

20       Q    And I am going to hand you another document

21   and ask if you can identify that.

22       A    Uh-huh.  That's a proposed syllabus for this

23   class.

24       Q    Okay.  I will just represent to you we got

25   that off the website for the -- for the university and

Robert Cassanello
August 05, 2022

Page 28

1      so --

2            A      I didn't realize it was on there.

3            Q      **I'm so sorry.  It was produced.  You produced**

4      **it to us.**

5            A      Okay.  That's what I thought.

6            Q      **I've been corrected.  I've been corrected.**

7      **But that's -- I take it you're saying that is the**

8      **proposed syllabus for the course you had planned to**

9      **teach?**

10           A      Okay.  When I say "proposed," can I clarify

11     that?

12           Q      **Please.**

13           A      Okay.  So when I submitted an internal form to

14     request that the class be created, I had to produce a

15     syllabus of my intent in teaching the class.  This is

16     that syllabus.  I haven't taught the class yet or

17     prepped the class, so I don't have an actual syllabus

18     for the class.  This is just what my intent of the class

19     was, which would have been when I submitted this -- in

20     the fall of 2020, I think -- when I submitted the forms.

21           MR. COOPER:  Okay.  And I'm going to ask the

22           court reporter to mark this now as I think we are

23           up to Number 4 now.  Right?

24           (Defendants' Exhibit 4 was marked for

25           identification.)

Robert Cassanello
August 05, 2022

Page 29

1   BY MR. COOPER:

2       Q    Okay.  Dr. Cassanello, has -- that class that

3   you submitted for approval, has it been approved?

4       A    Yes.

5       Q    Okay.  So -- so it has been approved and it

6   will be taught?

7       A    Yes.

8       Q    You say further in paragraph 4 that "this

9   class focuses on examining how America fell into the Jim

10  Crow system."

11      A    Uh-huh.

12      Q    When you say, "America fell into the Jim Crow

13  system," are you referring to all of America or parts of

14  America?

15      A    Can you tell me what you mean by "all of

16  America"?

17      Q    Well, you, of course, are an expert in

18  history.

19      A    Uh-huh.

20      Q    Particular events in history.  But when I

21  think of Jim Crow, I think of the South.

22      A    Okay.  Okay.  So the Jim Crow class -- I think

23  you would notice this too with the syllabus for The

24  Civil Rights Movement, but I -- I introduced to students

25  that the system of Jim Crow has its origins in

Robert Cassanello
August 05, 2022

Page 30

 1    antebellum Northern communities.  And when Southern

 2    communities begin to adopt Jim Crow after the Civil War,

 3    they're looking at those Northern communities as sort of

 4    antecedent to the system they would create after the

 5    Civil War.  So if -- if that's what you mean by "all of

 6    America," then, sure, all of America.  But, you know, if

 7    I was to parse it somewhat, you know, Jim Crow is sort

 8    of a state-local system.  So, you know, if you're saying

 9    U.S. government, I would have to parse that a little

10    bit.

**11        Q    What were the characteristics of the Jim Crow**

**12    system that -- that you just described in the North**

**13    antebellum?**

14        A    Sure.  So with the rise of -- of slavery in

15    America -- that really begins in the Colonial period.

16    Once America -- the American nation is formed, African

17    Americans may then begin to escape bondage.  They go to

18    Northern communities.  Some of these Northern

19    communities already have a free Black population.  So

20    throughout the antebellum period -- and I would say

21    that's about the turn of the 19th century.  So 1800

22    through about 1840 Northern communities begin to

23    experience not a sizable but a visible increase in the

24    number of African American residents who begin to live

25    there outside of slavery.  Because, at this point in

Robert Cassanello
August 05, 2022

Page 31

1   time, these Northern communities begin to abolish

2   slavery.  And what happens in these Northern communities

3   -- mostly in urban and port cities, less so in sort of

4   the hinterlands, if you will, or rural communities --

5   local communities begin to adopt systems of racial

6   segregation in public accommodations, transportation,

7   schooling, a variety of things.  This begins in the

8   1830s, I believe.  But if you consider voting, say right

9   to vote of Jim Crow or denying after -- denying African

10  Americans the right to vote, if you consider that part

11  of a Jim Crow system, right, you can actually trace it

12  back to the 1810s, because there are many Northern

13  communities on the local level, not so much state, but

14  some states, where African American men could vote in

15  municipal elections, not U.S. elections.  Sometimes not

16  state elections.  But they paid -- they paid taxes.  So

17  oftentimes they would -- they would be permitted to vote

18  on local issues because they were taxpayers, owned

19  property.  They can produce, you know, their -- at the

20  time what we called a poll tax, right, if they paid

21  their property tax.

22          So that begins to withdraw for African

23  Americans in the North starting in the 1910s.  Like,

24  actually around the War of 1812.  So if you take that to

25  a Jim Crow system, you can say the Jim Crow system in

Robert Cassanello
August 05, 2022

Page 32

1    the North begins at that point in time.  And then

2    various, like I said, public accommodations begin to

3    either be closed off or have separate spaces for African

4    Americans in the North between the 18- -- late 1820s

5    through 1840s.  Then in 1850, there is variety of

6    lawsuits and things to try and address that.

7        **Q    Were -- the systems of segregation that you**

8    **have described in the North, were they -- were they**

9    **created and enforced by laws?**

10       A    Some.  Some were private companies.  For

11   example, transportation companies back then would be

12   privately owned and they would enforce a system of

13   segregation that was not -- that did not originate from

14   legislation at all or local ordinances or anything like

15   that.

16            So sometimes with schools, right, schools in

17   the North -- specifically I think in Connecticut --

18   there would be -- I believe these were municipal laws

19   that would not allow African Americans to attend public

20   schools with white students, and there wouldn't be a

21   Black school at the time.  They just couldn't attend any

22   public school.  So that would have been legislative as

23   opposed to private.

24       **Q    I understand.  Now, let's focus on paragraph 5**

25   **of your declaration.**

Robert Cassanello
August 05, 2022

Page 33

```
 1     A    Okay.
 2     Q    There you say, "HB7 restricts my ability to
 3   teach these subjects fully and accurately to my
 4   students."
 5          Now, when you say "fully and accurately," do
 6   you -- are you saying that they restrict your ability to
 7   teach a factually accurate account of the historical
 8   events and people relevant to the subjects of these
 9   courses?
10     A    May I follow up your question with a question?
11     Q    Yes.
12     A    Okay.  Is it -- I think the problem is that
13   you see history as teaching fact.  I see history as
14   teaching interpretation.
15     Q    I want to ask you about that and ask you to
16   elaborate on that, but what is the answer to my question
17   about whether or not HB7 restricts your ability to teach
18   an accurate -- factually accurate -- account of events
19   and figures in -- in the history that you're teaching
20   about?
21     A    I believe HB7 restricts my ability to teach
22   interpretation, which is based on factual information.
23     Q    Okay.  And -- and the factual information on
24   which interpretation --
25     A    Uh-huh.
```

Robert Cassanello
August 05, 2022

1    Q    -- is founded and based, that factual

2    information is -- does HB7 restrict your ability to

3    teach accurately those facts?

4    A    It can.  If it interferes with my ability

5    to -- to instruct on interpretation.

6    Q    Interpretation.  Well, let's -- let's -- let's

7    probe that a little more.  You say in the next sentence

8    that "In each of my classes, I strive to give students a

9    comprehensive view of the history of race and racism in

10   America."

11        First, let me ask you to define for me what

12   you mean when you use the term "racism."

13   A    Uh-huh.  Racism is a -- racism is a prejudice

14   that is based on the false notion that people are

15   biologically distinct by race and that those fictitious

16   biological distinctions have meaning, true meaning.

17   Q    And do you understand that to be the generally

18   accepted understanding of racism when --

19   A    Well, you asked my definition.

20   Q    Yes.  I am asking if you -- is your definition

21   in anyway idiosyncratic?

22   A    Okay.  I don't think so.  I don't think it is.

23   I would think in academic circles it would represent a

24   majority opinion, if you will, I would say, exclusively

25   100 percent.

Robert Cassanello
August 05, 2022

Page 35

1    Q    And -- and is that in any way different from
2    the meaning of racism that is used in everyday parlance,
3    in your opinion?
4    A    I don't know.  I've never tested everyday
5    parlance.  I don't have a basis to know that answer.
6    Q    Well, would you agree with the proposition
7    that racism is racial, ethnic prejudice, or intolerance?
8    A    It's a form of it.  Yes.
9    Q    Okay.  And do you understand the basic
10   dictionary definition of racism to be any different from
11   what you understand racism to mean?
12   A    I don't know what the -- what the dictionary
13   definition of racism is.  If you can produce it, I will
14   comment on it, but I don't know it off the top of my
15   head.
16   Q    Well, let's -- according to Dictionary.com, if
17   I can represent to you that --
18   A    Okay.
19   Q    -- the initial definition is "a belief or
20   doctrine that inherent differences among the various
21   human races determine cultural, individual achievement,
22   usually involving the idea that one's own race is
23   superior and has the right to rule others."
24   A    The only thing I would dispute in that
25   definition would be the fictitious notion of that,

Robert Cassanello
August 05, 2022

Page 36

```
 1    because that definition doesn't dispute that that could

 2    be an actual state of being.  Right?  So that would be

 3    my addition to that definition.

 4         Q    Fair enough.  And another, apparently,

 5    secondary definition is intolerance of another race or

 6    other races.

 7         A    Okay.  I would -- I would agree with that.

 8         Q    So your statement says, again, "In each of my

 9    classes I strive to give students a comprehensive view

10    of the history of race and racism in America, including

11    giving them the tools to explore their own

12    interpretations" --

13         A    Uh-huh.

14         Q    -- "based on research of that history."

15              What are the tools you're referring to?

16         A    I mean -- cognitive skills are the tools I

17    mean.  Pedagogical strategies.

18         Q    Could you elaborate on that?

19         A    Sure.  Sure.  Critical thinking skills.  So,

20    for example, in all my classes, but also in this class,

21    if you went through the assignments, you will notice

22    that I require -- I, essentially, introduce students to

23    a set of reading, and the reading is exclusively

24    academic reading.  It's not, sort of, you know, popular

25    history, if you will.  It's people who are professional
```

Robert Cassanello
August 05, 2022

Page 37

1    historians and who offer an interpretation, offer some

2    argument, if you will, about some idea concerning The

3    Civil Rights Movement; and they support their argument

4    through primary research that they cite in their works.

5    Right?  And what I have the students do following each

6    reading that's connected to, sort of, a subject or theme

7    for that assignment, okay, is I have them go to the

8    library.  We have a set of databases on -- actually more

9    than one -- that has primary documents from The Civil

10   Rights Movement for African American history.  And

11   depending on the prompt, they are to go in there to

12   find, you know, one or more documents, whichever they

13   want to do, and then they come to the class and they

14   take their documents and they say, "Okay, I saw this

15   document on The Civil Rights Movement and I read it

16   based on how the reading influenced me this way."

17   Right.

18            So, for example let's just take what I said

19   earlier on the long history.  Right?  So the long

20   history is one of these debates.  It's not something

21   that's settled or consensus, if you will.  Right?

22   There's people that say there was this long history that

23   goes back to the antebellum period that I described

24   earlier in my testimony.  Right?  And there's others who

25   say, "No there's not."  The Civil Rights Movement was

Robert Cassanello
August 05, 2022

1   this 1940s, '50s, '60s thing.  Anything before is

2   something else, not The Civil Rights Movement.  So it's

3   sort of a debate, if you will.

4         **Q    Uh-huh.**

5         A    And so I could assign reading and say, "Okay,

6   read this.  This person is offering theory on the long

7   history and find me a document that you interpret that

8   is going to either defend or support that person's

9   argument."  So, you know, theoretically a student could

10  come in and say, "Here is a document I found.  It

11  supports this notion of long history," or "There's a

12  document I found that doesn't support this historian's

13  argument of long history."  That's sort of -- what that

14  is, is -- it is introducing students to critical

15  thinking.

16         Actually, if you go to, like, a pedagogical

17  Bloom's Taxonomy of learning -- do you know what that

18  is?

19        **Q    I do not.**

20        A    Bloom's Taxonomy of learning is kind of this

21  pyramid.  Right?  So at the bottom are basic cognitive

22  skills, things like -- sort of like reading, assessing

23  information, and stuff like this.  And you go all the

24  way up.  And at the top of the pyramid, right, is what

25  is called original ideas.  Okay?  So my objective as a

Robert Cassanello
August 05, 2022

1  professor, as a teacher, is to get students to travel up

2  that pyramid so that they are producing original ideas.

3  Right?  And so in the assignment I just described to

4  you, if they can demonstrate, "Okay, I have this

5  document independent of the reading.  It's not in the

6  citations anywhere.  This wasn't something this

7  historian looked at to give me a prompt or give me a

8  clue about how to read this document.  Wholly

9  independent.  Then I'm reading the document and I'm

10  taking this document.  And then I'm offering an original

11  interpretation."  Okay?  That represents the top of

12  Bloom's Taxonomy of original ideas, which is what I

13  strive my students to do in every class that I teach.

14      Q    Well -- and so when you say you attempt to

15  give them the tools to explore their own interpretations

16  based on research of that history, then have you just

17  described what you mean when you say "their own

18  interpretations" that they -- if I can attempt to

19  paraphrase -- that they read this material that you've

20  directed them to --

21      A    Uh-huh.

22      Q    -- or they select material from a body of --

23      A    Uh-huh.

24      Q    -- research that you've directed them to, and

25  they determine for themselves from that material whether

Robert Cassanello
August 05, 2022

Page 40

1    they agree with the long --

2        A     History.

3        Q     -- history of The Civil Rights Movement, a

4    proposition which you evidently --

5        A     Uh-huh.

6        Q     -- endorse, if you will --

7        A     Sure.

8        Q     -- or they -- or they agree with the scholars

9    who are on the other side of that debate?

10       A     Uh-huh.

11       Q     Is that an accurate perception on my part of

12   what you're describing?

13       A     Sure.  Sure.  So that's a sample, if you will.

14   I mean, every week I don't do the long history.

15       Q     Of course.

16       A     But, yeah.  That's basically the system, if

17   you will, the learning system I employ.  So the topics

18   just change.  The debates change week to week.

19       Q     You continue in paragraph 5 in saying, "As

20   part of that instruction, I encourage my students to

21   think about institutional and structural racism."

22             Would you tell me what you mean when you use

23   the terms "institutional and structural racism"?

24       A     Sure.  So institutional and structural racism

25   are policies and actions that don't necessarily have the

Robert Cassanello
August 05, 2022

Page 41

1    intent to produce a racial outcome or -- let's just say

2    a Jim Crow outcome -- right? -- but ultimately do.  So,

3    you know, the intent might be quite opposite.  Right?

4    But through the conduct of the policy or the conduct of

5    the action, it could ultimately produce a racial

6    outcome.

7            So an example of this is like -- well, an

8    example of this is sort of like the -- what's out here

9    to the window?  I-4.  The interstate highway system.

10   Right?  So the interstate highway system's intent,

11   right, was to connect all these cities to cure

12   congestion of the cities.  Right?  And it was promoted

13   and conceived as a public good for the country.  Right?

14   And in the pursuit of constructing the interstate

15   highway system, especially through historic downtowns,

16   you know, there's a premium placed on securing property

17   and purchasing locations that were cheap and were

18   politically easy, if you will, and that tended to be in

19   neighborhoods that had high minority populations.

20   Right?  So that created this racial outcome to the

21   interstate highway system.  So that would be an example

22   of institutional racism.

23       Q    And the -- and that's what you mean, I take

24   it, in the succeeding sentences in this paragraph when

25   you talk about racial outcomes or Jim Crow-like

Robert Cassanello
August 05, 2022

Page 42

1    outcomes?

2         A    Uh-huh.

3         Q    That's an example of what you're talking

4    about?

5         A    Yeah.  So the difference would be, you know,

6    if the intent of the policy was to be racist, right, or

7    to create a racial outcome, like Jim Crow laws.  Right?

8    So, you know, I know -- I don't mean to patronize.  And

9    I hope you don't feel that way, but, you know, Jim Crow

10   laws were designed specifically to segregate, to create

11   a second-class citizen for African Americans.  It was

12   their intent.  Right?

13        My example with the interstate highway system

14   didn't have that intent.  It wasn't an intent to, sort

15   of, decimate historic Black neighborhoods and

16   communities and things like this.  It was a result of --

17   it was a result of the policy.  Right?  So I wouldn't

18   put the interstate highway system, you know, in the same

19   context as a Jim Crow law.  And so that's why it has the

20   separate designation as institutional and structural

21   racism rather than Jim Crow.

22        Q    Okay.  That example that you have offered --

23   the interstate highway system and the -- the racial

24   outcomes that it had that were not designed into that

25   system by its creators I take it were the result of

Robert Cassanello
August 05, 2022

Page 43

1    actions in the implementation of the interstate highway

2    system policy that occurred in particular locations?

3        A    Yeah.  I mean, I would dispute your employ of

4    the term "design" or "designers" because I don't know.

5    I don't research interstate highways, so I don't want to

6    say I'm an expert on this.  I just read -- I read books

7    and articles on it.

8            So I would think, based on what I read, that

9    the further down you go in the design, if you will, the

10   more likely the discussions of racial implications are

11   probably there and dismissed, but the point I was trying

12   to make was, sort of, you know, the lawmakers who are

13   saying, "This interstate highway system is great; let's

14   do this," I don't think were at the same time saying

15   "Let's decimate Black neighborhoods."  That certainly

16   wasn't their intent and wasn't part of the legislation;

17   but implementing that policy, the legislation, what have

18   you, as it trickles down, then we get these racial

19   outcomes and that's the institutional racism.

20       Q    Let's move on to paragraph 6 --

21       A    Okay.

22       Q    -- of your declaration.

23       A    I'm sorry.  Before we move on, can I get

24   water, by chance?

25            MR. NEWHALL:  Let me see if I can find it for

Robert Cassanello
August 05, 2022

Page 44

1        you.  You guys can continue on.

2             (Discussion off the record.)

3   BY MR. COOPER:

4        Q    You say in paragraph 6 --

5        A    Uh-huh.

6        Q    -- "The legislation" -- and here you're

7   referring to HB7 --

8        A    Uh-huh.

9        Q    -- I trust?  "The legislation assumes a

10  condition of contemporary America that is, at best,

11  debatable.  Many historians in my field examine the ways

12  that America has failed to move on from a racial caste

13  system."

14            Tell me what you mean when you use the term

15  "racial caste system" there.

16       A    Sure.  So a caste system is something fixed.

17  You know.  So, you know, the term "caste" is something

18  that gets employed a great deal.  Excuse me.  In writing

19  on Jim Crow a lot of historians employ the term "caste"

20  and caste is a way to think about Jim Crow segregation

21  as opposed to just employ race -- racial segregation.

22            And so I would say that, you know, for -- even

23  for contemporary systems of -- of -- you know, racial

24  prejudices are more reflective of caste than a class

25  system.  I think that would be the distinction.  Because

Robert Cassanello
August 05, 2022

Page 45

1    in a class system, one would have access to social

2    mobility.  Right?  So, like, for example -- if you don't

3    mind me using myself as an example.  If you don't mind.

4    My father -- all four of my grandparents came to this

5    country from Italy, and they were all working class.  My

6    father was a steelworker.  My mom was a seamstress.  You

7    know.  They moved to Florida when I was really young.

8    Like I said, I went to school and I'm a professor.

9    Right?  So I was birthed in a working-class -- you know,

10   maybe lower working-class -- environment.  Yet

11   through -- because our class system is not as rigid, I

12   was able to attain social mobility and I'm not a

13   working-class person, by any description currently.

14   Right?

15           A caste system would not provide that sort of

16   upward social mobility, if you will.  You know.  It's

17   something that's fixed.  So that's a distinction of

18   using caste as opposed to class.  Like a racial class of

19   people versus a caste of people.

20       Q    Okay.  And so when you say that America has

21   failed to move on from a racial caste system --

22       A    I'm sorry.  I believe I said some people say

23   that.  Right?

24       Q    Yes.  Well --

25       A    You were saying I said that.

Robert Cassanello
August 05, 2022

1      Q     You write that "Many historians in my field
2  examine the ways that America has failed to move on from
3  a racial caste system."
4            Do you -- are you among the historians who
5  believe that?
6      A     I think in some cases, yes.  You know, I
7  believe there is a glass ceiling, if you will, not only
8  in regards to race, but gender and a variety of other
9  social categories in this country still.
10     Q     Well, you earlier suggested the term "caste"
11  has a particularly rigid --
12     A     Uh-huh.
13     Q     -- connotation, if you will.  And I think what
14  I'm hearing is that you don't think there's a rigid
15  racial caste system anymore in this country; am I right?
16     A     That's not what I said.  What I said was one
17  can find examples.  I think what -- you know, what I try
18  and think about and get students to think about in my
19  classes are the ways in which races, sort of, lived
20  locally.  Right?  So, you know, one may be able to look
21  at, like, say, enrollment based on race and ethnicity in
22  colleges and universities over, let's just say, the last
23  50 years.  Right?  And that could demonstrate social
24  mobility in some sense.  Right?  I wouldn't dispute
25  that.  Right?  But if you look on the local level, say,

Robert Cassanello
August 05, 2022

Page 47

 1    like, with something, like, you know -- you know,

 2    policing in a Southern inner city -- inner city -- I

 3    think you might be able to find evidence of a caste

 4    system and how policing is enforced.  So it's not like a

 5    one rule fits all, if you will.  Like, it's not that the

 6    country is in all ways a racial caste system, but it's

 7    not that -- the alternate is also not true.

 8        Q    I'm not sure I understand how policing in the

 9    inner city would qualify for your description of a

10    racial caste system.  Would you explain that?

11        A    I mean, I think this is a case-by-case

12    situation.  So we have seen over the past few years

13    cases in which urban -- urban communities -- not just in

14    the South, but I think in other parts over-policed --

15    over-policed in Black neighborhoods.  You know, we saw

16    the results of that in the urban protests and -- that

17    have manifested in light of George Floyd and others.

18    And I think that's no -- I think that is related to

19    policies and positions in some municipal police systems.

20        Q    Your paragraph 6 continues: "Additionally, the

21    law specifically prohibits concepts or discussions

22    around the moral superiority of one race over another."

23             Now, we are going to get to the concepts, in

24    particular the concept that I believe you to be

25    referring to in this -- in this sentence --

Robert Cassanello
August 05, 2022

Page 48

1    A    Okay.

2    Q    -- shortly.  But how is it that you understand

3  HB7 to prohibit discussions around the moral superiority

4  of one race over another?

5    A    Let me clarify.  Can I clarify something here?

6    Q    Sure.

7    A    So that specific sentence you identified as

8  just a statement of fact in the law, that's just -- I'm

9  just paraphrasing what the law says in the -- what is

10 it? -- the seven points.  Right?

11        Number one, members of one race, color, sex,

12 or national origin are morally superior to members of

13 another race, class, sex.  So the word "moral" is in all

14 of those prompts and so I'm just --

15   Q    Yes?

16   A    -- just stating as a fact, this is what the

17 law says.

18   Q    Well, where in that sentence does it prohibit

19 discussions around the moral superiority of one race

20 over another?

21   A    I don't understand your question.

22   Q    Let me refer you to section 2 of that law.  In

23 fact, why don't instead we jump now to paragraph 7 --

24   A    Okay.

25   Q    -- of your declaration.  You say that "HB7

```
 1   purports to allow me to discuss the concepts" -- and
 2   you're quoting here, quote, "discuss the concepts listed
 3   therein as part of a larger course of training or
 4   instruction, provided such training or instruction is
 5   given in an objective manner without endorsement of the
 6   concepts."
 7          And that is a fairly close quotation of
 8   section 2.  And I would like for you to reconcile the
 9   notion that the law prohibits discussions around the
10   moral superiority of one race over another with section
11   2 of the law.
12      A    Can you repeat section 2 for me?
13      Q    Why don't we mark it as an exhibit.
14           MR. DeMAGGIO:  Yeah.
15           MR. COOPER:  This is -- I represent to you
16      HB7.  It's a copy identical to the one that you
17      brought with you.  And -- let me see here.  Let me
18      get my copy.
19           (Defendants' Exhibit 5 was marked for
20           identification.)
21   BY MR. COOPER:
22      Q    I may have misidentified it, but if you turn
23   to page 6 of Exhibit 5.
24      A    Okay.
25      Q    At the top of the page is numeral 8, and then
```

Robert Cassanello
August 05, 2022

1    under that is subsection B.  Do you see that?

2        A    I don't have that on page 6.

3        Q    **I'm sorry.**

4        A    Sorry.  Page 6?

5        Q    **Page 6.**

6        A    All right.

7             MR. DeMAGGIO:  Let's get this out of the way.

8        A    Okay.

9             MR. DeMAGGIO:  He's directing you there.

10   BY MR. COOPER:

11       Q    **Subparagraph B.  Do you see that?**

12       A    8 subparagraph B.  Yes.

13       Q    **And it says "Paragraph A," which I will**

14   **represent to you includes the concept concerning moral**

15   **superiority.  "Paragraph A may not be construed to**

16   **prohibit discussion of the concepts listed therein as**

17   **part of a larger course of training or instruction,**

18   **provided such training or instruction is given in an**

19   **objective manner without endorsement of the concepts."**

20            **Again, that provision of the HB7 would appear**

21   **to permit discussion around the moral superiority -- the**

22   **concept of moral superiority of one race over another.**

23   **Do you dispute that?**

24       A    I think my problem -- if you don't mind me

25   elaborating -- is on the objective manner part of that

Robert Cassanello
August 05, 2022

Page 51

 1   passage.

 2        Q    Well --

 3        A    Do you want to handle that now or do you want

 4   to wait?

 5        Q    We are going to probe into that, but before we

 6   do, let me ask you this:  Was slavery itself premised in

 7   part on the concept that whites were morally superior to

 8   Blacks?

 9        A    I'm not a historian of slavery, in that whites

10   would have assumed superiority and moral.  Would have

11   been sort of in that milieu?  Yes.

12        Q    Do you think that HB7 would prohibit you from

13   discussing that element of slavery?

14        A    I think HB7 would prohibit me from discussing

15   that element of slavery if I have a student stand up in

16   class and say, "You're making me feel guilty by

17   introducing me to this material."  And then I think HB7

18   in that regard would be triggered in that discussion.

19        Q    Well, we are going to come to the provision or

20   the concept that deals with feelings of guilt and

21   anxiety, but I want to stay focused now on the question

22   of whether or not discussions --

23        A    Sure.

24        Q    -- in your course or in class about whether --

25   about the element of slavery in which -- in which

Robert Cassanello
August 05, 2022

1    whites, where slavery was practiced, believed that

2    whites were morally superior to Blacks and whether or

3    not this HB7 --

4        A    Uh-huh.

5        Q    -- in your opinion would prohibit you from

6    discussing that fact about slavery.

7        A    I think it depends on -- you know, I don't

8    have a role in the policing mechanisms of HB7, and I

9    don't have a role in, you know, how a student may or may

10   not feel based on a topic I introduce in class or how I

11   introduce that topic.  Right?  So I don't know that, you

12   know, if I introduce something, if that's not going to

13   have a requisite cascading effect of my teaching and the

14   content of my teaching comes under scrutiny.

15       Q    And so your view of whether or not discussion

16   about moral superiority would depend how students

17   reacted to that feature of slavery that we are

18   discussing?

19       A    That, or -- I mean, if you want to go, you

20   know -- really, kind of, a thought experiment here.  I

21   mean, not only a student, but someone off the street, a

22   lawmaker in Tallahassee, an administrator at UCF.  I

23   mean, I don't know.  You know, there isn't really a lot

24   in here that protects me and my academic freedom.  So

25   when you're saying, "Does it stop you from teaching?"  I

Robert Cassanello
August 05, 2022

Page 53

1    mean, theoretically -- I mean, this law is designed to

2    stop me from teaching a variety of things or its intent

3    is designed to stop me from teaching a variety of

4    things.  Unfortunately, I'm not the arbitrator of

5    whether what I'm teaching is appropriate or, you know,

6    germane to the topic or not.

7         Q    **And who do you understand the arbitrator to**

8    **be?**

9         A    I think there's a variety of arbitrators here.

10   One is the student, any student.  I think people off the

11   street -- if -- you know, say if I were to record a

12   lecture or discussion that I wanted to disseminate

13   publically and it's out there from a class, someone off

14   the street can say, "Hey, you know, he's violating HB7."

15   An administrator at UCF could say, "Yeah, you're

16   violating HB7 and we're not going to get our performance

17   fund.  It'll be taken away."

18        Board of Governors -- any standing committee

19   in the Florida legislature and there's -- I don't mean

20   to offend anybody in here, but I would like to talk --

21   if you don't mind giving me a little latitude here.

22        Q    **Please.**

23        A    Okay.  We have a local legislature who

24   represents Lake County, Anthony Sabatini.  Anthony

25   Sabatini went on our local news station, Channel 13 News

Robert Cassanello
August 05, 2022

Page 54

1  -- this would be just before this sometime -- and he

2  went on the news and he was interviewed by a local

3  newscaster.  And I am quoting here.  I'm not

4  paraphrasing.  He said, "99 percent of the professors

5  who teach in our public universities are cultural

6  Marxists and indoctrinate their students."  Now, that's

7  the figure he used.  99 percent.  I'm assuming I'm not

8  the 1 percent.  I'm assuming I'm the 99 percent.  And

9  Anthony Sabatini -- correct me if I'm wrong -- sits on

10  standing committees in Tallahassee.  And this law, or

11  the subsequent part of this law -- the -- and the

12  conforming bill -- allows any standing committee to

13  determine, you know, whether an HB7 violation had

14  occurred or not.

15          So, you know, I don't trust someone like

16  Anthony Sabatini to determine, whether, you know -- what

17  I'm doing in class is germane or not, because he has

18  inherent prejudice to someone like me and what I teach.

19      Q    I want to move now to paragraph 7.

20      A    Okay.

21      Q    And I will read, again, the first sentence,

22  which I read earlier: "HB7 purports to allow me to

23  'discuss' the concepts listed therein as part of a

24  larger course of training or instruction, provided such

25  training or instruction is given in an objective manner

Robert Cassanello
August 05, 2022

1    without endorsement of the concepts."  End quote.

2            You continue in your paragraph 7:  "However,

3    this exception reflects a misunderstanding of what

4    historians do and how history is taught.  It is

5    impossible to give an objective account of history."

6            I would like for you to explain -- I think you

7    alluded to it earlier --

8       A    Uh-huh.

9       Q    -- when you used the word "objective."  But I

10   would like for you to explain why you believe it's

11   impossible to give an objective account of history.

12      A    Sure.  As I mentioned earlier, when you were

13   saying, "Does this stop you from facts?"

14           And I said, "Well, history is not facts.

15   History is interpretation."

16           And since I believe history is interpretation,

17   objectivity comes into question because history is not a

18   science.  It's not a hard science.  It is not even

19   really a social science.  Right?  So the pursuit of

20   history -- and as a professional historian, I do not

21   believe that my personal pursuit -- my own research, my

22   own publications -- yields variable truth.  Right?

23   That's something that, you know, chemists and physicists

24   do and stuff.  They do an experiment.  Right?  And then

25   someone can reproduce that experiment anywhere in the

Robert Cassanello
August 05, 2022

Page 56

1    world and they come to the same conclusion.  Right?

2    Verifiable.  Right?  We don't have that in history.  We

3    have interpretation.  And what we, as historians, must

4    do is understand that we are not objective.  Right?  The

5    history produced is not objective.  Right?  History I

6    produce is not objective.  And I would say never the

7    articles I have written, the books I've done, represent

8    anything approaching a variable truth.  It represents a

9    truth.  It represents what I believe to be true; what

10   I'm trying to interpret; what I'm trying to prove.

11   Right?  But it doesn't represent something that is, sort

12   of, universally true, if you will.  Right?

13          And so when I instruct students on the

14   practice of history, right, I have this objectivity

15   discussion with them because what I don't want them to

16   come away with is the idea that there is a single

17   objective truth.  It's philosophically, sort of, a

18   school of thought that I think predominates in history

19   as an academic discipline now.

20          And so the problem with objectivity and the

21   problem with -- specifically with our -- the guidance we

22   have been given at UCF -- I've seen at the University of

23   Florida and the language I've seen in this document, as

24   well as previous laws passed about the instruction of

25   history in the Florida legislature, all assume that

Robert Cassanello
August 05, 2022

1  history is objective truth.  It's a single objective

2  truth.  Right?  And it's not.  It's not what I do, and

3  it's not how I instruct students to think, if their

4  intent is to become a practicing historian in some

5  capacity.

6       Q    Are there no objectively variable facts that

7  historians agree upon having occurred?

8       A    You're confusing facts with interpretation.

9       Q    Well -- and we discussed this previously and

10  if I --

11      A    You're being a little postmodern here.

12  Historians don't dispute facts.  Historians dispute

13  interpretation.  That interpretation is based on facts,

14  but historians don't say, "No, your facts are wrong."

15  They say, "Your interpretation is wrong."  And they

16  might bring with them other facts, other documents, but

17  they wouldn't say, "Hey, that fact is wrong.  This fact

18  is wrong."  That's kind of an absurd way of thinking

19  about history.

20      Q    So, for example, in your interpretation of the

21  facts that you believe to be relevant --

22      A    Uh-huh.

23      Q    -- and the historical events that occurred --

24      A    Okay.

25      Q    -- that you believe to be relevant to the

Robert Cassanello
August 05, 2022

Page 58

1    question of whether or not your view of the long

2    history --

3         A    Okay.

4         Q    -- of The Civil Rights Movement is accurate --

5         A    Uh-huh.

6         Q    -- are -- are facts that you and other

7    historians who debate the question, the

8    interpretation --

9         A    Uh-huh.  Might be the same facts.

10        Q    -- they are -- your -- would I be correct to

11   say that the historians who debate that issue, that

12   interpretation, are agreed upon the basic facts that

13   they either do or do not consider relevant to their

14   interpretation on the -- on the truth of those facts?

15        A    I don't understand what you mean by -- could

16   you -- could you give me a definition of truth of those

17   facts?  What do you mean by that?

18        Q    Well, I mean, you have been using the word

19   "facts" and -- and "history," either events in history

20   that occurred and there's no -- there's -- there's

21   general agreement that the event occurred, correct --

22        A    Sure.  The problem is you're focusing on facts

23   as if facts are part of the history, and I'm trying to

24   tell you it's the interpretation.

25             So I can give you a specific example from my

Robert Cassanello
August 05, 2022

Page 59

1    own work where I'm involved in a debate and we agree on

2    the facts, but it's the interpretation that myself and

3    another historian are going back and forth on.

4         Q     I think that would be helpful.  Thank you.

5         A     All right.  So in a lot of my work -- and I

6    will just specifically reference my book on

7    Jacksonville, To Render Invisible.  Right?  I offer the

8    argument that the response to Jim Crow and any success

9    that African American activists had in fighting Jim Crow

10   in Jacksonville between the years of, you know, roughly

11   1860 to 1920, was due to the fact of a bottom-up

12   interpretation theory of history.  So bottom-up meaning

13   that the masses -- the people at the bottom -- this

14   would be the African American working class, or the ones

15   who were sort of the catalyst for what drove the early

16   Civil Rights Movement in Jacksonville.  That's my

17   argument.  Right?  Okay.

18          So there has been a -- I didn't create this

19   argument.  I'm kind of pulling from what other people

20   have done.  I have read other people's works and said,

21   "Okay.  Like, this in Memphis or that -- here in

22   Chattanooga -- you know, Jacksonville experienced kind

23   of a similar thing in this way with these people, so on

24   and so forth."

25        Q     May I interrupt --

Robert Cassanello
August 05, 2022

Page 60

1      A      Sure.

**2      Q      -- to ask on what you based your argument.**

3      A      On primary research.

**4      Q      Primary research about historical events and**
**5   incidents --**

6      A      Yes.

**7      Q      -- and people --**

8      A      Uh-huh.

**9      Q      -- who populated the bottom-up?**

10     A      And also the top.  Because, you know, you have

11  to look at what is going on above as well.  Now you're

12  thinking like an historian.

**13     Q      Thank you for allowing the interruption.**
**14  Please continue.**

15     A      No problem.  Okay.  So when -- I published

16  that book in 2013, but there are a few articles I wrote

17  while I was working on that book that were published

18  throughout the 2000s.  And so that had represented, if

19  you will, a kind of consensus view of -- of African

20  American working-class history, right, as kind of a

21  distinct thing.

22             Now, recently -- and I've actually reviewed a

23  book, this book that I'm going to mention -- and other

24  people have done this as well, but this book, I think,

25  does the best case of disputing what I just told you.

Robert Cassanello
August 05, 2022

Page 61

1   And so there's a -- I don't remember his name, but there

2   is an historian who wrote about The Civil Rights

3   Movement in Pittsburgh.  Right?  And he actually points

4   to historians like myself who, he says, are

5   overemphasizing the working class -- the Black working

6   class.  And that the Black working class didn't have as

7   much of a role or significance to The Civil Rights

8   Movement and what we understand The Civil Rights

9   Movement to be.  And it was really the sort of -- I

10  don't know that he uses this word -- Black elites, who

11  were the true catalyst, if you will, of the contours,

12  the debates, the rhetoric, and things of The Civil

13  Rights Movement at that time.

14      **Q     And how does he -- what evidence does he point**

15  **to to support that view you've just described --**

16      A    Sure.

17      **Q     -- contrary to your own?**

18      A    Sure.  He's looking at, you know, records of

19  various organizations in Pittsburgh.  You know.  He

20  looks at newspaper articles, speeches, Black leaders and

21  NAACP records, government records.  The same stuff I've

22  looked at, but different city, obviously.

23      **Q     Well, it sounds to me like you both could be**

24  **correct because you could have --**

25      A    That's why I used the truths in plural.  We

Robert Cassanello
August 05, 2022

Page 62

```
 1   don't have an objectifiable truth.  You know, we have
 2   truths.  Right?  And it depends, again, interpretation,
 3   argument.  This is why, if I go back to the discussion
 4   of class, right, and the pyramid -- top of pyramid --
 5   original thinking, original interpretation.  That's why
 6   the class experience is so important to get students to
 7   achieve that top of the Bloom's Taxonomy.
 8        Q    To finish out this illuminating dialogue we
 9   are having here, Dr. Cassanello, let me proceed to the
10   next sentence, which is "Studying history is
11   interpreting history, and the central skill that history
12   teaches is how to interpret historical sources into the
13   coherent narrative."
14             Now, I think I understand that sentence with
15   one exception.  I would like for you to -- now that we
16   have had this discussion, I would like for you to tell
17   me what a "coherent narrative" -- what do you mean when
18   you say a "coherent narrative"?
19        A    Sure.  A coherent narrative is something that
20   one can understand that is not the author.  Right?  So,
21   you know, we talked a little bit about, like, research
22   and facts and things like this, but communication is
23   also history.  Right?  So students in my class -- you
24   know, if they are, again, trying to achieve the top of
25   the Bloom's Taxonomy pyramid, right, I have to be able
```

Robert Cassanello
August 05, 2022

Page 63

1    to and anybody off the street would have to be able to

2    understand their argument and be persuaded by their

3    argument.  And so that composes what I would refer to as

4    a coherent narrative.

5         Q    A coherent narrative.  So you would -- then

6    you've earlier said you have advanced the argument in

7    support of what you have called long history of The

8    Civil Rights Movement?

9         A    Sure.

10        Q    So that's -- and so -- then, do I understand

11   you've advanced what you consider to be a coherent

12   narrative that explains this -- your belief in the long

13   history of The Civil Rights Movement?  Is that a fair --

14        A    I hope so.  I'm sure I got some detractors

15   that would say that it's not coherent, but I believe so.

16   It's won awards and stuff, so someone, somewhere,

17   thought it was coherent.  Right?

18        Q    So I guess the answer is yes, that's a fair --

19        A    That's a fair.

20        Q    -- capture?

21        A    Yes.  It is fair.

22             MR. DeMAGGIO:  Off the record.

23             (Discussion off the record.)

24             MR. DeMAGGIO:  Back on now.

25

Robert Cassanello
August 05, 2022

Page 64

1           THE WITNESS:  Can I go to the bathroom?

2           MR. COOPER:  This might be a good moment to

3       take a ten-minute break.

4           (Recess taken 11:25 a.m. until 11:32 a.m.)

5   BY MR. COOPER:

6       Q    Okay.  I want to hand you another document and

7   ask you if you recognize that document.

8       A    Uh-huh.

9       Q    What is that?

10      A    That is a study guide for reading that I've

11  assigned on a content module that I called To Brown From

12  Brown, which is Brown v. Board.

13          MR. COOPER:  And I'm going to ask the court

14      reporter to mark a copy of that document as our

15      next exhibit.  Is that Number 6?

16          (Defendants' Exhibit 6 was marked for

17          identification.)

18          MR. COOPER:  Exhibit 6.

19  BY MR. COOPER:

20      Q    I want to call your attention to the paragraph

21  under the red -- color red statement at the top here.

22  It begins "note."

23      A    Uh-huh.

24      Q    And it reads as follows: "The history of this

25  article is outdated, so don't read it and think it

Robert Cassanello
August 05, 2022

Page 65

1    represents current thought and interpretation.  There

2    are many inaccuracies in the interpretation of the

3    history presented in the article."

4         A    Uh-huh.

5         Q    Could you describe for me what the -- what the

6    -- what you mean when you use the term "outdated" --

7         A    Uh-huh.

8         Q    -- the history is outdated?

9         A    Sure.  So the first article there was

10   published in 1872.  Right?  So, to me, it's sort of -- I

11   don't mean this in an insulting way.  It's obvious why

12   it's outdated.  It was written during time when Jim Crow

13   was the law of the land.

14        Q    Forgive me for interrupting, which article is

15   that that is published --

16        A    I think it's the -- is the first one?  Oh, I'm

17   sorry.  I'm sorry.  You know what?  I'm sorry.  I

18   apologize.  I didn't go to the citation.  1945.

19        Q    1945?

20        A    I'm sorry.  For some reason I thought I was

21   having them read the case.

22        Q    We are seeing the same thing.

23        A    Yeah.  That was my fault.

24        Q    So what you're talking about is --

25        A    -- Raymond Pace Alexander article.

Robert Cassanello
August 05, 2022

Page 66

1       Q    Right.  Please.

2       A    Okay.  So why did I characterize it as

3  outdated?

4       Q    Yes, sir.

5       A    Okay.  Okay.  So when I say "outdated," I do

6  this for a variety of reasons.  One, with this specific

7  article -- and I'm doing this from memory, so you have

8  to excuse me if I'm not 100 percent accurate --

9       Q    Fair enough.

10      A    -- is that -- look at the year.  It's 1945.

11  And what this article was doing was saying, "Hey, look

12  at all of these Supreme Court victories the NAACP has

13  had.  And this is where I think it is all going in the

14  future.  Right?  So a lot of this article is

15  speculative, if you will.  And so it -- this is before

16  Smith versus Allwright.  This is before Brown v. Board.

17  You know.  All the stuff.  So what I'm alerting the

18  students to is that, you know, this is accurate for 1945

19  -- the interpretations that are in here -- because this

20  person was speculating on The Civil Rights Movement in

21  1945 and can't, obviously, account for after 1945.  And

22  that's basically what I'm trying to alert my students

23  to.  And the reason I assigned this is because I like

24  the way that Alexander summarized these cases down here.

25  So you can see down here.  I have like a list of cases.

Robert Cassanello
August 05, 2022

                                                          Page 67

1   So each case is summarized in its civil rights context
2   by the author.  And I think that he does a very fine job
3   with, but his interpretation of things, again, is dated
4   to the 1940s.  So I wanted the students -- because I
5   don't know of any other article that would do the same
6   thing and introduce students to the number of cases and
7   for them to be able to then see a continuity from case
8   to case.  You know.  That's sort of where the lesson
9   came from.  So the article was more, sort of, mind this
10  for the court cases -- a description of the court cases.
11  The interpretation in here is, kind of, superfluous to
12  the assignment.
13       **Q    Well, you do also say there are many**
14  **inaccuracies in the interpretation of the history**
15  **presented in the article.  And what were you referring**
16  **to as inaccuracies in this interpretation?**
17       A    I would have to look at the article.  I can't
18  recall off the top of my head.
19       **Q    That's fair enough.**
20       A    It might be -- let me see.  If I look at the
21  cases I might --
22            MR. DeMAGGIO:  Don't guess.
23       A    Yeah.  Okay.  I don't know.  I would have to
24  read the article again.  But it must have been enough
25  for me to prompt the students that, you know, to be wary

Robert Cassanello
August 05, 2022

Page 68

1    of the interpretation.  As a rule -- I mean, you know, I

2    would caution students with anything written, you know,

3    in the 1940s they're reading today to kind of scrutinize

4    interpretation.

5    BY MR. COOPER:

6        **Q      Proceeding now to paragraph 8 of your**

7    **declaration.**

8        A     Okay.

9        **Q      You say -- and, again, for purposes of our**

10   **record, I am going to read the first sentence.  "It is**

11   **impossible to teach history without using some**

12   **interpretive lens."**

13            **And what interpretive lens do you use as a**

14   **historian?**

15       A     Sure.  There's not one interpretive lens.  I

16   mean, there's many one can choose from.  So I gave you

17   two.  I talked about my own work and a detractor, if you

18   will.  Those are two distinct interpretive lenses.

19            So if -- you know, I could be teaching

20   something on The Civil Rights Movement.  Like, say, I

21   could be teaching Birmingham in 1963.  And I could say,

22   "Okay.  Let's talk about Birmingham in 1963, but let's

23   look at the working class and the role of the working

24   class in the movement and whether that was catalyst for

25   success or not."  That's an interpretive lens.

Robert Cassanello
August 05, 2022

Page 69

1          Another interpretive lens might be, "Well,
2    let's look at African Americans Civil Rights leadership.
3    Let's look at the pastors.  Let's look at the churches."
4    That's a distinct interpretive lens; different from the
5    working-class interpretive lens.  So depending on the
6    moment, the history, what I'm trying to get across would
7    determine my interpretive lens.
8          Q    You then say, "For example, an 'objective' --
9    and you put the word objective in quotes -- "account of
10   the history of the Holocaust would require professors to
11   give credence to Holocaust denial."
12             Now, I would look for you to explain why you
13   believe that is the case.  Because, to be perfectly
14   up-front with you, I would have thought that an
15   objective account of the Holocaust would not give
16   credence to the Holocaust denial.
17        A    What I'm doing is referencing what I think is
18   the intent in the legislation.  Right?  This idea that
19   all opinions are valid.  Right?
20        Q    All opinions are what?
21        A    Are valid.  All opinions are valid.  All
22   opinions are informed and all opinions are treated the
23   same equally.
24             My employ of the analogy here to Holocaust is
25   to say, "No, that's not true."  So, you know, if we are

Robert Cassanello
August 05, 2022

1  to give room in a class, right, for every manner of

2  opinion, and if I were teaching Holocaust, then that

3  would also include Holocaust denial because that would

4  be a quote, unquote, objective way to approach the

5  subject.  Dispassionate, if you will.  Right?

6          And I share your -- I share your opinion.  I

7  just -- I think we express it differently.

8      Q    You share what?

9      A    About Holocaust denial.

10     Q    That, at least in terms of the factual

11  accuracy of the question whether the Holocaust occurred

12  or not --

13     A    Uh-huh.

14     Q    -- is not something on which there can be

15  reasonable disagreement, can there?

16     A    I would agree with that statement.

17     Q    Okay.  And you say -- you go on to say,

18  "However, for obvious reasons, Holocaust denial is an

19  interpretive lens that virtually all serious academics

20  reject and is not included in history courses."

21          And so we may have just touched on this, but

22  what are those obvious reasons that Holocaust denial is

23  an interpretive lens that virtually all serious

24  academics reject?  What are the obvious reasons?

25     A    Oh.  Wow.  I mean, you know, there -- there is

Robert Cassanello
August 05, 2022

1    documentary and photographic evidence of the Holocaust.

2    Right?  There is firsthand accounts and interviews and

3    world histories of the Holocaust by people who

4    experienced it.  Right?  So for someone to promote a

5    position of Holocaust denialism is, you know -- it's

6    sort of, like -- in the way I would describe it -- and

7    this is, you know, something I would talk about in class

8    but not with the Holocaust denial example -- would be

9    having -- having the interpretation before you do the

10   research.  So what ends up happening is your

11   interpretation forms the research rather than the

12   research informing the interpretation.  So with people

13   who deny the Holocaust, they come into -- if you want to

14   call it research -- the idea that the Holocaust didn't

15   happen -- and that's what they are attempting to prove,

16   so anything that proves the Holocaust is pushed aside

17   for the things that do not, you know -- that, for them,

18   you know, prove the Holocaust denialism.

19          So this would be the reason why professional

20   academics -- I would go beyond history, but academics

21   would consider Holocaust denial an inappropriate

22   interpretive lens for classroom instruction.

23        **Q    It just -- the existence of the Holocaust is**

24   **evidenced in history overwhelmingly by the kind of**

25   **evidence that you have just identified.**

Robert Cassanello
August 05, 2022

Page 72

1          Are there any -- you say, "Virtually all
2     serious academics reject Holocaust denialism."
3          Do you know of any -- any academics that
4     advance the proposition that the Holocaust did not
5     occur?
6     A    It's not my field, so I don't know their name,
7     but there was -- there was a few in England who did --
8     and, you know, they were called as expert witnesses in
9     trials over their denial of the Holocaust and they were,
10    quite frankly, shredded in the testimony and stuff,
11    but...
12    Q    Were these the Nuremberg Trials?
13    A    No, no, no.  It's like the '80s, 1980s.  '70s,
14    late '70s, 1970.  There's a film called Denial if you
15    want to see, sort of, a narrative film on this.  But if
16    I may, can I follow up with something?
17    Q    Sure.
18    A    So, for me, you know, I mean, Holocaust
19    denialism as an idea in the actual classroom is probably
20    absurd, in practical terms.  I don't teach the
21    Holocaust.  Certainly, I don't think I would be
22    experiencing having to confront Holocaust denial in the
23    classroom or having that -- I don't anticipate I will.
24    But where you see it and where it is a problem -- and I
25    think, you know, this might be analogous of the problems

Robert Cassanello
August 05, 2022

Page 73

 1   with the HB7 is -- and I have had this over the years,

 2   is I have students who come in -- you know, into a class

 3   -- and this might not be civil rights; this might be a

 4   class I teach on the methods and theory to history where

 5   they write a research paper and stuff like this -- and I

 6   have a student who will say, "Oh, I want to do this

 7   research paper.  I think that only 100,000 Jews died in

 8   the Holocaust, not 8 million" or whatever figure.

 9          Then I have to sit them down and say, "What

10   you're proposing is a form of Holocaust denial."  And

11   then I have to kind of explain that to them that, you

12   know -- the question about how many is not sort of

13   germane question historians ask.  And if I challenge

14   them and say, "Go into the literature.  Go into what

15   historians write and research" and so on and so forth,

16   "tell me where the number is" -- you know, is sort of

17   the central argument to the -- to the question.  And,

18   you know, obviously they can't do that because it

19   doesn't exist.  And then I kind of explain to them to be

20   careful because what they're drawing from are things

21   online, you know, that, I believe, are promoted on white

22   supremacist websites, and things like this, as

23   legitimate history, legitimate facts, if you will.  And

24   the students kind of bring that.  So this might be a

25   case where, you know, this comes into the classroom and,

Robert Cassanello
August 05, 2022

Page 74

 1  you know, I would address it in that sort of way.  Does

 2  that make sense?

 3      **Q     I think it does.**

 4      A     It's not completely out of the realm.  Right?

 5      **Q     Well, by "out of the realm," you mean it's --**

 6  **a history teacher could be confronted with a student --**

 7      A     Yeah.

 8      **Q     -- who might want to do that?**

 9      A     Right.  So it's not as blunt as, you know,

10  denying the Holocaust.  It's just sort of ancillary to

11  it.  Right?

12      **Q     Okay.  I do want to ask you if you meant to**

13  **suggest that the difference between the possibility of**

14  **100,000 Jews being murdered in the Holocaust and**

15  **8 million is -- is a matter of indifference to**

16  **historians who study that event and that period of**

17  **history?**

18      A     No.  I think it's more a proxy way, that

19  Holocaust denialism.  Right?  If I say, "Oh, the

20  Holocaust happened.  It was 100,000.  It wasn't 8

21  million.  Why are Jewish people making such a big deal

22  about this?"  That's where it comes from.  So it's kind

23  of a way of conceding a point, if you will, but then

24  achieving the same goal of Holocaust denialism.  Does

25  that make sense?

Robert Cassanello
August 05, 2022

Page 75

1          Q      I think it does.  Thank you.

2                 All right.  So let's move now back to

3    exhibit -- the exhibit we marked as 5, which is HB7.

4    Could you -- if you turn to page 5.  So this is really

5    the central issue in the case --

6          A      Uh-huh.

7          Q      -- these concepts.

8          A      Sorry.  You're including 8, too, in that,

9    right?  The 1 through 8?

10         Q      Yes.  Yes, I am.

11                Again, for the record, let me read into the

12   record the portion that's marked as section 4, little

13   (a).  "It shall constitute discrimination on the basis

14   of race, color, national origin, or sex under this

15   section to subject any student or employee to training

16   or instruction that espouses, promotes, advances,

17   inculcates, or compels such student or employee to

18   believe any of the following concepts."

19                And then the legislation lists eight concepts.

20   I want to -- I want to discuss those eight concepts with

21   you.

22                The first one reads:  "Members of one race,

23   color, national origin, or sex are morally superior to

24   members of another race, color, national origin, or

25   sex."

Robert Cassanello
August 05, 2022

Page 76

```
 1                So, Dr. Cassanello, do you believe that
 2   members of one race are morally superior to members of
 3   another race?
 4        A    Are you asking me to respond to 4(a) and 1 or
 5   just 1?
 6        Q    Just 1.
 7        A    No.
 8        Q    You do not believe that.
 9                Do you believe that someone who does believe
10   that members of one race are morally superior to members
11   of another race would be a racist?
12        A    Yes.
13        Q    So if one of your colleagues espouses that
14   belief -- espoused to his students -- that members of
15   the white race are morally superior to members of the
16   Black race, for example, you believe that would be a
17   racist?
18        A    I believe that's a racist statement.
19        Q    Yes.  Would that be, what I think -- elsewhere
20   in your declaration you use the term "white supremacist
21   discourse," would that be white supremacist discourse?
22        A    No.  White supremacist discourse would be more
23   aligned to some kind of racial outcome that benefits the
24   morally superior race.
25        Q    So moral superiority is not an element to the
```

Robert Cassanello
August 05, 2022

Page 77

1   white supremacy?

2        A    It is, but I think, you know -- you're giving

3   it a discrete thing, and you're saying "What is this

4   discrete thing?"  And I answered it.  I said, "That's a

5   racist statement."

6             And you said, "Well, is it a white

7   supremacist?"

8             And I said, "Well, it's white supremacist if

9   that racist statement is attached to an action.  That

10  action that would be an action of white supremacy."

11  That's where I'm going with this.

12       Q    So white supremacy is -- if I understand that

13  comment -- is tied to outcomes more --

14       A    Or aspirations.

15       Q    Okay.  So someone who -- who believes that

16  whites are morally superior to Blacks?

17       A    Uh-huh.

18       Q    But that is not in any way attached to any

19  particular outcome that is racially disparate.  That

20  would -- that would take that belief out of the --

21       A    Put action to the belief, if you will.

22       Q    Are you saying that white supremacy and the

23  belief in white supremacy requires action as opposed to

24  just mental beliefs?

25       A    I believe that the racist feeling or

Robert Cassanello
August 05, 2022

Page 78

1    statement, right, is at the center of white supremacy.

2    That's where it starts.  Right?  I would be hard-pressed

3    to find an example where one who espouses or believes

4    the racist statement stops there.  Right?  But usually

5    that's sort of the foundation and building block that

6    leads to white supremacist activity.

7         Q    Actions.

8         A    Or actions.  Right.

9         Q    Do you believe that the university -- your

10   university at UCF -- could prohibit your colleagues from

11   espousing that view to his or her students?

12        A    I believe the university tried to do that very

13   thing.

14             Are you familiar with Charles Negy and the

15   Negy case at UCF?

16        Q    I don't think I am.

17        A    Don't you read the news?  No?

18             Okay.  Charles Negy is a psychology professor

19   at UCF, and he was terminated in either December of 2020

20   or January of 2021 for some racist statements that he

21   made on Twitter.  Okay?  And what the university did --

22   and an independent arbitrator also made the same

23   conclusion I'm about to tell you -- is he went onto

24   Twitter during some of the George Floyd protests.

25   Right?  On his personal Twitter account.  And he said

Robert Cassanello
August 05, 2022

Page 79

1    something to the effect -- and I'm paraphrasing.  I'm

2    not quoting.  But something to the effect of Black

3    people having a pathology of underachievement and that

4    they are in the position they are because of who they

5    are as a culture, as a people, not because there's

6    racism in America.  All right?  So, to me, that reads as

7    a racist statement, like I said.  Right?

8            So it created a great deal of publicity around

9    the country, on campus.  A number of students protested

10   the fact that he was employed at UCF.

11           And this is my opinion:  UCF, I believe,

12   panicked, okay, about this criticism, and what they did

13   after the suite of protests was they created a reporting

14   mechanism, I believe, on a web page for students and

15   colleagues, former students to report Charles Negy.  And

16   they got something like 200 reports from that -- from

17   current, former students, colleagues and things.  They

18   went into his teaching evaluations over the course of 15

19   years at the university and kind of handpicked things

20   out and had a disciplinary hearing and terminated him.

21   This would have been, like I said, January of 2021.

22   Right?  And said, "Oh, you know, you did all of this

23   stuff and you're being terminated."

24           So he had tenuring.  He was a tenured

25   professor.  He wasn't nontenured.  So they terminated

Robert Cassanello
August 05, 2022

Page 80

1   him on the spot.  I think they suspended him first; then

2   they terminated him and he was gone.  And he -- actually

3   not us, the local chapter didn't defend him.  The state

4   one did, because we don't do terminations.  So UFF state

5   defended him.  Got him a lawyer and they went into

6   arbitration.  And it took almost two years, and the

7   arbitrator decided that UCF punished him for the

8   Twitter.  There was a number of tweets, not just that

9   one, but a number of tweets as opposed to what may or

10  may not have happened in the classroom.  Okay?

11          And so he was reinstated.  And the arbitrator,

12  essentially, said to UCF that, you know, "You terminated

13  him based on the speech that he gave on Twitter and that

14  the discipline didn't merit termination," basically.  So

15  he got his job back that day.

16      Q    Is he now teaching at UCF still?

17      A    As I understand it -- and I don't know him

18  personally, but as I understand it, he returns to

19  faculty in the fall.  So I think our contracts start

20  August 8.  So as far as I know, August 8th he should be

21  back employed, teaching classes and all this kind of

22  stuff.

23      Q    When you said earlier that "we" -- I think you

24  said something to the effect of "we didn't defend him."

25  Are you talking about --

Robert Cassanello
August 05, 2022

Page 81

```
 1      A    That's the way our -- it's the way our
 2  grievance process is set up.  Right?
 3      Q    And you are involved in that process as
 4  president of the --
 5      A    I wasn't president when it happened.  Someone
 6  else was president.
 7      Q    Uh-huh.
 8      A    But what happens in a grievance?  Right?  So
 9  locally, which would be our chapter, right, we handle
10  all grievances except for suspensions and terminations.
11      Q    By "chapter," you mean the UCF chapter of the
12  overall --
13      A    Right.
14      Q    -- statewide higher education union?
15      A    Right.
16      Q    Okay.
17      A    Right.  So if someone is suspended or
18  terminated, that's not handled locally.  That's handled
19  by the states.  That's in Tallahassee.
20      Q    Okay.
21      A    So what Tallahassee does is they send a
22  grievance person down.  Usually a service rep.  And then
23  they oversee the suspension or termination and, when
24  necessary, they would hire a lawyer.  As I understand,
25  they hired Negy a lawyer.  So a lawyer represented him
```

Robert Cassanello
August 05, 2022

Page 82

1    in the arbitration.

2            Now, when I was elected president, the Negy

3    thing was already going on.  And so state UFF just said

4    to me, like, "We're handling the Negy thing.  Don't

5    worry about it."  So I actually wasn't apprised of what

6    was going on because it wasn't a chapter thing.

7        Q    Uh-huh.

8        A    But they did hand me the arbitration decision,

9    so I did -- I read that and that's where I'm getting

10   what I'm telling you, from the arbitration decision.

11       Q    Is that arbitration decision available

12   publically?

13       A    That is a good question.  I have a copy of it

14   if you want it.

15       Q    I would --

16            MR. DeMAGGIO:  Yeah.  I would think that an

17            arbitration involving a public or employee in a

18            public university would be a matter of public

19            record anyway.

20       A    It should be, but I think you have to do a

21   public records request for it.  But I have a copy.  I

22   don't think --

23            MR. DeMAGGIO:  If you give it -- I've got to

24            assume it would be Chapter 119.

25       A    Because it was delivered to me as union

Page 83

1  president.  So if you're asking me, as union president,

2  "Can I see this document?"  I can say, "Yeah."

3          MR. COOPER:  Well, I would make that request.

4          MR. DeMAGGIO:  I clearly haven't seen, but

5      we'll deal with that.

6  BY MR. COOPER:

7      Q    But if it's appropriate, as you think it is,

8  for you to share it --

9      A    It answers your question, right?  You said,

10  "Would anybody who said these statements be punished at

11  UCF?"  Right?  That was the question.

12      Q    That did.  And I do have a further question.

13  Did you have a role with the local union when this took

14  place that required you to have any involvement at all,

15  even at the local level in the disciplinary process?

16      A    No.  The only thing I did was receive the

17  arbitrator's decision that I just mentioned.  That's the

18  only role I had.

19      Q    And based upon the arbitrator's decision, do I

20  correctly understand that the arbitrator concluded that,

21  because this was outside the classroom in a Twitter or

22  series of Twitter statements, public statements, that

23  the -- that the discipline of termination was a

24  violation of collective bargaining agreement?

25      A    No.  It was more nuanced than that.

Robert Cassanello
August 05, 2022

1          What UCF argued was that his termination was

2    wholly unrelated and independent of the Twitter

3    incident.

4        **Q    And, therefore, I take it, based upon reports**

5    **of his conduct in the classroom from students and what**

6    **have you?**

7        A    Yes.  So it was based on those 200 anonymous

8    reports, whatever it was, in 15 years of teaching

9    evaluations.  Right?  So what the judge said was --

10   actually, the judge and -- I don't know the exact word

11   he used, but said something to the effect that the

12   provost was deluding himself if he believed that this is

13   unrelated to the Twitter.  Right?  Because that was the

14   argument he said he was making.  We weren't seeing that.

15   We didn't know that happened.  This is all related to

16   that.  So the arbitrator smacked UCF and said, "No, no,

17   no.  This is all about this."  And said, essentially --

18   and this is the part where I think you're getting at --

19   is that what UCF violated in the contract, right, was

20   that it didn't go through what's called "progressive

21   discipline."  Right?  So in our contract we have a

22   discipline article and we have a section of it on

23   progressive discipline.  So the way progressive

24   discipline works is like this: Say I do something.

25   Right?  So for argument's sake, if you don't mind, say

Robert Cassanello
August 05, 2022

Page 85

1  UCF crafts an HB7 policy.  And I decide to violate it in

2  class.  Right?  So I go to class.  I say, "Hey,

3  violation of HB7."  Right?  What progressive discipline

4  would require, according to our contract, is the first

5  step is a -- it's called a letter of instruction.

6  Right?

7      Q    Uh-huh.

8      A    And a letter of instruction technically is not

9  disciplinary.  It's just essentially a letter that says,

10  you know, "I, Robert Cassanello, did this.  It violated

11  this policy.  I promise I won't do it again."  I sign

12  it, the letter of instruction.  Not disciplinary.  Does

13  not go in my disciplinary record.  Right?  That's the

14  first step.  Okay?

15          Now, say I do it again.  Right?

16      Q    Or you refused to sign the letter of

17  instruction?

18      A    You know, I think -- well, I don't know what

19  happens if -- I would -- I would think one could be

20  terminated, but I don't know.  I would think, if you

21  don't sign the letter, yeah.  I mean, you know, if I

22  were, like, a grievance person with the union, I would

23  say, "You better sign that," because they can probably

24  fire you, and it's not disciplinary "Don't do this

25  again" or something.  But that's the advice I would give

Robert Cassanello
August 05, 2022

Page 86

1    someone in that case, but I honestly don't know.

2    There's nothing in the CBA about what to do if you

3    refuse to sign a letter of instruction.

4            So a letter of instruction gets signed, say,

5    months down the road.  Same thing happens.  Right?  Come

6    back into the office.  And now you've got what's called

7    a letter of counsel.  Right?  So a letter of counsel is

8    "I promised I wouldn't do this and I signed this letter

9    of instruction on this date.  I did it again on that

10   date.  I promise I will not do it again.  Here."  Sign

11   this letter of counsel.  Letter of counsel is not

12   disciplinary.  It's like a letter of instruction, but it

13   also warns you, the next time you do this, you're going

14   to be suspended, you're going to be terminated, you

15   know, whatever.  It tells you the next step is a

16   disciplinary step and this is the disciplinary step that

17   will take place.

18       Q    Does that go in your records?

19       A    No.

20       Q    That one doesn't?

21       A    A letter of counsel does not go in your

22   disciplinary record.

23           So say third time.  Right?  Then whatever was

24   mapped out in the letter of counsel then can take place,

25   assuming whatever administrator wants to happen.  Right?

Robert Cassanello
August 05, 2022

Page 87

1    And say that's suspension without pay for a week or

2    something like that.  So you get docked a week's pay or

3    something like that.

4              Then that is the disciplinary action.  It will

5    come with a disciplinary letter.  That goes in your

6    disciplinary file.  Right?

7              So say if you're suspended, right, that letter

8    could come with "The next time you do this, you're

9    terminated."  Right?  And you sign off on that.  Then

10   the next time it happens, one would be terminated

11   because that was in the disciplinary letter.

12             So that's the steps that it goes through.

13   Right?  So what the arbitrator said was that this guy

14   Negy, right, may have done something in the classroom

15   that required discipline.  Like, the arbitrator didn't

16   dispute that point.  He might have needed to be

17   disciplined.  Right?  But you start with the letter of

18   instruction.  And, apparently, before the Twitter

19   incident, historically there's never been a problem with

20   his teaching.  "He's won three teaching awards.  You

21   actually gave him" -- you know -- like, we have to

22   negotiate raises, right, but you can get a raise outside

23   of everybody else if you make a pitch.  Like, for

24   example, if you get a counteroffer -- this was years

25   ago -- from another school.  And UCF is, "Oh, we want to

Robert Cassanello
August 05, 2022

                                                    Page 88

1    keep you so bad we're going to give you like an extra

2    $12,000 to stay at UCF."  This would have been, like,

3    years before the Twitter thing.

4              So the arbitrator is, like, "If you were

5    unsatisfied with him, why are you giving him a $12,000

6    raise at this point in time?"  Right?  Again, this is

7    all in arbitration decision.

8              So the arbitrator is, like, "I don't believe

9    that you were trying to discipline him for what was

10   going on in the classroom.  Clearly you're trying to

11   discipline him for what he said on Twitter; but you have

12   every right to discipline him for whatever he's done in

13   the classroom, but you got to start with the progressive

14   discipline.  You've got to start with the letter of the

15   instruction.  You've got to give him the feedbacks so

16   that he can change his behavior.  And in this process,

17   he refuses; then you terminate."  You don't terminate at

18   that first instance which was a violation of the

19   contract.  That's what the arbitrator said.

20             MR. DeMAGGIO:  Chuck, can I ask him a real

21        quick question just while we're on the progressive

22        discipline?

23             MR. COOPER:  Be my guest.

24             MR. DeMAGGIO:  Are there some transgressions

25        that are not subject to progressive discipline?

Robert Cassanello
August 05, 2022

Page 89

```
1        Because I do a lot of work with, you know, police
2        officers and things like that.  And, yeah, they
3        have progressive stuff, but there's some offenses
4        where "We're not starting that."  They are --
5     A     I'll give your office an hourly.  Yes.
6           MR. DeMAGGIO:  Okay.
7     A     In fact, there are certain laws.  Right?  So
8  if you violate a law and -- you know, I don't know the
9  laws off the top my head.  I know the descriptions of
10 them, so you will have to forgive me for this.  But, for
11 example, if you -- I believe if you are just arrested
12 for a felony -- not even if you're convicted, but if
13 you're arrested for a felony, you can be terminated on
14 the spot.  Okay?  Dereliction of duty.  If I just
15 decide, "I'm taking the fall semester off.  The students
16 can learn themselves," that's termination on the spot.
17           If the Holocaust denial -- if I taught a class
18 and I said, "Okay.  There was no Holocaust, and if you
19 say otherwise in this class you're going to be fired."
20 That's academic misconduct.  Right?  Academic misconduct
21 could get one terminated.
22 BY MR. COOPER:
23     Q     Okay.
24     A     So there's a variety of different ways one can
25 experience termination.  I don't think I have exhausted
```

Robert Cassanello
August 05, 2022

Page 90

 1   all of them, but those are the ones I'm aware of.

 2       Q    Well, let me ask you this:  Do you think that

 3   instructing in class -- and to make this as egregious as

 4   I can -- a class that is integrated racially --

 5       A    Okay.

 6       Q    -- that Blacks are morally inferior to whites,

 7   or whites -- to use the exact framing -- whites are

 8   morally superior to Blacks, would that be like Holocaust

 9   denial in its egregiousness that it would warrant

10   short-circuiting this process?  If you don't know --

11       A    I've never thought about that.  I would have

12   to -- I would have to have more specific information to

13   make a determination.  Academic misconduct is a very

14   specific thing.  Right?

15       Q    I don't know.

16       A    So academic misconduct is when you do

17   something that violates the ethics of research and

18   publications.  Right?  And it could extend to teaching.

19   So...

20       Q    Plagiarism?

21       A    Plagiarism is the most common, but it could

22   also be, you know, your -- you know, your research is

23   corrupted, let's say.  So an example of this -- I'll

24   give a specific example that you-all might be aware of

25   because maybe you watched the news in the '90s.  You

Robert Cassanello
August 05, 2022

Page 91

1   weren't watching it --

2            (Simultaneous laughter.)

3       A    But there was the professor that wrote that

4   book "Armed in America" about the Second Amendment and

5   gun culture and all sorts of things that was disputing

6   the notion of America and, you know, having an

7   inherent --

8   BY MR. COOPER:

9       Q    **More guns, less crime?**

10      A    No, no, no.  It's not that at all.

11      Q    **Not that good?**

12      A    He was arguing that the founders didn't really

13  envision a nation full of guns and guns owners.  That

14  the second amendment was written in a much more

15  circumspect way.  And what he did to prove that argument

16  is he was looking at this gun ownership data and -- what

17  is it? -- when you die, you go to court --

18           MR. DeMAGGIO:  Probate?

19      A    The probate records.  And who was leaving

20  guns.  If guns were so valuable, who was leaving guns in

21  wills and things like?  So he had all this quantitative

22  data from, you know, research.  I think he was looking

23  New England over all these decades and stuff.  Right?

24  He published charts and graphs and things.  And said, "I

25  counted up, and -- you know, I'm just making this up --

Robert Cassanello
August 05, 2022

Page 92

1    "20 percent of people, you know, only willed guns to

2    other people, so how common could it have been?" or

3    something like that.  You know.  What had happened is

4    there were some people -- some academics, some people

5    who were gun enthusiasts, if you will, who poured over

6    his research and said, you know, like, went into the

7    citations and said, "You said this.  Where is this?

8    Where is that?  I can't find it."  Right?

9             And so he confessed later, "Oh, all those

10   records I had were destroyed when the ceiling in my

11   office collapsed from a rainstorm and I threw out all of

12   those legal pads and all those records, so I don't have

13   them and I can't reproduce them, but these are the

14   figures I got from them."

15            And other people were saying, "Well, I can't

16   duplicate your figures."  Right?  "So unless I can see

17   your data, I can't verify."

18            And he said, "Sorry."

19            So he was at Emory, and Emory did a misconduct

20   evaluation.  Usually it's like a commission -- internal

21   group of professors decide.  So he was fired.  He was

22   terminated because of that.  So that's like -- he wasn't

23   plagiarizing, but his research was in question.  And so,

24   you know, he was terminated.  I am sure he had tenure.

25            I don't know an example like that at UCF.

Robert Cassanello
August 05, 2022

Page 93

 1   UCF -- I know the misconduct stuff I'm aware of is all

 2   in the nature of plagiarism.  I haven't seen anything

 3   that's research misconduct.

 4   BY MR. COOPER:

 5        Q    Let's move on to concept number 2 in Exhibit

 6   5, HB7.

 7        A    Okay.

 8        Q    I will read that as well.  "A person by virtue

 9   of his or her race, color, national origin, or sex is

10   inherently racist, sexist, or oppressive, whether

11   consciously or unconsciously."

12             Do you believe that a person by virtue of his

13   or her race is inherently racist or oppressive, whether

14   consciously or unconsciously?

15        A    No.

16        Q    Are you -- let me ask you, Doctor:  Are you

17   aware of any -- are you aware of --

18        A    I'm sorry.

19        Q    Are you aware of any -- it's a short table.

20             Are you aware of any of your colleagues at UCF

21   who hold that belief?

22        A    You mean from, like, casual conversations

23   or...?

24        Q    Any way you might be acquainted with their

25   beliefs and -- and know them to believe this concept.

Robert Cassanello
August 05, 2022

Page 94

1     A    I mean, not that I'm aware of.  No.
2         Q    From what you may know about other history
3     teachers within the public higher education system in
4     Florida --
5         A    Okay.
6         Q    -- any other teachers?  Are you aware of any
7     teachers who -- who hold that belief?
8         A    You mean someone I know personally?
9         Q    Not necessarily.  If you know maybe from their
10    scholarship that they, you know, hold that belief, I
11    would be interested to know about that.
12        A    Who's a college or university professor?
13        Q    Yes.
14        A    Not that I'm aware.
15        Q    Let's go to paragraph -- or concept number 3.
16    "A person's moral character or status as either
17    privileged or oppressed is necessarily determined by his
18    or her race, color, national origin, or sex."
19             So, Dr. Cassanello, do you believe that a
20    person's moral character is necessarily determined by
21    his or her race?
22        A    No.
23        Q    So that --
24        A    I noticed you skipped over "status."
25        Q    I -- I don't plan to not go back to...

Robert Cassanello
August 05, 2022

Page 95

```
 1              But earlier we talked about, in concept number
 2   1, the whole notion of moral superiority.  And I just --
 3   this kind of goes hand in hand with that.  And so I'm
 4   assuming your views are consistent here as they were
 5   when we discussed concept number 1?
 6        A    Yes.  Okay.
 7        Q    So let me ask this, then:  Do you believe that
 8   a person's status as either privileged or oppressed is
 9   necessarily determined by his or her race?
10        A    I think it's possible.
11        Q    Okay.  Okay.  Let me ask you to elaborate that
12   and -- and tell me what you base that on.
13        A    I base it on my understanding of institutional
14   and structural racism.
15        Q    Can you elaborate on that?
16        A    Well, earlier I gave the example of -- again,
17   this is not nationally systematic, let's say.  I won't
18   go that far, but, you know, we have -- I believe we have
19   seen evidence of individual, local policing policies, I
20   think, that would confer a differentiated status, either
21   privilege or oppressed, based on one's color, race,
22   national origin.  Maybe sex.  I don't know.  I haven't
23   thought about that.
24        Q    Well, just remaining focused on the race
25   issue.
```

Robert Cassanello
August 05, 2022

Page 96

1      A     Okay.

2      Q     And I take it from your syllabi -- I take it

3    from the course you've taught that your -- that your

4    historical focus is on race.

5      A     That's a fair assessment.

6      Q     Okay.  So in these -- in the example that you

7    just offered, the privileged race is, say, white cops

8    and the oppressed race is Black.

9      A     No.  I think you're thinking of this too

10   narrowly.  Right?

11     Q     Okay.

12     A     So the privileged race would be white citizens

13   and their interaction with cops.

14           And the oppressed would be Black citizens and

15   their interactions with cops.

16     Q     Okay.  And in most of these urban police

17   departments -- at least that I am aware of -- the police

18   force itself is quite thoroughly integrated.

19     A     Could be.

20     Q     Racially integrated.

21     A     Sure.

22     Q     And is the -- do those -- is the oppressed

23   Black citizenry oppressed by the Black police officers

24   as well as the white police officers, or is it a -- or

25   is that a white police officer phenomenon?

Robert Cassanello
August 05, 2022

Page 97

1      A    I mean, I can't say with authority because it
2  isn't something I research or have data on, but I don't
3  think the way institutional and structural racism works
4  on the part of the people who have power is necessarily
5  exclusively to one race, if that makes sense.
6      **Q    I'm not sure that does make sense to me.**
7      A    Okay.  So -- because I'm basing this on my
8  understanding of institutional and structural racism.
9  Right?  The people at the levers of power do not
10  necessarily have to be uniformly of a certain race.  And
11  when I, kind of, corrected you on status and where the
12  status is deployed, for example, of policing, right, I
13  said, "Police."  I never said white police or Black
14  police.
15      **Q    True.**
16      A    So that's what I meant by that.
17      **Q    Okay.  So a -- so the structural racism or**
18  **institutional racism is a phenomenon that -- that you**
19  **were describing that occurs notwithstanding that the**
20  **police force -- and I would suggest, perhaps, even the**
21  **individual policeman in any particular episode -- may be**
22  **Black.  They may themselves be Black, or at least the**
23  **police force is thoroughly integrated.**
24      A    Conceivably, but, again, I don't research
25  this, so I don't want to say authoritatively.

Robert Cassanello
August 05, 2022

Page 98

1      Q    Now, is this -- is this -- is the proposition

2   that a person's status as privileged or oppressed is

3   determined by his or her race in certain contexts such

4   as the context you have described?  Is that one that you

5   have had occasion to teach in your classes, or is that

6   part of the -- is that part of the -- is that part of

7   the courses that you teach, this The Civil Rights

8   History course?

9      A    I don't recall.  I don't recall addressing

10  that in The Civil Rights class.  If I did, it might have

11  been in some historic way, like pre-1950, to describe

12  policing before the 1950s.

13          But in the Jim Crow America class, I plan to.

14  And so I'm actually assigning text, which is on the

15  syllabus, called "The New Jim Crow," which, sort of, has

16  that premise too.

17     Q    And that is in your declaration you describe

18  in the New Jim Crow?

19     A    That's right.

20     Q    Let's go to that, then.  I think that is that

21  paragraph 11, if I read it correctly.

22     A    Uh-huh.

23     Q    Okay.  All right.  Well, then reading

24  paragraph 11: "HB7 also restricts the course materials

25  that I can offer in my courses.  One text I was planning

Robert Cassanello
August 05, 2022

Page 99

```
 1    on signing in my Jim Crow America course is the New Jim

 2    Crow by Michelle Alexander."

 3        A    All right.  Did you enjoy it?

 4        Q    I have to confess, I haven't read it all, but

 5    I read big chunks of it.  And, yes.  I found it very

 6    interesting.  But I am going to ask you -- I'm not going

 7    to mark this as an exhibit.  It's publically

 8    available -- but I am going to ask you if I am handing

 9    you a copy of the text that you're describing?

10        A    So I'm just confirming?

11        Q    Yes.

12        A    Yes.

13        Q    That is the book that you're planning to

14    assign?

15        A    I haven't done my book order yet, but at this

16    moment, I do.

17        Q    It is your plan to use it?

18        A    My plan, yes.

19             MR. DeMAGGIO:  May I?

20             MR. COOPER:  Certainly.

21    BY MR. COOPER:

22        Q    So you continue and say that "This book posits

23    that America's justice system perpetuates a racial caste

24    system through government-funded policing, racial

25    profiling and other factors that then disproportionately
```

Robert Cassanello
August 05, 2022

 1    labels Black men as criminals and felons and justifies

 2    subjecting them to inhuman treatment."

 3             We have already discussed racial caste system.

 4    A    Uh-huh.

 5    Q    But you go on and you say through --

 6    "perpetuates a racial caste system through

 7    government-funded policing, racial profiling and other

 8    factors."

 9             What other factors do you have in mind there,

10    if you can recall?

11    A    Could be hiring practices.  Could be community

12    -- I guess community policing would be part policing,

13    right, for policy?  I guess community policing

14    strategies.  Right?

15    Q    Would a community --

16    A    Community policing strategies -- as I

17    understand it, community policing strategies are much

18    more -- are more aligned with, let's say, better racial

19    outcomes than, say, racial profiling.  Right?  Embedding

20    the police in the community.  Making them feel as if

21    they are part of the community as opposed to outsiders

22    from the communities, if you will.  That is how I

23    understand community policing.  I might be wrong.

24    Again, I'm not an expert.  I don't teach criminal

25    justice or focuses attention disproportionately to

Robert Cassanello
August 05, 2022

Page 101

1    perceived crime and criminality like in Black

2    neighborhoods.

3        **Q     Well, taking community policing -- taking the**

4    **understanding of community policing that you have**

5    **described -- and I'm not an expert on it, either, but**

6    **accepting your understanding of it, how would that**

7    **disproportionately label Black men as criminals and**

8    **felons?**

9        A     No.  I'm sorry.  I meant rejecting community

10   policing as an option.  Like, they could do community

11   policing, but they are saying, "No, we are going to do

12   racial profiling instead."  Like, that's a decision some

13   departments make.

14       **Q     They actually -- you think police departments**

15   **actually make decisions to racial profile versus**

16   **practice community policing?**

17       A     The community policing part, I believe.  Yeah.

18   I can't tell how racial profiling happens, if it's -- I

19   don't think racial profiling happens in the squad room

20   or official policy or what have you.  Probably is more

21   informal.  But community policing is taught in criminal

22   justice programs.  You know, when police go to school or

23   what have you, they are trained in these kinds of

24   things.  And so a police department could adopt and say,

25   "Okay, you know, we're going to try this practice and

Robert Cassanello
August 05, 2022

Page 102

1    this is how it works," and what have you.  I know there

2    has been some success, you know.  And this came about

3    through the George Floyd protests in that there's some

4    police departments who adapted to community policing and

5    then they weren't having similar outcomes to places

6    like, you know, Minneapolis or what have you.

7         Q    They were not having similar outcomes?

8         A    It's my understanding, but I'm -- you know,

9    again, this is not something I research.  It's something

10   I've just read in the news or maybe read a report or

11   something like that.

12        Q    Okay.

13        A    I can't verify anything.

14        Q    When you say that "those things," including

15   these "other factors," then "disproportionately labels

16   Black men as criminals and felons."

17             What do you mean by labels them?

18        A    So this is part of, you know, this notion of,

19   sort of, embedding status -- I guess that would be the

20   academic term for it -- whereby -- so if we take Jim

21   Crow, if you don't mind me building an analogy.  So the

22   intent of Jim Crow, you know, was multifaceted.  It

23   wasn't just to create separation of the races in the

24   legal way.  Its intent was also to prescribe African

25   Americans with a visible reminder of second-class

Robert Cassanello
August 05, 2022

Page 103

1    citizenship.  Right?  So it had that -- that other

2    purpose as well.  And so here, I believe what Michelle

3    Alexander is arguing, is that policing in America is

4    also prescribing a status, which she describes, to Black

5    men.

6         Q    And this labeling Black men as criminals and

7    felons --

8         A    Uh-huh.

9         Q    -- as you put it, disproportionately labeling

10   Black men, but that -- but am I correct, though, that

11   the label of white men as criminals and felons who have

12   been convicted is -- is also the same label, correct?

13        A    No.

14        Q    How so?

15        A    Okay.  So there is a proportionality to this.

16   Right?  So if you look at stats, right, and, you know,

17   Black men and women are caught in the criminal justice

18   system at higher proportions to white men and women.

19   Right?  So on the part of people who might be so

20   inclined to pursue the moral character of one race over

21   another might look at those stats and say, "See, Black

22   people have a propensity to criminality because look at

23   these stats of convictions, stats of incarceration," da,

24   da, da, yada, yada, yada.  But you don't hear the same

25   argument for white criminality or white people who are

1   caught in the criminal justice system.  So see, there's

2   a difference in how the population is interpreted by

3   some.  That's the -- that's the kind of clothing of a

4   status, if you will.

5       **Q    And that is based upon the disproportionate**

6   **conviction and imprisonment of Blacks?**

7       A    Right.  So -- right.  So Michelle Alexander

8   would say that is because of institutional racism and

9   the criminal justice system.  Right?  That would be her

10  explanation.  Others, like, you know, might say, "Well,

11  no.  It's pathology.  Black people are just morally

12  inferior, so the incidence of criminality is higher

13  within their populations."  And that's where the

14  conferring happens in discourse, in that public

15  discourse.

16      **Q    I take it the professor you earlier**

17  **mentioned --**

18      A    Uh-huh.

19      **Q    -- perhaps not in the context of criminal**

20  **justice, but has voiced this notion of -- of -- that**

21  **you're just describing, correct?**

22      A    You know, I don't remember word for word what

23  those texts were, so I don't want to say.  I don't want

24  to put words in his mouth.  Right?  But I don't think

25  that what you just said is too far afield from what he

Robert Cassanello
August 05, 2022

Page 105

1    wrote.

2         Q    Do you know if anyone apart from him --

3         A    Uh-huh.

4         Q    -- who's advanced the view based upon the

5    disproportionate conviction and imprisonment rates of

6    white and Black men, that -- who takes -- who's

7    concluded from that that they are morally -- Blacks are

8    morally inferior to whites?

9         A    Again, this isn't my research.  But at

10   colleges and universities?

11        Q    Yes.

12        A    I personally don't know anybody.  But -- I

13   mean, I have heard students who have said, "Professor X

14   said this and this," but I don't take too much stock in

15   what a student might say a professor said personally.

16        Q    And the sentence goes on to say,

17   "disproportionately labels Black men as criminals and

18   felons and justifies subjecting them to inhuman

19   treatment."

20             What is the inhuman treatment you're referring

21   to there?

22        A    Well, you know, there was the case recently --

23   I don't remember his name, but the person that was in

24   the Angola prison and the Black man in Louisiana was in

25   solitary confinement for 48 years.  You know, I think

Robert Cassanello
August 05, 2022

 1    that's inhuman treatment.  That would be an example of

 2    inhuman treatment.

 3        Q    Well, is that -- is that -- is that a

 4    circumstance that is -- that reflects, you know,

 5    disproportionate -- that single episode reflects some

 6    type of disproportionate subjecting individuals to

 7    inhuman treatment, Blacks and whites?

 8        A    I mean, I know Angola prison where he was,

 9    that certainly seemed to be systematic there.  Inhuman

10    treatment of Black prisoners was definitely something

11    that has been documented and written about over the

12    years.

13            How pervasive is it in our prison system?  I'm

14    not sure.  I mean, I know what Michelle Alexander says,

15    but it's not something I research and can point to any

16    data on.

17        Q    Well, do you have a view of whether or not the

18    inhuman treatment that is referenced here is treatment

19    that is not visited upon, if you will, a white person?

20        A    I mean, it's my understanding, based upon what

21    I've read, it's not in the same proportion.

22        Q    And that -- that -- that's in this book or

23    something to that effect, in this Jim Crow -- the New

24    Jim Crow book?

25        A    I don't know if it's specifically in that or

Robert Cassanello
August 05, 2022

Page 107

1    somewhere else I read.  If I knew I had homework, I

2    would have studied.

3        Q    Now, do you know whether or not there are any

4    other races that are disproportionately represented in

5    American prisons, state and federal?

6        A    Than African Americans?

7        Q    Yes.

8        A    Not that I'm aware of.

9        Q    Well, if I represented to you that Hispanics

10   are disproportionately represented in -- in American

11   prisons when compared to their population and their

12   numbers in the population as a whole, you wouldn't have

13   any basis for disputing that?

14       A    Yeah.  I would not dispute that.  No.

15       Q    Do you --

16       A    But I don't know -- but then you get into the

17   question about what race means and what is race and

18   stuff like this, which can complicate.

19       Q    If we just accept census bureau categories --

20       A    Sure.

21       Q    -- for race.

22       A    Sure.

23       Q    And in the category of Hispanic, as a racial

24   minority --

25       A    Right.

Robert Cassanello
August 05, 2022

Page 108

1        Q    -- do you believe that that reflects a racial

2    caste system vis-a-vis Hispanics and whites?

3        A    Yes.  I just don't know -- I don't have a

4    basis for comparison with African Americans because my

5    research and studies are pretty much focused on African

6    American history.  So I would agree with that statement,

7    but I don't have a way to analyze a comparison, if you

8    will, if that makes sense.

9        Q    So that this racial caste system is -- is one

10   that isn't -- that it's -- it is -- it is oppressive to

11   multiple racial minorities, not just Blacks?

12       A    I think that is an accurate statement.

13       Q    Does Ms. Alexander address that, to your

14   recollection or knowledge, in her book?

15       A    I believe she does, but I read that book when

16   I was preparing the syllabus, which would have been,

17   like, over two years ago, and I haven't picked it back

18   up again.  So the specifics kind of escape me.

19       Q    Would you agree with the proposition that

20   these factors that are identified in your paragraph 11,

21   that then -- I'm quoting now -- that then

22   "disproportionately labels Black men as criminals and

23   felons and justify subjecting them to inhuman

24   treatment," would apply as well to labeling Hispanic

25   men?

Robert Cassanello
August 05, 2022

Page 109

 1            MR. DeMAGGIO:  Object to form.

 2            You can answer.

 3      A    Do you --

 4            MR. DeMAGGIO:  You can answer.  Go ahead.

 5      A    Oh.  Again, it's not my area.  I haven't read

 6  it, so I feel -- I don't feel confident in saying it's

 7  exactly the same.  Is that how you're phrasing it?

 8  BY MR. COOPER:

 9      Q    I'm just asking if that sentence could as well

10  read "disproportionately labels Hispanic men"?

11      A    Okay.  Yes.  Yes.  Sorry.

12      Q    And your answer is it could just as well do

13  that?

14      A    Yes.

15      Q    Let's go to paragraph 12.

16      A    Okay.

17      Q    "The sociological position that the New Jim

18  Crow advocates runs afoul of HB7's restriction on

19  endorsing the concept that 'a person's moral character

20  or status is either privileged or oppressed is

21  necessarily determined by his or her race, color,

22  national origin, or sex.'"

23            What is the sociological position that -- that

24  Michelle Alexander --

25      A    Sure.  Sure.

Robert Cassanello
August 05, 2022

Page 110

1       Q    -- advocates?

2       A    I was specifically referring to institutional

3   and structural racism.  That's the position I meant.

4       Q    And how -- and how did she -- how does

5   Michelle Alexander articulate that

6   structural-institutional racism as the sociological

7   position --

8       A    Uh-huh.

9       Q    -- that she advocate?

10      A    Sure.  Sure.  So, again, I'm basing this on

11  memory.  But, you know, she posits that the criminal

12  justice system, up to and including prisons, you know,

13  is a system in which, you know, racial outcomes

14  determine the -- you know, the experience and the --

15  maybe go so far as to say the rehabilitation of

16  prisoners of color, if you want to include both Hispanic

17  and Black.

18      Q    Is there any particular passage or place in

19  this book or chapter you would point to that you would

20  say runs afoul of this concept?  This concept --

21      A    You mean the concepts here?

22      Q    Yes.  The concept that is number 3 and that

23  you quote in paragraph 12.

24      A    It's the status part, not the moral part.

25      Q    Right.  Okay.  The status part.

Robert Cassanello
August 05, 2022

1          Is there a -- is there a place you can refer

2    me to in the book that you think would reflect content

3    that runs afoul because it endorses the concept that a

4    person's status is either privileged or oppressed is

5    necessarily determined by his or her race?

6        A    It's the thesis of the book.  So, certainly,

7    the conclusion and introduction.  Like I said, I don't

8    remember any real specifics because it's been a while

9    since I read that.

10       Q    Well, let me ask you this:  What do you think

11   -- what do you believe the word "necessarily" means in

12   that concept?

13       A    That's in the actual text of the -- I'm sorry.

14   To me, "necessarily" would mean something that is -- I

15   don't know if I'm using the right word -- but fixed.

16   Right?

17       Q    Okay.

18       A    If we are going back to my caste conversations

19   we were having, that would -- you know, that would

20   represent that fixed status, if you will, as a caste.

21   That might be one way I interpret this.

22       Q    Okay.  Well, if there are, let's say,

23   non-people of color, white people, who are convicted and

24   imprisoned and subjected to and labeled as criminals and

25   felons and subjected to exactly the same inhuman

Robert Cassanello
August 05, 2022

1    treatment that Black people in the --

2        A    Uh-huh.

3        Q    -- who have likewise been convicted and

4    imprisoned, then it would at least seem to me that their

5    status is likewise oppressed just as much as the Black

6    person.  And so race, in that circumstance, has not

7    determined, has it --

8        A    I think you misunderstood --

9        Q    -- who has been oppressed or privileged in

10    that -- in that criminal justice context?

11        A    Sure.  Sure.  I understand the question.  I

12    think you misunderstand how race operates.  Right?

13    You're taking a discrete anecdotal thing and you're

14    saying, "This example represents the whole."  What is

15    ascribed in the disproportionate treatment and the

16    inhumane treatment that's attached to people of color,

17    African Americans, right, is something that, not only

18    has consequences within the criminal justice system, but

19    also has consequences because of the way the media

20    portrays disproportionate, you know, outcomes in

21    criminal justice experience between Blacks and whites.

22    Right?  So it's not -- you know, it's not -- it's in the

23    individual; it's in the whole.  It's in the collective

24    and how the collective is interpreted and racialized, if

25    you will, might be a better way to think about it.

Robert Cassanello
August 05, 2022

1      Q     And so that is how a person's status is

2   privileged or oppressed is necessarily determined by his

3   or her race?

4      A     I mean, are you asking me as a rule?

5      Q     Yes, I am.

6      A     I can't answer that because I don't know.  You

7   mean -- you know, everything is -- a lot of things are,

8   you know, determined on a variety of variables.  Right?

9   And so for African Americans in the criminal justice

10  system more often than not that is probably the rule.  I

11  can't say with authority, again, because it's not my

12  research.  I have just read things, but I wouldn't say

13  it's like a -- you know, a -- a universal experience,

14  but I think it represents the majority experience.

15     Q     What -- in the next sentence you say, "I could

16  be violating the law by assigning the text."

17           By "text" you mean The New Jim Crow?

18     A     Yes.

19     Q     "By assigning the text because such

20  instruction could be construed to 'espouse, promote,

21  advance, inculcate, or compel' belief in this forbidden

22  concept."

23           On what do you base your concern that, if you

24  assign this as part of your class on Jim Crow America --

25  if you assign this book, presumably among other texts --

Robert Cassanello
August 05, 2022

Page 114

```
 1     A    Sure.
 2     Q    You are going to assign a number of texts; are
 3  you not?
 4     A    It's on the syllabus.
 5     Q    Yeah.  If you assign this book that you would
 6  be, yourself, espousing, promoting, advancing,
 7  inculcating or compelling --
 8     A    I'm sorry.  I said "construed" too.  So that's
 9  someone interpreting my behavior, not I'm doing this.
10     Q    Okay.  So let me ask you something.  By
11  assigning this book --
12     A    Uh-huh.
13     Q    -- or any book that is listed on your --
14     A    Sure.
15     Q    -- syllabus, does that -- do you -- do you
16  endorse -- do you espouse the -- the thesis, even let
17  alone all the material or content that is included in
18  every book that you assign?
19     A    I'm sorry.  I don't -- if you give me some
20  latitude here.
21     Q    Of course.
22     A    I think you're focusing on the wrong thing
23  here.  What -- how it can be construed, how it can be
24  construed, right, I think is -- is the idea that someone
25  sees that I'm assigning that book.  Right?  And then
```

Robert Cassanello
August 05, 2022

1    that book is going to come with a set of prejudices

2    along the lines of what is prohibited in this piece of

3    legislation.  Right?  And it's going to make me a target

4    of someone who is going to claim -- could be a student

5    in the class.  Could be a person on the street.  Like, I

6    have gotten emails from, you know, local UCF residents

7    who are not at all connected to UCF in any way and

8    said -- in fact, the most recent one was something to

9    the effect of, "You are doing Black people a great

10   disservice by teaching them that they are equals with

11   whites," and, you know, "They are" -- you know, "They

12   are never going to be a" -- you know, I'm paraphrasing.

13   I don't remember the exact words, but something to that

14   effect.  And "If you don't believe me, go drive through

15   Pine Hills," which is the Black -- one of the Black

16   neighborhoods here.  Right?  And that I would see with

17   my own eyes, and he confused me of being in the ivory

18   tower and, sort of, you know, I don't know what's going

19   on around the world.  Right?  So there's a person out

20   there, right, who's assuming what I'm doing in the

21   class, right, based on what I teach -- what's probably

22   online.  A separate piece of legislation, not connected

23   to HB7, right, requires me to keep a public record of

24   all the books I assign, right, any learning materials

25   that can be made public, and the syllabus and things

Robert Cassanello
August 05, 2022

Page 116

```
 1   like this, for five years -- for a five-year window.
 2   Right?  So this, again, provides the opportunity for one
 3   to construe what I am doing in the classroom.  Right?
 4   And so if one is so inclined to construe that assigning
 5   this book is equivalent of violation of one of these
 6   eight things, right, they then can go to UCF and say,
 7   "Well, now you have got to investigate Cassanello.  He
 8   violated HB7.  He assigned that book."  And there could
 9   be an investigation.  Or they could go to the
10   legislature -- go to one of those standing committees
11   and say, "Hey, he assigned this book" or "He assigned
12   that book.  He's teaching," you know -- you know,
13   "critical race theory" or whatever is embedded in all
14   this.  Right?  That's what I mean by this.
15       Q    I understand.  And I appreciate that
16   clarification -- clarifying explanation.
17       A    Can I add?
18       Q    Of course.
19       A    Sure.  For me -- the fear for me is not so
20   much what I do, because, I think, if you haven't
21   already, you got the impression that I come in the
22   class.  I'm a professional.  I take my job seriously as
23   an instructor in the classroom.  Right?  So -- but I
24   can't control what someone thinks of me or what someone
25   wishes to think of me.  You know.  That could include a
```

Robert Cassanello
August 05, 2022

```
 1   student.  That could include someone off the street.
 2   That could include -- I love saying his -- Anthony
 3   Sabatini, you know, who says, "99 percent of all
 4   professors are cultural Marxists."  Right?  So for him,
 5   who's on a standing committee -- probably more than one
 6   standing committee -- it wouldn't take much for him to
 7   see that I'm assigning that book and then come to some
 8   conclusion that I'm violating the --
 9        Q    Violating one of the concepts.
10        A    Right.  That's my concern.
11        Q    I understand.  And, yes.  I certainly, through
12   this dialogue we have been having, do believe you take
13   your profession and your responsibilities as a teacher
14   of these young people very, very seriously.
15             But I want to come back to my question,
16   because now I think I know the answer.  You say that,
17   because such instruction by assigning Michelle
18   Alexander's book, you could be construed to espouse,
19   promote beliefs, you know, that are in this book --
20        A    Yes.
21        Q    -- whatever they may be.  That would not be a
22   correct construction.  You don't espouse, promote,
23   advance the -- necessarily anyway -- everything that's
24   in the books that you assign, do you?
25        A    Any book.
```

Robert Cassanello
August 05, 2022

Page 118

1      Q      Any book.  Okay.

2      A      Sure.  Because that's part of the critical

3   thinking.  Right?  You want students to be able to take

4   arguments apart.  Say, maybe this part of the argument

5   works; this part doesn't, so on and so forth.  And that

6   includes my own work.  Like I said, people have poked my

7   work and said, you know, "Cassanello was wrong on this

8   or wrong on that."  That's how we get at a truth, if you

9   will.  Right?

10      Q      And that's how your students arrive at their

11   own interpretations, as you put it earlier?

12      A      Presumably.

13      Q      And presumably a student encountering your own

14   work could come to the student's own interpretation that

15   you're all wet, right?

16      A      Sure.

17      Q      That, you know, Cassanello doesn't have it

18   right on this and would --

19      A      Could be a whole class.  Could be.

20      Q      And that student's grade wouldn't be

21   prejudiced because they ventured a disagreement with

22   their professor in your class, would it?

23      A      Not on that alone.  No.  Seriously.  So what

24   you describe -- and I have had students who have done

25   this, because, like I said, I'm on the -- you know, when

Robert Cassanello
August 05, 2022

Page 119

1    I present the long history versus, we say, the short

2    history, if you will, for lack of a better term --

3        Q    Yes.

4        A    -- when I present it, I clearly -- and I

5    disclose to my students I'm long history.  You know.  If

6    they were to look up my research and figure it out

7    themselves.  Right?  Now, if a student says, "Dr.

8    Cassanello, I disagree with you.  It's short history."

9    And then that student is able to produce evidence and

10   some facts -- some evidence for their interpretation,

11   you know, able to, kind of, compile, like, "Well, you

12   know, there are these historians who say this.  It's

13   counter, and I think it has salience because of this,

14   this, and that.  And I did some research."  Right?  So

15   it constructs this -- what's the word I used? --

16   compelling narrative?

17             MR. DeMAGGIO:  Coherent narrative.

18       A    Coherent narrative.  Presents a coherent

19   narrative.  I would say "Tallyho.  You don't agree with

20   me, but wonderful that you got to this place."

21             The thing is the coherent narrative.  Now, a

22   student can present something which is not a coherent

23   narrative and say, "Well, I disagree with you,

24   Cassanello, because I know Black people are

25   pathologically inclined to be criminals."  And, you

Robert Cassanello
August 05, 2022

Page 120

1   know, "There's this that I saw from a website called

2   League of the South."  I actually had that once when

3   someone presented something from League of the South.

4   Turned it in.  And, like, "Here's my evidence."

5           I said, "Wow, League of the South are

6   self-professed," you know -- you know, "white

7   nationalists, right?  And "I don't think what you have

8   here" -- I'm just -- this is a fictitious example.  "I

9   don't think what you have here represents a compelling

10  narrative.  And so I'm sorry, but I'm going to have to

11  provide some grade consequences for you."

12  BY MR. COOPER:

13     **Q    Material on League of the South wouldn't,**

14  **under any accepted academic or scholarship -- scholarly**

15  **standards -- qualify as serious scholarship?**

16     A    Are you asking me?

17     **Q    I am.**

18     A    Oh, oh.

19     **Q    I'm asking if you agree with that.**

20     A    Oh, oh, oh.  You know, I have not -- I have

21  not perused the League of the South's website in some

22  time.  And, as I understand it, initially were some

23  academics attached to it who were sort of trained in the

24  '50s and '60s and had a little bit of -- you know, in

25  the parlance that I used -- an outdated interpretation

Robert Cassanello
August 05, 2022

Page 121

```
 1   to things.  And they did a lot of work with the League
 2   of the South -- I want to say the '70s and '80s, but
 3   since then, it's pretty much amateur historians, if you
 4   will.  So, no.  I don't think what people see on the
 5   League of the South represents academic -- academically
 6   accepted scholarship.
 7        Q    What is it -- let me ask you this:  Apart from
 8   the potential that you're assigning to this text --
 9        A    Uh-huh.
10        Q    -- that could be construed --
11        A    Right.
12        Q    -- as you're espousing, advancing, endorsing
13   --
14        A    Uh-huh.
15        Q    -- everything in it or anything in it for that
16   matter --
17        A    Uh-huh.
18        Q    -- apart from assigning it, what is it that
19   you would like to say about this text in your
20   instruction that concept number 3 would not allow you to
21   say that?  That -- perhaps to be clear, what is it that
22   concept number 3 would prohibit you from saying that you
23   would like to say in your instruction, in your upcoming
24   course, that would be prohibited by concept number 3?
25        A    So it's the status part, right, which we have
```

Robert Cassanello
August 05, 2022

Page 122

1   been -- we have talked about already.  So I think you

2   know my position on that.  Right?  What I usually do

3   with these texts and these readings is, you know, I

4   assign the readings.  They take, sort of, a quiz on the

5   reading to determine whether they read or not.  Right?

6   Then we usually have a -- I give a -- so you printed up

7   a study guide.  Right?  This is a study guide.  And so

8   -- so imagine, you know, that is just the study guide

9   for this.  Right?  So they would have study guide.  I

10  give them the questions, and these questions,

11  essentially, quiz related.  And quizzes are specifically

12  just to the reading.  Right?  And then, you know, they

13  take the quiz.  I determine, oh, they read, they didn't

14  read, what have you.  Then they come into class and we

15  will have a class discussion about the reading.  Then I

16  let them pick out -- usually can't do the entire study

17  guide, but I will pick out the questions that I might

18  think are important.

19          Then I will say, "Okay.  This question here,

20  this question there from the readings, where are you on

21  this or what can you do?"

22          And we'll have a discussion.  And the intent

23  of the discussion is a check to make sure they read.  So

24  got the quiz to make sure they read.  I do the

25  discussion to make sure they read.  And then I would

Robert Cassanello
August 05, 2022

Page 123

1    assign something.  Right?  And the assignment is

2    where -- where I'm getting at your question.  Right?

3              So what I do with reading is they read

4    something.  And I say, "Okay."  Because, remember, I'm

5    trying to get to the top of the Bloom's Taxonomy

6    original.  And I say, "Okay.  You got the New Jim Crow

7    thesis?"  She spends a lot of time on criminal justice.

8    So criminal justice is off the table.  "Go out there and

9    find some documents.  Maybe do some research that

10   supports or refutes her thesis based on the subject

11   you're looking at," which of course can't be criminal

12   justice.  Right?  So they can look at -- I don't know --

13   city planning, urban renewal, gentrification.  I'm just

14   throwing stuff out.  I mean, "Okay.  Does this apply in

15   any way to what is here in this?"  And you can

16   presumably, you know, argue for or against, but it's

17   usually based on, you know, the argument that they're --

18   that they have read.  And so what I am testing them on

19   is that they comprehended the argument; they can apply

20   the argument in a new way.  That's the original part.

21             So, again -- I hate to go back to the

22   construe.  You know, so I could be doing everything

23   aboveboard and say, you know -- there's 30 students in

24   here.  The end of the semester I want 30 independent

25   thinkers.  That doesn't matter.  If there's one or two

Robert Cassanello
August 05, 2022

Page 124

1    students in the classroom who are so inclined to want to

2    make issue with the text.  You know, if there's someone

3    on the street that wants to make issue with the texts I

4    assign.  Someone in the legislature.  Someone at UCF.

5    So someone in the Board of Governors.  It doesn't matter

6    what I actually do or say in the classroom, because they

7    have the authority to determine -- to construe -- what I

8    have done, not me.

9        Q    And so that the record is clear, I think you

10   were referring to Exhibit No. 6?

11       A    Yeah.

12       Q    When you were illustrating --

13       A    Yes.

14       Q    -- kind of methodology you have in your

15   classroom.  And that's the To Brown from --

16       A    To Brown From Brown.

17       Q    -- To Brown From Brown study?

18            MR. COOPER:  You know, if we take a short

19       snack/lunch break, I may be able to kind of tighten

20       my thoughts and --

21            MR. DeMAGGIO:  Fine.

22            MR. COOPER:  -- and make the rest my questions

23       more efficient and less time-consuming.

24            THE WITNESS:  That's because my answers are so

25       great.  Give me credit.  Right?

Robert Cassanello
August 05, 2022

Page 125

```
 1               MR. DeMAGGIO:  This is -- the thing is, like,
 2       what we are talking about here --
 3               THE STENOGRAPHER:  On the record?
 4               MR. COOPER:  We are off the record.
 5               (Recess taken 1:08 p.m. until 1:46 p.m.)
 6               MR. COOPER:  Back on the record.
 7               THE WITNESS:  Sure.
 8   BY MR. COOPER:
 9       Q    Okay.  Dr. Cassanello, I want to now move to
10   paragraph 13 of your declaration.
11       A    All right.
12       Q    And it reads: "Another text I plan to assign
13   is the Wages of Whiteness by David Roediger."
14       A    Roediger.
15       Q    Roediger?
16       A    Roediger.
17       Q    And I'm going to hand you a book by that title
18   and author and ask you if this is the book that you are
19   referring to?
20       A    That is the book.
21       Q    Okay.  You say that "The text examines
22   working-class racism in the United States.  Part of the
23   text explains how white workers during the labor
24   movement were ideologically opposed to Black workers and
25   how the 19th century labor movement demanded a racially
```

Robert Cassanello
August 05, 2022

Page 126

1   disparate system of employment."

2          Explain to me what you mean when you say

3   "ideologically opposed to Black workers."  Is that

4   different from -- or what does that mean?

5       A    Uh-huh.  So David Roediger is an early

6   proponent of a racial theory that is not as popular as

7   it was in the '80s and '90s when he wrote that book

8   called Whiteness.  And Whiteness is important because --

9   at least I believe.  Maybe some people might dispute

10  this, but whiteness is sort of the progenitor of

11  philosophy to those -- or at least -- let me put it this

12  way: People who look at, like, things, like, white

13  privilege, white fragility, all this kind of stuff, are

14  the descendants -- intellectual descendants of

15  Whiteness.  And what David Roediger did with Wages of

16  Whiteness -- so when he says that -- or when he's

17  looking at the 19th century labor movement, right, he's

18  mostly looking at New York.  I don't think he looks at

19  places beyond New York City, but he's -- he's looking at

20  white workers who are mobilizing and engaging, not only

21  in a practice, but a discourse of demanding that

22  specific jobs and trades be reserved for whites only and

23  Blacks be delegated to manual, unskilled labor,

24  sometimes excluded from labor organizations completely,

25  So that's what he means by -- so the labor movement, he

Robert Cassanello
August 05, 2022

Page 127

1    says, is creating -- is based on created privilege of

2    whiteness, if you will.  I don't know that he uses those

3    words.

4         Q    Uh-huh?

5         A    But that's how he might talk about it today.

6         Q    What periods during the 19th century was he

7    focused on?

8         A    Like, before the Civil War.  Like, 1840s maybe

9    through post-Civil War, like maybe 1880s.  There's --

10   yeah.  So it's, like, actually pre-height of the labor

11   movement.  So the height of the labor movement would be

12   like the turn of the 20th Century.  Like, 1890s and

13   1920s.  So he's looking, like, the 19th century before

14   that time.

15        Q    I'm still not sure I understand the use of the

16   words "ideologically opposed to Black workers" here.

17        A    Right.  So what Roediger is looking at is the

18   idea that what white workers did was make whiteness a

19   material gain.  Right?  So that's where it comes

20   ideologically right there.  That their whiteness --

21   themselves as white workers -- afforded them, you know,

22   the best jobs, access to a labor union, so on and so

23   forth.  So he kind of looks at workers being conscious

24   of being white and using that white consciousness as a

25   -- as a material -- material gain, I guess, in labor

Robert Cassanello
August 05, 2022

Page 128

1  negotiations.

2      Q      And were they -- were white workers at the

3  time successful in bringing about the racially disparate

4  system of employment by virtue of their numbers, their

5  sheer numbers over Black workers or what --

6      A      He's only looking at New York.  So that's the

7  only thing I can speak of -- speak about.  So, yeah.

8  He's saying that, essentially.  You know, if you think

9  -- like I mentioned bottom-up thesis with my work -- the

10  catalyst is at the bottom and it goes up.  So this is a

11  bottom-up thesis of racism.  The idea that the white

12  workers are -- he didn't say they are creating racism.

13  He doesn't say that.  Racism exists by the time this

14  labor movement is going on in the 19th century, but he's

15  saying that they are the ones who are promoting this

16  idea of Black exclusion because management wants to

17  employ Black workers because that -- you know, his

18  argument, that they create -- they create a wage wedge,

19  right, by being cheaper employed -- cheaply employed,

20  things like this that you hear today in common parlance

21  with the issues of labor and migration, specifically

22  from Mexico and Central America and stuff like this.

23  Right?  So same argument, but it's in the 19th century

24  with Black workers.  And so white workers are saying the

25  Black workers are oppressing our wages, so one solution

Robert Cassanello
August 05, 2022

Page 129

1    to this -- and this would be the ideological argument --

2    would be to exclude Blacks from certain jobs, so they

3    don't, quote, unquote, depress the wages.  That would be

4    the argument made in this book.

5         Q    Were they -- is one of the methods that the

6    white workers at the time, according to Mr. Roediger --

7         A    Roediger.

8         Q    Roediger.  Did they organize in labor unions

9    that were racially segregated and through the power of

10   organization overcome the economic impulse of the

11   would-be employers of Black workers?  How were they able

12   to distort the market, if you will --

13        A    Sure.

14        Q    -- in the way that you have described?

15        A    Again, this is New York, so it's a sample.  So

16   what he is saying -- and it's -- you know, the labor

17   unions he's looking at are like early labor unions.

18   They were what was called craft labor union.  So it's

19   skilled labor unions.  Unskilled workers didn't have

20   unions.  They didn't have organizations that represented

21   them.  Right?  So he's looking primarily at that era of

22   labor organizations.  And so he's making the case that

23   they were able to -- to be in such numbers that their

24   racial argument, if you will, in employment was able to

25   create some salience.  If not, you know, kind of -- you

Robert Cassanello
August 05, 2022

Page 130

1    know, I think this is the thing that he's interested in,

2    is sort of the role that the working class plays in

3    constructing and reinforcing the race as opposed to the

4    idea that race is being imposed by management.  Right?

5    He's saying, no, it's actually a dialogue between the

6    two.  It's not like, you know, racism is imposed to

7    separate the Black and the working class.  There's white

8    workers who are -- that's sort of what he introduces.

9    That's his frame, if you will, his thesis.

10            So what you're describing, you know, is sort

11   of the height of the labor movement and this is after

12   the book -- after the period of study -- is when you get

13   unskilled labor unions, like the Knights of Labor.  I'm

14   sure you have heard about before in your history

15   classes.  And some of those working-class labor unions,

16   right, were integrated.  Not all of them.  But some of

17   them were integrated.  So the extent in question by

18   which these unions were, sort of, exclusively white over

19   the course of the 19th century is, sort of, in question

20   or, you know, is debated, but, you know, his point is

21   really on the early, early labor movement.

22       Q    Moving, then, to paragraph 14 of your

23   declaration. "HB7's prohibition on advocating the racial

24   connotations of the concepts of merit and hard work as

25   well as its prohibition of endorsing the concept that 'a

Robert Cassanello
August 05, 2022

Page 131

 1    person's moral character or status is either privileged

 2    or oppressed is necessarily determined by his or her

 3    race, color, national origin, or sex' would restrict my

 4    ability to offer instruction on this text."

 5            Now, I want to focus on the latter part of

 6    that sentence --

 7        A    Uh-huh.

 8        Q    -- and your reference to what we are talking

 9    about here, concept number 3, and more specifically

10    focus on -- well, let me ask you this:  Is Roediger's

11    thesis focused on the moral character piece of that or

12    on the status as either privileged or oppressed is

13    necessarily determined by his or her race piece of

14    concept 3?

15        A    It's obviously status.  Right?  Whiteness as a

16    material gain is a whole status argument.

17        Q    I expected that answer.  So, yes.  It seems

18    obvious to me --

19        A    If you're my student, you make an A in this

20    class.

21        Q    Keeping the focus, then, on the status point.

22    Where in this book or in his thesis --

23        A    Uh-huh.

24        Q    -- does Roediger advance the view that a

25    person's status is privileged or oppressed is

Robert Cassanello
August 05, 2022

Page 132

1    necessarily determined by his or her race?

2        A    This is all the thesis of his book.  Right?

3    That the labor movement is creating the conditions by

4    which one who is of a white racial background as

5    determined by 19th century standards, right, are

6    privileged and enjoy greater material opportunity, if

7    you will -- if you want to put it in a Marxist term,

8    right -- than African Americans.  That's a complete

9    status argument.

10       Q    Okay.  Now, that argument focused on the labor

11   movement in the couple of decades before -- if I

12   understood your earlier answer -- up through a couple of

13   decades after the Civil War?

14       A    Yes.

15       Q    So in what way would this book support the

16   proposition, if at all, that today a person's moral

17   character -- excuse me -- a person's status is either

18   privileged or oppressed is necessarily determined by his

19   or her race?

20       A    So that would be done more in a

21   historiographically way.  Do you know what

22   historiography is?

23       Q    I don't.  I'm not sure.  So please tell me.

24       A    Historiography is sort of the philosophy --

25   the philosophy of the history of history.  Right?  So

Robert Cassanello
August 05, 2022

Page 133

1    when I mention -- you know, when you mentioned that
2    earlier article from that Brown study guide, you're
3    like, "Why are you bashing someone who published
4    something in 1946?"  Right?  That's historiography.  So,
5    like, I as an historian today look at something written
6    in 1946 and then I try to interpret why this was written
7    the way it was in 1946.  This is, by nature of the
8    practice, is a criticism because, you know, you've got
9    to kind of take it apart and say, "Well, this is 1946.
10   The author was African American who was involved in The
11   Civil Rights Movement, so had, you know, this and that,
12   you know, shaped their view of these court cases in this
13   way."  You know.  That kind of thing.
14          So my interest in using the Wages of Whiteness
15   isn't so much to teach -- I mean, it is to teach the
16   history of the labor movement and the issue of whiteness
17   as it applies to Jim Crow.  Right?  But it's also to
18   engage in this kind of historiographical conversations.
19   Right?
20          And, for me, the Wages of Whiteness represents
21   the progenitor of the ideas that HB7 is trying to
22   prohibit in some way, shape, or fashion things like,
23   like I said, white privilege -- what is it? -- critical
24   race theory.  You know, also is premised on structural
25   racism, if you will.  So I would imagine that these

Robert Cassanello
August 05, 2022

Page 134

 1   things will come up.  So it's not so much that students

 2   might have to confront the labor movement of the 19th

 3   century, but then in what way do these concepts, you

 4   know, are the sort of ancestor to these, you know,

 5   racial concepts that we are today grappling with and,

 6   you know, that are -- some of which are a target in this

 7   legislation.

 8        **Q    Uh-huh.  And so you say that this book, the**

 9   **Wages of Whiteness, is -- contains content that, if you**

10   **assign it -- or that you believe that concept number 3,**

11   **as we have been discussing it here, would restrict your**

12   **ability to offer instruction on this text, does that get**

13   **us back to our dialogue earlier about, for example,**

14   **Mr. Sabatini or any particular student in the class?**

15        A    Yes.  Construed.  Construed question?

16   Absolutely.  Absolutely.  You know, whiteness is a

17   buzzword.  I don't know that academics still use --

18   like, employ whiteness currently, but certainly

19   whiteness -- like I said, whiteness starts there, and

20   then there's all these branches that come out to these

21   racial theories that are in prohibition here.  Right?

22           And so, for me, I can't see myself teaching

23   that book and just say, "Okay.  Labor movement, labor

24   movement, labor movement.  Thank you.  Go home.  I'll

25   see you next week."  I'm going to have to bring up the

Robert Cassanello
August 05, 2022

Page 135

1    legacy of this book because it has such an

2    intellectually important paternity, if you will.  It

3    happens to interest me.  You know.  So, you know, I

4    don't see this purely as an instruction on the 19th

5    century labor -- labor movement.

6         Q    Okay.  And that legacy is one that includes

7    concepts that you believe you are prohibited from

8    teaching in the course that you're going -- in which

9    you're going to assign?

10        A    I believe that includes concepts that one will

11   be more than willing to construe that I'm teaching that

12   violates the prohibitions in HB7.

13        Q    Okay.

14        A    I think we have established what I do in the

15   classroom.  It's about how one construes.  And I'm

16   certain -- you know, I like using Anthony Sabatini

17   because he's a convenient example.  But, I mean, I'm

18   sure -- you know, like I said, my book assignments and

19   my syllabi are going to be public for five years --

20   five-year window -- for the purpose of people to go

21   through them and say, "This thing, this thing."  And

22   when someone sees Wages of Whiteness, the whiteness is

23   going to trigger a discussion that's going to get us

24   back to here --

25        Q    Uh-huh.

Robert Cassanello
August 05, 2022

1     A     -- no matter how I teach it.  How I teach is

2  irrelevant.

3     Q     Okay.  Well, which is -- which is to say, as

4  we earlier, I think, discussed, whether you -- you would

5  not be endorsing this book and its content or espousing

6  it by assigning it, but simply assigning it and having

7  it as a subject of discussion in your classes could be

8  misconstrued --

9     A     Certainly as an endorsement.  Right?

10     Q     -- as an endorsement.  Misconstrued.

11     A     I would like to say on the record I do like

12  the Wages of Whiteness.  It's one of my favorite books,

13  so I'll put that out there.

14     Q     Okay.  Can we now move along last to concept

15  number four in HB7.

16     A     Okay.

17     Q     Actually before we do, let me ask one other

18  question, and I will ask it before, so... I think I can

19  anticipate the answer.  But what would you want to say

20  about this book or its content or its legacy that you

21  believe that concept number 3 would forbid you to say in

22  your instruction in class?

23     A     Let me answer it this way:  I believe someone

24  might construe an endorsement in the way I have fondness

25  for this book.  And I think this book represents an

Robert Cassanello
August 05, 2022

Page 137

```
 1    important point, an important dialogue in the history of
 2    race and the study of race and racism in the country.
 3    And I think, you know, if I were to present it that way
 4    and say, "Okay.  Wages of Whiteness, let's use that as
 5    an origin point and let's, you know, kind of tree all of
 6    the ideas that flow out of the Wages of Whiteness."  To
 7    me, it's an incredible story because I was in graduate
 8    school when this book came out and I remember this book
 9    was hotly contested.  Now, you probably would think
10    every, you know -- in order to get a degree in history,
11    you've got to sign off on this book somewhere before
12    they give you your diploma.  Right?  Not true.  When the
13    book came out it was -- the concept of whiteness was
14    contested.  There were historians who were saying
15    whiteness is, you know, a canard.
16            And since then, I think -- this is my personal
17    opinion -- I think the book's legacy has been much more
18    esteemed than it was when it came out.  And so I think
19    by discussing that with my students, mapping that out in
20    some way, pointing to the idea that, "Okay.  Here's a
21    book that people, you know, were willing to, kind of,
22    track when it came out; and then, since then it's had,
23    you know, this kind of legacy to, you know, to engender
24    and germane all these kinds of interesting ideas on race
25    and stuff like that."  I think someone in the class,
```

Robert Cassanello
August 05, 2022

Page 138

 1    someone who hears about this, could construe that as an

 2    endorsement and would put me in violation of HB7.

 3         **Q    Well, do you agree that it would be correct to**

 4    **construe it, construe what you have just described about**

 5    **your views about the Wages of Whiteness and its legacy,**

 6    **as you put it, as endorsing the proposition that a**

 7    **person's status is either privileged or oppressed is**

 8    **necessarily determined by his or her race?**

 9         A    I think the -- especially, the contemporary

10    stuff that could trace its lineage to the Wages of

11    Whiteness would all make that case clearly and

12    emphatically.  And I think someone who is witness to

13    that conversation could construe or walk away from it

14    and say, "Oh," you know, "This is what Cassanello

15    believes."  I mean, I'm not neutral on the book.  Right?

16    This is the whole objectivity thing.  Right?  I think

17    this is important for -- for, you know, scholars in the

18    classroom and scholars in the work.  You've got to

19    disclose what you -- what you're passionate about,

20    what -- you know, what -- you're not objective.  Right?

21         And so probably -- I mean, on the list of

22    things I assign in Jim Crow class, I just have a

23    fondness for this book.  I don't think I would hide that

24    and say -- you know, when I teach the book, I would say,

25    "I really like this book."  Someone could construe that,

Robert Cassanello
August 05, 2022

Page 139

1    well, that's an endorsement.  You are telling me this

2    book and its legacy I have to endorse.  I may not be

3    doing that.  I may not have been be intending that, but,

4    certainly, you know, me coming in the classroom and

5    just, you know, professing for the record, "I like this

6    book," could have that -- could have that consequence.

7        Q    Are there other books that you like and you

8    want -- to use your word that you like -- that you don't

9    endorse their contents?

10       A    I can give you a specific example if you want

11   to hear it.

12       Q    Please.

13       A    Okay.  This actually gets into the

14   objectivity.  Right?  So I don't do this anymore, but I

15   used to assign a book that's called Time on the Cross.

16   Right?  It was published in '73, I think, 1973.  And

17   it's a book about slavery, American slavery.  It is

18   published by two sociologists, I believe, historical

19   sociologists or historical sociologists or whatever.  I

20   can't remember both their names.  One is Stanley

21   Engerman.  And what they did is came across very

22   detailed records of a rice plantation in Louisiana.

23   Like, totally detailed records.  Right?  And they both

24   practice climacteric methods, which is quantitative

25   analysis.  Right?  And so what they did is they took

Robert Cassanello
August 05, 2022

Page 140

1    these records and they -- this is, like, '73 when it's,

2    like, punch cards -- and they created a data set of all

3    the records on this rice plantation.  Right?  All data

4    sets.  And they created formulas, variables, all this

5    other kind of stuff, right, just on the records.  So

6    they ran it in a computer.  Then the computer produced

7    numbers, outcomes.  Right?  Then they used that.  And

8    they said, "Here's the history of slavery in America

9    based on the records of this plantation."  Right?  So I

10   would assign this book.  Right?

11          And, invariably -- and I did this, kind of,

12   purposely.  Right?  I said, "Okay."  You know, I

13   wouldn't say anything about the book.  They read it.

14   They come to class.  "What did you think?

15          "Okay.  Great.  All the numbers" -- all

16   the" -- you know, "Everything was proved and everything

17   was" -- "you know, had a hard factual, you know,

18   quantitative answer to it."  Right?  Which amazed the

19   students.  You know.

20          So I would take one of the things out, like,

21   from the book.  So, like, one of the things -- I don't

22   know if I'm getting the figure right, but it is an

23   approximate.  Right?  One of the things they do is they

24   say, "On this plantation only 20 percent of the people

25   enslaved were whipped" over the course of the records.

Robert Cassanello
August 05, 2022

Page 141

1    Right?

2            And I had the students think about that.

3    Like, "What does that say?"

4            And they don't really do much with that

5    interpretation other than to note it and say, "Well,

6    20 percent is based on the records."

7            So then I start to probe with the students.

8    I'm like, "Okay.  Does that mean 20 percent of people in

9    bondage were whipped across the South?"

10           Well, this is just one plantation.  Right?

11   Not only is it one plantation, but it's a rice

12   plantation.  Most plantations in the antebellum South

13   were cotton and cotton is a much more abusing work

14   system than rice.  And we would talk about this stuff.

15   Right?  And it was all in the context of this.  Is --

16   that book, that one book brought down the concept of

17   history and objectivity.  Right?  Because these were

18   social scientists who said, "I have the numbers.  These

19   numbers tell us everything."  Right?  They can be

20   repeated.  They can be reproduced.  Right?  But what

21   does it tell us about slavery?  It doesn't really tell

22   us about anything because there's no humanity in that

23   history book, right, about bondage.  Right?

24           So I get the students to be thinking about

25   that.  I'll say, "So they have all the numbers.  Are

Robert Cassanello
August 05, 2022

Page 142

1    they producing truth?"  You know, invariably from this

2    conversation the students will say, "Well, I guess not."

3    Right?  "If it's just numbers" -- "if it's numbers

4    absent of other things."  You know.  "How can this

5    be" -- you know, "How can this be valid history, if you

6    will?"

7              So I get at that kind of objectivity question

8    by assigning that text.  So that's a text I do not

9    endorse.  Right?  I don't think it's a well -- I don't

10   want to say it's not well researched.  It's well

11   researched, obviously, but it's just not well argued.

12   Right?  So it's a problem with the narrative and

13   interpretation, for me.  You know.  Then I get the

14   students to think about, "Well, if it's" -- you know,

15   because when I assign the text, I talk about that moment

16   in historiography -- philosophy of history -- where

17   historians begin to push away from this notion of

18   objectifiable truth.  Right?  That's the book that did

19   it for the profession.

20             Then they started to think about objectivity

21   and truth in, you know, very different ways than the

22   ways I've described so far in this deposition.

23        Q    Turning to concept number 4, it reads:

24   "Members of one race, color, national origin, or sex

25   cannot and should not attempt to treat others without

Robert Cassanello
August 05, 2022

Page 143

1   respect to race, color, national origin, or sex."

2          Do you believe, Dr. Cassanello, that members

3   of one race cannot and should not attempt to treat

4   others without respect to race?

5      A    Well, I mean, I have a problem with the notion

6   of race that we mentioned earlier, but I think all

7   people should treat others with -- with respect, no

8   matter the category or classifications they fall under.

9      Q    Okay.  Well, does that -- is that the same as

10  saying people should treat others regardless of their

11  race as they would treat anyone else --

12     A    As their perceived race maybe.  That's how I

13  would modify it, but yes.  Does that make sense?  I

14  don't want to endorse the notion of race and say race is

15  something which exists.  So I don't want to say, you

16  know, "I believe everyone of every different race should

17  be treated equally" because then I'm endorsing the

18  notion of race, that I'm endorsing.  I don't mind

19  speaking about race in an historical way.

20     Q    Okay.  Well, I do have to ask you to explain

21  that to me.  What do you mean by you don't want to

22  endorse the concept of races as though races exist, if I

23  understood?

24     A    Sure.  Yeah.  You understood me correctly.

25  Right?  So I believe that race is a social construct and

Robert Cassanello
August 05, 2022

Page 144

1   not a biological one.

2       Q     Not a biological one?

3       A     That is correct.  Yes.

4             So when we speak about race, we are actively

5   constructing race.  Right?  And so I understand

6   historically and the way, you know -- I even write in

7   terms of race in a past connotation.  I take great care

8   not to give voice to it in my presence -- my present.

9   Right?  So I don't want to say, "Well, yeah, everybody

10  of all these different races should all just get along,"

11  because then I'm endorsing this notion that there are

12  these different races and these different races are

13  biologically determined.

14            If you're saying, "Well, couldn't they be

15  socially constructed?"

16            Yes.  They could be socially constructed and I

17  have a problem with the social construction.  And if I'm

18  employing the notion of race, I am also a person

19  actively constructing that notion of race.  Does that

20  make sense?

21      Q     Not -- to be perfectly frank, no.  I don't

22  think I'm following you.

23            When Roediger speaks of Wages of Whiteness, is

24  he speaking about a race that we often, in normal terms,

25  speak of as the white race?

Robert Cassanello
August 05, 2022

Page 145

1    A    It depends what your definition of white race

2    is.  Do you think race is a biological determination or

3    are there biologically white people and Black people and

4    Asian people?

5    **Q    Well, did --**

6    A    You have to define race for me.

7    **Q    I'm actually asking you to define it for me**

8    **and how you understand it, but how --**

9    A    Sure.  Sure.

10   **Q    How did Roediger?**

11   A    So Roediger is -- actually, that book is an

12   argument about the social construction of race.  He's

13   not making a biological argument to race.  He's making a

14   social construction to race.  These people, you know,

15   white and Black, if you will, you know, saw each other

16   as distinct races of people.  And I think, like,

17   technically whites would have been on the biological

18   definition of race.  Blacks in 19th century and 20th

19   Century America would have gravitated towards a cultural

20   understanding of race as opposed to a biological.

21   Right?  But they would have both interacted and

22   recognized each other as categories of races.  Right?

23        So I understand that in an historical sense.

24   I write about this stuff in my research.  I use the term

25   white.  I use the term Black.  Things like this.  Right?

Robert Cassanello
August 05, 2022

Page 146

```
 1   Which -- okay.  But what I don't want to do is be a
 2   person today, in 2022, that's, sort of, constructing
 3   someone's race for them and saying, "Well, there's the
 4   white race and the Black race, because I don't believe
 5   that people's race is biologically determined.  Right?
 6   It's socially determined.  And we construct when someone
 7   is white and someone is Black; when someone is Asian,
 8   what have you.  Right?  So I don't personally want to be
 9   an active participant in constructing someone else's
10   race.
11        Q    When you -- in your instruction and in your
12   scholarship, you use the term "white" and "Black" --
13        A    Uh-huh.
14        Q    -- or "Asian" or --
15        A    Sure.
16        Q    -- any of these other terms that, I think, in
17   the -- in the average person's mind --
18        A    Uh-huh.
19        Q    -- is a biological construct.
20        A    I don't know.  I might dispute that.
21        Q    Well --
22        A    What's your evidence that the average person
23   thinks race is a biological construct?
24        Q    Well, then let me --
25        A    Because I will say this, if you don't mind.
```

Robert Cassanello
August 05, 2022

Page 147

1        Q      Please.

2        A      So -- I mean, I have been -- you know, like I

3   said, Wages of Whiteness was one of the seminal books

4   for me in graduate school.  Right?  So I was very

5   conscious of this notion of socially constructed versus

6   biological constructions of race.  Right?  And when I

7   got into the classroom, you know, that really became

8   something for me to point out to students.  Okay?

9   There's a way of thinking about race as a social

10  construction.  If it's social construction, what does

11  that mean, so on and so forth.

12              What I found early on within, like, one or two

13  years of teaching, the students understood that.  Like,

14  I have yet to meet a student, at least verbally or in

15  any way, shape, or form who has communicated a

16  biological category of race, as I understand it

17  historically.

18              So historically in my own research, if I'm

19  referencing something that's white, Black, Hispanic,

20  what have you, I'm basing that on the perceptions of the

21  time, right, not in a contemporary categorization.

22       Q      When you use those terms to -- in reference to

23  contemporary times --

24       A      Uh-huh.

25       Q      -- what do these terms mean, the terms "white"

Robert Cassanello
August 05, 2022

Page 148

1    and "Black"?

2        A    When I use them in contemporary terms, they

3    are social constructions.

4        **Q    And who -- who are you describing when you**

5    **describe the race -- when you describe Blacks as a race?**

6        A    So I guess an example I might go to in the

7    classroom would be this.  You know, if you look

8    historically at -- especially the South and the legal

9    definitions of the South, right, students are familiar

10   with this notion of the one-drop rule.  You know.  One

11   drop of African blood equals an African American, no

12   matter what someone's complexion may look like.  Right?

13   So students are familiar with this.  They understood

14   what it means.  They understood it's a biological

15   definition.  Right?

16            Okay.  Then I talk about Brazil.  Right?  And

17   Brazil has, like -- I don't know the exact figure, but

18   roughly like 20 different racial categories of Black.

19   Racial categories of Black, based on skin color.  Right?

20   You know, so race is not the same thing around the

21   world.  You know.  And so -- I mean, it's not the same

22   thing.  It doesn't have the same definitions.  Isn't it

23   ultimately socially conducted?  Right?  Like, the

24   Brazilians can have a different definition of race than

25   we employ in the United States, that is employed in

Robert Cassanello
August 05, 2022

Page 149

 1  Cuba, that is employed at West Africa, things like that,

 2  South Africa.  Right?

 3       Q    Then, again, when you use the term "Black" --

 4       A    Uh-huh.

 5       Q    -- to make reference to a group or a class, if

 6  you will, of people in contemporary times, who are you

 7  referring to?

 8       A    I'm referring to people of African descent.  I

 9  employ the word "Black" because most people of African

10  decent prefer that term.  I don't want to say I

11  exclusively use it.  Sometimes I use "African American"

12  because, when we say, "Black, Black, Black," you know,

13  it can -- you know, in a prose or in a lecture or

14  something, it can almost sound -- have a connotation or

15  intent you don't mean.  So I mostly use "Black," but I

16  then switch back and forth.  But the reason I adopt

17  "Black" is because most African Americans, based on

18  surveys, prefer to be called "Black" than "African

19  American" or any of the other racial categories that

20  have come about over the years.

21       Q    Well, racial categories.  What race do you

22  consider yourself?

23       A    I consider myself part of the human race.

24       Q    Do you -- and of course no one would dispute

25  that.  Do you consider yourself part of the white race?

Robert Cassanello
August 05, 2022

1    A    If -- you know, I have been confronted with

2    this on various government documents, if you will,

3    right, where it's, like, race and you pick.  I

4    consciously will not pick white if it's white race, just

5    for the reasons I mentioned about race.  But what I

6    found recently is that a lot of these forms now say

7    "white," then there's like a parenthesis "ethnic

8    origin," and I will pick "white" if it's categorized as

9    an ethnic origin, meaning European.  That's how I

10   interpret it.  But if like "white" parentheses "race," I

11   will choose "other" and write "human race," or something

12   like that.

13       **Q    In concept 4 and any of the other concepts**

14   **that are identified in HB7, how do you think the word**

15   **"race" is being used there?  What is the meaning of race**

16   **in the statute in your opinion?**

17   A    I don't know.  I didn't write it.  I have no

18   idea what's in the minds of the lawmakers who drafted

19   this.  If they think race is a social construct or

20   biological construct, I can't tell you.

21       **Q    And if they -- and what would the difference**

22   **be in the -- in the enforcement and implementation of**

23   **the statute if they believed it was one or the other?**

24   **Would there be a difference in how it was understood and**

25   **enforced?**

Robert Cassanello
August 05, 2022

Page 151

 1          A    I don't think so.  I mean, it would depend on

 2     the -- well, first of all, it would depend on who was --

 3     who was construing, right, the violation and what race

 4     means to them.  And then it would depend on who is

 5     taking the disciplinary action.  I can't answer those

 6     questions because I don't know.

 7          Q    And when you say race is a social construct --

 8          A    Uh-huh.

 9          Q    -- could you elaborate on that -- what you

10     mean by "social construct"?

11          A    That it's created through learning.  It's

12     created -- race is created and understood through social

13     and cultural interaction.  It's not something that is

14     inherent, primordial, biological in regards to DNA or

15     anything like that.

16          Q    And so is someone's race -- what determines if

17     race is a social construct?  What determines what

18     someone's race is?

19          A    That's a great question.  Depends on the

20     person who is the perceiver.  I can't answer that

21     question.

22          Q    Well, when you say the perceiver, is it --

23          A    Well, for example --

24          Q    -- a matter --

25          A    So, for example, if my neighbor's in the Ku

Robert Cassanello
August 05, 2022

Page 152

1    Klux Klan, right, race would have a biological

2    definition for that person -- a Black person, a

3    biologically inherently Black and a white person,

4    biologically inherently white.  You know.  If my

5    neighbor's, say, you know, like me, who -- you know, who

6    went to college, learned about these things and said,

7    "Oh, race is just a social construct."  To them, it's

8    going to be a social construct.  They might not put

9    credence to active contemporary constructions of race in

10   the way I do.  So it depends on the -- you know, on who

11   is doing the assessment.

12        Q    When you say "perceiver," does race, as a

13   social construct, depend upon an individual's own

14   determination of what race they are?

15        A    I can't answer that.  It depends on the

16   person.  Right?  I would assume if I use the Klan

17   example, right, certainly people who are in the Klan who

18   profess the biological distinction of races, presumably

19   if they are white, they have those feelings because they

20   are white and they have been told they are white.  And

21   they were told, just like Wages of Whiteness, that they

22   have benefits to being white.  Right?  So that's where

23   it comes from.  I mean, you know, I can't tell you

24   across the board how it operates.

25        Q    You're not suggesting that everyone who

Robert Cassanello
August 05, 2022

Page 153

1    understands race in biological terms rather than social

2    construct terms is a Klansman or a racist, are you?

3        A    Not necessarily.  But I think -- well, I think

4    racists, yeah, if they believe that -- that there are

5    distinct races of humans on the earth, right, by

6    definition that's racism.

7             What's his name?  Spencer -- Richard Spencer,

8    do you know who he is?

9        Q    I don't think I do.

10       A    You guys got to get into the news.

11            So Richard Spencer is this --

12            Do you know Richard Spencer?  Richard Spencer

13   is this guy.  He actually was studying to be an

14   historian.  He was in Ph.D. program, I think, at Duke.

15   And he is a self-professed -- what he uses the term is

16   racialist.  He doesn't use racist.  He uses racialist,

17   but his -- he believes in these biological distinctions

18   between people and that, you know, inter- -- in his

19   parlance -- interracial marriages lead to, sort of, a

20   degradation of white stock and things like this.  So for

21   him, yeah.  That's, I think, him believing in this

22   biological distinctions would put him square in the

23   definition of a racist.

24       Q    Earlier in our dialogue, I think you

25   acknowledged that your classes are racially integrated?

Robert Cassanello
August 05, 2022

Page 154

```
1        A    Our campus is racially integrated.

2        Q    Are your classes also racially integrated?

3        A    Uh-huh.  Yes.

4        Q    And what races -- what different races are in

5    your classes typically?

6        A    Well, I mean, if I remember correctly, UCF

7    materials don't ask race; they ask ethnic origin.  So I

8    don't know -- well, I do know.  I don't know the

9    specific data, but based on that, UCF does publish the

10   categories of people's ethnic backgrounds.  You know.

11   So I know we're over -- a little bit over 25 percent

12   Hispanic because we are a Hispanic-serving institution.

13   Basing the last time I saw the stuff, student

14   self-identify as Black, I think, around 12 or

15   13 percent.  I don't know Asian.  I don't know the

16   number.  I don't recall what that figure is.  And then a

17   majority or the highest number probably would be

18   self-described as white.

19       Q    Self-described as white.  And in

20   self-describing themselves as white, do you believe they

21   are describing race as a social construct?

22       A    I can't answer that.  I would have to ask

23   every one of them.

24       Q    Yeah.

25       A    I don't know.
```

Robert Cassanello
August 05, 2022

Page 155

1    Q    When you -- does your -- do your classes
2    include members of more than one of those, at least,
3    self-described races?
4    A    Oh, yeah.  Yeah.
5    Q    And how do you know that?
6    A    Because I would assume that someone who's
7    self-described as Black would be someone I would
8    recognize as African American or Black.  I mean, you're
9    right, I might not.
10   Q    How would you recognize them as African
11   American or Black?
12   A    That's a good question.  I mean, I don't ask
13   them how they fill their form out, but...
14   Q    But it's not based upon their skin color?
15   A    Right.  It's based upon their ethnic origin.
16   So there are some things -- some people's ethnic origin
17   you can discern visually sometimes.  Not all the time.
18   Sometimes.  For example, I know someone's South Asian,
19   you know, based on their hair, their skin color, their
20   name possibly.  Right?
21   Q    Those are biological evidences, then, of race,
22   no?
23   A    No.  I don't think so.  I don't think so.  I
24   don't think the difference is genetically in what I just
25   described is significant enough to merit a distinct race

Robert Cassanello
August 05, 2022

Page 156

1   of people between humans.

2        Q    And so when you -- when you are perceiving

3   your class as being racially integrated, race being

4   understood as a social construct --

5        A    Uh-huh.

6        Q    -- you are guessing?

7        A    Yes.

8        Q    You're guessing?

9        A    Right.  It's not a topic I bring up.  It's not

10  something I ask anyone to disclose.  And it's, you

11  know --

12       Q    And so it sounds to me, based upon your

13  understanding of the meaning of race, is a social

14  construct and that's how you understand it?

15       A    Uh-huh.

16       Q    That it would not even be possible for you to

17  believe that members of one race cannot and should not

18  attempt to treat others without respect to race because

19  race is not a -- that's like saying blood type.  You

20  don't have any earthly idea what their blood type is, so

21  you couldn't possibly distinguish among them based upon

22  their blood types?

23       A    Yeah.  Yeah.  So I would qualify that this

24  way -- right? -- is if two individuals, say, in my

25  class, self-describe themselves of different races,

Robert Cassanello
August 05, 2022

Page 157

```
 1    that's them.  That's onto them.  That's their -- you
 2    know, their identity, their ways to which they wish to
 3    categorize themselves.  So I would understand that.  And
 4    I would expect that, if they perceive each other as
 5    different races, then I would hope and encourage that
 6    they would treat each other with respect, even though I
 7    might not say that you are biologically two different
 8    people.  I might not -- I don't believe that, but if
 9    they are self-ascribing and saying, "I'm" -- you know,
10    "I'm a socially constructed Black person.  I'm a
11    socially constructed white person," you know, I would do
12    my best to respect that.  You know.
13        Q    And would you treat them differently based
14    upon their --
15        A    No.
16        Q    -- self-described race?
17        A    No.
18        Q    Would you think that either one of them should
19    treat each other differently based upon their race?
20        A    No.  I think everyone should be respected.
21        Q    And -- and is your -- is that your answer as
22    well with respect to color?
23        A    Yes.
24        Q    Let's move to paragraph 15 of your --
25        A    Okay.
```

Robert Cassanello
August 05, 2022

Page 158

1        Q    -- declaration.  And it reads:  "A component
2    of The Civil Rights Movement involves criticisms of how
3    desegregation was implemented or failed to be
4    implemented during The Civil Rights Movement.  For
5    example, a text I assign, Why Busing Failed:  Race,
6    Media, and the National Resistance to School
7    Desegregation, by Matthew Delmont discusses how
8    predominantly white antibusing activists, including
9    former Florida Governor Claude Kirk, ultimately
10    succeeded in preventing public school desegregation and
11    helped to create a system that gave precedence to the
12    desires of white parents who opposed desegregation over
13    the civil rights of Black students."
14            Now, who are you referring to in that sentence
15    when you referred to "white antibusing activists" and
16    when you refer to "white parents"?
17        A    Sure.  So, again, these are in historical
18    contexts.  So I didn't do the research.  Delmont did the
19    research and he's ascribing people being Black and
20    white.  And I'm assuming he's basing that on their own
21    self-ascribed identities.  I don't know that he's -- I
22    can't say for certainty he doesn't determine whether
23    it's biological or social constructed, but he's
24    employing that to categorize the people who are engaged
25    in the history.

Robert Cassanello
August 05, 2022

Page 159

```
1      Q    Well, during that period of time -- what
2   period of time is he referring to?
3      A    He actually starts in the '50s, the late '50s,
4   and he goes into the early '70s.
5      Q    Early '70s?
6      A    He starts in New York, I believe.  New York
7   and Boston.  No, not Boston.  He starts in New York and
8   then ends up in the '70s where busing or antibusing
9   activism was really kind of a national movement, if you
10  will.
11     Q    And during that period of time, would you say
12  that the categories of white and Black were referring to
13  biological categories?
14     A    I don't know.  I didn't do the research, but I
15  can talk about my own research, if that would help.
16     Q    No.  I'm wondering about this research and --
17     A    I don't know that --
18     Q    -- that you assign it --
19     A    Sure.  Sure.  I don't know that, um, Matt
20  Delmont would know the answer to that question.  We
21  can't know the answer to that question because you're
22  looking at historical documents, and in the historical
23  documents, when someone uses "Black" they don't say
24  "Black, I mean socially constructed" or "white, I mean
25  biological."  No one uses that.
```

Robert Cassanello
August 05, 2022

Page 160

1          Sometimes you can draw the context from what
2     is written and you can make that distinction, but then
3     you're only drawing a conclusion based on the person who
4     wrote the document or possibly the people who are
5     predisposed to agree with said document.  So it's not --
6     there isn't an answer to your question.
7          Q    **Well, then, if there's not an answer to the**
8     **question, do we know what kind of group of people he's**
9     **referring to when he speaks about predominantly white**
10    **antibusing activists?**
11         A    He is speaking to white suburban.  And I
12    believe he's making the case of mostly of women,
13    mothers, who are trying to prevent busing of students to
14    achieve some kind of integration goals in local school
15    systems.
16         Q    **When you say "white suburban" --**
17         A    Uh-huh.
18         Q    **-- "women," who are they?**
19         A    Those are white women who probably would
20    self-describe themselves as white and live in suburbs.
21    Certainly they would use those -- those terms and some
22    documents and things and some of the advocacy they are
23    doing would self-describe as white.
24         Q    **Might those women you're referring to as**
25    **likely self-describing as white, could they just as**

Robert Cassanello
August 05, 2022

Page 161

1    accurately describe themselves as Black?

2        A    I don't think so.  I've never seen evidence of

3    that.

4        Q    How do you mean?

5        A    Well, you're talking about, like -- what's her

6    name? -- Rachel Dolezal.  Right?

7             MR. NEWHALL:  Dolezal or --

8        A    Do you know who I'm talking about?

9    BY MR. COOPER:

10       Q    I do.

11       A    So I don't think that phenomenon existed in

12   this period of time, at least I have never seen evidence

13   of it.

14       Q    Well, if we were talking about today --

15       A    Uh-huh.

16       Q    -- could those suburban women describe

17   themselves as white or Black?

18       A    Well, I mean, I do believe they have the

19   constitutional right to describe themselves any way they

20   want.  That's not for me to determine or evaluate.

21       Q    And -- and race as a social construct would

22   accept as accurate either description, correct?

23       A    I don't know.  I don't think that's true.

24   Again, I'll use the Rachel Dolezal example.  Right?

25   Here's a white woman who --

Robert Cassanello
August 05, 2022

```
 1      Q    Well, you say she's a white woman.  As a --

 2      A    Can I finish?

 3      Q    Please.

 4      A    I'm just saying how people interpret it.

 5   Right?  All right.  So she came out and said that, you

 6   know, she's a Black woman.  She got a great deal of

 7   criticism for that.  I don't know that anybody that I'm

 8   aware of affirmed her trans-racial identity, if you

 9   will.  So, you know, for me personally, you know, I'm

10   not trying to arbitrate her race.  Right?  But I don't

11   think she -- she's making a social construction

12   argument, but I don't think it is a social construction

13   argument that has salience and that people are accepting

14   it.

15      Q    Well, do people accept your argument about the

16   social construction of race?

17      A    I think some people do.  Sure.  A lot of

18   people do.

19      Q    Well -- and do the people who accept your

20   argument for the social construction of race accept

21   Rachel Dolezal's self-identification as Black?

22      A    I can't answer that question.  I've never

23   talked to anybody.

24      Q    Do you?

25      A    Do I?  I mean, to be honest with you I don't
```

Robert Cassanello
August 05, 2022

Page 163

1    think about it.  You know.  It's not something that sort

2    of impacts me as a scholar, so I don't really have a

3    scholarly opinion about it.  I think it's kind of

4    interesting that she's making that argument, but I think

5    it also -- it's also -- there's a -- you know, I don't

6    know her and I never researched her motivations or

7    anything, so I don't want to ascribe any behavior to

8    her.  But in cases like that kind of smack of

9    convenience, if you will.  And what is probably a

10   greater example of that is Ward Churchill.  Do you know

11   who Ward Churchill was?

12        Q    I do.

13        A    To me Ward Churchill more, kind of, represents

14   this -- this convenience of using the social

15   construction of race to achieve a material gain, if you

16   will.

17        Q    Well, if we eliminate from Rachel -- I'm not

18   sure --

19             MR. NEWHALL:  It's Dolezal, D-O-L-E-Z-A-L.

20   BY MR. COOPER:

21        Q    -- Rachel Dolezal's insincere motives and we

22   attribute to her sincerity in her self-perception and

23   self-description --

24        A    Uh-huh.

25        Q    -- would you accept it?

Robert Cassanello
August 05, 2022

Page 164

1      A    I mean, accept in what way?  I mean, it's none
2   of my business.  I don't interact with her.  She's no --
3   she has no consequence to my life or my scholarship or
4   me as a professional.  I mean, you know, if she --
5   however she wishes to self-describe is her business.
6   It's not my business and it's not my business to
7   arbitrate who she is or who she thinks she is.
8      **Q    So that -- and to the extent race is a social**
9   **construct, then, you would have no basis on which to**
10  **dispute her if you didn't doubt her sincerity, would**
11  **you?**
12     A    I don't know her sincerity.
13     **Q    If you had no basis to doubt her sincerity.**
14  **That's my hypothetical.**
15     A    Sure.  Sure.  Again, I would not put myself in
16  a position to affirm or dispute how she self-identifies.
17  She put it out there.  Everybody knows all the
18  information.  It's not up to me.  What do I care?  What
19  does it matter what my opinion is?  So I just -- you
20  know, I wouldn't have an interest in formulating one or
21  expressing one.  It doesn't achieve anything for me.
22     **Q    Well, would -- I'm simply trying to understand**
23  **how you draw your distinctions among people concerning**
24  **race.  And -- and I'm -- I quite simply don't understand**
25  **how you understand race as a social construct --**

Robert Cassanello
August 05, 2022

1        A     Uh-huh.

**2        Q     -- if you are unwilling to answer questions**

**3   about Rachel Dolezal.**

4        A     I thought I did answer questions.  I'm not --

5   I'm not saying that she represents a race of people.

**6        Q     You're not saying what?**

7        A     I'm not saying that she represents a race of

8   people.  That's my position.  She's saying that.  That

9   is on her.  So it's not on me.  I'm not the race police.

10  I don't go in and say, "This person is this race; that

11  person is that race," or anything like this.  I think

12  you're kind of misconstruing my belief system.

**13       Q     I am just having a hard time understanding**

**14  your belief system and -- and how it is that -- based**

**15  upon how you have described your belief system, that**

**16  race is a social construct, you identify the races of**

**17  individuals that you encounter.  How do you?**

18       A     You know, I think you mentioned it earlier.

19  Some of it is assumptions.  Some of it is guess.  I

20  mean, some of it self-describes.  I've had students over

21  the years who said, "I don't"-- "I believe race is a

22  social construction," and so, you know, "I believe," you

23  know, "I'm human" or something or whatever.

24            You know.  I say, "Okay."  But, I mean, until

25  I have that information, I try not to know make

Robert Cassanello
August 05, 2022

Page 166

```
 1   assumptions.  I try not to.  You know.  But, you know,

 2   there's sort of a -- you know, I recognize how we

 3   socially group ourselves by race.  So I can recognize

 4   that in the classroom.  And I am open to the fact of

 5   being wrong in that.  If a student corrects me and says,

 6   "This is how I self-identify," I will say, "Okay."

 7        Q    You wouldn't say that with Rachel Dolezal?

 8        A    I don't know Rachel Dolezal.  I've never met

 9   her.  I don't know her --

10        Q    If she were a student.  If she were a student

11   in your class and she said just what you just said --

12        A    Uh-huh.

13        Q    -- would you say, "Well, okay"?

14        A    Probably.  It's not my business to ascribe her

15   race or police her race.

16             Can I say something off the record for a

17   moment?

18             MR. COOPER:  Go off the record for a second.

19             (Discussion off the record.)

20   BY MR. COOPER:

21        Q    I am going to hand you another document and

22   ask if that is one that you recognize.

23        A    Okay.

24        Q    Do you recognize the document?

25        A    Uh-huh.
```

Robert Cassanello
August 05, 2022

Page 167

1       Q     What is it?

2       A     That is an assignment from the section, or

3    part of class, where I introduce the book Why Busing

4    Failed.

5             MR. COOPER:  I am going to ask the court

6         reporter to mark that as our next exhibit.

7             (Defendants' Exhibit 7 was marked for

8             identification.)

9    BY MR. COOPER:

10      Q     Okay.  So this exhibit, which has been marked

11   as Exhibit 7 -- in this exhibit you say, "In a

12   two-paragraph essay cite two interviews from the

13   Assignment 11-Busing and the Media."

14      A     Do you want me to tell me where that link

15   goes?

16      Q     That would be helpful.  Yes.

17      A     So the link goes to a website that hosts

18   public radio and TV interviews from the past.  I don't

19   remember the name of the sites.  Like, American Public

20   Television Archive or something like that.  And so I was

21   able to create a link that just had historic news items

22   from busing from the late '60s and early '70s, like in

23   Boston.  There might have been a few in Florida and

24   things like this.  So the interviews are going to be,

25   sort of, news reports from radio or from TV -- public

Robert Cassanello
August 05, 2022

Page 168

1   radio and public television from that time.

2       Q    I see.  Okay.  So you ask your students to

3   cite two of the interviews from that link.  And "In

4   these two paragraphs affirm or refute the thesis of Matt

5   Delmont's book Why Busing Failed or use the information

6   from the book and in the discussion post to argue that

7   busing can represent a declination narrative for The

8   Civil Rights Movement."

9           What -- what is the book's thesis that you're

10  asking students to either affirm or refute?

11      A    Sure.  The book argues that busing, sort of,

12  represents failure to truly grapple with the integration

13  of American schools after The Civil Rights Movement.  So

14  this is Matt -- this is his word.  I don't know if I

15  would have worded that... When The Civil Rights Movement

16  ends, there is this expectation that American public

17  schools would be integrated.  And he's saying that

18  busing -- busing interferes with efforts at what maybe

19  he might describe as a true integration.  And it is sort

20  of similar in a way of the Wages of Whiteness in that

21  he's looking a lot at the suburban moms.  Right?  And

22  trying to make the case that it's this -- you know, it's

23  sort of a gendered movement, women movement, to sort of

24  block integration.  Meaningful ways in these -- that's

25  roughly his thesis.

Robert Cassanello
August 05, 2022

Page 169

```
 1        Q    And I want to hand you a book that is titled
 2   Why Busing Failed -- and it's by Matthew Delmont -- and
 3   ask you if you confirm to me that that's the book that
 4   you do assign and that you were talking about?
 5        A    Yes.  Yes it is.
 6        Q    Thank you.  Now, you ask your students to
 7   either affirm or refute that thesis and so --
 8        A    Or the declination narrative.
 9        Q    Yes.
10        A    Those are two different things.
11        Q    Sure.  They have a --
12        A    Choice.
13        Q    They have a choice.  They can choose either
14   option?
15        A    Uh-huh.
16        Q    But if they choose to treat [sic] with the
17   thesis itself, they are free to refute it or affirm it
18   based upon -- harkening back to our earlier conversation
19   --
20        A    What's the term I use on the narratives?
21        Q    Coherent narrative.
22        A    Coherent narrative.
23        Q    Based upon their own interpretation of the --
24        A    And constructing a coherent narrative.
25        Q    Yes.
```

Robert Cassanello
August 05, 2022

1                -- of the paragraphs -- excuse me -- of the

2     interviews that they select, correct?

3          A    Uh-huh.

4          Q    Yeah.

5          A    Conceivably.

6          Q    And I take it you're indifferent to whether

7     they affirm or refute it.  Your assessment of their

8     paragraphs, of their work in the assignment depends on

9     how they support it and how they defend it?

10         A    Yes.

11         Q    Okay.  Moving on to your paragraph 16.  "Other

12    interpretations of The Civil Rights Movement that I

13    teach discuss ways in which integration harmed the Black

14    community.  Specifically, the desegregation of public

15    schools resulted in many Black educators and

16    administrators taking pay cuts and losing their jobs as

17    schools closed.  I co-directed a film called Marching

18    Forward with UCF film professor Dr. Lisa Mills and my

19    student" --

20         A    Oswmer.

21         Q    -- "Oswmer Louis that covers desegregation in

22    Orlando public schools.  In discussing those topics,

23    part of the film features interviews by Black public

24    school administrators and teachers who were adversely

25    impacted by desegregation."

Page 171

1              When did you and Dr. Mills produce Marching

2    Forward?

3         A    We did it in a -- we teach a class that's

4    called History Documentary Workshop.  And I'm the

5    historian and she's the filmmaker.  And we have students

6    there that are in the Burnett Honors College.  This is,

7    like, the fourth film we have done.  We have done

8    previous ones as well.  And we collaborate on a

9    documentary project.  Most of them end up on public

10   television.  So this film was WUCF.  It's aired

11   nationally.

12        Q    What's the content of the time frame that --

13        A    The time frame of the content or when we made

14   it?

15        Q    Originated.

16        A    So this class -- I think we started in 2016

17   and we had a final film 2020.  It aired nationally on

18   public television February of 2021.

19        Q    Okay.  So very recently it aired?

20        A    Yeah.  But it streams online, so anybody can

21   watch it because it's public television.  So it's not

22   behind the paywall.

23        Q    And in order to produce the film, did you

24   and/or Dr. Mills -- are you the ones that interviewed

25   the Black public school administrators, or were those

Robert Cassanello
August 05, 2022

1    clips of interviews that had previously been taken and

2    you found in archives?

3         A    The black administrators?

4         Q    **Yes.**

5         A    They were -- we interviewed them.

6         Q    **You interviewed them?**

7         A    We did or the students did.

8         Q    **Okay.**

9         A    We had -- there was a person involved in the

10   content of the film who passed before we started the

11   project, and there were some historic interviews he did

12   that's in the film, but we never interviewed him.  But

13   he's the only one.

14        Q    **The Black public school administrators and**

15   **teachers that you interviewed, how did you identify them**

16   **as Black?**

17        A    They identified themselves as Black.

18        Q    **They identified themselves as Black too.**

19        A    Sure.

20        Q    **Moving to paragraph 18.  "Under HB7's regime,**

21   **I could be violating the law to offer these texts**

22   **criticizing the desegregation movement because these**

23   **criticisms could be perceived as advocating the**

24   **viewpoint that 'members of one race, color, national**

25   **origin, or sex cannot and should not attempt to treat**

Robert Cassanello
August 05, 2022

Page 173

1    others without respect to race, color, national origin,

2    or sex.'"  That is concept number 4 that we have been

3    talking about.

4              Explain to me how these texts that criticize

5    the desegregation movement -- and I take it the

6    criticism is based upon the harm that some in the Black

7    community suffered as a result of that desegregation

8    movement.

9         A    Sure.

10        Q    Explain to me how -- how those criticisms of

11   the desegregation movement could be perceived as

12   advocating the viewpoint that members of one race,

13   color, national origin, or sex cannot and should not

14   attempt to treat others without respect to race, color,

15   national origin, or sex.

16        A    So that, again, goes back to how a discussion

17   or concept can be construed.  Obviously, I want to --

18   because I said I want to teach that.  I want it to be

19   part of the curriculum.  But the literature, if you

20   will, on desegregation is pretty recent and it's pretty

21   -- can be controversial because it -- to some extent --

22   maybe not so much in Why Busing Failed, but some other

23   stuff with the film -- some other things that I might be

24   so inclined to assign -- really sort of criticizes

25   things like white flight, public schools, various and,

Robert Cassanello
August 05, 2022

1    you know, multiple attempts to integrate public schools

2    and things like this.  And I think in that context,

3    there could be a person or their student off the street

4    or one of these entities that has the ability to

5    construe what I do.

6        **Q    Mr. Sabatino?**

7        A    Mr. Sabatini.

8        **Q    Mr. Sabatini?**

9        A    Right.  Sabatini could construe that as a

10   criticism of, you know -- school system criticism of,

11   you know, families who desired, let's say, to move to

12   the suburbs, you know, you know, which had a direct

13   impact on desegregation.  You can go so far as to say

14   private school and charter school systems, you know,

15   things like that.

16           Now, this may not -- you know, again, I don't

17   come in the class and say, "In order to pass this class,

18   you must think X, Y and Z."  We have pretty much

19   established that here.  Right?  But I can tell you when

20   I taught -- when I taught this last time, I had a

21   student in the class who was a -- not just supportive

22   but was an activist for the school choice movement.  And

23   I know that, you know, when did this reading, had this

24   discussion -- it didn't get heated, right, but, you

25   know, I could say that she probably expressed views that

Robert Cassanello
August 05, 2022

Page 175

1   some students didn't agree with, let's say, but it was

2   in a politeful [sic] and -- what's the word here,

3   respectful?  It was in a respectful way.  I'm in touch

4   with her.  We talk frequently and stuff like this.  You

5   know.  There's no ill-will from her experience there.

6   But I can see, you know, in a different context someone

7   presenting that same argument, yet feeling that somehow

8   that -- that the class discussion, class content was

9   violating.

10      Q    Was what?

11      A    That somehow the class content or class

12   discussion was in somehow violating their opinion about

13   desegregation.

14      Q    And you're citing her and her support for

15   school choice as the person whose opinion about

16   desegregation might have been violated?

17      A    No.  I'm saying that -- not her, because

18   obviously it didn't happen.  I'm giving you an example

19   where this did not happen.  I'm saying I could see in

20   the future, because this law is going to create the

21   conditions by which, you know, students, people in the

22   street, Representative Sabatini have police powers in a

23   sense almost.  Right?  I can see, you know, someone

24   with, you know, that viewpoint who doesn't take the

25   discussion, say, the respectful way that it was offered

Robert Cassanello
August 05, 2022

Page 176

 1  might construe it in a way that they believe is a

 2  violation of HB7.

 3      **Q    Well, how is it that the discussion you have**

 4  **just described would advocate the viewpoint that members**

 5  **of one race cannot and should not attempt to treat**

 6  **others without respect to race?**

 7      A    Not in the -- not in the real example I gave

 8  you.  But, say, again, in a future class, if I have a

 9  student that believes, say, in the Black pathology

10  argument of African Americans, I can see that discussion

11  become quite a contestation, if you will.  Because, you

12  know, then, you know, I would have to challenge that.

13  And, you know, we kind of had a discussion about some of

14  these things.

15      **Q    Yes.**

16      A    And imagine that discussion transposed to this

17  desegregation.  Because, you know, that argument is made

18  for -- by -- those who ascribe to the pathology argument

19  also subscribe oftentimes to, you know, a feeling that

20  desegregation should never have been attempted at all.

21  Right?  So that kind of discussion could lead down.

22  Again, it wasn't in the example I gave you, but I could

23  see it.

24      **Q    It sounds to me, actually, like exactly the**

25  **kind of discussion that we hope is happening in our**

Robert Cassanello
August 05, 2022

Page 177

1    college classrooms where people of differing approaches

2    and thoughts are airing them, exposing them to other

3    students, seeing the reactions of the other students and

4    their professors, debating them and what have you.

5    That's -- that's what I -- how I remembered --

6         A    Sure.

7         Q    -- college.

8         A    That's the idea.  Right?

9         Q    That's the idea.

10        A    Right.  But, unfortunately, the way the law is

11   written, one can construe what my intent is or what my

12   purpose is or what my -- what -- what I achieved.  And

13   whether it's correct or not, I think has no bearing.

14        Q    Well, a student -- this hypothetical

15   student -- down the road who believed in the pathology

16   theory that we discussed, would, by definition, not

17   believe, I take it, that members of one race should

18   attempt to treat others without respect to their race.

19   He would --

20        A    I think you're making a lot of assumptions

21   there.  We don't know.  You know, if we are using --

22   we'll use a real person.  If we are using Richard

23   Spencer, right, Richard Spencer says, "We should treat

24   every race as respectful," and so on and so forth, but

25   he would be -- I'm speculating on this.  He would be of

Robert Cassanello
August 05, 2022

                                                    Page 178
1   the opinion that, you know, African Americans, as a

2   lesser race of people, you know, would represent, you

3   know, the kind of pathology that we are talking about

4   and would not be someone who would be so inclined to

5   support efforts to, say, truly integrate American public

6   schools.

7        Q    Right.

8        A    And I think he does it in a very respectful

9   way.  He wears a suit and tie.  He doesn't use the word

10  racism.  He uses racialist.  And someone like him would

11  take offense, you know, to some of this material, I

12  would think.

13       Q    Let's move on to -- let's move on to concept

14  number 5.

15       A    Concept number 5.

16            MR. DeMAGGIO:  Can I run to the bathroom

17       before we do that?

18            MR. COOPER:  Yeah.  Sure.  Let's take ten

19       minutes or so.

20            (Recess taken 3:17 p.m. until 3:24 p.m.)

21            MR. COOPER:  Back on the record.

22  BY MR. COOPER:

23       Q    All right.  I want to call your attention to

24  concept number 5 in HB7.  That concept reads: "A person,

25  by virtue of his or her race, color, national origin, or

Robert Cassanello
August 05, 2022

1    sex bears responsibility for, or should be discriminated

2    against or receive adverse treatment because of, actions

3    committed in the past by other members of the same race,

4    color, national origin, or sex."

5            So, Dr. Cassanello, do you believe that a

6    person by virtue of his or her race bears responsibility

7    for or should be discriminated against or receive

8    adverse treatment because of actions committed in the

9    past by other members of the same race?

10   A    No.

11   Q    Okay.  In fact, in paragraph 20 of your

12   declaration -- we can take a quick look at that -- you

13   say in that first sentence, "I would not instruct a

14   student, for example, that they bear personal

15   responsibility for a lynching committed in the past."

16           So that's just, I take it, an example of --

17   A    Sure.

18   Q    And so why wouldn't you instruct the student

19   in one of your classes that they bear personal

20   responsibility for that kind of lynching in the past?

21   A    Why wouldn't I?

22   Q    Yes.  Why wouldn't you?

23   A    I think that would be irresponsible teaching.

24   That could be something that could result in academic

25   misconduct.

Robert Cassanello
August 05, 2022

1        Q    Okay.  And let me just -- to fill this out:
2    Would you instruct that same student that they should be
3    discriminated against or receive adverse treatment
4    because of that lynching or some such other thing that
5    was committed in the past by other members of that
6    student's same race?
7        A    No.  I would not.
8        Q    So this -- this concept number 5 --
9        A    Uh-huh.
10       Q    -- I think goes hand in hand with number 7.
11   So why don't we jump --
12       A    Actually, can we stay on 5?
13       Q    Yes, of course.
14       A    Because I think you're missing a nuance here.
15       Q    Please.  I don't want to do that, so...
16       A    Great.  Great.  So I used the example of
17   lynching here.  That's a pretty historically remote
18   example.  Right?
19       Q    Yes.
20       A    So my concern with number 5 would be if I were
21   teaching or had my students reading things about white
22   flight -- some of the desegregation issues we talked
23   about -- because that has a much more immediate or a
24   student could interpret that, let's say, construe that
25   -- has a much more immediate responsibility than

Robert Cassanello
August 05, 2022

Page 181

```
 1   lynching that might have taken place 100 years ago.
 2   Right?  So they could look at themselves and say, "Oh, I
 3   live in the suburbs so all of this stuff about white
 4   flight and problems with white flight I might have some
 5   personal responsibility to that."
 6              Now, I wouldn't teach that.  I would, you
 7   know, definitely expect that students wouldn't come away
 8   from a lesson on that with that sort of opinion, but I
 9   think that if one were so inclined -- a student, on the
10   street, Sabatini -- they can walk away with that sort of
11   interpretation of what I'm doing with that specific
12   lesson.
13      Q    Okay.  And I think this may get to your
14   description of a student's possible reaction to that
15   lesson about the more recent, kind of, racial
16   controversy relating to busing and white flight that the
17   student's reaction may be something you describe in
18   paragraph 20 --
19      A    Uh-huh.
20      Q    -- of your --
21      A    Uh-huh.
22      Q    -- of your declaration when you -- beyond the
23   first sentence, which we just referenced with respect to
24   lynching you go to say, "However, I have no control over
25   how students will interpret the particular lesson."
```

Robert Cassanello
August 05, 2022

Page 182

```
 1       A     Uh-huh.
 2       Q     "Psychological distress, anguish, or a feeling
 3  of personal responsibility to correct injustices is
 4  often a natural response when students learn the role
 5  that events during Jim Crow and The Civil Rights
 6  Movement impacted those students' socioeconomic status."
 7       A     Sure.
 8       Q     Okay.  Well -- and -- and that -- that
 9  particular --
10       A     Can I qualify some of that?  Do you mind?
11       Q     Qualify your --
12       A     What you just read.
13       Q     Yes.
14       A     So the reason I used the term "natural
15  response" is because over the years I have seen students
16  who internalize lessons, especially lessons on Jim Crow,
17  The Civil Rights Movement, and stuff I've taught over
18  the years.  So, to me -- and I'm using the term "natural
19  response" in an anecdotal way from what I've seen
20  students -- how I've seen students internalize these
21  lessons and say, "Hey, I" -- you know, "I'm a person" --
22  you know, I don't know they -- I don't recall
23  specifically how they might articulate it but it could
24  be, you know, "I lived in suburbs and I went to a
25  private school."  And, you know, then they start kind of
```

Robert Cassanello
August 05, 2022

Page 183

```
 1   unpacking all this stuff.  Right?
 2       Q     Uh-huh.
 3       A     And so forth ones who -- and, again, over
 4   years I have seen this.  For the ones who approach me --
 5   say after class or something -- you know, I will talk to
 6   them about that, and, sort of, talk them off the ledge,
 7   if you will.  And just say, "Hey, this is history.
 8   Let's" -- you know, and I will speak to them, but I
 9   guarantee you there are students who don't approach me
10   after probably and who might harbor those feelings.  And
11   if they are so inclined, you know, to interpret this
12   stuff this way, I can see them also lashing out and
13   saying, "Well, Professor Cassanello made me feel this
14   way."  And that's, you know...
15       Q     But the ones who -- and you have had this
16   actually happen, I take it --
17       A     Uh-huh.
18       Q     -- you're saying --
19       A     Uh-huh.
20       Q     -- where students do feel this psychological
21   anguish --
22       A     Uh-huh.
23       Q     -- in light of a lesson and come to you,
24   but -- and you've -- you know, what is it that you say
25   to them?
```

Robert Cassanello
August 05, 2022

                                                          Page 184

1        A    I mean, it depends situationally, you know,

2   what they communicate to me, but usually --

3        Q    Talk about the ledge.

4        A    The ledge.  Sure.  Sure.  So usually it -- it

5   brings forth -- like I said, what I notice is an

6   internal psychological anguish.  Right?  And so I try

7   and get them to -- to undo that, if you will.  "Let's

8   not internalize this.  Let's not make this about you.

9   Let's learn about history so that, you know, we can take

10  lessons from this."  And, you know, "Learning about the

11  history about people might make you a much more

12  empathetic person and that's what you might want to be

13  going forward.  And that maybe is the lesson you learned

14  out of all of that.  That might be something I would

15  say.

16       Q    Sure.  But your concern is for the students --

17       A    That don't talk to me.

18       Q    -- that don't and who may feel the same

19  reaction?

20       A    Because I think -- yeah.  I personally think

21  it might be, you know, more often the case than not.

22       Q    Uh-huh.

23       A    You know.  It depends if a student feels

24  comfortable talking to you, if a student feels they are

25  in a place where they can tell you about how they

Robert Cassanello
August 05, 2022

Page 185

1  emotionally feel.  You know.  You might find it hard to

2  believe, I'm not the most cuddly professor on campus and

3  so a lot of students feel intimidated to talk to their

4  professors.  So I would imagine there's a lot of

5  students who keep this stuff inside.

6      Q    Okay.  So let's move on to concept number 8.

7      A    We're going to be here till 7:00.

8      Q    Huh?

9      A    We're going to be here till 7:00.

10     Q    Why do you say that?

11     A    Concept 8.

12          MR. DeMAGGIO:  It's the last one.

13     A    It's what's in there -- what's in there is, I

14  think, is going --

15  BY MR. COOPER:

16     Q    Okay.  Well --

17     A    We'll see.

18     Q    All right.  Well, concept 8 reads as follows:

19  "Such virtues as merit, excellence, hard work, fairness,

20  neutrality, objectivity, and racial colorblindness are

21  racist or sexist, or were created by members of a

22  particular race, color, national origin, or sex to

23  oppress members of another race, color, national origin,

24  or sex."

25          So, first of all, Dr. Cassanello, do you

Robert Cassanello
August 05, 2022

1    believe that these concepts that are ticked off here --

2    merit, excellence, hard work, and the rest of them -- do

3    you believe those are virtues as they are characterized

4    in the statute?

5        A    Just as a base definition?

6        Q    Yes.

7        A    Yes.

8        Q    Do you believe that those virtues, then --

9    just using that as a base definition -- those virtues or

10   any of them are racist?

11       A    I can't answer that question because it

12   depends on the instruments and the people who are

13   measuring all those categories.  So my answer would be

14   they could be.  Inherently they may not be, but they

15   could be.

16       Q    Give me an example of -- of a concept that

17   could be racist in its -- in its use.

18       A    Use this?

19       Q    Yeah.

20       A    Well, it's not the concept.  It's the one who

21   employs the concept.  Right?  So what you're assuming is

22   if one, you know, faithfully deploys each of these

23   concepts, right, the outcome will be fairness.  Right?

24   My argument would be that would depend on the person

25   employing the concept.  If the person employing the

Robert Cassanello
August 05, 2022

Page 187

1    concept is racist, is not colorblind, sexist, what have

2    you -- any of these categories or more -- then I think

3    it doesn't matter whether those concepts in and of

4    themselves are truly virtuous.

5         Q    So they -- they can be used -- would it be

6    fair to say -- or is it fair for me to understand your

7    point here that these concepts could be used as pretexts

8    for racist actions?

9         A    I think racist would point to these things and

10   claim some cloak of objectivity, if you will, and make

11   the case that their actions did not violate any of these

12   principles.

13        Q    Okay.

14        A    But, again, it would depend on the person.  It

15   would depend on the tool, if you will.

16        Q    Well -- and let's -- I think it may be helpful

17   to my understanding anyway if we refer to your

18   declaration --

19        A    Okay.

20        Q    -- when you mentioned a couple of these

21   things.  Let's go to paragraph 14.

22        A    14?

23        Q    Now, first of all, recall that in paragraph 14

24   you were referring to the Wages of Whiteness text, which

25   you describe in paragraph 13.

Robert Cassanello
August 05, 2022

```
 1       A     Uh-huh.

 2       Q     Is that -- as you look at that; is that

 3   correct?

 4       A     I believe that's correct.

 5       Q     In paragraph 13 you talk about the Wages of

 6   Whiteness.

 7             In paragraph 14 you say that -- you say,

 8   "HB7's prohibition on advocating the racial connotations

 9   of the concepts of merit and hard work..."

10       A     Uh-huh.

11       Q     And then I'm going to skip over the next

12   because we have already discussed that concept.

13       A     Sure.

14       Q     "...of merit and hard work would restrict my

15   ability to offer instruction on this text."

16             "This text" being the Wages of Whiteness.

17       A     Sure.

18       Q     So now, reflecting back upon what you have

19   already said about these virtues as being potentially

20   racist --

21       A     It could.

22       Q     -- if that's a fair point.

23       A     Sure.

24       Q     What do you mean when you say "prohibition on

25   advocating the racial connotations of the concepts of
```

Robert Cassanello
August 05, 2022

Page 189

1    merit and hard work," racial connotations?

2        A    That I recall, the context of 14, you're

3    right.  It's centered around Wages of Whiteness.  So I

4    believe what I was doing there was trying to present

5    those concepts within concepts of the history of work

6    and labor in the labor movement.  You know.  And,

7    clearly, Roediger's book -- you know, those virtues that

8    we mentioned have no role in -- I'm not saying no role,

9    but have limited role in whether someone can achieve

10   social mobility in 19th century America.

11            But if I were to kind of revise this, I would

12   maybe move that paragraph below 15 and include both

13   texts because I think the desegregation questions and

14   white flight, and all this other kind of stuff, too,

15   probably runs into what I'm saying in 14.

16       Q    Okay.  So how -- well, just keeping the focus

17   for a moment now on the Wage of Whiteness text.  What in

18   this text in busing -- excuse me, Wages of Whiteness --

19   would contradict the proposition that -- or maybe -- let

20   me rephrase that.

21            What in the Wages of Whiteness would endorse

22   the proposition that merit and hard work are racist or

23   that they were created by members of a particular race

24   to oppress members of another race?

25       A    I would say it this way, if we are talking

Robert Cassanello
August 05, 2022

Page 190

```
 1   about Wages of Whiteness.  Right?  What Wages of

 2   Whiteness does is introduce the ways in which the person

 3   or the instrument, right, is inherently racist.  Right?

 4   The whiteness.  And they are using concepts of merit,

 5   excellence, hard work, fairness, neutrality, objectivity

 6   -- I don't know that I would go so far as

 7   colorblindness, but all of those other things to say --

 8   to defend the racial outcomes that are their intent.

 9            So this is an example of where we have the

10   people who are employing the virtues of merit and so on

11   and so forth, but their intent is not to truly create a

12   system of those virtues.  It's something different, but

13   employ those virtues to cover what their real intent is.

14       Q    To cover.  They are offered as, essentially, a

15   pretext for racism or racial --

16       A    Right.

17       Q    -- discrimination, if you will, or --

18       A    National origin, too -- national origin with

19   the labor movement because the Irish and German --

20       Q    The Irish.

21       A    -- were probably not treated equally too.

22       Q    And so those -- that example from the Wage of

23   Whiteness with respect to the 19th century labor

24   movement is one in which these virtues have been -- I

25   think, to use your phrasing -- used really to cover
```

Robert Cassanello
August 05, 2022

Page 191

1     racist actions.  Is that a fair understanding of what
2     you mean?
3          A    I think I did say that, but I don't know if
4     "cover" is the accurate word.  Right?  Because they
5     would have had the intent to be racist, and they would
6     have seen nothing wrong with being racist, so it wasn't
7     for them a moral failing.  So I don't know that "cover"
8     really -- I know I said that, but I don't know that
9     "cover" really explains things more.  They use -- they
10    sort of racialize the notion of merit and colorblindness
11    and so on and so forth to achieve a racist goal, which
12    is inherently not those things.
13         Q    And you -- you express the concern that this
14    concept, number 8, would restrict your ability to offer
15    instruction on Wage of Whiteness.  And I think you have
16    now added Why Busing Failed to that concern.
17         A    Sure.
18         Q    Does this get back to the Sabatini --
19         A    Uh-huh.
20         Q    -- dialogue?
21         A    Certainly.  Certainly.  Because it's related
22    to the earlier point about, you know, sort of, natural
23    psychological distress, if you will.  Right?  Because
24    this also kind of rolls with my personal responsibility
25    for this system.  You know.  And if you're talking about

Robert Cassanello
August 05, 2022

Page 192

```
 1    busing, it's certainly much more recent to those
 2    students individually.  Right?  And then they might feel
 3    anguish because they might question whether, "Well, did
 4    I get here because of merit?  Did I get here because of
 5    fairness?"  And it could cause some psychological
 6    distress to that individual.
 7        Q    Well, further to this point, or to this issue,
 8    let's take a look at paragraph 9 of your declaration,
 9    which you address the Bell Curve.
10        A    Uh-huh.
11        Q    Paragraph 9 reads: "An example of a
12    discredited interpretative lens in the area that this
13    law regulates is the concept of the bell curve."
14             Now, there was a book by Richard Herrnstein
15    and Charles Murray -- and I very well remember when this
16    book came out --
17        A    So do I.
18        Q    -- and the controversy that erupted around the
19    book.
20        A    Continues to erupt currently.
21        Q    Well, I'm sure it hasn't -- it hasn't
22    dissipated a lot.  Maybe only increased.  But when you
23    refer to the Bell Curve, are you referring to this book
24    specifically or to the basic theory?  Or what does this
25    book, if anything, have to do --
```

Robert Cassanello
August 05, 2022

Page 193

```
 1      A    Sure.
 2      Q    -- with your reference here to the concept of
 3   the Bell Curve --
 4      A    Uh-huh.
 5      Q    -- which you don't really --
 6      A    I don't have it in quotes or --
 7      Q    -- identifies --
 8      A    -- italics of the book.  I get what you're
 9   saying.
10      Q    Yeah.
11      A    So, yeah.  That's -- I think that's accurate.
12   I'm trying to express the notion of the bell curve more
13   so than the book itself.  So I think what the Bell Curve
14   does is it introduces -- it's been a while since I read
15   the Bell Curve.  I read it when it came out.  I haven't
16   read it recently.  But it expresses -- I guess to be
17   most accurate -- a question about whether genetics and
18   intelligence can be correlated to race.  Right?
19   There's, like, a chapter in there, essentially, that
20   maps that whole thing out.  And since that book got
21   published there have been people, including Charles
22   Murray -- his work since -- at least his recent work --
23   has been trying to make that connection of race and
24   intellectual -- intellectual correlation of race.  It is
25   more recent work that he's done.
```

Robert Cassanello
August 05, 2022

```
 1              And so when I'm using that term, I'm trying to

 2     employ the idea of people trying to promote a biological

 3     distinction to race that can explain what they would

 4     refer to as intelligence of different ethnic groups.

 5        Q    Innate intelligence of --

 6        A    Yes.  That's very good.  Right.

 7        Q    In what way does Herrnstein and Murray or, you

 8     know, any theorist that embraces the thesis that you

 9     describe --

10        A    Sure.

11        Q    -- as the Bell Curve -- in what way do they --

12     in what way does merit or excellence, hard work, the

13     other virtues in concept 8 relate to that thesis?

14        A    Uh-huh.

15        Q    Innate intelligence --

16        A    Sure.

17        Q    -- is not, you know --

18        A    Sure.

19        Q    -- merit.  It's not excellence.  It's not hard

20     work.  It is a --

21        A    Right.

22        Q    -- personal --

23        A    It's more like what's not in here, if you

24     will.

25        Q    Okay.
```

Robert Cassanello
August 05, 2022

1    A    Okay.  So it's more like -- the Bell Curve,

2    broadly speaking.  Right?  The Bell Curve gives a

3    impetus to the argument that there's no point in trying

4    to create any equity between the races, if you will, in

5    their parlance, because Black people are inherently

6    intellectually inferior to white people.  So what's the

7    point in trying to create opportunities at equity?

8    Right?  So in that context, a person of that opinion,

9    right, would go on to say that, you know, this country

10   and the education system is inherently a system of

11   merit, of excellence, hard work, fairness, neutrality,

12   objectivity.  The problems and disparities we are seeing

13   with desegregation -- the issues related around

14   desegregation -- is purely pathology inherent to the

15   biology of the African American.

16   **Q    And when you use the word "equity," what does**

17   **that mean, or what does that entail?**

18   A    Equity is creating -- creating, sort of, a

19   level playing field, if you will, based on accounting

20   for -- if we are using the Jim Crow context -- historic

21   discrimination.

22   **Q    So would you say, then -- is it fair for me to**

23   **say that the proponents of the Bell Curve theory --**

24   A    Uh-huh.

25   **Q    -- of innate intelligence, if you will, and**

Robert Cassanello
August 05, 2022

1    differences that are --

2         A     Biological.

3         Q     -- biological among races --

4         A     Uh-huh.

5         Q     -- biological races -- that the virtues listed

6    in concept 8 are -- are racist?  They are used by the

7    proponents of the Bell Curve for a racist purpose or --

8         A     I don't know, because then I have to think

9    about intent.  I don't know the intent of the authors.

10   But if we put it, you know -- make it a -- I was going

11   to make it analogous to Wages and Whiteness, but I don't

12   think it's a good analogy.  So I don't -- I don't know

13   what the intent of the Bell Curve folks are, as far as

14   using the term -- using these concepts.  Right?  But I

15   think it might be along the lines of these authors

16   operate under the assumption that, you know, racial

17   discrimination and any, you know, legacy left over from

18   Jim Crow and so on and so forth has in absolute terms no

19   bearing on intelligence.  And I think that's what they

20   and others since them try and get at.

21        Q     And you disagree with those propositions?

22        A     Yes.

23        Q     You say in paragraph 10 that "HB7 restricts my

24   ability to explain the bell curve's failings to

25   students."

Robert Cassanello
August 05, 2022

Page 197

1          So you obviously disagree with the thesis of

2    the Bell Curve?

3      A    Sure.

4      Q    And you characterize it in paragraph 9, in

5    fact, as junk science.

6      A    Uh-huh.

7      Q    And you say that "Historians and social

8    science generally consider the Bell Curve to be junk

9    science."

10          What is junk science?  What do you mean?

11      A    Sure.  Junk science is the pursuit of what is

12    usually characterized as, sort of, scientific methods

13    that aren't very scientific or sound.  Right?  And --

14    and an example of that, sort of -- if we go back to

15    early conversation was this idea of having thesis before

16    the research.  Right?  So pursuing that, even though it

17    methodologically might be sound scientifically on -- the

18    face of it might appear systematic, you know, if it's

19    pursued in a way that's not -- the word escapes me.

20      Q    Honest?

21      A    No.  I wouldn't say "honest."  Again, I don't

22    know --

23          MR. DeMAGGIO:  Generally accepted principles?

24      A    Generally accepted is --

25

Robert Cassanello
August 05, 2022

 1  BY MR. COOPER:

 2      Q      Rigorous?

 3      A      Rigorous maybe.  That's a good word.  Not as

 4  rigorous.  Not questioning yourself, you know, in how

 5  you're pursuing this, that could result in junk science,

 6  I think.  You know, like, junk science could also be my

 7  example with Time on the Cross.  Right?  It's like they

 8  are going to get all these stats.  They're

 9  mathematicians and they're going to do all this stuff.

10  And it's like that might be great.  It might technically

11  be mathematically sound, but is it producing, you know,

12  history?  Is it producing what they think?  I know this

13  is not history.  Was it producing what they think

14  they're producing?  So, sort of, that would be akin to,

15  like, junk science.

16      Q      You -- in that same sentence where you talk

17  about the Bell Curve to be junk science, you say, "And

18  socioeconomic disparities are determined by a wide range

19  of societal factors outside a person's control than a

20  person's innate intelligence."

21          What are the societal factors that you have in

22  mind there -- you are referring to -- that are outside

23  of a person's control that determines socioeconomic

24  disparities?

25      A      Well, I think -- maybe I wrote it in a way

Robert Cassanello
August 05, 2022

Page 199

1    that's not coherent, but --

2         Q    It's the last sentence of paragraph --

3         A    I think it's a socioeconomic --

4         Q    If you want to read it in its full context --

5    and I just read this, that snippet -- but it's the last

6    sentence of paragraph 9.

7         A    Right.  So these societal factors, I think,

8    are socioeconomic disparities.  Right?  And so, for

9    example, you know, if a person grows up in poverty.

10   Right?  And they grow up in a school district that -- I

11   forget the term for it -- a majority of the students are

12   one free and reduced lunch, or whatever it is that those

13   categories are.  You know.  Then they are in a school

14   system where there's no AP classes.  There's no advanced

15   classes.  And the teachers are cycled in and out, and

16   many of them might be temporary.  Many of them might be

17   substitutes -- versus someone who is going to school,

18   say, in the suburbs where, you know, the school -- the

19   school system might be -- in this state we have, like,

20   grade categories:  A school system, B school system, C

21   school system.  I think that has more impact on

22   achievement outcomes than innate intellectual ability in

23   my opinion.

24        Q    Okay.  Well, let me ask this:  Again, the

25   phrase that we are examining here is "and socioeconomic

Robert Cassanello
August 05, 2022

Page 200

1    disparities are determined by a wide range of societal

2    factors outside a person's control than a person's

3    innate intelligence."

4           Are there factors that are within a person's

5    control that contribute to a person's socioeconomic

6    status, if you will, their out -- those outcomes --

7    A    Or their ability for social mobility?  Maybe

8    that might be the better way to think about that.

9    Q    Whatever personal -- whatever factors that are

10   personal to an individual that may be within their

11   control.  Their innate intelligence is not within their

12   control, right?

13   A    Sure.

14   Q    And the -- and, you know, where their

15   socioeconomic circumstance that they grow up in, as you

16   have mentioned, that's --

17   A    Uh-huh.

18   Q    You know, you're either blessed or not --

19   A    Sure.  Sure.

20   Q    -- with --

21   A    You're either in the right ZIP code or you're

22   not.

23   Q    Or you're not.  So that's not within your

24   control.  But are there some factors that are within a

25   person's control that help to contribute to determine

Robert Cassanello
August 05, 2022

 1    socioeconomic outcome?

 2        A    There can be.  Again, this is, you know -- it

 3    depends on individual examples and individual examples

 4    are not what makes the bell curve.  It's about groups.

 5    It's about categorizing people by categories of race,

 6    but certainly there's -- you know, depending on the

 7    person -- you know, there are certainly things that

 8    account for an individual's determination, if you will.

 9        Q    Uh-huh.

10        A    A parent's determination in, you know, taking

11    what is a bad situation and making that better.  That's

12    within people's controls.  It can be.  But, you know,

13    the forces that are constricting those kinds of things,

14    I think, are greater than -- than people have the

15    opportunity to express them, let's say.

16        Q    **But there are examples and they cut across all**

17    **races of individuals who do rise, quote, above their**

18    **circumstances?**

19        A    Sure.

20        Q    **And -- and some of these virtues that are**

21    **identified, things like, I would say, hard work.**

22        A    Uh-huh.

23        Q    **I'm sure you have students in your class who**

24    **work very hard to excel and some who --**

25        A    Sure.

Robert Cassanello
August 05, 2022

Page 202

1        Q     -- who don't.

2        A     Sure.

3        Q     And that would just seem to me -- certainly in

4    my own experience -- to contribute to how well they do

5    in your class, for example?

6        A     Sure.

7        Q     In your paragraph 10 you say, "HB7 restricts

8    my ability to explain the bell curve's failings to

9    students since it prohibits me from instructing students

10   that" -- and then you quote concept number 8 -- "'such

11   virtues as merit, excellence, hard work, fairness,

12   neutrality, objectivity, and racial colorblindness are

13   racist or sexist, or were created by members of a

14   particular race, color, national origin, or sex to

15   oppress members of another race, color, national origin,

16   or sex.'"

17       A     Uh-huh.

18       Q     Now, what in this prohibition of teaching or

19   espousing this concept number 8 --

20       A     Uh-huh.

21       Q     -- would prevent you from explaining the Bell

22   Curve's failings that you have now just explained to me

23   to students in your class?

24       A     Sure.  So I would have to companion that with

25   Wages of Whiteness.  And when I say Wages of Whiteness,

Robert Cassanello
August 05, 2022

Page 203

1    I also mean all of the literature that came about

2    because of Wages of Whiteness.  I'm including that, you

3    know, if you will, Wages of Whiteness in the same way

4    the Bell Curve book and then its followers, if you will.

5         Q    Uh-huh.

6         A    So, you know, I think that history and those

7    works -- some directly related and otherwise -- really

8    kind of question whether merit, excellence, hard work,

9    fairness, so on and so forth, are really what determines

10   one's success as opposed to, you know, systems of racial

11   preference or privilege.

12        Q    They -- they question how it -- how do they

13   question?

14        A    Well, you know, again, if we take either book.

15   Right?  So if we take Why Busing Failed, right, he

16   discusses white flight, right, and the role white flight

17   played in the -- any attempt to kind of thwart

18   meaningful integration.  Right?  Because the suburbs

19   happened by his estimation.  White schools.  And same

20   thing with the Wages of Whiteness, obviously, except in

21   the workplace in the 19th century.

22             And so I think those concepts would introduce

23   students to, you know, a system of achievement that's

24   explained as meritous [sic], right, and some of the

25   other words, but according to these authors inherently

Robert Cassanello
August 05, 2022

Page 204

1   is not.  So I can see going over this material.  I might

2   have a student who might be steeped in the Bell Curve, I

3   would say, who then would say, "Wait a second.  This is

4   how I see things."

5           If I say, "Well, you know, these are the

6   reasons I think the Bell Curve is not an effective

7   argument."  Right?  I can just leave at that and that

8   student might say, "You're violating HB7" and interpret,

9   you know, my engagement has me admonishing him or her.

10          Can I say a Bell Curve story real quick?  I'd

11  like to get it on the record, if I could.

12      Q    Okay.  Sure.

13      A    I had a student one time come to my office

14  with the Bell Curve.  It was maybe eight or nine years

15  ago.

16          MR. DeMAGGIO:  With the book?

17      A    With the book in her hand -- in her hand.

18  Came by my office and was, like, "A professor gave this

19  to me and told me it's a great book and I should read

20  it.  And he had about 15 copies of it in the office that

21  he said he gives the students when they come by and see

22  him."

23          And I go, "Really?"

24          She never told me the name of the professor. I

25  didn't ask.

Robert Cassanello
August 05, 2022

Page 205

```
 1              And I said, "What class were you taking?"  I
 2    was thinking, were you taking sociology, anthropology?
 3    I don't think a history class...
 4              She said, "No.  I was taking a class on
 5    optics.
 6              "So your optics professor is assigning the
 7    Bell Curve and telling you that the Bell Curve and the
 8    science is based on something you should read?"
 9              I think she showed it to me because she knew
10    my inclination, if you will.  And said, "Look at this."
11              So the Bell Curve -- that's why I brought the
12    Bell Curve as -- not so much the book, but the thing --
13    because it is something, you know -- I think it's
14    something I see on UCF campus.
15    BY MR. COOPER:
16         Q    Okay.
17         A    I know these other professors are addressing
18    that, whether it's appropriate or not in their own
19    classes.  Right?
20         Q    They are addressing it --
21         A    I'm assuming the optics professor is -- I
22    don't know what optics has to do with the Bell Curve.
23    If you can tell me that, I will learn something from
24    you.
25         Q    I certainly don't, either.  And I'm not even
```

Robert Cassanello
August 05, 2022

Page 206

 1   sure I know what an optics class is.

 2       A    That's like --

 3            MR. NEWHALL:  The eye, optics.

 4       A    The biology of the eye or something.

 5            MR. DeMAGGIO:  Oh, really?

 6   BY MR. COOPER:

 7       Q    Okay.  Getting real close here.

 8       A    Sure.

 9       Q    Real close.

10       A    I'm about to order takeout, if you don't get

11   us out of here by 5:00.

12       Q    I will do that.  I want to -- I want to hand

13   you --

14       A    A tweet?

15       Q    Yes.  A tweet that, at least I think, you may

16   have authored.

17       A    I did author that.  I believe that.

18       Q    Well, I just want to ask you to explain that

19   belief.

20            MR. COOPER:  And we will mark that an exhibit

21       as well.

22            (Defendants' Exhibit 8 was marked for

23            identification.)

24       A    Sure.  Sure.

25

1    BY MR. COOPER:

2        Q    For the purposes of the record the tweet

3    reads: "I think the history profession needs to get

4    behind abolishing civics education as it is a pernicious

5    vehicle for promoting nationalism and patriotism.  We

6    should support an education movement to teach a

7    curriculum that introduces universal human empathy and

8    understanding instead."

9        A    Isn't that a beautiful sentiment?

10        Q    It's two sentences.

11        A    I said "sentiment," not "sentence."

12        Q    Oh.  Sentiment.

13        A    Sentiment.

14        Q    Well, let's start with civics education.

15        A    Sure.

16        Q    What is civics education?

17        A    Sure.  So if you don't mind, I can explain

18    some context for this?

19        Q    Of course.  Please.

20        A    So years and years ago -- I would say this

21    would have been around 2010 -- I attended a conference

22    that was -- I think it was in Tallahassee -- a history

23    conference.  And at the time there was a big push in

24    this state around the country for STEM education.

25    Right?

Robert Cassanello
August 05, 2022

Page 208

1      Q      STEM?

2      A      STEM.  Right.

3             MR. COOPER:  STEM being -- for the reporter --

4      S-T-E-M all caps.

5      A      Right.

6   BY MR. COOPER:

7      Q      It's an acronym for science --

8      A      Science, technology, engineering, and math, I

9   believe.  Don't quote me.

10     Q      I think that's right.

11     A      Okay.  So there was a history professor at the

12  conference who was organizing a movement, if you will,

13  right, for civics education in the state of Florida,

14  making it a requirement compulsory for K through 12,

15  that would also accompany a test of civics education.

16  And so at this conference, you know, he was one of the

17  organizers of the conference so we were all kind of

18  captive audience -- 100 or so historians in the same

19  room.  He pitched this idea and said, "I want everyone

20  to sign off on this and to sign this petition."

21             And you might take some assurance from this: I

22  was the only one who protested.  And I said, "I think

23  this is an awful idea."  I said, "We need history to be

24  under the radar of the legislature."  Because if history

25  has the attention of the legislature, they tend to muck

Robert Cassanello
August 05, 2022

Page 209

 1   it up.  And I can go into detail if you want that later.

 2            But I had concerns that if civics rose to the

 3   level of being tested, rose to the level of attention by

 4   the Florida legislature, that it would not be a field

 5   that pursued critical thinking, but instead be something

 6   that would promote American nationalism or patriotism.

 7   And this article that I linked to in the Atlantic sort

 8   of mentioned that that is sort of happening around the

 9   country.

10            So the reason I wrote this and posted this is

11   because I was kind of recalling that 2019 conference and

12   all that stuff and I just said to myself, "Years from

13   now this is successful," and it was successful.  You

14   know, we are going to be in this position where students

15   in the K through 12 system are just being fed

16   nationalism and patriotism as opposed to opportunities

17   towards critical thinking, empathy, or understanding, if

18   you will.

19        Q    Excuse me.  I'm sorry.  When you use the word

20   "patriotism," what does that -- what does that embrace?

21   I mean --

22        A    Patriotism, I believe, embraces an uncritical

23   allegiance, a feeling of defense of one's nation, or,

24   you know, body politic, if it's not a nation.

25        Q    Well, is patriotism itself a bad thing?

Robert Cassanello
August 05, 2022

1      A      Again, this would be a depends argument.

2   Right?

3      **Q      Yeah.**

4      A      So, I mean, if, you know, someone wants to fly

5   a cross outside of their property, you know, which I see

6   in my neighborhood all the time or -- there's a flag

7   here.  I don't have a problem with that at all.  What

8   the State of Florida does, which I have a problem with,

9   they have embedded in the civics curriculum things that,

10  I think, teachers should have the freedom to debate with

11  the students.

12          For example -- and this actually predates 2010

13  conference I mentioned.  This goes back to, like, I

14  think, 2007, maybe 2006.  But the state legislature

15  created a whole set of social studies curriculum

16  guidelines that, you know, students should walk away

17  with the, quote, unquote, genius of the free market

18  system.  Right?

19          The Declaration of Independence and U.S.

20  Constitution wholly has progenitors of, you know,

21  democracy around the world or something like that.

22          And so, like, these things to me were written

23  within the context of promoting nationalism and

24  patriotism as opposed to trying to introduce the

25  students to history, if you will.  Certainly isn't

Robert Cassanello
August 05, 2022

Page 211

```
 1    something I would do in my classes.  Right?

 2             And so this is what I was sort of worried

 3    about.  And, you know, in 2006 or 2007, right, when

 4    these concepts were introduced and the legislature was

 5    telling K through 12 social studies teachers, "You must

 6    teach these concepts that promote nationalism and

 7    patriotism," and so on and so forth.  Stuff wasn't

 8    tested, you know, at the time.  So an individual -- not

 9    really K through 12, but mostly high school.  That's

10    where they teach U.S. history, I believe.  High school

11    teachers have a great deal of discretion of how this was

12    taught.  It wasn't sort of -- there wasn't a monitoring,

13    you know, of this kind of stuff.

14             And my concern in 2010 -- this would be after

15    that -- 2010 was that if you put this and test this,

16    it's going to be monitored.  And it's going to, in fact,

17    be this and not civics education.  That was my concern.

18    But I can probably say with some certainty I'm in the

19    minority of that position.  I'm aware.

20         Q    Well --

21         A    I don't think there's any, like -- there's

22    four "likes" on this tweet, so it wasn't very popular.

23         Q    How --

24         A    You weren't one of the four, were you?  I

25    don't think you were.
```

Robert Cassanello
August 05, 2022

Page 212

1       Q    How -- what in your conception is an

2   appropriate civics education?

3       A    You know, I don't know.  I don't know that I'm

4   qualified to answer that question.  I think there's

5   something -- there's some people who promote a civics

6   education that -- or a curriculum, I should say -- that

7   is guided towards productive citizenship, you know,

8   teaching students about the concept of voting.  How do

9   you vote?  Why is voting important as opposed to vote

10  for this, vote for that?  You know.  Why is voting so

11  central to being an American citizen?  To be a citizen

12  of your community?  You know.  Understanding the text of

13  the Declaration of Independence, the Constitution.  I

14  don't in and of itself have a problem with, but when the

15  spin on it is "These are inherently genius documents

16  that you must hold, you know, sacrosanct," I think that

17  is kind of skewing the history.  Since the Constitution

18  in its original form, you know, established the system

19  of American slavery.  And to call that the wellspring of

20  democracy, I think, is problematic.  It's going to

21  confuse a lot of students, especially if they end up

22  going to college and they learn about slavery.

23           So to answer your question, yes.  I think

24  there is a civics curriculum.  I have seen that.  I

25  think it's beneficial, but I don't know that I have seen

Robert Cassanello
August 05, 2022

Page 213

1    that civics curriculum ever implemented.  I have only

2    seen the nationalism and patriotism curriculum

3    implemented.

4        Q    Recently -- and I do read some news.

5        A    Okay.

6        Q    Recently I saw in the news where your -- your

7    college's -- university's administration --

8        A    At UCF?

9        Q    UCF.  I think I --

10        A    Oh, yeah.  They have a curriculum, a civics

11    curriculum.  Is that what you're mentioning?

12        Q    No.  Actually, I'm asking a different question

13    now.

14        A    Okay.

15        Q    They renamed one of the libraries on campus

16    from the Karl Marx --

17        A    No.  That was UF.  That was University of

18    Florida.

19        Q    Oh?  That was University of Florida?

20        A    Yeah.  It wasn't the library.  It was a

21    reading room.  Yeah.

22        Q    Did you weigh in on that?

23        A    Did I weigh in on that?

24        Q    Yeah.

25        A    I'm sure I -- I'm sure --

Robert Cassanello
August 05, 2022

Page 214

```
 1                MR. DeMAGGIO:  What did they change it from?
 2        Who was on it?
 3        A    No.  I don't think anybody was on it.  I'm
 4   trying to recall, because it was a while ago that I read
 5   the article.  I believe I posted the article on Twitter.
 6    I'm sure I did that.  I'm not sure if I commented on it
 7   or not.  But it was a room -- and I can't remember the
 8   student organization, but there was a student
 9   organization who advocated to have a reading room in the
10   library, and they were able to name it what they wanted
11   because I guess they raised funds for it or something
12   like that.  Right?  I imagine the student organization's
13   leftist.  Right?  Because it wasn't Groucho Marx, right?
14   BY MR. COOPER:
15        Q    It was Karl Marx.
16        A    I might do Groucho Marx because I'm tongue in
17   cheek, but... Anyway, what they did is they said, "Our
18   members" or whatever it is "want this to be the Karl
19   Marx reading room."  Then I understand it was that for
20   about a year, and then they took it down.  And that's
21   when it became a news story.  It was just the room; it
22   wasn't the library itself.
23                MR. NEWHALL:  Now known as the Cultural
24        Marxist.
25                THE WITNESS:  Room?
```

Robert Cassanello
August 05, 2022

Page 215

```
 1              MR. NEWHALL:  Yes.
 2        A    No.  They named it something else.  I don't
 3   know what they named it.
 4   BY MR. COOPER:
 5        Q    Okay.  Well, now I am seeing a tweet where --
 6   at least it seems to be ascribed to you --
 7        A    Could be.
 8        Q    "I think we need more things named after Karl
 9   Marx in this country."
10        A    Oh, yeah.  There you go.  So I did say
11   something.
12        Q    Yes.  Is that -- was that tongue in cheek, or
13   did you mean that?
14        A    You know, a lot of stuff I do is tongue in
15   cheek.  But I will say this, I do appreciate Karl Marx,
16   and I think this would be a better country if more
17   things were named after him.  In fact, in my office --
18   I'm surprised you didn't go -- you didn't go too far
19   back in my Twitter feed, because if you go further back
20   I have, like, a bust of Karl Marx in my office.  Right?
21   It's kind of funny.  Do you want to hear a funny story?
22        Q    I do.
23        A    So I have this bust -- like, bust of Karl Marx
24   in my office.  I don't know if you've seen some things,
25   but sometimes I have a long beard, a white beard.  And
```

Robert Cassanello
August 05, 2022

 1   so I can't tell you the number of students that come in

 2   my office and they look at the bust of Karl Marx, right,

 3   and they say, "Where did you get a bust of yourself?"

 4            I said, "I just got it at the store."  Right?

 5            And then I have a big cardboard cutout of Marx

 6   in my office.

 7        **Q    Most of the photos I have seen of Karl Marx,**

 8   **his beard is down to here (indicating).**

 9        A    I had -- my beard was down to here too.  You

10   probably saw it.  If you do a search for me on Google,

11   you'll see some pictures of me with my beard all the way

12   down here (indicating).

13        **Q    Would you self-identify as a Marxist?**

14        A    I mean, that's a tough question.  No.  I would

15   self-identify politically as akin to a democratic

16   socialist.  You know, like the Democratic Socialists of

17   America.  To me they most represent my views

18   politically.  I'm registered in the Democratic party.

19            As an historian, though -- again, if we use

20   the example I gave you, the Wages of Whiteness.  Right?

21   If you say, "Okay."  If you take my work and you go back

22   and you go back and you go back -- da, da, da -- all the

23   way back, you're going to end up at Marx.  But I

24   wouldn't call my work Marxism.  In fact, the problem

25   with Marxism is the same problem I have with objectivity

Robert Cassanello
August 05, 2022

Page 217

```
 1   is because Marxist has a philosophy "believe in the
 2   inherent objectivity of their theory producing
 3   verifiable truth."  That, I don't ascribe to.  So as a
 4   historian, I don't think it would be accurate to call me
 5   a Marxist, but I do acknowledge the debt intellectually
 6   I owe to Karl Marx and his writing as a social historian
 7   who believes in the ground up, bottom-up.  All that
 8   comes from Marxist thought.
 9          MR. COOPER:  Can we take five minutes?  Let
10       me --
11          THE WITNESS:  You want to go back through
12       Twitter, right?
13          MR. COOPER:  No.  Gather my thoughts.  Confer
14       with my colleagues.  Because I think we can wrap
15       this up.
16          THE WITNESS:  Okay.
17          MR. COOPER:  So if you give me five minutes
18       and a very quick bathroom break.
19          (Recess taken 4:25 p.m. until 4:30 p.m.)
20          MR. COOPER:  Okay.  Dr. Cassanello, I want to
21       thank you for your time today.  I want to thank you
22       for your good cheer and your patience with my
23       questioning all day here.
24          THE WITNESS:  You're welcome.  I'm a teacher,
25       right?  I'm here to make sure people learn.
```

Robert Cassanello
August 05, 2022

Page 218

 1        MR. COOPER:  So we appreciate that very much.

 2  And so I am done.  I have conferred with my

 3  co-counsel, neither of whom have any questions for

 4  you.  So we are done for the day.

 5        THE WITNESS:  Okay.

 6        MR. COOPER:  And many thanks for your patience

 7  and your time.

 8        MR. DeMAGGIO:  We'll read.

 9        THE STENOGRAPHER:  Are you ordering?

10        MR. COOPER:  Yes.

11        MR. DeMAGGIO:  And I will take a copy.

12      (Reading and signing of the deposition was

13  not waived by the witness.)

14      (The deposition was concluded at 4:30 p.m.)

15                   - - - - -

16

17

18

19

20

21

22

23

24

25

Robert Cassanello
August 05, 2022

Page 219

1                  CERTIFICATE OF OATH

2

3    STATE OF FLORIDA)

4    COUNTY OF ORANGE)

5              I, Donna Fontaine, Stenographic Reporter

6    and Notary Public, State of Florida, certify

7    that ROBERT CASSANELLO, Ph.D., appeared before

8    me on August 5, 2022, and was duly sworn.

9

10             Signed this 12th day of August, 2022.

11

12

13   _____
     DONNA FONTAINE, STENOGRAPHIC REPORTER
14   Notary Public, State of Florida
        at Large
15   Commission No. GG 255902
     Expiration:  November 17, 2022
16

17

18

19

20

21

22

23

24

25

Robert Cassanello
August 05, 2022

Page 220

1                     CERTIFICATE OF REPORTER

2    STATE OF FLORIDA)

3    COUNTY OF ORANGE)

4              I, DONNA FONTAINE, Stenographic Reporter and

5    Notary Public, certify that I was authorized to and did

6    stenographically report the deposition of ROBERT

7    CASSANELLO, Ph.D.; pages 1 through 218; that a review of

8    the transcript was requested; and that the transcript is

9    a true record of my stenographic notes.

10        I FURTHER CERTIFY that I am not a relative,

11   employee, or attorney, or counsel of any of the

12   parties, nor am I a relative or employee of any of the

13   parties' attorneys or counsel connected with the action,

14   nor am I financially interested in the action.

15        DATED this 12th day of August, 2022, at Orlando,

16   Orange County, Florida.

17

18

19   _____
     *Donna Fontaine*
20   DONNA FONTAINE, STENOGRAPHIC REPORTER
     Notary Public, State of Florida
         at Large
21   Commission No. GG 255902
     Expiration:  November 17, 2022
22

23

24

25

Robert Cassanello
August 05, 2022

Page 221

1                    WITNESS NOTIFICATION LETTER

2    August 12, 2022

3
     ROBERT CASSANELLO, Ph.D.
4    c/o BRYAN E. DeMAGGIO, ESQUIRE
     215 North Washington Street
5    Jacksonville, Florida 32202
     Email: bdemaggio@sheppardwhite.com
6
     In Re:  Falls, et al. vs. DeSantis, et al.
7            Deposition of: ROBERT CASSANELLO, Ph.D.
             Taken: 8/5/22
8            Job No.: 264002

9    Enclosed please find your copy of the deposition of
     ROBERT CASSANELLO, Ph.D., which was taken in the
10   above-styled cause on August 5, 2022.  Please have
     deponent execute the Errata Sheet, which can be found at
11   the back of the transcript, when reading your copy, and
     have it returned to us for distribution to all parties.
12
     If deponent does not read and sign the deposition within
13   30 days, the original, which has already been forwarded
     to the ordering attorney, may be filed with the Clerk of
14   the Court.

15   If deponent wishes to now waive signature, please have
     deponent sign his name in the blank at the bottom of
16   this letter and return to the address listed below.

17
     Very truly yours,
18

19   DONNA FONTAINE, STENOGRAPHIC REPORTER
     Phipps Reporting, Inc.
20   1551 Forum Place, Suite 200-E
     West Palm Beach, Florida 33401
21
     I do hereby waive my signature.
22
     _____
23   ROBERT CASSANELLO, Ph.D.

24

25

Robert Cassanello
August 05, 2022

Page 222

1                         ERRATA SHEET

2          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3     Falls, et al. vs. DeSantis, et al.
      Deponent:  ROBERT CASSANELLO, Ph.D.
4     Date of :  8/5/22
      Case No.:  4:22-cv-166-MW/MJF
5     Job. No.:  264002

6     PAGE    LINE          CHANGE               REASON

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    Under penalties of perjury, I declare that I have read
      the foregoing transcript of my deposition, and I hereby
21    swear that the testimony therein was true at the time it
      was given and is now true and correct, including any
22    corrections and/or amendments listed above.

23    _____            _____
      Date                       DEPONENT
24

25

**$**

**$12,000**
  88:2,5

**(**

**(a)**
  75:13

**1**

**1**
  15:22 54:8
  75:9 76:4,5,6
  95:2,5
**10**
  196:23 202:7
**100**
  17:1 34:25
  66:8 181:1
  208:18
**100,000**
  73:7 74:14,20
**11**
  98:21,24
  108:20
**11-busing**
  167:13
**119**
  82:24
**11:25**
  64:4
**11:32**
  64:4
**12**
  8:16 15:9,10
  109:15 110:23
  154:14 208:14

  209:15 211:5,
  9
**120**
  6:8
**13**
  53:25 125:10
  154:15 187:25
  188:5
**14**
  130:22
  187:21,22,23
  188:7 189:2,
  15
**15**
  79:18 84:8
  157:24 189:12
  204:20
**16**
  170:11
**18**
  172:20
**18-**
  32:4
**1800**
  30:21
**1810s**
  31:12
**1812**
  31:24
**1820s**
  32:4
**1830s**
  31:8
**1840**
  30:22
**1840s**
  32:5 127:8
**1850**

  32:5
**1860**
  59:11
**1872**
  65:10
**1880s**
  127:9
**1890s**
  127:12
**1910s**
  31:23
**1920**
  59:11
**1920s**
  127:13
**1940s**
  38:1 67:4
  68:3
**1945**
  65:18,19
  66:10,18,21
**1946**
  133:4,6,7,9
**1950s**
  98:12
**1963**
  68:21,22
**1968**
  21:9,13
**1970**
  72:14
**1973**
  139:16
**1980s**
  72:13
**1999**
  17:20

**19th**
  30:21 125:25
  126:17 127:6,
  13 128:14,23
  130:19 132:5
  134:2 135:4
  145:18 189:10
  190:23 203:21
**1:08**
  125:5
**1:46**
  125:5

**2**

**2**
  26:1,2,6
  48:22 49:8,
  11,12 93:5
**20**
  92:1 140:24
  141:6,8
  148:18 179:11
  181:18
**20-**
  25:3
**200**
  79:16 84:7
**2000s**
  60:18
**2003**
  14:22 17:16,
  17,21
**2006**
  210:14 211:3
**2007**
  210:14 211:3
**2008**
  20:13

Robert Cassanello
August 05, 2022

2

**2010**
    6:5 207:21
    210:12
    211:14,15
**2011**
    6:3 7:5,6
**2012**
    6:3
**2013**
    60:16
**2014**
    7:6,7
**2016**
    171:16
**2019**
    209:11
**2020**
    28:20 78:19
    171:17
**2021**
    78:20 79:21
    171:18
**2022**
    146:2
**2023**
    24:9,10 25:4
    27:15
**2024**
    24:10
**20th**
    127:12 145:18
**25**
    154:11
**25th**
    21:25

—————————
**3**
—————————

**3**
    26:8 27:4,6,
    8,9 94:15
    110:22
    121:20,22,24
    131:9,14
    134:10 136:21
**30**
    123:23,24
**3:17**
    178:20
**3:24**
    178:20

—————————
**4**
—————————

**4**
    27:12 28:23,
    24 29:8 75:12
    142:23 150:13
    173:2
**4(a)**
    76:4
**48**
    105:25
**4:25**
    217:19
**4:30**
    217:19

—————————
**5**
—————————

**5**
    6:5,16 32:24
    40:19 49:19,
    23 75:3,4
    93:6 178:14,
    15,24 180:8,

12,20
**50**
    46:23
**50s**
    38:1 120:24
    159:3
**50th**
    21:8
**5:00**
    206:11

—————————
**6**
—————————

**6**
    43:20 44:4
    47:20 49:23
    50:2,4,5
    64:15,16,18
    124:10
**60s**
    38:1 120:24
    167:22

—————————
**7**
—————————

**7**
    14:17 48:23
    54:19 55:2
    167:7,11
    180:10
**70s**
    72:13,14
    121:2 159:4,
    5,8 167:22
**73**
    139:16 140:1
**7:00**
    185:7,9

—————————
**8**
—————————

**8**
    49:25 50:12
    68:6 73:8
    74:15,20
    75:8,9 80:20
    185:6,11,18
    191:14 194:13
    196:6 202:10,
    19 206:22
**80s**
    72:13 121:2
    126:7
**8th**
    80:20

—————————
**9**
—————————

**9**
    192:8,11
    197:4 199:6
**90s**
    90:25 126:7
**98**
    17:20
**99**
    54:4,7,8
    117:3
**9:51**
    4:1

—————————
**A**
—————————

**a.m.**
    4:1 64:4
**ability**
    33:2,6,17,21
    34:2,4 131:4
    134:12 174:4

188:15 191:14
196:24 199:22
200:7 202:8

**abolish**
31:1

**abolishing**
207:4

**abolitionists**
18:10

**aboveboard**
123:23

**absent**
142:4

**absolute**
196:18

**Absolutely**
134:16

**absurd**
57:18 72:20

**abusing**
141:13

**academic**
14:8 18:1,3
34:23 36:24
52:24 56:19
89:20 90:13,
16 102:20
120:14 121:5
179:24

**academically**
121:5

**academics**
70:19,24
71:20 72:2,3
92:4 120:23
134:17

**accept**
107:19 161:22
162:15,19,20

163:25 164:1

**accepted**
34:18 120:14
121:6 197:23,
24

**accepting**
101:6 162:13

**access**
45:1 127:22

**accommodations**
31:6 32:2

**accompany**
208:15

**account**
22:16,19,20
23:1 33:7,18
55:5,11 66:21
69:9,15 78:25
201:8

**accounting**
195:19

**accounts**
22:22 71:2

**accuracy**
70:11

**accurate**
16:4 33:7,18
40:11 58:4
66:8,18
108:12 161:22
191:4 193:11,
17 217:4

**accurately**
33:3,5 34:3
161:1

**achieve**
62:7,24
160:14 163:15
164:21 189:9

191:11

**achieved**
177:12

**achievement**
35:21 199:22
203:23

**achieving**
74:24

**acknowledge**
217:5

**acknowledged**
153:25

**acquainted**
93:24

**acronym**
208:7

**Act**
14:12,13

**action**
41:5 77:9,10,
21,23 87:4
151:5

**actions**
40:25 43:1
78:7,8 179:2,
8 187:8,11
191:1

**active**
146:9 152:9

**actively**
144:4,19

**activism**
159:9

**activist**
174:22

**activists**
59:9 158:8,15
160:10

**activity**
78:6

**actual**
7:6 10:3
14:16 28:17
36:2 72:19
111:13

**adapted**
102:4

**add**
116:17

**added**
191:16

**addition**
36:3

**Additionally**
47:20

**address**
4:21 32:6
74:1 108:13
192:9

**addressing**
98:9 205:17,
20

**administration**
213:7

**administrator**
52:22 53:15
86:25

**administrators**
170:16,24
171:25 172:3,
14

**admonishing**
204:9

**adopt**
30:2 31:5
101:24 149:16

Robert Cassanello
August 05, 2022

4

advance
72:4 113:21
117:23 131:24

advanced
63:6,11 105:4
199:14

advances
75:16

advancing
114:6 121:12

adverse
179:2,8 180:3

adversely
170:24

advice
85:25

adviser
16:10

advocacy
160:22

advocate
110:9 176:4

advocated
214:9

advocates
109:18 110:1

advocating
130:23 172:23
173:12 188:8,
25

affiliated
17:22

affirm
164:16 168:4,
10 169:7,17
170:7

affirmed
162:8

afforded
127:21

afield
104:25

afoul
109:18 110:20
111:3

Africa
149:1,2

African
7:13 16:13,23
17:24 18:5
19:11,12
30:16,24
31:9,14,22
32:3,19 37:10
42:11 59:9,14
60:19 69:2
102:24 107:6
108:4,5
112:17 113:9
132:8 133:10
148:11 149:8,
9,11,17,18
155:8,10
176:10 178:1
195:15

agree
35:6 36:7
40:1,8 57:7
59:1 70:16
108:6,19
119:19 120:19
138:3 160:5
175:1

agreed
58:12

agreement
14:10 20:10
58:21 83:24

ahead
26:23 109:4

aired
171:10,17,19

airing
177:2

akin
198:14 216:15

Alabama
17:19

alert
66:22

alerting
66:17

Alexander
65:25 66:24
99:2 103:3
104:7 106:14
108:13 109:24
110:5

Alexander's
117:18

aligned
76:23 100:18

allegiance
209:23

allowing
60:13

alluded
55:7

Allwright
66:16

alternate
47:7

amateur
121:3

amazed
140:18

amendment
91:4,14

America
23:23 25:13
27:16 29:9,
12,13,14,16
30:6,15,16
34:10 36:10
44:10,12
45:20 46:2
79:6 91:4,6
98:13 99:1
103:3 113:24
128:22 140:8
145:19 189:10
216:17

America's
99:23

American
16:13 17:24
18:5 19:9,10,
11,13 30:16,
24 31:14
37:10 59:9,14
60:20 107:5,
10 108:6
133:10 139:17
148:11
149:11,19
155:8,11
167:19
168:13,16
178:5 195:15
209:6 212:11,
19

Americans
7:13 16:23
30:17 31:10,
23 32:4,19
42:11 69:2
102:25 107:6

108:4 112:17
113:9 132:8
149:17 176:10
178:1

**analogous**
72:25 196:11

**analogy**
69:24 102:21
196:12

**analysis**
139:25

**analyze**
108:7

**ancestor**
134:4

**ancillary**
74:10

**and/or**
171:24

**anecdotal**
112:13 182:19

**Angola**
105:24 106:8

**anguish**
182:2 183:21
184:6 192:3

**anniversary**
21:9,25

**anonymous**
84:7

**answers**
83:9 124:24

**antebellum**
18:9 21:12
30:1,13,20
37:23 141:12

**antecedent**
30:4

**Anthony**
53:24 54:9,16
117:2 135:16

**anthropology**
205:2

**antibusing**
158:8,15
159:8 160:10

**anticipate**
72:23 136:19

**anxiety**
51:21

**anymore**
46:15 139:14

**AP**
199:14

**apologize**
65:18

**apparently**
36:4 87:18

**applies**
133:17

**apply**
108:24
123:14,19

**apprised**
82:5

**approach**
70:4 183:4,9

**approaches**
177:1

**approaching**
21:25 56:8

**approval**
29:3

**approved**
29:3,5

**approximate**
140:23

**arbitrate**
162:10 164:7

**arbitration**
80:6 82:1,8,
10,11,17 88:7

**arbitrator**
53:4,7 78:22
80:7,11 83:20
84:16 87:13,
15 88:4,8,19

**arbitrator's**
83:17,19

**arbitrators**
53:9

**Archive**
167:20

**archives**
172:2

**area**
109:5 192:12

**argue**
123:16 168:6

**argued**
6:15 84:1
142:11

**argues**
168:11

**arguing**
91:12 103:3

**argument**
37:2,3 38:9,
13 59:8,17,19
60:2 62:3
63:2,3,6
73:17 84:14
91:15 103:25
118:4 123:17,

19,20 128:18,
23 129:1,4,24
131:16 132:9,
10 145:12,13
162:12,13,15,
20 163:4
175:7 176:10,
17,18 186:24
195:3 204:7
210:1

**argument's**
84:25

**arguments**
118:4

**Armed**
91:4

**arrested**
89:11,13

**arrive**
118:10

**Art**
21:19

**article**
64:25 65:3,9,
14,25 66:7,
11,14 67:5,9,
15,17,24
84:22 133:2
209:7 214:5

**articles**
43:7 56:7
60:16 61:20

**articulate**
110:5 182:23

**ASALH**
19:11

**ascribe**
163:7 166:14
176:18 217:3

ascribed
 112:15  215:6

ascribing
 158:19

Asian
 145:4  146:7,
 14  154:15
 155:18

aspirations
 77:14

assessing
 38:22

assessment
 96:5  152:11
 170:7

assign
 38:5  99:14
 113:24,25
 114:2,5,18
 115:24  117:24
 122:4  123:1
 124:4  125:12
 134:10  135:9
 138:22  139:15
 140:10  142:15
 158:5  159:18
 169:4  173:24

assigned
 64:11  66:23
 116:8,11

assigning
 98:14  113:16,
 19  114:11,25
 116:4  117:7,
 17  121:8,18
 136:6  142:8
 205:6

assignment
 37:7  39:3
 67:12  123:1

167:2,13
170:8

assignments
 36:21  135:18

associate
 14:19

Association
 19:9,15

assume
 9:15  56:25
 82:24  152:16
 155:6

assumed
 51:10

assumes
 44:9

assuming
 54:7,8  86:25
 95:4  115:20
 158:20  186:21
 205:21

assumption
 196:16

assumptions
 165:19  166:1
 177:20

assurance
 208:21

Atlantic
 17:5,7  209:7

attached
 8:24  15:1,2
 26:22  77:9,18
 112:16  120:23

attain
 45:12

attempt
 39:14,18

142:25  143:3
156:18  172:25
173:14  176:5
177:18  203:17

attempted
 176:20

attempting
 71:15

attempts
 174:1

attend
 32:19,21

attended
 207:21

attention
 22:1,15  64:20
 100:25  178:23
 208:25  209:3

attorney
 5:10  13:7,9,
 16

attorney-client
 10:20

attribute
 163:22

Aubrey
 11:25

audience
 208:18

August
 80:20

author
 62:20  67:2
 125:18  133:10
 206:17

authored
 206:16

authoritatively

97:25

authority
 97:1  113:11
 124:7

authors
 196:9,15
 203:25

average
 146:17,22

awards
 63:16  87:20

aware
 90:1,24  93:1,
 17,19,20
 94:1,6,14
 96:17  107:8
 162:8  211:19

awful
 208:23

_____

B

bachelor's
 17:5,11

back
 18:8  19:25
 31:12  32:11
 37:23  59:3
 62:3  63:24
 75:2  80:15,21
 86:6  94:25
 108:17  111:18
 117:15  123:21
 125:6  134:13
 135:24  149:16
 169:18  173:16
 178:21  188:18
 191:18  197:14
 210:13  215:19
 216:21,22,23

217:11

**background**
16:24 132:4

**backgrounds**
154:10

**bad**
88:1 201:11
209:25

**balloon**
20:1

**bargaining**
14:9 20:10
83:24

**base**
95:12,13
113:23 186:5,
9

**based**
7:14 33:22
34:1,14 36:14
37:16 39:16
43:8 46:21
52:10 57:13
60:2 80:13
83:19 84:4,7
95:21 104:5
105:4 106:20
115:21
123:10,17
127:1 140:9
141:6 148:19
149:17 154:9
155:14,15,19
156:12,21
157:13,19
160:3 165:14
169:18,23
173:6 195:19
205:8

**bashing**
133:3

**basic**
8:6 10:17
11:1,2 14:5
35:9 38:21
58:12 192:24

**basically**
22:12 40:16
66:22 80:14

**basing**
97:7 110:10
147:20 154:13
158:20

**basis**
35:5 75:13
107:13 108:4
164:9,13

**bathroom**
64:1 178:16
217:18

**bear**
179:14,19

**beard**
215:25 216:8,
9,11

**bearing**
177:13 196:19

**bears**
179:1,6

**beautiful**
207:9

**began**
4:1

**begin**
30:2,17,22,24
31:1,5 32:2
142:17

**begins**
30:15 31:7,22
32:1 64:22

**behalf**
5:10,13 6:22
7:9

**behavior**
88:16 114:9
163:7

**belief**
35:19 63:12
76:14 77:20,
21,23 93:21
94:7,10
113:21
165:12,14,15
206:19

**beliefs**
77:24 93:25
117:19

**believed**
52:1 84:12
150:23 177:15

**believes**
77:15 78:3
138:15 153:17
176:9 217:7

**believing**
153:21

**bell**
192:9,13,23
193:3,12,13,
15 194:11
195:1,2,23
196:7,13,24
197:2,8
198:17 201:4
202:8,21
203:4 204:2,
6,10,14

205:7,11,12,
22

**beneficial**
212:25

**benefits**
76:23 152:22

**Betton**
16:11

**big**
74:21 99:5
207:23 216:5

**bill**
14:16 54:12

**biological**
34:16 144:1,2,
145:2,13,17,
20 146:19,23
147:6,16
148:14 150:20
151:14 152:1,
18 153:1,17,
22 155:21
158:23
159:13,25
194:2 196:2,
3,5

**biologically**
34:15 144:13
145:3 146:5
152:3,4 157:7

**biology**
195:15 206:4

**Birmingham**
17:19 68:21,
22

**birthed**
45:9

**bit**
20:17 30:10

62:21 120:24
154:11

**black**
6:10,17,19
17:18 30:19
32:21 42:15
43:15 47:15
61:5,6,10,20
76:16 79:2
96:8,14,23
97:13,22
100:1 101:1,7
102:16 103:4,
6,10,17,21
104:11 105:6,
17,24 106:10
108:22 110:17
112:1,5
115:9,15
119:24 125:24
126:3 127:16
128:5,16,17,
24,25 129:11
130:7 145:3,
15,25 146:4,
7,12 147:19
148:1,18,19
149:3,9,12,
15,17,18
152:2,3
154:14 155:7,
8,11 157:10
158:13,19
159:12,23,24
161:1,17
162:6,21
170:13,15,23
171:25 172:3,
14,16,17,18
173:6 176:9
195:5

**Blacks**
51:8 52:2
77:16 90:6,8
104:6 105:7
106:7 108:11
112:21 126:23
129:2 145:18
148:5

**blessed**
200:18

**block**
78:5 168:24

**blood**
148:11
156:19,20,22

**Bloom's**
38:17,20
39:12 62:7,25
123:5

**blunt**
74:9

**board**
12:25 20:1
53:18 64:12
66:16 124:5
152:24

**body**
39:22 209:24

**bondage**
30:17 141:9,
23

**book**
6:12 59:6
60:16,17,23,
24 91:4
99:13,15,22
106:22,24
108:14,15
110:19 111:2,
6 113:25

114:5,11,13,
18,25 115:1
116:5,8,11,12
117:7,18,19,
25 118:1
125:17,18,20
126:7 129:4
130:12 131:22
132:2,15
134:8,23
135:1,18
136:5,20,25
137:8,11,13,
21 138:15,23,
24,25 139:2,
6,15,17
140:10,13,21
141:16,23
142:18 145:11
167:3 168:5,
6,11 169:1,3
189:7 192:14,
16,19,23,25
193:8,13,20
203:4,14
204:16,17,19
205:12

**book's**
137:17 168:9

**books**
43:6 56:7
115:24 117:24
136:12 139:7
147:3

**borne**
18:10

**Boston**
159:7 167:23

**bottom**
38:21 59:13
128:10

**bottom-up**
59:11,12 60:9
128:9,11
217:7

**branches**
134:20

**Brazil**
148:16,17

**Brazilians**
148:24

**break**
5:1 10:8,9
15:14 64:3
124:19 217:18

**bring**
22:1,15 57:16
73:24 134:25
156:9

**bringing**
128:3

**brings**
184:5

**broadest**
18:6

**broadly**
195:2

**brought**
14:22 49:17
141:16 205:11

**Brown**
64:11,12
66:16 124:15,
16,17 133:2

**Bryan**
5:12 15:1,15

**building**
78:5 102:21

**bureau**

107:19

**Burnett**
171:6

**business**
164:2,5,6
166:14

**busing**
158:5 159:8
160:13 167:3,
22 168:5,7,
11,18 169:2
173:22 181:16
189:18 191:16
192:1 203:15

**bust**
215:20,23
216:2,3

**buzzword**
134:17

---
**C**
---

**call**
16:9 64:20
71:14 178:23
212:19 216:24
217:4

**called**
6:12 11:11
12:22 14:15
17:21 21:19
22:4 23:21,
22,23 24:2
25:5 26:13
27:16 31:20
38:25 63:7
64:11 72:8,14
84:20 85:5
86:6 98:15
120:1 126:8

129:18 139:15
149:18 170:17
171:4

**campus**
79:9 154:1
185:2 205:14
213:15

**canard**
137:15

**capacity**
8:5 9:11 57:5

**caps**
208:4

**captive**
208:18

**capture**
63:20

**cardboard**
216:5

**cards**
140:2

**care**
144:7 164:18

**careful**
73:20

**cascading**
52:13

**case**
5:6,17 6:4,23
7:6,7,16 8:8,
25 9:11 11:14
25:22 60:25
65:21 67:1,7,
8 69:13 73:25
75:5 78:15
86:1 105:22
129:22 138:11
160:12 168:22
184:21 187:11

**case-by-case**
47:11

**cases**
46:6 47:13
66:24,25
67:6,10,21
133:12 163:8

**Cassanello**
4:9,14,20,22,
23 5:14,16
29:2 62:9
76:1 85:10
94:19 116:7
118:7,17
119:8,24
125:9 138:14
143:2 179:5
183:13 185:25
217:20

**caste**
44:12,15,16,
17,19,20,24
45:15,18,19,
21 46:3,10,15
47:3,6,10
99:23 100:3,6
108:2,9
111:18,20

**casual**
93:22

**catalyst**
59:15 61:11
68:24 128:10

**categories**
46:9 107:19
145:22
148:18,19
149:19,21
154:10
159:12,13

186:13 187:2
199:13,20
201:5

**categorization**
147:21

**categorize**
157:3 158:24

**categorized**
150:8

**categorizing**
201:5

**category**
107:23 143:8
147:16

**caught**
103:17 104:1

**caution**
68:2

**CBA**
86:2

**ceiling**
46:7 92:10

**celebrate**
22:2

**census**
107:19

**center**
7:3 78:1

**centered**
189:3

**central**
14:20 62:11
73:17 75:5
128:22 212:11

**century**
30:21 125:25
126:17 127:6,
12,13 128:14,

23 130:19
132:5 134:3
135:5 145:18,
19 189:10
190:23 203:21

**certainty**
158:22 211:18

**challenge**
73:13 176:12

**Chambliss**
22:8

**chance**
43:24

**change**
40:18 88:16
214:1

**Channel**
53:25

**chapter**
20:5,22 80:3
81:9,11 82:6,
24 110:19
193:19

**character**
94:16,20
103:20 109:19
131:1,11
132:17

**characteristics**
30:11

**characterize**
66:2 197:4

**characterized**
186:3 197:12

**Charles**
5:4 78:14,18
79:15 192:15
193:21

**charter**
174:14

**charts**
91:24

**Chattanooga**
59:22

**chatting**
11:13

**cheap**
41:17

**cheaper**
128:19

**cheaply**
128:19

**check**
122:23

**cheek**
214:17
215:12,15

**cheer**
217:22

**chemists**
55:23

**choice**
169:12,13
174:22 175:15

**choose**
68:16 150:11
169:13,16

**Christian**
17:23

**Chuck**
4:14 88:20

**chunks**
99:5

**Church**
17:23

**churches**
69:3

**Churchill**
163:10,11,13

**circles**
34:23

**circumspect**
91:15

**circumstance**
106:4 112:6
200:15

**circumstances**
201:18

**citation**
65:18

**citations**
8:18 39:6
92:7

**cite**
37:4 167:12
168:3

**cities**
31:3 41:11,12

**citing**
175:14

**citizen**
42:11 212:11

**citizenry**
96:23

**citizens**
96:12,14

**citizenship**
103:1 212:7

**city**
47:2,9 61:22
123:13 126:19

**civics**
207:4,14,16

208:13,15
209:2 210:9
211:17 212:2,
5,24 213:1,10

**civil**
18:7,8 23:21
24:6,22 26:13
29:24 30:2,5
37:3,9,15,25
38:2 40:3
58:4 59:16
61:2,7,8,12
63:8,13 66:20
67:1 68:20
69:2 73:3
98:7,10 127:6
132:13 133:11
158:2,4,13
168:8,13,15
170:12 182:5,
17

**claim**
14:5,7 115:4
187:10

**clarification**
116:16

**clarify**
28:10 48:5

**clarifying**
116:16

**class**
19:15 26:13,
20 27:1,16,23
28:14,15,16,
17,18 29:2,9,
22 36:20
37:13 39:13
44:24 45:1,5,
11,18 48:13
51:16,24

Robert Cassanello
August 05, 2022                                                                11

52:10 53:13
54:17 59:14
61:5,6 62:4,
6,23 68:23,24
70:1 71:7
73:2,4 85:2
89:17,19
90:3,4 98:10,
13 113:24
115:5,21
116:22
118:19,22
122:14,15
130:2,7
131:20 134:14
136:22 137:25
138:22 140:14
149:5 156:3,
25 166:11
167:3 171:3,
16 174:17,21
175:8,11
176:8 183:5
201:23 202:5,
23 205:1,3,4
206:1

**classes**
17:25 24:1
34:8 36:9,20
46:19 80:21
98:5 130:15
136:7 153:25
154:2,5 155:1
179:19
199:14,15
205:19 211:1

**classifications**
143:8

**classroom**
14:8 71:22
72:19,23

73:25 80:10
83:21 84:5
87:14 88:10,
13 116:3,23
124:1,6,15
135:15 138:18
139:4 147:7
148:7 166:4

**classrooms**
177:1

**Claude**
158:9

**clear**
14:11 121:21
124:9

**clearer**
10:1

**climacteric**
139:24

**clips**
172:1

**cloak**
187:10

**close**
49:7 206:7,9

**closed**
32:3 170:17

**clothing**
104:3

**clue**
39:8

**co-directed**
170:17

**code**
200:21

**cognitive**
36:16 38:21

**coherent**

62:13,17,18,
19 63:4,5,11,
15,17 119:17,
18,21,22
169:21,22,24
199:1

**collaborate**
171:8

**collaborated**
22:7

**collapsed**
92:11

**colleague**
11:12 22:8

**colleagues**
14:1 76:13
78:10 79:15,
17 93:20
217:14

**collective**
14:9 20:10
83:24 112:23,
24

**college**
17:18,22 22:8
94:12 152:6
171:6 177:1,7
212:22

**college's**
213:7

**colleges**
46:22 105:10

**Colonial**
30:15

**color**
48:11 64:21
75:14,23,24
93:9 94:18
95:21 109:21

110:16 111:23
112:16 131:3
142:24 143:1
148:19
155:14,19
157:22 172:24
173:1,13,14
178:25 179:4
185:22,23
202:14,15

**colorblind**
187:1

**colorblindness**
185:20 190:7
191:10 202:12

**comfortable**
184:24

**commemorate**
21:8

**comment**
35:14 77:13

**commented**
214:6

**commission**
92:20

**committed**
179:3,8,15
180:5

**committee**
53:18 54:12
117:5,6

**committees**
54:10 116:10

**common**
90:21 92:2
128:20

**communicate**
19:25 184:2

communicated
  147:15

communication
  21:21 62:22

communications
  10:20,21

communities
  30:1,2,3,18,
  19,22 31:1,2,
  4,5,13 42:16
  47:13 100:22

community
  19:20 100:11,
  12,13,15,16,
  17,20,21,23
  101:3,4,9,10,
  16,17,21
  102:4 170:14
  173:7 212:12

companies
  32:10,11

companion
  202:24

compared
  107:11

comparison
  108:4,7

compel'
  113:21

compelling
  114:7 119:16
  120:9

compels
  75:17

compile
  119:11

complete
  132:8

completely
  74:4 126:24

complexion
  148:12

complicate
  107:18

component
  158:1

composes
  63:3

comprehended
  123:19

comprehensive
  23:7 34:9
  36:9

compulsory
  208:14

computer
  140:6

conceding
  74:23

Conceivably
  97:24 170:5

conceived
  41:13

concentration
  16:8,10,16

concept
  47:24 50:14,
  22 51:7,20
  93:5,25 94:15
  95:1,5 109:19
  110:20,22
  111:3,12
  113:22
  121:20,22,24
  130:25 131:9,
  14 134:10
  136:14,21

137:13 141:16
142:23 143:22
150:13 173:2,
17 178:13,15,
24 180:8
185:6,11,18
186:16,20,21,
25 187:1
188:12 191:14
192:13 193:2
194:13 196:6
202:10,19
212:8

conception
  212:1

concepts
  47:21,23
  49:1,2,6
  50:16,19
  54:23 55:1
  75:7,18,19,20
  110:21 117:9
  130:24 134:3,
  5 135:7,10
  150:13 186:1,
  23 187:3,7
  188:9,25
  189:5 190:4
  196:14 203:22
  211:4,6

concern
  113:23 117:10
  180:20 184:16
  191:13,16
  211:14,17

concerns
  209:2

concluded
  83:20 105:7

conclusion

56:1 78:23
111:7 117:8
160:3

condition
  44:10

conditions
  132:3 175:21

conduct
  41:4 84:5

conducted
  148:23

confer
  95:20 217:13

conference
  21:10 207:21,
  23 208:12,16,
  17 209:11
  210:13

conferring
  104:14

confess
  22:5 99:4

confessed
  92:9

confident
  109:6

confinement
  105:25

confirm
  169:3

confirming
  99:10

conforming
  54:12

confront
  72:22 134:2

confronted
  74:6 150:1

confuse
212:21

confused
6:24 115:17

confusing
57:8

congestion
41:12

connect
41:11

connected
20:20,22
22:5,6,13
37:6 115:7,22

Connecticut
32:17

connection
193:23

connotation
46:13 144:7
149:14

connotations
130:24 188:8,
25 189:1

conscious
127:23 147:5

consciously
93:11,14
150:4

consciousness
127:24

consensus
37:21 60:19

consequence
139:6 164:3

consequences
112:18,19
120:11

consistent
95:4

constitute
75:13

constitution
21:9,11,12,
13,14 210:20
212:13,17

constitutional
161:19

constitutions
21:8,16

constricting
201:13

construct
143:25 146:6,
19,23 150:19,
20 151:7,10,
17 152:7,8,13
153:2 154:21
156:4,14
161:21 164:9,
25 165:16

constructed
144:15,16
147:5 157:10,
11 158:23
159:24

constructing
41:14 130:3
144:5,19
146:2,9
169:24

construction
117:22 144:17
145:12,14
147:10
162:11,12,16,
20 163:15
165:22

constructions
147:6 148:3
152:9

constructs
119:15

construe
116:3,4
123:22 124:7
135:11 136:24
138:1,4,13,25
174:5,9 176:1
177:11 180:24

construed
50:15 113:20
114:8,23,24
117:18 121:10
134:15 173:17

construes
135:15

construing
151:3

contact
12:7,9

contacted
10:14 11:3,5
12:8

contemporary
18:11,12
44:10,23
138:9 147:21,
23 148:2
149:6 152:9

content
52:14 64:11
111:2 114:17
134:9 136:5,
20 171:12,13
172:10 175:8,
11

contents
139:9

contestation
176:11

contested
137:9,14

context
8:1 42:19
67:1 98:4
104:19 112:10
141:15 160:1
174:2 175:6
189:2 195:8,
20 199:4
207:18 210:23

contexts
98:3 158:18

continue
40:19 44:1
55:2 60:14
99:22

continues
47:20 192:20

continuity
67:7

contours
61:11

contract
84:19,21 85:4
88:19

contracted
7:6,20 8:13

contracts
80:19

contradict
189:19

contrary
61:17

contribute
 200:5,25
 202:4
control
 116:24 181:24
 198:19,23
 200:2,5,11,
 12,24,25
controls
 201:12
controversial
 173:21
controversy
 181:16 192:18
convenience
 163:9,14
convenient
 135:17
conversation
 138:13 142:2
 169:18 197:15
conversations
 93:22 111:18
 133:18
convicted
 89:12 103:12
 111:23 112:3
conviction
 104:6 105:5
convictions
 103:23
Cooper
 4:13,15 5:4,
 5,7,15 11:22
 13:2,15 15:5,
 15,20,24
 25:24 26:4
 27:7,11 28:21
 29:1 44:3

49:15,21
 50:10 64:2,5,
 13,18,19 68:5
 83:3,6 88:23
 89:22 91:8
 93:4 99:20,21
 109:8 120:12
 124:18,22
 125:4,6,8
 161:9 163:20
 166:18,20
 167:5,9
 178:18,21,22
 185:15 198:1
 205:15 206:6,
 20 207:1
 208:3,6
 214:14 215:4
 217:9,13,17,
 20
copies
 204:20
cops
 96:7,13,15
copy
 14:23,24
 25:24 49:16,
 18 64:14
 82:13,21 99:9
correct
 27:18 54:9
 58:10,21
 61:24 103:10,
 12 104:21
 117:22 138:3
 144:3 161:22
 170:2 177:13
 182:3 188:3,4
corrected
 28:6 97:11

correctly
 83:20 98:21
 143:24 154:6
corrects
 166:5
correlated
 193:18
correlation
 193:24
corrupted
 90:23
cotton
 141:13
Council
 19:14
counsel
 10:2,3 86:7,
 11,21,24
counted
 91:25
counter
 119:13
counteroffer
 87:24
country
 41:13 45:5
 46:9,15 47:6
 79:9 137:2
 195:9 207:24
 209:9 215:9,
 16
County
 53:24
couple
 11:18 132:11,
 12 187:20
courses
 23:2,17

24:20,23
 25:2,12,15
 33:9 70:20
 98:7,25
court
 7:24 9:18
 10:1 15:21
 28:22 64:13
 66:12 67:10
 91:17 133:12
 167:5
cover
 190:13,14,25
 191:4,7,9
covers
 170:21
craft
 129:18
crafts
 85:1
create
 19:19 30:4
 42:7,10 59:18
 102:23 128:18
 129:25 158:11
 167:21 175:20
 190:11 195:4,
 7
created
 23:1 28:14
 32:9 41:20
 79:8,13 127:1
 140:2,4
 151:11,12
 185:21 189:23
 202:13 210:15
creating
 127:1 128:12
 132:3 195:18

creators
  42:25
credence
  69:11,16
  152:9
credit
  124:25
crime
  91:9 101:1
criminal
  100:24 101:21
  103:17 104:1,
  9,19 110:11
  112:10,18,21
  113:9 123:7,
  8,11
criminality
  101:1 103:22,
  25 104:12
criminals
  100:1 101:7
  102:16 103:6,
  11 105:17
  108:22 111:24
  119:25
critical
  36:19 38:14
  116:13 118:2
  133:23 209:5,
  17
criticism
  79:12 133:8
  162:7 173:6
  174:10
criticisms
  158:2 172:23
  173:10
criticize
  173:4

criticizes
  173:24
criticizing
  172:22
cross
  139:15 198:7
  210:5
cross-examined
  9:2
Crow
  6:12 23:23
  25:13 27:16
  29:10,12,21,
  22,25 30:2,7,
  11 31:9,11,25
  41:2 42:7,9,
  19,21 44:19,
  20 59:8,9
  65:12 98:13,
  15,18 99:1,2
  102:21,22
  106:23,24
  109:18
  113:17,24
  123:6 133:17
  138:22 182:5,
  16 195:20
  196:18
Crow-like
  41:25
Cuba
  149:1
cuddly
  185:2
cultural
  35:21 54:5
  117:4 145:19
  151:13 214:23
culture
  79:5 91:5

cure
  41:11
current
  14:18 65:1
  79:17
curriculum
  173:19 207:7
  210:9,15
  212:6,24
  213:1,2,10,11
curve
  192:9,13,23
  193:3,12,13,
  15 194:11
  195:1,2,23
  196:7,13
  197:2,8
  198:17 201:4
  203:4 204:2,
  6,10,14
  205:7,11,12,
  22
curve's
  196:24 202:8,
  22
cut
  201:16
cutout
  216:5
cuts
  170:16
CV
  14:23,25 19:4
cycled
  199:15

_____

        D

_____

D-O-L-E-Z-A-L
  163:19

da
  103:23,24
  216:22
data
  91:16,22
  92:17 97:2
  106:16 140:2,
  3 154:9
databases
  37:8
date
  9:1 23:13,15
  86:9,10
dated
  67:3
David
  125:13 126:5,
  15
day
  19:25 80:15
  217:23
deal
  44:18 74:21
  79:8 83:5
  162:6 211:11
deals
  51:20
debatable
  44:11
debate
  38:3 40:9
  58:7,11 59:1
  210:10
debated
  130:20
debates
  18:4 37:20
  40:18 61:12

debating
   177:4

debt
   217:5

decades
   91:23 132:11,
   13

December
   78:19

decent
   149:10

decide
   85:1 89:15
   92:21

decided
   80:7

decimate
   42:15 43:15

decision
   82:8,10,11
   83:17,19 88:7
   101:12

decisions
   101:15

declaration
   12:23,24
   14:25 15:4
   25:21 27:13
   32:25 43:22
   48:25 68:7
   76:20 98:17
   125:10 130:23
   158:1 179:12
   181:22 187:18
   192:8 210:19
   212:13

declination
   168:7 169:8

defend
   38:8 80:3,24
   170:9 190:8

defendants
   5:5,8

defendants'
   15:22 26:2
   27:9 28:24
   49:19 64:16
   167:7 206:22

defended
   80:5

defending
   7:10,11,16

defense
   209:23

define
   34:11 145:6,7

definition
   34:19,20
   35:10,13,19,
   25 36:1,3,5
   58:16 145:1,
   18 148:15,24
   152:2 153:6,
   23 177:16
   186:5,9

definitions
   148:9,22

degradation
   153:20

degree
   17:11,13
   137:10

delegated
   126:23

delivered
   82:25

Delmont
   158:7,18
   159:20 169:2

Delmont's
   168:5

deluding
   84:12

Demaggio
   5:12 11:8
   12:23 13:11
   15:3,13,18
   27:6 49:14
   50:7,9 63:22,
   24 67:22
   82:16,23 83:4
   88:20,24 89:6
   91:18 99:19
   109:1,4
   119:17 124:21
   125:1 178:16
   185:12 197:23
   204:16 206:5
   214:1

demanded
   125:25

demanding
   126:21

democracy
   210:21 212:20

democratic
   216:15,16,18

demonstrate
   39:4 46:23

denial
   69:11,16
   70:3,9,18,22
   71:8,21 72:9,
   14,22 73:10
   89:17 90:9

denialism
   71:5,18 72:2,
   19 74:19,24

deny
   71:13

denying
   31:9 74:10

department
   101:24

departments
   96:17 101:13,
   14 102:4

depend
   52:16 151:1,
   2,4 152:13
   186:24
   187:14,15

depending
   37:11 69:5
   201:6

depends
   52:7 62:2
   145:1 151:19
   152:10,15
   170:8 184:1,
   23 186:12
   201:3 210:1

deployed
   97:12

deploys
   186:22

deposed
   8:7,9 9:9,11

deposition
   4:22 12:12
   13:4,5,6,17,
   23 142:22

depress
   129:3

**Dereliction**
89:14

**descendants**
126:14

**descent**
149:8

**describe**
65:5 71:6
98:11,17
118:24 148:5
161:1,16,19
168:19 181:17
187:25 194:9

**describes**
103:4

**describing**
40:12 97:19
99:9 104:21
130:10 148:4
154:21

**description**
10:25 11:1,15
12:10 25:8
45:13 47:9
67:10 161:22
181:14

**descriptions**
89:9

**desegregation**
158:3,7,10,12
170:14,21,25
172:22 173:5,
7,11,20
174:13
175:13,16
176:17,20
180:22 189:13
195:13,14

**design**
43:4,9

**designation**
42:20

**designed**
6:16 42:10,24
53:1,3

**designers**
43:4

**desired**
174:11

**desires**
158:12

**destroyed**
92:10

**detail**
209:1

**detailed**
139:22,23

**determination**
90:13 145:2
152:14 201:8,
10

**determine**
35:21 39:25
54:13,16 69:7
110:14 122:5,
13 124:7
158:22 161:20
200:25

**determined**
94:17,20 95:9
98:3 109:21
111:5 112:7
113:2,8
131:2,13
132:1,5,18
138:8 144:13
146:5,6
198:18 200:1

**determines**

151:16,17
198:23 203:9

**detractor**
68:17

**detractors**
63:14

**dialogue**
19:20 62:8
117:12 130:5
134:13 137:1
153:24 191:20

**dictionary**
35:10,12

**Dictionary.com**
35:16

**die**
91:17

**died**
73:7

**difference**
42:5 74:13
104:2 150:21,
24 155:24

**differences**
35:20 196:1

**differentiated**
95:20

**differently**
70:7 157:13,
19

**differing**
177:1

**digital**
19:18 25:5

**diploma**
137:12

**direct**
4:12 174:12

**directed**
39:20,24

**directing**
50:9

**directly**
203:7

**disagree**
119:8,23
196:21 197:1

**disagreement**
70:15 118:21

**discern**
155:17

**disciplinary**
79:20 83:15
85:9,12,13,24
86:12,16,22
87:4,5,6,11
151:5

**discipline**
56:19 80:14
83:23 84:21,
22,23,24 85:3
87:15 88:9,
11,12,14,22,
25

**disciplined**
87:17

**disclose**
119:5 138:19
156:10

**discourse**
76:21,22
104:14,15
126:21

**discovery**
8:24 12:15,18

**discredited**
192:12

discrete
  77:3,4 112:13

discretion
  211:11

discriminated
  179:1,7 180:3

discrimination
  7:13 75:13
  190:17 195:21
  196:17

discuss
  12:2 13:3,17
  49:1,2 54:23
  75:20 170:13

discussed
  13:8,12,16
  57:9 95:5
  100:3 136:4
  177:16 188:12

discusses
  158:7 203:16

discussing
  51:13,14
  52:6,18
  134:11 137:19
  170:22

discussion
  44:2 50:16,21
  51:18 52:15
  53:12 56:15
  62:3,16 63:23
  122:15,22,23,
  25 135:23
  136:7 166:19
  168:6 173:16
  174:24 175:8,
  12,25 176:3,
  10,13,16,21,
  25

discussions
  43:10 47:21
  48:3,19 49:9
  51:22

dismissed
  43:11

disparate
  77:19 126:1
  128:3

disparities
  195:12
  198:18,24
  199:8 200:1

Dispassionate
  70:5

disproportionat
e
  104:5 105:5
  106:5,6
  112:15,20

disproportionat
ely
  99:25 100:25
  101:7 102:15
  103:9 105:17
  107:4,10
  108:22 109:10

dispute
  35:24 36:1
  43:3 46:24
  50:23 57:12
  87:16 107:14
  126:9 146:20
  149:24
  164:10,16

disputing
  60:25 91:5
  107:13

disseminate
  53:12

dissertation
  16:10,21,22

disservice
  115:10

dissipated
  192:22

distinct
  34:15 60:21
  68:18 69:4
  145:16 153:5
  155:25

distinction
  44:25 45:17
  152:18 160:2
  194:3

distinctions
  34:16 153:17,
  22 164:23

distinguish
  156:21

distort
  129:12

distress
  182:2 191:23
  192:6

district
  6:4,7,16,18,
  19 199:10

DNA
  151:14

docked
  87:2

Doctor
  4:25 93:16

doctrine
  35:20

document
  15:7 25:17,19

26:6,16,18,
19,24 27:20
37:15 38:7,
10,12 39:5,8,
9,10 56:23
64:6,7,14
83:2 160:4,5
166:21,24

documentary
  71:1 171:4,9

documented
  106:11

documents
  37:9,12,14
  57:16 123:9
  150:2 159:22,
  23 160:22
  212:15

Dolezal
  161:6,7,24
  163:19 165:3
  166:7,8

Dolezal's
  162:21 163:21

don't"--
  165:21

doubt
  164:10,13

Downtown
  6:6,7

downtowns
  41:15

draft
  12:25

drafted
  150:18

draw
  160:1 164:23

drawing
  73:20 160:3
dress
  13:14
drive
  115:14
drives
  16:14
drop
  148:11
drove
  59:15
due
  59:11
Duke
  153:14
duly
  4:10
duplicate
  92:16
duty
  89:14

_____

**E**
_____

earlier
  27:18 37:19,
  24 46:10
  54:22 55:7,12
  63:6 80:23
  95:1,16
  104:16 118:11
  132:12 133:2
  134:13 136:4
  143:6 153:24
  165:18 169:18
  191:22
early
  18:10 59:15

126:5 129:17
130:21 147:12
159:4,5
167:22 197:15
earth
  153:5
earthly
  156:20
easy
  41:18
economic
  129:10
education
  15:25 17:2,4
  19:15 81:14
  94:3 195:10
  207:4,6,14,
  16,24 208:13,
  15 211:17
  212:2,6
educational
  16:24
educators
  170:15
effect
  6:15 52:13
  79:1,2 80:24
  84:11 106:23
  115:9,14
effective
  204:6
efficient
  124:23
efforts
  168:18 178:5
egregious
  90:3
egregiousness
  90:9

elaborate
  33:16 36:18
  95:11,15
  151:9
elaborating
  50:25
elected
  82:2
elections
  31:15,16
element
  51:13,15,25
  76:25
elicit
  10:19
eliminate
  163:17
elites
  61:10
else's
  146:9
email
  12:5,6
emails
  115:6
Emancipation
  23:23
embedded
  116:13 210:9
embedding
  100:19 102:19
embrace
  209:20
embraces
  194:8 209:22
Emory
  92:19

emotionally
  185:1
empathetic
  184:12
empathy
  207:7 209:17
emphatically
  138:12
employ
  40:17 43:3
  44:19,21
  69:24 128:17
  134:18 148:25
  149:9 190:13
  194:2
employed
  44:18 79:10
  80:21 128:19
  148:25 149:1
employee
  75:15,17
  82:17
employers
  129:11
employing
  144:18 158:24
  186:25 190:10
employment
  126:1 128:4
  129:24
employs
  186:21
encompassed
  6:6
encounter
  165:17
encountering
  118:13

Robert Cassanello
August 05, 2022                                                                      20

encourage
  40:20 157:5
end
  55:1 123:24
  171:9 212:21
  216:23
endorse
  40:6 114:16
  139:2,9 142:9
  143:14,22
  189:21
endorsement
  49:5 50:19
  55:1 136:9,
  10,24 138:2
  139:1
endorses
  111:3
endorsing
  109:19 121:12
  130:25 136:5
  138:6 143:17,
  18 144:11
ends
  71:10 159:8
  168:16
enforce
  32:12
enforced
  32:9 47:4
  150:25
enforcement
  150:22
enforcing
  13:1
engage
  133:18
engaged
  6:22 7:15

  158:24
engagement
  204:9
engaging
  126:20
engender
  137:23
Engerman
  139:21
engineering
  208:8
England
  72:7 91:23
enjoy
  99:3 132:6
enrollment
  46:21
enslaved
  140:25
entail
  195:17
enthusiasts
  92:5
entire
  122:16
entities
  174:4
environment
  45:10
envision
  91:13
episode
  21:13 97:21
  106:5
episodes
  21:17
equally

  69:23 143:17
  190:21
equals
  115:10 148:11
equity
  195:4,7,16,18
equivalent
  116:5
era
  129:21
erupt
  192:20
erupted
  192:18
escape
  30:17 108:18
escapes
  197:19
espouse
  113:20 114:16
  117:18,22
espoused
  76:14
espouses
  75:16 76:13
  78:3
espousing
  78:11 114:6
  121:12 136:5
  202:19
essay
  167:12
essentially
  36:22 80:12
  84:17 85:9
  122:11 128:8
  190:14 193:19
established

  135:14 174:19
  212:18
esteemed
  137:18
estimation
  203:19
ethics
  90:17
ethnic
  35:7 150:7,9
  154:7,10
  155:15,16
  194:4
ethnicity
  46:21
European
  150:9
evaluate
  161:20
evaluation
  92:20
evaluations
  79:18 84:9
event
  58:21 74:16
events
  29:20 33:8,18
  57:23 58:19
  60:4 182:5
everyday
  35:2,4
evidence
  6:10 47:3
  61:14 71:1,25
  95:19 119:9,
  10 120:4
  146:22 161:2,
  12

evidenced
71:24

evidences
155:21

evidently
40:4

exact
84:10 90:7
115:13 148:17

EXAMINATION
4:12

examine
44:11 46:2

examined
4:11

examines
125:21

examining
29:9 199:25

examples
46:17 201:3,
16

excel
201:24

excellence
185:19 186:2
190:5 194:12,
19 195:11
202:11 203:8

exception
55:3 62:15

exclude
129:2

excluded
126:24

exclusion
128:16

exclusively
34:24 36:23
97:5 130:18
149:11

excuse
20:25 44:18
66:8 132:17
170:1 189:18
209:19

exhausted
89:25

exhibit
15:1,21,22
25:18,25 26:2
27:6,8,9
28:24 49:13,
19,23 64:15,
16,18 75:3
93:5 99:7
124:10 167:6,
7,10,11
206:20,22

exist
73:19 143:22

existed
161:11

existence
71:23

exists
128:13 143:15

expect
13:13 157:4
181:7

expectation
168:16

expected
131:17

experience
30:23 62:6

89:25 110:14
112:21
113:13,14
175:5 202:4

experienced
59:22 71:4

experiencing
72:22

experiment
52:20 55:24,
25

expert
5:18 6:3,9
8:1,2 29:17
43:6 72:8
100:24 101:5

explain
47:10 55:6,10
69:12 73:11,
19 126:2
143:20 173:4,
10 194:3
196:24 202:8
206:18 207:17

explained
202:22 203:24

explaining
202:21

explains
63:12 125:23
191:9

explanation
9:14 104:10
116:16

explore
36:11 39:15

exposing
177:2

express
70:7 191:13
193:12 201:15

expressed
174:25

expresses
193:16

expressing
164:21

extend
90:18

extent
130:17 164:8
173:21

extra
88:1

eye
206:3,4

eyes
115:17

eyewitness
5:19,25

---

F

face
197:18

Facebook
22:19,20

fact
14:25 33:13
48:8,16,23
52:6 57:17
59:11 79:10
89:7 115:8
166:4 179:11
197:5 211:16
215:17 216:24

factors

99:25 100:8,9
102:15 108:20
198:19,21
199:7 200:2,
4,9,24

**facts**
34:3 55:13,14
57:6,8,12,13,
14,16,21
58:6,9,12,14,
17,19,22,23
59:2 62:22
73:23 119:10

**factual**
33:22,23 34:1
70:10 140:17

**factually**
33:7,18

**faculty**
20:3,21,23
80:19

**failed**
44:12 45:21
46:2 158:3,5
167:4 168:5
169:2 173:22
191:16 203:15

**failing**
191:7

**failings**
196:24 202:8,
22

**failure**
168:12

**fair**
36:4 63:13,
18,19,21 66:9
67:19 96:5
187:6 188:22
191:1 195:22

**fairly**
49:7

**fairness**
185:19 186:23
190:5 192:5
195:11 202:11
203:9

**faithfully**
186:22

**fall**
24:10,18,21
28:20 80:19
89:15 143:8

**false**
34:14

**familiar**
78:14 148:9,
13

**families**
174:11

**fashion**
133:22

**father**
45:4,6

**fault**
65:23

**favorite**
136:12

**fear**
116:19

**feature**
52:17

**features**
170:23

**February**
171:18

**fed**
209:15

**federal**
107:5

**feed**
215:19

**feedbacks**
88:15

**feel**
9:14 10:7
42:9 51:16
52:10 100:20
109:6 183:13,
20 184:18
185:1,3 192:2

**feeling**
77:25 175:7
176:19 182:2
209:23

**feelings**
51:20 152:19
183:10

**feels**
184:23,24

**fell**
29:9,12

**felons**
100:1 101:8
102:16 103:7,
11 105:18
108:23 111:25

**felony**
89:12,13

**felt**
11:20

**festival**
22:6,14,15

**fictitious**
34:15 35:25
120:8

**field**
19:21 44:11
46:1 72:6
195:19 209:4

**fields**
19:24

**fighting**
59:9

**figure**
54:7 73:8
119:6 140:22
148:17 154:16

**figures**
33:19 92:14,
16

**file**
87:6

**filed**
25:21

**fill**
155:13 180:1

**film**
72:14,15
170:17,18,23
171:7,10,17,
23 172:10,12
173:23

**filmmaker**
171:5

**final**
171:17

**find**
37:12 38:7
43:25 46:17
47:3 78:3
92:8 123:9
185:1

**fine**
15:14 67:2

124:21

**finish**
9:23,25  62:8
162:2

**finished**
10:9

**fire**
85:24

**fired**
89:19  92:21

**firm**
5:13  10:13
11:9

**firsthand**
71:2

**fits**
47:5

**five-year**
116:1  135:20

**fixed**
44:16  45:17
111:15,20

**flag**
210:6

**flight**
173:25  180:22
181:4,16
189:14  203:16

**Florida**
5:9  6:13  7:2
14:20  16:3,25
17:1,5,7,9
19:16  20:4,
21,23  21:8,16
45:7  53:19
56:23,25  94:4
158:9  167:23
208:13  209:4
210:8  213:18,

19

**flow**
137:6

**Floyd**
18:13  47:17
78:24  102:3

**fly**
210:4

**focus**
18:1,3  26:8
32:24  96:4
131:5,10,21
189:16

**focused**
51:21  95:24
108:5  127:7
131:11  132:10

**focuses**
29:9  100:25

**focusing**
58:22  114:22

**folks**
196:13

**follow**
33:10  72:16

**follow-up**
11:18

**followers**
203:4

**fondness**
136:24  138:23

**forbid**
136:21

**forbidden**
113:21

**force**
96:18  97:20,
23

**forces**
201:13

**forget**
199:11

**forgive**
65:14  89:10

**form**
28:13  35:8
73:10  109:1
147:15  155:13
212:18

**formed**
30:16

**forms**
28:20  71:11
150:6

**formulas**
140:4

**formulating**
164:20

**forward**
170:18  171:2
184:13

**found**
20:18  38:10,
12  99:5
147:12  150:6
172:2

**foundation**
78:5

**founded**
34:1

**founders**
91:12

**fourth**
171:7

**fragility**
126:13

**frame**
130:9  171:12,
13

**framing**
90:7

**frank**
144:21

**frankly**
72:10

**free**
9:14  14:8
30:19  169:17
199:12  210:17

**freedom**
14:9,12,13
52:24  210:10

**frequently**
175:4

**Friday**
13:22

**FSU**
16:11

**full**
4:19  91:13
199:4

**fully**
33:3,5

**fund**
53:17

**funds**
214:11

**funny**
215:21

**future**
66:14  175:20
176:8

---
**G**
---

**gain**
  127:19,25
  131:16 163:15

**Gather**
  217:13

**gave**
  7:9 11:15
  13:10 68:16
  80:13 87:21
  95:16 158:11
  176:7,22
  204:18 216:20

**gender**
  46:8

**gendered**
  168:23

**general**
  5:11 58:21

**General's**
  5:10

**generally**
  34:17 197:8,
  23,24

**genetically**
  155:24

**genetics**
  193:17

**genius**
  210:17 212:15

**gentrification**
  123:13

**George**
  18:13 47:17
  78:24 102:3

**German**
  190:19

**germane**
  53:6 54:17
  73:13 137:24

**get all**
  198:8

**get along**
  144:10

**give**
  4:5 6:3,9
  7:11 26:15
  34:8 36:9
  39:7,15 55:5,
  11 58:16,25
  69:11,15 70:1
  82:23 85:25
  88:1,15 89:5
  90:24 114:19
  122:6,10
  124:25 137:12
  139:10 144:8
  186:16 217:17

**giving**
  36:11 53:21
  77:2 88:5
  175:18

**glass**
  46:7

**goal**
  74:24 191:11

**goals**
  160:14

**good**
  4:14,16 41:13
  64:2 82:13
  91:11 155:12
  194:6 196:12
  198:3 217:22

**Google**
  216:10

**government**
  30:9 61:21
  150:2

**government-
funded**
  99:24 100:7

**Governor**
  158:9

**Governors**
  53:18 124:5

**Governors'**
  12:25

**grade**
  118:20 120:11
  199:20

**graduate**
  24:1,2,5
  137:7 147:4

**grandparents**
  45:4

**graphs**
  91:24

**grapple**
  168:12

**grappling**
  134:5

**gravitated**
  145:19

**Gray**
  6:2 7:1 8:13

**great**
  43:13 44:18
  79:8 115:9
  124:25 140:15
  144:7 151:19
  162:6 180:16
  198:10 204:19
  211:11

**greater**
  132:6 163:10
  201:14

**grievance**
  81:2,8,22
  85:22

**grievances**
  20:11 81:10

**Groucho**
  214:13,16

**ground**
  8:7 217:7

**group**
  92:21 149:5
  160:8 166:3

**groups**
  194:4 201:4

**grow**
  199:10 200:15

**grows**
  199:9

**guarantee**
  183:9

**guess**
  9:2 15:16
  25:25 63:18
  67:22 100:12,
  13 102:19
  127:25 142:2
  148:6 165:19
  193:16 214:11

**guessing**
  156:6,8

**guest**
  21:4 88:23

**guidance**
  56:21

**guide**

64:10 122:7,
8,9,17 133:2

**guided**
212:7

**guidelines**
210:16

**guilt**
51:20

**guilty**
51:16

**gun**
91:5,16 92:5

**guns**
91:9,13,20
92:1

**guy**
87:13 153:13

**guys**
15:13 44:1
153:10

---

**H**

---

**H-FLORIDA**
19:23

**H-LABOR**
19:23

**H-NET**
19:16,17
21:20,24,25

**H-PODCAST**
19:23

**H-URBAN**
19:23

**hair**
155:19

**hand**
4:3 27:20
64:6 82:8

95:3 125:17
166:21 169:1
180:10 204:17
206:12

**handing**
99:8

**handle**
51:3 81:9

**handled**
81:18

**handling**
82:4

**handpicked**
79:19

**happen**
71:15 86:25
175:18,19
183:16

**happened**
74:20 80:10
81:5 84:15
92:3 203:19

**happening**
71:10 176:25
209:8

**harbor**
183:10

**hard**
55:18 130:24
140:17 165:13
185:1,19
186:2 188:9,
14 189:1,22
190:5 194:12,
19 195:11
201:21,24
202:11 203:8

**hard-pressed**
78:2

**harkening**
169:18

**harm**
173:6

**harmed**
170:13

**hate**
123:21

**HB7**
12:25 13:1
14:7,11,13
33:2,17,21
34:2 44:7
48:3,25 49:16
50:20 51:12,
14,17 52:3,8
53:14,16
54:13,22 73:1
75:3 85:1,3
93:6 98:24
115:23 116:8
133:21 135:12
136:15 138:2
150:14 176:2
178:24 196:23
202:7 204:8

**HB7's**
109:18 130:23
172:20 188:8

**head**
8:21 9:21
10:6 20:14
27:5 35:15
67:18 89:9

**hear**
103:24 128:20
139:11 215:21

**heard**
105:13 130:14

**hearing**
46:14 79:20

**hears**
138:1

**heated**
174:24

**height**
127:11 130:11

**helped**
158:11

**helpful**
59:4 167:16
187:16

**Herrnstein**
192:14 194:7

**Hey**
53:14 57:17
66:11 85:2
116:11 182:21
183:7

**hide**
138:23

**high**
41:19 211:9,
10

**higher**
17:4 81:14
94:3 103:18
104:12

**highest**
154:17

**highway**
41:9,10,15,21
42:13,18,23
43:1,13

**highways**
43:5

**Hills**

115:15

**hinterlands**
31:4

**hire**
81:24

**hired**
6:2 17:23
81:25

**hiring**
100:11

**Hispanic**
107:23 108:24
109:10 110:16
147:19 154:12

**Hispanic-serving**
154:12

**Hispanics**
107:9 108:2

**historian**
16:12 39:7
51:9 55:20
57:4 59:3
60:12 61:2
68:14 133:5
153:14 171:5
216:19 217:4,
6

**historian's**
38:12

**historians**
19:10 37:1
44:11,19
46:1,4 55:4
56:3 57:7,12,
14 58:7,11
61:4 73:13,15
74:16 119:12
121:3 137:14

142:17 197:7
208:18

**historic**
6:10 7:12
41:15 42:15
98:11 167:21
172:11 195:20

**historical**
17:18 19:9,16
33:7 57:23
60:4 62:12
96:4 139:18,
19 143:19
145:23 158:17
159:22

**historically**
87:19 144:6
147:17,18
148:8 180:17

**histories**
71:3

**historiographical**
133:18

**historiographically**
132:21

**historiography**
132:22,24
133:4 142:16

**history**
14:19 16:1,8,
13,14 17:12,
14,24 18:5,6
19:13,14,15
23:21 24:22
29:18,20
33:13,19 34:9
36:10,14,25
37:10,19,20,

22 38:7,11,13
39:16 40:2,3,
14 55:4,5,11,
14,15,16,17,
20 56:2,5,14,
18,25 57:1,19
58:2,19,23
59:12 60:20
62:10,11,23
63:7,13 64:24
65:3,8 67:14
68:11 69:6,10
70:20 71:20,
24 73:4,23
74:6,17 94:2
98:8 108:6
119:1,2,5,8
130:14 132:25
133:16 137:1,
10 140:8
141:17,23
142:5,16
158:25 171:4
183:7 184:9,
11 189:5
198:12,13
203:6 205:3
207:3,22
208:11,23,24
210:25 211:10
212:17

**hold**
93:21 94:7,10
212:16

**Holocaust**
69:10,11,15,
16,24 70:2,3,
9,11,18,22
71:1,3,5,8,
13,14,16,18,
21,23 72:2,4,

9,18,21,22
73:8,10
74:10,14,19,
20,24 89:17,
18 90:8

**home**
134:24

**homework**
107:1

**honest**
162:25
197:20,21

**honestly**
86:1

**Honors**
171:6

**hope**
42:9 63:14
157:5 176:25

**host**
21:4

**hosted**
21:19 22:4,10

**hosts**
167:17

**hotly**
137:9

**hourly**
89:5

**House**
14:16

**human**
35:21 149:23
150:11 165:23
207:7

**humanities**
19:18,19

**humanity**

141:22

**humans**
153:5 156:1

**Hurston**
22:6

**hypothetical**
164:14 177:14

———————————

I

———————————

**I-4**
41:9

**idea**
18:7 35:22
37:2 56:16
69:18 71:14
72:19 114:24
127:18
128:11,16
130:4 137:20
150:18 156:20
177:8,9 194:2
197:15
208:19,23

**ideas**
38:25 39:2,12
133:21 137:6,
24

**identical**
49:16

**identification**
15:23 26:3
27:10 28:25
49:20 64:17
167:8 206:23

**identified**
48:7 71:25
108:20 150:14
172:17,18
201:21

**identifies**
15:25 193:7

**identify**
5:2 23:15
26:16 27:21
165:16 172:15

**identities**
158:21

**identity**
157:2 162:8

**ideological**
129:1

**ideologically**
125:24 126:3
127:16,20

**idiosyncratic**
34:21

**ill-will**
175:5

**illuminating**
62:8

**illustrating**
124:12

**imagine**
122:8 133:25
176:16 185:4
214:12

**impact**
174:13 199:21

**impacted**
170:25 182:6

**impacts**
163:2

**impetus**
195:3

**implementation**
43:1 150:22

**implemented**
158:3,4
213:1,3

**implementing**
43:17

**implications**
43:10

**important**
9:18 62:6
122:18 126:8
135:2 137:1
138:17 212:9

**imposed**
130:4,6

**impossible**
55:5,11 68:11

**impression**
116:21

**imprisoned**
111:24 112:4

**imprisonment**
104:6 105:5

**impulse**
129:10

**inaccuracies**
65:2 67:14,16

**inappropriate**
71:21

**incarceration**
103:23

**incidence**
104:12

**incident**
84:3 87:19

**incidents**
60:5

**inclination**
205:10

**inclined**
103:20 116:4
119:25 124:1
173:24 178:4
181:9 183:11

**include**
12:15 18:13
70:3 110:16
116:25 117:1,
2 155:2
189:12

**included**
70:20 114:17

**includes**
50:14 118:6
135:6,10

**including**
12:20 13:21
36:10 75:8
102:14 110:12
158:8 193:21
203:2

**increase**
30:23

**increased**
192:22

**incredible**
137:7

**inculcate**
113:21

**inculcates**
75:17

**inculcating**
114:7

**Independence**
210:19 212:13

**independent**
39:5,9 78:22
84:2 123:24

indicating
216:8,12

indifference
74:15

indifferent
170:6

individual
14:12,13
35:21 95:19
97:21 112:23
192:6 200:10
201:3 211:8

individual's
152:13 201:8

individually
192:2

individuals
106:6 156:24
165:17 201:17

indoctrinate
54:6

inferior
90:6 104:12
105:8 195:6

influenced
37:16

informal
101:21

information
10:15 33:22,
23 34:2 38:23
90:12 164:18
165:25 168:5

informed
69:22

informing
71:12

inherent

indicating
35:20 54:18
91:7 151:14
195:14 217:2

inherently
93:10,13
152:3,4
186:14 190:3
191:12 195:5,
10 203:25
212:15

inhuman
100:2 105:18,
20 106:1,2,7,
9,18 108:23
111:25

inhumane
112:16

initial
35:19

initially
120:22

injustices
182:3

innate
194:5,15
195:25 198:20
199:22 200:3,
11

inside
185:5

insincere
163:21

Instagram
22:21

instance
88:18

institution
154:12

institutional
40:21,23,24
41:22 42:20
43:19 95:13
97:3,8,18
104:8 110:2

instruct
34:5 56:13
57:3 179:13,
18 180:2

instructing
90:3 202:9

instruction
40:20 49:4
50:17,18
54:24,25
56:24 71:22
75:16 85:5,8,
12,17 86:3,4,
9,12 87:18
88:15 113:20
117:17
121:20,23
131:4 134:12
135:4 136:22
146:11 188:15
191:15

instructor
116:23

instructs
10:4

instrument
190:3

instruments
186:12

insulting
65:11

integrate
174:1 178:5

integrated
90:4 96:18,20
97:23 130:16,
17 153:25
154:1,2 156:3
168:17

integration
160:14
168:12,19,24
170:13 203:18

intellectual
126:14 193:24
199:22

intellectually
135:2 195:6
217:5

intelligence
193:18 194:4,
5,15 195:25
196:19 198:20
200:3,11

intending
139:3

intent
28:15,18
41:1,3,10
42:6,12,14
43:16 53:2
57:4 69:18
102:22,24
122:22 149:15
177:11 190:8,
11,13 191:5
196:9,13

inter-
153:18

interact
164:2

interacted
145:21

interaction
  96:13 151:13

interactions
  96:15

interest
  133:14 135:3
  164:20

interested
  6:14 10:19
  11:14,16,20
  16:12 94:11
  130:1

interesting
  99:6 137:24
  163:4

interferes
  34:4 168:18

internal
  28:13 92:20
  184:6

internalize
  182:16,20
  184:8

interpret
  38:7 56:10
  62:12 111:21
  133:6 150:10
  162:4 180:24
  181:25 183:11
  204:8

interpretation
  33:14,22,24
  34:5,6 37:1
  39:11 55:15,
  16 56:3 57:8,
  13,15,20
  58:8,12,14,24
  59:2,12 62:2,
  5 65:1,2
  67:3,11,14,16

68:1,4 71:9,
  11,12 118:14
  119:10 120:25
  141:5 142:13
  169:23 181:11

interpretations
  36:12 39:15,
  18 66:19
  118:11 170:12

interpretative
  192:12

interpreted
  104:2 112:24

interpreting
  62:11 114:9

interpretive
  68:12,13,15,
  18,25 69:1,4,
  5,7 70:19,23
  71:22

interracial
  153:19

interrupt
  59:25

interrupting
  65:14

interruption
  60:13

interstate
  41:9,10,14,21
  42:13,18,23
  43:1,5,13

interview
  21:14 22:12

interviewed
  22:12 54:2
  171:24 172:5,
  6,12,15

interviews
  71:2 167:12,
  18,24 168:3
  170:2,23
  172:1,11

intimidated
  185:3

intolerance
  35:7 36:5

introduce
  36:22 52:10,
  11,12 67:6
  167:3 190:2
  203:22 210:24

introduced
  29:24 211:4

introduces
  130:8 193:14
  207:7

introducing
  6:15 38:14
  51:17

introduction
  111:7

invariably
  140:11 142:1

investigate
  116:7

investigation
  116:9

Invisible
  6:12 59:7

invited
  21:4

involved
  10:11 59:1
  81:3 133:10
  172:9

involvement
  83:14

involves
  158:2

involving
  35:22 82:17

Irish
  190:19,20

irrelevant
  136:2

irresponsible
  179:23

issue
  58:11 75:5
  95:25 124:2,3
  133:16 192:7

issues
  31:18 128:21
  180:22 195:13

italics
  193:8

Italy
  45:5

items
  167:21

ivory
  115:17

_____

**J**
_____

J-E-W-E-T-T
  12:1

Jacksonville
  5:13 6:7,11,
  13,18 7:13
  16:23 59:7,
  10,16,22

January
  22:7 78:20

79:21

**Jessie**
11:7,12 12:7

**Jewett**
11:25 12:3

**Jewish**
74:21

**Jews**
73:7 74:14

**Jim**
6:12 23:22
25:13 27:16
29:9,12,21,
22,25 30:2,7,
11 31:9,11,25
41:2,25 42:7,
9,19,21
44:19,20
59:8,9 65:12
98:13,15,18
99:1 102:20,
22 106:23,24
109:17
113:17,24
123:6 133:17
138:22 182:5,
16 195:20
196:18

**job**
67:2 80:15
116:22

**jobs**
126:22 127:22
129:2 170:16

**John**
5:7

**John's**
21:12

**judge**

84:9,10

**Julian**
22:8

**jump**
48:23 180:11

**jumping**
10:18

**junk**
197:5,8,10,11
198:5,6,15,17

**justice**
99:23 100:25
101:22 103:17
104:1,9,20
110:12
112:10,18,21
113:9 123:7,
8,12

**justifies**
100:1 105:18

**justify**
108:23

___

**K**

**Karl**
213:16
214:15,18
215:8,15,20,
23 216:2,7
217:6

**keeping**
131:21 189:16

**kind**
6:24 13:14
16:18 20:15,
16 22:1,2,14
38:20 52:20
57:18 59:19,
22 60:19,20

67:11 68:3
71:24 73:11,
19,24 74:22
76:23 79:19
80:21 95:3
97:11 104:3
108:18 119:11
124:14,19
126:13 127:23
129:25 133:9,
13,18 137:5,
21,23 140:5,
11 142:7
159:9 160:8,
14 163:3,8,13
165:12
176:13,21,25
178:3 179:20
181:15 182:25
189:11,14
191:24 203:8,
17 208:17
209:11 211:13
212:17 215:21

**kindergarten**
17:2

**kinds**
101:23 137:24
201:13

**Kirk**
5:5,8 158:9

**Klan**
152:1,16,17

**Klansman**
153:2

**Klux**
152:1

**knew**
107:1 205:9

**Knights**
130:13

**knowledge**
108:14

**Ku**
151:25

___

**L**

**label**
101:7 103:11,
12

**labeled**
111:24

**labeling**
103:6,9
108:24

**labels**
100:1 102:15,
17 105:17
108:22 109:10

**labor**
16:12 19:15
125:23,25
126:17,23,24,
25 127:10,11,
22,25 128:14,
21 129:8,16,
17,18,19,22
130:11,13,15,
21 132:3,10
133:16 134:2,
23,24 135:5
189:6 190:19,
23

**lack**
119:2

**Lake**
53:24

land
  65:13
language
  56:23
larger
  49:3 50:17
  54:24
lashing
  183:12
late
  32:4 72:14
  159:3 167:22
latitude
  53:21 114:20
laughter
  91:2
law
  7:3 10:13
  42:19 47:21
  48:8,9,17,22
  49:9,11 53:1
  54:10,11
  65:13 89:8
  113:16 172:21
  175:20 177:10
  192:13
lawmaker
  52:22
lawmakers
  43:12 150:18
laws
  32:9,18 42:7,
  10 56:24
  89:7,9
lawsuit
  10:12
lawsuits
  32:6

lawyer
  10:24 80:5
  81:24,25
lawyers
  7:15,18 10:21
lead
  153:19 176:21
leaders
  61:20
leadership
  69:2
leads
  78:6
League
  120:2,3,5,13,
  21 121:1,5
learn
  89:16 182:4
  184:9 205:23
  212:22 217:25
learned
  152:6 184:13
learning
  38:17,20
  40:17 115:24
  151:11 184:10
leave
  204:7
leaving
  91:19,20
lecture
  53:12 149:13
ledge
  183:6 184:3,4
left
  22:9 196:17
leftist
  214:13

legacy
  135:1,6
  136:20
  137:17,23
  138:5 139:2
  196:17
legal
  92:12 102:24
  148:8
legislation
  14:16 32:14
  43:16,17
  44:6,9 69:18
  75:19 115:3,
  22 134:7
legislative
  32:22
legislature
  7:2,10 53:19,
  23 56:25
  116:10 124:4
  208:24,25
  209:4 210:14
  211:4
legislature's
  7:17
legitimate
  73:23
lens
  68:12,13,15,
  25 69:1,4,5,7
  70:19,23
  71:22 192:12
lenses
  68:18
lesser
  178:2
lesson
  67:8 181:8,

12,15,25
  183:23 184:13
lessons
  182:16,21
  184:10
letter
  85:5,8,9,12,
  16,21 86:3,4,
  7,8,11,12,21,
  24 87:5,7,11,
  17 88:14
level
  31:13 46:25
  83:15 195:19
  209:3
levers
  97:9
libraries
  213:15
library
  37:8 213:20
  214:10,22
lie
  16:5,6
life
  6:13 19:12
  164:3
light
  47:17 183:23
likes
  211:22
likewise
  112:3,5
limited
  189:9
lineage
  138:10
lines

115:2 196:15

**link**
167:14,17,21
168:3

**linked**
209:7

**Lisa**
170:18

**list**
19:6 21:2,6
66:25 138:21

**listed**
23:5 49:2
50:16 54:23
114:13 196:5

**listening**
20:19

**lists**
75:19

**literature**
73:14 173:19
203:1

**litigation**
14:4,5

**live**
30:24 160:20
181:3

**lived**
46:19 182:24

**local**
31:5,13,18
32:14 46:25
53:23,25 54:2
80:3 83:13,15
95:19 115:6
160:14

**locally**
22:5 46:20
81:9,18

**locations**
41:17 43:2

**logic**
6:17

**long**
6:8 10:9
14:21 18:6
20:12 26:21
37:19,22
38:6,11,13
40:1,14 58:1
63:7,12
119:1,5
215:25

**longer**
22:22

**looked**
12:21,24,25
39:7 61:22

**losing**
170:16

**lot**
16:14 18:16
44:19 52:23
59:5 66:14
89:1 113:7
121:1 123:7
150:6 162:17
168:21 177:20
185:3,4
192:22 212:21
215:14

**Louis**
170:21

**Louisiana**
105:24 139:22

**love**
117:2

**lower**

45:10

**lunch**
199:12

**lynching**
179:15,20
180:4,17
181:1,24

———————

**M**

**Madam**
15:20

**made**
22:22 78:21,
22 115:25
129:4 171:13
176:17 183:13

**majority**
34:24 113:14
154:17 199:11

**make**
9:12,23 24:16
43:12 74:2,25
83:3 87:23
90:3,13 97:6
101:13,15
115:3 122:23,
24,25 124:2,
3,22 127:18
131:19 138:11
143:13 144:20
149:5 160:2
165:25 168:22
184:8,11
187:10 193:23
196:10,11
217:25

**makes**
97:5 108:8
201:4

**making**
51:16 74:21
84:14 91:25
100:20 129:22
145:13 160:12
162:11 163:4
177:20 201:11
208:14

**man**
10:13 105:24

**management**
128:16 130:4

**manifested**
47:17

**manner**
49:5 50:19,25
54:25 70:1

**manual**
126:23

**mapped**
86:24

**mapping**
137:19

**maps**
6:5 193:20

**Marching**
170:17 171:1

**mark**
15:17,20
25:18 27:7
28:22 49:13
64:14 99:7
167:6 206:20

**marked**
15:22 25:25
26:2 27:9
28:24 49:19
64:16 75:3,12
167:7,10

206:22

**market**
129:12 210:17

**marriages**
153:19

**Marx**
213:16
214:13,15,16,
19 215:9,15,
20,23 216:2,
5,7,23 217:6

**Marxism**
216:24,25

**Marxist**
132:7 214:24
216:13 217:1,
5,8

**Marxists**
54:6 117:4

**masses**
59:13

**master's**
17:7,13

**material**
39:19,22,25
51:17 114:17
120:13
127:19,25
131:16 132:6
163:15 178:11
204:1

**materials**
98:24 115:24
154:7

**math**
208:8

**mathematically**
198:11

**mathematicians**
198:9

**Matt**
159:19 168:4,
14

**matter**
11:21 12:2
74:15 82:18
121:16 123:25
124:5 136:1
143:8 148:12
151:24 164:19
187:3

**Matthew**
158:7 169:2

**meaning**
18:12 34:16
35:2 59:12
150:9,15
156:13

**meaningful**
168:24 203:18

**means**
107:17 111:11
126:25 148:14
151:4

**meant**
74:12 97:16
101:9 110:3

**measuring**
186:13

**mechanism**
79:14

**mechanisms**
52:8

**media**
22:18,25
112:19 158:6
167:13

**meet**
147:14

**member**
18:15,16 19:8
20:3,12

**members**
20:11 48:11,
12 75:22,24
76:2,10,14,15
142:24 143:2
155:2 156:17
172:24 173:12
176:4 177:17
179:3,9 180:5
185:21,23
189:23,24
202:13,15
214:18

**memory**
66:7 110:11

**Memphis**
59:21

**men**
31:14 100:1
101:7 102:16
103:5,6,10,
11,17,18
105:6,17
108:22,25
109:10

**mental**
77:24

**mention**
60:23 133:1

**mentioned**
27:18 55:12
83:17 104:17
128:9 133:1
143:6 150:5
165:18 187:20

189:8 200:16
209:8 210:13

**mentioning**
213:11

**merit**
80:14 130:24
155:25 185:19
186:2 188:9,
14 189:1,22
190:4,10
191:10 192:4
194:12,19
195:11 202:11
203:8

**meritous**
203:24

**met**
166:8

**Methodist**
17:23

**methodologically**
197:17

**methodology**
124:14

**methods**
73:4 129:5
139:24 197:12

**Mexico**
128:22

**Michelle**
99:2 103:2
104:7 106:14
109:24 110:5
117:17

**Michigan**
22:9

**migration**
16:22 128:21

miles
6:8 17:21

milieu
51:11

million
73:8 74:15,21

Mills
170:18 171:1,
24

mind
45:3 50:24
53:21 67:9
84:25 100:9
102:21 143:18
146:17,25
182:10 198:22
207:17

minds
150:18

mine
12:7

Minneapolis
102:6

minorities
108:11

minority
41:19 107:24
211:19

minutes
178:19 217:9,
17

misconduct
89:20 90:13,
16 92:19
93:1,3 179:25

misconstrued
136:8,10

misconstruing
165:12

misidentified
49:22

missing
180:14

misunderstand
112:12

misunderstandin
g
55:3

misunderstood
112:8

mobility
45:2,12,16
46:24 189:10
200:7

mobilizing
126:20

mode
21:21

modify
143:13

module
64:11

mom
45:6

moment
64:2 69:6
99:16 142:15
166:17 189:17

moms
168:21

monitored
211:16

monitoring
211:12

months
86:5

moral
47:22 48:3,
13,19 49:10
50:14,21,22
51:10 52:16
76:25 94:16,
20 95:2
103:20 109:19
110:24 131:1,
11 132:16
191:7

morally
48:12 51:7
52:2 75:23
76:2,10,15,24
77:16 90:6,8
104:11 105:7,
8

morning
4:14,16,18

mothers
160:13

motivations
163:6

motives
163:21

mouth
104:24

move
43:20,23
44:12 45:21
46:2 54:19
75:2 93:5
125:9 136:14
157:24 174:11
178:13 185:6
189:12

moved
45:7

movement
18:7,8,11
23:21 24:6,22
26:14 29:24
37:3,10,15,25
38:2 40:3
58:4 59:16
61:3,8,9,13
63:8,13 66:20
68:20,24
125:24,25
126:17,25
127:11 128:14
130:11,21
132:3,11
133:11,16
134:2,23,24
135:5 158:2,4
159:9 168:8,
13,15,23
170:12 172:22
173:5,8,11
174:22 182:6,
17 189:6
190:19,24
207:6 208:12

Moving
130:22 170:11
172:20

muck
208:25

multifaceted
102:22

multiple
108:11 174:1

municipal
31:15 32:18
47:19

murdered
74:14

**Murray**
  192:15  193:22
  194:7

**Museum**
  25:6

**Myspace**
  23:1

---

**N**

**NAACP**
  7:2  61:21
  66:12

**named**
  12:7  22:8
  215:2,3,8,17

**names**
  139:20

**narrative**
  62:13,17,18,
  19  63:4,5,12
  72:15  119:16,
  17,18,19,21,
  23  120:10
  142:12  168:7
  169:8,21,22,
  24

**narratives**
  169:20

**narrowly**
  96:10

**nation**
  30:16  91:13
  209:23,24

**national**
  19:13,14
  48:12  75:14,
  23,24  93:9
  94:18  95:22
  109:22  131:3

142:24  143:1
158:6  159:9
172:24  173:1,
13,15  178:25
179:4  185:22,
23  190:18
202:14,15

**nationalism**
  207:5  209:6,
  16  210:23
  211:6  213:2

**nationalists**
  120:7

**nationally**
  95:17  171:11,
  17

**natural**
  182:4,14,18
  191:22

**nature**
  93:2  133:7

**necessarily**
  40:25  94:9,
  17,20  95:9
  97:4,10
  109:21  111:5,
  11,14  113:2
  117:23  131:2,
  13  132:1,18
  138:8  153:3

**necessitated**
  8:16

**needed**
  87:16

**negotiate**
  87:22

**negotiates**
  20:10

**negotiations**

128:1

**Negy**
  78:14,15,18
  79:15  81:25
  82:2,4  87:14

**neighbor's**
  151:25  152:5

**neighborhood**
  210:6

**neighborhoods**
  41:19  42:15
  43:15  47:15
  101:2  115:16

**Neil**
  16:11

**network**
  19:22,23

**neutral**
  138:15

**neutrality**
  185:20  190:5
  195:11  202:12

**Newhall**
  5:9  43:25
  161:7  163:19
  206:3  214:23
  215:1

**news**
  53:25  54:2
  78:17  90:25
  102:10  153:10
  167:21,25
  213:4,6
  214:21

**newscaster**
  54:3

**newspaper**
  61:20

**nod**
  9:21

**nods**
  10:6  27:5

**non-people**
  111:23

**nontenured**
  79:25

**normal**
  144:24

**North**
  30:12  31:23
  32:1,4,8,17

**Northern**
  30:1,3,18,22
  31:1,2,12

**note**
  64:22  141:5

**notice**
  29:23  36:21
  184:5

**noticed**
  94:24

**notion**
  34:14  35:25
  38:11  49:9
  91:6  95:2
  102:18  104:20
  142:17  143:5,
  14,18  144:11,
  18,19  147:5
  148:10  191:10
  193:12

**notwithstanding**
  97:19

**nuance**
  180:14

**nuanced**
  83:25

number
14:17 28:23
30:24 48:11
64:15 67:6
73:16 79:9
80:8,9 93:5
94:15 95:1,5
110:22 114:2
121:20,22,24
131:9 134:10
136:15,21
142:23
154:16,17
173:2 178:14,
15,24 180:8,
10,20 185:6
191:14
202:10,19
216:1

numbers
107:12 128:4,
5 129:23
140:7,15
141:18,19,25
142:3

numeral
49:25

Nuremberg
72:12

O

oath
4:11 7:22,25

object
10:2 109:1

objectifiable
62:1 142:18

objective
38:25 49:5

50:19,25
54:25 55:5,9,
11 56:4,5,6,
17 57:1 69:8,
9,15 70:4
138:20

objectively
57:6

objectivity
55:17 56:14,
20 138:16
139:14 141:17
142:7,20
185:20 187:10
190:5 195:12
202:12 216:25
217:2

obvious
65:11 70:18,
22,24 131:18

occasion
98:5

occupation
14:18

occur
72:5

occurred
43:2 54:14
57:7,23
58:20,21
70:11

occurs
97:19

offend
53:20

offense
178:11

offenses
89:3

offer
37:1 59:7
98:25 131:4
134:12 172:21
188:15 191:14

offered
42:22 96:7
175:25 190:14

offering
38:6 39:10

office
5:10 86:6
89:5 92:11
204:13,18,20
215:17,20,24
216:2,6

officer
96:25

officers
89:2 96:23,24

official
101:20

oftentimes
31:17 176:19

one's
35:22 95:21
203:10 209:23

one-drop
148:10

online
19:20 73:21
115:22 171:20

open
166:4

operate
196:16

operates
112:12 152:24

opinion
34:24 35:3
52:5 70:2,6
79:11 137:17
150:16 163:3
164:19
175:12,15
178:1 181:8
195:8 199:23

opinions
69:19,20,21,
22

opportunities
195:7 209:16

opportunity
116:2 132:6
201:15

opposed
6:18 21:4
32:23 44:21
45:18 77:23
80:9 100:21
125:24 126:3
127:16 130:3
145:20 158:12
203:10 209:16
210:24 212:9

opposite
41:3

oppress
185:23 189:24
202:15

oppressed
94:17 95:8,21
96:8,14,22,23
98:2 109:20
111:4 112:5,9
113:2 131:2,
12,25 132:18
138:7

Robert Cassanello
August 05, 2022

37

oppressing
128:25

oppressive
93:10,13
108:10

optics
205:5,6,21,22
206:1,3

option
101:10 169:14

order
99:15 137:10
171:23 174:17
206:10

ordinances
32:14

organization
19:10,12,13,
19 20:8,15
129:10 214:8,
9

organization's
214:12

organizations
18:15,16 19:6
61:19 126:24
129:20,22

organize
129:8

organizers
208:17

organizing
18:9 208:12

origin
48:12 75:14,
23,24 93:9
94:18 95:22
109:22 131:3
137:5 142:24

143:1 150:8,9
154:7 155:15,
16 172:25
173:1,13,15
178:25 179:4
185:22,23
190:18
202:14,15

original
38:25 39:2,
10,12 62:5
123:6,20
212:18

originate
32:13

Originated
171:15

origins
29:25

Orlando
6:7,18 170:22

Oswmer
170:20,21

outcome
41:1,2,6,20
42:7 76:23
77:19 186:23
201:1

outcomes
41:25 42:1,24
43:19 77:13
100:19 102:5,
7 110:13
112:20 140:7
190:8 199:22
200:6

outdated
64:25 65:6,8,
12 66:3,5
120:25

outsiders
100:21

over-policed
47:14,15

overcome
129:10

overemphasizing
61:5

oversee
81:23

oversees
20:11

overwhelmingly
71:24

owe
217:6

owned
31:18 32:12

owners
91:13

ownership
91:16

_____

P

p.m.
125:5 178:20
217:19

Pace
65:25

pads
92:12

pages
15:8,10

paid
31:16,20

panicked
79:12

paper
73:5,7

paragraph
26:8 27:4,12
29:8 32:24
40:19 41:24
43:20 44:4
47:20 48:23
50:13,15
54:19 55:2
64:20 68:6
94:15 98:21,
24 108:20
109:15 110:23
125:10 130:22
157:24 170:11
172:20 179:11
181:18
187:21,23,25
188:5,7
189:12 192:8,
11 196:23
197:4 199:2,6
202:7

paragraphs
168:4 170:1,8

paraphrase
39:19

paraphrasing
48:9 54:4
79:1 115:12

parent's
201:10

parentheses
150:10

parenthesis
150:7

parents
158:12,16

Robert Cassanello
August 05, 2022

38

parlance
35:2,5 120:25
128:20 153:19
195:5

parse
30:7,9

part
8:23 31:10
40:11,20
43:16 49:3
50:17,25 51:7
54:11,23
58:23 84:18
97:4 98:6
100:12,21
101:17 102:18
103:19
110:24,25
113:24 118:2,
4,5 121:25
123:20 125:22
131:5 149:23,
25 167:3
170:23 173:19

participant
7:24 146:9

parts
6:6 29:13
47:14

party
5:21,22 14:6
216:18

pass
174:17

passage
51:1 110:18

passed
56:24 172:10

passionate
138:19

past
9:12 47:12
144:7 167:18
179:3,9,15,20
180:5

pastors
69:3

paternity
135:2

pathologically
119:25

pathology
79:3 104:11
176:9,18
177:15 178:3
195:14

patience
217:22

patriotism
207:5 209:6,
16,20,22,25
210:24 211:7
213:2

patronize
42:8

pay
87:1,2 170:16

paywall
171:22

pedagogical
36:17 38:16

pending
10:10

people
5:3 22:13
33:8 34:14
36:25 37:22
45:19,22
53:10 59:13,

19,23 60:7,24
71:3,12 74:21
79:3,5 92:1,
2,4,15 97:4,9
103:19,22,25
104:11 111:23
112:1,16
115:9 117:14
118:6 119:24
121:4 126:9,
12 135:20
137:21 140:24
141:8 143:7,
10 145:3,4,
14,16 149:6,
8,9 152:17
153:18 156:1
157:8 158:19,
24 160:4,8
162:4,13,15,
17,18,19
164:23 165:5,
8 175:21
177:1 178:2
184:11 186:12
190:10 193:21
194:2 195:5,6
201:5,14
212:5 217:25

people's
59:20 146:5
154:10 155:16
201:12

perceive
157:4

perceived
101:1 143:12
172:23 173:11

perceiver
151:20,22
152:12

perceiving
156:2

percent
17:1 34:25
54:4,7,8 66:8
92:1 117:3
140:24 141:6,
8 154:11,15

perception
40:11

perceptions
147:20

perfectly
69:13 144:21

performance
53:16

period
18:9 21:12
30:15,20
37:23 74:16
130:12 159:1,
2,11 161:12

periods
127:6

permit
50:21

permitted
31:17

pernicious
207:4

perpetuates
99:23 100:6

person
11:4,17 38:6
45:13 66:20
81:22 85:22
93:8,12
105:23 106:19
112:6 115:5,

19 144:18
146:2,22
151:20 152:2,
3,16 157:10,
11 160:3
165:10,11
172:9 174:3
175:15 177:22
178:24 179:6
182:21 184:12
186:24,25
187:14 190:2
195:8 199:9
201:7

person's
38:8 94:16,20
95:8 98:2
109:19 111:4
113:1 131:1,
25 132:16,17
138:7 146:17
198:19,20,23
200:2,4,5,25

personal
55:21 78:25
137:16
179:14,19
181:5 182:3
191:24 194:22
200:9,10

personally
80:18 94:8
105:12,15
146:8 162:9
184:20

persuaded
63:2

perused
120:21

pervasive

106:13

petition
208:20

Ph.d.
4:9 15:25
17:3,9 153:14

phenomenon
96:25 97:18
161:11

philosophically
56:17

philosophy
126:11
132:24,25
142:16 217:1

phone
11:13

photographic
71:1

photos
216:7

phrase
199:25

phrasing
109:7 190:25

physicists
55:23

pick
122:16,17
150:3,4,8

picked
108:17

pictures
216:11

piece
115:2,22
131:11,13

Pine
115:15

pitch
87:23

pitched
208:19

Pittsburgh
61:3,19

place
83:14 86:17,
24 110:18
111:1 119:20
181:1 184:25

places
102:5 126:19

plagiarism
90:20,21 93:2

plagiarizing
92:23

plaintiff
6:24 10:12
14:6

plaintiffs
6:21,22

plan
94:25 98:13
99:17,18
125:12

planned
28:8

planning
27:16 98:25
99:13 123:13

plantation
139:22 140:3,
9,24 141:10,
11,12

plantations

141:12

played
203:17

playing
195:19

plays
130:2

plenty
21:1

plural
61:25

podcast
20:17,20
21:7,19 22:2,
4,12

podcasts
20:16,24 21:3

point
11:19 12:8
18:22 19:1
23:11 30:25
32:1 43:11
61:14 74:23
87:16 88:6
106:15 110:19
130:20 131:21
137:1,5 147:8
187:7,9
188:22 191:22
192:7 195:3,7

pointing
137:20

points
48:10 61:3

poked
118:6

police
47:19 89:1
96:16,17,23,

24,25 97:13,
14,20,23
100:20
101:14,22,24
102:4 165:9
166:15 175:22

**policeman**
97:21

**policies**
40:25 47:19
95:19

**policing**
47:2,4,8 52:8
95:19 97:12
98:12 99:24
100:7,12,13,
16,17,23
101:3,4,10,
11,16,17,21
102:4 103:3

**policy**
12:25 41:4
42:6,17 43:2,
17 85:1,11
100:13 101:20

**polite**
13:14

**politeful**
175:2

**politic**
209:24

**political**
6:10 7:12

**politically**
41:18 216:15,
18

**poll**
31:20

**popular**

36:24 126:6
211:22

**populated**
60:9

**population**
30:19 104:2
107:11,12

**populations**
41:19 104:13

**port**
31:3

**portion**
75:12

**portrays**
112:20

**position**
71:5 79:4
109:17,23
110:3,7 122:2
164:16 165:8
209:14 211:19

**positions**
47:19

**posits**
99:22 110:11

**possibility**
74:13

**possibly**
155:20 156:21
160:4

**post**
168:6

**post-civil**
127:9

**posted**
209:10 214:5

**postmodern**
57:11

**potential**
121:8

**potentially**
188:19

**poured**
92:5

**poverty**
7:3 199:9

**power**
97:4,9 129:9

**powers**
175:22

**practical**
72:20

**practice**
56:14 101:16,
25 126:21
133:8 139:24

**practiced**
52:1

**practices**
100:11

**practicing**
57:4

**pre-1950**
98:11

**pre-height**
127:10

**precedence**
158:11

**predates**
210:12

**predisposed**
160:5

**predominantly**
158:8 160:9

**predominates**
56:18

**prefer**
4:21,24
149:10,18

**preference**
203:11

**prejudice**
34:13 35:7
54:18

**prejudiced**
118:21

**prejudices**
44:24 115:1

**premise**
98:16

**premised**
51:6 133:24

**premium**
41:16

**preparation**
13:6,7,17

**prepare**
12:12

**preparing**
12:18,19
108:16

**prepped**
28:17

**prescribe**
102:24

**prescribed**
14:9

**prescribing**
103:4

**presence**
144:8

**present**
119:1,4,22
137:3 144:8

189:4

**presented**
65:3 67:15
120:3

**presenting**
175:7

**Presents**
119:18

**president**
20:5 21:23
81:4,5,6 82:2
83:1

**pretext**
190:15

**pretexts**
187:7

**pretty**
22:21 26:21
108:5 121:3
173:20 174:18
180:17

**prevent**
160:13 202:21

**preventing**
158:10

**previous**
56:24 171:8

**previously**
57:9 172:1

**primarily**
129:21

**primary**
8:18 16:16
37:4,9 60:3,4

**primordial**
151:14

**principles**
187:12 197:23

**printed**
122:6

**prior**
17:17

**prison**
105:24 106:8,
13

**prisoners**
106:10 110:16

**prisons**
107:5,11
110:12

**private**
17:22 32:10,
23 174:14
182:25

**privately**
32:12

**privilege**
95:21 126:13
127:1 133:23
203:11

**privileged**
94:17 95:8
96:7,12 98:2
109:20 111:4
112:9 113:2
131:1,12,25
132:6,18
138:7

**probate**
91:18,19

**probe**
34:7 51:5
141:7

**problem**
33:12 50:24
56:20,21
58:22 60:15

72:24 87:19
142:12 143:5
144:17 210:7,
8 212:14
216:24,25

**problematic**
212:20

**problems**
72:25 181:4
195:12

**proceed**
62:9

**Proceeding**
68:6

**Proceedings**
4:1

**process**
81:2,3 83:15
88:16 90:10

**produce**
28:14 31:19
35:13 41:1,5
56:6 119:9
171:1,23

**produced**
28:3 56:5
140:6

**producer**
22:10

**producing**
39:2 142:1
198:11,12,13,
14 217:2

**productive**
212:7

**profess**
152:18

**professing**
139:5

**profession**
117:13 142:19
207:3

**professional**
19:13 36:25
55:20 71:19
116:22 164:4

**professor**
4:23 11:16,23
14:19 39:1
45:8 78:18
79:25 91:3
94:12 104:16
105:13,15
118:22 170:18
183:13 185:2
204:18,24
205:6,21
208:11

**professors**
54:4 69:10
92:21 117:4
177:4 185:4
205:17

**profile**
11:15 101:15

**profiling**
99:25 100:7,
19 101:12,18,
19

**progenitor**
126:10 133:21

**progenitors**
210:20

**program**
22:1,3 153:14

**programs**
101:22

**progressive**

Robert Cassanello
August 05, 2022

84:20,23 85:3
88:13,21,25
89:3

prohibit
48:3,18 50:16
51:12,14 52:5
78:10 121:22
133:22

prohibited
115:2 121:24
135:7

prohibition
130:23,25
134:21 188:8,
24 202:18

prohibitions
135:12

prohibits
47:21 49:9
202:9

project
21:22 171:9
172:11

promise
85:11 86:10

promised
86:8

promote
71:4 113:20
117:19,22
194:2 209:6
211:6 212:5

promoted
41:12 73:21

promotes
75:16

promoting
114:6 128:15
207:5 210:23

promotional
22:14

prompt
37:11 39:7
67:25

prompts
48:14

propensity
103:22

property
31:19,21
41:16 210:5

proponent
126:6

proponents
195:23 196:7

proportion
106:21

proportionality
103:15

proportions
103:18

proposed
27:22 28:8,10

proposing
73:10

proposition
35:6 40:4
72:4 98:1
108:19 132:16
138:6 189:19,
22

propositions
196:21

prose
149:13

protects
52:24

protested
79:9 208:22

protests
18:13 47:16
78:24 79:13
102:3

prove
56:10 71:15,
18 91:15

proved
140:16

proves
71:16

provide
8:17 45:15
120:11

provided
49:4 50:18
54:24

provision
50:20 51:19

provost
84:12

proxy
74:18

psychological
182:2 183:20
184:6 191:23
192:5

psychology
78:18

public
6:12 17:1
19:14 20:16
31:6 32:2,19,
22 41:13 54:5
82:17,18,21
83:22 94:3
104:14

115:23,25
135:19 158:10
167:18,19,25
168:1,16
170:14,22,23
171:9,18,21,
25 172:14
173:25 174:1
178:5

publically
53:13 82:12
99:7

publications
21:23 55:22
90:18

publicity
79:8

publish
154:9

published
6:11 16:15
60:15,17
65:10,15
91:24 133:3
139:16,18
193:21

pulled
15:6

pulling
59:19

punch
140:2

punished
80:7 83:10

purchasing
41:17

purely
135:4 195:14

purports
  49:1 54:22

purpose
  103:2 135:20
  177:12 196:7

purposely
  140:12

purposes
  4:18,22,25
  68:9 207:2

pursue
  103:20

pursued
  197:19 209:5

pursuing
  11:14,21
  197:16 198:5

pursuit
  41:14 55:19,
  21 197:11

pursuits
  18:2,3

push
  142:17 207:23

pushed
  71:16

put
  9:3 42:18
  69:9 77:21
  103:9 104:24
  118:11 126:11
  132:7 136:13
  138:2,6 152:8
  153:22
  164:15,17
  196:10 211:15

putting
  6:17

pyramid
  38:21,24 39:2
  62:4,25

_____

          Q

_____

qualified
  212:4

qualify
  47:9 120:15
  156:23
  182:10,11

quantitative
  91:21 139:24
  140:18

question
  9:13,16,25
  10:3,4,10
  18:6 33:10,16
  48:21 51:21
  55:17 58:1,7
  70:11 73:12,
  13,17 82:13
  83:9,11,12
  88:21 92:23
  107:17 112:11
  117:15
  122:19,20
  123:2 130:17,
  19 134:15
  136:18 142:7
  151:19,21
  155:12
  159:20,21
  160:6,8
  162:22 186:11
  192:3 193:17
  203:8,12,13
  212:4,23
  213:12 216:14

questioning
  198:4 217:23

questions
  8:15,19,22
  11:18 18:4
  19:2 23:12
  122:10,17
  124:22 151:6
  165:2,4
  189:13

quick
  88:21 179:12
  204:10 217:18

quiz
  122:4,11,13,
  24

quizzes
  122:11

quotation
  49:7

quote
  49:2 55:1
  70:4 110:23
  129:3 201:17
  202:10 208:9
  210:17

quotes
  69:9 193:6

quoting
  49:2 54:3
  79:2 108:21

_____

          R

_____

race
  34:9,15 35:22
  36:5,10 44:21
  46:8,21 47:22
  48:4,11,13,19
  49:10 50:22

75:14,22,24
76:2,3,10,11,
15,16,24
93:9,13
94:18,21
95:9,21,24
96:4,7,8,12
97:5,10 98:3
103:20
107:17,21
109:21 111:5
112:6,12
113:3 116:13
130:3,4
131:3,13
132:1,19
133:24 137:2,
24 138:8
142:24 143:1,
3,4,6,11,12,
14,16,18,19,
25 144:4,5,7,
18,19,24,25
145:1,2,6,12,
13,14,18,20
146:3,4,5,10,
23 147:6,9,16
148:5,20,24
149:21,23,25
150:3,4,5,10,
11,15,19
151:3,7,12,
16,17,18
152:1,7,9,12,
14 153:1
154:7,21
155:21,25
156:3,13,17,
18,19 157:16,
19 158:5
161:21
162:10,16,20

163:15 164:8,
24,25 165:5,
7,9,10,11,16,
21 166:3,15
172:24 173:1,
12,14 176:5,6
177:17,18,24
178:2,25
179:3,6,9
180:6 185:22,
23 189:23,24
193:18,23,24
194:3 201:5
202:14,15

**races**
35:21 36:6
46:19 102:23
107:4 143:22
144:10,12
145:16,22
152:18 153:5
154:4 155:3
156:25 157:5
165:16 195:4
196:3,5
201:17

**Rachel**
161:6,24
162:21
163:17,21
165:3 166:7,8

**racial**
31:5 35:7
41:1,5,20,25
42:7,23
43:10,18
44:12,15,21,
23 45:18,21
46:3,15 47:6,
10 76:23
99:23,24

100:3,6,7,18,
19 101:12,15,
18,19 107:23
108:1,9,11
110:13 126:6
129:24 130:23
132:4 134:5,
21 148:18,19
149:19,21
181:15 185:20
188:8,25
189:1 190:8,
15 196:16
202:12 203:10

**racialist**
153:16 178:10

**racialize**
191:10

**racialized**
112:24

**racially**
77:19 90:4
96:20 125:25
128:3 129:9
153:25 154:1,
2 156:3

**racism**
34:9,12,13,18
35:2,7,10,11,
13 36:10
40:21,23,24
41:22 42:21
43:19 79:6
95:14 97:3,8,
17,18 104:8
110:3,6
125:22
128:11,12,13
130:6 133:25
137:2 153:6
178:10 190:15

**racist**
42:6 76:11,
17,18 77:5,9,
25 78:4,20
79:7 93:10,13
153:2,16,23
185:21
186:10,17
187:1,8,9
188:20 189:22
190:3 191:1,
5,6,11 196:6,
7 202:13

**racists**
153:4

**radar**
208:24

**radio**
167:18,25
168:1

**rainstorm**
92:11

**raise**
4:2 87:22
88:6

**raised**
214:11

**raises**
87:22

**Ramer**
5:7

**ran**
140:6

**range**
198:18 200:1

**rates**
105:5

**Raymond**
65:25

**reacted**
52:17

**reaction**
181:14,17
184:19

**reactions**
177:3

**read**
23:9 26:10
37:15 38:6
39:8,19 43:6,
8 54:21,22
59:20 64:25
65:21 67:24
68:10 75:11
78:17 82:9
93:8 98:21
99:4,5 102:10
106:21 107:1
108:15 109:5,
10 111:9
113:12 122:5,
13,14,23,24,
25 123:3,18
140:13 182:12
193:14,15,16
199:4,5
204:19 205:8
213:4 214:4

**reading**
36:23,24
37:6,16 38:5,
22 39:5,9
64:10 68:3
98:23 122:5,
12,15 123:3
174:23 180:21
213:21 214:9,
19

**readings**
24:2,3,6

122:3,4,20

**reads**
64:24 75:22
79:6 125:12
142:23 158:1
178:24 185:18
192:11 207:3

**real**
88:20 111:8
176:7 177:22
190:13 204:10
206:7,9

**realize**
28:2

**realm**
74:4,5

**reared**
17:1

**reason**
65:20 66:23
71:19 149:16
182:14 209:10

**reasonable**
70:15

**reasons**
66:6 70:18,
22,24 150:5
204:6

**recall**
18:17 67:18
98:9 100:10
154:16 182:22
187:23 189:2
214:4

**recalling**
209:11

**receive**
83:16 179:2,7
180:3

**recent**
115:8 173:20
181:15 192:1
193:22,25

**recently**
60:22 105:22
150:6 171:19
193:16 213:4,
6

**recess**
64:4 125:5
178:20 217:19

**recognize**
25:19 64:7
155:8,10
166:2,3,22,24

**recognized**
145:22

**recollection**
108:14

**reconcile**
49:8

**Reconstruction**
23:24

**record**
4:18 5:2
18:25 26:11
44:2 53:11
63:22,23
68:10 75:11,
12 82:19
85:13 86:22
115:23 124:9
125:3,4,6
136:11 139:5
166:16,18,19
178:21 204:11
207:2

**records**
61:18,21

82:21 86:18
91:19 92:10,
12 139:22,23
140:1,3,5,9,
25 141:6

**red**
64:21

**Reddit**
22:23

**redistricting**
6:4,10 7:17

**reduced**
199:12

**refer**
14:14 48:22
63:3 111:1
158:16 187:17
192:23 194:4

**reference**
59:6 131:8
147:22 149:5
193:2

**referenced**
106:18 181:23

**referencing**
69:17 147:19

**referred**
11:23 19:11
158:15

**referring**
24:12 27:2
29:13 36:15
44:7 47:25
67:15 105:20
110:2 124:10
125:19 149:7,
8 158:14
159:2,12
160:9,24

187:24 192:23
198:22

**reflect**
111:2

**reflecting**
188:18

**reflective**
44:24

**reflects**
55:3 106:4,5
108:1

**refuse**
86:3

**refused**
85:16

**refuses**
88:17

**refute**
168:4,10
169:7,17
170:7

**refutes**
123:10

**regard**
51:18

**regime**
172:20

**registered**
216:18

**regulates**
192:13

**rehabilitation**
110:15

**reinforcing**
130:3

**reinstated**
80:11

reject
  70:20,24 72:2

rejecting
  101:9

relate
  194:13

related
  18:10 47:18
  84:15 122:11
  191:21 195:13
  203:7

relating
  181:16

relevant
  33:8 57:21,25
  58:13

remaining
  95:24

remember
  61:1 104:22
  105:23 111:8
  115:13 123:4
  137:8 139:20
  154:6 167:19
  192:15 214:7

remembered
  177:5

reminder
  102:25

remote
  180:17

renamed
  213:15

Render
  6:12 59:7

renewal
  123:13

rep

81:22

repeat
  49:12

repeated
  141:20

rephrase
  189:20

report
  8:17,23 9:8
  10:22 79:15
  102:10

reporter
  9:18 10:1
  15:21 28:22
  64:14 167:6
  208:3

reporting
  79:13

reports
  79:16 84:4,8
  167:25

represent
  27:24 34:23
  35:17 49:15
  50:14 56:7,11
  111:20 168:7
  178:2 216:17

representations
  6:11

Representative
  175:22

represented
  7:1 60:18
  81:25 107:4,
  9,10 129:20

representing
  5:5,8 7:16

represents
  39:11 53:24

56:8,9 65:1
112:14 113:14
120:9 121:5
133:20 136:25
163:13 165:5,
7 168:12

reproduce
  55:25 92:13

reproduced
  141:20

request
  28:14 82:21
  83:3

require
  36:22 69:10
  85:4

required
  83:14 87:15

requirement
  208:14

requires
  77:23 115:23

requisite
  52:13

research
  7:14 8:16,18
  16:15 36:14
  37:4 39:16,24
  43:5 55:21
  60:3,4 62:21
  71:10,11,12,
  14 73:5,7,15
  90:17,22
  91:22 92:6,23
  93:3 97:2,24
  102:9 105:9
  106:15 108:5
  113:12 119:6,
  14 123:9
  145:24 147:18

158:18,19
159:14,15,16
197:16

researched
  6:14 142:10,
  11 163:6

reserved
  126:22

residents
  30:24 115:6

Resistance
  158:6

respect
  143:1,4,7
  156:18 157:6,
  12,22 173:1,
  14 176:6
  177:18 181:23
  190:23

respected
  157:20

respectful
  175:3,25
  177:24 178:8

respond
  9:19 76:4

response
  59:8 182:4,
  15,19

responsibilitie
s
  117:13

responsibility
  179:1,6,15,20
  180:25 181:5
  182:3 191:24

rest
  124:22 186:2

restrict
  33:6 34:2
  131:3 134:11
  188:14 191:14

restriction
  109:18

restricts
  33:2,17,21
  98:24 196:23
  202:7

result
  42:16,17,25
  173:7 179:24
  198:5

resulted
  170:15

results
  47:16

retired
  16:11

returns
  80:18

Review
  21:20

reviewed
  60:22

reviewing
  21:20

reviews
  21:23 22:1,3

revise
  189:11

rhetoric
  61:12

rice
  139:22 140:3
  141:11,14

Richard

153:7,11,12
177:22,23
192:14

rights
  18:7,8 23:21
  24:6,22 26:14
  29:24 37:3,
  10,15,25 38:2
  40:3 58:4
  59:16 61:2,7,
  8,13 63:8,13
  66:20 67:1
  68:20 69:2
  73:3 98:7,10
  133:11 158:2,
  4,13 168:8,
  13,15 170:12
  182:5,17

rigid
  45:11 46:11,
  14

rigorous
  198:2,3,4

rise
  30:14 201:17

road
  86:5 177:15

Robert
  4:9,20,24 5:1
  85:10

Robinson
  6:2 7:1 8:14

Roediger
  125:13,14,15,
  16 126:5,15
  127:17 129:6,
  7,8 131:24
  144:23
  145:10,11

Roediger's
  131:10 189:7

role
  52:8,9 61:7
  68:23 83:13,
  18 130:2
  182:4 189:8,9
  203:16

Rollins
  22:8

rolls
  191:24

room
  70:1 101:19
  208:19 213:21
  214:7,9,19,
  21,25

rose
  209:2,3

roughly
  59:10 148:18
  168:25

rule
  35:23 47:5
  68:1 113:4,10
  148:10

rules
  8:7

run
  178:16

runs
  109:18 110:20
  111:3 189:15

rural
  6:19 31:4

_____

          S

_____

S-T-E-M

208:4

Sabatini
  53:24,25
  54:9,16 117:3
  134:14 135:16
  174:7,8,9
  175:22 181:10
  191:18

Sabatino
  174:6

sacrosanct
  212:16

sake
  84:25

salience
  119:13 129:25
  162:13

sample
  40:13 129:15

scholar
  21:10,14
  163:2

scholarly
  120:14 163:3

scholars
  19:21,24 40:8
  138:17,18

scholarship
  94:10 120:14,
  15 121:6
  146:12 164:3

school
  24:11 32:21,
  22 45:8 56:18
  87:25 101:22
  137:8 147:4
  158:6,10
  160:14 170:24
  171:25 172:14

174:10,14,22
175:15 182:25
199:10,13,17,
18,19,20,21
211:9,10

**schooling**
31:7

**schools**
17:3 32:16,20
168:13,17
170:15,17,22
173:25 174:1
178:6 203:19

**science**
55:18,19
197:5,8,9,10,
11 198:5,6,
15,17 205:8
208:7,8

**scientific**
197:12,13

**scientifically**
197:17

**scientists**
141:18

**scrutinize**
68:3

**scrutiny**
52:14

**seamstress**
45:6

**search**
216:10

**second-class**
42:11 102:25

**secondary**
36:5

**section**
48:22 49:8,

10,12 75:12,
15 84:22
167:2

**securing**
41:16

**sees**
114:25 135:22

**segregate**
42:10

**segregated**
129:9

**segregation**
31:6 32:7,13
44:20,21

**select**
39:22 170:2

**self-ascribed**
158:21

**self-ascribing**
157:9

**self-describe**
156:25
160:20,23
164:5

**self-described**
154:18,19
155:3,7
157:16

**self-describes**
165:20

**self-describing**
154:20 160:25

**self-
description**
163:23

**self-
identification**
162:21

**self-identifies**
164:16

**self-identify**
154:14 166:6
216:13,15

**self-perception**
163:22

**self-professed**
120:6 153:15

**semester**
23:20 24:4,9,
10,18,21 25:3
89:15 123:24

**seminal**
147:3

**seminar**
24:3,4,7

**Seminole/
miccosukee**
21:15,18

**send**
81:21

**sense**
24:16 46:24
74:2,25 97:5,
6 108:8
143:13 144:20
145:23 175:23

**sentence**
34:7 47:25
48:7,18 54:21
62:10,14
68:10 105:16
109:9 113:15
131:6 158:14
179:13 181:23
198:16 199:2,
6 207:11

**sentences**

41:24 207:10

**sentiment**
207:9,11,12,
13

**separate**
32:3 42:20
115:22 130:7

**separation**
102:23

**series**
8:14 21:8
83:22

**service**
81:22

**set**
36:23 37:8
81:2 115:1
140:2 210:15

**sets**
140:4

**settled**
37:21

**sex**
48:11,13
75:14,23,25
93:9 94:18
95:22 142:24
143:1 172:25
173:13,15
179:1,4
185:22,24
202:14

**sex'**
131:3

**sex.'**
109:22 173:2
202:16

**sexist**
93:10 185:21

187:1 202:13

**shape**
133:22 147:15

**shaped**
133:12

**share**
70:6,8 83:8

**sheer**
128:5

**Sheppard**
5:13

**short**
93:19 119:1,8
124:18

**short-
circuiting**
90:10

**shortly**
48:2

**show**
25:17

**showed**
205:9

**shredded**
72:10

**sic**
169:16 175:2
203:24

**side**
7:16 40:9

**sign**
85:11,16,21,
23 86:3,10
87:9 137:11
208:20

**signed**
86:4,8

**significance**
61:7

**significant**
155:25

**signing**
99:1

**similar**
59:23 102:5,7
168:20

**simply**
136:6 164:22,
24

**simultaneous**
91:2

**sincerity**
163:22
164:10,12,13

**single**
16:9 56:16
57:1 106:5

**sir**
66:4

**sit**
73:9

**sites**
167:19

**sits**
54:9

**situation**
47:12 201:11

**situationally**
184:1

**sizable**
30:23

**skewing**
212:17

**skill**
62:11

**skilled**
129:19

**skills**
36:16,19
38:22

**skin**
148:19
155:14,19

**skip**
188:11

**skipped**
94:24

**slavery**
30:14,25 31:2
51:6,9,13,15,
25 52:1,6,17
139:17 140:8
141:21
212:19,22

**smack**
163:8

**smacked**
84:16

**Smith**
66:16

**snack/lunch**
124:19

**snippet**
199:5

**social**
22:18,25
45:1,12,16
46:9,23 55:19
141:18 143:25
144:17
145:12,14
147:9,10
148:3 150:19
151:7,10,12,

17 152:7,8,13
153:1 154:21
156:4,13
158:23 161:21
162:11,12,16,
20 163:14
164:8,25
165:16,22
189:10 197:7
200:7 210:15
211:5 217:6

**socialist**
216:16

**Socialists**
216:16

**socially**
144:15,16
146:6 147:5
148:23
157:10,11
159:24 166:3

**societal**
198:19,21
199:7 200:1

**Society**
19:16

**socioeconomic**
182:6 198:18,
23 199:3,8,25
200:5,15
201:1

**sociological**
109:17,23
110:6

**sociologists**
139:18,19

**sociology**
205:2

**solitary**

105:25

**solution**
128:25

**someone's**
146:3 148:12
151:16,18
155:18

**sort**
19:20,21
21:24 30:3,7
31:3 36:24
37:6 38:3,13,
22 41:8 42:14
43:12 45:15
46:19 51:11
56:11,17
59:15 61:9
65:10 67:8,9
71:6 72:15
73:12,16
74:1,10 78:5
98:15 102:19
115:18 120:23
122:4 126:10
130:2,8,10,
18,19 132:24
134:4 146:2
153:19 163:1
166:2 167:25
168:11,19,23
173:24 181:8,
10 183:6
191:10,22
195:18
197:12,14
198:14 209:7,
8 211:2,12

**sorts**
91:5

**sound**
149:14

197:13,17
198:11

**sounds**
11:17 61:23
156:12 176:24

**sources**
62:12

**South**
29:21 47:14
120:2,3,5,13
121:2,5
141:9,12
148:8,9 149:2
155:18

**South's**
120:21

**Southern**
7:2 30:1 47:2

**spaces**
32:3

**speak**
8:6 128:7
144:4,25
183:8

**speaking**
143:19 144:24
160:11 195:2

**speaks**
144:23 160:9

**specific**
48:7 58:25
66:6 90:12,
14,24 126:22
139:10 154:9
181:11

**specifically**
16:13 32:17
42:10 47:21
56:21 59:6

106:25 110:2
122:11 128:21
131:9 170:14
182:23 192:24

**specifics**
108:18 111:8

**speculating**
66:20 177:25

**speculative**
66:15

**speech**
14:8 80:13

**speeches**
61:20

**Spencer**
153:7,11,12
177:23

**spends**
123:7

**spin**
212:15

**spot**
80:1 89:14,16

**spring**
24:9,10 25:3,
4,12,14,15
27:15

**squad**
101:19

**square**
153:22

**St**
21:12

**stand**
9:3 51:15

**standards**
120:15 132:5

**standing**
53:18 54:10,
12 116:10
117:5,6

**Stanley**
139:20

**start**
80:19 87:17
88:13,14
141:7 182:25
207:14

**started**
17:15 142:20
171:16 172:10

**starting**
31:23 89:4

**starts**
78:2 134:19
159:3,6,7

**state**
7:2,10 16:3,
25 17:9 22:9
31:13,16 36:2
80:3,4 82:3
107:5 199:19
207:24 208:13
210:8,14

**state-local**
30:8

**statement**
12:22 36:8
48:8 64:21
70:16 76:18
77:5,9 78:1,4
79:7 108:6,12

**statements**
78:20 83:10,
22

**states**

31:14 81:19
125:22 148:25

**statewide**
81:14

**stating**
48:16

**station**
53:25

**stats**
103:16,21,23
198:8

**status**
94:16,24
95:8,20
97:11,12 98:2
102:19 103:4
104:4 109:20
110:24,25
111:4,20
112:5 113:1
121:25 131:1,
12,15,16,21,
25 132:9,17
138:7 182:6
200:6

**statute**
150:16,23
186:4

**stay**
51:21 88:2
180:12

**steelworker**
45:6

**steeped**
204:2

**STEM**
207:24 208:1,
2,3

**STENOGRAPHER**

4:2,8 125:3

**step**
85:5,14
86:15,16

**steps**
87:12

**stock**
105:14 153:20

**stop**
52:25 53:2,3
55:13

**stopped**
20:18

**stops**
78:4

**store**
216:4

**story**
137:7 204:10
214:21 215:21

**strategies**
36:17 100:14,
16,17

**streams**
171:20

**street**
52:21 53:11,
14 63:1 115:5
117:1 124:3
174:3 175:22
181:10

**strive**
34:8 36:9
39:13

**structural**
40:21,23,24
42:20 95:14
97:3,8,17
110:3 133:24

**structural-
institutional**
110:6

**student**
12:6 38:9
51:15 52:9,21
53:10 73:6
74:6 75:15,17
105:15 115:4
117:1 118:13
119:7,9,22
131:19 134:14
147:14 154:13
166:5,10
170:19 174:3,
21 176:9
177:14,15
179:14,18
180:2,24
181:9 184:23,
24 204:2,8,13
214:8,12

**student's**
118:14,20
180:6 181:14,
17

**students**
24:3 29:24
32:20 33:4
34:8 36:9,22
37:5 38:14
39:1,13 40:20
46:18 52:16
54:6 56:13
57:3 62:6,23
66:18,22
67:4,6,25
68:2 73:2,24
76:14 78:11
79:9,14,15,17
84:5 89:15

105:13 118:3,
10,24 119:5
123:23 124:1
134:1 137:19
140:19 141:2,
7,24 142:2,14
147:8,13
148:9,13
158:13 160:13
165:20 168:2,
10 169:6
171:5 172:7
175:1,21
177:3 180:21
181:7,25
182:4,15,20
183:9,20
184:16 185:3,
5 192:2
196:25 199:11
201:23 202:9,
23 203:23
204:21 209:14
210:11,16,25
212:8,21
216:1

**students'**
182:6

**studied**
107:2

**studies**
17:24 19:12
108:5 210:15
211:5

**study**
64:10 74:16
122:7,8,9,16
124:17 130:12
133:2 137:2

**studying**
62:10 153:13

Robert Cassanello
August 05, 2022

52

stuff
 12:15,18
 13:14 26:22
 38:23 55:24
 61:21 63:16
 66:17 72:10
 73:5 79:23
 80:22 89:3
 91:23 93:1
 107:18 123:14
 126:13 128:22
 137:25 138:10
 140:5 141:14
 145:24 154:13
 173:23 175:4
 181:3 182:17
 183:1,12
 185:5 189:14
 198:9 209:12
 211:7,13
 215:14

style
 21:20

subfield
 16:18 19:22

subfields
 16:19

subject
 37:6 70:5
 75:15 88:25
 123:10 136:7

subjected
 111:24,25

subjecting
 100:2 105:18
 106:6 108:23

subjects
 33:3,8

submitted
 8:23 28:13,

 19,20 29:3

subparagraph
 50:11,12

subscribe
 176:19

subscribed
 19:22

subsection
 50:1

subsequent
 54:11

substitutes
 199:17

suburban
 160:11,16
 161:16 168:21

suburbs
 160:20 174:12
 181:3 182:24
 199:18 203:18

succeeded
 158:10

succeeding
 41:24

success
 59:8 68:25
 102:2 203:10

successful
 128:3 209:13

suffered
 173:7

suggest
 74:13 97:20

suggested
 46:10

suggesting
 152:25

suit
 178:9

suite
 79:13

summarized
 66:24 67:1

summer
 7:7

superfluous
 67:11

superior
 35:23 48:12
 51:7 52:2
 75:23 76:2,
 10,15,24
 77:16 90:8

superiority
 47:22 48:3,19
 49:10 50:15,
 21,22 51:10
 52:16 76:25
 95:2

support
 37:3 38:8,12
 61:15 63:7
 132:15 170:9
 175:14 178:5
 207:6

supportive
 174:21

supports
 38:11 123:10

supremacist
 73:22 76:20,
 21,22 77:7,8
 78:6

supremacy
 77:1,10,12,
 22,23 78:1

Supreme
 66:12

surprised
 215:18

surveys
 149:18

suspended
 80:1 81:17
 86:14 87:7

suspension
 81:23 87:1

suspensions
 81:10

swear
 4:4

switch
 149:16

sworn
 4:10

syllabi
 96:2 135:19

syllabus
 26:20,25
 27:1,22 28:8,
 15,16,17
 29:23 98:15
 108:16 114:4,
 15 115:25

system
 17:2 29:10,
 13,25 30:4,8,
 12 31:11,25
 32:12 40:16,
 17 41:9,15,21
 42:13,18,23,
 25 43:2,13
 44:13,15,16,
 25 45:1,11,
 15,21 46:3,15

47:4,6,10
94:3 99:23,24
100:3,6
103:18 104:1,
9 106:13
108:2,9
110:12,13
112:18 113:10
126:1 128:4
141:14 158:11
165:12,14,15
174:10 190:12
191:25 195:10
199:14,19,20,
21 203:23
209:15 210:18
212:18

**system's**
41:10

**systematic**
95:17 106:9
197:18

**systems**
31:5 32:7
44:23 47:19
160:15 174:14
203:10

---

**T**

**table**
5:3 93:19
123:8

**takeout**
206:10

**takes**
105:6

**taking**
39:10 89:15
101:3 112:13

151:5 170:16
201:10 205:1,
2,4

**talk**
9:12,22 21:11
41:25 53:20
68:22 71:7
127:5 141:14
142:15 148:16
159:15 175:4
183:5,6
184:3,17
185:3 188:5
198:16

**talked**
62:21 68:17
95:1 122:1
162:23 180:22

**talking**
11:16 42:3
65:24 80:25
125:2 131:8
161:5,8,14
169:4 173:3
178:3 184:24
189:25 191:25

**Tallahassee**
9:2 52:22
54:10 81:19,
21 207:22

**Tallyho**
119:19

**target**
115:3 134:6

**taught**
23:3,20 28:16
29:6 55:4
89:17 96:3
101:21 174:20
182:17 211:12

**tax**
31:20,21

**taxes**
31:16

**Taxonomy**
38:17,20
39:12 62:7,25
123:5

**taxpayers**
31:18

**teach**
17:24 26:13
27:16 28:9
33:3,7,17,21
34:3 39:13
54:5,18 68:11
72:20 73:4
98:5,7 100:24
115:21 133:15
136:1 138:24
170:13 171:3
173:18 181:6
207:6 211:6,
10

**teacher**
39:1 74:6
117:13 217:24

**teachers**
94:3,6,7
170:24 172:15
199:15 210:10
211:5,11

**teaches**
62:12

**teaching**
23:17,20,22
24:1,20 25:2,
5,13 28:15
33:13,14,19
52:13,14,25

53:2,3,5
68:19,21 70:2
79:18 80:16,
21 84:8 87:20
90:18 115:10
116:12 134:22
135:8,11
147:13 179:23
180:21 202:18
212:8

**technically**
85:8 145:17
198:10

**technology**
208:8

**television**
167:20 168:1
171:10,18,21

**telling**
82:10 139:1
205:7 211:5

**tells**
86:15

**temporary**
199:16

**ten**
178:18

**ten-minute**
15:14 64:3

**tend**
208:25

**tended**
41:18

**tenure**
92:24

**tenured**
79:24

**tenuring**
79:24

**term**
34:12 43:4
44:14,17,19
46:10 65:6
76:20 102:20
119:2 132:7
145:24,25
146:12 149:3,
10 153:15
169:20
182:14,18
194:1 196:14
199:11

**terminate**
88:17

**terminated**
78:19 79:20,
23,25 80:2,12
81:18 85:20
86:14 87:9,10
89:13,21
92:22,24

**termination**
80:14 81:23
83:23 84:1
89:16,25

**terminations**
80:4 81:10

**terms**
10:16 40:23
70:10 72:20
144:7,24
146:16
147:22,25
148:2 153:1,2
160:21 196:18

**test**
208:15 211:15

**tested**
35:4 209:3

211:8

**testified**
4:11

**testimony**
4:4 5:16,18,
19,23 6:3,9,
15 7:9,11,21,
25 37:24
72:10

**testing**
123:18

**text**
98:14,25 99:9
111:13
113:16,17,19
121:8,19
124:2 125:12,
21,23 131:4
134:12 142:8,
15 158:5
187:24
188:15,16
189:17,18
212:12

**texts**
104:23 113:25
114:2 122:3
124:3 172:21
173:4 189:13

**theme**
37:6

**theoretically**
38:9 53:1

**theories**
134:21

**theorist**
194:8

**theory**
38:6 59:12

73:4 116:13
126:6 133:24
177:16 192:24
195:23 217:2

**thesis**
111:6 114:16
123:7,10
128:9,11
130:9 131:11,
22 132:2
168:4,9,25
169:7,17
194:8,13
197:1,15

**thing**
22:14 35:24
38:1 59:23
60:21 65:22
67:6 77:3,4
78:13 82:3,4,
6 83:16 86:5
88:3 90:14
112:13 114:22
119:21 125:1
128:7 130:1
133:13 135:21
138:16
148:20,22
180:4 193:20
203:20 205:12
209:25

**things**
31:7 32:6
38:22 42:16
53:2,4 61:12
62:22 67:3
71:17 73:20,
22 79:17,19
89:2 91:5,21,
24 101:24
102:14 113:7,

12 115:25
116:6 121:1
126:12 128:20
133:22 134:1
138:22
140:20,21,23
142:4 145:25
149:1 152:6
153:20 155:16
160:22 167:24
169:10
173:23,25
174:2,15
176:14 180:21
187:9,21
190:7 191:9,
12 201:7,13,
21 204:4
210:9,22
215:8,17,24

**thinkers**
123:25

**thinking**
36:19 38:15
57:18 60:12
62:5 96:9
118:3 141:24
147:9 205:2
209:5,17

**thinks**
116:24 146:23
164:7

**thought**
28:5 52:20
56:18 63:17
65:1,20 69:14
90:11 95:23
165:4 217:8

**thoughts**
124:20 177:2
217:13

**threw**
92:11

**throwing**
123:14

**thumbed**
18:18

**thwart**
203:17

**ticked**
186:1

**tie**
178:9

**tied**
77:13

**tighten**
124:19

**till**
185:7,9

**Tim**
5:9

**time**
6:16 7:21,23
9:10 10:7
11:19 12:8
21:23 22:23,
24 23:1,2
31:1,20 32:1,
21 43:14
61:13 65:12
86:13,23
87:8,10 88:6
120:22 123:7
127:14 128:3,
13 129:6
139:15 147:21
154:13 155:17
159:1,2,11
161:12 165:13
168:1 171:12,

13 174:20
198:7 204:13
207:23 210:6
211:8 217:21

**time-consuming**
124:23

**times**
147:23 149:6

**title**
25:11 125:17

**titled**
169:1

**today**
12:13,14
13:17 14:12
18:12 68:3
127:5 128:20
132:16 133:5
134:5 146:2
161:14 217:21

**told**
8:13 9:1
60:25 152:20,
21 204:19,24

**tongue**
22:4 214:16
215:12,14

**tool**
187:15

**tools**
36:11,15,16
39:15

**top**
8:21 20:13
35:14 38:24
39:11 49:25
60:10 62:4,7,
24 64:21
67:18 89:9

123:5

**topic**
24:5 52:10,11
53:6 156:9

**topics**
40:17 170:22

**totally**
139:23

**touch**
175:3

**touched**
70:21

**tough**
216:14

**tower**
115:18

**trace**
31:11 138:10

**traced**
18:8

**track**
137:22

**trades**
126:22

**trained**
101:23 120:23

**training**
49:3,4 50:17,
18 54:24,25
75:15

**trans-racial**
162:8

**transgressions**
88:24

**transportation**
31:6 32:11

**transposed**
176:16

**travel**
39:1

**treat**
142:25 143:3,
7,10,11
156:18 157:6,
13,19 169:16
172:25 173:14
176:5 177:18,
23

**treated**
69:22 143:17
190:21

**treatment**
100:2 105:19,
20 106:1,2,7,
10,18 108:24
112:1,15,16
179:2,8 180:3

**tree**
137:5

**trendy**
22:24

**trial**
7:7

**trials**
72:9,12

**trickles**
43:18

**trigger**
135:23

**triggered**
51:18

**true**
34:16 47:7
56:9,12 61:11
69:25 97:15
137:12 161:23
168:19

trust
  16:4 44:9
  54:15

truth
  4:5,6,10
  55:22 56:8,9,
  17 57:1,2
  58:14,16 62:1
  118:8 142:1,
  18,21 217:3

truths
  61:25 62:2

turn
  26:5 30:21
  49:22 75:4
  127:12

Turned
  120:4

Turning
  142:23

TV
  167:18,25

tweet
  206:14,15
  207:2 211:22
  215:5

tweets
  80:8,9

Twitter
  22:16 78:21,
  24,25 80:8,13
  83:21,22
  84:2,13 87:18
  88:3,11 214:5
  215:19 217:12

two-paragraph
  167:12

type
  11:15 22:18

106:6 156:19,
20

types
  156:22

typically
  154:5

---

U

U.S.
  30:9 31:15
  210:19 211:10

UCF
  11:12 14:1
  17:15 20:7,23
  23:2 52:22
  53:15 56:22
  78:10,15,19
  79:10,11
  80:7,12,16
  81:11 83:11
  84:1,16,19
  85:1 87:25
  88:2 92:25
  93:1,20
  115:6,7 116:6
  124:4 154:6,9
  170:18 205:14
  213:8,9

UF
  213:17

UFF
  80:4 82:3

Uh-huh
  8:20 9:20,24
  16:2 23:16
  24:19 25:23
  26:7,9,17
  27:17,19,22
  29:11,19

33:25 34:13
36:13 38:4
39:21,23
40:5,10 42:2
44:5,8 46:12
52:4 55:8
57:22 58:5,9
60:8 64:8,23
65:4,7 70:13
75:6 77:17
81:7 82:7
85:7 98:22
100:4 103:8
104:18 105:3
110:8 112:2
114:12 121:9,
14,17 126:5
127:4 131:7,
23 134:8
135:25
146:13,18
147:24 149:4
151:8 154:3
156:5,15
160:17 161:15
163:24 165:1
166:12,25
169:15 170:3
180:9 181:19,
21 182:1
183:2,17,19,
22 184:22
188:1,10
191:19 192:10
193:4 194:14
195:24 196:4
197:6 200:17
201:9,22
202:17,20
203:5

ultimately
  8:15 41:2,5

148:23 158:9

unconsciously
  93:11,14

uncritical
  209:22

underachievemen
t
  79:3

undergrad
  23:24

undergraduate
  23:19 24:25
  25:6

understand
  9:13 14:13
  32:24 34:17
  35:9,11 47:8
  48:2,21 53:7
  56:4 58:15
  61:8 62:14,20
  63:2,10 77:12
  80:17,18
  81:24 83:20
  100:17,23
  112:11 116:15
  117:11 120:22
  127:15 144:5
  145:8,23
  147:16 156:14
  157:3 164:22,
  24,25 187:6
  214:19

understanding
  34:18 95:13
  97:8 101:4,6
  102:8 106:20
  145:20 156:13
  165:13 187:17
  191:1 207:8
  209:17 212:12

understands
153:1

understood
9:16 132:12
143:23,24
147:13
148:13,14
150:24 151:12
156:4

undo
184:7

uniformly
97:10

union
20:9 81:14
82:25 83:1,13
85:22 127:22
129:18

unions
129:8,17,19,
20 130:13,15,
18

United
20:3,21,22
125:22 148:25

universal
113:13 207:7

universally
56:12

universities
46:22 54:5
105:10

university
14:20 16:3
17:6,8,10
27:25 56:22
78:9,10,12,21
79:19 82:18
94:12 213:17,

19

university's
213:7

unpacking
183:1

unquote
70:4 129:3
210:17

unrelated
84:2,13

unsatisfied
88:5

unskilled
126:23 129:19
130:13

unwilling
165:2

up-front
69:14

upcoming
121:23

upward
45:16

urban
6:17,19 31:3
47:13,16
96:16 123:13

_____

**V**

_____

valid
69:19,21
142:5

valuable
91:20

variable
55:22 56:8
57:6

variables
113:8 140:4

variety
18:4 31:7
32:5 46:8
53:2,3,9 66:6
89:24 113:8

vehicle
207:5

ventured
118:21

verbally
9:19 147:14

verifiable
56:2 217:3

verify
92:17 102:13

versus
45:19 66:16
101:15 119:1
147:5 199:17

vice
21:23

victories
66:12

view
34:9 36:9
52:15 58:1
60:19 61:15
78:11 105:4
106:17 131:24
133:12

viewpoint
172:24 173:12
175:24 176:4

views
95:4 138:5
174:25 216:17

violate
85:1 89:8
187:11

violated
84:19 85:10
116:8 175:16

violates
14:7 90:17
135:12

violating
53:14,16
113:16 117:8,
9 172:21
175:9,12
204:8

violation
54:13 83:24
85:3 88:18
116:5 138:2
151:3 176:2

virtually
70:19,23 72:1

virtue
93:8,12 128:4
178:25 179:6

virtues
185:19 186:3,
8,9 188:19
189:7 190:10,
12,13,24
194:13 196:5
201:20 202:11

virtuous
187:4

vis-a-vis
108:2

visible
30:23 102:25

visited

106:19

**visually**
155:17

**voice**
144:8

**voiced**
104:20

**vote**
31:9,10,14,17
212:9,10

**voters**
6:17,19

**voting**
31:8 212:8,9,
10

---

**W**

---

**wage**
128:18 189:17
190:22 191:15

**wages**
125:13 126:15
128:25 129:3
133:14,20
134:9 135:22
136:12 137:4,
6 138:5,10
144:23 147:3
152:21 168:20
187:24 188:5,
16 189:3,18,
21 190:1
196:11 202:25
203:2,3,20
216:20

**wait**
51:4 204:3

**walk**
138:13 181:10

210:16

**wanted**
11:4 21:25
53:12 67:4
214:10

**War**
30:2,5 31:24
127:8,9
132:13

**Ward**
163:10,11,13

**warns**
86:13

**warrant**
90:9

**wary**
67:25

**watch**
171:21

**watched**
90:25

**watching**
91:1

**water**
43:24

**ways**
44:11 46:2,19
47:6 89:24
142:21,22
157:2 168:24
170:13 190:2

**wears**
178:9

**web**
79:14

**website**
15:7,8 27:25
120:1,21

167:17

**websites**
73:22

**wedge**
128:18

**week**
40:14,18 87:1
134:25

**week's**
87:2

**weeks**
24:13

**weigh**
213:22,23

**wellspring**
212:19

**West**
149:1

**wet**
118:15

**whichever**
37:12

**whipped**
140:25 141:9

**white**
5:13 10:13
32:20 73:21
76:15,20,21,
22 77:1,6,8,
10,12,22,23
78:1,6 96:7,
12,24,25
97:13 103:11,
18,25 105:6
106:19 111:23
120:6 125:23
126:12,13,20
127:18,21,24
128:2,11,24

129:6 130:7,
18 132:4
133:23 144:25
145:1,3,15,25
146:4,7,12
147:19,25
149:25 150:4,
7,8,10 152:3,
4,19,20,22
153:20
154:18,19,20
157:11 158:8,
12,15,16,20
159:12,24
160:9,11,16,
19,20,23,25
161:17,25
162:1 173:25
180:21 181:3,
4,16 189:14
195:6 203:16,
19 215:25

**whiteness**
125:13 126:8,
10,15,16
127:2,18,20
131:15
133:14,16,20
134:9,16,18,
19 135:22
136:12 137:4,
6,13,15
138:5,11
144:23 147:3
152:21 168:20
187:24 188:6,
16 189:3,17,
18,21 190:1,
2,4,23 191:15
196:11 202:25
203:2,3,20
216:20

**whites**
51:7,9 52:1,2
77:16 90:6,7
105:8 106:7
108:2 112:21
115:11 126:22
145:17

**wholly**
39:8 84:2
210:20

**wide**
198:18 200:1

**Wilkison**
11:7,24

**willed**
92:1

**wills**
91:21

**window**
41:9 116:1
135:20

**wishes**
116:25 164:5

**withdraw**
31:22

**witnesses**
72:8

**woman**
161:25 162:1,
6

**women**
103:17,18
160:12,18,19,
24 161:16
168:23

**won**
63:16 87:20

**wonderful**
119:20

**wondering**
159:16

**word**
48:13 55:9
58:18 61:10
69:9 84:10
104:22
111:11,15
119:15 139:8
149:9 150:14
168:14 175:2
178:9 191:4
195:16 197:19
198:3 209:19

**worded**
168:15

**words**
104:24 115:13
127:3,16
203:25

**work**
7:17 11:8
59:1,5 68:17
89:1 118:6,7,
14 121:1
128:9 130:24
138:18 141:13
170:8 185:19
186:2 188:9,
14 189:1,5,22
190:5 193:22,
25 194:12,20
195:11
201:21,24
202:11 203:8
216:21,24

**worked**
22:10

**workers**
125:23,24

126:3,20
127:16,18,21,
23 128:2,5,
12,17,24,25
129:6,11,19
130:8

**working**
19:15 45:5
59:14 60:17
61:5,6 68:23
130:2,7

**working-class**
16:13,14,23
45:9,10,13
60:20 69:5
125:22 130:15

**workplace**
203:21

**works**
23:10 37:4
59:20 84:24
97:3 102:1
118:5 203:7

**Workshop**
171:4

**world**
56:1 71:3
115:19 148:21
210:21

**worried**
211:2

**worry**
82:5

**would-be**
129:11

**Wow**
70:25 120:5

**wrap**
217:14

**write**
46:1 73:5,15
144:6 145:24
150:11,17

**writing**
44:18 217:6

**written**
6:13 56:7
65:12 68:2
91:14 106:11
133:5,6 160:2
177:11 210:22

**wrong**
54:9 57:14,
15,17,18
100:23 114:22
118:7,8 166:5
191:6

**wrote**
60:16 61:2
91:3 105:1
126:7 160:4
198:25 209:10

**WUCF**
171:10

---

**Y**

---

**yada**
103:24

**year**
20:17 21:21,
22 22:11
24:6,8,11,12,
13,14 25:3
66:10 214:20

**year's**
22:13

**years**
16:15 17:19

Robert Cassanello
August 05, 2022                                                        60

19:5 22:11,21
46:23 47:12
59:10 73:1
79:19 80:6
84:8 87:24
88:3 105:25
106:12 108:17
116:1 135:19
147:13 149:20
165:21 181:1
182:15,18
183:4 204:14
207:20 209:12

**yields**
55:22

**York**
126:18,19
128:6 129:15
159:6,7

**you-all**
12:16 90:24

**young**
10:13 45:7
117:14

———————————
          **Z**
———————————

**ZIP**
200:21

**Zora**
22:6

DEFENDANT'S
EXHIBIT NO. 1
FOR IDENTIFICATION
8-5-22
DATE:        RPTR: DF

### Robert Cassanello

Department of History
University of Central Florida
Orlando, Florida 32816-1350

Office: (407) 823-1681                                   Fax: (407) 823-3184
robert.cassanello@ucf.edu

## Education

2000    Ph.D. History, Florida State University

## Teaching and Professional Appointments

2013-Associate Professor of History, University of Central Florida

2007-2013 Assistant Professor of History, University of Central Florida

2003-2007 Visiting Assistant Professor of History, University of Central Florida

1999-2003 Assistant Professor of History, Miles College

## Research and Publications

### Publications

<u>Books</u> (Peer Reviewed)

*To Render Invisible: Jim Crow and Public Life in New South Jacksonville*, (Gainesville: University Press of Florida, 2013)

<u>Edited Books</u> (Peer Reviewed)

*Migration and the Transformation of the Southern Workplace since 1945.* with Colin J. Davis, eds. (Gainesville: University Press of Florida, 2010)

*Florida's Working-Class Past: Current Perspectives on Labor, Race, and Gender from Spanish Florida to the New Immigration.* with Melanie Shell Weiss, eds. (Gainesville: University Press of Florida, 2009)

1

<u>Journal Articles</u> (Peer Reviewed)

"The Right to Vote and the Long Nineteenth Century in Florida," *Florida Historical Quarterly*, 95 (Fall:2016) 194-220.

"Avoiding "Jim Crow:" Negotiating Separate and Equal on Florida's Railroads and Streetcars and The Progressive Era Origins of the Modern Civil Rights Movement, 1882-1905" *Journal of Urban History*, 34 (March 2008) 435-457.

"The Epic of Greater Florida: Florida's Global Past," with Daniel S. Murphree, *Florida Historical Quarterly*, 84 (Summer 2005), 1-9

"Racial Etiquette, Violence and African American Working Class *Infrapolitics* in Jacksonville during World War I," *Florida Historical Quarterly*, (Winter 2003), 155-169

"The Fluidity of Racial Hierarchy: Changing Ethnic Images of Germans and Czechs in the American Mind, 1877-1918," (March 2001) *49th Parallel*

<u>Works in Edited Collections</u> (Peer Reviewed)

"Park Monroe Trammell" in *The Governors of Florida*, R. Boyd Murphree and Robert A. Taylor eds. Gainesville: University Press of Florida, 2020, 332-344

"Introduction" With Colin J. Davis in *Migration and the Transformation of the Southern Workplace since 1945.* (Gainesville: University Press of Florida, 2010), 1-12

"We Are White Men and Haven't Got Black Hearts' Racialized Gender and the Labor Movement in Florida, 1900-1920." in *Florida's Working-Class Past: Current Perspectives on Labor, Race, and Gender from Spanish Florida to the New Immigration.* (Gainesville: University Press of Florida, 2009), 111-142

"Introduction: The Promise of Florida's Labor History," With Melanie Shell Weiss in *Florida's Working-Class Past: Current Perspectives on Labor, Race, and Gender from Spanish Florida to the New Immigration.* (Gainesville: University Press of Florida, 2009), 1-16

"Epilogue: Florida and the Contemporary Labor Movement" With Melanie Shell Weiss in *Florida's Working-Class Past: Current Perspectives on Labor, Race, and Gender from Spanish Florida to the New Immigration.* (Gainesville: University Press of Florida, 2009), 257-274

<u>Other Published Articles</u> (Not Refereed)

"Highlighting Florida's Past," *Organization of American Historians Newsletter*, (August 2004)

"Erasing Florida's Past," *Organization of American Historians Newsletter*, (May 2003)

2

Co-authored, "Implementing *The La Pietra Report*: Globalizing U.S. History Instruction in Birmingham, Alabama," *Organization of American Historians Newsletter*, (November 2001)

"Tearing Down Walls and Building Bridges to Extend the Reach: The Positives in Creating a Local History Community," (April 2001) *Perspectives*

Co-authored, "Understanding Student Interest--A Survey," *Organization of American Historians Newsletter*, (May 2000)

<u>Multi & Digital Media:</u>

*Marching Forward*, (2020) Film, with Lisa Mills, Executive Producer, Director

*Filthy Dreamers*, (2020) Film, with Lisa Mills, Executive Producer, Director

*The Florida Constitutions Podcast*, (2019) [iTunes & H-Net] Co-Producer and Co-Host

*Every Tongue Got to Confess: A Podcast Exploring Communities of Color*, (2016) [iTunes] Co-Producer and Host

*The Art of the Review: An H-Net Podcast*, (2015) [iTunes] Executive Producer and Co-Host

*Hymns of Three Cities* (2015) Film, with Lisa Mills Executive Producer, Director

*A History of Central Florida Podcast*, [iTunes] (2013-2015), Executive Producer

*The Committee*, (2012), Film, with Lisa Mills, Executive Producer, Director

*RICHES of Central Florida Podcast*, [iTunesU] Executive Producer

*Shadows of the Past, Reflections for the Future*, (2010), Film, with Lisa Mills, Producer, Director

*Florida Historical Quarterly Podcast*, [iTunes] (2009-2017), Producer

*Public History Podcast*, (2009-2010) [iTunesU] Producer

<u>Museum Exhibits</u>

*The History of Jones High School-Online Exhibit*, (2019), Curator, [https://joneshighschoolhistoricalsociety.org/]

*The Long History of the Civil Rights Movement in Florida: 1865-1965*, [Traveling Exhibit], (2012), Harry and Harriette Moore Cultural Complex, Assistant-Curator

3

*From Kin to Kant: The Culture of Turpentine in Central Florida*, [Featured Exhibit Installation], (2009), Winter Park History Museum, Curator

Encyclopedia Entries:

"Railroad/bus stations," "Jim Crow Rail Car" & "Streetcar Boycotts" in *The World of Jim Crow America: A Daily Life Encyclopedia* Steven A. Reich, ed. (Santa Barbara, CA: ABC-CLIO, 2019)

"Jacksonville" *The Great Black Migration*, Steven A. Reich, ed. (Westport, CN: Greenwood Press, 2006), 446-448

"National War Labor Board 1917-1919," "Labor and Jim Crow Segregation," "Black Codes during Reconstruction," "Muller *v.* Oregon," in *Encyclopedia of Labor History Worldwide*, Schlager Group, (2004)

Book Reviews:

*American Historical Review, Journal of American History, H-Reviews, Florida Historical Quarterly, Georgia Historical Quarterly, Left Review, Urban Studies*

**Research Grants, Funding and Awards:**

Awards

Hampton Dunn Broadcasting Award, Filthy Dreamers, (2021)

Hampton Dunn Internet Award, *Florida Constitutions Podcast*, (2019)

Florida Humanities Council, Mini Grants for Community Organizations, (2018)

CAH UCF Sabbatical (Spring 2018)

UCF Teaching Incentive Program (TIP) 2018

UCF Research Incentive Award (RIA) 2017

Special Recognition Award, (In)justice For All Film Festival, *Hymns of Three Cities* (2016)

Hampton Dunn Internet Award, *A History of Central Florida Podcast*, (2016)

Hampton Dunn Internet Award, *A History of Central Florida Podcast*, (2015)

4

Suncoast Emmy© Award, Best Historical Documentary, *The Committee* (2014)

Hampton Dunn Internet Award, *A History of Central Florida Podcast*, (2014)

International Jury Award for Best Documentary, Durban Gay & Lesbian Film Festival, South Africa, *The Committee* (2014)

Love Your Shorts Film Festival, Best Documentary, *The Committee* (2014)

Harry and Harriette Moore Book Award, *To Render Invisible: Jim Crow and Public Life in New South Jacksonville* (2014)

Hampton Dunn Internet Award, *RICHES Podcast Documentaries*, (2013)

Hampton Dunn Broadcasting Award, Film *The Committee*, (2013)

Broadcast Education Association, Best of Competition Mixed Video, *The Committee*, (2012)

Research

Florida Humanities Council, Mini Grants for Community Organizations, (2018)

Information Fluency Grant, UCF Faculty Center for Teaching and Learning, (2014)

Florida Humanities Council, Mini Grants for Community Organizations, (2013)

Florida Humanities Council, Mini Grants for Community Organizations, (2011)

CAH In-House Research Award, (2011-2012)

US Army Corp of Engineers Vicksburg District, Research and Development Contract, Principal Investigator, (2002-2003)

National Endowment for the Humanities, Extending the Reach Fellowship: Research Grant (2001-2002)

Miles College, Faculty Summer Research Award, (2000)

## Conference Papers and Presentations

International

"Traveling Down the Long Tail: A Local History Podcast for a Global Listening Public" The Society for U.S. Intellectual History Conference, Nashville, Tennessee, November (2021)

5

"Voter Suppression as Violence, the Florida Example, 1870-1920," Racial Violence: the American (hi)story, Global Institute for Research, Education & Scholarship (GIRES), Virtual Amsterdam, Netherlands, July (2021)

"Suffrage at the Onset: African American Activism and the Right to Vote in Florida, 1865-1870" at the ASALH (Association for the Study of African American Life and History) Virtual Conference September (2020)

With Lisa Mills, "Just Below the Surface and in the Shadow of Disney: Documenting Everyday Activism in the Civil Rights Struggle in Orlando Florida, An Oral History Film Project" Oral History Association Meeting, Salt Lake City, (2019)

"Marching Forward" Florida Historical Society Meeting, Cape Canaveral (2019)

"Podcasting and Public History," Chair, National Council for Public History Meeting, Indianapolis, IN, (2017)

"Podcasting and Digital Storytelling," HASTAC (Humanities, Arts, Science, and Technology Alliance and Collaboratory) Conference, Tempe Arizona, (2016)

"The Book Review as Art Form," American Historical Association Conference, (2013)

"Public Space, the Public Sphere and the Discourse of Citizenship in the Age of Emancipation: Urban Antebellum Protest against Jim Crow, 1840-1890," Association of American Geographers Meeting, (2012)

"Maintaining the "Public Peace": Black Workers, Labor Strikes and Public Space in Jacksonville, Florida, 1867-1882," Race, Labor and Citizenship in the Post Emancipation South Conference, Charleston, S. C. (2010)

"Negotiating Segregation: Respectable Blacks, White Conductors and the Making of "Jim Crow" on Public Transportation, 1840-1905," Social Science History Association Conference (2006)

"Worker Transcripts and the Redefining of Race and Gender Roles: Working Class Infrapolitics in Florida, 1890-1920" Social Science History Association Conference (2003)

"What Represents the Great Migration? Conflicting Public and Scholarly Images," Social Science History Association Conference (2002)

"Urban Segregation, Urban Protest: Jacksonville's Streetcar Boycott, 1901-1906" American Historical Association West Coast Conference, (1996)

National

"Suffrage at the Onset: African American Activism and the Right to Vote in Florida, 1865-1870," Association for the Study of African American Life and History Virtual Conference, Zoom (2020)

"Podcasting and Building an Audience from the Bottom Up," Organization of American Historians Conference, Providence, RI (2016)

"Podcasting Roundtable," Organization of American Historians Meeting (2013)

"Podcasting and Public History," Organization of American Historians Meeting (2012)

"The Jim Crowing of Public Transportation: Respectability and the Meaning of Public Space, 1840-1905," Southern Historical Association Conference (2007)

A Transnational Approach to the Great Migration in Florida, 1890-1920" Organization of American Historians Conference (2004)

"Rethinking Amos and Andy, Martin and In-Living Color in the Age of Agency: The Use of Media to Teach Stereotypes," Organization of American Historians Conference (2001)

<u>Regional</u>

"Filthy Dreamers & The Committee: Screening and Discussion," Florida Conference of Historians, (2016)

"*Hymns of Three Cities*," Florida Historical Society Meeting and Conference, (2015)

"Filthy Dreamers: Screening and Discussion," Florida Historical Society Meeting and Conference, (2014)

"River City Round Table: Jacksonville in Urban History," Florida Historical Society Meeting, (2011)

"The Union Shop as a Crisis of Public Space: The 1912 Jacksonville Streetcar Strike," Southern Labor Studies Association Conference, (2011)

"Imagined Homelands in Ethnic Festivals and Commemorations in Florida, 1959-2005," Florida Historical Society Meeting, (2010)

"The Strong Arm of the State:" William N. Sheats, His Detractors, and the Jim Crowing of the Orange Park School, 1892-1896," Florida Historical Society Meeting, (2009)

"From the Streetcars to the Labor Temples: Organizing Labor in Florida during the 1910s," Southern Labor History Conference (2002)

7

"Migration and African American Labor in Jacksonville, FL, 1915-1920" presented at the Southern Afro-American Studies Association Conference (1996)

## Film Screenings & Festivals

*Hymns of Three Cities* (2015, 23 mins, Co-Director)
>    Created Equal Screening:  NEH Grant. January 2015. National.
>    Flickering Landscapes Conference Screening.  November 2015.  Regional.
>    Flagler Film Festival.  January 2016.  Regional.
>    Jacksonville Documentary Film Festival.  April 2016. Regional.
>    Show Me Justice Film Festival. April 2016.  National.
>    Special Recognition Award, (In)justice For All Film Festival.  April 2016.  National.

*Filthy Dreamers* (2014, 27 mins, Co-Director)
>    Fort Lauderdale Film Festival, November 2014, International.

*The Committee* (2012, 27 mins, Co-Director)
>    National Distribution:  American Public Television Exchange. June 2016.  National.
>    Gasparilla International Film Festival.  March 2012. International.
>    Best of Competition Award, Festival of Media Arts.  Broadcast Educators Association.  April 2012.  National.

*Shadows of the Past, Reflections for the Future* (2011, 15 mins, Co-director)
>    Award of Excellence, Faculty/Student Video
>    Broadcast Educators Association. April 2010.  National.

## Presentations for Local Community

"The Civil Rights Movement in Jacksonville, Florida," Harry T. & Harriette V. Moore Memorial Park, (Fall 2014)

"The Legacy of Harry T. Moore in Florida," The Holocaust Memorial Resource and Education Center of Florida, Maitland, Florida, (Fall 2014)

"The Woman Suffrage Movement in Florida," Ormond Beach Historical Society (Spring 2014)

"The Woman Suffrage Movement in Florida," Frank DeGroot Public Library, Palm Bay, Florida (Winter 2014)

"The Long History of the African American Civil Rights Movement in Florida," Ormond Beach Historical Society (Spring 2013)

"James Weldon Johnson's Jacksonville" 2012 James Weldon Johnson Festival, Jacksonville, Florida, Featured Speaker (Summer 2012)

"The Long History of the African American Civil Rights Movement in Florida," Frank DeGroot Public Library, Palm Bay, Florida (Winter 2012)

"Eatonville: The Town that Freedom Built," Roundtable Discussion, Zora Festival (Winter 2012)

"Traveling Exhibit: The Long History of the African American Civil Rights Movement in Florida, 1865-1965," Florida Humanities Council Mini-Grant for Community Organizations, (2011)

"The Early History of the Civil Rights Movement in Jacksonville, Florida," Aurora Lecture Series, Aurora Theatre, Jacksonville Florida, (Summer 2011)

"Zora Neale Hurston and Black Folk Music," Zora Memorial Celebration, Maitland Public Library (Fall 2009)

"Origins of the Seminoles," Winter Park Public Library, (Fall 2009)

"Florida Labor History," Student Labor Action Project, (Fall 2009)

Exhibit Curator, From Kin to Kant: The Culture of Turpentine with the Winter Park Historical Association (2008-2009)

"If God Send Me a Pistol, I'll Send Him a Man' Zora Neale Hurston and Black Life in the Florida Turpentine Camps" Winter Park Historical Society, (Winter 2008)

"Jim Crow Transportation in Florida, 1876-1905," Florida Historical Society, (Spring 2008)

Chaired, "Florida and the Civil Rights Movement" the Orange County Regional History Center, (Spring 2006)

## Teaching Grants and Awards

UCF UCF Teaching Incentive Program (TIP) (2013)

UCF Excellence in Undergraduate Teaching Award, (2012)

U. S. Department of Education, Teaching American History Grant, (Co-Author with Polk County School, Florida), (2002-2005)

National Endowment for the Humanities, Focus on Teaching Grant (2001-2002)

National Endowment for the Humanities, Extending the Reach: Institutional Grant (2001)

Birmingham Area Consortium of Higher Education, Consortium Development Grant, (2000)

**Courses Taught**

<u>Undergraduate</u>

HIS 4150 History and Historians
AMH 3422 Frontier Florida
AMH 3425 Sunbelt Florida
AMH 3403 History of the South since 1865
LAH 4136 Colonial Florida
FIL 3930H Honors Documentary Workshop
HIS 4070 Oral History
HIS3081 Hist. Museums and Digital Spaces

<u>Graduate</u>

AMH 5937 Colloquium Gender and Sexuality
HIS 6918 Historiography
AMH 5407 Colloquium Southern History
AMH 6429 Seminar in Local and Community History
HIS 5067 Introduction to Public History
AMH 6938 Historical Documentary and New Media
HIS6094 Seminar in Curation & New Media
HIS5088 Readings Curation & Public History

**Thesis Supervision**

"A digital media exploration of the Federal Writers' Project's folk song collecting expeditions in Depression Era Florida" by Holly Baker Defended Summer 2018
"Creating a Digital Exhibit on the Colonial Fur Trade in Florida: A Public History/Digital History Project" by Benjamin DiBiase, Defended Summer 2017

"Hippieland: Bohemian Space and Countercultural Place in San Francisco's Haight-Ashbury Neighborhood" by Kevin Mitchell Mercer, Defended Summer 2017

"The Rhetoric of Public Memory in Urban Park Revitalization in 20th Century Jacksonville, Florida" by Mary Catherine Kelley, Defended Spring 2016

"Conflict and Modernity in New South Florida's Phosphate Mines, 1900-1930," by Terrell Orr, defended Spring 2016

10

"Stage Illusionists: A Historical Study Using Illusionists as a Reflection of Mass Entertainment, Popular Culture, and Change During the Late Nineteenth Century," by Clayton Phillips, defended Fall 2015

"The Best and Worst of all that God and Man Can Do": Paternalistic Perceptions on the Intellectually Disabled at Florida's Sunland Institutions," by Bethany Dickens, defended Spring of 2014.

"The North Comes South:  Northern Methodists in Florida during Reconstruction," Heather Bollinger, Defended Summer 2011

"The Whiteman's Seminole: White Manhood, Indians and Slaves, and the Second Seminole War," Francis Mahan IV, Defended Spring 2011

"From Celery City to Navy Town: The Impact of Naval Air Station Sanford during World War II," Lewis W. Metzger V, Defended Summer 2010

"Outside the Circle: The Juxtaposition of Powwow Imagery and Cherokee Historical Representation" Dana Brumley, Defended Summer 2009

"Constructing African American Histories in Central Florida," Kathy Parry, Defended Spring 2008

"Brazilian Immigration: A New View of Latinization," Patricia Buzato, Defended Fall 2007

**Service to the College and Department**

Faculty Senate, Steering Committee, (2014-2016)

Faculty Senate, Budget and Administration Committee (2012-2016)

Faculty Senate, (2012-2016)

Chair, Technology Committee (2007-2012)

Department Webpage Administrator (2007-2012)

Public History Committee (2006-2009)

Coordinator of RICHES Podcasts (2009-2015)

Library Liaison (2006-2007)

Phi Alpha Theta Sponsor (2006-2007)

11

**Service to the Profession**

Vice President of Research and Publications, H-Net, (2013-2018)

Board of Directors, Florida Historical Society, (2010-2018)

Manuscript Reviewer, *Florida Historical Quarterly*, *Agricultural History*, *Journal of South History*, University Press of Florida, Oxford University Press, Bedford Books, Vanderbilt University Press

Judge, Harry T. Moore Award, Best Book on the history of ethnic minorities in Florida, (2011)

Judge, Rembert Patrick Award, Best Scholarly Book in Florida History, (2007) (2012)

Judge, Arthur W. Thompson Award, Best Article in the *Florida Historical Quarterly*, (2005, 2005)

Member, *Florida Historical Quarterly* Editorial Board (2004-Present)

National Endowment for the Humanities, Judge, Research Grants (July 2004)

Program and Locations Committee, Southern Labor Studies Conference, (2004)

National Endowment for the Humanities, Judge Education Grants (December 2003)

List Editor, Review Editor and Web Editor, H-Florida, H-Net Humanities Network (1999-2008)

Membership Committee, Southern Historical Association, (1998-1999)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION



**DONALD FALLS, JILL HARPER,
Dr. ROBERT CASSANELLO, STEPHANIE
NICOLE JAMIESON,** as next of friend of **RMJ,
Dr. TAMMY L. HODO,**

    **Plaintiffs,**

**vs.**                                              **Case No.: 4:22-cv-00166**

**RON DESANTIS,** in his official
capacity as Governor of Florida; **RICHARD CORCORAN,**
in his official capacity as Commissioner of the
Florida State Board of Education; **TOM GRADY,
BEN GIBSON, MONESIA BROWN, MARVA
JOHNSON, RYAN PETTY, JOE YORK,**
in their official capacities as members of the
Florida State Board of Education; **BRIAN LAMB,
TIMOTHY M. CERIO, AUBREY EDGE, PATRICIA FROST,
EDWARD HADDOCK, H. WAYNE HUIZENGA, JR.,
NATASSIA JANVIER, KEN JONES,
DARLENE LUCCIO JORDAN, ALAN LEVINE,
CHARLES H. LYDECKER, STEVEN M. SCOTT,
WILLIAM SELF, ERIC SILAGY, KENT STERMON,**
in their official capacities as members of the Florida Board of
Governors of the State University System; and **ASHLEY MOODY,**
in her official capacity as Florida's Attorney General,

    **Defendants.**

_____

## DECLARATION OF DR. ROBERT CASSANELLO

STATE OF FLORIDA       }
                           } SS.
COUNTY OF ORANGE   }

1

I, Robert Cassanello, do hereby submit this declaration and state the following:

1.      I am over the age of 18 and am a resident of the State of Florida. I have personal knowledge of the facts herein, and if called as a witness, could testify competently thereto.

2.      I am an associate professor of history at the University of Central Florida and have taught there since 2007. I have a PhD in history from Florida State University and have spent my career studying, producing scholarship, and teaching the history of the civil rights movement. A copy of my curriculum vitae is attached hereto as Exhibit A.

3.      I currently teach a class called The Civil Rights Movement. The class focuses on the ways in which social protests undid Jim Crow through the civil rights movement.

4.      In Spring 2023, I am also planning to teach a class called Jim Crow America. This class focuses on examining how America fell into the Jim Crow system.

5.      HB7 restricts my ability to teach these subjects fully and accurately to my students. In each of my classes, I strive to give students a comprehensive view of the history of race and racism in America, including giving them the tools to explore their own interpretations based on research of that history. As part of that

2

instruction, I encourage my students to think about institutional and structural racism. Specifically, the idea that policies, laws, and court decisions have racial outcomes that their proponents may not consciously intend. I also discuss with them the ways contemporary America can perpetuate a Jim Crow like outcomes despite the repeal of Jim Crow laws.

6.     The legislation assumes a condition of contemporary America that is, at best, debatable. Many historians in my field examine the ways that America has failed to move on from a racial caste system. Additionally, the law specifically prohibits concepts or discussions around the "moral superiority" of one race over another. However absent in HB7 is the prohibition, in specific terms, of the intellectual superiority of one race over another. With this absence the law itself is privileging a white supremacists discourse whether intentional or unintentional.

7.     HB7 purports to allow me to "discuss [] the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." However, this exception reflects a misunderstanding of what historians do and how history is taught. It is impossible to give an "objective" account of history. Studying history is interpreting history, and the central skill that history teaches is how to interpret historical sources into a coherent narrative. Thus, there is no single interpretation or

explanation for the study of history, but instead debates which are based on scholarly research and discourse.

8. It is impossible to teach history without using some interpretive lens. For example, an "objective" account of the history of the holocaust would require professors to give credence to holocaust denial. However, for obvious reasons, holocaust denial is an interpretive lens that virtually all serious academics reject and is not included in history courses.

9. An example of a discredited interpretive lens in the area that this law regulates is the concept of the Bell Curve. This sociological theory posited that cognitive ability and intelligence influenced by genetics and environmental factors predict outcomes like financial income, job performance, crime rates, and a person's socio-economic status. The Bell Curve's proponents suggested connections between race and intelligence that purportedly explained socio-economic disparities between various races. Historians and social science generally consider the Bell Curve to be junk science, and socio-economic disparities are determined by a wide range of societal factors outside a person's control than a person's innate intelligence.

10. HB7 restricts my ability to explain the bell curve's failings to students since it prohibits me from instructing students that "such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex

4

to oppress members of another race, color, national origin or sex." However, the bell curve theory has explicitly used the concept of merit and innate intelligence to justify socioeconomic inequality among various races and ethnicities. Under HB7's regime, it appears that I would be required to give equal credence to discredited theories like the bell curve as accepted historical theories when discussing the concept of socio-economic inequality.

11. HB7 also restricts the course materials I can offer in my courses. One text I was planning on assigning in my Jim Crow America course is *The New Jim Crow* by Michelle Alexander. This book posits that America's justice system perpetuates a racial caste system through government funded policing, racial profiling and other factors that then disproportionately labels black men as criminals and felons and justifies subjecting them to inhuman treatment. *The New Jim Crow* is a widely discussed text that has been cited in both law review articles and judicial opinions.

12. The sociological position that the *New Jim Crow* advocates runs afoul of HB7's restriction on endorsing the concept that "a person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." Given the legislation broad and ambiguous language, I could be violating the law by assigning the text because such instruction could be

5

construed to "espouse, promote, advance, inculcate, or compel" belief in this forbidden concept.

13.     Another text I plan to assign is *The Wages of Whiteness* by David Roediger. This text examines working-class racism in the United States. Part of the text explains how white workers during the labor movement were ideologically opposed to black workers and how the 19th Century labor movement demanded a racially disparate system of employment.

14.     HB7's prohibition on advocating the racial connotations of the concepts of "merit" and "hard work" as well as its prohibition of endorsing the concept that "a person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex" would restrict my ability to offer instruction on this text.

15.     A component on the civil rights movement involves criticisms of how desegregation was implemented or failed to be implemented during the civil rights movement. For example, a text I assign, *Why Busing Failed: Race. Media, and the National Resistance to School Desegregation* by Matthew Delmont discusses how predominantly white antibusing activists, including former Florida Governor Claude Kirk, ultimately succeeded in preventing public school desegregation and helped to create a system that gave precedence to the desires of white parents who opposed desegregation over the civil rights of black students.

6

16.     Other interpretations of the civil rights movement that I teach discuss ways in which integration harmed the black community. Specifically, the desegregation of public schools resulted in many black educators and administrators taking pay cuts and losing their jobs as schools closed. I co-directed a film called *Marching Forward* with UCF film professor Dr. Lisa Mills and my student Oswmer Louis that covers desegregation in Orlando Public schools. In discussing those topics, part of the film features interviews by black public-school administrators and teachers who were adversely impacted by desegregation.

17.     The purpose of these texts is not to advocate a return to a Jim Crow system of segregation, but to identify some of the failings of desegregation in both accomplishing its stated goal of eliminating racial class barriers and uplifting disadvantaged black communities.

18.     Under HB7's regime, I could be violating the law to offer these texts criticizing the desegregation movement because these criticisms could be perceived as advocating the viewpoint that "members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex."

19.     HB7 also restricts my ability to teach these subjects by putting the power in individual students to interpret the law and determine if a lesson implicates one of the forbidden viewpoints. For example, the prohibition on advocating

7

viewpoints that "a person, by virtue of his or her race, color, sex, or national origin bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national, origin or sex."

20.     I would not instruct a student, for example, that they bear personal responsibility for a lynching committed in the past. However, I have no control over how students will interpret a particular lesson. Psychological distress, anguish, or a feeling of personal responsibility to correct injustices is often a natural response when students learn the role that events during Jim Crow and the civil rights movement impacted those students' socioeconomic status.

21.     Furthermore, HB7's amendments to Florida's Education Equity Act permits students to interpret the law's vague principles as they wish and bring legal action if they feel my lessons violate those principles. Additionally, in the state budget, republican lawmakers added a provision that stated, "contingent upon HB7 or similar legislation…if any instruction is found to have a substantiated violation…the institution shall be ineligible to receive performance funding during the next fiscal year following the year in which the violation is substantiated." And Republican lawmakers on any standing committee can decide this is the case, whether they are right or wrong. Thus, by teaching these concepts, not only am I

8

putting myself at risk of civil liability, but also putting the University of Central Florida at risk of losing its performance funding. As such, this legislation forces me to second guess all my instructional materials to determine if they could be construed as violating one of the law's forbidden viewpoints.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on the __17__ day of __May__, 2022.

9

# Course Syllabus



**Jump to Today**   ✎ Edit





# AMH 4575

**Instructor:** Dr. Robert Cassanello **Email:** robert.cassanello@ucf.edu
(mailto:robert.cassanello@ucf.edu) **Web Page**: Department Webpage
(https://history.cah.ucf.edu/faculty-staff/?id=282) **Office Hours:** by appointment, phone or Email **Office:**
**TCH 348K**   (https://map.ucf.edu/locations/trevor-colbourn-hall/trevor-colbourn-hall/) **Office Phone:**
(407-823-1681)

**Course Description:** History of the African-American Civil Rights Movement from 19th century origins
to 1960s victories to today, through analysis of social and cultural primary sources. Spring.

**Purpose of Course & Learning Outcomes:** Students will gain an understanding of how to analyze,
interpret, and synthesize historical information. In addition students will gain an understanding of the civil
rights movement from the 19th through the 20th centuries.

**Texts & Electronic Requirements:**

**Required**

 Kyle G. Volk, *Moral Minorities and the Making of American Democracy,*

(https://global.oup.com/academic/product/moral-minorities-and-the-making-of-american-democracy-
9780199371914?cc=us&lang=en&)

Glenn T. Eskew, *But for Birmingham: The Local and National Movements in the Civil Rights*

*Struggle*  (https://uncpress.org/book/9780807846674/but-for-birmingham/).

Case 4:22-cv-00166-MW-MJF    Document 77    Filed 08/31/22    Page 320 of 359



Pete Daniel, *Dispossession: Discrimination against African American Farmers in the Age of*

*Civil Rights* (https://uncpress.org/book/9781469622071/dispossession)



Nicholas Buccola, *The Fire Is upon Us: James Baldwin, William F. Buckley Jr., and the*

*Debate over Race in America* (https://press.princeton.edu/books/hardcover/9780691181547/the-fire-is-upon-us)



Matthew F. Delmont, (https://www.ucpress.edu/book/9780520284258/why-busing-failed#about-

author) *Why Busing Failed: Race, Media, and the National Resistance to School Desegregation (https://www.ucpress.edu/book/9780520284258/why-busing-failed#about-author)*

**MS Word**--You must use MS Word in this class or have access to it. As a student you have access to an online cloud version of MS Word for free with your Knights email account and you can purchase MS Office with your student ID at the computer store for less than $20.00. You cannot use Open Office, Word Perfect, Google Doc or any other word processing program. Use of MS Word is a requirement. If you think you can produce a paper through an alternative word processing program and can <span style="color:red">**SUCCESSFULLY**</span> export that file as a MS Word formatted file and I cannot tell the difference then you have my blessing. But if you turn your paper assignments in and they are not correctly formatted as doc or docx files then the onus is on you not me to accept your assignment.

(https://archive.org/details/ost-history-a_comprehensive_outline_of_world_history) **Specific Course Objectives:**

Students must:

1. know and be able to identify the significance of important key figures, terms and facts covered in class and the readings.
2. comprehend and analyze the major themes in the course and place them within a historical context.
3. write essays on the major themes.
4. interpret historical frameworks as they apply to the history of the Civil Rights Movement.
5. Your participation and attendance will be required through the successful completion of the

assignments for this class as well as attending scheduled classes. In order to optimize my employment of active learning strategies in this class you must attend classes, participate in all discussions online and in class and contribute to group projects fully. If you do not it will impact your grade and your learning environment negatively. I will work with students who have documented excused absences so that they will not be impacted by this class policy negatively.

**Course Requirements:**

**1. Exams.** There will be two non cumulative exams consisting of essay and short answers. (20% grade)

**2. Short Papers:** There will be several written papers due throughout the course of this class. Papers will be completed by a due date and time and must adhere to the assignment directions and rubric as well as style guide. (30% of grade)

**3. Presentations & Discussions**: During each class session there will either be a discussion of the reading or a class presentation where you will prepare a presentation for the rest of the class that you will also post in the discussion section, they will be in text or blog format not interactive. You will also be required to reply to posts (other people's presentations) as part of your overall grade. (15% of grade)

**4. Quizzes:** There will be quizzes connected to the reading. They will be short answer free response questions. (20% of grade)

**5. Final Paper:** There will be a final 3 page paper that will be due before the Final Exam and must adhere to the assignment directions and rubric as well as style guide. (15% of grade)

**Rules for Writing Assignments, Exams and Quizzes:**

All papers, quizzes and exams are due when they are scheduled, any late paper will receive 10% off for each calendar day it is late. The final research paper will not be turned in late without prior approval due to a documented excuse which will earn an Incomplete for the class. All final papers must be turned in on time or will receive no credit if turned in too late. All papers must be turned in through Canvas. There will be several writing assignments given throughout the semester. There will be no make ups on the assignments and I do not accept late papers for full credit without a documented written excuse. Unless due to some extenuating circumstances, there will be no late or make-up exams. If there are extenuating circumstances they must be discussed with me in advanced of the exam deadline or after once I have approved the documented excuse.

**Grading Scale:**

| A = 100-93 | B = 87-83 | C = 77-73 | D = 67-63 |
|---|---|---|---|
| A- = 92-90 | B- = 82-80 | C- = 72-70 | D- = 62-60 |
| B+ = 89-88 | C+ = 79-78 | D+ = 69-68 | F = 59- below |

Students are responsible for calculating their own grades throughout the semester. The instructor will not

calculate any student's grade until the end of the final exam week.

**Attendance Policy:**

1. Students should attend all classes, even online ones. If you miss 4 classes or 4 assignments during the semester (without a documented excuse) I will penalize your overall grade, see Attendance in Course Requirements.

2. **Unexcused absences by way of not completing a quiz or exam will result in a "0."**

3. Excused absences for reasons such as illness requiring medical care, college activities, religious holidays etc. must be documented. Exceptional cases must be approved by me.

4. Incompletes will be given only in very rare documented cases, i.e. almost never!

5. Your participation and attendance will be required through the successful completion of the assignments for this class. If you do not turn an assignment in it will be interpreted as you not attending class. Thus if you do not complete four assignments by turning them in on time or within 10 days of the due date you will automatically fail this class. Students with documented excused absences will not be impacted by this class policy.

6. **I do not take work related excuses as documented excuses. I will only accept documented medical care of yourself or a loved one in exceptional cases.**

7. If you find yourself without internet or limited use of internet or something in Canvas is not working for you but working for the rest of the class this will not translate into an excuse to delay turning in Assignments or taking quizzes and exams including any of these events due to travel on your part. Unrelated natural causes that can be documented like storms, hurricanes power outages which can be documented and verified so they will be excused.

**Deployed Active Duty Military Students**-Students who are deployed active duty military and/or National Guard personnel and require accommodation should contact their instructors as soon as possible after the semester begins and/or after they receive notification of deployment to make related arrangements.

**Academic Honesty:**

Students should familiarize themselves with UCF's Rules of Conduct at <**http://osc.sdes.ucf.edu/process/roc** (http://osc.sdes.ucf.edu/process/roc) >. According to Section 1, "Academic Misconduct," students are prohibited from engaging in

1. Unauthorized assistance: Using or attempting to use unauthorized materials, information or study aids in any academic exercise unless specifically authorized by the instructor of record. The unauthorized possession of examination or course-related material also constitutes cheating.

2. Communication to another through written, visual, electronic, or oral means: The presentation of material which has not been studied or learned, but rather was obtained through someone else's efforts and used as part of an examination, course assignment, or project.

3. Commercial Use of Academic Material: Selling of course material to another person, student, and/or uploading course material to a third-party vendor without authorization or without the express written

7/12/22, 1:17 AM                                   Summer of Dev Fa22/AMH4578 - Cassanello_R_01

permission of the university and the instructor. Course materials include but are not limited to class notes, Instructor's PowerPoints, course syllabi, tests, quizzes, labs, instruction sheets, homework, study guides, handouts, etc.

4. Falsifying or misrepresenting the student's own academic work.
5. Plagiarism: Using or appropriating another's work without any indication of the source, thereby attempting to convey the impression that such work is the student's own.
6. Multiple Submissions: Submitting the same academic work for credit more than once without the express written permission of the instructor.
7. Helping another violate academic behavior standards.

For more information about Academic Integrity, consult the International Center for Academic Integrity <**http://academicintegrity.org**   **(http://academicintegrity.org/)** >.

For more information about plagiarism and misuse of sources, see "Defining and Avoiding Plagiarism: The WPA Statement on Best Practices" <**http://wpacouncil.org/node/9**   **(http://wpacouncil.org/node/9)** >.

**Portfolios**: All History majors are required to turn in a portfolio during the semester they intend to graduate. This portfolio should contain 8-12 examples (the originals not copies) of graded, written work (research papers, book reviews, essay exams, etc.) from History classes. For more information on History graduation requirements see **http://history.cah.ucf.edu/portfolio.php**  **(http://history.cah.ucf.edu/portfolio.php)**

**Responses to Academic Dishonesty, Plagiarism, or Cheating**
Students should also familiarize themselves with the procedures for academic misconduct in UCF's student handbook, *The Golden Rule* <  **http://goldenrule.sdes.ucf.edu/docs/goldenrule.pdf** **(http://goldenrule.sdes.ucf.edu/docs/goldenrule.pdf)** >. UCF faculty members have a responsibility for students' education and the value of a UCF degree, and so seek to prevent unethical behavior and when necessary respond to academic misconduct. Penalties can include a failing grade in an assignment or in the course, suspension or expulsion from the university, and/or a "Z Designation" on a student's official transcript indicating academic dishonesty, where the final grade for this course will be preceded by the letter Z. For more information about the Z Designation, see <**http://goldenrule.sdes.ucf.edu/zgrade** **(http://goldenrule.sdes.ucf.edu/zgrade)** >.

**Course Accessibility Statement**

The University of Central Florida is committed to providing access and inclusion for all persons with disabilities. Students with disabilities who need access to course content due to course design limitations should contact the professor as soon as possible. Students should also connect with Student Accessibility Services (SAS) <**http://sas.sdes.ucf.edu/**   **(http://sas.sdes.ucf.edu/)** > (Ferrell Commons 185, **sas@ucf.edu (mailto:sas@ucf.edu)**, phone 407-823-2371). For students connected with SAS, a Course Accessibility Letter may be created and sent to professors, which informs faculty of potential

course access and accommodations that might be necessary and reasonable. Determining reasonable access and accommodations requires consideration of the course design, course learning objectives and the individual academic and course barriers experienced by the student. Further conversation with SAS, faculty and the student may be warranted to ensure an accessible course experience.

### Campus Safety Statement-On Campus Students

Emergencies on campus are rare, but if one should arise during class, everyone needs to work together. Students should be aware of their surroundings and familiar with some basic safety and security concepts.

- In case of an emergency, dial 911 for assistance.
- Every UCF classroom contains an emergency procedure guide posted on a wall near the door. Students should make a note of the guide's physical location and review the online version at <**http://emergency.ucf.edu/emergency_guide.html (http://emergency.ucf.edu/emergency_guide.html)** >.
- Students should know the evacuation routes from each of their classrooms and have a plan for finding safety in case of an emergency.
- If there is a medical emergency during class, students may need to access a first-aid kit or AED (Automated External Defibrillator). To learn where those are located, see <**http://www.ehs.ucf.edu/AEDlocations-UCF  (http://www.ehs.ucf.edu/AEDlocations-UCF)** > (click on link from menu on left).
- To stay informed about emergency situations, students can sign up to receive UCF text alerts by going to <**https://my.ucf.edu   (https://my.ucf.edu/)** > and logging in. Click on "Student Self Service" located on the left side of the screen in the toolbar, scroll down to the blue "Personal Information" heading on the Student Center screen, click on "UCF Alert", fill out the information, including e-mail address, cell phone number, and cell phone provider, click "Apply" to save the changes, and then click "OK."
- Students with special needs related to emergency situations should speak with their instructors outside of class.
- To learn about how to manage an active-shooter situation on campus or elsewhere, consider viewing this video (< **You CAN Survive an Active Shooter   (https://youtu.be/NIKYajEx4pk)**



**(https://youtu.be/NIKYajEx4pk)**
>).

### Campus Safety Statement for Students Online Classes

Though most emergency situations are primarily relevant to courses that meet in person, such incidents can also impact online students, either when they are on or near campus to participate in other courses or activities or when their course work is affected by off-campus emergencies. The following policies apply to courses in online modalities.

- To stay informed about emergency situations, students can sign up to receive UCF text alerts by going to <**https://my.ucf.edu** **(https://my.ucf.edu/)** > and logging in. Click on "Student Self Service" located on the left side of the screen in the toolbar, scroll down to the blue "Personal Information" heading on the Student Center screen, click on "UCF Alert", fill out the information, including e-mail address, cell phone number, and cell phone provider, click "Apply" to save the changes, and then click "OK."
- Students with special needs related to emergency situations should speak with their instructors outside of class.

## Course Due Dates & Schedule

**Please note that all due dates are not on the same day of the week. It is your responsibility to know when each due date is.**

## Class Protocols
## Email and Discussion:

1. Check your course e-mail at least twice per week.
2. When emailing the instructor concerning class please only email him through the Course Mail option within Canvas (otherwise your email might get lost with other email coming to the instructor's email account). Expect an answer within 48 hours during the week, excluding weekends.
3. Always try to include a subject in the heading to orientate the instructor or classmates as to what to expect from the email message.
4. Make sure you are clear and courteous in email because innocent and genuine wording could come across as malicious and mean-spirited to others.
5. Sign your e-mail messages with both your first and last name.
6. Do not use all caps. This makes the message very hard to read and is considered "shouting."
7. Check spelling, grammar, and punctuation most email programs have a function for this if not you may want to compose in a word processor, then cut and paste the message into the e-mail.
8. Use a space between paragraphs and different ideas within the email.
9. **Never...Never...Never...**email an assignment as an attachment unless directed first by the instructor.

## Assignments:

https://webcourses.ucf.edu/courses/1411263/assignments/syllabus

1. All assignments must adhere to the grading rubric for that assignment.

2. All assignments must be turned in through Canvas on the assignment direction page.

3. **All assignments must be turned in on time or they will be flagged as late. I will not accept any assignments through email attachments and any late assignment (from an unexcused absence) will receive 10% points off for every calendar day it is late. After 10 days you will not have the option to turn the assignment in at all and will receive a "0."**

4. You are free to turn in paper drafts to the instructor for revision comments; however any rough drafts must be submitted to the instructor at least 48 hours in advance of the due date, any draft turned in within 48 hours of the due date will not be reviewed for comments. All drafts should be turned in through an email attachment in Canvas webmail or at my email address with a request to review it for comments.

5. Any problems computer related on your part does not translate into the ability to turn a paper in late. You must prepare for unforeseen computer problems by completing your work early enough to anticipate potential problems.

6. **Most important**: You should never turn in an assignment (only drafts) through Canvas email as an attachment or the instructor's email as an attachment. **Also your papers must be in MS Word format as a .doc or .docx file, no plain text, Rich Text, PDF or any Open Office file extension will be accepted. If you turn in an assignment this is not in MS Word format it will not be graded.**

7. Since I have had trouble in the past **all papers must use citations no exceptions**. Any paper turned in without citations will not be graded and when turned in with correct citations will receive 10% points off the final paper grade. **If this continues to be a problem I will refuse to grade papers without correct citation formatting. You may use Chicago Manual, APA or MLA Style Citations.**

8. If you have taken this class with me in the past then your papers for this semester must be at least 50% different from your previous effort(s) according to Turnitin.com. You cannot turn the exact (or closely resembling the) same papers in from the previous semester. If you turn a paper in that is more than a 49% match to the previous semester you will receive a "0" for that paper.

9. **It is up to you to know all due dates. During the early stretch of this class assignments are due on the same day each week, at some point that changes. You will need to mark your calendars and go by the schedule and due dates for the class because all assignments are not due on the same day every week.**

10. Each assignment has a number, such as Assignment 2 or Assignment 3. Some assignments are broken into parts such as Assignment 1.1, Assignment 1.2 and Assignment 1.3. Each of those are all Assignment 1. Assignments 1 and 7 are broken into smaller parts, so understand that when you schedule your time to complete them.

11. Since this is an online class, your participation and attendance will be required through the successful completion of the assignments for this class. If you do not turn an assignment in it will be interpreted as you not attending class. Thus if you do not complete two assignments by turning them in on time or within 10 days of the due date you will automatically fail this class. Students with documented excused absences will not be impacted by this class policy.

## Quizzes

1. All quizzes must be taken before the due date. Once the date and time have passed you will not be allowed to complete the quiz.

2. Important!--Do not open a quiz unless you are ready to take it. If you open a quiz to just "see what it looks like" Webcourses will think you are taking it and then grade it once you click out of the quiz. Assuming you did not answer any questions then your quiz will be counted as a "0." Remember only open a quiz when the quiz is part of an assignment and you have read the directions for that assignment. Do not go to the assessment link and start opening quizzes.

3. If there is a study guide before a quiz you may use the study while answering the quiz. All quizzes are open book and open note. However be prepared, most quizzes will be timed so it will not allow you to locate all the answers from a cold reading of the material.

4. Expect for the orientation quiz, all quizzes will be timed and submitted once. The orientation quiz you must receive a 100% on in order to move on to other assignments (remember you can take it as many times as you want)

5. You must have the "pop-ups blocked" function disabled and your firewall disabled before you take the quiz.

---

Pages are maintained by **Robert Cassanello (mailto:robert.cassanello@ucf.edu?subject=WOH2012)** and the

**Techrangers (http://techrangers.cdws.ucf.edu/support/)** at **Course Development & Web Services (http://cdws.ucf.edu)** , IT&R.

© Copyright 2004, **University of Central Florida (http://www.ucf.edu)**

# Course Summary:

| Date | Details | Due |
|------|---------|-----|
| Fri Jan 10, 2020 | 🚀 **Style Quiz (https://webcourses.ucf.edu/courses/1411263/assignments/7604448)** | due by 11:59pm |

https://webcourses.ucf.edu/courses/1411263/assignments/syllabus

| Date | Details | | Due |
|------|---------|--|-----|
| | 🚀 **Syllabus Quiz** (https://webcourses.ucf.edu/courses/1411263/assignments/7604480) | | due by 11:59pm |
| | 🚀 **Assignment 1.3 Part 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604436) | | due by 8:30am |
| Tue Jan 14, 2020 | 📝 **Assignment 1.3 The Long History of the Civil Rights Movement: Parts 1 & 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604477) | | due by 8:30am |
| | 💬 **Discussion: Assignment 1.3 The Long History of the Civil Rights Movement** (https://webcourses.ucf.edu/courses/1411263/assignments/7604473) | | due by 9am |
| Tue Jan 21, 2020 | 🚀 **Assignment 2-Part 2 Quiz** (https://webcourses.ucf.edu/courses/1411263/assignments/7604455) | | due by 8:30am |
| | 💬 **Moral Minorities-Presentations** (https://webcourses.ucf.edu/courses/1411263/assignments/7604472) | | due by 8:30am |
| Wed Jan 22, 2020 | 📝 **Assignment 2: Moral Minorities Parts 1 & 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604478) | | due by 11:59pm |
| Tue Jan 28, 2020 | 💬 **To Brown v Board and From Brown** (https://webcourses.ucf.edu/courses/1411263/assignments/7604471) | | due by 8:30am |
| Wed Jan 29, 2020 | 📝 **Assignment 3: To Brown v Board and From Brown** (https://webcourses.ucf.edu/courses/1411263/assignments/7604479) | | due by 11:59pm |
| Thu Jan 30, 2020 | 🚀 **Assignment 4-But for Birmingham Pt. 1** (https://webcourses.ucf.edu/courses/1411263/assignments/7604438) | | due by 8:30am |
| Tue Feb 4, 2020 | 🚀 **Assignment 4-But for Birmingham-Part 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604444) | | due by 8:30am |

7/12/22, 1:17 AM                    Syllabus for Dev F a22 AMH4970-0793-19200 _Pag...

Case 4:22-cv-00166-MW-MJF    Document 77   Filed 08/31/22   Page 329 of 359

| Date | Details | Due |
|------|---------|-----|
| | 💬 **Urban Protest & Short History** (https://webcourses.ucf.edu/courses/1411263/assignments/7604470) | due by 8:30am |
| Wed Feb 5, 2020 | 📝 **Assignment 4: But for Birmingham** (https://webcourses.ucf.edu/courses/1411263/assignments/7604480) | due by 11:59pm |
| Thu Feb 6, 2020 | 🚀 **Dispossession Pt. 1** (https://webcourses.ucf.edu/courses/1411263/assignments/7604459) | due by 8:30am |
| Tue Feb 11, 2020 | 💬 **Black Farmers and Discrimination** (https://webcourses.ucf.edu/courses/1411263/assignments/7604469) | due by 8:30am |
| | 🚀 **Dispossession Pt. 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604432) | due by 8:30am |
| Wed Feb 12, 2020 | 📝 **Assignment 5: Dispossession** (https://webcourses.ucf.edu/courses/1411263/assignments/7604481) | due by 11:59pm |
| Thu Feb 13, 2020 | 🚀 **Part 1: Eyes on the Prize: Mississippi: Is This America? (1962–1964)** (https://webcourses.ucf.edu/courses/1411263/assignments/7604433) | due by 8:30am |
| Tue Feb 18, 2020 | 💬 **On the Right to Vote** (https://webcourses.ucf.edu/courses/1411263/assignments/7604468) | due by 8:30am |
| Wed Feb 19, 2020 | 📝 **Assignment 6: On the Right to Vote** (https://webcourses.ucf.edu/courses/1411263/assignments/7604482) | due by 11:59pm |
| Thu Feb 20, 2020 | 📝 **Midterm Presentation** (https://webcourses.ucf.edu/courses/1411263/assignments/7604488) | due by 6am |
| Tue Feb 25, 2020 | 🚀 **Midterm Exam** (https://webcourses.ucf.edu/courses/1411263/assignments/7604442) | due by 10:15am |
| Thu Feb 27, 2020 | 🚀 **Quiz: The Fire is Upon Us Pt. 1** (https://webcourses.ucf.edu/courses/1411263/assignments/7604434) | due by 8:30am |

| Date | Details | Due |
|------|---------|-----|
| Tue Mar 3, 2020 | 🚀 **Quiz: The Fire is Upon Us Pt. 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604453) | due by 8:30am |
| Thu Mar 5, 2020 | 📝 **Assignment 7: Class Presentation** (https://webcourses.ucf.edu/courses/1411263/assignments/7604483) | due by 8am |
| Fri Mar 6, 2020 | 📝 **Assignment 7: The Fire is Upon Us** (https://webcourses.ucf.edu/courses/1411263/assignments/7604484) | due by 11:59pm |
| Thu Mar 19, 2020 | 🚀 **Quiz: Eyes on the Prize: A Nation of Law (1968–1971)** (https://webcourses.ucf.edu/courses/1411263/assignments/7604446) | due by 11:59pm |
| Mon Mar 23, 2020 | 🗨 **Black Power: Long History or declension narrative?** (https://webcourses.ucf.edu/courses/1411263/assignments/7604467) | due by 11:59pm |
| | 📝 **Assignment 8: Black Power** (https://webcourses.ucf.edu/courses/1411263/assignments/7604485) | due by 11:59pm |
| Tue Mar 24, 2020 | 🚀 **Quiz: "The Civil Rights Movement in World Perspective"** (https://webcourses.ucf.edu/courses/1411263/assignments/7604454) | due by 11:59pm |
| Fri Mar 27, 2020 | 🗨 **Assignment 9-The CRM or BLM and the World** (https://webcourses.ucf.edu/courses/1411263/assignments/7604466) | due by 11:59pm |
| Mon Mar 30, 2020 | 📝 **Assignment 9: Civil Rights/Black Liberation in Global Perspective** (https://webcourses.ucf.edu/courses/1411263/assignments/7604486) | due by 11:59pm |
| Fri Apr 3, 2020 | 🗨 **Assignment 10-Progressive Era & New Deal** (https://webcourses.ucf.edu/courses/1411263/assignments/7604465) | due by 11:59pm |
| Mon Apr 6, 2020 | 📝 **Assignment 10: Progressive Era to New Deal Civil Rights Organizing** (https://webcourses.ucf.edu/courses/1411263/assignments/7604474) | due by 11:59pm |

| Date | Details | Due |
|------|---------|-----|
| | 🗨 **Assignment 11-Busing and the Media** (https://webcourses.ucf.edu/courses/1411263/assignments/7604464) | due by 11:30pm |
| Mon Apr 13, 2020 | | |
| | 📝 **Assignment 11: Why Busing Failed** (https://webcourses.ucf.edu/courses/1411263/assignments/7604475) | due by 11:59pm |
| | 🚀 **Part 2: Eyes on the Prize: Bridge to Freedom (1965)** (https://webcourses.ucf.edu/courses/1411263/assignments/7604439) | due by 8:30am |
| Mon Apr 20, 2020 | 🗨 **CRM Gender & Sexuality** (https://webcourses.ucf.edu/courses/1411263/assignments/7604463) | due by 11:59pm |
| | 📝 **Assignment 12: CRM Gender & Sexuality** (https://webcourses.ucf.edu/courses/1411263/assignments/7604476) | due by 11:59pm |
| Tue Apr 21, 2020 | 🚀 **Quiz Assignment 10 Part 1** (https://webcourses.ucf.edu/courses/1411263/assignments/7604441) | due by 11:59pm |
| Wed Apr 22, 2020 | 🚀 **Assignment 1.3 Part 1** (https://webcourses.ucf.edu/courses/1411263/assignments/7604451) | due by 8:30am |
| | 🚀 **Assignment 2-Part 1 Quiz** (https://webcourses.ucf.edu/courses/1411263/assignments/7604435) | due by 8:30am |
| | 🚀 **Assignment 3-To Brown v. Board and from Brown Pt. 1** (https://webcourses.ucf.edu/courses/1411263/assignments/7604457) | due by 8:30am |
| | 🚀 **Assignment 3-To Brown v. Board and from Brown Pt. 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604458) | due by 8:30am |
| | 🚀 **Quiz "Building a Black Nation"** (https://webcourses.ucf.edu/courses/1411263/assignments/7604461) | due by 11:59pm |
| | 🚀 **Quiz Assignment 10 Part 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604437) | due by 11:59pm |

Case 4:22-cv-00166-MW-MJF   Document 77   Filed 08/31/22   Page 332 of 359

| Date | Details | Due |
|------|---------|-----|
| | 🚀 **Quiz: Eyes on the Prize: The Time Has Come (1964–1966)** (https://webcourses.ucf.edu/courses/1411263/assignments/7604445) | due by 11:59pm |
| | 🚀 **Quiz: The Black Power Movement: A State of the Field** (https://webcourses.ucf.edu/courses/1411263/assignments/7604449) | due by 11:59pm |
| | 🚀 **Quiz: "Constituents or Myopic Investors: Marcus Garvey and Black Americans"** (https://webcourses.ucf.edu/courses/1411263/assignments/7604462) | due by 11:59pm |
| Fri Apr 24, 2020 | 🚀 **Quiz Eyes on the Prize: Power! (1966–1968)** (https://webcourses.ucf.edu/courses/1411263/assignments/7604443) | due by 11:59pm |
| | 🚀 **Final Exam** (https://webcourses.ucf.edu/courses/1411263/assignments/7604452) | due by 11:59pm |
| | 🚀 **Quiz CRM: Gender & Sexuality Pt. 1** (https://webcourses.ucf.edu/courses/1411263/assignments/7604450) | due by 11:59pm |
| Mon Apr 27, 2020 | 🚀 **Quiz CRM: Gender & Sexuality Pt. 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604447) | due by 11:59pm |
| | 🚀 **Quiz Why Busing Failed Pt. 1** (https://webcourses.ucf.edu/courses/1411263/assignments/7604440) | due by 11:59pm |
| | 🚀 **Quiz Why Busing Failed Pt. 2** (https://webcourses.ucf.edu/courses/1411263/assignments/7604456) | due by 11:59pm |
| | 📝 **Final Paper** (https://webcourses.ucf.edu/courses/1411263/assignments/7604487) | due by 11:59pm |



### AMH 4XXX Jim Crow America

**Instructor:** Dr. Robert Cassanello     **Spring: 2023**
**Email:** robert.cassanello@ucf.edu
**RM:  Time:**
**Office Hours:**
**Office:** TCH 346K
**Office Phone:** 407-823-1681 Orlando

**Course Description:** This course will examine the history of Jim Crow Segregation from its origins in the 19th Century through desegregation its successes and failures. 3 units, PR: AMH 2010 and 2020 or C.I., 3(3,0)

**Purpose of Course:** The course will pay particular attention to the larger themes and historical trends present throughout the origins of Jim Crow as de facto and de jure systems of racial segregation from their origins in the urban north through desegregation efforts in the late 20th century. This course will examine the broader debates about the periodization, nature of Jim Crow as a system of social control and subordination  and short comings related to federal, state and local efforts at desegregation in the United States.

### Specific Course Goals:

Students must:

- Understand the issues related to the history of Jim Crow segregation and black citizenship in modern America.
- Comprehend lectures and reading materials and apply those ideas to quizzes, exams and papers

### Learning Outcomes:

Students will:

- critically analyze the history of Jim Crow segregation and Black citizenship in the American past.
- understand and comprehend theories and debates related to the origins, evolution and dismantling of Jim Crow institutions, practices and legislation.
- apply theories of the history of Jim Crow segregation to quizzes, exams and papers.

### Texts:

*Colored Travelers: Mobility and the Fight for Citizenship before the Civil War*
By Elizabeth Stordeur Pryor, (University of North Caroline Press, 2016)

1

*Gender and Jim Crow, Women and the Politics of White Supremacy in North Carolina*, 1896-1920, By Glenda Elizabeth Gilmore, (University of North Caroline Press, 2019, 2nd edition)

*The New Jim Crow: Mass Incarceration in the Age of Colorblindness*, by Michelle Alexander (The New Press, 2020)

*Segregation by Design: Local Politics and Inequality in American Cities*, by Jessica Trounstine, (Cambridge University Press, 2018)

*Justice Deferred: Race and the Supreme Court*, by Orville Vernon Burton and Armand Derfner, (Harvard University Press, 2021)

Contested Waters: A Social History of Swimming Pools in America
by Jeff Wiltse, (University of North Carolina Press, 2009)

**Specific Course Objectives:**

Students must:

1. know and be able to identify the significance of important key figures, terms and facts covered in class and the readings.

2. comprehend and analyze the major themes in the course and place them within a historical context.

3. write essays on the major themes.

4. interpret historical frameworks as they apply to the history of Jim Crow Segregation.

**Course Requirements:**

1. **Exams**. There will be three non cumulative exams consisting of essay questions and multiple choice answers. (35% grade)

2. **Final**. There will be a cumulative final consisting of essay questions. (20% of grade)

3. **Papers**: There will be several written papers due throughout the course of this class. Some papers will be completed within class, while other papers will be completed outside class and must be 3-4 type written pages and must adhere to the guidelines on my style web page. (35% of grade)

4. **Quizzes**: There will be several quizzes based on the reading assignments. (10% of grade)

**Rules for Writing Assignments, Exams and the Final Exam:**

2

There will be several writing assignments given throughout the semester. There will be no make ups on the assignments and I do not accept late papers without a written excuse. There will be three exams given throughout the class (see the course outline for dates). The questions will be taken from the lectures and the readings. Any student who misses an exam will receive a zero for that exam. Make up exams will not be given. Instead, a student's cumulative final exam grade will also count as the make up exam grade if the student has a legitimate documented excuse for missing an exam. Only in a rare documented emergency will the instructor give a make up final. Any student that is satisfied with their cumulative exam grade may choose not to take the final and instead allow their entire cumulative grade to count as their final exam grade as well. Please note that the instructor reserves the right not to discuss a grade with any student until after 24 hours have passed since the return of any graded exams or papers.

**Course Policies:**

1. The instructor will not provide notes or outlines to any student who misses class excused or otherwise.

2. **Unexcused** absences from papers, exams and/or the final will result in a "0."

3. **Excused** absences which are for reasons such as illness requiring medical care, college activities, religious holidays etc. must be documented. Exceptional cases must be approved by me.

4. **Incompletes** will be given only in very rare documented cases, i.e. **almost never!**

5. **Grades** will be posted through Canvas. The instructor will not give grade over the phone, email or post them in any form due to privacy concerns—outside of Canvas, all grades must be given face to face and cannot pass through an intermediate.

**Academic Honesty:**

The penalty for cheating on any exam/final or not writing or plagiarizing one's own paper, is an "F" for the course, no exceptions. If anyone is unsure of what I consider cheating or plagiarism please feel free to see me anytime for further explanation. It is the responsibility of all students to consult the Golden Rule of Student Rights and Responsibilities at http://www.goldenrule.sdes.ucf.edu/2a_Rules.html for a detailed explanation of what the university supports in the area of academic honesty.

**Grading Scale:**

| A = 100-93 | A- = 92-90 | |
|---|---|---|
| B+ = 89-88 | B = 87-83 | B- = 82-80 |
| C+ = 79-78 | C + 77-73 | C- = 72-70 |
| D+ = 69-68 | D = 67-63 | D- = 62-60 |
| F = 59- below | | |

3

**Course Outline**

| Week 1 | Introduction to the course go over syllabus and course materials. | Syllabus and Writing Guide Quiz |
|---|---|---|
| Week 2 | The Early 19th Century Struggle for Black Citizenship<br><br>Readings: *Colored Travelers: Mobility and the Fight for Citizenship before the Civil War* By Elizabeth Stordeur Pryor, (University of North Caroline Press, 2016) | Quiz and Paper on the Struggle for Black Citizenship |
| Week 3 | The struggle against Jim Crow<br><br>Reading: *Gender and Jim Crow, Women and the Politics of White Supremacy in North Carolina*, 1896-1920, By Glenda Elizabeth Gilmore, (University of North Caroline Press, 2019, 2nd edition) | Quiz and Paper on *Gender and Jim Crow* |
| Week 4 | Racial Segregation in Economics and Employment<br><br>Readings on JSTOR:<br><br>Roback, Jennifer. "Southern Labor Law in the Jim Crow Era: Exploitative or Competitive*?" The University of Chicago Law Review* 51, no. 4 (1984): 1161–92 and Griffin, Larry J., and Robert R. Korstad. "Class as Race and Gender: Making and Breaking a Labor Union in the Jim Crow South." *Social* | Quiz and Paper on Racial Segregation in Economics and Employment |

4

|  |  |  |
|---|---|---|
|  | *Science History* 19, no. 4 (1995): 425–54. |  |
| **Week 5** | **Exam 1** | **Exam 1** |
| **Week 6** | Jim Crow and the Courts<br><br>Readings: *Justice Deferred: Race and the Supreme Court,* by Orville Vernon Burton and Armand Derfner, (Harvard University Press, 2021) | Quiz and Paper on Jim Crow and the Courts |
| **Week 7** | Jim Crow and the Military-Two World Wars<br><br>Readings JSTOR: CHILES, MARVIN T. "'A Period of Misunderstanding': Reforming Jim Crow in Richmond, Virginia, 1930–1954." The Virginia Magazine of History and Biography 129, no. 3 (2021): 244–78; Mormino, Gary R. "Gi Joe Meets Jim Crow: Racial Violence and Reform in World War II Florida." The Florida Historical Quarterly 73, no. 1 (1994): 23–42. | Quiz and Paper on the Desegregation of the Military |
| **Week 8** | Residential Segregation and Housing<br><br>Reading: *Segregation by Design: Local Politics and Inequality in American Cities,* by Jessica Trounstine, (Cambridge University Press, 2018) | Quiz and Paper on *Segregation by Design: Local Politics and Inequality in American Cities* |
| **Week 9** | Jim Crow and the World<br><br>Readings JSTOR: ROOK, ROBERT. "Race, Water, and Foreign Policy: The Tennessee Valley Authority's Global Agenda Meets 'Jim Crow.'" | Quiz and Paper on Jim Crow and the World |

| | | |
|---|---|---|
| | Diplomatic History 28, no. 1 (2004): 55–81; Gould, Rebecca. "JIM CROW IN THE SOVIET UNION." Callaloo 36, no. 1 (2013): 125–41; Perry, Kennetta Hammond. "'Little Rock' in Britain: Jim Crow's Transatlantic Topographies." Journal of British Studies 51, no. 1 (2012): 155–77. | |
| **Week 10** | **Exam 2** | **Exam 2** |
| **Week 11** | Jim Crow in the North<br><br>Readings JSTOR: Mark Wyman, and John W. Muirhead. "Jim Crow Comes to Central Illinois: Racial Segregation in Twentieth-Century Bloomington-Normal." Journal of the Illinois State Historical Society (1998-) 110, no. 2 (2017): 154–82. | Quiz and Paper on Jim Crow in the North |
| **Week 12** | Jim Crow and People of Color<br><br>Reading JSTOR: Wolfley, Jeanette. "Jim Crow, Indian Style: The Disenfranchisement of Native Americans." American Indian Law Review 16, no. 1 (1991): 167–202; Hessel, Beth. Review of Japanese American Activists and the Democratic Ideal, by Matthew M. Briones, Gordon K. Hirabayashi, James A. Hirabayashi and Lane Ryo Hirabayashi, Greg Robinson, and Harry Honda. Journal of | Quiz and Paper on Jim Crow and People of Color |

| | American Ethnic History 34, no. 1 (2014): 86–91. | |
|---|---|---|
| **Week 13** | Desegregation Success or Failure?<br><br>Readings JSTOR: Danns, Dionne. "Northern Desegregation: A Tale of Two Cities." History of Education Quarterly 51, no. 1 (2011): 77–104; Fairclough, Adam. "The Costs of Brown: Black Teachers and School Integration." The Journal of American History 91, no. 1 (2004): 43–55. | Quiz and paper Desegregation |
| **Week 14** | The New Jim Crow<br><br>Reading *The New Jim Crow: Mass Incarceration in the Age of Colorblindness*, by Michelle Alexander (The New Press, 2020) | Quiz and Paper on the New Jim Crow |
| **Week 15** | **Exam 3** | **Exam 3** |
| **Week 16** | **Final Exam** | **Final Exam** |



DEFENDANT'S
EXHIBIT NO. 5
FOR IDENTIFICATION
8-5-22
DATE:        RPTR: DF

CHAPTER 2022-72

Committee Substitute for House Bill No. 7

An act relating to individual freedom; amending s. 760.10, F.S.; providing that subjecting any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination, to training, instruction, or any other required activity that espouses, promotes, advances, inculcates, or compels such individual to believe specified concepts constitutes discrimination based on race, color, sex, or national origin; providing construction; amending s. 1000.05, F.S.; providing that subjecting any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such individual to believe specified concepts constitutes discrimination based on race, color, sex, or national origin; conforming provisions to changes made by the act; amending s. 1003.42, F.S.; revising requirements for required instruction on the history of African Americans; authorizing instructional personnel to facilitate discussions and use curricula to address, in an age-appropriate manner, specified topics; prohibiting classroom instruction and curricula from being used to indoctrinate or persuade students in a manner inconsistent with certain principles or state academic standards; requiring the department to prepare and offer certain standards and curriculum; authorizing the department to seek input from a specified organization for certain purposes; revising the requirements for required instruction on health education; requiring such instruction to comport with certain principles and include certain life skills; requiring civic and character education instead of a character development program; providing the requirements of such education; providing legislative findings; requiring instruction to be consistent with specified principles of individual freedom; authorizing instructional personnel to facilitate discussions and use curricula to address, in an age-appropriate manner, specified topics; prohibiting classroom instruction and curricula from being used to indoctrinate or persuade students in a manner inconsistent with certain principles or state academic standards; conforming cross-references to changes made by the act; requiring the State Board of Education to adopt a specified curriculum to be made available to schools for a certain purpose; amending s. 1006.31, F.S.; prohibiting instructional materials reviewers from recommending instructional materials that contain any matter that contradicts certain principles; amending s. 1012.98, F.S.; requiring the Department of Education to review school district professional development systems for compliance with certain provisions of law; amending ss. 1002.20 and 1006.40, F.S.; conforming cross-references; providing an effective date.

Be It Enacted by the Legislature of the State of Florida:

1

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Section 1.   Subsections (8) through (10) of section 760.10, Florida Statutes, are renumbered as subsections (9) through (11), respectively, and a new subsection (8) is added to that section, to read:

760.10   Unlawful employment practices.—

(8)(a)   Subjecting any individual, as a condition of employment, membership, certification, licensing, credentialing, or passing an examination, to training, instruction, or any other required activity that espouses, promotes, advances, inculcates, or compels such individual to believe any of the following concepts constitutes discrimination based on race, color, sex, or national origin under this section:

1.   Members of one race, color, sex, or national origin are morally superior to members of another race, color, sex, or national origin.

2.   An individual, by virtue of his or her race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3.   An individual's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, sex, or national origin.

4.   Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to race, color, sex, or national origin.

5.   An individual, by virtue of his or her race, color, sex, or national origin, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, sex, or national origin.

6.   An individual, by virtue of his or her race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.   An individual, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the individual played no part, committed in the past by other members of the same race, color, sex, or national origin.

8.   Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin.

(b)   Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of a course of training or instruction, provided

2

CODING: Words strieken are deletions; words underlined are additions.

such training or instruction is given in an objective manner without endorsement of the concepts.

Section 2.   Subsections (4) through (8) of section 1000.05, Florida Statutes, are renumbered as subsections (5) through (9), respectively, subsections (2) and (3), present subsection (4), and paragraph (d) of present subsection (6) are amended, and a new subsection (4) is added to that section, to read:

1000.05   Discrimination against students and employees in the Florida K-20 public education system prohibited; equality of access required.—

(2)(a)   Discrimination on the basis of race, color ethnicity, national origin, sex gender, disability, religion, or marital status against a student or an employee in the state system of public K-20 education is prohibited. No person in this state shall, on the basis of race, color ethnicity, national origin, sex gender, disability, religion, or marital status, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any public K-20 education program or activity, or in any employment conditions or practices, conducted by a public educational institution that receives or benefits from federal or state financial assistance.

(b)   The criteria for admission to a program or course shall not have the effect of restricting access by persons of a particular race, color ethnicity, national origin, sex gender, disability, religion, or marital status.

(c)   All public K-20 education classes shall be available to all students without regard to race, color ethnicity, national origin, sex gender, disability, religion, or marital status; however, this is not intended to eliminate the provision of programs designed to meet the needs of students with limited proficiency in English, gifted students, or students with disabilities or programs tailored to students with specialized talents or skills.

(d)   Students may be separated by sex gender for a single-gender program as provided under s. 1002.311, for any portion of a class that deals with human reproduction, or during participation in bodily contact sports. For the purpose of this section, bodily contact sports include wrestling, boxing, rugby, ice hockey, football, basketball, and other sports in which the purpose or major activity involves bodily contact.

(e)   Guidance services, counseling services, and financial assistance services in the state public K-20 education system shall be available to students equally. Guidance and counseling services, materials, and promotional events shall stress access to academic and career opportunities for students without regard to race, color ethnicity, national origin, sex gender, disability, religion, or marital status.

(3)(a)   No person shall, on the basis of sex gender, be excluded from participating in, be denied the benefits of, or be treated differently from another person or otherwise be discriminated against in any interscholastic,

3

CODING: Words stricken are deletions; words underlined are additions.

intercollegiate, club, or intramural athletics offered by a public K-20 educational institution; and no public K-20 educational institution shall provide athletics separately on such basis.

(b)   Notwithstanding the requirements of paragraph (a), a public K-20 educational institution may operate or sponsor separate teams for members of each sex ~~gender~~ if the selection for such teams is based upon competitive skill or the activity involved is a bodily contact sport. However, when a public K-20 educational institution operates or sponsors a team in a particular sport for members of one sex ~~gender~~ but does not operate or sponsor such a team for members of the other sex ~~gender~~, and athletic opportunities for that sex ~~gender~~ have previously been limited, members of the excluded sex ~~gender~~ must be allowed to try out for the team offered.

(c)   This subsection does not prohibit the grouping of students in physical education classes and activities by ability as assessed by objective standards of individual performance developed and applied without regard to sex ~~gender~~. However, when use of a single standard of measuring skill or progress in a physical education class has an adverse effect on members of one sex ~~gender~~, the educational institution shall use appropriate standards which do not have such effect.

(d)   A public K-20 educational institution which operates or sponsors interscholastic, intercollegiate, club, or intramural athletics shall provide equal athletic opportunity for members of both sexes ~~genders~~.

1.   The Board of Governors shall determine whether equal opportunities are available at state universities.

2.   The Commissioner of Education shall determine whether equal opportunities are available in school districts and Florida College System institutions. In determining whether equal opportunities are available in school districts and Florida College System institutions, the Commissioner of Education shall consider, among other factors:

a.   Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes ~~genders~~.

b.   The provision of equipment and supplies.

c.   Scheduling of games and practice times.

d.   Travel and per diem allowances.

e.   Opportunities to receive coaching and academic tutoring.

f.   Assignment and compensation of coaches and tutors.

g.   Provision of locker room, practice, and competitive facilities.

h.   Provision of medical and training facilities and services.

4

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

i.   Provision of housing and dining facilities and services.

j.   Publicity.

Unequal aggregate expenditures for members of each sex ~~gender~~ or unequal expenditures for male and female teams if a public school or Florida College System institution operates or sponsors separate teams do not constitute nonimplementation of this subsection, but the Commissioner of Education shall consider the failure to provide necessary funds for teams for one sex ~~gender~~ in assessing equality of opportunity for members of each sex ~~gender~~.

(e)   A public school or Florida College System institution may provide separate toilet, locker room, and shower facilities on the basis of gender, but such facilities shall be comparable to such facilities provided for students of the other sex ~~gender~~.

(4)(a)   It shall constitute discrimination on the basis of race, color, national origin, or sex under this section to subject any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:

1.   Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2.   A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3.   A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4.   Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5.   A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6.   A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.   A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

(b)  Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.

(5)(4)  Public schools and Florida College System institutions shall develop and implement methods and strategies to increase the participation of students of a particular race, color ethnicity, national origin, sex gender, disability, or marital status in programs and courses in which students of that particular race, color ethnicity, national origin, sex gender, disability, or marital status have been traditionally underrepresented, including, but not limited to, mathematics, science, computer technology, electronics, communications technology, engineering, and career education.

(7)(6)  The functions of the Office of Equal Educational Opportunity of the Department of Education shall include, but are not limited to:

(d)  Conducting studies of the effectiveness of methods and strategies designed to increase the participation of students in programs and courses in which students of a particular race, color ethnicity, national origin, sex gender, disability, or marital status have been traditionally underrepresented and monitoring the success of students in such programs or courses, including performing followup monitoring.

Section 3.  Subsection (3) of section 1003.42, Florida Statutes, is renumbered as subsection (5), paragraph (b) of subsection (1) and subsection (2) are amended, and a new subsection (3) and subsection (4) are added to that section, to read:

1003.42  Required instruction.—

(1)

(b)  All instructional materials, as defined in s. 1006.29(2), used to teach reproductive health or any disease, including HIV/AIDS, its symptoms, development, and treatment, as part of the courses referenced in subsection (5) (3), must be annually approved by a district school board in an open, noticed public meeting.

(2)  Members of the instructional staff of the public schools, subject to the rules of the State Board of Education and the district school board, shall teach efficiently and faithfully, using the books and materials required that meet the highest standards for professionalism and historical accuracy, following the prescribed courses of study, and employing approved methods of instruction, the following:

6

CODING: Words stricken are deletions; words underlined are additions.

(a)   The history and content of the Declaration of Independence, including national sovereignty, natural law, self-evident truth, equality of all persons, limited government, popular sovereignty, and inalienable rights of life, liberty, and property, and how they form the philosophical foundation of our government.

(b)   The history, meaning, significance, and effect of the provisions of the Constitution of the United States and amendments thereto, with emphasis on each of the 10 amendments that make up the Bill of Rights and how the constitution provides the structure of our government.

(c)   The arguments in support of adopting our republican form of government, as they are embodied in the most important of the Federalist Papers.

(d)   Flag education, including proper flag display and flag salute.

(e)   The elements of civil government, including the primary functions of and interrelationships between the Federal Government, the state, and its counties, municipalities, school districts, and special districts.

(f)   The history of the United States, including the period of discovery, early colonies, the War for Independence, the Civil War, the expansion of the United States to its present boundaries, the world wars, and the civil rights movement to the present. American history shall be viewed as factual, not as constructed, shall be viewed as knowable, teachable, and testable, and shall be defined as the creation of a new nation based largely on the universal principles stated in the Declaration of Independence.

(g)1.   The history of the Holocaust (1933-1945), the systematic, planned annihilation of European Jews and other groups by Nazi Germany, a watershed event in the history of humanity, to be taught in a manner that leads to an investigation of human behavior, an understanding of the ramifications of prejudice, racism, and stereotyping, and an examination of what it means to be a responsible and respectful person, for the purposes of encouraging tolerance of diversity in a pluralistic society and for nurturing and protecting democratic values and institutions, including the policy, definition, and historical and current examples of anti-Semitism, as described in s. 1000.05(8) s. 1000.05(7), and the prevention of anti-Semitism. Each school district must annually certify and provide evidence to the department, in a manner prescribed by the department, that the requirements of this paragraph are met. The department shall prepare and offer standards and curriculum for the instruction required by this paragraph and may seek input from the Commissioner of Education's Task Force on Holocaust Education or from any state or nationally recognized Holocaust educational organizations. The department may contract with any state or nationally recognized Holocaust educational organizations to develop training for instructional personnel and grade-appropriate classroom resources to support the developed curriculum.

7

CODING: Words stricken are deletions; words underlined are additions.

2. The second week in November shall be designated as "Holocaust Education Week" in this state in recognition that November is the anniversary of Kristallnacht, widely recognized as a precipitating event that led to the Holocaust.

(h) The history of African Americans, including the history of African peoples before the political conflicts that led to the development of slavery, the passage to America, the enslavement experience, abolition, and the history and contributions of ~~African~~ Americans of the African diaspora to society. Students shall develop an understanding of the ramifications of prejudice, racism, and stereotyping on individual freedoms, and examine what it means to be a responsible and respectful person, for the purpose of encouraging tolerance of diversity in a pluralistic society and for nurturing and protecting democratic values and institutions. Instruction shall include the roles and contributions of individuals from all walks of life and their endeavors to learn and thrive throughout history as artists, scientists, educators, businesspeople, influential thinkers, members of the faith community, and political and governmental leaders and the courageous steps they took to fulfill the promise of democracy and unite the nation. Instructional materials shall include the vital contributions of African Americans to build and strengthen American society and celebrate the inspirational stories of African Americans who prospered, even in the most difficult circumstances. Instructional personnel may facilitate discussions and use curricula to address, in an age-appropriate manner, how the individual freedoms of persons have been infringed by slavery, racial oppression, racial segregation, and racial discrimination, as well as topics relating to the enactment and enforcement of laws resulting in racial oppression, racial segregation, and racial discrimination and how recognition of these freedoms has overturned these unjust laws. However, classroom instruction and curriculum may not be used to indoctrinate or persuade students to a particular point of view inconsistent with the principles enumerated in subsection (3) or the state academic standards. The department shall prepare and offer standards and curriculum for the instruction required by this paragraph and may seek input from the Commissioner of Education's African American History Task Force.

(i) The elementary principles of agriculture.

(j) The true effects of all alcoholic and intoxicating liquors and beverages and narcotics upon the human body and mind.

(k) Kindness to animals.

(l) The history of the state.

(m) The conservation of natural resources.

(n)~~1.~~ Comprehensive age-appropriate and developmentally appropriate K-12 instruction on: ~~health education that addresses~~

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

1.  Health education that addresses concepts of community health, consumer health, environmental health, and family life, including:

~~a.  Mental and emotional health.~~

a.~~b.~~  Injury prevention and safety.

b.~~c.~~  Internet safety.

c.~~d.~~  Nutrition.

d.~~e.~~  Personal health.

e.~~f.~~  Prevention and control of disease.

f.~~g.~~  Substance use and abuse.

g.~~h.~~  Prevention of child sexual abuse, exploitation, and human trafficking.

2.  ~~The health education curriculum~~ For students in grades 7 through 12, ~~shall include a~~ teen dating violence and abuse. This component must include ~~that includes~~, but is not be limited to, the definition of dating violence and abuse, the warning signs of dating violence and abusive behavior, the characteristics of healthy relationships, measures to prevent and stop dating violence and abuse, and community resources available to victims of dating violence and abuse.

3.  ~~The health education curriculum~~ For students in grades 6 through 12, ~~shall include an~~ awareness of the benefits of sexual abstinence as the expected standard and the consequences of teenage pregnancy.

4.  Life skills that build confidence, support mental and emotional health, and enable students to overcome challenges, including:

a.  Self-awareness and self-management.

b.  Responsible decisionmaking.

c.  Resiliency.

d.  Relationship skills and conflict resolution.

e.  Understanding and respecting other viewpoints and backgrounds.

f.  For grades 9 through 12, developing leadership skills, interpersonal skills, organization skills, and research skills; creating a resume, including a digital resume; exploring career pathways; using state career planning resources; developing and practicing the skills necessary for employment interviews; workplace ethics and workplace law; managing stress and expectations; and self-motivation.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

Health education and life skills instruction and materials may not contradict the principles enumerated in subsection (3).

(o)  Such additional materials, subjects, courses, or fields in such grades as are prescribed by law or by rules of the State Board of Education and the district school board in fulfilling the requirements of law.

(p)  The study of Hispanic contributions to the United States.

(q)  The study of women's contributions to the United States.

(r)  The nature and importance of free enterprise to the United States economy.

(s)  Civic and character education on ~~A character development program in the elementary schools, similar to Character First or Character Counts, which is secular in nature. Beginning in school year 2004-2005, the character development program shall be required in kindergarten through grade 12. Each district school board shall develop or adopt a curriculum for the character development program that shall be submitted to the department for approval.~~

~~1.  The character development curriculum shall stress~~ the qualities and responsibilities of patriotism and~~; responsibility;~~ citizenship, including,~~;~~ kindness; respect for authority, life, liberty, and personal property; honesty; charity; ~~self-control;~~ racial, ethnic, and religious tolerance; and cooperation and~~.~~

~~2.  The character development curriculum for grades 9 through 12 shall, at a minimum, include instruction on developing leadership skills, interpersonal skills, organization skills, and research skills; creating a resume, including a digital resume; exploring career pathways; using state career planning resources; developing and practicing the skills necessary for employment interviews; conflict resolution, workplace ethics, and workplace law; managing stress and expectations; and developing skills that enable students to become more resilient and self-motivated.~~

~~3.  The character development curriculum~~ for grades 11 and 12, ~~shall include instruction on~~ voting using the uniform primary and general election ballot described in s. 101.151(9).

(t)  In order to encourage patriotism, the sacrifices that veterans and Medal of Honor recipients have made in serving our country and protecting democratic values worldwide. Such instruction must occur on or before Medal of Honor Day, Veterans' Day, and Memorial Day. Members of the instructional staff are encouraged to use the assistance of local veterans and Medal of Honor recipients when practicable.

The State Board of Education is encouraged to adopt standards and pursue assessment of the requirements of this subsection. Instructional programming ~~A character development program~~ that incorporates the values of the

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

recipients of the Congressional Medal of Honor and that is offered as part of a social studies, English Language Arts, or other schoolwide character building and veteran awareness initiative meets the requirements of paragraph (t) ~~paragraphs (s) and (t)~~.

(3)   The Legislature acknowledges the fundamental truth that all persons are equal before the law and have inalienable rights. Accordingly, instruction and supporting materials on the topics enumerated in this section must be consistent with the following principles of individual freedom:

(a)   No person is inherently racist, sexist, or oppressive, whether consciously or unconsciously, solely by virtue of his or her race or sex.

(b)   No race is inherently superior to another race.

(c)   No person should be discriminated against or receive adverse treatment solely or partly on the basis of race, color, national origin, religion, disability, or sex.

(d)   Meritocracy or traits such as a hard work ethic are not racist but fundamental to the right to pursue happiness and be rewarded for industry.

(e)   A person, by virtue of his or her race or sex, does not bear responsibility for actions committed in the past by other members of the same race or sex.

(f)   A person should not be instructed that he or she must feel guilt, anguish, or other forms of psychological distress for actions, in which he or she played no part, committed in the past by other members of the same race or sex.

Instructional personnel may facilitate discussions and use curricula to address, in an age-appropriate manner, how the freedoms of persons have been infringed by sexism, slavery, racial oppression, racial segregation, and racial discrimination, including topics relating to the enactment and enforcement of laws resulting in sexism, racial oppression, racial segregation, and racial discrimination, including how recognition of these freedoms have overturned these unjust laws. However, classroom instruction and curriculum may not be used to indoctrinate or persuade students to a particular point of view inconsistent with the principles of this subsection or state academic standards.

(4)   The State Board of Education shall develop or adopt a curriculum to inspire future generations through motivating stories of American history that demonstrate important life skills and the principles of individual freedom that enabled persons to prosper even in the most difficult circumstances. This curriculum shall be known as "Stories of Inspiration" and made available to schools to implement the requirements of subsection (3).

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Section 4.   Paragraph (d) of subsection (2) of section 1006.31, Florida Statutes, is amended to read:

1006.31   Duties of the Department of Education and school district instructional materials reviewer.—The duties of the instructional materials reviewer are:

(2)   EVALUATION OF INSTRUCTIONAL MATERIALS.—To use the selection criteria listed in s. 1006.34(2)(b) and recommend for adoption only those instructional materials aligned with the Next Generation Sunshine State Standards provided for in s. 1003.41. Instructional materials recommended by each reviewer shall be, to the satisfaction of each reviewer, accurate, objective, balanced, noninflammatory, current, free of pornography and material prohibited under s. 847.012, and suited to student needs and their ability to comprehend the material presented. Reviewers shall consider for recommendation materials developed for academically talented students, such as students enrolled in advanced placement courses. When recommending instructional materials, each reviewer shall:

(d)   Require, when appropriate to the comprehension of students, that materials for social science, history, or civics classes contain the Declaration of Independence and the Constitution of the United States. A reviewer may not recommend any instructional materials that contain any matter reflecting unfairly upon persons because of their race, color, creed, national origin, ancestry, gender, religion, disability, socioeconomic status, or occupation or otherwise contradict the principles enumerated under s. 1003.42(3).

Section 5.   Paragraph (b) of subsection (4) of section 1012.98, Florida Statutes, is amended to read:

1012.98   School Community Professional Development Act.—

(4)   The Department of Education, school districts, schools, Florida College System institutions, and state universities share the responsibilities described in this section. These responsibilities include the following:

(b)   Each school district shall develop a professional development system as specified in subsection (3). The system shall be developed in consultation with teachers, teacher-educators of Florida College System institutions and state universities, business and community representatives, and local education foundations, consortia, and professional organizations. The professional development system must:

1.   Be reviewed and approved by the department for compliance with s. 1003.42(3) and this section. All substantial revisions to the system shall be submitted to the department for review for continued approval.

2.   Be based on analyses of student achievement data and instructional strategies and methods that support rigorous, relevant, and challenging curricula for all students. Schools and districts, in developing and refining

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

the professional development system, shall also review and monitor school discipline data; school environment surveys; assessments of parental satisfaction; performance appraisal data of teachers, managers, and administrative personnel; and other performance indicators to identify school and student needs that can be met by improved professional performance.

3. Provide inservice activities coupled with followup support appropriate to accomplish district-level and school-level improvement goals and standards. The inservice activities for instructional personnel shall focus on analysis of student achievement data, ongoing formal and informal assessments of student achievement, identification and use of enhanced and differentiated instructional strategies that emphasize rigor, relevance, and reading in the content areas, enhancement of subject content expertise, integrated use of classroom technology that enhances teaching and learning, classroom management, parent involvement, and school safety.

4. Provide inservice activities and support targeted to the individual needs of new teachers participating in the professional development certification and education competency program under s. 1012.56(8)(a).

5. Include a master plan for inservice activities, pursuant to rules of the State Board of Education, for all district employees from all fund sources. The master plan shall be updated annually by September 1, must be based on input from teachers and district and school instructional leaders, and must use the latest available student achievement data and research to enhance rigor and relevance in the classroom. Each district inservice plan must be aligned to and support the school-based inservice plans and school improvement plans pursuant to s. 1001.42(18). Each district inservice plan must provide a description of the training that middle grades instructional personnel and school administrators receive on the district's code of student conduct adopted pursuant to s. 1006.07; integrated digital instruction and competency-based instruction and CAPE Digital Tool certificates and CAPE industry certifications; classroom management; student behavior and interaction; extended learning opportunities for students; and instructional leadership. District plans must be approved by the district school board annually in order to ensure compliance with subsection (1) and to allow for dissemination of research-based best practices to other districts. District school boards must submit verification of their approval to the Commissioner of Education no later than October 1, annually. Each school principal may establish and maintain an individual professional development plan for each instructional employee assigned to the school as a seamless component to the school improvement plans developed pursuant to s. 1001.42(18). An individual professional development plan must be related to specific performance data for the students to whom the teacher is assigned, define the inservice objectives and specific measurable improvements expected in student performance as a result of the inservice activity, and include an evaluation component that determines the effectiveness of the professional development plan.

13

CODING: Words stricken are deletions; words underlined are additions.

6. Include inservice activities for school administrative personnel that address updated skills necessary for instructional leadership and effective school management pursuant to s. 1012.986.

7. Provide for systematic consultation with regional and state personnel designated to provide technical assistance and evaluation of local professional development programs.

8. Provide for delivery of professional development by distance learning and other technology-based delivery systems to reach more educators at lower costs.

9. Provide for the continuous evaluation of the quality and effectiveness of professional development programs in order to eliminate ineffective programs and strategies and to expand effective ones. Evaluations must consider the impact of such activities on the performance of participating educators and their students' achievement and behavior.

10. For middle grades, emphasize:

a. Interdisciplinary planning, collaboration, and instruction.

b. Alignment of curriculum and instructional materials to the state academic standards adopted pursuant to s. 1003.41.

c. Use of small learning communities; problem-solving, inquiry-driven research and analytical approaches for students; strategies and tools based on student needs; competency-based instruction; integrated digital instruction; and project-based instruction.

Each school that includes any of grades 6, 7, or 8 must include in its school improvement plan, required under s. 1001.42(18), a description of the specific strategies used by the school to implement each item listed in this subparagraph.

11. Provide training to reading coaches, classroom teachers, and school administrators in effective methods of identifying characteristics of conditions such as dyslexia and other causes of diminished phonological processing skills; incorporating instructional techniques into the general education setting which are proven to improve reading performance for all students; and using predictive and other data to make instructional decisions based on individual student needs. The training must help teachers integrate phonemic awareness; phonics, word study, and spelling; reading fluency; vocabulary, including academic vocabulary; and text comprehension strategies into an explicit, systematic, and sequential approach to reading instruction, including multisensory intervention strategies. Each district must provide all elementary grades instructional personnel access to training sufficient to meet the requirements of s. 1012.585(3)(f).

14

CODING: Words stricken are deletions; words underlined are additions.

Section 6.   Paragraph (d) of subsection (3) of section 1002.20, Florida Statutes, is amended to read:

1002.20   K-12 student and parent rights.—Parents of public school students must receive accurate and timely information regarding their child's academic progress and must be informed of ways they can help their child to succeed in school. K-12 students and their parents are afforded numerous statutory rights including, but not limited to, the following:

(3)   HEALTH ISSUES.—

(d)   *Reproductive health and disease education.*—A public school student whose parent makes written request to the school principal shall be exempted from the teaching of reproductive health or any disease, including HIV/AIDS, in accordance with s. 1003.42(5) s. 1003.42(3). Each school district shall, on the district's website homepage, notify parents of this right and the process to request an exemption. The homepage must include a link for a student's parent to access and review the instructional materials, as defined in s. 1006.29(2), used to teach the curriculum.

Section 7.   Paragraph (b) of subsection (4) of section 1006.40, Florida Statutes, is amended to read:

1006.40   Use of instructional materials allocation; instructional materials, library books, and reference books; repair of books.—

(4)   Each district school board is responsible for the content of all materials used in a classroom or otherwise made available to students. Each district school board shall adopt rules, and each district school superintendent shall implement procedures, that:

(b)   Provide a process for public review of, public comment on, and the adoption of instructional materials, including instructional materials used to teach reproductive health or any disease, including HIV/AIDS, under ss. 1003.42(5) and 1003.46 ss. 1003.42(3) and 1003.46, which satisfies the requirements of s. 1006.283(2)(b)8., 9., and 11.

Section 8.   This act shall take effect July 1, 2022.

Approved by the Governor April 22, 2022.

Filed in Office Secretary of State April 22, 2022.

CODING: Words stricken are deletions; words underlined are additions.



DEFENDANT'S
EXHIBIT NO. 6
FOR IDENTIFICATION
DATE: 0-5-22
RPTR: OF

## To Brown and From Brown Study Guide

**Part 1-Three articles all in Blue font.**

**1. Raymond Pace Alexander, "The Upgrading of the Negro's Status by Supreme Court Decisions," The *Journal of Negro History*, Vol. 30, No. 2 (April: 1945) 117-149.**

**Although the words "Negro" and "Colored" were in common use in 1945, do not use those words on your quiz or paper unless they are used historically, not by your description of people, instead use black or African American.**

Note: The history in this article is outdated, so don't read it and think it represents current thought and interpretation, there are many inaccuracies in the interpretation of the history presented in the article. What I want you to do instead is use this article to catalog legislation and legal cases important to the history of Civil Rights from 1865-1945.

What are listed are cases and legislation, use the article to come up with a one sentence description of how that item might fit into a history of civil rights, just based on what is in the article feel free to explore online if you feel you need more information. I am only pointing out the more important cases not all the cases listed.

### The 14th Amendment

The Slaughterhouse Cases, The Butchers' Benevolent Association of New Orleans versus the Crescent City Livestock Company, et al, 83 U. S. 36 (1872).

What does the author describe as "Knocking at Closed Courtroom Doors" then "Cracking the Courtroom Doors" finally "Opening of Courtroom Doors?"

The "Civil Rights" cases, viz. U. S. vs. Stanley (Kentucky), U. S. vs. Ryan (California), UT. S. vs. Nichols (Missouri), U. S. vs. Singleton (New York), Rob- ertson et. ux. vs. Memphis & Charleston Railway (Ten- nessee) 109 U. S. (1883). Known as **The Civil Rights Cases, 109 U.S. 3 (1883)**

### The Right to Vote

Guinn vs. United States, 238 U. S. 347 (1915)

### Neighborhood Segregation

Buchannan vs. Warley, 245 U. S. 16 (1917), known as the "Louisville Segregation Case."

### Right to a Fair Trial

Elaine, Arkansas, Riot Cases (Moore vs. Dempsey, 261 U. S. 86 (1923).

City of Richmond vs. Deans, 281 U. S. 704 (1930)

### The Right to be called for Jury Service and the Right of Representation by Council

1

"Scottsboro Case" (Powell vs. Alabama, 287 U. S. 45 (1932), Norris vs. Alabama, 294 U. S. 587, 55 S. St. 579, and Paterson vs. Alabama, 294 U. S. 600; 55 S. Ct. 575

**Freedom of Speech and Assembly**

Herndon vs. Lowery, 301 U. S. 242, (1937)

**The Texas Primary Upholding the White Primary**

Smith vs. Allwright et al (1944)

**Forced Confession of Defendant by Physical Violence**

Brown, Ellington and Shields vs. State of Mississippi (297 U. S. 278) (1936)

Hale vs. Kentucky 303 U. S. 613 (1938)

**The Equal Right to Education in State Supported University**

Missouri, ex rel. Gaines vs. Canada, et al. (Lloyd Gaines vs. University of Missouri) (305 U. S. 337)

**Opening of Courtroom Doors**

Chambers vs. Florida, 309 U. S. 227 (1940)

**Restrictive Covenants Resulting in Residential Segregation**

Lee vs. Hansberry, U. S. 61, S. Ct. 521, 70 L. Ed. 969 (1940)

**Railroad Discrimination**

Mitchell vs. Chicago, Rock Is. & Pac. Ry., U. S. 61 S. Ct. 873,85 L. Ed. 811 (1941)

**Jury Exclusion**

Hill vs. Texas, 316 U. S. 400 (1942)

**Civil Rights Prosecution**

The United States vs. Classic, 313 U. S. 299, and United States vs. Saylor, (1924) and Taylor vs. Georgia, 313 U. S. 25, and Pollock vs. Williams, (1944)

**Economic Action at Law**

The New Negro Alliance vs. Sanitary Grocery Co., 303 U. S. 552; 58 S. Ct. 703, decided in (1938)

**Equalization of Teachers' Salaries**

Walter Mills vs. Board of Education of Anne Arundel County, Maryland, 30 F. Supp. 245 (D. Md. 1939). Mills vs. Loundes, 26 F. Supp. 792, 801: (1940) 53 Harv. Law Rev. 669.

2

**The Fight Against Discrimination by Labor Unions**

Bester W. Steele vs. Louisville and Nashville R. R. Co., Brotherhood of Locomotive Firemen and Enginemen, et al., No. 45 U. S. Sup. Ct., Oct. Term 1944

**Civil Rights**

What is the author's opinion (in 1946) of the Courts vs Civil Rights and the Federal Government vs Civil Rights? How does he characterize each?

**2. Mark Tushnet, "The Politics of Equality in Constitutional Law: The Equal Protection Clause, Dr. Du Bois,and Charles Hamilton Houston," The Journal of American History, Vol. 74, No. 3, The Constitution and American Life: A Special Issue (Dec., 1987), pp. 884-903**

What does the author characterize "tactical" vs. "philosophical" when confronting racial segregation?

How did Du Bois criticize the NAACP in his editorials?

How did Du Bois and the officers of the NAACP define "equality" differently? And Du Bois view on integration?

Who was Nathan Margold and what was his legal strategy for the NAACP?

How did the case McCabe v. Atchison, Topeka, & Santa Fe Railway Company, (1914) relate to Plessy v. Ferguson and the NAACP legal strategy to overturn it?

Why did Houston look toward graduate school cases and teacher salary cases as the first step in a civil rights litigation plan?

Why does the author think the actions and stands of Houston and Du Bois was just as much a case of politics as it was Constitutional Law?

**3. Ramona Houston, "The NAACP State Conference in Texas: Intermediary and Catalyst for Change, 1937–1957," The Journal of African American History, Vol. 94, No. 4, Special Issue: "Documenting the NAACP's First Century" (Fall 2009), pp. 509-528**

What impact did the Smith v. Allwright case have on the direction of the civil rights movement in Texas?

What inspired the Sweatt v. Painter case and what was the overall strategy?

What was the problem with implementing the Brown Decision and how did the NAACP in Texas respond?

How did white supremacist in Texas target the NAACP and civil rights activists?

How did the Texas NAACP successfully challenge racial segregation?

According to the author what was the impact of the Texas NAACP?

3



Published    ✎ **Edit**    ⋮

**This is a graded discussion:** 15 points possible

due Apr 13, 2020 at 11:30pm

## Assignment 11-Busing and the Media

In a two paragraph essay cite two interviews from the **Assignment 11-Busing and the Media**.  In these two paragraphs affirm or refute the thesis of Matt Delmont's book *Why Busing Failed* or use the information from the book and in the discussion post to argue that busing can represent a declination narrative for the Civil Rights Movement.

And you will use APA, MLA or Chicago Manual citation correctly. You can use any one of the three as long as you do it correctly. And be sure you adhere to **the class Style Guide.**

Submit the paper to the submission feature to the right of this page. If you have questions please let me know.

| Search entries or author | Unread | 👁 | ⬆ | ⬇ | | ✓ **Subscribe** |
|---|---|---|---|---|---|---|

↰ **Reply**



DEFENDANT'S
EXHIBIT NO. 7
FOR IDENTIFICATION
DATE: 8-5-22    RPTR: DE
PENGAD 800-631-6989



tter.com/Cassanello/status/1402223683335245825

**DEFENDANT'S**
EXHIBIT NO. 8
FOR IDENTIFICATION
DATE: 8-5-22   RPTR: D

← **Thread**

**Robert Cassanello (he/him/his)** 📝✏️  ···
@Cassanello

I think the History Profession needs to get behind abolishing Civics Education as it is a pernicious vehicle for promoting nationalism and patriotism. We should support an education movement to teach a curriculum that introduces universal human empathy and understanding instead

7:19 AM · Jun 8, 2021 · Twitter Web App

**4** Likes

Tweet your reply                    **Reply**

**Robert Cassanello (he/him/his)** 📝✏️ @Cassanello · Jun 10, 2021  ···
Replying to @Cassanello

📄  theatlantic.com
The Problem With Patriotism
I can't ignore what this country has done to Black people. How do I find my place in it?