UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DONALD FALLS, et al.

    Plaintiffs,

vs.                                        Case No.: 4:22-cv-00166-MW/MJF

RON DESANTIS, et al.

    Defendants.

_____

**PLAINTIFF'S REPLY TO DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF FALLS'S SECOND MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Donald Falls, by and through undersigned counsel, hereby replies to Defendants' Memorandum in Opposition to his Second Motion for Preliminary Injunction (Doc. 106), and in support thereof states as follows:

**I.**    **Falls Has Standing**

Defendants challenge whether Falls has demonstrated injury-in-fact for standing purposes. At the outset, it must be noted that when First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely, "lest free speech be chilled even before the law or regulation is enforced." *Harrell v. Florida Bar*, 608 F.3d. 1241, 1254 (11th Cir. 2010). To demonstrate injury-in-fact, Falls must show (1) he intends to engage in a course of conduct *arguably affected* with a constitutional interest, (2) the challenged provisions *arguably proscribe* that

conduct, and (3) he is subject to a credible threat of enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (emphasis added). Defendants read these requirements too narrowly. Properly applied, it is clear Falls has standing as to each of the Concepts.

A.  **Concept 2**

**A person, by virtue of his or her race, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.**

Falls sets forth that frank discussions regarding racial, ethnic, and gender discrimination are necessary and that in those discussions about historical events and current events (including lynchings, bus boycotts, and lunch counter sit-ins) it is possible that "some white students will see these historical truths as evidence of white racism that they are linked to by virtue of their race… and the student may well feel an unconscious racism." (Doc. 99-1 at 3-4). He fears that this would therefore run afoul of the prohibition in the Concept regarding a person being "inherently racist… whether consciously or unconsciously." *Id.* at 4. The impact of Falls's instruction and how students may view it for standing purposes it is discussed more fully in section I.G., *infra*.

### B. Concept 3

**A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, national origin, or sex.**

As to Concept 3, Falls states that "the problem for myself, and for any teacher, trying to teach about our Nation's long, complicated, and difficult racial history would be the impossibility of teaching students that we have a race-neutral history. … Frankly, to present accurate, historical facts to students, it is obvious that Blacks and other people of color, immigrants, and women have all been oppressed in our history." (Doc. 99-1 at 5). Falls then goes on to discuss lessons about slavery, the women's suffrage movement, and the Chinese Exclusion Act. *Id* at 5-6. As to slavery, it shows that if one was black, they were "oppressed" because of their race. *Id.* at 6. Likewise, women were oppressed because of their sex because they could not vote. *Id.* The same holds true for the Chinese as it relates to the Chinese Exclusion Act, which singularly identified one nationality for oppression. *Id.* In all examples of instruction, Falls therefore clearly teaches a person's status as "oppressed" is necessarily determined by their "race, color, national origin, or sex." §1000.05(4)(a)3., Fla. Stat. (2022). Thus, Falls has demonstrated his instruction on these topics gives him standing as to Concept 3 as it is arguably proscribed by the same.

## C. Concepts 4, 5, and 6

**Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex;**

**A person, by virtue of his or her race, color, national origin, or sex, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex; and**

**A person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.**

Falls's instruction and teaching about affirmative action would violate each of these Concepts. As Falls states in his Interrogatory Answers, "[t]he purpose of affirmative action is to correct past injustices that prevented discriminated groups from receiving the same opportunities as others. Discussing the history of affirmative action and civil rights measures pursued by the government and the [Supreme] court's review of those actions and measures may suggest to students that previously favored groups are now 'adversely affected' by policies that, for example, look at race as a factor in college admissions." (Doc. 99-1 at 4-5). Put simply, one cannot discuss affirmative action without running afoul of Concepts 4, 5, and 6 because affirmative action by definition treats people with respect to race, causes a person of one race to receive adverse treatment because of actions committed in the past by members of the same race, and does so to achieve diversity, equity, or inclusion. *See Affirmative Action, Black's Law Dictionary* (11th ed. 2019) ("The

4

practice of selecting people for jobs, college spots, and other important posts in part because some of their characteristics are consistent with those of a group that has historically been treated unfairly by reason of race, sex, etc.; specif., a preference or decision-making advantage given to members of a racial minority that has historically been subjected to systematic discrimination."). This Court even recognized in the *Pernell* Order that Concept 4 is vague and asked the rhetorical question: "Does it ban topics such as affirmative action and diversity?" *Pernell* Order at pg. 115. The answer is yes, as do Concepts 5 and 6 as explained above. Accordingly, Falls has standing to challenge these Concepts.

