## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DONALD FALLS, et al.**

     **Plaintiffs,**

**vs.**                            **Case No.:  4:22-cv-00166-MW/MJF**

**RON DESANTIS, et al.**

     **Defendants.**

_____

### PLAINTIFFS' SUPPLEMENTAL BRIEFING ON JURISDICTION

Plaintiffs, by and through undersigned counsel and pursuant to this Court's Orders of April 21, 2023 (Doc. 110) and April 26, 2023 (Doc. 112), hereby submit the following supplemental briefing on jurisdiction and in support thereof state as follows:

1.     **In light of the binding precedent cited above, can this Court consider the current version of Rule 6A-10.081(2)(a)9. (or any other rule that went into effect months after Plaintiffs filed their lawsuit) for purposes of analyzing Plaintiffs' standing at the outset of the litigation?**

It would appear not. However, this is not fatal to standing for the reasons set forth below in response to the Court's second question.

2.   **If this Court cannot consider the current version of Rule 6A-10.081(2)(a)9. or any other rule that went into effect months after Plaintiffs filed suit, have Plaintiff Falls and Cassanello met their burden to establish traceability for purposes of standing? Namely, is the Legislature's specific command in section 1000.05(6)(a), Florida Statutes, to Defendants to implement the challenged amendments to section 1000.05(4) by promulgating regulations, along with the factual allegations included in Plaintiffs' verified complaint, sufficient to establish, at the pleading stage, the causal link necessary for traceability to Plaintiffs' alleged First Amendment injuries?**

A.   **Plaintiff Donald Falls**

To answer this question, one needs to consider the state of Florida law in effect prior to the legislation which brings the Plaintiffs before this Court. Section 1000.05(2)(a) has long prohibited discrimination against students in the Florida K-20 public education system. *See* §1000.05(2)(a), Fla. Stat. (2003). This section has also long contained a provision mandating that the "State Board of Education shall adopt rules to implement this section." *See* §1000.05(5), Fla. Stat. (2003). And pursuant to that mandate, the Board of Education has long had a rule in effect providing for teachers to be disciplined if they discriminated against students on the basis of race, color, religion, sex, etc. *See* Rule 6A-10.081(2)(a)7., F.A.C. (effective March 23, 2016 until November 22, 2022).[1]

---

[1] In fact, it appears this disciplinary rule dates back to at least 1995 and was previously codified at Rule 6B-1006(3)(g) before being transferred over to Rule 6A-10.081 in 2016.

Therefore, Florida law has long prohibited teachers from discriminating against students and has provided for discipline by the Board of Education in the event that they did so. What the challenged legislation in this case (HB 7) did was expand the definition of discrimination to include teaching the prohibited concepts now set forth in section 1000.05(4)(a), Florida Statutes. As this Court observed in its Order, Plaintiffs filed this action on April 22, 2022, the same day HB 7 was signed into law. (Doc. 110 at 1). At that point in time then, (1) Florida law prohibited teachers from discriminating against a student (§1000.05(2)(a)); (2) discrimination was defined to include teaching the eight prohibited concepts (§1000.05(4)(a) 1.-8.); and (3) a teacher could be disciplined for discriminating against a student on the basis of race, color, religion, sex, etc. (then Rule 6A-10.081(2)(a)7.). As a result, at the time of the filing this suit, a teacher faced discipline by the Board of Education for discriminating against a student and such discrimination was defined by HB 7 as teaching the prohibited concepts.

True, the Board of Education later (in November of 2022) amended Rule 6A-10.081 to provide that discrimination includes the teaching of the concepts in §1000.05(4)(a), but it was already clear that Florida law (through HB 7) defined discrimination in this manner. At a minimum, a teacher such as Falls therefore could have reasonably feared he may be subject to discipline by the Board under the version of Rule 6A-10.081 in effect from April 22 through November 22, 2022,