### D. Concept 7

**A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.**

Falls is reasonably concerned about how his teaching awful historical truths may result in students' feelings that could arise from teaching of the same. (Doc. 99-1 at 2-3). Falls is also concerned that it is possible that white students may feel they bear some responsibility because of their race when one considers lessons about the way blacks have been treated by whites to arguably violate Concept 7. *Id.* at 4. Furthermore, while not articulated by Falls in his Interrogatory Answers, Concept 7 could also be implicated by his teaching of affirmative action. After all, one could

5

view affirmative action as current white people bearing personal responsibility for and needing to feel guilt for actions in which they played no part, committed by other whites in the past to remedy the same. In this respect, such instruction could arguably violate Concept 1 ("morally superior") as well. *See Pernell* Order at p.67, n.34.

### E.    Concept 8

**Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.**

As to Concept 8, Falls explains its subjectivity and vagueness have a whole range of implications for the classroom teacher. (Doc. 99-1 at 6). He then shares one example regarding the civil rights movement and a speech given by Dr. Martin Luther King that he assigns his students to read. *Id.* at 6-7. Falls describes his instruction about the speech as follows: "the speech at its core is an attack on politicians and policy makers who pursue change under the guise of racial class equality but questions whether those changes are a mere veil to keep the mostly white, powerful, and wealthy in control." *Id.* Falls further states that the profound questions raised by that speech are "as relevant today as they were in 1967" and that this "is not lost on students." (Doc. 99-1 at 6-7). Indeed, his instruction about this topic causes students to "wonder if many policies promoted as making social and racial progress are really ploys to keep the powerful in power." *Id* at 7. This directly runs afoul of Concept 8.

6

Furthermore, Falls also states that his instruction regarding lynchings and the Civil Rights Movement could cause students to interpret these events and others as evidence of the virtues of "merit, excellence, hard work [and] fairness" being "used to create a system to 'oppress' people of color." (Doc. 99-1 at 4). Again, this runs directly afoul of Concept 8. Defendants argue that Falls cannot violate this concept because his instruction does not suggest these virtues are racist, but Concept 8 is broader than that since it prohibits instruction that "*such virtues…are racist…**or** were created by members of a particular race… to oppress members of another race*[.]" §1000.05(4)(a)8., Fla. Stat. (2022) (emphasis added). Thus, Falls has shown his speech is arguably proscribed by Concept 8.

F.   **"Objectivity" (§1000.05(4)(b))**

**Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of the larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.**

As to this provision, Falls plainly states "the problem with the IFA is that the "endorsement" provision is tied to an objectivity requirement. *See* Section 1000.05(4)(b). However, what 'objective' means under the IFA is unclear to me, and in any event, history is not an objective science. … Teaching history, and in other disciplines of the social sciences, recognizes that historical events are an

7

amalgamation of objective facts and subjective interpretation." (Doc. 99-1 at 8).[1] Falls then goes on to explain how subjectivity and objectivity interact with the teaching of history. The vagueness issues with this provision of the statute have been discussed at length by the Court in both the *Honeyfund* and the *Pernell* orders and Falls adopts those without repeating them again here.