3

which makes his injury here directly traceable to the Board of Education from the outset of this case. On this point, it is notable that in 2019, section 1000.05's definition of discrimination was amended to specifically include anti-Semitism. *See* Chapter 2019-59, Laws of Florida. This is currently codified at section 1000.05(8), Florida Statutes. At the time of that amendment (2019), section 1000.05 contained the provision requiring the Board of Education to adopt rules to implement this section. *See* §1000.05(5)(a), Fla. Stat. (2019). And, as stated before, the Board of Education had its Rule providing for discipline in the event a teacher engaged in discrimination against a student. Nevertheless, despite the anti-Semitism provision being added to section 1000.05's definition of discrimination in 2019, the Board of Education has yet to add this definition to its anti-discrimination disciplinary rule. *See* Rule 6A-10.081(2)(a)9., F.A.C. That said, it would be preposterous to claim that a teacher who engaged in anti-Semitic conduct could not be disciplined under the Board's Rule prohibiting discrimination simply because the Board has not explicitly added "discrimination includes anti-Semitism" to the Rule. The same holds true for a teacher like Falls, who at the outset of this litigation would have been subject to discipline for discriminating against a student by teaching the prohibited concepts despite such specific language not appearing in the Rule at that point.

Turning to the the allegations in the Verified Complaint, they show that Plaintiff Falls pled facts to fall within the ambit of the statutory scheme for

traceability purposes. He alleges that he is a public high school teacher at Manatee County public high school and teaches American Government and Economics. (Doc. 1 at ¶4). He further alleges that the legislation at issue restricts his ability to accurately and fully teach these subjects. *Id.* Among the provisions challenged is HB 7's amendments to the Florida Educational Equity Act. *Id.* at ¶¶40-44. Falls alleges that the amendments are unconstitutional viewpoint based restrictions and that they employ nebulous terms with vague definitions in order to chill protected speech. *Id.* at ¶14. He alleges that the Board of Education is charged under Florida law with supervising the system of free, public education. *Id.* at 11. Furthermore, as discussed below, Florida law mandates that the Board of Education, as part of its duties over the public education system, to specifically enforce section 1000.05's anti-discrimination provisions and discipline teachers when they fail to comply. Finally, Falls seeks an injunction enjoining, *inter alia*, the "IFA's provisions amending the Florida Education Equity Act." (Doc. 1 at p. 20). The analysis here is straightforward: at the time this action was filed, Falls (and any other teacher for that matter) who engaged in speech arguably proscribed by HB 7 risked discipline under the Board of Education's Rule prohibiting discrimination against students. Thus, Falls's injury here (chilled speech) is directly  traceable to the Board of Education and enjoining it from enforcing HB 7's definition of discrimination would redress that injury.

To establish traceability to enjoin a government official from enforcing a law, "a plaintiff must show that the official has the authority to enforce the particular provision being challenged." *Dream Defenders v. Governor of Fla.*, 57 F.4th 879, 889 (11th Cir. 2023) (quoting *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021)). Thus, in *Dream Defenders*, where organizations that led protests for racial justice filed an action against the Governor of Florida and various sheriffs alleging that the new definition of "riot" in Florida's anti-riot statute was unconstitutionally vague and overbroad, the Eleventh Circuit found the traceability and redressability requirements for standing satisfied where the Governor and the sheriffs had the specific legal authority to enforce the riot statute. *Id.* at 889. By contrast, in *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), voters and supporters of Democratic party candidates sued to enjoin the Florida Secretary of State from enforcing a law specifying the order in which candidates appeared on the ballot in Florida elections. *Id.* at 1242. The Eleventh Circuit held that the plaintiffs there lacked standing because the Secretary did not have any actual authority to enforce the ballot law. *Id.* at 1253-58. Rather, the various county supervisors of elections, rather than the Secretary, had the responsibility. *Id.* The same held true in *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1299 (11th Cir. 2019) (en banc) where the Attorney General lacked any authority to enforce the challenged provision. *Id.* at 1299. ("The fact that the Act itself doesn't contemplate

6

enforcement by the Attorney General counts heavily against Plaintiffs' traceability argument.").