### G. Defendants' Arguments

As to many of the Concepts, Defendants argue that Falls does not have standing because "he does not *intend* to teach any of the concepts enumerated in the Act," but instead relies on how "students *might react* to his lessons in a way that supposedly implicates those concepts." (Doc. 106 at 9-10) (emphasis in original). While Falls disputes this reading of his Interrogatory Answers, such a reading would not be fatal to standing here. *See Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 301-303 (1979). There, a union of farm workers brought suit to challenge various provisions of a farm labor statute passed by the State of Arizona. *Id.* at 292. One provision of the statute made it an unlawful labor practice "to induce or encourage the ultimate consumer of any agricultural product to refrain from purchasing, consuming or using such agricultural products by the use of dishonest,

---

[1] Indeed, Falls is not alone on this point. *See McDonald v. City of Chicago*, 561 U.S. 742, 907 (2010) (Stevens, J., dissenting) ("It is hardly a novel insight that history is not an objective science... The historian must choose which pieces to credit and which to discount, and then must try to assemble them into a coherent whole.").

8

untruthful and deceptive publicity" and violations of that section were criminally punishable. *Id.* at 301. The Union argued that the consumer publicity provision penalized "inaccuracies inadvertently uttered in the course of consumer appeals." *Id.* Relevant here, the Union contended that it "[did] not plan to propagate untruths[.]" *Id.* at 302. Despite the Union's expressed intention not to deliberately violate the statute, the Supreme Court nevertheless found there to be standing in the case and that their fear of prosecution was not "imaginary or wholly speculative." *Id.* at 301-302.

Likewise, in *Driehaus*, the petitioner brought a challenge to an Ohio statute that criminalized certain false statements made during the course of a political campaign. *Driehaus*, 573 U.S. at 152. One of the respondent's arguments against standing was that the petitioner "has not said it 'plans to lie' or recklessly disregard the veracity of its speech." *Id.* at 163. Therefore, the respondent claimed the petitioner's insistence that its speech was factually true made the possibility of prosecution for uttering such false statements exceedingly slim. *Id.* at 163. Notwithstanding the respondent's arguments, the Supreme Court found standing for the petitioner and noted that "[n]othing in this Court's decisions require a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate the law." *Id.* (citing *Babbitt*, 442 U.S. at 301). Therefore, pursuant to *Babbitt* and *Driehaus*, Defendants arguments regarding Falls's lack of purported "intent" to

9

violate the statute fall flat.

Defendants, as stated above, also take issue with Falls's concern about how his students may interpret his teaching as if this shows that he could not arguably violate the IFA or that the IFA would not arguably proscribe his conduct. Yet, as this Court recognized in *Pernell*, the vagueness problems with this statute give rise to such a potential violation. *See Pernell* Order at 117, n.59. In recounting the testimony of the IFA's sponsor, this Court stated as follows:

> When asked to define what it means to teach something from an objective standpoint under the IFA, Representative Avila stated, "[s]omething that would compel someone to feel a sense of guilt, or a sense of anguish, or something to that extent…would certainly violate that piece of being objective within a classroom. *Representative Avila's definition of "objective" hinges upon the subjective response of the professor's students.* Such a standard can hardly be considered objective in any sense of the word. Indeed, it makes it impossible for a professor to know for certain what speech violates the IFA. To put it plainly, Representative Avila's view of the IFA offers a heckler's veto to the professor's students. His understanding of "objectivity" would force professors to walk on eggshells when discussing certain topics to avoid upsetting the most sensitive or unreasonable student in class. How, under such a standard, would a professor be able to discuss topics like discrimination, racism, or even the civil rights movement and know beforehand which viewpoints are allowed if a student like Richard Spencer, or any other white supremacist, was enrolled in their course.

*Id.* (citation omitted, emphasis added). Accordingly, Defendants cannot belittle Falls's concerns as to how his students may interpret or react to his instruction as

10

undermining his claims here or being unreasonable when the very sponsor of the Act endorsed a similar reading of the same. This is particularly true given the vagueness of the "objective discussion" provision of the IFA.

Defendants also claim Falls does not violate the Act because he only teaches about <u>past</u> acts of racial oppression, and in making this argument, Defendants appear to engraft a present tense requirement into the statute. (Doc. 106 at 12). While Falls would disagree with such a reading of the Act's plain language, as well as Defendants' reading of his Interrogatory Answers (in which he specifically references "current events," "the more current examples of racial violence in society," and current principles and applications of affirmative action (Doc. 99-1 at 3-4)), out of an abundance of caution, Falls has submitted a Supplemental Declaration herewith.