Here, like in *Dream Defenders* and in contrast to *Jacobson* and *Lewis*, the statute at issue gives the Board of Education the specific legal authority to enforce the challenged provisions. Start with the plain language of the statutory provision at issue: "The State Board of Education shall adopt rules to implement this section as it relates to school districts and the Florida College System institution." §1000.05(6)(a), Fla. Stat. (2022). First, the statute's command is mandatory as it uses "shall." *See e.g. United States v. Peters*, 783 F.3d 1361, 1364 (11th Cir. 2015) ("Using the verb 'shall' in a statute is a command. 'Shall' creates an obligation not subject to judicial discretion.") (citations omitted). Second, the use of "implement" is significant here. "Implement" when used as a verb, as it is in this section, is defined as: "CARRY OUT, ACCOMPLISH, *especially:* to give practical effect to and ensure the actual fulfillment by concrete measures."[2] One synonym of "implement" is "enforce."[3] Thus, the statutory mandate in section 1000.05(6)(a) commands the Board of Education to implement, *i.e.* enforce, the provisions of section 1000.05 in total, including those relating to the eight prohibited concepts that are challenged

---

[2] *See https://www.merriam-webster.com/dictionary/implement* (last accessed 4/28/2023).

[3] *See https://www.merriam-webster.com/thesaurus/implement* (last accessed 4/28/2023); *see also https://www.thesaurus.com/browse/implement* (last accessed 4/28/2023). Furthermore, Black's Law Dictionary defines "enforce" as "[t]o give force or effect to (a law, etc.); to compel obedience to." *Enforce, Black's Law Dictionary* (11th ed. 2019).

here in section 1000.05(4). A clearer specific authority to enforce section 1000.05's provisions is hard to envision. And, of course, we know that the Board of Education has followed its specific mandate by having a disciplinary rule on its books to enforce the anti-discrimination provisions of section 1000.05 for quite some time in the form of Rule 6A-10.081. Given this clear statutory authority, the traceability requirement for standing is satisfied here. *See Dream Defenders*, 57 F.4th at 889.

Plaintiffs are cognizant of the Eleventh Circuit's discussion in *Jacobson* that the mere authority to prescribe rules was not enough to create traceability to the Secretary of State in that case. *Jacobson*, 974 F.3d at 1256-57. There, the Court noted "[t]hat the Secretary had the power to prescribe rules about and issue directives about ballot order, which the Supervisors might be obliged to follow, says nothing about whether she possesses the authority to *enforce* the complained-of provision, as the causation element of standing requires." *Id.* at 1257 (quoting *Lewis*, 944 F.3d at 1299) (internal quotations and alterations omitted, emphasis in original). Though the Court rejected the argument that simply having rule-making authority was enough to establish traceability, it also stated that in many cases the same official will both make and execute a challenged regulation, an arrangement that was not present in *Jacobson. Id.* That is a major distinction here. As stated above, in *Jacobson*, despite the Secretary having the power to "prescribe rules," it was actually the various supervisors of elections who were in charge of actually enforcing the

same. Here, by contrast, the Board of Education is charged with not only adopting rules, but also to "implement this section," which means to *enforce* this section. There is no middle layer here like there was in *Jacobson*. Relatedly, the statutory language is different here. Whereas the statute in this case contains the mandatory language about the Board of Education implementing (enforcing) the non-discrimination commands of the statute, the statute in *Jacobson* merely directed the Secretary to "prescribe" rules for others to follow. *See Jacobson*, 974 F.3d at 1256-57.

Accordingly, to answer this Court's second question, the legislature's specific command in section 1000.05(6)(a), Florida Statutes to the Board of Education to implement the challenged amendments in section 1000.05(4) by promulgating regulations is sufficient to establish *at the pleading stage* that the causal link necessary for traceability to Plaintiff Falls's alleged First Amendment injuries.[4]

**B.    Plaintiff RMJ**

RMJ's right to receive information is derivative of the right of the speaker to make such communications. The analysis controlling the discussion regarding Falls and the applicability of the statute and regulations to K-20 teachers thus applies here to RMJ with the same force and effect. That is, if the teachers cannot convey the

---

[4] While this discussion specifically addresses Plaintiff Falls by name, the same analysis applies to Plaintiff Jill Harper for the purposes of the Court's April 26, 2023 Order (Doc. 112).

information because they fear being disciplined, then RMJ will not receive it. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipient both); *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982); *Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 625 n.5 (1976). And RMJ has pled that the legislation at issue here restricts her right to access such information in a public school setting. (Doc. 1 at ¶7). Accordingly, RMJ has established causation for standing purposes at the pleading stage.