In his Supplemental Declaration, Falls addresses the Defendants' claims that Falls does not relate his historical teachings to the present. First, Falls discusses his teachings about the electoral college. He teaches it was established with race and slavery at the forefront and that slavery and its inherent racism are embedded in the electoral college. *Id.* at ¶ 4. This continues to be embedded in American society today as a way to uphold the supremacy of white persons. *Id.* Thus, the electoral college and political system "still disempowers black voters to this day." *Id.* at ¶ 5. In other words, it "oppresses" blacks. *Id.*

Next, Falls discusses the criminal justice system and the disparity of blacks being incarcerated at a rate much higher than their white counterparts. *Id.* at ¶ 6. Then Falls discusses affirmative action. As if this was not clear enough in his Interrogatory Answers, Falls avers that the reasons for affirmative action's existence "are still concerns today, which is why the program still exists." *Id.* at ¶ 7. Last, Falls ties his teachings and discussions about racial violence and lynchings to the present. *Id.* at ¶ 8. Therefore, in his Supplemental Declaration Falls refutes Defendants' argument that his teachings are tied solely to the past.

Moreover, it should also be noted that his Supplemental Declaration and its attachments lend further support that his discussions about the electoral college are arguably proscribed by Concept 3 (status as oppressed is necessarily determined by race) and by Rule 6A-1.094124(3)(b) ("racism is embedded in American society and its legal systems in order to uphold the supremacy of white persons"). The Supplemental Declaration also bolsters Falls's arguments regarding his discussions about affirmative action as arguably being proscribed by Concepts 4,5,6, and 7. *See also* §I.C., *supra*.

II. **<u>Falls's Classroom Speech is Protected by the First Amendment</u>**

Defendants again argue that Falls's in class speech is government speech not protected by the First Amendment. (Doc. 106 at 15). However, as recognized by this Court, binding precedent in this Circuit holds "the First Amendment protects

12

classroom discussion." (Doc. 68 at 7). That binding precedent of course is *Kingsville Independent School District v. Cooper*, 611 F.2d 1109 (5th Cir. 1980)[2]. So, while Defendants may not like *Kingsville*, they cannot avoid it because "it remains binding on this Court … and this Court cannot ignore it[.]" (Doc. 68 at 7). This has been covered extensively in prior briefing in this case and need not to be repeated here. *See e.g.* (Doc. 51 at 2-34).

### III. Falls has Demonstrated Irreparable Harm Should an Injunction Not be Granted

Falls has shown on ongoing violation of his First Amendment rights. This alone constitutes an irreparable injury. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022) ("We have expressly held that an ongoing violation of the First Amendment constitutes an irreparable injury") (internal quotations and citations omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976). Defendants claim there is no irreparable harm here because of Falls's alleged "delay in renewing his request for an injunction." (Doc. 106 at 20). However, while a delay in seeking an injunction militates against a finding of irreparable harm, such delay is not determinative. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

13

Further, as this Court has recognized, "delay is less probative in the context of continuing injuries – especially constitutional injuries." *Dream Defenders v. DeSantis*, 559 F.Supp.3d 1238, 1285 (N.D. Fla. 2021) (citing *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019)). In *Dream Defenders*, this Court summarized the law on this topic:

> Although "[a] delay in seeking a preliminary injunction of even only a few months ... militates against a finding of irreparable harm," such delay is not determinative. *Wreal*, 840 F.3d at 1248. Indeed, as the Governor acknowledged, "delay is but one factor in the irreparable harm analysis." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009); *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019); *see also Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979) (explaining there is no "general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction."). Generally, each case hinges on the reason for the delay. Some cases have held a two-year delay excusable. *See Arc of Cal. v. Douglas*, 757 F.3d 975, 990–91 (9th Cir. 2014). Others have held a five-month delay inexcusable. *See Wreal*, 840 F.3d at 1248.

*Dream Defenders*, 559 F.Supp.3d at 1285.