### C.      Plaintiff Robert Cassanello

As with the discussion relating to Falls, the analysis and answer to the Court's second question regarding Cassanello is quite similar. Recall, that section 1000.05(2)(a) has long prohibited discrimination against students in the K-20 system. Cassanello, of course, is a history professor at the University of Central Florida who teaches classes in the Civil Rights Movements, Jim Crow America, and Emancipation and Reconstruction. (Doc. 1 at ¶6). Like Falls, Cassanello avers that legislation at issue (the amendments to section 1000.05) restricts his ability to accurately and fully teach these subjects. *Id.* at ¶¶6, 44. Last, the Verified Complaint alleges that the Board of Governors is responsible for operating, regulating, and controlling the State University System. *Id.* at ¶¶12, 40.

As far as the undersigned can tell, since at least 2010, section 1000.05 has contained a provision mandating that "the Board of Governors shall adopt regulations to implement this section as it relates to state universities." *See* §1000.05(5)(b), Fla. Stat. (2010). Pursuant to this statutory mandate, the Board of Governors enacted Regulation 2.003 in November of 2010. This Regulation prohibits discrimination "on the basis of race, color, national origin, sex, religion... or *any other basis protected by applicable state... law* against a covered individual." B.O.G. Reg. 2.003(1) (emphasis added). "Covered individuals" include "enrolled students," *e.g.* those who Cassanello instructs, and discrimination is prohibited in any university program or activity, *e.g.* classes in which Cassanello instructs. *Id.* Relevant here, the Regulation mandates each university to "establish policies, procedures, and reporting mechanisms that prohibit and address unlawful discrimination" and empowers the universities to receive and investigate complaints relating to unlawful discrimination. B.O.G. Reg. 2.003(2)(b) and (c).

Accordingly, as with the discussion regarding Falls above, a college professor in Cassanello's shoes at the time this lawsuit was filed was prohibited from discriminating on the basis of race or any other basis protected by applicable State law. State law at the time (HB 7) defined discrimination to include teaching the prohibited concepts. The Board of Governors had a Regulation in place prohibiting students from being discriminated against in university activities, which would

11

include Cassanello teaching students in class. The Board of Governors' Regulation further required universities to enact mechanisms to prohibit and address unlawful discrimination. In other words, as with Falls, at the time the lawsuit was filed, the Board of Governors was mandated to enforce section 1000.05's provisions, which prohibited Cassanello from engaging in activities that violated the dictates of HB 7. All put together *at the pleading stage*, this demonstrates that like with Falls, section 1000.05(6)'s mandate to the Board of Governors to implement (enforce) the statute's provisions makes Cassanello's injuries traceable to the Board of Governors. *See Pernell v. Fla. Board of Governors of State University System*, ___ F.Supp.3d ___, 2022 WL 16985720 at * 28 (N.D. Fla. 2022) (finding plaintiffs established injury traceable to the Board of Governors and respective Boards of Trustees where enforcement regulation mandated each institution pass corresponding regulations to enforce challenged provisions).

## **CONCLUSION**

While the answer to the Court's first question appears to be no, this is not fatal to standing because the answer to its second question is yes. Specifically, the allegations in the Verified Complaint along with the state of Florida law in place the day of the filing of this lawsuit established the causal link necessary for traceability to Plaintiffs' First Amendment injuries to satisfy standing at the outset of this case.

Respectfully submitted,


Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Elizabeth L. White, Esquire
Florida Bar No.:  314560
Matthew R. Kachergus, Esquire
Florida Bar No.:  503282
Camille Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:  (904) 356-9661
Facsimile:   (904) 356-9667
Email:       sheplaw@sheppardwhite.com
COUNSEL FOR PLAINTIFFS

13

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to **Megan Marie Wold, Esquire,** mwold@cooperkirk.com, **Charles J. Cooper, Esquire,** ccooper@cooperkirk.com, **Davis Cooper, Esquire,** pdcooper@cooperkirk.com, **John D. Ohlendorf, Esquire,** johlendorf@cooperkirk.com, **John Ramer, Esquire,** jramer@cooperkirk.com, **Timothy Newhall, Esquire,** timothy.newhall@myfloridalegal.com, via Electronic Mail this 28th day of April, 2023.

_____
ATTORNEY

14