A comparison of the case relied upon by Defendants (*Wreal*) shows why the alleged delay was not fatal here. First, the plaintiff in *Wreal* did not assert a constitutional cause of action, but rather sought a preliminary injunction relating to a trademark violation. *Wreal*, 840 F.3d at 1247. Indeed, *Wreal*, like many cases addressing delay, involved copyright infringements, which are far simpler than the complex constitutional litigation presented here. *See Dream Defenders*, 559

14

F.Supp.3d at 1286. Second, the delay in *Wreal* was "over five months." *Wreal*, 840 F.3d at 1247. Here, by contrast, the delay (even in a light most favorable to Defendants) was less than 3 months as Falls's renewed motion was filed on February 13, 2023, and the Rule which he asserts now gives him standing became effective November 22, 2022. On this point, Falls would also contend that he sought his renewed injunction less than a week after serving his Interrogatory Answers that expound upon his claims (both standing and merits wise). (Doc. 99 and 99-1). Third, and relatedly, Falls is distinguishable from *Wreal* because he is not relying exclusively on evidence that was available at the time he filed his complaint, nor at the time he last sought preliminary injunctive relief. *See Wreal*, 840 F.3d at 1248-49.

Fourth, there is a reason for the delay here (even assuming one attributes the "delay" to have started on the effective date of the Board's disciplinary rule). During that operative timeframe, Falls issued Rule 45 subpoenas to the various school boards in the State. The majority of these subpoenas were met with heavy objections and there was conferral with counsel for the various Boards as to the objections and production of the documents. Document production was also delayed given the time of year during which the subpoenas were issued (Thanksgiving/Christmas/New Years). Falls sought to acquire the documents at issue and review them before making the decision to file for a subsequent request for an injunction. Also, during

15

the same timeframe, Falls likewise propounded document requests upon the Board of Education and a similar back and forth occurred. This is a complex constitutional case and Falls did not want to proceed "half-cocked" before reviewing all this material. Further, within a week of serving his Interrogatory Answers, Falls sought an injunction in large part based upon those. Thus, to the extent that there was any delay here, it does not militate against a finding of irreparable harm. This starkly contrasts with *Wreal* in which the plaintiff "failed to offer any explanation for its five-month delay." *Wreal*, 840 F.3d at 1248. Accordingly, irreparable harm has been shown here and the alleged delay does not undercut the same. *See also Dream Defenders*, 559 F.3d at 1285-86; *Vazzo v. City of Tampa*, 2019 WL 12529065, *14 (M.D. Fla. January 30, 2019) (holding an 8-month delay did not vitiate irreparable harm and noting the "seemingly automatic conclusion of irreparable injury in a First Amendment action").

## IV. <u>Conclusion</u>

In sum, Falls has shown (1) that his classroom speech, which is protected by the First Amendment in this Circuit, (2) is arguably proscribed by the IFA and its associated Rule, and (3) this curtailment of his protected speech constitutes irreparable harm under long standing precedent for which any alleged delay in bringing his request for injunctive relief is not undermined. For these reasons and for those set forth in his Second Motion for Preliminary Injunction, this Court should grant Falls the preliminary injunctive relief he seeks as it relates to the challenged provisions.

Respectfully submitted,

*/s/ Bryan E. DeMaggio*
_____
Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Elizabeth L. White, Esquire
Florida Bar No.:  314560
Matthew R. Kachergus, Esquire
Florida Bar No.:  503282
Camille Sheppard, Esquire
Florida Bar No.:  124518
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:  (904) 356-9661
Facsimile:   (904) 356-9667
Email:          sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to **Megan Marie Wold, Esquire,** mwold@cooperkirk.com, **Charles J. Cooper, Esquire,** ccooper@cooperkirk.com, **Davis Cooper, Esquire,** pdcooper@cooperkirk.com, **John D. Ohlendorf, Esquire,** johlendorf@cooperkirk.com, **John Ramer, Esquire,** jramer@cooperkirk.com, **Timothy Newhall, Esquire,** timothy.newhall@myfloridalegal.com, via Electronic Mail this 31st day of March, 2023.

_____
ATTORNEY